1  Mildred K. O'Linn, Esq. (State Bar No. 159055)
      mko@manningllp.com
2  Lynn Carpenter, Esq. (State Bar No. 310011)
      llc@manningllp.com
3  Tori Bakken, Esq. (State Bar No. 329069)
      txb@manningllp.com
4  **MANNING & KASS**
   **ELLROD, RAMIREZ, TRESTER LLP**
5  801 S. Figueroa St, 15th Floor
   Los Angeles, California 90017-3012
6  Telephone: (213) 624-6900
   Facsimile: (213) 624-6999
7
   Attorneys for Defendants, CITY OF FRESNO
8  and OFFICERS JAMES ROSSETTI, SEAN
   CALVERT, and CHRIS MARTINEZ
9

10          **UNITED STATES DISTRICT COURT**

11      **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

12

13  ANTHONY PEREZ, individually,
    CECILIA PEREZ, individually,
14  TERRALEE PEREZ, individually and
    as successor in interest to Joseph Perez,
15  JOSPEH PEREZ, JR., individually and
    as successor in interest to Joseph Perez,
16  and X.P., a minor, by and through his
    Guardian ad Litem, MICHELLE
17  PEREZ, individually and as successor
    in interest to Joseph Perez,
18
               Plaintiffs,
19
          v.
20
    CITY OF FRESNO, COUNTY OF
21  FRESNO, JAMES ROSSETTI, an
    individual, SEAN CALVERT, an
22  individual, CHRIS MARTINEZ, an
    individual, BRAITHAN
23  STOLTENBERG, an individual,
    ROBERT MCEWEN, an individual,
24  KARLSON MANASAN, an individual,
    JIMMY ROBNETT, an individual, and
25  DOES 1-10, inclusive,
26               Defendants.
27

Case No. 1:18-cv-00127-AWI-EPG
*[Hon. Anthony W. Ishi;*
*Magistrate Judge: Erica P. Grosjean]*

**NOTICE OF MOTION AND
MOTION OF CITY DEFENDANTS
TO EXCLUDE CERTAIN
OPINIONS OF PLAINTIFFS'
CARDIOLOGIST EXPERT DR.
ALON STEINBERG [PARTIAL
DAUBERT MOTION];
MEMORANDUM OF POINTS AND
AUTHORITIES; DECLARATION
OF LYNN CARPENTER IN
SUPPORT**

*Filed concurrently with [Proposed]
Order*

Date:     December 6, 2021
Time:     1:30 p.m.
Crtrm.:   2

28  ///

4831-5609-8557.1

**MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' CARDIOLOGIST EXPERT ALON
STEINBERG [PARTIAL DAUBERT MOTION]**

1  **TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

2  **PLEASE TAKE NOTICE THAT** on December 6, 2021, at 1:30 p.m., or as

3  soon thereafter as counsel may be heard, in the courtroom of the Honorable Anthony

4  W. Ishii, located in the United States Courthouse, Robert E. Coyle United States

5  Courthouse, 2500 Tulare Street, Fresno, California 93721, Defendants, CITY OF

6  FRESNO and OFFICERS JAMES ROSSETTI, SEAN CALVERT, and CHRIS

7  MARTINEZ ("City Defendants") will, and hereby do, move this Court to exclude

8  specific opinions and testimony by Plaintiffs' cardiologist expert, Dr. Alon Steinberg

9  ("Dr. Steinberg"), both at trial and in conjunction with City Defendants' Motion for

10  Summary Judgment or, in the Alternative, Partial Summary Judgment.

11  Specifically, City Defendants seek exclusion of all of Dr. Steinberg's opinions

12  regarding asphyxia, in particular as it relates to Joseph Perez's cause of death.

13  This motion is made on the grounds that expert Dr. Steinberg lacks the requisite

14  qualifications to opine on asphyxia, that his opinions lack adequate evidentiary

15  support pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and that

16  his opinions constitute nothing more than speculation.  Therefore, Dr. Steinberg

17  cannot state said opinions to a reasonable degree of scientific probability.  As such,

18  his opinions are inadmissible under Fed. R. Evid. 702.

19

20

21

22

23

24

25

26  ///

27  ///

28  ///

1   This motion is based on the attached memorandum of points and authorities,

2   declaration of Lynn Carpenter, and attached exhibits, all the pleadings, records, and

3   files in this action, and upon such further oral and documentary evidence as may be

4   presented upon the hearing of this motion.

5

6   DATED:  October 6, 2021          **MANNING & KASS**

7                                    **ELLROD, RAMIREZ, TRESTER LLP**

8

9                                    By:  _____/s/ Lynn Carpenter_____

10                                        Mildred K. O'Linn, Esq.

11                                        Lynn Carpenter, Esq.
                                          Tori L.N. Bakken, Esq.

12                                        Attorneys for Defendants, CITY OF
                                          FRESNO and OFFICERS JAMES

13                                        ROSSETTI, SEAN CALVERT, and
                                          CHRIS MARTINEZ

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4831-5609-8557.1

**MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' CARDIOLOGIST EXPERT DR. ALON STEINBERG [PARTIAL DAUBERT MOTION]**

## MEMORANDUM OF POINTS AND AUTHORITIES

**1.    INTRODUCTION.**

Defendants CITY OF FRESNO and OFFICERS JAMES ROSSETTI, SEAN CALVERT, and CHRIS MARTINEZ (collectively "City Defendants") seek to exclude the opinions and testimony of Plaintiffs' expert, Alon Steinberg, M.D., F.A.C.C. ("Dr. Steinberg") in this action, both at trial and in conjunction with the filing of City Defendants' Motion for Summary Judgment.

Dr. Steinberg is not qualified to offer opinions on asphyxia, in particular as it relates to Joseph Perez's ("Perez") cause of death, as these opinions are outside the reasonable confines of his subject area (cardiology) and medical experience.

**2.    A DAUBERT MOTION MAY BE FILED IN CONJUNCTION WITH A MOTION FOR SUMMARY JUDGMENT.**

"[A] Daubert motion connected to a pending summary judgment motion may be effectively dispositive of a motion for summary judgment.' [citations]." *In Re Midland National Life Insurance Co. Annuity Sales Practices Litigation v. Allinaz Life Insurance Company of North America*, 686 F.3d 1115, 1119 (9th Cir. 2010) (citing *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F. 3d 594, 597 (9th Cir. 1996)) (holding that although a <u>Daubert</u> motion was dispositive, the abuse of discretion standard still applies).  "[P]rior to ruling on summary judgment motion, '[t]he trial judge must ensure that any and all scientific testimony or evidence admitted is not relevant, but reliable.'" *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 971 (C.D. Cal. 2012) (parentheticals omitted) (citing *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994)).

City Defendants seek to exclude the scientific opinions and testimony of Dr. Steinberg because he lacks the qualification to render expert opinions on asphyxia, in particular as it relates to Perez's cause of death, and his opinions lack evidentiary support and are stated as speculation under the *Daubert* standard of admissibility, and his opinions are cumulative.  City Defendants seek exclusion of

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
*Attorneys at Law*

Dr. Steinberg's opinions both at trial and in conjunction with the filing of City Defendants' Motion for Summary Judgment as the same are unreliable.

**3.   SUMMARY OF RELEVANT EXPERT OPINIONS OF DR. STEINBERG.**

In his June 30, 2021 Rule 26(a) expert report in this matter, Dr. Steinberg offered the following observations and opinions:

1.   "I agree with the autopsy report that Mr. Perez's death was due to a mechanism of compression causing death by asphyxia . . . [.]"  [Exh. A., Steinberg Report at p. 5.]

**4.   THE COURT SHOULD EXCLUDE DR. STEINBERG'S OPINIONS REGARDING ASPHYXIA AND CAUSE OF DEATH.**

**A.   The *Daubert* Threshold for Expert Opinion Evidence.**

Fed. R. Evid. Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid, Rule 702 also provides that a witness may be qualified as an expert if "the testimony is based on sufficient facts or data." "Where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question…, the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).  If the testimonial evidence fails in this regard, the expert opinion is inadmissible. *Id.*

In applying Rule 702, the Court functions as a gatekeeper, determining whether proffered expert testimony meets the requirements of Rule 702 by a preponderance of the evidence." *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 984 F.Supp.2d 1021,1026 (C.D. Cal. 2013); (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  The offering party must prove admissibility. *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  The offering party must

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

show by a preponderance of the evidence that (1) the expert is qualified to render the opinion; and (2) the opinion offered has adequate factual and scientific support for that opinion.  *Daubert*, 509 U.S. at 592-93.

**B.       Steinberg Lacks the Qualifications to Render Such Opinions.**

Expert opinions are properly excluded if the *Daubert* standard is not met.  *See Lash v. Hollis*, 2007 U.S. Dist. LEXIS 3633, *12 (E.D. Mo. 2007) (plaintiff's expert opinion on the effects of TASER ECD deployments was excluded under *Daubert* because the court found plaintiff was not qualified to testify as an expert due to his lack of familiarity with TASER devices and his reliance on only one scholarly article on the effects of TASER ECD deployments).

An expert must stay "within the reasonable confines of his subject area." *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (quoting *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 969–70 (10th Cir. 2001)). "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Ralston,* 275 F.3d at 970 (internal citations omitted).

Dr. Steinberg is also not qualified to render opinions on asphyxia and in particular restraint/compressive asphyxia as it relates to the coroner's stated cause of Joseph Perez's death.  While Dr. Steinberg has written an article entitled, "Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology," it is simply that – a review of the literature and not based on any independent research performed by Dr. Steinberg himself.  [Exh. C at 61:18-62:12; 115:12-18.]  Dr. Steinberg has not conducted any studies on human subjects regarding the effect of prone restraint on them, or where weight was applied in the prone maximal restraint position.  [*Id.* at 148:18-25.] Dr. Steinberg has never treated a patient after they have been restrained by law enforcement. [*Id.* at 149:1-3.] Moreover, Dr. Steinberg has not testified regarding restraint, positional, or

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

compressive asphyxia, in any court, federal or otherwise, in the last four years.  [*Id.* at 119:17-120:2.]

Thus, while Dr. Steinberg may *think* he's an expert of prone restraint and asphyxial deaths because he is "a cardiologist and … reviewed the literature and published a report on … review of the literature," that is not enough under *Daubert*. [*Id.* at 121:19-25.]    Accordingly, the Court should exclude the opinions of Dr. Steinberg on asphyxia, in particular as it relates to Joseph Perez's cause of death, as outside the reasonable confines of his subject area, cardiology.

**5.   CONCLUSION.**

Based on the foregoing, City Defendants respectfully request that this Honorable Court exclude the opinions of Dr. Alon Steinberg regarding asphyxia and all other associated opinions rendered in his Rule 26(a) Expert Report and at deposition, both at trial and in conjunction with City Defendants' Motion for Summary Judgment.

DATED:  October 6, 2021          **MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**


By:      /s/ Lynn Carpenter
Mildred K. O'Linn, Esq.
Lynn Carpenter, Esq.
Tori L.N. Bakken, Esq.
Attorneys for Defendants, CITY OF FRESNO and OFFICERS JAMES ROSSETTI, SEAN CALVERT, and CHRIS MARTINEZ

**MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' CARDIOLOGIST EXPERT DR. ALON STEINBERG [PARTIAL DAUBERT MOTION]**

# DECLARATION OF LYNN CARPENTER

I, Lynn Carpenter, declare as follows:

1.      I am an attorney duly admitted to practice before this Court.  I am an attorney with Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record for Defendants, CITY OF FRESNO and OFFICERS JAMES ROSSETTI, SEAN CALVERT, and CHRIS MARTINEZ.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto. I make this declaration in support of Notice of Motion and Motion of City Defendants to Exclude Certain Opinions of Plaintiffs' Cardiologist Expert Alon Steinberg [partial Daubert Motion].

2.      Attached hereto as Exhibit A is a true and correct copy of Dr. Alon Steinberg's Rule 26(a) expert report, which was served on Defendants as part of Plaintiffs' Expert Disclosures Pursuant to FRCP 26(a)(2) on July 2, 2021.

3.      Attached hereto as Exhibit B is a true and correct copy of Dr. Alon Steinberg's curriculum vitae, which was served on Defendants as part of Plaintiffs' Expert Disclosures Pursuant to FRCP 26(a)(2) on July 2, 2021.

4.      Attached hereto as Exhibit C is a true and correct copy of the relevant excerpts of the deposition transcript of Dr. Alon Steinberg, taken in this matter on September 10, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 5th day of October, 2021, at Los Angeles, California.


  _/s/ Lynn Carpenter_____
Lynn Carpenter

1

**MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' CARDIOLOGIST EXPERT DR. ALON STEINBERG [PARTIAL DAUBERT MOTION]**

# EXHIBIT A



June 30, 2021

Neil Gehlawat
Taylor & Ring
1230 Rosecrans Ave, Suite 360
Manhattan Beach, CA 90266

**Expert Opinion of Dr. Alon Steinberg in the matter of Perez, et al. vs. City of Fresno, et al.**

**Introduction**

I am a board-certified cardiologist, and I have been asked by Mr. Neil Gehlawat to review the above referenced case. I have been asked to review and comment on the cause of death of Mr. Joseph Perez.

**Materials reviewed**

Body-camera footage (16:33 minutes)
Deposition transcripts of officers Martinez, Calvert and Rossetti; deputies McEwen, Robnett, Manasan and Stoltenberg; EMTs Anderson, Dines and Ortiz.; Dr. Chambliss (vols. 1 and 2); witnesses Perez, Sendejas and Ramirez; Deputy Karla Keeley, Detective Juan Galindo, Deputy Adrian Villegas, Captain Joe Alvarez, Rick Carvalho, Steve Comstock, and Dr. Tarik Tihan.
Photographs of officers and deputies at the scene
Autopsy report for Joseph Perez by Dr. Michael Chambliss at the Fresno County morgue
City of Fresno responses to discovery
County of Fresno responses to discovery
Community Medical Centers medical records from 5/9/17 and 5/10/17
Central California EMS American ambulance records from 5/9/17 and 5/10/17
First aid, CPR, AED expanded course outline
Roll call training bulletin August 20, 1999 by Ed Winchester, Chief of Police
RIPP restraints paper regarding respiratory compromise and sudden custody death syndrome
Interviews by detectives Galindo and Palma of officers and deputies
Roll call training bulletin 8/20/99
RIPP Restraints International Inc. Law Enforcement/SCDS Instructor Certification Course student manual



**Interpretation of events and facts of the case, per officers, paramedics and autopsy findings**

Mr. Joseph Perez was a 41-year-old Hispanic man, 6'1/2" and 241 lbs (BMI 32 or obese). On 5/9/2017, he was found by police boxing in the middle of the street, where Mr. Perez stated that he was just working out. EMS was called at 3:41 am and arrived at 4 am. Mr. Perez was brought by EMS and the Fresno PD to the emergency room of Community Medical Centers in Fresno, CA, at 04:02 am. He could not sit still, denied drug use and did not want to answer questions; why he was there was unclear to him. His past medical history comprised only of asthma. His initial BP was 105/65, with a heart rate of 145 bpm and temperature of 98.8F. He was described as disoriented, diaphoretic and tachycardic, with dilated pupils. An EKG at 5:20 am showed sinus tachycardia at 130 bpm with QTc 480 ms. He was described to have had bizarre behavior with a clinical presentation consistent with the use of methamphetamines or other stimulants. He was sedated with 10 mg Versed to allow for IV placement at 9:18 am, and IV fluids were given. He was discharged at 1:15 pm with a BP of 109/71 and heart rate of 99 bpm.

That evening, Mr. Joseph Perez slept at his sister's house. The next morning, on 5/10/17, Mr. Perez left the house and was noted to be talking to himself. He was reported to have tried to flag down cars in the middle of the street and to have told a person that the police were after him. Stacy Hutson stated that Mr. Perez came up to her asking to use her cell phone, and asked her to call his son and 785. Because of his behavior, she felt that he was in distress.

Sergeant Rosetti was driving officers Sean Calvert and Chris Martinez when they encountered Mr. Joseph Perez in the area of Palm and Santa Fe in Fresno, CA. Mr. Perez was waving and screaming at the police car to help him. The police car stopped. On assessment, Mr. Perez was noted to be breathing heavily and sweating profusely. Mr. Perez was acting strangely and was perceived to have someone after him. Mr. Perez was told by Officer Martinez to sit on the curb, to which he complied after being asked two or three times. Sargent Rossetti called EMS code 2. There was a concern that Mr. Perez might run, and a plan was made to detain him. Officer Martinez handcuffed Mr. Perez with his hands behind his back, and Mr. Perez complied with no issues. After a pat down, Mr. Perez again sat on the curb. Mr. Perez stated, "Hey, they are trying to hit me," and moved his head as if he was dodging something. Mr. Perez then started to panic.

Deputy Stoltenberg and Deputy Robert McEwen arrived in two separate cars when Mr. Perez was sitting on the curb. Mr. Perez then stood up, and Officer Calvert grabbed Mr. Perez on his right and told him to sit down. Mr. Perez did not comply. Officer Martinez grabbed Mr. Perez on his left side. Mr. Perez continued to fight and was taken to the ground by officers Calvert and Martinez. Mr. Perez was first held on his back but continued to fight and kick. Officer Calvert, Deputy McEwen and Officer Martinez tried to control Mr. Perez. Officer Martinez could not control Mr. Perez's legs. Officers Calvert and Deputy McEwen rolled Mr. Perez onto his stomach (prone position). Mr. Perez's upper body was on a grainy asphalt surface, and his lower body was on dirt and gravel-like rocks. Officer Martinez was able to cross Mr. Perez's legs right over left to control him. Officer Calvert at first laid across Mr. Perez's back and then attempted to control the right side of Mr. Perez's body by placing positive pressure between his shoulder blades. Deputy McEwen, at Mr. Perez's left, applied pressure to Mr. Perez's back to keep him in place and prone. Sargent Rossetti called a code 3 for an ambulance.

Mr. Perez was grinding his head back and forth on the asphalt. Officer Calvert could not prevent this, because Mr. Perez's head was sweaty and Mr. Perez was strong. Officer Calvert had his elbow on Mr. Perez's upper right shoulder area while deputy McEwan tried to straddle Mr. Perez to lift his head from the ground. A white towel was brought over by Deputy Stoltenberg and was wrapped over Mr. Perez's face to protect it.



Officer Martinez turned his camera on vest on. The video is 16 minutes and 33 seconds long. The camera was turned on approximately 30 seconds after Mr. Perez was placed in prone position. Mr. Perez is on the ground and restrained in the prone position during the entire video. On the video, the first 9 minutes and 32 seconds contains many dialogues telling Joseph to relax and stop fighting. Officer Chris Martinez (weight 165 lbs) is at Mr. Perez's feet; Officer Sean Calvert (5'11" and 175 lbs, 190 lbs with gear) is on the right; and Deputy McEwen is on the left holding Mr. Perez down. Deputy Stoltenberg is observing and states that the officers are having a hard time keeping him down. Deputy Stoltenberg goes to Deputy McEwen's truck to retrieve a towel to keep Mr. Perez's head from striking the ground. Deputy Stoltenberg stated in his deposition that he then assisted in holding Mr. Perez down afterwards. Sargent Rossetti is observing. Deputy Robnett and trainee Deputy Manasan arrive and check on Mr. Perez to see whether he is breathing well. Officer Martinez described in his interview that Mr. Perez had an explosive amount of energy and was strong. At 9:32 into the video, Mr. Perez is still restrained, and hobbling Mr. Perez is discussed.

EMS sirens can be heard at 10:00, and the sirens stop at 10:43, thus suggesting EMS arrival. Mr. Perez is hobbled with an RIPP at approximately this time by Deputy Robnett. EMS arrives with personnel Joel Dines, Jennifer Ortiz and Morgan Anderson. EMS personnel state that they are going to strap Mr. Perez to a board. A blue rigid backboard is brought out, and Mr. Anderson provides instructions for it to be placed on Mr. Perez's back. At 12:06 into the video, the black straps are removed, and at 12:29 the rigid blue backboard is placed on Mr. Perez's back while he is prone. At 12:35 into video, six sets of hands are on the backboard pressing back or holding Mr. Perez down. At 12:44, Mr. Anderson states, "sit on the board." At 12:45, Officer Calvert, weighing 190 lbs with tactical equipment, sits on the board while five other hands are placed on the board. At 12:52 into video, Mr. Perez screams his last scream, and at 12:58, Mr. Perez makes his last sound that I can hear. At 13:22 into video, an officer states to Mr. Perez, "I want you to relax, OK?" It is unclear whether Mr. Perez is resisting at this point. At 13:43, an officer asks, "Joseph, are you OK?" and "Are you alright?" During the time in which Officer Calvert is on the board, EMS personnel strap Mr. Perez onto the blue board, first by his legs. Mr. Joel Dines, EMT, ties each leg with leather restraints to the backboard and still appears to be at Perez's feet when Officer Calvert gets off the board at 13:58. An officer states at 14:11, "Joseph, Joseph." Paramedic Morgan Anderson ties Mr. Perez's right hand to the backboard while Joel Dines ties Mr. Perez's left hand to the backboard. There is no resistance from Mr. Perez when his hands are strapped. At 14:44 into video, Mr. Perez's right hand appears and is being strapped by Mr. Anderson. There appears to be no resistance from Mr. Perez. At 15:00, officers appear to remove their hands from the blue backboard. At 16:05, Mr. Perez is rolled over or "flipped" from prone to upright position by Mr. Dines and Mr. Anderson. It is noted that Mr. Perez is unresponsive. At 16:33, the camera is turned off.

Mr. Anderson was then checked for a carotid artery pulse, and none was noted. CPR was started either outside or in the ambulance by Mr. Anderson and Ms. Ortiz. Officer Calvert, along with Mr. Anderson and Ms. Ortiz, performed CPR during the ambulance drive while Mr. Dines drove. The initial rhythm was pulseless electrical activity (PEA) and changed to asystole. Two doses of epinephrine and 12 minutes of CPR were given on route to Community Medical Centers in Fresno, CA, where advanced cardiac life support was continued, and eventually Mr. Perez was declared dead.

An autopsy was performed on 5/11/17 at 10:15am, one day after the date of death. Mr. Perez was noted to be 6'1/2" and 241 pounds (BMI of 32). His heart was noted to be mildly enlarged at 436 g with left ventricular hypertrophy. Serial sections of the right coronary artery showed moderate/severe luminal narrowing with several areas of narrowing on the upper posterior ventricular septum. Sections of his left anterior descending artery had focal moderate luminal narrowing. His circumflex artery had mild to moderate luminal narrowing. No coronary thrombosis was noted.



CARDIOLOGY
ASSOCIATES
MEDICAL GROUP, INC.

Microscopic evaluation of sections of the left anterior descending artery showed a severe luminal narrowing (80% or more) with a post mortem clot in the lumen. Several sections of the right coronary artery had severe luminal narrowing.

The autopsy showed a methamphetamine level of 2459 ng/ml and an amphetamine level of 95 ng/ml. The cause of death noted by Dr. Chambliss was compressive asphyxia during restraint, with other significant conditions of methamphetamine toxicity. The manner of death was homicide.

## My findings

On the basis of the records, my education, my training and my experience, it is my opinion, with a reasonable degree of medical certainty, that Police, Deputy and Emergency Medical Services personnel's restraining process directly led to the cardiac arrest and death of Mr. Perez.

## Analysis and Discussion

During strenuous activity, there is a dramatic increase in acid in the body as well as a high demand for oxygen intake and carbon dioxide ($CO_2$) removal. The normal pH of the body is 7.4. As the pH drops with activity, the body's natural response is to increase the rate and depth of breathing. Consequently, the amount of $CO_2$ exhaled by the lungs increases, and the amount of $CO_2$ in the body decreases. This loss of $CO_2$ offsets the increased acidity of the blood and brings the pH back to a normal range. This hyperventilation can decrease the $pCO_2$ to as low as 15–20 mmHg. Despite this hyperventilation, the decrease in $pCO_2$ only partially corrects for the low blood pH. This hyperventilation is critical to maintaining the blood pH in a life sustaining range[1].

Mr. Joseph Perez had taken methamphetamines. He was acting in a bizarre and inappropriate manner, which hindered him from complying with police officers. His very prolonged struggle with police caused significant activation of his sympathetic nervous system, and release of catecholamines caused his heart to beat harder and faster, thus resulting in significant metabolic acidosis. This exertional activity creates lactic acid, because of the muscles working so hard, and also lowers the pH, making the blood more acidic. This lactic acid production was additive to the metabolic acidosis from the methamphetamine. Ho et al[2]. have measured blood pH, lactate and biochemical markers during various exercises to simulate encounters with police and have reported a pH as low as 7.01 being maintained after 10 minutes of rest. Hick et al[3] have published a case series on five restraint-associated deaths and described five at risk cases that did not result in death. The pH was noted to be very low in both cases. To maintain a normal acid-base balance (pH) in the body, one must breathe harder and faster to exhale $CO_2$. The body circulatory system also must move blood faster to deliver oxygen to muscles to provide energy, and remove $CO_2$ through delivery to the lungs.

The officers on top of Mr. Perez decreased his ventilatory capacity because he had been placed in the prone position, with weight on his upper and lower back.[4-7] Mr. Perez was unable to maintain his $pCO_2$ and pH within the values needed to survive. A decrease in ventilation can potentially also decrease oxygenation in people with very high oxygen demand. The process in which a person with impaired oxygen intake or accumulation of excess $CO_2$ attempts to maintain life is called asphyxia. This often leads to unconsciousness and death.

Weight placed on the upper back impedes the ability of the ribs to expand and decrease ventilation. This weight also increases the pressure within the chest cavity, thus decreasing the blood flow into the heart. Weight placed on the lower back impedes the ability of the diaphragm to expand and decrease ventilation, and additionally restricts the flow through venous blood vessels from the legs to the

4



heart[7]. This decrease in blood flow to the heart limits the amount of blood exiting the heart, thereby decreasing the cardiac output. Because deaths due to prone restraint are due a combination of a decrease in ventilation (asphyxia) and a decrease in cardiac output, I regard Mr. Perez's death as a prone restraint cardiac arrest rather than traditional positional or restraint asphyxia.

A decrease in ventilation decreases the pH and consequently worsens severe acidosis. A decrease in cardiac output causes less blood to reach crucial organs and deliver oxygen, and less blood flow in the pulmonary veins to deliver $CO_2$ to the lungs for removal, thus leading to cardiac arrest. Mr. Perez underwent a protracted struggle in the prone position and prolonged prone restraint (approximately 16 minutes). Officer Martinez estimated that Mr. Perez was restrained for approximately 30 seconds before he turned on his camera. Mr. Perez's last sound was uttered after approximately 13:30 minutes of prone restraint. Officers are no longer audible after 15:30 minutes.  Mr. Perez in the prone position turned over at approximately 16:30 minutes after prone restraint had begun.

Mr. Perez, given his struggle and the methamphetamines in his body, had significant metabolic acidosis and a high demand for oxygen and removal of $CO_2$. During this prolonged restraint in prone position, Mr. Perez's ventilation and cardiac output decreased, thus leading to positional asphyxia or prone restraint cardiac arrest.

According to a Bulletin from the Chief of Police Ed Winchester on 8/20/99, Mr. Perez had all the stated predispositions for death in the prone position, including obesity, drug intoxication and a violent struggle sufficient to require officers to hobble him. Mr. Perez also had an unresponsiveness during the struggle that was important to recognize, as stated in this bulletin. The bulletin also stated that as soon as people are handcuffed, they should be moved off their stomachs.

Mr. Perez was under restraint by at least three officers for a prolonged period of time. When the blue backboard was placed on Mr. Perez's back, as many as six officers pushed down on him, including a 190 lb officer sitting on the backboard. This pressure significantly worsened his ventilation (breathing) and hemodynamics, thus culminating in Mr. Perez's unresponsiveness and death.

While Mr. Perez was under the blue backboard, his responsiveness and breathing were poorly monitored. Around 13:30 minutes into prone restraint, Mr. Perez stopping making sounds. It is unclear for how much longer he continued to struggle and remained alive after that time. At 14:30 minutes into prone restraint, just after officer Calvert stood up off the board, Mr. Perez no longer appeared to be resisting. Only after 16:30 minutes into initiation of prone restraint was Mr. Perez realized to have no pulse, and an additional minute was likely to have elapsed before CPR was initiated. A significant delay of approximately 3 minutes existed between the recognition of Mr. Perez's unresponsiveness and the initiation of CPR. If Mr. Perez's arrest had been recognized earlier, Mr. Perez could possibly have been resuscitated. CPR helps maintain blood flow to the heart and brain, and increases the chances of survival. Every minute in delay of CPR is associated with a higher mortality risk. Out of hospital PEA arrest survival is very poor, and earlier CPR would not have been likely to have saved Mr. Perez but definitely would have increased Mr. Perez's chances of survival.

Mr. Perez did have significant underlying coronary artery disease that I feel did not contribute to his death. In light of the clear prone restraint position and physiology, Mr. Perez's death was due to prone restraint cardiac arrest. The arrhythmia of PEA and then a flat line or asystole is more consistent with acidosis (and asphyxia) than a primary cardiac arrest of ventricular arrhythmias, as commonly seen in patients with severe blocked arteries[7].

Mr. Perez's heart was reported to be mildly enlarged in the autopsy but was within the normal range for his body habitus. People with enlarged hearts are at increased risk of sudden death, again because of being prone to ventricular arrhythmias, not PEA or asystole.
I agree with the autopsy report that Mr. Perez's death was due to a mechanism of compression causing death by asphyxiation and was not due to underlying cardiac disease



## Conclusion

On the basis of all available records, my education, my training and my experience, it is my opinion, with a reasonable degree of medical certainty, that the Fresno Police, Sheriff and EMS personnel's actions contributed and caused Mr. Perez's prone restraint cardiac arrest and death.

Alon Steinberg, MD FACC

## References

1.    McArdle WD, Katch FI, Katch VL. Exercise physiology: nutrition, energy, and human performance. Baltimore; Philadelphia: Wolters Kluwer Health/Lippincott Williams & Wilkins, 2015. p200, p264, pp.286-301, p337.

2.    Ho JD, Dawes DM, Nelson RS, et al. Acidosis and Catecholamine Evaluation Following Simulated Law Enforcement "Use of Force" Encounters. Acad Emerg Med 2010; 17: e60–e68.

3.    Hick JL, Smith SW, Lynch MT. Metabolic Acidosis in Restraint-associated Cardiac Arrest. A Case Series. Acad Emerg Med 1999; 6: 239–243.

4.    Roeggla G, Roeggla H, Moser B, et al. Cardiorespiratory Consequences of the Hobble Restraint. Acad Emerg Med 1999; 6: 1076–1077.

5.    Cary NRB, Roberts CA, Cummin ARC, et al. The effect of simulated restraint in the prone position on cardiorespiratory function following exercise in humans. J Physiol 2000; 525: 30P-31P.

6.    Parkes J, Carson R. Sudden death during restraint: do some positions affect lung function? Med Sci Law 2008; 48: 137–141.

7.    Steinberg A. Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology.  Med Sci Law 2/2021

# EXHIBIT B

# CURRICULUM VITAE

# ALON ABRAHAM STEINBERG, M.D. F.A.C.C.

### *PERSONAL INFORMATION*

Date of Birth:      April 20, 1967
Place of Birth:     New York, NY
Email             aloncardio@gmail.com

### PROFESSIONAL INFORMATION

**Member and partner of Cardiology Associates Medical Group, an eight person single specialty Cardiology practice in Ventura County, California since 1/2005.**

**Office Address:**     Cardiology Associates Medical Group, Inc.
                    168 N. Brent Street #503
                    Ventura, CA  93003
                    (805) 653-0101
                    (805) 641-0434 (FAX)

                    Cardiology Associates Medical Group, Inc.
                    1701 Solar Drive #150
                    Oxnard, CA  93030
                    (805) 278-4020
                    (805) 278-4015 (FAX)

**California Medical License:**    #C51240

### *CURRENT HOSPITAL PRIVILEGES*

Community Memorial Hospital  147
N. Brent Street
Ventura, CA 93003

St Johns Regional Medical Center
1600 N. Rose Avenue Oxnard, CA 93030

### *EDUCATION:*

**COLLEGE:**        University of Texas, Austin TX
                           BA Mathematics 1985-1988 with high honors

**MEDICAL:**        University of Texas Medical Branch
                           Galveston, TX
                           MD 1988-1992

### *POST GRADUATE TRAINING:*

**RESIDENCY:**      Internal Medicine
                           Jackson Memorial Hospital
                           University of Miami, Miami FL
                           July 1992 - June 1995

**FELLOWSHIP:**     Cardiovascular Disease
                           University of Florida Hospitals
                           Jacksonville, FL
                           Chairman- Theodore Bass, MD
                           July 1995 – June 1998

**ADDITIONAL:**     Cardiovascular MRI
                           Berlin Heart Institute
                           Director- Eike Nagel, MD
                           Sept. 2004 – Sept. 2005  (3 months total).

                           Cardiovascular CT
                           Tennessee Heart Institute
                           Director- Tracy Q Callister, MD
                           May, 2006

### *PRIOR WORK EXPERIENCE*

Attending Cardiologist
Post Doctoral Associate/Clinical Instructor
University of Florida Health Science Center
Memorial Hospital
Jacksonville, FL
July 1998 – December 1998

Cardiologist in Private Practice
Lake Champlain Cardiology Associates
Plattsburgh, NY
Feb. 1999 to Dec. 2005

## CERTIFICATIONS

American Board of Internal Medicine, Cardiovascular Disease valid till 12/2026
Certification Board of Nuclear Cardiology, valid till 3/2023

## *MEMBERSHIPS/ASSOCIATIONS/OTHER*

Chair of the Division of Cardiology at Community Memorial Hospital. Ventura, California, since 2009

Chair of Department of Medicine at Community Memorial Hospital. Ventura, California, 2021

Clinical Assistant Professor, Western University Health Sciences College medical residency programs

Expert reviewer and consultant for the Medical Board of the State of California since 2006.  Gave testimony for State of California in case of Conrad Murray versus State of California, 2011.

Seaview Independent Physician Association (network of over 300 physicians). Utilization and review committee member.

Medical Director of Nuclear Cardiology and Radiation Safety Officer at Cardiology Associates Medical Group since 2005

Medical Director of Cardiac Rehabilitation, Community Memorial Hospital, Ventura, California

Axis Clinical Trials, Consulting Cardiologist and Clinical Investigator

Ventura Clinical Trials, Chief Medical Officer and Clinical Investigator

Faculty Speaker and Advisory Board Member for Boston Scientific (Watchman)

California and Ventura County Medical Associations

Fellow of the American College of Cardiology

## RECENT PUBLICATIONS

Steinberg A. Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology.  Medicine, Science and the Law published first online 2/2021.

Steinberg A, Hazan S. The Microbiome and the Heart.  Practical Gastroenterology April 2018 • Volume XLII, Issue 4

# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ANTHONY PEREZ, individually, )
CECILIA PEREZ, individually, )
TERRALEE PEREZ, individually )
and as successor in interest )
to Joseph Perez, JOSEPH )
PEREZ, JR., individually and )
as successor in interest to )
Joseph Perez, and X.P., a )
minor, by and through his )
Guardian ad Litem, MICHELLE )
PEREZ, individually and as )
successor in interest to )
Joseph Perez, )
                          )
          Plaintiffs,     )
                          )
     v.                   )   CASE NO. 1:18-cv-00127
                          )             -AWI-EPG
CITY OF FRESNO, COUNTY OF )
FRESNO, et al.,           )
                          )
          Defendants.     )
_____)

**CERTIFIED COPY**

VIDEO RECORDED VIDEO CONFERENCE DEPOSITION OF

ALON ABRAHAM STEINBERG, M.D.

APPEARING REMOTELY VIA ZOOM WEBCAM

SEPTEMBER 10, 2021

Reported by:
DEBBIE STRICKLAND
CSR 9036
No. 21-103183



THE SULLIVAN GROUP OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860  |  323.938.8750

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION


ANTHONY PEREZ, individually, )
CECILIA PEREZ, individually, )
TERRALEE PEREZ, individually )
and as successor in interest )
to Joseph Perez, JOSEPH      )
PEREZ, JR., individually and )
as successor in interest to  )
Joseph Perez, and X.P., a    )
minor, by and through his    )
Guardian ad Litem, MICHELLE  )
PEREZ, individually and as   )
successor in interest to     )
Joseph Perez,                )
                             )
        Plaintiffs,          )
                             )
    v.                       )  CASE NO. 1:18-cv-00127
                             )           -AWI-EPG
CITY OF FRESNO, COUNTY OF    )
FRESNO, et al.,              )
                             )
        Defendants.          )
_____)

**CERTIFIED COPY**


VIDEO RECORDED VIDEO CONFERENCE DEPOSITION OF

ALON ABRAHAM STEINBERG, M.D.

APPEARING REMOTELY VIA ZOOM WEBCAM

SEPTEMBER 10, 2021


Reported by:
DEBBIE STRICKLAND
CSR 9036
No. 21-103183

```
 1                    UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4   ANTHONY PEREZ, individually, )
     CECILIA PEREZ, individually, )
 5   TERRALEE PEREZ, individually )
     and as successor in interest )
 6   to Joseph Perez, JOSEPH       )
     PEREZ, JR., individually and )
 7   as successor in interest to   )
     Joseph Perez, and X.P., a     )
 8   minor, by and through his     )
     Guardian ad Litem, MICHELLE   )
 9   PEREZ, individually and as    )
     successor in interest to      )
10   Joseph Perez,                 )
                                   )
11            Plaintiffs,          )
                                   )
12       v.                        )   Case No. 1:18-cv-00127
                                   )              -AWI-EPG
13   CITY OF FRESNO, COUNTY OF     )
     FRESNO, et al.,               )
14                                 )
              Defendants.          )
15   _____)

16

17

18            VIDEO RECORDED VIDEO CONFERENCE DEPOSITION

19            OF ALON ABRAHAM STEINBERG, M.D., taken on

20            behalf of DEFENDANTS, AMERICAN AMBULANCE

21            and MORGAN ANDERSON, all parties appearing

22            remotely via Zoom Webcam, commencing at 1:30

23            p.m., Friday, September 10, 2021, before

24            Debbie Strickland, CSR 9036.

25
```

```
 1   A P P E A R A N C E S :     (Via Webcam)

 2          FOR PLAINTIFFS:

 3                  TAYLOR & RING, LLP
                    By:  NEIL K. GEHLAWAT, Attorney at Law
 4                  1230 Rosecrans Avenue, Suite 360
                    Manhattan Beach, California 90266
 5                  310.209.4100
                    gehlawat@taylorring.com
 6

 7          FOR DEFENDANTS, K.W.P.H. ENTERPRISES, INC., a
            California corporation dba AMERICAN AMBULANCE
 8          and MORGAN ANDERSON:

 9                  R.J. RYAN LAW, APC
                    By:  RICHARD J. RYAN, Attorney at Law
10                  500 North Brand Boulevard, Suite 950
                    Glendale, California 91203
11                  818.956.3600
                    rick@rjryanlaw.com
12

13          FOR DEFENDANTS COUNTY OF FRESNO; BRAITHAN
            STOLTENBERG; ROBERT McEWEN; KARLSON MANASAN; and
14          JIMMY ROBNETT:

15                  WEAKLEY & ARENDT
                    By:  JAMES D. WEAKLEY, Attorney at Law
16                  5200 North Palm Avenue, Suite 211
                    Fresno, California 93704
17                  559.221.5256
                    jim@walaw-fresno.com
18

19          FOR DEFENDANTS, CITY OF FRESNO; JAMES ROSSETTI;
            SEAN CALVERT; and CHRIS MARTINEZ:
20
                    MANNING & KASS, ELLROD, RAMIREZ, TRESTER,
21                  LLP
                    By:  LYNN L. CARPENTER, Attorney at Law
22                  801 South Figueroa Street, 15th Floor
                    Los Angeles, California 90017
23                  213.624.6900
                    llc@manningllp.com
24

25
```

1    A P P E A R A N C E S :     (Continued Via Webcam)

2         ALSO PRESENT:

3              MIGUEL CONCEPCION, Videographer

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2  W I T N E S S :

 3  ALON ABRAHAM STEINBERG, M.D.                      PAGE

 4          EXAMINATION BY MR. RYAN:                    8

 5          EXAMINATION BY MS. CARPENTER:             148

 6

 7  QUESTIONS INSTRUCTED NOT TO ANSWER:

 8       PAGE       LINE

 9       125          8

10

11

12

13  E X H I B I T S :

14  NUMBER            DESCRIPTION                   PAGE

15    EX 1      Third Amended Notice of Deposition    30
16              of Alon Abraham Steinberg, M.D.,
                FACC and Request to Produce

17    EX 2      Curriculum Vitae of Alon Abraham       30
18              Steinberg, M.D. F.A.C.C.

19    EX 3      Expert Dr. Alon Steinberg Fee          57
              Schedule

20    EX 4      Invoice #0000084 from Alon             57
21              Steinberg, MD FACC

      EX 5      Expert Alon Steinberg, MD FACC         59
22              Deposition History Last Four Years

23    EX 6      Review Article by Alon Steinberg       61
              Re Prone Restraint Cardiac Arrest:
24              A Comprehensive Review of the
              Scientific Literature and an
25              Explanation of the Physiology
```

```
1    E X H I B I T S :      (Continued)

2    NUMBER                 DESCRIPTION                      PAGE

3      EX 7        Viewpoint Article by Gary Vilke,         117
                   Tom Neuman and Theodore Chan
4                  Re Response To: Prone Restraint
                   Cardiac Arrest - A Comprehensive
5                  Review of the Scientific Literature
                   and an Explanation of the
6                  Physiology

7      EX 8        Response to: Response to: Prone          117
                   Restraint Cardiac Arrest: A
8                  Comprehensive Review of the
                   Scientific Literature and an
9                  Explanation of the Physiology
                   by Alon Steinberg, MD FACC
10
       EX 9        6/30/21 Expert Opinion of Dr. Alon       122
11                 Steinberg in the Matter of Perez,
                   at al. vs. City of Fresno, et al.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|    |                                                           |
|----|-----------------------------------------------------------|
| 1  | ALL PARTIES APPEARING REMOTELY VIA ZOOM WEBCAM            |
| 2  | FRIDAY, SEPTEMBER 10, 2021                                |
| 3  | 1:30 P.M.                                                 |
| 4  | ***                                                       |

01:17  5      THE VIDEOGRAPHER:  Good afternoon.  We are

6      now on the record.  Today's date is September 10th,

7      2021, and the time is 1:30 p.m. pacific time.  This is

8      the video deposition of Dr. Alon Abraham Steinberg in

9      the matter of Perez, et al. versus American Ambulance,

01:30  10     et al. filed in the United States District Court,

11     Eastern District of California, Fresno Division, Case

12     Number 1:18-CV-00127-AWI-EPG.

13          This deposition is taking place via web video

14     conference with all participants attending remotely.

15     My name is Miguel Concepcion.  I'm the videographer

16     representing The Sullivan Group of Court Reporters.

17          Would counsel on the conference please

18     identify yourselves and state whom you represent

19     beginning with the questioning attorney.

01:31  20     MR. RYAN:  Rick Ryan for American Ambulance

21     and Morgan Anderson.

22          MR. WEAKLEY:  James Weakley appearing for the

23     County of Fresno; Deputies Braithan Stoltenberg;

24     Robert McEwen; Karlson Manasan; and Jimmy Robnett.

01:31  25     MS. CARPENTER:  Good afternoon.  Lynn

```
 1   Carpenter on behalf of Defendant, City of Fresno, and

 2   Officers James Rossetti, Sean Calvert, and Chris

 3   Martinez.

 4          MR. GEHLAWAT:  Good afternoon.  Neil Gehlawat

 5   for the plaintiffs.

 6          THE VIDEOGRAPHER:  Thank you.

 7          Our court reporter today is Debbie Strickland

 8   representing The Sullivan Group.  The court reporter

 9   will now swear in the witness.

10                        ***

11            ALON ABRAHAM STEINBERG, M.D.,

12            having been duly administered an oath

13            remotely in accordance with CCP 2094,

14            was examined and testified as follows:

15                        ***

16          THE VIDEOGRAPHER:  Counsel, you may proceed.

17                        ***

18                     EXAMINATION

19   BY MR. RYAN:

20      Q    Dr. Steinberg, please state and spell your

21   full name for us please.

22      A    Alon Steinberg, A-l-o-n; last name,

23   S-t-e-i-n-b-e-r-g.

24      Q    Dr. Steinberg, I'm Rick Ryan.  I represent

25   American Ambulance and Morgan Anderson.  I'll have a
```

01:31  5
01:32  20
01:32  25

8

```
 1    and take care of the patient.  If it happens to be a

 2    problem postoperatively or perioperatively after a

 3    surgery, then it's the surgeon who's gonna be --

 4    attending surgeon is usually consulting me.

 5        Q    Right.  But you're consulting for cardiology

 6    purposes only; correct?

 7        A    Yes.  I'm -- I'm primarily a cardiologist.

 8        Q    Well, if not a cardiologist, what else?  I

 9    mean, I just want to establish you're a cardiologist

10    and you're not a pulmonologist; correct?

11        A    Okay.  Yeah, I'm not a pulmonologist, I'm not

12    a pathologist --

13        Q    You've not a --

14        A    I'm not --

15        Q    -- toxicologist.

16        A    -- an ER doctor.  I'm not a toxicologist.

17        Q    So let me go through each of -- each of

18    these.

19             Dr. Steinberg, it is correct that you're not

20    a pulmonology consultant; correct?

21        A    That is correct.

22        Q    And you have no significant expertise in

23    pulmonology; correct?

24        A    I mean, I have some expertise in, in -- in

25    pulmonary care.  I take care of critically ill
```

02:20 (line 5)
02:20 (line 10)
02:21 (line 20)
02:21 (line 25)

```
 1    patients at times.  In my previous job a long time
 2    ago, I worked in a small hospital, and I would
 3    cross-cover with the pulmonary medicine consultants.
 4        Q    Right.  But --
 5        A    But that -- but I primarily only deal with
 6    cardiology.  I wouldn't call myself a pulmonologist.
 7        Q    Right.  And my question was you have no
 8    significant expertise in pulmonology; correct?
 9             MR. GEHLAWAT:  I'm just going to object.
10    It's vague.  But go ahead.
11             THE WITNESS:  Yeah.  I don't know what that
12    means, but I'm not a pulmonologist.
13    BY MR. RYAN:
14        Q    Okay.  Have you had training in pulmonary
15    medicine?
16        A    I mean, I had training during my internal
17    medicine residency.  We rotated in pulmonary
18    medicine --
19        Q    Yeah.  That was, what --
20        A    -- as part of my training.
21        Q    -- a three-month rotation over 25 years ago;
22    true?
23        A    Oh, yeah.  A long time ago.
24        Q    Okay.
25             And you're not a toxicologist and don't hold
```

02:21   5

02:22   15

02:22   25

47

```
 1   yourself out as a toxicologist; correct?
 2       A    I'm absolutely not a toxicologist.
 3       Q    You're not an intensivist; correct?
 4       A    I don't practice intense -- I'm not a
 5   particular -- practicing intensivist care.
 6       Q    Right.
 7            And you are not an emergency physician and
 8   have no expertise in emergency care; correct?
 9       A    Well, I have expertise in emergency care with
10   regarding to cardiology.
11       Q    Well, not in emergency department?
12       A    No.
13       Q    Right.  I mean, you may deal with patients
14   who come in or have an MI in your office, and then
15   suddenly you are dealing with an emergency; correct?
16       A    That is correct.
17       Q    Yeah.  But you don't hold yourself out as an
18   emergency physician; correct?
19       A    No.
20       Q    My statement is correct?
21       A    Yes.
22       Q    And you do not hold yourself out as an expert
23   in EMS, emergency services; true?
24       A    In ambulance services?
25       Q    Correct.
```

02:22   (line 5)
02:22   (line 10)
02:22   (line 15)
02:23   (line 20)
02:23   (line 25)

1    of seven times, six at depo, one at trial; true?

2        A    I trust if that's what I sent you, then I --

3    I trust what you're saying.

4        Q    Do you have a recollection of testifying on

02:42  5    any other occasion other than the seven times on that

6    document?

7        A    No.

8        Q    Now, in terms of your professional

9    experience, have you done any research on the basis of

02:43  10   grants?

11       A    No.

12       Q    And have you done any independent research in

13   the area of deaths that occur in custody?

14           MR. GEHLAWAT:  It's vague.  Go ahead.

02:43  15           THE WITNESS:  Have I done any research?

16   BY MR. RYAN:

17       Q    Well, let me -- I'll just back up.

18           You know, we're going to get to your article

19   here shortly, but you authored an article entitled

02:43  20   Prone Restraint Cardiac Arrest; true?

21       A    True.

22       Q    Yeah.  We'll mark that article as Exhibit 6.

23           (Exhibit Number 6 was marked for

24           identification and is attached hereto.)

25   ///

1    BY MR. RYAN:

2        Q    That article is a review of the literature

3    that you were able to find or chose to include in

4    your -- in your review; correct?

02:43    5        A    Yes.

6        Q    This article did not result in any

7    independent research that you performed; correct?

8        A    No.

9        Q    Is my statement correct?

02:43   10        A    Yes.  It's a review article on, on the

11    research that has been performed regarding this --

12    regarding prone restraint.

13        Q    Okay.  So I've marked the article as

14    Exhibit 6.  Let me just ask you a few questions about

02:44   15    this article at this time, probably more than a few.

16            Now, the article was published in a

17    publication called, Medicine, Science and the Law;

18    correct?

19        A    Yes.

02:44   20        Q    Now, this was not a peer reviewed

21    publication; correct?

22        A    It is a peer reviewed publication.

23        Q    In terms of your article, do you believe it

24    was peer reviewed before being published in Medicine,

02:44   25    Science and the Law?

```
 1    your expertise in cardiology and because you did a

 2    review of the literature; true?

 3         A    True.

 4         Q    Now, in terms of the review of the

 5    literature, you conclude by saying that some authors

 6    have concluded incorrectly that prone restraint has no

 7    significant impact on respiratory or hemodynamic

 8    physiology and is not a mechanism underlying death.

 9    And you disagree with the conclusions of, for

10    instance, Vilke and Chan and Neuman; correct?

11         A    Correct.

12         Q    Now, isn't it true that Drs. Vilke, Chan, and

13    Neuman did the seminal actual research on the

14    physiologic effects of prone restraint; correct?

15         A    That is correct.

16         Q    And you have done none of your own

17    independent research; true?

18         A    True.

19         Q    Based upon your review of the literature,

20    your introduction to the -- your conclusion states

21    that the actual physiologic cause of death in these

22    circumstances remain uncertain; correct?

23         A    In the conclusion to my introduction or in my

24    conclusion?

25         Q    In your -- in your report you state the
```

03:58 — 5
03:58 — 10
03:58 — 15
03:59 — 20
03:59 — 25

1   told you before, when someone has a very high

2   temperature, their, their metabolism is increased, and

3   it could cause more stress and dehydration on

4   someone's system.  And that could have been somewhat

04:01   5   contributory to his death, because when you couple

6   that with a decreased output on someone who's already

7   possibly dehydrated and hyperthermic with some vasal

8   dilatation, then that can cause death earlier.

9       Q   Do you consider yourself to be an expert in

04:01   10   restraint asphyxia?

11       A   I think I'm an expert of restraint asphyxia

12   due to the fact that I'm well aware of the literature

13   and I'm published in a peer review journal reviewing

14   the, the -- the mechanism and the -- and the

04:02   15   physiological literature in this state.

16       Q   Okay.  I, I appreciate the response, but,

17   again, I didn't ask for the reasons why.  I just asked

18   for you to affirm or deny.  So let me try it again.

19       A   Yes.

04:02   20       Q   Thank you.

21       Do you consider yourself to be an expert in

22   restraint asphyxia?

23       A   Yes.

24       Q   Do you consider yourself to be an expert in

04:02   25   positional asphyxia?

         1        A     Yes.

         2        Q     Do you consider yourself to be an expert in

         3   compressive asphyxia?

         4        A     Yes.

04:02    5        Q     How many times have you testified -- withdraw

         6   that.

         7              How many times have you qualified in Federal

         8   Court to testify on the issues of restraint,

         9   positional, or compressive asphyxia?

04:02   10        A     I think we've discussed that before, but I

        11   think it's been about five or six times.

        12        Q     That you've testified in Federal Court on

        13   these issues?

        14        A     I've testified in court?  Oh, I'm sorry.  I

04:02   15   was deposed.  I think I testified maybe three times.

        16        Q     Okay.  So let me try it again.

        17              Estimate for me the number of times you have

        18   qualified in Federal Court to testify about your

        19   opinions on restraint, positional, or compressive

04:03   20   asphyxia?

        21        A     I'll answer I don't know.  I, I -- I have to

        22   look back at all the cases and which ones were federal

        23   and which ones were not.

        24        Q     Well, we've got your list of cases for the

04:03   25   last several years.

1      A      So in the last four years, it's none as far

2  as in court.

3      Q      Okay.  So let me try it again, then, and I'll

4  broaden it to include Federal and State Court.

04:03    5          Can you identify for me how many times in the

6  last four years you have qualified to testify in

7  Federal or State Court on issues of restraint

8  asphyxia, positional asphyxia, or compressive

9  asphyxia?

04:04   10      A      Probably once.

11      Q      And can you identify that case?

12      A      Probably the Salcedo versus City of Whittier.

13      Q      And that was in March of 2017 for a

14  deposition, but it doesn't mention court.

04:04   15      A      Yeah.  I was never in court.

16      Q      So let me try it again.  In the last -- I

17  want court testimony.

18      A      Sorry.

19      Q      Do you understand that?

04:04   20      A      Yeah.  None.  None in court in the last four

21  years.

22      Q      So let me ask the question again.

23          Can you estimate for me how many times in the

24  last four years you have qualified to testify in court

04:04   25  on the issues of restraint asphyxia, positional

1    asphyxia, compressive asphyxia, or prone asphyxia?

2         A    None.

3         Q    Okay.

4              Now, then, can you identify any court in

04:05  5    which you have testified on these issues ever?

6         A    I don't recall.

7         Q    And it's your belief that you are qualified

8    to testify on issues of restraint, positional,

9    compressive, or prone asphyxia because, in large part,

04:05  10   of your expert review of the literature demonstrated

11   in your 2021 report and your expertise as a

12   cardiologist; correct?

13        A    It's based on my expertise as a cardiologist

14   as well as my knowledge of the -- of the literature as

04:05  15   well as publishing the literature.

16        Q    Right.  So I think you agreed with my

17   question, so let me just try it again.

18        A    Yes, then, the answer is.

19        Q    Yeah.  So, Doctor, is it correct that you

04:05  20   believe that you are an expert in the area of prone

21   restraint and asphyxial deaths because you're a

22   cardiologist and because you reviewed the literature

23   and published a report on your review of the

24   literature; true?

04:06  25        A    Correct.

```
 1    have any questions, so I'll pass it to Lynn.
 2             MS. CARPENTER:  Yeah.  I don't --
 3             MR. GEHLAWAT:  I can always rely on you, Jim.
 4             MS. CARPENTER:  Yeah.  So --
 5             MR. WEAKLEY:  Actually, I have about two
 6    hours of questions, but I'll save them.
 7             THE WITNESS:  Oh, good.
 8                         ***
 9                      EXAMINATION
10    BY MS. CARPENTER:
11        Q    Good afternoon, Doctor.  So as you know, I'm
12    Lynn Carpenter.  I represent the City of Fresno
13    defendants.
14             I think that this was asked of you, but I'm
15    just making sure that it's on the record.  You are not
16    a police practices expert; true?
17        A    That is true.
18        Q    And you have not conducted any studies on
19    human subjects regarding the effect of prone restraint
20    on them; true?
21        A    That is correct.  True.
22        Q    And you have not conducted any studies on
23    human subjects where weight was applied in the prone
24    maximal restraint position; true?
25        A    True.
```

04:38 — line 5
04:39 — line 15
04:39 — line 20
04:39 — line 25

148

1    good weekend.

2            THE WITNESS:  Thank you.

3            MS. CARPENTER:  Thank you, Doctor.

4            MR. WEAKLEY:  Thank you.

04:49   5            THE VIDEOGRAPHER:  This concludes the

6    deposition of Dr. Alon Abraham Steinberg.  Going off

7    the record at 4:49 p.m. pacific time.  Thank you.

8            (At the hour of 4:49 p.m., the

9            deposition was concluded.)

10                        -oOo-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5  STATE OF CALIFORNIA    )
                         )   ss.
6  COUNTY OF LOS ANGELES )

7       I, _ALON ABRAHAM STEINBERG, M.D. , having appeared

8  remotely for my deposition on _September 10 , 2021, do

9  this date declare under penalty of perjury that I have

10 read the foregoing deposition, I have made any

11 corrections, additions or deletions that I was desirous

12 of making in order to render the within transcript true

13 and correct.

14      IN WITNESS WHEREOF, I have hereunto subscribed my

15 name this _____ day of _____, 2021.

16

17
                   _____
18                 ALON ABRAHAM STEINBERG, M.D.

19

20

21

22

23

24

25

```
 1              DEPONENT'S CHANGES OR CORRECTIONS

 2   Note:  If you are adding to your testimony, print

 3   the exact words you want to add.  If you are deleting

 4   from your testimony, print the exact words you want

 5   to delete.  Specify with "Add" or "Delete" and sign

 6   this form.

 7

 8   DEPOSITION OF:      ALON ABRAHAM STEINBERG, M.D.

 9   CASE:               PEREZ v AMERICAN AMBULANCE

10   DATE OF DEPOSITION:  SEPTEMBER 10, 2021

11

12   PAGE     LINE     CHANGE/ADD/DELETE/REASON

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23   _____    _____    _____

24   _____    _____    _____

25   Deponent's Signature _____ Date _____
```

```
 1    PAGE     LINE      CHANGE/ADD/DELETE/REASON

 2    _____    _____     _____

 3    _____    _____     _____

 4    _____    _____     _____

 5    _____    _____     _____

 6    _____    _____     _____

 7    _____    _____     _____

 8    _____    _____     _____

 9    _____    _____     _____

10    _____    _____     _____

11    _____    _____     _____

12    _____    _____     _____

13    _____    _____     _____

14    _____    _____     _____

15    _____    _____     _____

16    _____    _____     _____

17    _____    _____     _____

18    _____    _____     _____

19    _____    _____     _____

20    _____    _____     _____

21    _____    _____     _____

22    _____    _____     _____

23    _____    _____     _____

24    _____    _____     _____

25    Deponent's Signature _____ Date _____
```

```
 1   STATE OF CALIFORNIA    )
                            )  SS.
 2   COUNTY OF LOS ANGELES  )

 3

 4          I, Debbie Strickland, a Certified Shorthand

 5   Reporter of the State of California, do hereby certify;

 6          That the foregoing proceedings were taken before

 7   me remotely at the time and place herein set forth; that

 8   any witnesses in the foregoing proceedings, prior to

 9   testifying, were administered an oath; that a record of

10   the proceedings was made by me using machine shorthand

11   which was thereafter transcribed under my direction; that

12   the foregoing transcript is a true record of the

13   testimony given.

14          Further, that if the foregoing pertains to the

15   original transcript of a deposition in a Federal Case,

16   before completion of the proceedings, review of the

17   transcript [ ] was [X] was not requested.

18          I further certify I am neither financially

19   interested in the action nor a relative or employee of

20   any attorney or any party to this action.

21

22          Dated this _23rd_ day of _September , 2021.

23

24                         _____
                              Debbie Strickland
25                         DEBBIE STRICKLAND, CSR 9036
```