1  James D. Weakley, Esq.  Bar No. 082853
   Ashley N. Reyes, Esq.    Bar No. 312120
2
   WEAKLEY & ARENDT
3  A Professional Corporation
   5200 N. Palm Avenue, Suite 211
4  Fresno, California 93704
   Telephone: (559) 221-5256
5  Facsimile: (559) 221-5262
   Jim@walaw-fresno.com
6  Ashley@walaw-fresno.com

7  Attorneys for Defendants, County of Fresno, Robert McEwen, Karlson Mansan, Jimmy
   Robnett, and Braithan Stoltenberg
8

9                  UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11  ANTHONY PEREZ, individually, CECILIA      ) CASE NO. 1:18-cv-00127-AWI-EPG
    PEREZ, individually, TERRALEE PEREZ,      )
12  individually, and as successor in interest to )
    Joseph Perez, JOSEPH PEREZ, JR.,          ) DECLARATION OF ASHLEY N.  REYES
13  individually and as successor in interest to ) IN SUPPORT OF COUNTY
    Joseph Perez, and X.P. a minor, by and through) DEFENDANTS' MOTION FOR
14  his Guardian ad Litem, MICHELLE PEREZ,    ) SUMMARY JUDGMENT, OR
    individually and as successor in interest to ) ALTERNATIVELY, SUMMARY
15  Joseph Perez,                             ) ADJUDICATION
                                              )
16            Plaintiffs,                     )
                                              ) Date: December 6, 2021
17       vs.                                  ) Time: 1:30 p.m.
                                              ) Ctrm: 2
18  CITY OF FRESNO, COUNTY OF FRESNO,         ) Honorable Anthony W. Ishii
    JAMES ROSSETTI, an individual, SEAN       )
19  CALVERT, an individual, CHRIS             )
    MARTINEZ, an individual, BRAITHAN         )
20  STOLTENBERG, an individual, ROBERT        ) Complaint Filed: January 23, 2018
    MCEWEN, an individual, KARLSON            )
21  MANASAN, an individual, JIMMY             ) Trial:  May 10, 2022
    ROBNETT, an individual, and DOES 1-10,    )
22  inclusive,                                )
                                              )
23            Defendants.                     )
                                              )
24  _____       )

25       I, Ashley N. Reyes, declare:

26

27

28
   Declaration of Ashley N. Reyes in
   Support of County Defendants'
   Summary Judgment/Adjudication            1

1     1.     I am an associate with the law firm of Weakley & Arendt, PC, duly licensed to

2 practice before all courts in the State of California, including the United States District Court for

3 the Eastern District of California.

4     2.     I have personal knowledge of all facts set forth in this declaration, except those

5 facts which are set forth on information and belief. As to those facts, I believe them to be true. If

6 called as a witness, I could competently testify thereto.

7

8     3.     Attached as **Exhibit 1** is a true and correct copy of portions of the transcript of

9 Paramedic Morgan Anderson, taken March 27, 2019.

10     4.     Attached as **Exhibit 2** is a true and correct copy of portions of the transcript of

11 Fresno Police Officer Sean Calvert, taken March 6, 2019.

12     5.     Attached as **Exhibit 3** is a true and correct copy of portions of the transcript of

13 Steve Comstock, taken February 27, 2019.

14

15     6.     Attached as **Exhibit 4** is a true and correct copy of portions of the transcript of

16 Clarence Chapman, taken August 27, 2021.

17     7.     Attached as **Exhibit 5** is a true and correct copy of portions of the transcript of

18 Scott DeFoe, taken August 6, 2021.

19     8.     Attached as **Exhibit 6** is a true and correct copy of portions of the transcript of

20 Joel Dines, taken February 18, 2019.

21

22     9.     Attached as **Exhibit 7** is a true and correct copy of portions of the transcript of

23 Fresno County Deputy Karla Keely, and relevant Exhibits from the deposition, taken April 28,

24 2021.

25     10.     Attached as **Exhibit 8** is a true and correct copy of portions of the transcript of

26 Fresno County Deputy Karlsan Manasan, taken March 5, 2019.

27

28

11.     Attached as **Exhibit 9** is a true and correct copy of portions of the transcript of Fresno Police Officer Chris Martinez, taken March 6, 2019.

12.     Attached as **Exhibit 10** is a true and correct copy of portions of the transcript of Fresno County Deputy Robert McEwen, taken March 4, 2019.

13.     Attached as **Exhibit 11** is a true and correct copy of portions of the transcript of Jennifer Ortiz, taken February 18, 2019.

14.     Attached as **Exhibit 12** is a true and correct copy of portions of the transcript of Fresno County Deputy Jimmy Robnett, taken March 5, 2019.

15.     Attached as **Exhibit 13** is a true and correct copy of portions of the transcript of Fresno Police Sergeant James Rosetti, taken March 6, 2019.

16.     Attached as **Exhibit 14** is a true and correct copy of portions of the transcript of Fresno County Deputy Braithan Stoltenberg, taken March 4, 2019.

17.     Attached as **Exhibit 15** is a true and correct copy of portions of the transcript of Fresno County Deputy Adrian Villegas, taken April 28, 2021.

18.     Attached as **Exhibit 16** is a true and correct copy of portions of the transcript of Andrew Wachtel, M.D., taken August 19, 2021.

19.     Attached hereto as **Exhibit 17** is a true and correct copy of portions of the transcript of Alon Steinberg, MD, taken September 10, 2021.

20.     Attached hereto as **Exhibit 18** is a true and correct copy of the autopsy report of Joseph Perez, which was produced by Plaintiffs in discovery in this action and bates stamped as PLTF 000007-000027.

///

///

///

Declaration of Ashley N. Reyes in
Support of County Defendants'
Summary Judgment/Adjudication                              3

1    I declare under penalty of perjury under the laws of the United States that the foregoing

2  is true and correct to the best of my knowledge and belief and that this declaration was executed

3  in Fresno, California on October 6, 2021.

4
                                    _____/s/ Ashley N. Reyes_____
5                                          Ashley N. Reyes

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 1

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Morgan Anderson on 03/27/2019

```
 1                UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3                        ---oOo---

 4   ANTHONY PEREZ, individually,     )
     CECILIA PEREZ, individually,     )
 5   TERRALEE PEREZ, individually and )
     as successor in interest to      )
 6   Joseph Perez, JOSEPH PEREZ, JR., )
     individually and as successor in )
 7   interest to Joseph Perez, and    )
     X.P., a minor, by and through his)
 8   Guardian ad Litem, MICHELLE      )
     PEREZ, individually and as       )
 9   successor in interest to Joseph  )
     Perez.,                          )
10                                    )
              Plaintiffs,             )
11                                    )
        vs.                           )Case No.
12                                    )1:18-cv-00127-AWI-EPG
     CITY OF FRESNO, COUNTY OF FRESNO,)
13   JAMES ROSSETTI, an individual,   )
     SEAN CALVERT, an individual,     )
14   CHRIS MARTINEZ, an individual,   )
     BRAITHAN STOLTENBERG, an         )
15   individual, ROBERT MCEWEN, an    )
     individual, KARLSON MANASAN, an  )
16   individual, JIMMY ROBNETT, an    )
     individual, and DOES 1-10,       )
17   inclusive.,                      )
                                      )
18            Defendants.             )
     _____)
19

20                        ---oOo---

21            DEPOSITION OF MORGAN ANDERSON

22                  FRESNO, CALIFORNIA

23              WEDNESDAY, MARCH 27, 2019

24     REPORTED BY:  FLORENCE A. COLBY, CSR NO. 12433

25
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Morgan Anderson on 03/27/2019                                      Page 32

```
 1   like, "Hey, can you hear me," something to that effect,

 2   and didn't get a response.

 3           Q.   Underneath that it says, "Patient was

 4   finished being restrained, and rolled over, and patient

 5   was pulseless and not breathing."  So, what was the

 6   source of that information?

 7           A.   I saw it.

 8           Q.   Okay.  And were you the individual that

 9   checked for the pulse?

10           A.   Yes.

11           Q.   And once the patient was restrained and

12   rolled over, was that the first point in time when the

13   patient's pulse was taken?

14           A.   Yes.

15           Q.   Okay.  And once the patient was restrained

16   and rolled over, was that the first point in time at

17   which you confirmed he was not breathing?

18           A.   Yes.

19           Q.   "CPR was started, airway and ventilations

20   established, and connected to the monitor."  Where was

21   the patient located when the CPR was started?

22           A.   He was already restrained on the

23   backboard.  He was lifted onto the gurney, and CPR was

24   was started at that time.

25           Q.   Okay.  Was he still out of the ambulance,
```

```
 1   individual.
 2        Q.   Okay.  So, these barriers that you
 3   described here, how are they barriers if you were able
 4   to, I guess, release him from the restraints that were
 5   on him when you first arrived on the scene, and then
 6   restrained him to the backboard?
 7        A.   They are still barriers because the
 8   individual was already being restrained because he was
 9   combative and becomes a safety issue to people
10   responding, the responding law enforcement, EMS, or
11   whatever, or becomes a safety issue to himself.  While
12   they are fighting until they can actually be assessed,
13   it is not safe for me to get in there and get close to
14   them, and do a full assessment.  So, can I -- if
15   somebody is thrashing around, I cannot accurately count
16   a pulse rate, count a respiratory rate especially when
17   they are exerting themselves, and in this case right
18   here when they're, I mean fighting off people or --
19        Q.   Was Joseph Perez exerting himself?
20        A.   Yes.
21        Q.   Okay.  How so?
22        A.   He was thrashing around.  He was flailing
23   his body around.  He was bucking.  He was riding,
24   trying to, you know, the best way you can explain it, I
25   guess, without putting my personal opinion in it.
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Morgan Anderson on 03/27/2019                                Page 39

```
 1              Q.  So, once you started the restraint

 2    process onto the backboards, did he continue to resist?

 3              A.  Yes.

 4              Q.  How so?

 5              A.  Any effort that was made to move an

 6    extremity, so an arm or a leg or whatever, he would

 7    push, pull, yank, would not cooperate with verbal

 8    commands, or let himself be guided.

 9              Q.  Okay.  And then underneath the barriers it

10    states, "PMH medications to allergies, unable to

11    complete," was that because you didn't have any patient

12    medical history from him?

13              A.  Yeah, no patient medical history,

14    medication or allergies, wasn't answering any of my

15    questions.  Law enforcement doesn't usually have that

16    type of information; that's my job.

17              Q.  Okay.  And then moving onto the second

18    page, down at the bottom it talks about response

19    information?

20              A.  Okay.

21              Q.  It has pick-up location Palm -- or Sante

22    Fe Avenue and Palm Avenue?

23              A.  Okay.

24              Q.  So that would be area where you actually

25    picked up the patient?
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Morgan Anderson on 03/27/2019                    Page 80

```
 1    BY MS. CARPENTER:

 2         Q.  So just making sure that it's clear on the

 3    record, there around 11:38, 11:40, that would have been

 4    your voice like talking about what's going to happen?

 5         A.  I remember giving instructions.  Do I

 6    recognize my voice as a recorded voice?  No, because I

 7    haven't heard it many times recorded.

 8         Q.  Okay.  But you remember?

 9         A.  I remember giving instructions because I

10    mean --

11         Q.  That would have been your role as a

12    paramedic?

13         A.  Yeah.  It's like hey, this is kind a

14    general idea what we are going go get done.  Is

15    everybody on the same page?  Hopefully, we'll start

16    making it happen.

17         Q.  Okay.  And whenever you observed, the

18    hobble on Mr. Perez, was he still vocalizing, and

19    resisting the officers?

20         A.  When I first showed up, he was still

21    vocalizing, and resisting.  During the starting of

22    trying to restrain him, he was vocalizing, and

23    resisting.  During the restraint process, did he go

24    limp, flaccid, unresponsive, yes.

25         Q.  But that was already after the board had
```

```
 1   were, no.
 2          Q.   Okay.  But you would say that there were
 3   hands all over his body in an effort to try and
 4   restrain him?
 5          MS. CARPENTER:  Objection.  Misstates his
 6   testimony, and I believe it's been asked and answered.
 7   BY MR. GEHLAWAT:
 8          Q.  Go ahead.
 9          A.  You are asking me to give a specific
10   answer about -- well, a dozen plus hands, and where
11   exactly they were?  They were all over his body.  I
12   mean, pressure was applied to try and hold him down.
13          Q.  Okay.  And --
14          A.  So now you are asking me how much
15   pressure, was it excessive was it -- that I can't tell
16   you.
17          Q.  Okay.  And I don't want to know how much
18   pressure, whether it was excessive.  I was just trying
19   to get a sense of where the hands were relative to his
20   body.  But my understanding is, you just don't really
21   remember; is that your --
22          A.  Extremities, shoulders, he was trashing
23   around a lot.
24          Q.  Okay.  And you would agree with me at the
25   time that you showed up, his hands, and legs were both
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Morgan Anderson on 03/27/2019                                    Page 109

```
 1   face?
 2           A.  I was in that general area, and I remember
 3   when after he went limp, or became unresponsive,
 4   checking that, and trying to get him to respond.
 5           Q.  Okay.  When he was turned over, and you
 6   had a view of his face, did you think that he was dead
 7   that the point?
 8           A.  I could tell that he wasn't breathing.
 9           Q.  Okay.  He was pronounced dead at the
10   hospital; is that true?
11           A.  Yes.
12           Q.  Were you present for that?
13           A.  When they actually pronounced him, I can't
14   remember if I was still physically the in the room or
15   not.
16           Q.  But you suspected that he was dead or was
17   at least not breathing when he first turned over?
18           MS. CARPENTER:  Objection.  Misstates his
19   testimony.  He never said dead.
20   BY MR. GEHLAWAT:
21           Q.  Okay.  Did you believe that he was not
22   breathing when you turned him over?
23           A.  When we turned him over, it appeared that
24   he was not breathing.
25           Q.  Okay.  And he had no pulse, correct?
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Morgan Anderson on 03/27/2019                                    Page 122

```
 1                    REPORTER'S CERTIFICATION

 2

 3           I, FLORENCE A. COLBY, a Certified Shorthand

 4    Reporter, DO HEREBY CERTIFY:

 5           That the foregoing witness was by me duly

 6    sworn; that the deposition was then taken before me at

 7    the time and place herein set forth; that the testimony

 8    and proceedings were reported stenographically by me

 9    and later be transcribed into typewritten form under my

10    direction; that the foregoing is a true record of the

11    testimony and taken at that time.

12           I further certify that I am neither counsel

13    for, not in any way related to any party to said

14    action, nor in any way interested in the result or

15    outcome thereof.

16           IN WITNESS WHEREOF, I have subscribed my

17    name on April 20, 2019.

18

19

20                         Florence A. Colby
                          _____
21

22                          FLORENCE A. COLBY, CSR #12433

23

24

25
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 2

PEREZ

vs

CITY OF FRESNO

---

Deposition of: Sean Calvert

Taken on: Wednesday, March 06, 2019

---



**CERTIFIED COPY**



Certified Shorthand Reporters

*A Professional Corporation*

Main Office: 900 Truxtun Avenue, Suite 320
Bakersfield, CA 93301
(800) 322-4595 Toll Free ● (661) 395-1050
www.woodrandall.com

Serving Central California - Bakersfield, Visalia & Fresno

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

_____

| | |
|---|---|
| ANTHONY PEREZ, individually, CECILIA PEREZ, individually, TERRALEE PEREZ, individually, and as successor in interest to Joseph Perez, JOSEPH PEREZ, JR., individually and as successor in interest to Joseph Perez, and X.P. a minor, by and through his Guardian ad Litem, MICHELLE PEREZ, individually and as successor in interest to Joseph Perez, | ) ) ) ) ) No. 1:18-cv-00127-AWI-EPG ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) |
| CITY OF FRESNO, COUNTY OF FRESNO, JAMES ROSSETTI, an individual, SEAN CALVERT, an individual, CHRIS MARTINEZ, an individual, BRAITHAN STOLTENBERG, an individual, ROBERT MCEWEN, an individual, KARLSON MANASAN, an individual, JIMMY ROBNETT, an individual, and DOES 1-10, inclusive, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

_____)

VIDEOTAPED DEPOSITION

OF

SEAN CALVERT

Wednesday, March 6, 2019

Fresno, California

Reported by:  Bree Mervin, CSR No. 13057, RPR, CRR

2

1                          APPEARANCES

2

3    For Plaintiffs:          Alder Law, P.C.
                              BY MR. NEIL GEHLAWAT
4                             Attorney at Law
                              1875 Century Park East
5                             Suite 1500
                              Los Angeles, California   90067
6                             (310)275-9131
                              ngehlawat@alderlaw.com
7

8
     For County of Fresno:    Weakley & Arendt
9                             BY MR. JAMES D. WEAKLEY
                              Attorney at Law
10                            5200 North Palm Avenue
                              Suite 211
11                            Fresno, California   93704
                              (559)221-5256
12                            jim@walaw-fresno.com

13

14   For City of Fresno:      Manning & Kass, Ellrod,
                              Ramirez, Trester, LLP
15                            BY MS. MILDRED K. O'LINN
                              Attorney at Law
16                            801 South Figueroa Street
                              15th Floor
17                            Los Angeles, California   90017
                              (213)624-6900
18                            mko@manningllp.com

19

20   The Videographer:        CHELCIE LEWIS

21

22   Also present:            OFFICER CHRIS MARTINEZ
                              OFFICER JAMES ROSSETTI
23

24

25

12

| | | |
|---|---|---|
| 09:06:24 | 1 | A.   Yes. |
| 09:06:24 | 2 | Q.   And at the time of that incident, were you |
| 09:06:28 | 3 | assigned to the MAGEC unit? |
| 09:06:30 | 4 | A.   Yes, I was. |
| 09:06:31 | 5 | Q.   Okay.   How long had you been with the MAGEC |
| 09:06:34 | 6 | unit as of the time of the incident? |
| 09:06:39 | 7 | A.   Approximately, five months. |
| 09:06:46 | 8 | Q.   And before you were assigned to the MAGEC |
| 09:06:48 | 9 | unit, what was your assignment? |
| 09:06:49 | 10 | A.   I was assigned to the downtown policing |
| 09:06:53 | 11 | unit.   I was a bicycle patrol officer. |
| 09:06:57 | 12 | Q.   And how long did you do that for? |
| 09:07:03 | 13 | A.   Approximately, a year and a half. |
| 09:07:07 | 14 | Q.   Okay.   Back on May 10th, 2017, you were on |
| 09:07:14 | 15 | the job with the Fresno Police Department; correct? |
| 09:07:17 | 16 | A.   Yes. |
| 09:07:18 | 17 | Q.   And you were -- strike that. |
| 09:07:26 | 18 | You had an assignment in the Merced area, in |
| 09:07:30 | 19 | the early morning hours of May 10th, 2017? |
| 09:07:32 | 20 | A.   That is correct. |
| 09:07:35 | 21 | Q.   Okay.   And were you on your way back from |
| 09:07:38 | 22 | the Merced area to Fresno when this incident |
| 09:07:41 | 23 | occurred? |
| 09:07:42 | 24 | A.   We were already back in the city of Fresno. |
| 09:07:45 | 25 | Q.   Okay.   And if this incident with Mr. Perez |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

13

| | | |
|---|---|---|
| 09:07:50 | 1 | had not occurred, meaning the vehicle did not stop |
| 09:07:54 | 2 | and this encounter did not occur, what would have |
| 09:07:58 | 3 | been your intended destination, if you know? |
| 09:08:00 | 4 | A.  Somewhere in the city of Fresno. |
| 09:08:02 | 5 | Q.  Okay.  Do you know if it would have been |
| 09:08:05 | 6 | back at the police department or not? |
| 09:08:07 | 7 | A.  No. |
| 09:08:08 | 8 | Q.  Okay.  What time would your shift have been |
| 09:08:16 | 9 | over on that date? |
| 09:08:20 | 10 | A.  Approximately between the hours of noon to |
| 09:08:25 | 11 | 1400 hours.  So noon to 2:00 p.m. |
| 09:08:28 | 12 | Q.  Okay.  And this incident with Mr. Perez, do |
| 09:08:38 | 13 | you recall what time it was when you and the other |
| 09:08:44 | 14 | officers pulled over in the Palm and Santa Fe area to |
| 09:08:48 | 15 | make contact with Mr. Perez initially? |
| 09:08:52 | 16 | A.  Approximately between 1028 hours and 1030 |
| 09:09:00 | 17 | hours. |
| 09:09:01 | 18 | Q.  Okay.  And is that based on your review of |
| 09:09:05 | 19 | the -- the CAD information? |
| 09:09:07 | 20 | A.  Yes, it is. |
| 09:09:08 | 21 | Q.  Okay.  And my understanding is that Fresno |
| 09:09:13 | 22 | police was not dispatched to any call regarding |
| 09:09:18 | 23 | Mr. Perez.  Is that your understanding? |
| 09:09:20 | 24 | A.  That is correct. |
| 09:09:21 | 25 | Q.  And when you were coming back from the |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

21

| | | |
|---|---|---|
| 09:16:31 | 1 | when the handcuffs were placed on his wrists; true? |
| 09:16:36 | 2 | A.  Correct. |
| 09:16:36 | 3 | Q.  And was he cooperative during the |
| 09:16:40 | 4 | handcuffing process? |
| 09:16:42 | 5 | MS. O'LINN:  Objection; asked and answered. |
| 09:16:43 | 6 | You can answer again. |
| 09:16:47 | 7 | THE WITNESS:  Yes. |
| 09:16:47 | 8 | BY MR. GEHLAWAT: |
| 09:16:49 | 9 | Q.  Okay.  And who placed the handcuffs on his |
| 09:16:51 | 10 | wrists? |
| 09:16:52 | 11 | A.  Officer Martinez. |
| 09:16:56 | 12 | Q.  Did he place the handcuffs on his wrists |
| 09:16:59 | 13 | while he was still in the seated position, or was he |
| 09:17:01 | 14 | standing up when they were placed on his wrists? |
| 09:17:03 | 15 | A.  He was sitting on the curb. |
| 09:17:06 | 16 | Q.  And after the handcuffs were placed on his |
| 09:17:08 | 17 | wrists and he was on the curb, did you remain in that |
| 09:17:14 | 18 | area? |
| 09:17:16 | 19 | A.  Yes, I did. |
| 09:17:18 | 20 | Q.  Okay.  And at some point did you go back to |
| 09:17:21 | 21 | your -- to the patrol vehicle? |
| 09:17:23 | 22 | A.  No. |
| 09:17:25 | 23 | Q.  Okay.  So you remained in the area where |
| 09:17:32 | 24 | Mr. Perez was seated on the curb; correct? |
| 09:17:34 | 25 | A.  Correct. |

23

| | | |
|---|---|---|
| 09:18:36 | 1 | were behind him and to the right and Officer Martinez |
| 09:18:37 | 2 | was behind him to the left, where was Sergeant |
| 09:18:40 | 3 | Rossetti standing? |
| 09:18:41 | 4 | A.  I do not recall. |
| 09:18:42 | 5 | Q.  Okay.  Was the street on Palm in front of |
| 09:18:48 | 6 | Mr. Perez at that time? |
| 09:18:50 | 7 | A.  Can you rephrase the question? |
| 09:18:52 | 8 | Q.  Sure.  So when you were -- you and Officer |
| 09:18:55 | 9 | Martinez were standing behind Mr. Perez to his right |
| 09:18:58 | 10 | and to his left, was he -- when he was seated on the |
| 09:19:02 | 11 | curb, if he was looking straight ahead, was he |
| 09:19:06 | 12 | looking at the street on Palm Avenue? |
| 09:19:07 | 13 | A.  Yes. |
| 09:19:08 | 14 | Q.  Okay.  And you said at some point Officer |
| 09:19:14 | 15 | Martinez went back to the patrol vehicle; is that |
| 09:19:17 | 16 | true? |
| 09:19:17 | 17 | A.  Yes. |
| 09:19:18 | 18 | Q.  Okay.  How long after Mr. Perez was |
| 09:19:23 | 19 | handcuffed did Officer Martinez go back to his patrol |
| 09:19:28 | 20 | vehicle? |
| 09:19:28 | 21 | A.  I do not recall. |
| 09:19:32 | 22 | Q.  Okay.  So at some point did Mr. Perez get up |
| 09:19:38 | 23 | off of the sidewalk? |
| 09:19:41 | 24 | A.  Yes. |
| 09:19:42 | 25 | Q.  All right.  And did he get off -- did he get |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

24

09:19:46  1  up from the sidewalk because you had instructed him
09:19:50  2  to get up off the sidewalk, or did he do that on his
09:19:53  3  own?
09:19:53  4      A.  I did not instruct him to.  He got up on his
09:19:57  5  own.
09:19:58  6      Q.  Can you describe the method in which he got
09:20:01  7  up from the sidewalk?
09:20:06  8      A.  He stood up straight.
09:20:09  9      Q.  Okay.
09:20:09 10      A.  With both feet.
09:20:11 11      Q.  Did he initially rock backwards and then
09:20:15 12  stand up straight, kind of all in one motion?
09:20:22 13      A.  From what I recall, he rocked back prior to
09:20:25 14  him standing up.  Even before he stood up, he rocked
09:20:30 15  back.
09:20:31 16      Q.  Okay.  And at that point when he stood up,
09:20:37 17  was Officer Martinez present in the area, or was he
09:20:41 18  still in the patrol vehicle?
09:20:43 19          MS. O'LINN:  You said "in the patrol
09:20:45 20  vehicle."
09:20:46 21  BY MR. GEHLAWAT:
09:20:46 22      Q.  Or was he at the patrol vehicle?
09:20:48 23      A.  He was with me.
09:20:49 24      Q.  Okay.  So he was with you when Mr. Perez got
09:20:53 25  up off the ground?

25

| | | |
|---|---|---|
| 09:20:55 | 1 | A.  Correct. |
| 09:20:56 | 2 | Q.  Okay.  And at the time that he -- that |
| 09:20:59 | 3 | Mr. Perez got up off the ground, do you recall where |
| 09:21:03 | 4 | Sergeant Rossetti was at that time? |
| 09:21:08 | 5 | A.  I do not recall. |
| 09:21:09 | 6 | Q.  Okay.  And once Mr. Perez got up off the |
| 09:21:15 | 7 | ground, did you tell him to sit back down? |
| 09:21:19 | 8 | A.  I did. |
| 09:21:23 | 9 | Q.  And did he listen? |
| 09:21:24 | 10 | A.  No. |
| 09:21:25 | 11 | Q.  Would you say that that was the first time |
| 09:21:30 | 12 | during your contact with Mr. Perez that he did not or |
| 09:21:35 | 13 | he was not compliant? |
| 09:21:38 | 14 | A.  Correct. |
| 09:21:39 | 15 | Q.  Okay.  And at that point, did you attempt to |
| 09:21:47 | 16 | grab his shirt? |
| 09:21:51 | 17 | A.  Correct. |
| 09:21:51 | 18 | Q.  And did you grab his shirt from his front or |
| 09:21:55 | 19 | from behind? |
| 09:21:56 | 20 | A.  From the back. |
| 09:21:57 | 21 | Q.  Okay.  And at this point when you have |
| 09:22:02 | 22 | grabbed his shirt from behind, had any deputies from |
| 09:22:05 | 23 | the sheriff's office showed up on scene? |
| 09:22:07 | 24 | A.  Yes. |
| 09:22:08 | 25 | Q.  Okay.  How many? |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

36

09:33:42  1   showed up at the same time?

09:33:44  2       A.  It was -- I believe it was two deputies.

09:33:49  3       Q.  Okay.  And having sat through their

09:33:52  4   depositions, would that have been Deputy Robnett and

09:33:55  5   Deputy Manasan?

09:33:58  6       A.  Correct.

09:34:00  7       Q.  And when they first showed up, were you

09:34:05  8   still on the ground, on the right side of Mr. Perez's

09:34:09  9   body?

09:34:10  10      A.  Correct.

09:34:11  11      Q.  Okay.  And at some point was Mr. Perez's

09:34:17  12  head elevated off the ground using a white towel?

09:34:21  13      A.  Yes.

09:34:22  14      Q.  Okay.  Did that happen before or after

09:34:26  15  Deputies Robnett and Deputy -- Deputies Robnett and

09:34:30  16  Manasan showed up?

09:34:33  17      A.  I do not recall if they were on scene, the

09:34:36  18  two deputies that showed up after, if the towel was

09:34:41  19  applied before or after they had arrived.

09:34:44  20      Q.  Okay.  While you were on -- initially when

09:34:53  21  you were on Mr. Perez's right side and you were

09:34:57  22  applying positive pressure between his shoulder

09:35:00  23  blades, was Deputy McEwen hands on with Mr. Perez at

09:35:06  24  that time as well?

09:35:06  25      A.  Yes, he was.

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

39

```
09:37:23   1   BY MR. GEHLAWAT:
09:37:23   2       Q.   Did Deputy McEwen remain on Mr. Perez's left
09:37:26   3   side when he was moving around?
09:37:27   4       A.   Yes.
09:37:29   5       Q.   All right.  And at some point you said a
09:37:38   6   towel was brought out, a white towel; is that true?
09:37:41   7       A.   Yes.
09:37:42   8       Q.   Do you know who brought the white towel?
09:37:45   9       A.   I do not know who brought the white towel.
09:37:48  10       Q.   Did you hear someone requesting the white
09:37:50  11   towel?
09:37:51  12       A.   Yes, I did.
09:37:52  13       Q.   And who was that?
09:37:55  14       A.   The deputy, McEwen.
09:37:57  15       Q.   And do you know why he was requesting a
09:37:59  16   white towel?
09:38:00  17       A.   During that time, Mr. Perez was grinding,
09:38:04  18   rubbing his head against the asphalt sidewalk,
09:38:07  19   damaging his head.  I asked if Deputy McEwen, if he
09:38:12  20   had anything because I did not have anything on me to
09:38:14  21   prevent him from doing that.  We wanted to protect
09:38:18  22   his head and not cut -- we didn't want him to cause
09:38:21  23   any further damage to his head.  So Deputy McEwen
09:38:24  24   said, "I have a towel in the back of my truck."
09:38:26  25       Q.   Okay.  And do you know who retrieved that
```

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

51

| | | |
|---|---|---|
| 09:59:44 | 1 | MS. O'LINN:  I want to make sure that's |
| 09:59:45 | 2 | included in his question. |
| 09:59:47 | 3 | MR. GEHLAWAT:  Sure, yeah. |
| 09:59:48 | 4 | MS. O'LINN:  Did you or someone else? |
| 09:59:49 | 5 | MR. GEHLAWAT:  We'll eliminate that.  We'll |
| 09:59:50 | 6 | eliminate that. |
| 09:59:52 | 7 | BY MR. GEHLAWAT: |
| 09:59:52 | 8 | Q.  Did you ever call for emergency medical |
| 09:59:54 | 9 | personnel to the scene of the incident? |
| 09:59:56 | 10 | A.  I did not. |
| 09:59:57 | 11 | Q.  So going back to my previous question, prior |
| 10:00:01 | 12 | to you observing emergency medical personnel on |
| 10:00:06 | 13 | scene, did you ever hear anyone else call for |
| 10:00:08 | 14 | emergency medical personnel? |
| 10:00:09 | 15 | A.  I did. |
| 10:00:10 | 16 | Q.  And who was that? |
| 10:00:10 | 17 | A.  Sergeant Rossetti. |
| 10:00:11 | 18 | Q.  And when did you first hear him call for |
| 10:00:14 | 19 | emergency medical personnel? |
| 10:00:16 | 20 | A.  Estimated approximately five minutes after |
| 10:00:23 | 21 | we contacted Mr. Perez. |
| 10:00:25 | 22 | Q.  Okay.  And at the time you heard it, was |
| 10:00:33 | 23 | Mr. Perez still seated on the curb? |
| 10:00:36 | 24 | MS. O'LINN:  Objection; argumentative as to |
| 10:00:39 | 25 | still, but go ahead. |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

52

| | | |
|---|---|---|
| 10:00:40 | 1 | THE WITNESS:  From what I recall, yes. |
| 10:00:42 | 2 | BY MR. GEHLAWAT: |
| 10:00:43 | 3 | Q.  And was he in handcuffs? |
| 10:00:46 | 4 | A.  I do not recall if he was in handcuffs or |
| 10:00:49 | 5 | not. |
| 10:00:49 | 6 | Q.  At that time did you have an understanding |
| 10:00:52 | 7 | as to why Sergeant Rossetti was calling emergency |
| 10:00:56 | 8 | medical personnel? |
| 10:00:57 | 9 | A.  Yes. |
| 10:00:58 | 10 | Q.  And what was your understanding in that |
| 10:00:59 | 11 | respect? |
| 10:01:01 | 12 | A.  Due to Mr. Perez's agitated state, believing |
| 10:01:07 | 13 | he was under the influence of a controlled substance, |
| 10:01:12 | 14 | his erratic behavior. |
| 10:01:13 | 15 | Q.  And did you hear at that time if Sergeant |
| 10:01:18 | 16 | Rossetti had asked the emergency medical personnel to |
| 10:01:22 | 17 | respond code two or code three? |
| 10:01:25 | 18 | A.  He advised our dispatch for a code two. |
| 10:01:29 | 19 | Q.  Okay.  Before Mr. -- |
| 10:01:35 | 20 | MS. O'LINN:  Counsel, just to be clear.  It |
| 10:01:37 | 21 | was sort of a list question.  I want to make sure, |
| 10:01:39 | 22 | and you started asking him specifics. |
| 10:01:41 | 23 | So he asked you for the -- all the times you |
| 10:01:46 | 24 | heard EMS called for, and then you got into |
| 10:01:51 | 25 | specifics. |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

53

| | | |
|---|---|---|
| 10:01:51 | 1 | MR. GEHLAWAT:  I think I just said, "Did you |
| 10:01:52 | 2 | hear it at some point?"  And he said, "Yes, the first |
| 10:01:55 | 3 | time," and I'll get back to -- |
| 10:01:56 | 4 | MS. O'LINN:  I want to make sure we're clear |
| 10:01:58 | 5 | if there's more than once. |
| 10:01:59 | 6 | MR. GEHLAWAT:  Sure. |
| 10:02:00 | 7 | BY MR. GEHLAWAT: |
| 10:02:06 | 8 | Q.  Going back, prior to Mr. Perez being taken |
| 10:02:09 | 9 | to the ground, did you form the belief that he was |
| 10:02:16 | 10 | under the influence of a controlled substance? |
| 10:02:19 | 11 | A.  Yes. |
| 10:02:19 | 12 | Q.  Was that based on his behavior? |
| 10:02:23 | 13 | A.  Yes. |
| 10:02:24 | 14 | Q.  Did you form the opinion that he might be |
| 10:02:28 | 15 | suffering from a mental disability? |
| 10:02:33 | 16 | A.  No. |
| 10:02:37 | 17 | Q.  Did you have an understanding that when |
| 10:02:40 | 18 | Sergeant Rossetti initially called for EMS, that it |
| 10:02:46 | 19 | was done in part because Mr. Perez was going to be |
| 10:02:51 | 20 | 50150? |
| 10:02:53 | 21 | A.  Correct. |
| 10:02:54 | 22 | Q.  And you have an understanding as to what |
| 10:02:58 | 23 | 50150 is? |
| 10:02:59 | 24 | A.  I do. |
| 10:03:00 | 25 | Q.  Okay.  And do you know if 50150 refers to |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

54

| | | |
|---|---|---|
| 10:03:06 | 1 | individuals who have a mental disability? |
| 10:03:11 | 2 | A.  That is one of them, yes. |
| 10:03:13 | 3 | Q.  Okay.  And there's also a danger to himself |
| 10:03:14 | 4 | and a danger to others; true? |
| 10:03:16 | 5 | A.  Correct. |
| 10:03:17 | 6 | Q.  And out of those, do you have -- did you |
| 10:03:20 | 7 | have an understanding as to which one of them |
| 10:03:24 | 8 | Sergeant Rossetti was calling emergency medical |
| 10:03:26 | 9 | personnel for? |
| 10:03:28 | 10 | A.  Yes. |
| 10:03:29 | 11 | Q.  And which one was that? |
| 10:03:30 | 12 | A.  It was a danger to himself and a danger to |
| 10:03:35 | 13 | others. |
| 10:03:35 | 14 | Q.  And was that also based on his behavior? |
| 10:03:38 | 15 | A.  Correct. |
| 10:03:39 | 16 | Q.  So at the time that Sergeant Rossetti had |
| 10:03:43 | 17 | initially called for emergency medical personnel, as |
| 10:03:48 | 18 | of that time, was Mr. Perez cooperative? |
| 10:03:52 | 19 | A.  Yes. |
| 10:03:53 | 20 | Q.  So if at that point or if up to that point |
| 10:03:57 | 21 | he was cooperative, why did you think that he may be |
| 10:04:03 | 22 | a danger to others? |
| 10:04:08 | 23 | A.  Based on him being seen running in traffic, |
| 10:04:14 | 24 | and also him talking to himself, believing people |
| 10:04:19 | 25 | were chasing him and hitting him. |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

55

| | | |
|---|---|---|
| 10:04:21 | 1 | Q.  When did you see him running into traffic? |
| 10:04:25 | 2 | A.  When I initially saw him. |
| 10:04:28 | 3 | Q.  Was he in the roadway on Palm Avenue? |
| 10:04:33 | 4 | A.  I'm sorry, can you repeat that? |
| 10:04:35 | 5 | Q.  Sure.  Was he in the roadway on Palm Avenue? |
| 10:04:37 | 6 | A.  Yes, he was. |
| 10:04:38 | 7 | Q.  And did you see him run through Palm Avenue? |
| 10:04:44 | 8 | MS. O'LINN:  Okay.  You can explain. |
| 10:04:46 | 9 | THE WITNESS:  When I initially saw him, he |
| 10:04:48 | 10 | was in the number one lane of Palm Avenue in traffic. |
| 10:04:54 | 11 | BY MR. GEHLAWAT: |
| 10:04:54 | 12 | Q.  Was that northbound? |
| 10:04:56 | 13 | A.  Southbound. |
| 10:04:59 | 14 | Q.  Okay.  And did he eventually cross the |
| 10:05:03 | 15 | street from the southbound lanes over to the |
| 10:05:05 | 16 | northbound lanes? |
| 10:05:07 | 17 | A.  I'm sorry.  Can you repeat that? |
| 10:05:10 | 18 | Q.  Sure.  Did he at any point cross from the |
| 10:05:12 | 19 | southbound lanes of Palm Avenue where you initially |
| 10:05:15 | 20 | saw him, over to the northbound lanes of Palm Avenue? |
| 10:05:24 | 21 | A.  I'm not understanding the question as far as |
| 10:05:26 | 22 | the direction of Palm Avenue, how you're describing |
| 10:05:30 | 23 | it. |
| 10:05:30 | 24 | MS. O'LINN:  Counsel, maybe, did he ever |
| 10:05:32 | 25 | cross the centerline? |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

56

| | | |
|---|---|---|
| 10:05:33 | 1 | THE WITNESS:  No, he did not. |
| 10:05:36 | 2 | BY MR. GEHLAWAT: |
| 10:05:36 | 3 | Q.  All right.  So there are southbound lanes |
| 10:05:38 | 4 | and northbound lanes of Palm Avenue where this |
| 10:05:41 | 5 | incident occurred; is that true? |
| 10:05:42 | 6 | A.  Correct. |
| 10:05:42 | 7 | Q.  And when you first observed him, he was in |
| 10:05:45 | 8 | the number one or left lane of southbound Palm; true? |
| 10:05:50 | 9 | A.  Number one right lane of southbound Palm. |
| 10:05:52 | 10 | Q.  Okay.  So he was in the right lane of |
| 10:05:55 | 11 | southbound Palm; correct? |
| 10:05:56 | 12 | A.  Correct. |
| 10:05:56 | 13 | Q.  Was that the lane closest to the curb? |
| 10:05:59 | 14 | A.  Yes. |
| 10:06:00 | 15 | Q.  All right.  And so that was your basis for |
| 10:06:06 | 16 | believing -- that was one of the reasons why you |
| 10:06:10 | 17 | believed he could be a danger to others? |
| 10:06:12 | 18 | A.  Yes. |
| 10:06:13 | 19 | MS. O'LINN:  Counsel, before we go too far |
| 10:06:15 | 20 | down it, the number one lane, they count the lanes |
| 10:06:18 | 21 | from the centerline. |
| 10:06:19 | 22 | MR. GEHLAWAT:  I have done enough of these |
| 10:06:21 | 23 | cases, and that's why I said left. |
| 10:06:22 | 24 | MS. O'LINN:  It didn't make sense the way |
| 10:06:24 | 25 | you said it though. |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

57

10:06:24  1          MR. GEHLAWAT:  He said right.

10:06:27  2          MS. O'LINN:  Then you said right bound

10:06:29  3  number one.  I don't know where we are.

10:06:33  4  BY MR. GEHLAWAT:

10:06:33  5      Q.  All right.  Okay.  And did you hear Sergeant

10:06:38  6  Rossetti call for EMS any other times, other than the

10:06:41  7  initial time we discussed?

10:06:43  8      A.  Yes.

10:06:43  9      Q.  And how many more times?

10:06:45  10      A.  One other time.

10:06:46  11      Q.  And when he did that, was Mr. Perez on the

10:06:51  12  ground in a prone position?

10:06:53  13      A.  Not that I recall.

10:06:54  14      Q.  Okay.  Where was Mr. Perez at that time?

10:06:59  15      A.  I believe he was still sitting down.

10:07:02  16      Q.  Was he handcuffed at this point?

10:07:04  17      A.  I believe he was, yes.

10:07:05  18      Q.  Okay.  And what did you hear at this time

10:07:09  19  from Sergeant Rossetti?

10:07:10  20      A.  Approximately two minutes after he had

10:07:12  21  called -- he had upgraded from a code two to a code

10:07:16  22  three.

10:07:17  23      Q.  And do you have an understanding as to why

10:07:19  24  that was done?

10:07:21  25      A.  Yes.

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

58

| | | |
|---|---|---|
| 10:07:22 | 1 | Q.   What was that? |
| 10:07:22 | 2 | A.   That was due to Mr. Perez's erratic |
| 10:07:25 | 3 | behavior. |
| 10:07:26 | 4 | Q.   Okay.  At that time, did you believe it was |
| 10:07:29 | 5 | a medical emergency? |
| 10:07:33 | 6 | A.   It could, yes, a medical emergency. |
| 10:07:36 | 7 | Q.   And that was before Mr. Perez got up off the |
| 10:07:41 | 8 | ground; true? |
| 10:07:42 | 9 | A.   From what I recall, yes. |
| 10:07:45 | 10 | Q.   So prior to Mr. Perez being taken to the |
| 10:07:49 | 11 | ground, you thought he was under the influence of a |
| 10:07:53 | 12 | controlled substance; correct? |
| 10:07:55 | 13 | A.   Correct. |
| 10:07:55 | 14 | Q.   You thought he was acting erratically; |
| 10:07:57 | 15 | correct? |
| 10:07:58 | 16 | A.   Correct. |
| 10:07:58 | 17 | Q.   And you thought that it was a medical |
| 10:08:01 | 18 | emergency; correct? |
| 10:08:03 | 19 | A.   It could have turned into a medical |
| 10:08:06 | 20 | emergency. |
| 10:08:07 | 21 | Q.   Okay.  Okay.  So once -- let's go back to |
| 10:08:16 | 22 | where we were before we talked about calling EMS.  At |
| 10:08:20 | 23 | some point they showed up on scene, and you heard the |
| 10:08:23 | 24 | sirens, and you saw the ambulance pull up on scene; |
| 10:08:27 | 25 | true? |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

60

| | | |
|---|---|---|
| 10:09:47 | 1 | were in the area where Mr. Perez was being |
| 10:09:49 | 2 | restrained? |
| 10:09:51 | 3 | A.   Approximately 20 to 30 seconds. |
| 10:10:00 | 4 | Q.   And when they initially arrived on scene, |
| 10:10:07 | 5 | did you hear one or more of them saying anything? |
| 10:10:10 | 6 | A.   Yes. |
| 10:10:10 | 7 | Q.   And what did any one of them say? |
| 10:10:16 | 8 | A.   One of them said something to the effect of, |
| 10:10:19 | 9 | "We're going to place a board on his back." |
| 10:10:22 | 10 | Q.   Okay.   Do you know, was the person that said |
| 10:10:29 | 11 | that a male? |
| 10:10:30 | 12 | A.   Yes. |
| 10:10:30 | 13 | Q.   Was it -- was that person wearing a white |
| 10:10:33 | 14 | shirt? |
| 10:10:35 | 15 | A.   Yes. |
| 10:10:35 | 16 | Q.   Was that person on Mr. Perez's right side |
| 10:10:41 | 17 | where you were? |
| 10:10:42 | 18 | MS. O'LINN:   When he said that? |
| 10:10:43 | 19 | BY MR. GEHLAWAT: |
| 10:10:44 | 20 | Q.   When he said that. |
| 10:10:46 | 21 | A.   I do not recall. |
| 10:10:47 | 22 | Q.   Did you know the name of the individual who |
| 10:10:49 | 23 | said that? |
| 10:10:51 | 24 | A.   No. |
| 10:10:51 | 25 | Q.   Did you know if he was a paramedic or an |

62

| | | |
|---|---|---|
| 10:12:14 | 1 | A.   Yes. |
| 10:12:15 | 2 | Q.   And were they attached to the backboard in a |
| 10:12:19 | 3 | way that they were supine? |
| 10:12:22 | 4 | A.   Yes. |
| 10:12:22 | 5 | Q.   So the back of the person was on the board; |
| 10:12:26 | 6 | is that true? |
| 10:12:28 | 7 | A.   That is true. |
| 10:12:28 | 8 | Q.   Had you ever seen it done before, where the |
| 10:12:32 | 9 | board was placed on top of someone's back while he or |
| 10:12:37 | 10 | she was in a prone position? |
| 10:12:39 | 11 | A.   I had not. |
| 10:12:42 | 12 | Q.   But you recall with respect to this |
| 10:12:47 | 13 | incident, that it was one of the EMS workers who said |
| 10:12:52 | 14 | that the board was going to be placed on top of |
| 10:12:55 | 15 | Mr. Perez's back? |
| 10:12:56 | 16 | A.   Yes. |
| 10:12:57 | 17 | Q.   Was there any discussion prior to that or at |
| 10:13:03 | 18 | that time about sliding the board underneath |
| 10:13:05 | 19 | Mr. Perez's body, as opposed to placing it on top of |
| 10:13:08 | 20 | him? |
| 10:13:09 | 21 | A.   Yes. |
| 10:13:09 | 22 | Q.   Okay.  And who had that discussion? |
| 10:13:13 | 23 | A.   I do not recall. |
| 10:13:14 | 24 | Q.   Were you participating in that discussion? |
| 10:13:16 | 25 | A.   I was not. |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

63

| | | |
|---|---|---|
| 10:13:17 | 1 | Q.   Were you the one who suggested that the |
| 10:13:19 | 2 | board be placed underneath Mr. Perez's body? |
| 10:13:22 | 3 | A.   No. |
| 10:13:22 | 4 | Q.   Once that idea was proposed, do you recall |
| 10:13:30 | 5 | what, if anything, was said in response? |
| 10:13:35 | 6 | A.   Which idea? |
| 10:13:36 | 7 | Q.   The idea of placing the board underneath |
| 10:13:39 | 8 | Mr. Perez's body instead of on top, was anything said |
| 10:13:44 | 9 | in response? |
| 10:13:44 | 10 | A.   Yes. |
| 10:13:45 | 11 | Q.   What was said? |
| 10:13:47 | 12 | A.   Someone had said, I believe it was the |
| 10:13:49 | 13 | paramedic said, "We're just going to place the board |
| 10:13:53 | 14 | on his back so you guys can sit on him." |
| 10:13:57 | 15 | Q.   Okay.  Prior to the date of this incident, |
| 10:14:01 | 16 | talking about all of the encounters that we had |
| 10:14:05 | 17 | mentioned just previously, had there ever been a |
| 10:14:10 | 18 | circumstance where that happened, where a backboard |
| 10:14:14 | 19 | was placed on top of a subject in a prone position, |
| 10:14:17 | 20 | and one or more of the officers or deputies was |
| 10:14:20 | 21 | instructed to sit on top of the board? |
| 10:14:23 | 22 | A.   No. |
| 10:14:24 | 23 | Q.   Okay.  And so when you heard that being said |
| 10:14:31 | 24 | by the paramedics, did that give you concern? |
| 10:14:38 | 25 | A.   No. |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

69

| | |
|---|---|
| 10:20:51 | 1 | Mr. Perez's head facing downward? |
| 10:20:59 | 2 | A.  I do not recall. |
| 10:21:00 | 3 | Q.  Was his face facing downward? |
| 10:21:03 | 4 | A.  I do not recall the position of his head. |
| 10:21:05 | 5 | Q.  Was his head still being elevated by the |
| 10:21:08 | 6 | towel at that time? |
| 10:21:12 | 7 | A.  I believe -- yes, it was. |
| 10:21:14 | 8 | Q.  Okay.  So once the backboard was placed on |
| 10:21:22 | 9 | top of his body, the -- his head was still being |
| 10:21:26 | 10 | elevated at that time by the towel? |
| 10:21:28 | 11 | A.  After the board was placed on his body, |
| 10:21:31 | 12 | Deputy McEwen removed the towel and moved off to the |
| 10:21:34 | 13 | side. |
| 10:21:35 | 14 | Q.  Okay.  So up until the point that the |
| 10:21:38 | 15 | backboard was placed on his body, his head was still |
| 10:21:41 | 16 | being elevated by the towel? |
| 10:21:43 | 17 | A.  Yes. |
| 10:21:43 | 18 | Q.  And once it was placed on his body, Deputy |
| 10:21:46 | 19 | McEwen removed the towel and moved over to the left |
| 10:21:48 | 20 | side of his body? |
| 10:21:49 | 21 | A.  Yes. |
| 10:21:50 | 22 | Q.  Kind of in the same location that he was in |
| 10:21:53 | 23 | when Mr. Perez was initially on the ground in the |
| 10:21:58 | 24 | prone position, across from you? |
| 10:22:01 | 25 | A.  I don't recall where Deputy McEwen went to |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

94

10:49:47  1   have turned him over into a supine position?

10:49:51  2       A.  Yes.

10:49:52  3       Q.  And is your training generally that it's

10:50:00  4   easier for someone to breathe when a person is in a

10:50:03  5   supine position as compared to a prone position?

10:50:09  6           MS. O'LINN:  Objection; calls for

10:50:10  7   speculation.  Incomplete hypothetical.

10:50:12  8           You can answer if you know.

10:50:14  9           THE WITNESS:  I do not know.

10:50:16  10  BY MR. GEHLAWAT:

10:50:19  11      Q.  Okay.  Is part --

10:50:20  12          MS. O'LINN:  Do you need a break?

10:50:21  13          THE VIDEOGRAPHER:  This marks the end of

10:50:23  14  media number one.  We are going off the record.  The

10:50:25  15  time is 10:50 a.m.

10:59:25  16                  (Recess taken.)

10:59:25  17          THE VIDEOGRAPHER:  This marks the beginning

10:59:41  18  of media number two.  We are back on the record.  The

10:59:44  19  time is 10:59 a.m.

10:59:46  20  BY MR. GEHLAWAT:

10:59:47  21      Q.  All right.  Officer Calvert, you understand

10:59:49  22  you're still under oath?

10:59:51  23      A.  I do.

10:59:53  24      Q.  Okay.  I believe you said in your interview

11:00:02  25  that you heard one deputy ask Mr. Perez if he could

95

| | | |
|---|---|---|
| 11:00:07 | 1 | breathe at one point.  Do you recall that? |
| 11:00:09 | 2 | A.  Yes. |
| 11:00:10 | 3 | Q.  Okay.  And did Mr. Perez say anything in |
| 11:00:17 | 4 | response? |
| 11:00:18 | 5 | A.  From what I recall, he said, "Yes, I can." |
| 11:00:22 | 6 | Q.  Do you know if that question was asked |
| 11:00:27 | 7 | before or after Mr. -- the backboard was applied onto |
| 11:00:34 | 8 | Mr. Perez's body? |
| 11:00:37 | 9 | A.  From what I recall, it was before. |
| 11:00:40 | 10 | Q.  Was it during the time that Deputy McEwen |
| 11:00:44 | 11 | was holding his face up with a towel? |
| 11:00:49 | 12 | A.  His head up with a towel, yes. |
| 11:00:52 | 13 | Q.  Other than that time, did you ever hear |
| 11:00:56 | 14 | anyone else ask Mr. Perez if he could breathe? |
| 11:01:01 | 15 | A.  Not during that time. |
| 11:01:02 | 16 | Q.  Okay.  How about at all during the 13 to 15 |
| 11:01:09 | 17 | minutes during which time he was in a prone position, |
| 11:01:12 | 18 | other than the one time the deputy asked him if he |
| 11:01:15 | 19 | could breathe and he said he could, did you hear |
| 11:01:20 | 20 | anyone else ask him if he could breathe during that |
| 11:01:22 | 21 | 13- to 15-minute stretch of time? |
| 11:01:23 | 22 | MS. O'LINN:  Just those specific words? |
| 11:01:25 | 23 | MR. GEHLAWAT:  Sure. |
| 11:01:27 | 24 | MS. O'LINN:  Okay. |
| 11:01:28 | 25 | THE WITNESS:  Can you repeat the question? |

PEREZ vs CITY OF FRESNO
Sean Calvert, Wednesday, March 06, 2019

124

```
 1   STATE OF CALIFORNIA )
                         ) ss.
 2   COUNTY OF FRESNO    )

 3

 4        I, Bree Mervin, a Certified Shorthand Reporter

 5   in the State of California, holding Certificate

 6   No. 13057, do hereby certify that SEAN CALVERT, the

 7   witness named in the foregoing deposition, was by me

 8   duly sworn; that said deposition was taken Wednesday,

 9   March 6, 2019, at the time and place set forth on the

10   first page hereof.

11        That upon the taking of the deposition, the

12   words of the witness were written down by me in

13   stenotype and thereafter transcribed by computer under

14   my supervision; that the foregoing is a true and correct

15   transcript of the testimony given by the witness.

16        Pursuant to Federal Rule 30(e), transcript

17   review was requested.

18        I further certify that I am neither counsel for

19   nor in any way related to any party to said action, nor

20   in any way interested in the result or outcome thereof.

21        Dated this 28th day of March, 2019, at

22   Visalia, California.

23        _____

24        Bree Mervin, CSR No. 13057

25

26
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 3

**ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.**
Steve Comstock on 02/27/2019

```
 1                  UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4      ANTHONY PEREZ, individually,
        CECILIA PEREZ, individually,
 5      TERRALEE PEREZ, individually and
        as successor in interest to Joseph
 6      Perez, JOSEPH PEREZ, JR.,

 7                              Plaintiffs,

 8                vs.                       Case No.
                                           1:18-CV-00127-AWI-EPG
 9      CITY OF FRESNO, COUNTY OF FRESNO,
        JAMES ROSETTI, an individual, SEAN
10      CALVERT, an individual, CHRIS
        MARTINEZ, an individual, BRAITHAN
11      STOLTENBERG, an individual, ROBERT

12                              Defendants.

13      _____

14

15                  DEPOSITION OF STEVE COMSTOCK

16

17                      February 27, 2019

18                         9:30 a.m.

19

20              5200 North Palm, Suite 211

21                  Fresno, California

22

23      REPORTED BY:

24      Mikki L. Morse

25      CSR No. 13642
```

```
 1                  UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4    ANTHONY PEREZ, individually,
      CECILIA PEREZ, individually,
 5    TERRALEE PEREZ, individually and
      as successor in interest to Joseph
 6    Perez, JOSEPH PEREZ, JR.,
      individually and as successor in
 7    interest to Joseph Perez, and
      X.P., a minor, by and through his
 8    Guardian ad Litem, MICHELLE PEREZ,
      individually and as successor in
 9    interest to Joseph Perez,

10                                  Plaintiffs,

11              vs.                      Case No.
                                         1:18-CV-00127-AWI-EPG
12    CITY OF FRESNO, COUNTY OF FRESNO,
      JAMES ROSETTI, an individual, SEAN
13    CALVERT, an individual, CHRIS
      MARTINEZ, an individual, BRAITHAN
14    STOLTENBERG, an individual, ROBERT
      MCEWEN, an individual, KARLTON
15    MANASAN, an individual, JIMMY
      ROBNETT, an individual, and DOES
16    1-10, inclusive,

17                                  Defendants.
      _____

18

19

20

21

22

23

24

25
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Steve Comstock on 02/27/2019                              Page 3

```
 1    APPEARANCES:

 2

 3                    For Plaintiffs:

 4                            ALDER LAW, P.C.
                              NEIL K. GEHLAWAT
 5                            1875 Century Park East, Suite 1500
                              Los Angeles, California  90067
 6                            (310) 275-9131
                              ngehlawat@alderlaw.com
 7

 8                    For Defendants CITY OF FRESNO, JAMES ROSETTI,
                      CHRIS MARTINEZ and SEAN CALVERT:
 9
                              MANNING, & KASS, ELLROD, RAMIREZ,
10                            TRESTER, LLP
                              LYNN L. CARPENTER
11                            15th Floor at 801 Tower
                              801 South Figueroa Street
12                            Los Angeles, California  90017
                              (213) 486-2272
13                            llc@manningllp.com

14
                      For Defendants COUNTY OF FRESNO, BRAITHAN
15                    STOLTENBERG, ROBERT MCEWEN, KARLSON MANASAN
                      and JIMMY ROBNETT
16
                              WEAKLEY & ARENDT
17                            JAMES D. WEAKLEY
                              5200 North Palm Avenue, Suite 211
18                            Fresno, California  93704
                              (559) 221-5256
19                            jim@walaw-fresno.com

20

21

22

23

24

25
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Steve Comstock on 02/27/2019                                    Page 20

```
 1        A.   We say -- basically, if you look under

 2   amphetamines, it says, see amphetamine confirmation.  We

 3   don't really call it positive until it's been confirmed on

 4   the GC/MS.

 5        Q.   Okay.

 6        A.   So we basically just tell people, go look down at

 7   the bottom of the page to see what the results are.

 8        Q.   So the GC/MS would be the confirming mechanism,

 9   correct?

10        A.   Correct.

11        Q.   Okay.  Now, underneath amphetamine confirmation

12   GC/MS results, what does that mean?

13        A.   Okay.  Well, this is basically the results that we

14   got off of the GC/MS.  The amphetamine level was 95 nanograms

15   per milliliter.  The methamphetamine level in the blood was

16   2,459 nanograms per milliliter.

17        Q.   Okay.  And then the benzodiazepine confirmation

18   GC/MS results?

19        A.   Basically, we did not see anything in there.

20   That's why, again, we say it's not confirmed positive until

21   we do the confirmation.

22        Q.   All right.  Thank you.

23             Moving on to 6-7.

24        A.   This is the second page that talks about the blood

25   levels.  It has quant levels.  And in this particular case,
```

**ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.**
Steve Comstock on 02/27/2019                                    Page 37

 1   a very, very different result than one who is using it for a

 2   long time.  So you can't really directly give a number for

 3   where you think they are based on how they're acting.  And

 4   there's no absolute number that says below this you're okay

 5   and above this you're under the influence because it depends

 6   on individual tolerance.

 7         Q.    So in the study that you talked about where they

 8   measured the meth levels of persons who have died from the

 9   drug, would it be fair to say that there was a range of

10   levels that were found in those individuals?

11         A.    Absolutely.

12         Q.    Okay.  Did you review the autopsy report in this

13   case?

14         A.    No, I did not.

15         Q.    Okay.  And then you did review the toxicology

16   report, and your name is on part of the documentation,

17   correct?

18         A.    Correct.

19         Q.    Okay.  Based on your review of the records, how

20   much methamphetamine was measured in the blood sample taken

21   from Mr. Perez?

22         A.    2,459 nanograms per milliliter.

23         Q.    Okay.  And after -- so this measurement that you

24   just read, was that confirmed by the gas chromatograph mass

25   spectrometer?

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Steve Comstock on 02/27/2019                                    Page 41

1    whatever they ask us to.

2        Q.   Okay.

3        A.   But as part of the screen, those things are all

4    part of what we look for.  That's part of our standard menu.

5        Q.   Did the level of meth in Mr. Perez's blood measured

6    after his death lead you to form any conclusions about the

7    presence of meth in his system at the time of his death?

8        A.   It was positive.  There was definitely meth in his

9    system, I knew that.

10       Q.   Okay.

11       A.   But beyond that, it is actually a very, very high

12   level.

13       Q.   Okay.  And based on your view of the records and in

14   your training and experience, was the presence of amphetamine

15   in Mr. Perez's blood -- did you draw any conclusions from

16   that?

17       A.   Again, that 10 percent level still holds there.

18   And it's less than 10 percent for the amphetamine versus the

19   methamphetamine, which makes it seem like it was more recent

20   rather than very, very old.

21       Q.   And this level of 2,459 nanograms per milliliter,

22   is that a level that is the same or comparable to other

23   methamphetamine levels in persons' blood or body fluids that

24   you have examined after they've died?

25       A.   You can die at substantially lower levels than

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Steve Comstock on 02/27/2019                                   Page 42

1    that.  I've seen many coroner samples that did not have this

2    much.  However, I would say that this level is in the top one

3    percent of what we ever see in blood for methamphetamine.

4              MR. WEAKLEY:  All right.  Do you have any

5    questions, Mr. Weakley?

6              MR. WEAKLEY:  No, I think you covered them.  I

7    don't have any questions.

8                        EXAMINATION

9    BY MR. GEHLAWAT:

10   Q.   Sir, I just have a couple of questions.

11        Looking at the first page of the documents you

12   provided us with -- I think it's 6-1, the chain of custody

13   and test requisition form.

14        Do you have that in front of you?

15   A.   Yes.

16   Q.   Okay.  Where it says date and time of death, do you

17   have an understanding that that is the date and time of death

18   when the person was pronounced deceased?

19   A.   That would be my understanding, yes.

20   Q.   Okay.

21   A.   But I wasn't there, so I don't know personally.

22   Q.   Understood.

23        But your understanding is, that's when the person

24   was pronounced deceased?

25   A.   Yes.

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Steve Comstock on 02/27/2019                                    Page 54

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF FRESNO         )

 3

 4          I, Mikki L. Morse, CSR No. 13642, Certified

 5   Shorthand Reporter, certify:

 6          That the foregoing proceedings were taken before me

 7   at the time and place therein set forth, at which time the

 8   witness was put under oath by me;

 9          That the testimony of the witness, the questions

10   propounded, and all objections and statements made at the

11   time of the examination were recorded stenographically by me

12   and were thereafter transcribed;

13          That a review of the transcript by the deponent was

14   requested;

15          That the foregoing is a true and correct transcript

16   of my shorthand notes so taken.

17          I further certify that I am not a relative or

18   employee of any attorney of the parties, not financially

19   interested in the action.

20          I declare under penalty of perjury under the laws

21   of California that the foregoing is true and correct.

22          Dated this 28th day of February, 2019.

23

24          _____
            Mikki L. Morse, CSR No. 13642
25
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 4

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION |

```
 3       ANTHONY PEREZ, individually;         )
         CECELIA PEREZ, individually;         )
 4       TERRALEE PEREZ, individually, and    )
         as Successor in Interest to Joseph   )
 5       Perez; JOSEPH PEREZ, JR.,            )
         individually and as Successor in     )
 6       Interest to Joseph Perez; and        )
         X.P., a minor, by and through his    )
 7       Guardian Ad Litem, MICHELLE PEREZ,   )
         individually and as Successor in     )
 8       Interest to Joseph Perez,            )
                                              )
 9            Plaintiffs,                      )
                                              )
10       vs.                                  ) Case No.
                                              ) 1:18-cv-00127
11       CITY OF FRESNO; COUNTY OF FRESNO;    ) AWI(EPG
         AMERICAN AMBULANCE; JAMES            )
12       ROSSETTI, an individual; SEAN        )
         CALVERT, an individual; CHRIS        )
13       MARTINEZ, an individual; BRAITHAN    )
         STOLTENBERG, an individual; ROBERT   )
14       MCEWEN, an individual; KARLSON       )
         MANASAN, an individual; JIMMY        )
15       ROBNETT, an individual; MORGAN       )
         ANDERSON, an individual; and DOES    )
16       1-10, inclusive,                     )
                                              )
17            Defendants.                      )
         _____)
18
19      VIDEOTAPED REMOTE DEPOSITION OF CLARENCE CHAPMAN
20                 Friday, August 27, 2021
21
22
         STENOGRAPHICALLY REPORTED BY:
23
         CLAUDIA CASOTTI-STEVENSON
24       CSR NO. 13617
25       JOB NO.:  241120
```

1

Clarence Chapman                                                      August 27, 2021

```
 1               UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3         ANTHONY PEREZ, individually;      )
           CECELIA PEREZ, individually;      )
 4         TERRALEE PEREZ, individually, and )
           as Successor in Interest to Joseph)
 5         Perez; JOSEPH PEREZ, JR.,          )
           individually and as Successor in  )
 6         Interest to Joseph Perez; and     )
           X.P., a minor, by and through his )
 7         Guardian Ad Litem, MICHELLE PEREZ,)
           individually and as Successor in  )
 8         Interest to Joseph Perez,          )
                                             )
 9              Plaintiffs,                   )
                                             )
10         vs.                               )   Case No.
                                             )   1:18-cv-00127
11         CITY OF FRESNO; COUNTY OF FRESNO; )   AWI(EPG
           AMERICAN AMBULANCE; JAMES          )
12         ROSSETTI, an individual; SEAN     )
           CALVERT, an individual; CHRIS     )
13         MARTINEZ, an individual; BRAITHAN )
           STOLTENBERG, an individual; ROBERT)
14         MCEWEN, an individual; KARLSON    )
           MANASAN, an individual; JIMMY     )
15         ROBNETT, an individual; MORGAN    )
           ANDERSON, an individual; and DOES )
16         1-10, inclusive,                  )
                                             )
17              Defendants.                   )
           _____)

18

19              Videotaped Remote Deposition of CLARENCE

20         CHAPMAN, taken on behalf of the Plaintiffs,

21         commencing at 10:02 a.m. and ending at

22         11:19 a.m., on Friday, August 27, 2021, before

23         Claudia Casotti-Stevenson, CSR No. 13617, a

24         Certified Shorthand Reporter in and for the State

25         of California.
```

2

Clarence Chapman                                                          August 27, 2021

```
1    position, that could interfere with the person's          10:31:26

2    ability to breathe?                                       10:31:29

3        A    Only with further definition and                 10:31:30

4    explanation.                                              10:31:34

5        Q    Okay.  What -- what further details would        10:31:34

6    you need to know?                                         10:31:39

7        A    I would need to know the amount of pressure      10:31:40

8    and the duration of the -- the prone restraint.           10:31:43

9        Q    Okay.  So as -- as far as the training for       10:31:49

10   reasonably well-trained officers in California, what      10:31:54

11   is the training, say, about how much weight needs to      10:31:57

12   be applied in order for it to interfere with the          10:32:00

13   person's ability to breathe?                              10:32:03

14       A    There's no definitive weight as far as           10:32:05

15   poundage or how much pressure can be exerted, but         10:32:09

16   even POST training guidelines say that the most           10:32:15

17   efficient way to apply handcuffs and restrain an          10:32:21

18   individual is in a prone position as long as it's         10:32:25

19   not extensive in time and as long as it is only           10:32:28

20   necessary to complete the -- the goal of controlling      10:32:33

21   a resistive and violently struggling individual.          10:32:38

22       Q    Okay.  Are officers trained that any             10:32:45

23   particular duration of time applying pressure to          10:32:48

24   somebody's back while in a prone position can             10:32:54

25   interfere with their ability to breathe?                  10:32:58
```

                                                                    28

Clarence Chapman                                                    August 27, 2021

| | | |
|---|---|---|
| 1 | A     Yes.   And that period of time would start | 10:33:02 |
| 2 | as soon as the individual is restrained -- | 10:33:05 |
| 3 | Q     Okay. | 10:33:05 |
| 4 | A     -- and controlled. | 10:33:05 |
| 5 | Q     Okay. | 10:33:05 |
| 6 | A     At that point in time they're -- officers | 10:33:07 |
| 7 | are trained to turn them over into what they call | 10:33:09 |
| 8 | the safety position, which is their left side, or | 10:33:13 |
| 9 | sit -- to be sat up or stood up at that time where | 10:33:17 |
| 10 | they are no longer engaged in the struggle to be -- | 10:33:24 |
| 11 | to resist restraint. | 10:33:28 |
| 12 | Q     Okay.   Is that also referred to at times | 10:33:30 |
| 13 | the recovery position? | 10:33:33 |
| 14 | A     Yes.   The recovery position, but the | 10:33:35 |
| 15 | recovery position has many facets.   So like | 10:33:37 |
| 16 | Mr. DeFoe says, it could be recumbent.   It could be | 10:33:41 |
| 17 | sitting up.   It could be standing up or actually | 10:33:44 |
| 18 | laying supine on their back. | 10:33:48 |
| 19 | Q     Okay.   In terms of the safety position that | 10:33:50 |
| 20 | you referenced and -- and that is referenced in | 10:33:54 |
| 21 | POST, why is -- why is it the safety position for | 10:33:59 |
| 22 | somebody to be turned onto his or her side? | 10:34:02 |
| 23 | A     I -- my answer is based on a -- a -- a | 10:34:06 |
| 24 | doctor from San Diego University -- University of | 10:34:14 |
| 25 | San Diego, Dr. Newman.   And he explained it that | 10:34:19 |

29

| | | |
|---|---|---|
| 1 | professional medical care arrived, it was not | 10:47:26 |
| 2 | unreasonable, not excessive to leave Mr. Perez in | 10:47:30 |
| 3 | the prone position and not turn him on his side. | 10:47:34 |
| 4 | Q    Okay.  Let's -- | 10:47:37 |
| 5 | A    If we're talking about less than | 10:47:38 |
| 6 | 10 seconds, that's not sufficient enough to | 10:47:42 |
| 7 | constitute a violation of policy or training. | 10:47:44 |
| 8 | Q    Okay.  So I want you to assume now that the | 10:47:47 |
| 9 | paramedics did not arrive when they did and they | 10:47:49 |
| 10 | arrived 10 minutes later than that.  If Mr. Perez | 10:47:52 |
| 11 | had been restrained in the manner that we know he | 10:47:57 |
| 12 | was, with handcuffs and a leg restraint around his | 10:48:03 |
| 13 | legs, should he have been turned over onto his side? | 10:48:07 |
| 14 | MR. WEAKLEY:  I'm going to object as an | 10:48:12 |
| 15 | incomplete hypothetical and calling for speculation. | 10:48:14 |
| 16 | But go ahead and answer if you can. | 10:48:16 |
| 17 | THE WITNESS:  If it's an extended period of | 10:48:18 |
| 18 | time and it serves no useful purpose to leave him in | 10:48:21 |
| 19 | the prone position, then he -- it -- the -- the -- | 10:48:23 |
| 20 | the officers should have turned him on his side. | 10:48:24 |
| 21 | But I saw no evidence that Mr. Perez ceased | 10:48:27 |
| 22 | struggling at that point in time.  And the best | 10:48:31 |
| 23 | way -- and this is according to POST training out of | 10:48:34 |
| 24 | POST Learning Domain 20 -- that the best way to | 10:48:37 |
| 25 | maintain control of an individual who is violently | 10:48:41 |

37

Clarence Chapman                                                    August 27, 2021

```
 1   struggling is in the prone position.            10:48:44

 2   BY MR. GEHLAWAT:                                 10:48:45

 3       Q    Okay.  So if -- if Mr. Perez has nylon  10:48:46

 4   straps around his legs or ankles and he's        10:48:58

 5   handcuffed, that obviously limits his ability to -- 10:49:01

 6   to hurt the officers or deputies; true?          10:49:04

 7           MR. WEAKLEY:  Objection.  Speculation,   10:49:08

 8   vague.                                           10:49:09

 9           THE WITNESS:  Well, when you say         10:49:10

10   "eliminate," it doesn't eliminate.  It reduces the 10:49:14

11   possibility of what Mr. Perez can do as far as   10:49:16

12   personal weapons.  In other words, it eliminates his 10:49:20

13   ability to kick.  It eliminates his ability to throw 10:49:25

14   fist punches, but it doesn't eliminate the fact that 10:49:28

15   he can still struggle.  He can still resist the  10:49:31

16   officers, and, you know, constitute a justifiable 10:49:34

17   reason to leave him in the prone position.       10:49:42

18   Unfortunately the -- the body-worn camera footage 10:49:44

19   doesn't show the whole picture.  So it's hard for me 10:49:48

20   to dispute what the officers say.                10:49:51

21   BY MR. GEHLAWAT:                                 10:49:54

22       Q    Okay.  Based on what you did see from the 10:49:55

23   body-worn camera footage, if after -- if the     10:49:57

24   paramedics had not arrived on scene, once the -- the 10:50:02

25   RIPP restraint had been applied to Mr. Perez's legs, 10:50:09
```

                                                                    38

Clarence Chapman                                                    August 27, 2021

```
 1    there's -- there's nothing physically going on that    10:52:28

 2    threatens the well-being of the peace officers.        10:52:29

 3        Q    So once he stops actively resisting, they    10:52:32

 4    should turn him over onto his side; true?              10:52:36

 5        A    Yes.  Once the officers are satisfied that   10:52:39

 6    he is no longer a physical threat, yes, turn him       10:52:41

 7    over on his side.                                      10:52:45

 8        Q    Okay.  Now -- now, you said that once the    10:52:46

 9    paramedics arrived, then the deputies and officers     10:52:54

10    turn -- turned things over to the paramedic and EMTs   10:52:59

11    who showed up on scene; correct?                       10:53:04

12        A    That is correct.                              10:53:06

13        Q    And they were to follow the direction of     10:53:06

14    paramedics and EMTs; correct?                          10:53:09

15        A    Correct.                                      10:53:10

16        Q    But you do agree that officers and deputies  10:53:11

17    have to follow their own training at all times;        10:53:14

18    correct?                                               10:53:19

19        A    Their train -- peace officer training,       10:53:19

20    correct.                                               10:53:23

21        Q    Yes.  So, for example, if a paramedic asked  10:53:24

22    an officer or deputy to do something that did not      10:53:27

23    comply with their own police training, the officers    10:53:30

24    are expected to follow their own training under        10:53:34

25    those circumstances; true?                             10:53:37
```

                                                                    41

Clarence Chapman                                                    August 27, 2021

```
 1   was doing.  The officers were restraining him so      11:08:03

 2   that they wouldn't get hurt and for the benefit of    11:08:06

 3   the well-being also of Mr. Perez so he wouldn't get   11:08:10

 4   hurt.                                                 11:08:13

 5       Q    Well -- well, hold on.  Mr. Chapman, when    11:08:13

 6   did he ever try and punch any officer or deputy?      11:08:16

 7       A    He didn't.  But if you read the documents,   11:08:20

 8   when he was first seen at the -- in the intersection  11:08:23

 9   out in the street, he was punching at an imaginary    11:08:28

10   enemy.  Even when he was sitting on the curb and he   11:08:32

11   was -- before he was restrained in handcuffs, he was  11:08:36

12   punching and -- and yelling, "Get off of me.  Get     11:08:39

13   away from me," to some -- something that wasn't       11:08:41

14   there.                                                11:08:44

15       Q    Okay.                                        11:08:45

16       A    So in his imagination, based on whatever --  11:08:45

17   you know, his altered state of consciousness and --   11:08:50

18   and whatever caused it, he was hallucinating.  And    11:08:52

19   people who hallucinate strike out at imaginary        11:08:56

20   images that are created in his head.  So he was a --  11:09:01

21   a threat.  He was a credible threat at that point,    11:09:05

22   and I think even civilian witnesses attest to how     11:09:08

23   violently he was acting even when he was by himself.  11:09:14

24       Q    Which civilian witnesses are you referring  11:09:18

25   to?                                                   11:09:20
```

                                                                    53

Clarence Chapman                                          August 27, 2021

```
 1       A      There was -- there was testimony -- I think    11:09:20
 2   Sergeant Rossetti was talking to an individual on a       11:09:24
 3   bus bench, and I think he was talking to another          11:09:29
 4   female who was using a cell phone, and they were          11:09:32
 5   describing the bizarre behavior of Perez.  Obviously      11:09:34
 6   the Fresno city police officers came upon this just       11:09:40
 7   as an observation.  They were passing by.                 11:09:44
 8            But there were 911 calls to the sheriff's        11:09:48
 9   department, and I think they all described this           11:09:50
10   bizarre behavior of Mr. Perez in the street,             11:09:53
11   punching at cars, punching in the air.  So to any        11:09:57
12   reasonably trained police officer, that would           11:10:00
13   represent a threat to his or her safety and             11:10:03
14   well-being.                                              11:10:07
15       Q      Okay.  But you do recall me asking each       11:10:07
16   officer and deputy the specific question, "Did he       11:10:10
17   punch you?"  "Did he kick you?"  Do you recall me       11:10:13
18   asking that question of every officer and deputy?       11:10:17
19       A      Yes.  Yes, I do.  Yes, sir.                   11:10:20
20       Q      Okay.  And each of the officers and          11:10:21
21   deputies all said "no" to those questions; true?       11:10:24
22       A      That's true.                                 11:10:26
23       Q      All right.  Okay.  I would propose           11:10:28
24   that we --                                               11:10:31
25            MR. WEAKLEY:  Neil, can we take a break?       11:10:32
```

                                                                54

```
 1    STATE OF CALIFORNIA     )
                              ) SS.
 2    COUNTY OF LOS ANGELES   )

 3

 4            I, CLAUDIA CASOTTI-STEVENSON, do hereby

 5    certify:

 6            That I am a duly qualified Certified

 7    Shorthand Reporter, in and for the State of

 8    California, holder of certificate number 13617,

 9    which is in full force and effect and that I am

10    authorized to administer oaths and affirmations;

11            That the foregoing deposition testimony of

12    the herein named witness was taken before me at the

13    time and place herein set forth;

14            That prior to being examined, the witness

15    named in the foregoing deposition, was duly sworn or

16    affirmed by me, to testify the truth, the whole

17    truth, and nothing but the truth;

18            That the testimony of the witness and all

19    objections made at the time of the examination were

20    recorded stenographically by me, and were thereafter

21    transcribed under my direction and supervision;

22            That the foregoing pages contain a full,

23    true and accurate record of the proceedings and

24    testimony to the best of my skill and ability;

25            That prior to the completion of the
```

59

1    foregoing deposition, review of the transcript was

2    requested.

3            I further certify that I am not a relative

4    or employee or attorney or counsel of any of the

5    parties, nor am I a relative or employee of such

6    attorney or counsel, nor am I financially interested

7    in the outcome of this action.

8

9            IN WITNESS WHEREOF, I have subscribed my

10   name this 9th day of September, 2021.

11

12

13   _____

14   CLAUDIA CASOTTI-STEVENSON, CSR No. 13671

15

16

17

18

19

20

21

22

23

24

25

                                                      60

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 5

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Scott DeFoe on 08/06/2021

```
 1                 UNITED STATES DISTRICT COURT

 2         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3   ANTHONY PEREZ, individually,  )
     CECELIA PEREZ, individually,  )
 4   TERRALEE PEREZ, individually, )
     and as Successor in Interest  )
 5   to Joseph Perez, JOSEPH PEREZ,) CASE NO. 1:18-cv-00127
     JR., individually and as      ) AWI (EPG)
 6   Successor in Interest to      )
     Joseph Perez, and             )
 7   X.P., a minor, by and through )
     his Guardian Ad Litem,        )
 8   MICHELLE PEREZ,) individually )
     and as Successor in Interest  )
 9   to Joseph Perez,              )
                                   )
10              Plaintiffs,        )
                                   )
11        vs.                      )
                                   )
12   CITY OF FRESNO, COUNTY OF     )
     FRESNO, AMERICAN AMBULANCE,   )
13   JAMES ROSSETTI, an individual,)
     SEAN CALVERT, an individual,  )
14   CHRIS MARTINEZ, an individual,)
     BRAITHAN STOLTENBERG, an      )
15   individual, ROBERT MCEWEN, an )
     individual, KARLSON MANASAN,  )
16   an individual, JIMMY ROBNETT, )
     an individual, MORGAN         )
17   ANDERSON, and DOES 1-10,      )
     inclusive,                    )
18                                 )
                Defendants.        )
19   _____)

20              REMOTE DEPOSITION OF SCOTT DEFOE

21            HUNTINGTON BEACH, CALIFORNIA

22               FRIDAY, AUGUST 6, 2021

23

24   STENOGRAPHICALLY REPORTED BY:
     Valerie C. Rodriguez
25   CSR No. 12871 (orig 6980)
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Scott DeFoe on 08/06/2021                                    Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3   ANTHONY PEREZ, individually,   )
     CECELIA PEREZ, individually,   )
 4   TERRALEE PEREZ, individually,  )
     and as Successor in Interest   )
 5   to Joseph Perez, JOSEPH PEREZ, ) CASE NO.1:18-cv-00127
     JR., individually and as       ) AWI (EPG)
 6   Successor in Interest to       )
     Joseph Perez, and              )
 7   X.P., a minor, by and through  )
     his Guardian Ad Litem,         )
 8   MICHELLE PEREZ,) individually  )
     and as Successor in Interest   )
 9   to Joseph Perez,               )
                                    )
10              Plaintiffs,         )
                                    )
11        vs.                       )
                                    )
12   CITY OF FRESNO, COUNTY OF      )
     FRESNO, AMERICAN AMBULANCE,    )
13   JAMES ROSSETTI, an individual,)
     SEAN CALVERT, an individual,   )
14   CHRIS MARTINEZ, an individual,)
     BRAITHAN STOLTENBERG, an       )
15   individual, ROBERT MCEWEN, an )
     individual, KARLSON MANASAN,   )
16   an individual, JIMMY ROBNETT,  )
     an individual, MORGAN          )
17   ANDERSON, and DOES 1-10,       )
     inclusive,                     )
18                                  )
                Defendants.         )
19   _____    )

20   REMOTE DEPOSITION OF SCOTT DEFOE, TAKEN ON BEHALF OF THE

21   DEFENDANTS, IN HUNTINGTON BEACH, CALIFORNIA, COMMENCING

22    AT 11:03 a.m. AND ENDING AT 3:12 p.m. PACIFIC TIME, ON

23    FRIDAY, AUGUST 6, 2021, BEFORE VALERIE C. RODRIGUEZ,

24      CERTIFIED SHORTHAND REPORTER NO. 12871 (ORIGINALLY

25                       6980).
```

```
 1    APPEARANCES:

 2
           FOR PLAINTIFF ANTHONY PEREZ, ET AL.:
 3
               TAYLOR & RING
 4             BY:  NEIL K. GEHLAWAT, ESQ.
               1230 ROSECRANS AVENUE
 5             SUITE 360
               MANHATTAN BEACH, CALIFORNIA 90266
 6             TEL:    310.209.4100
               EMAIL:  GEHLAWAT@TAYLORRING.COM
 7             VIA ZOOM

 8
           FOR DEFENDANT CITY OF FRESNO, OFFICERS JAMES
 9         ROSSETTI, SEAN CALVERT AND CHRIS MARTINEZ:

10             MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
               BY:  LYNN CARPENTER, ESQ.
11             801 SOUTH FIGUEROA STREET
               15TH FLOOR
12             LOS ANGELES, CALIFORNIA 90017
               TEL:    213.624.6900
13             EMAIL:  LLC@MANNINGLLP.COM
               VIA ZOOM
14

15         FOR DEFENDANTS:  COUNTY OF FRESNO, BRAITHAN
           STOLTENBERG, ROBERT MCEWEN, KARLSON MANASAN
16         AND JIMMY ROBNETT

17             WEAKLEY & ARENDT
               BY: JAMES D. WEAKLEY, ESQ.
18             AMES D. WEAKLEY, ESQ
               SUITE 211
19             FRESNO, CALIFORNIA 92704
               TEL:    559.221.5256
20             EMAIL:  JIM@WALAW-FRESNO.COM
               VIA ZOOM
21

22

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2
          FOR THE DEFENDANTS MORGAN ANDERSON AND
 3        K.W.P.H. ENTERPRISES, INC., A CALIFORNIA
          CORPORATION DBA AMERICAN AMBULANCE:
 4

 5              R.J. RYAN LAW, APC
                BY:  RICK RYAN, ESQ.
 6              500 NORTH BRAND BOULEVARD
                SUITE 950
 7              GLENDALE, CALIFORNIA 91203
                TEL:   818.956.2407
 8              EMAIL:  RICK@RJRYANLAW.COM
                (VIA ZOOM)
 9

10    ALSO PRESENT:

11              CHIEF PHILLIP SANCHEZ
                ASHLEY REYES
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Scott DeFoe on 08/06/2021                                    Page 54

1        A    To my understanding, there was some sedation,

2    yes.

3        Q    Based on your training and experience as a DRE,

4    persons under the influence of methamphetamine can

5    behave in a violent manner.  Based on your training and

6    experience, persons that are under the influence of

7    methamphetamine, can they also be prone to acts of

8    aggression?

9        A    Possibly, yes.

10       Q    In your law enforcement training and

11   experience, are you familiar with Welfare and

12   Institutions Code Section 5150?

13       A    Yes, ma'am.

14       Q    What is Welfare and Institutions Code 5150 --

15   or as commonly referred to as a 5150 hold?

16       A    It's basically when a person, as a result of a

17   mental health disorder, is a danger to others, or

18   himself, or gravely disabled, a peace officer upon

19   probable cause can take or cause to be taken the person

20   into custody for a period up to 72 hours for assessment,

21   evaluation, and crisis intervention.

22       Q    When you were a law enforcement officer working

23   in patrol for the Los Angeles Police Department, did you

24   ever have the occasion to take a subject into custody on

25   a Welfare and Institutions Code 5150 hold?

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Scott DeFoe on 08/06/2021                                    Page 55

```
 1        A    Many times, ma'am.

 2        Q    How many times would you estimate that that

 3   happened in the course of your law enforcement career?

 4        A    As an officer, sergeant and detective,

 5   definitely north of 50-plus times.  Then in SWAT, we

 6   responded to barricaded subjects who may be suicidal.

 7   Many of those times, because there wasn't a crime

 8   committed, that individual may have been taken into

 9   custody for 5150.

10        So probably another 50-plus times on barricaded

11   subject incidents, where that individual is a danger to

12   self or others, and was taken into custody based on

13   probable cause for that very reason.

14        Q    In your law enforcement training and

15   experience, if a subject is being taken into custody on

16   a 5150 hold, exhibiting signs and symptoms of being

17   under the influence of methamphetamine, to include acts

18   of aggression and violence, officers are trained to

19   restrain that individual for the safety of the subject,

20   as well as the officers, true?

21        A    Properly restrain them, yes.

22        Q    According to standard police practices, if an

23   officer has reasonable suspicion that under the totality

24   of the circumstances that a person is presently engaged

25   or engaging in a crime, the officer may lawfully detain
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Scott DeFoe on 08/06/2021                                    Page 56

 1   that person, true?

 2        A    Yes.  But once again, you have to look at the

 3   scope, manner, and duration of the detention as well,

 4   ma'am.

 5        Q    According to standard police practices, there

 6   are different levels of force that an officer can use,

 7   depending on whether it is objectively reasonable under

 8   the totality of the circumstances.

 9             Would you agree with that?

10        A    I agree that officers can use reasonable force

11   to effect an arrest, prevent escape, or overcome

12   resistance of a subject they are placing into custody.

13        Q    According to standard police practices, manual

14   restraints would be considered low level, non-deadly

15   force, true?

16        A    If used properly, yes, ma'am.

17        Q    According to standard police practices, body

18   strikes are considered to be low level force, true?

19        A    It depends, ma'am.  Typically, an intermediate

20   use of force, if you're looking at body strikes, similar

21   to that of an impact weapon, knees to the sternum or to

22   the chest or to the abdomen area, can be considered

23   intermediate use of force, depending once again on the

24   department's policies and specifically, most

25   importantly, depending on the totality of the

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Scott DeFoe on 08/06/2021                              Page 57

```
 1   circumstances.
 2        Q    Would you agree that according to standard
 3   police practices, body strikes or knee strikes would be
 4   considered low level and/or intermediate level
 5   non-deadly force, true?
 6        A    To the torso, they can be -- if they're knee
 7   strikes to the head, they can be lethal force.  But
 8   typically, yes, it's going to be based on an
 9   intermediate level.  I wouldn't say a low level use of
10   force.  A knee strike to the abdomen or knee area, if
11   someone is in a prone position, could be considered an
12   intermediate level of force, ma'am.
13        Q    According to standard police practices, control
14   holds are considered to be low level, non-deadly force,
15   true?
16        A    It depends, ma'am.  Carotid restraint holds,
17   which used to be considered a control hold, can be a
18   lethal use of force in some cases, ma'am.
19        Q    Your understanding is that carotid restraints
20   have generally been prohibited in the advent of the
21   George Floyd case, correct?
22        A    In some agencies.  I think there were four or
23   five matters since the George Floyd matter where there
24   was a neck restraint used and that resulted in a death
25   of a subject.
```

```
 1              Typically, my old agency looked at -- that

 2    being the Los Angeles Police Department, looked at the

 3    use of the carotid restraint, even when I came on,

 4    almost parallel with that being use of lethal force.

 5    Many departments have had a much more liberal policy.

 6              But you're right.  Since the George Floyd case,

 7    many departments have augmented or completely banned the

 8    use of neck restraints as part of their use of force

 9    continuum.

10         Q    So according to standard police practices,

11    control hold -- and I'm not referring to a carotid

12    restraint or a carotid hold, but generally speaking,

13    carotid [sic] holds are considered to be low level

14    non-deadly force, correct?

15              MR. GEHLAWAT:  You mean controlled?

16              THE WITNESS:  Non-carotid restraints.  Just to

17    clarify, you mentioned carotid, but control holds, wrist

18    locks, twist locks, joint locks, shoulder locks, they

19    are considered to be low level use of force, typically.

20    That's typically your lower level use of force on most

21    departments' use of force policies.

22    BY MS. CARPENTER:

23         Q    According to standard police practices, a

24    controlled take-down maneuver would also be considered a

25    low level non-deadly force, true?
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Scott DeFoe on 08/06/2021                              Page 59

1        A    It depends.  Once again, if the person is taken

2    down on cement, many times during take-downs -- it could

3    be a team take-down or an individual tackle -- subjects

4    have suffered traumatic brain injury and even death as a

5    result of the take-down.  So if done properly, then a

6    take-down could be a reasonable lower level to immediate

7    use of force.  Once again, depending on the ground,

8    the -- obviously, the force used to take that individual

9    down.  It just depends.

10        Q    And according to standard police practices, you

11    would agree that when officers are allowed to use low

12    level non-deadly force, the standard that officers are

13    trained on is that they are authorized to use such force

14    when it is objectively reasonable under the totality of

15    the circumstances, from the perspective of a reasonable

16    peace officer, to effect an arrest, overcome resistance,

17    or to prevent escape?

18        A    Yes, based on the subject's level of

19    resistance.

20        Q    And according to standard police practices,

21    officers are trained that they can use low level

22    non-deadly force when, from the perspective of a

23    reasonable peace officer, it is objectively reasonable

24    under the totality of the circumstances to overcome a

25    threat of harm to the officer or others?

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Scott DeFoe on 08/06/2021                                Page 60

1         A    Yes, ma'am.

2         Q    According to standard police practices, you

3    would agree that deadly force is force that is

4    substantially likely to cause death or serious body

5    injury at the time it is deployed, true?

6         A    Yes, ma'am.

7         Q    According to standard police practices, would

8    you agree that officers are trained that every peace

9    officer has a lawful right of self-defense, true?

10         A    Yes, ma'am.

11         Q    You mentioned the term "hog-tie" in your

12    report.  Based on your law enforcement training and

13    experience, what is your understanding of that term,

14    "hog-tie"?

15         A    Basically, when the person is in a prone

16    position, the legs are typically restrained by the use

17    of a RIPP Hobble restraint device, the legs are pushed

18    towards the buttocks where there's pressure put on

19    there.  Then the RIPP Hobble restraint device or some

20    type of device is used to attach the actual ankles to

21    the handcuffs and/or the belt, putting that person in a

22    position where their breathing or respiratory -- ability

23    to breathe is compromised based on the position, in

24    conjunction with force that may be applied to that

25    individual when they're in the prone position and while

1       CERTIFIED STENOGRAPHIC REPORTER'S CERTIFICATION

2

3             I, Valerie C. Rodriguez, a Certified Shorthand

4       Reporter for the State of California, do hereby certify:

5             That prior to being examined, SCOTT DEFOE, the

6       witness named in the foregoing proceedings, was by me

7       duly sworn remotely;

8             That said proceedings were taken before me at

9       the time and place set forth herein and was

10      stenographically reported by me, and I hereby certify

11      that said proceedings are a full, true, and correct

12      transcript of my shorthand notes so taken; that the

13      dismantling, unsealing, or unbinding of the original

14      transcript will render the reporter's certificate null

15      and void.

16            I further certify that I am neither counsel

17      for, nor related to any party to said action, nor in any

18      way interested in the outcome thereof.

19            IN WITNESS WHEREOF, I have subscribed my name

20      this 20th day of August, 2021.

21

23                           _____
                             VALERIE C. RODRIGUEZ
24                           CSR No. 12871 (orig. 6980)

25

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 6

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Joel Dines, EMT on 02/18/2019

```
 1              UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4    ANTHONY PEREZ, individually,
      CECILIA PEREZ, individually,
 5    TERRALEE PEREZ, individually and
      as successor in interest to Joseph
 6    Perez, JOSEPH PEREZ, JR.,

 7                          Plaintiffs,

 8              vs.                      Case No.
                                        1:18-CV-00127-AWI-EPG
 9    CITY OF FRESNO, COUNTY OF FRESNO,
      JAMES ROSETTI, an individual, SEAN
10    CALVERT, an individual, CHRIS
      MARTINEZ, an individual, BRAITHAN
11    STOLTENBERG, an individual, ROBERT

12                          Defendants.

13    _____

14

15         VIDEOTAPED DEPOSITION OF JOEL DINES, EMT

16

17                   February 18, 2019

18                      9:50 a.m.

19

20            5200 North Palm, Suite 211

21               Fresno, California

22

23    REPORTED BY:

24    Mikki L. Morse

25    CSR No. 13642
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Joel Dines, EMT on 02/18/2019                                    Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2           EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4    ANTHONY PEREZ, individually,
      CECILIA PEREZ, individually,
 5    TERRALEE PEREZ, individually and
      as successor in interest to Joseph
 6    Perez, JOSEPH PEREZ, JR.,
      individually and as successor in
 7    interest to Joseph Perez, and
      X.P., a minor, by and through his
 8    Guardian ad Litem, MICHELLE PEREZ,
      individually and as successor in
 9    interest to Joseph Perez,

10                              Plaintiffs,

11              vs.                      Case No.
                                         1:18-CV-00127-AWI-EPG
12    CITY OF FRESNO, COUNTY OF FRESNO,
      JAMES ROSETTI, an individual, SEAN
13    CALVERT, an individual, CHRIS
      MARTINEZ, an individual, BRAITHAN
14    STOLTENBERG, an individual, ROBERT
      MCEWEN, an individual, KARLTON
15    MANASAN, an individual, JIMMY
      ROBNETT, an individual, and DOES
16    1-10, inclusive,

17    _____  Defendants.

18    _____

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3                   For Plaintiffs:

 4                       ALDER LAW, P.C.
                         NEIL K. GEHLAWAT
 5                       1875 Century Park East, Suite 1500
                         Los Angeles, California  90067
 6                       (310) 275-9131
                         ngehlawat@alderlaw.com
 7

 8                   For Defendants CITY OF FRESNO, JAMES ROSETTI,
                     CHRIS MARTINEZ and SEAN CALVERT:
 9
                         MANNING, & KASS, ELLROD, RAMIREZ,
10                       TRESTER, LLP
                         LYNN L. CARPENTER
11                       15th Floor at 801 Tower
                         801 South Figueroa Street
12                       Los Angeles, California  90017
                         (213) 486-2272
13                       llc@manningllp.com

14

15                   For Defendants COUNTY OF FRESNO, BRAITHAN
                     STOLTENBERG, ROBERT MCEWEN, KARLSON MANASAN
16                   and JIMMY ROBNETT

17                       WEAKLEY & ARENDT
                         JAMES D. WEAKLEY
18                       5200 North Palm Avenue, Suite 211
                         Fresno, California  93704
19                       (559) 221-5256
                         jim@walaw-fresno.com

20

21                   Also Present:

22                       Sergeant James Rosetti, Defendant
                         Chris Martinez, Defendant
23                       Sean Calvert, Defendant
                         Loren Bogart, Videographer
24

25
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Joel Dines, EMT on 02/18/2019                                    Page 26

1    will point you to the exact page and the exact line.  Okay?

2         A.   Okay.

3              MS. CARPENTER:  All right.  Counsel, is that

4    acceptable?

5              MR. GEHLAWAT:  Yes.

6    BY MS. CARPENTER:

7         Q.   Okay.  Now, during your interview, you stated that

8    you looked and there were officers holding the patient's face

9    up with white fabric, correct?

10        A.   Yeah.  With, like, a white towel or white fabric.

11        Q.   Okay.  And then you also stated that the patient

12   was actively resisting the officers when the fabric was on

13   his face, correct?

14        A.   That's correct.

15        Q.   And what did you mean by that?

16        A.   He was physically resisting and verbally making --

17   yelling.

18        Q.   And when you say "physically resisting," that can

19   mean a lot of different things.  What was he specifically

20   doing with his body that caused you to say in your statement

21   that he was actively resisting the officers?

22        A.   Trying to get off the ground.

23        Q.   And at that particular point, could you see how

24   many officers were trying to keep him from moving?

25        A.   I never counted, but more than five.

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Joel Dines, EMT on 02/18/2019                                        Page 99

1            So based on your testimony, Mr. Perez was still

2     resisting and fighting with the officers up until the point

3     at which the restraint board was placed on his back, correct?

4         A.   Correct.

5         Q.   And then based on your previous testimony, he

6     continued to resist and fight and was combative after the

7     restraint board was placed on top of him, correct?

8         A.   Correct.

9         Q.   And was Mr. Perez vocalizing and yelling up to the

10    point before the restraint board was placed on top of him?

11        A.   Before, yes.

12        Q.   And was he -- did he continue to vocalize and yell

13    after the restraint board was placed on top of him?

14        A.   Yes, I believe so.

15        Q.   Now, on the way to the hospital, were you delayed

16    at all in your ability to transport Mr. Perez to the

17    emergency room?

18        A.   Yes.

19        Q.   How were you delayed?

20        A.   On the -- we were going to Fresno Community, RMC,

21    and the -- the shortest route was interrupted by the train.

22    And the train crossing guards came down, and the train

23    passed.  We were delayed by the train.

24        Q.   And how long would you say was the length of your

25    delay that was caused by the train?

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Joel Dines, EMT on 02/18/2019                              **Page 110**

```
 1   STATE OF CALIFORNIA        )
                                )
 2   COUNTY OF FRESNO           )

 3

 4           I, Mikki L. Morse, CSR No. 13642, Certified

 5   Shorthand Reporter, certify:

 6           That the foregoing proceedings were taken before me

 7   at the time and place therein set forth, at which time the

 8   witness was put under oath by me;

 9           That the testimony of the witness, the questions

10   propounded, and all objections and statements made at the

11   time of the examination were recorded stenographically by me

12   and were thereafter transcribed;

13           That a review of the transcript by the deponent was

14   requested;

15           That the foregoing is a true and correct transcript

16   of my shorthand notes so taken.

17           I further certify that I am not a relative or

18   employee of any attorney of the parties, not financially

19   interested in the action.

20           I declare under penalty of perjury under the laws

21   of California that the foregoing is true and correct.

22           Dated this 21st day of February, 2019.

23

24           _____
             Mikki L. Morse, CSR No. 13642
25
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 7

```
 1                    UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4
                                          )
 5   ANTHONY PEREZ, individually,         )
     CECELIA PEREZ, individually,         )
 6   TERRALEE PEREZ, individually, and    )
     as Successor in Interest to          )
 7   Joseph Perez, JOSEPH PEREZ, JR.,     )
     individually and as Successor in     )
 8   Interest to Joseph Perez, and        )
     X.P., a minor, by and through his    )
 9   Guardian Ad Litem, MICHELLE PEREZ,   )
     individually and as Successor in     )
10   Interest to Joseph Perez,            )
                                          )
11              Plaintiffs,               )
                                          )
12        vs.                             ) Case No. 1:18-cv-00127
                                          )          AWI (EPG)
13   CITY OF FRESNO, COUNTY OF FRESNO,    )
     AMERICAN AMBULANCE,                  )
14   JAMES ROSSETTI, an individual,       )
     SEAN CALVERT, an individual,         )
15   CHRIS MARTINEZ, an individual,       )
     BRAITHAN STOLTENBERG, an             )
16   individual, ROBERT MCEWEN, an        )
     individual, KARLSON MANASAN, an      )
17   individual, JIMMY ROBNETT, an        )
     individual, MORGAN ANDERSON, and     )
18   DOES 1-10, inclusive,                )
                                          )
19              Defendants.               )

20

21          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

22          30(B)(6) WITNESS DEPUTY KARLA KEELEY

23          WEDNESDAY, APRIL 28, 2021; 10:12 A.M.

24

25      Reported by Shandy Layne Bush, CSR No. 10213, RPR
```

                                                                    1

Karla Keeley                                                          April 28, 2021

```
 1                  UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3


 4                                        )
      ANTHONY PEREZ, individually,        )
 5    CECELIA PEREZ, individually,        )
      TERRALEE PEREZ, individually, and   )
 6    as Successor in Interest to         )
      Joseph Perez, JOSEPH PEREZ, JR.,    )
 7    individually and as Successor in    )
      Interest to Joseph Perez, and       )
 8    X.P., a minor, by and through his   )
      Guardian Ad Litem, MICHELLE PEREZ,  )
 9    individually and as Successor in    )
      Interest to Joseph Perez,           )
10                                        )
                 Plaintiffs,              )
11                                        )
         vs.                              )Case No. 1:18-cv-00127
12                                        )        AWI (EPG)
      CITY OF FRESNO, COUNTY OF FRESNO,   )
13    AMERICAN AMBULANCE,                 )
      JAMES ROSSETTI, an individual,      )
14    SEAN CALVERT, an individual,        )
      CHRIS MARTINEZ, an individual,      )
15    BRAITHAN STOLTENBERG, an            )
      individual, ROBERT MCEWEN, an       )
16    individual, KARLSON MANASAN, an     )
      individual, JIMMY ROBNETT, an       )
17    individual, MORGAN ANDERSON, and    )
      DOES 1-10, inclusive,               )
18                                        )
                 Defendants.              )
19

20

21


22       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF 30(B)(6)

23    WITNESS DEPUTY KARLA KEELEY, taken on Wednesday, April 28,

24    2021, at 10:12 a.m., before Shandy Layne Bush, Certified

25    Shorthand Reporter, in and for the State of California.
```

                                                                    2

```
 1    APPEARANCES OF COUNSEL

 2        For the Plaintiffs:

 3            TAYLOR & RING
              BY:  NEIL K. GEHLAWAT, ESQ.
 4            (VIA REMOTE ZOOM)
              1230 Rosecrans Avenue, Suite 360
 5            Manhattan Beach, California  90266
              (310) 209-4100 / gehlawat@taylorring.com
 6
          For the Defendants COUNTY OF FRESNO, BRAITHAN
 7        STOLTENBERG, ROBERT McEWEN, KARLSON MANASAN and
          JIMMY ROBNETT:
 8
              WEAKLEY & ARENDT
 9            BY:  JAMES D. WEAKLEY, ESQ.
              (VIA REMOTE ZOOM)
10            5200 North Palm Avenue, Suite 211
              Fresno, California  92704
11            (559) 221-5256 / jim@walaw-fresno.com

12        For the Defendants CITY OF FRESNO, OFFICERS JAMES
          ROSSETTI, SEAN CALVERT and CHRIS MARTINEZ:
13
              MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
14            BY:  MILDRED K. O'LINN, ESQ.
              (VIA REMOTE ZOOM)
15            801 South Figueroa Street, Fifteenth Floor
              Los Angeles, California  90017-3012
16            (213) 624-6900 / mko@manningllp.com

17        For the Defendants MORGAN ANDERSON and K.W.P.H.
          ENTERPRISES, INC., a California corporation dba
18        AMERICAN AMBULANCE:

19            R.J. RYAN LAW, APC
              BY:  NIKKO S. STEVENS, ESQ.
20            (VIA REMOTE ZOOM)
              500 North Brand Boulevard, Suite 950
21            Glendale, California  91203
              (818) 956-2407 / nikko@rjryanlaw.com
22

23    ALSO PRESENT:   CAPTAIN JOE ALVAREZ
                      JASON PATSALIS, VIDEOGRAPHER
24                    (VIA REMOTE ZOOM)

25
```

                                                          3

Karla Keeley                                                                  April 28, 2021

| | | |
|---|---|---|
| 1 | Q    As were a paramedic and two EMTs from American | 10:23:16 |
| 2 | Ambulance? | 10:23:22 |
| 3 | A    Yes. | 10:23:22 |
| 4 | Q    Okay.  Did you review any deposition transcripts | 10:23:22 |
| 5 | to prepare for your deposition today? | 10:23:27 |
| 6 | A    No, I did not. | 10:23:29 |
| 7 | MR. GEHLAWAT:  All right.  Okay.  Now, what I'll | 10:23:31 |
| 8 | do is mark next in order the County of Fresno's Objections | 10:23:36 |
| 9 | to Plaintiffs' Notice of the Taking of Deposition of the | 10:23:42 |
| 10 | County of Fresno Pursuant to FRCP 30(b)(6), and Requests | 10:23:46 |
| 11 | for Production of Documents.  That's a 13-page document. | 10:23:50 |
| 12 | We'll mark that as Exhibit 2. | 10:23:53 |
| 13 | (Exhibit 2 marked) | 10:23:57 |
| 14 | BY MR. GEHLAWAT: | 10:23:58 |
| 15 | Q    Okay.  Let's start with Category No. 1.  So | 10:23:58 |
| 16 | Category No. 1 are -- is the Fresno County Sheriff's | 10:24:09 |
| 17 | Department's policies and procedures with respect to | 10:24:14 |
| 18 | positional and/or restraint asphyxia in effect at the time | 10:24:17 |
| 19 | of the incident. | 10:24:19 |
| 20 | What policies would be responsive to this -- to | 10:24:23 |
| 21 | this topic?  Would that be Policy 300 and Policy 302? | 10:24:30 |
| 22 | A    Yes. | 10:24:35 |
| 23 | MR. GEHLAWAT:  Okay.  So Policy 300, which we've | 10:24:36 |
| 24 | referred to as Bates stamp 1441 to 1448, we'll mark that | 10:24:43 |
| 25 | as Exhibit 3 to the deposition transcript. | 10:24:48 |

14

Karla Keeley                                                             April 28, 2021

| | | |
|---|---|---|
| 1 | (Exhibit 3 marked) | 10:24:48 |
| 2 | BY MR. GEHLAWAT: | 10:24:48 |
| 3 | Q    Do you have a copy of that policy with you? | 10:24:51 |
| 4 | A    Yes, I do. | 10:24:54 |
| 5 | Q    Okay. | 10:24:55 |
| 6 | MR. WEAKLEY:  For the record, these policies were | 10:24:55 |
| 7 | produced subject to a protective order, so I would request | 10:24:59 |
| 8 | that the deposition be sealed with regard to testimony | 10:25:02 |
| 9 | about these policies. | 10:25:06 |
| 10 | MR. GEHLAWAT:  That's fine.  I mean, I'm not sure | 10:25:10 |
| 11 | why the policies should be confidential, but we can | 10:25:12 |
| 12 | discuss that later.  But -- but for now, I have no | 10:25:14 |
| 13 | objection to that. | 10:25:18 |
| 14 | Q    As to the use of force policy, this Policy 300, | 10:25:21 |
| 15 | Exhibit 3, this was in effect as of the time of this | 10:25:26 |
| 16 | incident with Mr. Perez; correct? | 10:25:30 |
| 17 | A    Yes. | 10:25:32 |
| 18 | Q    Okay.  And your understanding is that the | 10:25:33 |
| 19 | incident in question occurred in May of 2017? | 10:25:36 |
| 20 | A    Yes. | 10:25:40 |
| 21 | Q    Okay.  And all of the deputies who were named | 10:25:40 |
| 22 | defendants in this case were trained with respect to | 10:25:46 |
| 23 | Exhibit 3 as of the time of the incident; true? | 10:25:51 |
| 24 | A    Yes. | 10:25:54 |
| 25 | Q    Okay.  Just in general, you would agree with me | 10:25:55 |

15

Karla Keeley                                                          April 28, 2021

```
 1    that the use of force policy says that deputies should    10:26:03

 2    only use as much force as they believe is reasonable to -- 10:26:08

 3    in -- in any given situation; is that true?              10:26:14

 4         A    Yes.                                            10:26:17

 5         Q    Okay.  And the policy also says that if a deputy 10:26:17

 6    observes another officer or deputy to be using excessive  10:26:28

 7    or unreasonable force then that deputy has a              10:26:32

 8    responsibility or duty to intervene; is that true?       10:26:35

 9         A    Yes.                                            10:26:39

10         Q    Okay.  And that refers not just to other deputies 10:26:40

11    within the same department, but any other law enforcement 10:26:47

12    officer; correct?                                        10:26:51

13         A    For our department.  It's specific to our agency. 10:26:53

14         Q    Okay.  So let me ask it this way:  If          10:26:56

15    hypothetically deputies from the sheriff's department    10:27:01

16    responded to a scene and CHP officers responded to that  10:27:07

17    scene and one of the sheriff's deputies observed the CHP 10:27:11

18    officer to be using excessive force, would the Fresno    10:27:17

19    County sheriff's deputy have a responsibility to         10:27:23

20    intervene?                                               10:27:26

21         A    If it is absolutely clear that they are using  10:27:27

22    excessive force, yes.                                    10:27:31

23         Q    Okay.  So in that sense then, the -- the duty to 10:27:33

24    intervene is not just limited to the deputies at the     10:27:37

25    department, it would apply to other law enforcement      10:27:43
```

16

Karla Keeley                                                    April 28, 2021

1    officers that would be at the scene as well; correct?    10:27:46

2         A    Correct.                                       10:27:48

3         Q    Okay.  So in this case, we have the Fresno Police   10:27:49

4    Department officers that were present.  To the extent that   10:27:55

5    one or more of the deputies believed that one or more of   10:27:58

6    the officers was using excessive or unreasonable force,   10:28:02

7    then the deputy would have to intervene in that conduct;   10:28:06

8    correct?                                                 10:28:12

9         A    I'm sorry --                                   10:28:12

10        MR. WEAKLEY:  Could you repeat the question or      10:28:14

11   have it read back?                                       10:28:15

12        MR. GEHLAWAT:  Sure.  I'll repeat it.               10:28:16

13        Q    In this case, for example, to the extent that a   10:28:19

14   Fresno sheriff's deputy who was on scene observed a Fresno   10:28:26

15   Police Department officer to be using excessive or        10:28:31

16   unreasonable force, the Fresno sheriff's deputy would have   10:28:34

17   a responsibility to intervene; correct?                  10:28:38

18        MR. WEAKLEY:  Objection.  Misstates her testimony   10:28:40

19   and the policy.  Also, it's calling for speculation, and I   10:28:43

20   don't know that she knows all the details of this case.   10:28:47

21        MR. GEHLAWAT:  Okay.  I'm not asking about the      10:28:50

22   specific details of the case.  It's posed as a           10:28:51

23   hypothetical.                                            10:28:54

24        Q    So I'm asking you -- I'm asking you -- I'll --   10:28:56

25   I'll ask it again.                                       10:28:58

                                                                        17

| | | |
|---|---|---|
| 1 | If a Fresno sheriff's deputy were to respond to a | 10:29:01 |
| 2 | scene and Fresno Police Department officers were also | 10:29:07 |
| 3 | present at that scene and the Fresno Police Department | 10:29:11 |
| 4 | officers were using unreasonable or excessive force, under | 10:29:14 |
| 5 | this policy, the sheriff's deputy would have a | 10:29:19 |
| 6 | responsibility to intervene under those circumstances; | 10:29:23 |
| 7 | true? | 10:29:27 |
| 8 | MR. WEAKLEY:  Objection.  Incomplete | 10:29:27 |
| 9 | hypothetical.  Speculative. | 10:29:28 |
| 10 | BY MR. GEHLAWAT: | 10:29:32 |
| 11 | Q    You can answer. | 10:29:32 |
| 12 | MR. WEAKLEY:  Misstates the policy. | 10:29:33 |
| 13 | Go ahead.  Can you answer it? | 10:29:35 |
| 14 | THE WITNESS:  I'm sorry. | 10:29:38 |
| 15 | Yes.  So our policy states that we will intervene | 10:29:39 |
| 16 | if we are present and realize that there is an excessive | 10:29:42 |
| 17 | force situation occurring; however, the hypothetical, that | 10:29:46 |
| 18 | would have to be something that's very specific as to what | 10:29:51 |
| 19 | the circumstances were -- | 10:29:54 |
| 20 | BY MR. GEHLAWAT: | 10:29:56 |
| 21 | Q    Okay. | 10:29:56 |
| 22 | A    -- and very clear to the officer there. | 10:29:56 |
| 23 | Q    Okay.  Without -- without going into a | 10:29:58 |
| 24 | hypothetical, what I'm saying is, to use your words, you | 10:30:01 |
| 25 | said that if one of your deputies observed there to be | 10:30:05 |

18

Karla Keeley                                                    April 28, 2021

1    excessive or unreasonable force going on that that deputy          10:30:11

2    would have a duty to intervene; correct?                           10:30:15

3        A    Correct.                                                  10:30:17

4        Q    Okay.  And that would be true even if he observed         10:30:18

5    the excessive or unreasonable force to be by an officer            10:30:22

6    from a different agency; correct?                                  10:30:28

7        A    Yes.  It has to be very clear to them that that's         10:30:30

8    what's occurring.                                                  10:30:34

9        Q    Okay.  But provided it is clear to them and it's          10:30:35

10   from an officer from a different agency, they still have a         10:30:38

11   duty to intervene; correct?                                        10:30:41

12       A    Correct.                                                  10:30:42

13       Q    All right.  If you could turn to COF 1446,                10:30:42

14   Section 300.5.1 that's titled "Notification to                     10:31:02

15   Supervisors."  Let me know when you have that in front of          10:31:07

16   you.                                                               10:31:09

17       A    Yes, I have it.                                           10:31:10

18       Q    Okay.  This policy says that to the extent that           10:31:14

19   there's an application of a restraint device other than            10:31:20

20   handcuffs, shackles, or belly chains that a supervisor             10:31:23

21   must be notified about that; is that true?                         10:31:27

22       A    Yes.                                                      10:31:30

23       Q    Okay.  And if a supervisor is not notified about          10:31:31

24   application of a restraint device other than a handcuff,           10:31:37

25   shackle, or belly chain, that would be a violation of this         10:31:40

                                                                       19

Karla Keeley                                                          April 28, 2021

| 1 | A    Yes. | 10:33:09 |
|---|---|---|
| 2 | Q    Okay.  And just generally speaking now, what is | 10:33:10 |
| 3 | the training? | 10:33:14 |
| 4 | A    We -- we give them scenarios when it comes to | 10:33:15 |
| 5 | intervening.  We pose scenarios so that we can -- they can | 10:33:19 |
| 6 | recognize when excessive force is being used and be able | 10:33:23 |
| 7 | to intervene at that point. | 10:33:26 |
| 8 | Q    Okay.  And the interventions could take different | 10:33:27 |
| 9 | forms? | 10:33:31 |
| 10 | A    Correct. | 10:33:32 |
| 11 | Q    They could be verbal interventions; correct? | 10:33:33 |
| 12 | A    Correct. | 10:33:36 |
| 13 | Q    They could be physical interventions; correct? | 10:33:37 |
| 14 | A    Yes. | 10:33:40 |
| 15 | Q    All right.  Okay.  Let's go to Policy 302. | 10:33:41 |
| 16 | Policy 302 was in effect as of the time of this incident; | 10:33:50 |
| 17 | correct? | 10:33:58 |
| 18 | A    Yes. | 10:33:58 |
| 19 | Q    And all of the deputies who are named defendants | 10:33:59 |
| 20 | in the lawsuit would have been trained with respect to | 10:34:02 |
| 21 | this policy? | 10:34:07 |
| 22 | A    Yes. | 10:34:08 |
| 23 | Q    And they all would have been expected to comply | 10:34:09 |
| 24 | with this policy; correct? | 10:34:12 |
| 25 | A    Yes. | 10:34:13 |

21

| | | |
|---|---|---|
| 1 | scene. | 10:35:37 |
| 2 | Q    Okay.  And is it your understanding that the | 10:35:37 |
| 3 | deputies -- that the -- the individuals who applied the | 10:35:41 |
| 4 | leg restraint were deputies from the Fresno County | 10:35:44 |
| 5 | Sheriff's Department? | 10:35:47 |
| 6 | A    Yes. | 10:35:48 |
| 7 | Q    Okay.  Okay.  In terms of the guidelines for use | 10:35:48 |
| 8 | of leg restraints, those are identified in Section | 10:35:59 |
| 9 | 302.7.1, which is on COF 1440; correct? | 10:36:03 |
| 10 | A    Yes. | 10:36:07 |
| 11 | Q    Okay.  Subsection (a) indicates that if | 10:36:08 |
| 12 | practicable, members should notify a supervisor of the | 10:36:17 |
| 13 | intent to apply the leg restraint device; correct? | 10:36:22 |
| 14 | A    Yes. | 10:36:25 |
| 15 | Q    And that in any event, as soon as practicable | 10:36:26 |
| 16 | after the application of the leg restraint device, a | 10:36:31 |
| 17 | supervisor should be notified; correct? | 10:36:34 |
| 18 | A    Correct. | 10:36:38 |
| 19 | Q    And that's somewhat a restatement of the policy | 10:36:38 |
| 20 | that we talked about previously under use of force; true? | 10:36:41 |
| 21 | A    Yes. | 10:36:44 |
| 22 | Q    Okay.  Section (c) says that -- or Subsection (c) | 10:36:45 |
| 23 | says, "Once the leg restraint is secured, the person | 10:36:53 |
| 24 | should be placed in a seated or upright position, secured | 10:36:58 |
| 25 | with a seat belt, and shall not be placed on his/her | 10:37:01 |

23

Karla Keeley                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | stomach for an extended period, as this could reduce the | 10:37:05 |
| 2 | person's ability to breathe"; correct? | 10:37:09 |
| 3 | A    Yes. | 10:37:11 |
| 4 | Q    Okay.  And all of the deputies in this case were | 10:37:11 |
| 5 | trained with respect to this policy; correct? | 10:37:15 |
| 6 | MR. WEAKLEY:  Objection.  Speculation. | 10:37:18 |
| 7 | BY MR. GEHLAWAT: | 10:37:22 |
| 8 | Q    Correct? | 10:37:22 |
| 9 | MR. WEAKLEY:  And it's beyond the scope. | 10:37:25 |
| 10 | BY MR. GEHLAWAT: | 10:37:27 |
| 11 | Q    Okay.  Well, I think you told me earlier that all | 10:37:27 |
| 12 | of the deputies had received training with respect to this | 10:37:29 |
| 13 | policy; correct? | 10:37:33 |
| 14 | A    Yes. | 10:37:35 |
| 15 | Q    Okay.  And so they would have been -- also | 10:37:36 |
| 16 | received training with respect to Subsection (c) of | 10:37:40 |
| 17 | 302.7.1; correct? | 10:37:46 |
| 18 | A    Yes. | 10:37:46 |
| 19 | Q    Okay.  When this -- this policy says that the | 10:37:47 |
| 20 | person shall not be placed on his or her stomach for an | 10:37:54 |
| 21 | extended period, do you have an understanding of what an | 10:37:58 |
| 22 | extended period means? | 10:38:02 |
| 23 | A    There could be different -- different | 10:38:04 |
| 24 | circumstances means different extended period of time. | 10:38:08 |
| 25 | Once the subject is no longer resisting, we can get them | 10:38:11 |

24

Karla Keeley                                                    April 28, 2021

```
 1   into a position for his safety and -- or in this case,   10:38:14

 2   medical personnel to attend to him, then that would be    10:38:18

 3   reasonably the amount of time that you want to keep him on 10:38:22

 4   his stomach until that happens.                           10:38:25

 5        Q    Okay.  But deputies are trained that if someone  10:38:26

 6   is placed on his or her -- on his or her stomach for an   10:38:30

 7   extended period, that could interfere with the person's   10:38:35

 8   ability to breathe; correct?                             10:38:39

 9        A    Yes.  Yes, they are trained on that.           10:38:40

10        Q    All right.  And so that's why the training is   10:38:42

11   that as soon as possible they should turn the person onto 10:38:45

12   their side so that that person is able to breathe;        10:38:49

13   correct?                                                 10:38:52

14        A    Yes.                                           10:38:53

15        Q    Okay.  Subsection (d) says that the restrained  10:38:53

16   person should be continually monitored by a member while 10:39:00

17   in the leg restraint.  The member should ensure that the 10:39:03

18   person does not roll onto and remain on his or her        10:39:06

19   stomach.  That's what Subsection (d) says; correct?      10:39:10

20        A    Yes.                                           10:39:13

21        Q    And all of the deputies in this case would be   10:39:14

22   expected to comply with this policy; correct?            10:39:17

23        A    Correct.                                       10:39:19

24        Q    All right.  Continual monitoring means that they 10:39:20

25   should continue to make sure that the person against whom 10:39:26
```

                                                                      25

Karla Keeley                                                                      April 28, 2021

1    the leg restraint is being applied is able to breathe;    10:39:30

2    correct?                                                  10:39:35

3        A    Yes.                                             10:39:35

4        Q    Okay.  And as part of that process, the deputies  10:39:37

5    have a responsibility to make sure that the person who's   10:39:43

6    in the leg restraint does not roll onto and remain on      10:39:47

7    or -- on his or her stomach; correct?                      10:39:51

8        A    For an extended period of time, yes.             10:39:53

9        Q    Okay.  Well, does -- does this subsection,       10:39:55

10   Subsection (d), say for an extended period of time        10:40:03

11   anywhere in it?                                            10:40:08

12       A    No.                                              10:40:09

13       Q    Okay.  And my next question really has more to do  10:40:09

14   with -- with Subsection (e), which -- which says, "The    10:40:17

15   members should look for signs of labored breathing and    10:40:21

16   take appropriate steps to relieve and minimize any obvious  10:40:24

17   factors contributing to this condition."                  10:40:29

18            All of the deputies in this case would have been  10:40:32

19   trained with respect to this subsection; correct?         10:40:36

20       A    Yes.                                             10:40:39

21       Q    Okay.  And so deputies are trained -- just so    10:40:39

22   we're clear, when it says, "The member should look,"      10:40:44

23   member is referring to deputies in the department;        10:40:47

24   correct?                                                  10:40:50

25       A    Right.                                           10:40:50

                                                                         26

Karla Keeley                                                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | checking the carotid, checking to see if we can see the | 10:48:16 |
| 2 | person either responding to a question, to talking, to | 10:48:19 |
| 3 | seeing their chest rise and fall.  There's different -- | 10:48:24 |
| 4 | different techniques to tell if somebody is still | 10:48:28 |
| 5 | breathing. | 10:48:31 |
| 6 | Q    Okay.  All right.  Going back to the duty to | 10:48:32 |
| 7 | intercede or intervene, you recall our discussion about | 10:48:41 |
| 8 | that policy? | 10:48:45 |
| 9 | A    Yes. | 10:48:47 |
| 10 | Q    Okay.  Does that also apply to medical personnel | 10:48:48 |
| 11 | that arrives on scene; for example, EMS, you know, | 10:48:55 |
| 12 | paramedics, EMTs, people of that sort? | 10:49:01 |
| 13 | A    Yes. | 10:49:03 |
| 14 | Q    Okay.  So in other words, if a sheriff's deputy | 10:49:04 |
| 15 | observes a paramedic or EMT to be using excessive or | 10:49:08 |
| 16 | unreasonable force, then the -- the deputy would have a | 10:49:14 |
| 17 | responsibility to intervene under those circumstances; | 10:49:19 |
| 18 | correct? | 10:49:22 |
| 19 | MR. WEAKLEY:  Objection.  Misstates the policy. | 10:49:22 |
| 20 | Go ahead and answer, if you can. | 10:49:23 |
| 21 | THE WITNESS:  Excessive force, yes.  Unreasonable | 10:49:25 |
| 22 | would depend on the -- the training.  We don't -- we're | 10:49:28 |
| 23 | not trained in what paramedics use or methods that they | 10:49:32 |
| 24 | use.  So we wouldn't be able to identify unreasonable | 10:49:35 |
| 25 | techniques. | 10:49:38 |

33

| | | |
|---|---|---|
| 1 | BY MR. GEHLAWAT: | 10:49:39 |
| 2 | Q    Okay.  But if the -- if the -- the force that was | 10:49:39 |
| 3 | being used was excessive, the deputies would have a | 10:49:44 |
| 4 | responsibility to intervene; correct? | 10:49:49 |
| 5 | A    Correct.  Excessive, yes. | 10:49:51 |
| 6 | MR. GEHLAWAT:  Okay.  Okay.  I want to move to | 10:49:54 |
| 7 | another document that's entitled -- | 10:50:03 |
| 8 | Shandy, where are we in terms of marking | 10:50:11 |
| 9 | exhibits?  Did I mark Policy 300 as Exhibit 3? | 10:50:13 |
| 10 | THE VIDEOGRAPHER:  We have three exhibits so far, | 10:50:22 |
| 11 | Counsel. | 10:50:24 |
| 12 | MR. GEHLAWAT:  Oh, thank you.  Okay. | 10:50:24 |
| 13 | So we'll mark Policy 302 as Exhibit 4. | 10:50:26 |
| 14 | And then we'll mark as Exhibit 5 a document | 10:50:39 |
| 15 | that's titled "RIPP Restraints."  It's COF 1449. | 10:50:42 |
| 16 | THE REPORTER:  Neil, I believe Exhibit 3 is | 10:50:42 |
| 17 | Policy 300.  Let me just double-check. | 10:50:42 |
| 18 | MR. GEHLAWAT:  I think that's -- | 10:51:00 |
| 19 | MS. O'LINN:  Neil, would you mind doing Exhibit | 10:51:00 |
| 20 | 1, 2, 3, 4, and 5 -- let's just make sure we have a list, | 10:51:02 |
| 21 | because I was dealing with technical difficulties right | 10:51:04 |
| 22 | there at the beginning, and I didn't actually get to note | 10:51:06 |
| 23 | those.  So maybe that will help the court reporter as | 10:51:09 |
| 24 | well. | 10:51:11 |
| 25 | MR. GEHLAWAT:  Sure. | 10:51:11 |

34

Karla Keeley                                                             April 28, 2021

```
 1              So Exhibit 1 is the Notice of Taking the 30(b)(6)    10:51:12

 2    deposition.  Exhibit 2 is the County's objections to the      10:51:17

 3    notice with production of documents.                          10:51:22

 4         MS. O'LINN:  That's the reason I didn't write            10:51:25

 5    them down.  Thank you.                                        10:51:26

 6         MR. GEHLAWAT:  Okay.  And then Exhibit 3 is the          10:51:27

 7    County's Policy 300 on use of force.  Exhibit 4 should be     10:51:32

 8    Policy 302 on handcuffing and restraints.  And now           10:51:38

 9    Exhibit 5 will be a document titled "RIPP Restraints."       10:51:45

10    That is COF 1449.                                             10:51:48

11         MS. O'LINN:  Thank you, sir.                             10:51:54

12         MR. GEHLAWAT:  No problem.                               10:51:55

13              (Exhibits 4 and 5 marked)                          10:51:56

14    BY MR. GEHLAWAT:                                              10:51:56

15    Q    Okay.  Ms. Keeley, do you have this document in         10:51:57

16    front of you?                                                 10:51:59

17    A    Yes, I do.                                               10:51:59

18    Q    Okay.  Is -- is this a document that was used to        10:52:00

19    train deputies at the sheriff's department?                  10:52:06

20    A    Yes.                                                     10:52:09

21    Q    Okay.  And so as of the time of this incident          10:52:09

22    back in May of 2017, the deputies that are named            10:52:13

23    defendants in the lawsuit would have been trained with       10:52:17

24    respect to this document; correct?                           10:52:19

25    A    Yes.                                                     10:52:21
```

35

Karla Keeley                                                          April 28, 2021

| | | |
|---|---|---|
| 1 | Q    Okay.  A leg restraint is a RIPP Restraint; is | 10:52:22 |
| 2 | that true? | 10:52:28 |
| 3 | A    Yes. | 10:52:28 |
| 4 | Q    Okay.  And this document discusses the topic of | 10:52:28 |
| 5 | respiratory compromise during RIPP Restraints; correct? | 10:52:37 |
| 6 | A    Yes. | 10:52:41 |
| 7 | Q    And it also discusses sudden custody death | 10:52:42 |
| 8 | syndrome; correct? | 10:52:45 |
| 9 | A    Yes. | 10:52:46 |
| 10 | Q    Okay.  It -- it says under "Respiratory | 10:52:47 |
| 11 | Compromise," "The three elements of respiration are:  1. | 10:52:52 |
| 12 | Gas exchange function of lungs; 2.  The openness of the | 10:52:55 |
| 13 | airway; and 3.  The bellows action of the diaphragm that | 10:52:59 |
| 14 | ventilates the lungs." | 10:53:03 |
| 15 | Do you see that? | 10:53:04 |
| 16 | A    Yes. | 10:53:05 |
| 17 | Q    Okay.  You'd agree with me that respiration | 10:53:06 |
| 18 | basically means breathing? | 10:53:10 |
| 19 | A    Yes. | 10:53:11 |
| 20 | Q    Okay.  And so put differently, in order for | 10:53:12 |
| 21 | someone to breathe, there has to be gas exchange function | 10:53:16 |
| 22 | of lungs, openness of the airway, and bellows action of | 10:53:19 |
| 23 | the diaphragm that ventilates the lungs; correct? | 10:53:23 |
| 24 | A    Yes. | 10:53:26 |
| 25 | Q    Okay.  The second sentence under those elements | 10:53:27 |

36

Karla Keeley                                                                April 28, 2021

| | | |
|---|---|---|
| 1 | says, "If a subject is placed in a compromising position, | 10:53:32 |
| 2 | the neural centers may not be capable of responding to the | 10:53:37 |
| 3 | body's oxygen demands." | 10:53:41 |
| 4 | Do you see where it says that? | 10:53:43 |
| 5 | A   Yes. | 10:53:44 |
| 6 | Q   Okay.  One example of a compromising position | 10:53:45 |
| 7 | would be facedown in a prone position; correct? | 10:53:50 |
| 8 | A   Yes. | 10:53:56 |
| 9 | Q   Okay.  And under the circumstances of someone | 10:53:56 |
| 10 | being placed in a prone position, the neural centers may | 10:54:00 |
| 11 | not be capable of responding to the body's oxygen demands; | 10:54:05 |
| 12 | correct? | 10:54:09 |
| 13 | A   Yes. | 10:54:09 |
| 14 | Q   Okay.  And this is especially true if the neural | 10:54:10 |
| 15 | centers are depressed because of intoxication due to drugs | 10:54:14 |
| 16 | and alcohol; correct? | 10:54:17 |
| 17 | A   Yes. | 10:54:18 |
| 18 | Q   Okay.  And that's why the department has training | 10:54:19 |
| 19 | to its deputies, in part, that says that people should not | 10:54:24 |
| 20 | remain on their stomach for an extended period of time; | 10:54:29 |
| 21 | correct? | 10:54:33 |
| 22 | A   Yes. | 10:54:33 |
| 23 | Q   Because it could interfere with their ability to | 10:54:34 |
| 24 | breathe; correct? | 10:54:37 |
| 25 | A   Yes. | 10:54:37 |

37

Karla Keeley                                                      April 28, 2021

| | | |
|---|---|---|
| 1 | Q    All right.  The last sentence of this second | 10:54:38 |
| 2 | paragraph says, "Respiratory compromise may cause death | 10:54:45 |
| 3 | through positional asphyxia when the position of the | 10:54:50 |
| 4 | subject's body interferes with the muscular or mechanical | 10:54:54 |
| 5 | elements of respiration." | 10:54:58 |
| 6 |        Do you see where it says that? | 10:55:00 |
| 7 | A    Yes. | 10:55:01 |
| 8 | Q    Okay.  And -- and you'd agree with me that | 10:55:02 |
| 9 | respiratory compromise basically means, you know, not | 10:55:06 |
| 10 | being able to breathe; correct? | 10:55:09 |
| 11 | A    Yes. | 10:55:11 |
| 12 | Q    Okay.  So put more simply, someone -- if someone | 10:55:12 |
| 13 | is having trouble breathing, that can -- that can cause | 10:55:17 |
| 14 | their death through positional asphyxia when their body is | 10:55:21 |
| 15 | placed in such a position that it interferes with their | 10:55:26 |
| 16 | muscular or -- or mechanical elements of respiration; | 10:55:30 |
| 17 | correct? | 10:55:34 |
| 18 | A    Yes. | 10:55:34 |
| 19 | Q    Okay.  So, for example, if someone is facedown in | 10:55:35 |
| 20 | a prone position for an extended period of time, they can | 10:55:41 |
| 21 | die through positional asphyxia because it could interfere | 10:55:45 |
| 22 | with the muscular or mechanical elements of their ability | 10:55:48 |
| 23 | to breathe; correct? | 10:55:52 |
| 24 | A    Yes. | 10:55:53 |
| 25 | Q    All right.  The -- the deputies in the sheriff's | 10:55:54 |

38

Karla Keeley                                                          April 28, 2021

| | | |
|---|---|---|
| 1 | department are trained with respect to positional | 10:56:07 |
| 2 | asphyxia; correct? | 10:56:09 |
| 3 | A    Yes. | 10:56:10 |
| 4 | Q    Okay.  Are the terms in the department | 10:56:13 |
| 5 | "positional" and "restraint asphyxia" used somewhat | 10:56:17 |
| 6 | interchangeably? | 10:56:19 |
| 7 | A    Positional asphyxia is normally the term that we | 10:56:21 |
| 8 | use.  I haven't heard the other term that you mentioned. | 10:56:24 |
| 9 | Q    Okay.  So it seems obvious from the documents, | 10:56:26 |
| 10 | but the department trains its deputies that positional | 10:56:31 |
| 11 | asphyxia is a real phenomena; correct? | 10:56:36 |
| 12 | A    Yes. | 10:56:38 |
| 13 | Q    And it can occur; correct? | 10:56:39 |
| 14 | A    Yes. | 10:56:41 |
| 15 | Q    And it can occur if someone is placed in a prone | 10:56:42 |
| 16 | position that interferes with their ability to breathe; | 10:56:45 |
| 17 | correct? | 10:56:50 |
| 18 | A    Yes. | 10:56:50 |
| 19 | Q    All right.  Okay.  Next in order -- I want to | 10:56:51 |
| 20 | look at the documents that -- that -- the training plan, | 10:57:00 |
| 21 | which, I believe, is COF 5356 through 5365. | 10:57:08 |
| 22 | We'll mark that as Exhibit 6. | 10:57:29 |
| 23 | (Exhibit 6 marked) | 10:57:29 |
| 24 | BY MR. GEHLAWAT: | 10:57:34 |
| 25 | Q    Do you have those documents in front of you? | 10:57:34 |

39

Karla Keeley                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | in handcuffs during that process? | 11:10:59 |
| 2 | A    Right. | 11:11:02 |
| 3 | Q    Okay.  And then the next page is titled | 11:11:02 |
| 4 | "Respiratory Compromise," and it goes through the three | 11:11:12 |
| 5 | elements of respiration; correct? | 11:11:14 |
| 6 | A    Yes. | 11:11:16 |
| 7 | Q    Okay.  And this more or less restates the | 11:11:16 |
| 8 | training that we went over in Exhibit 5 which had to do | 11:11:19 |
| 9 | with RIPP Restraints; correct? | 11:11:23 |
| 10 | A    Yes. | 11:11:25 |
| 11 | Q    Okay.  That respiratory compromise occurs when | 11:11:26 |
| 12 | the position of the body interferes with respiration; | 11:11:28 |
| 13 | correct? | 11:11:32 |
| 14 | A    Yes. | 11:11:32 |
| 15 | Q    All right.  And all of the deputies in this case | 11:11:33 |
| 16 | were trained with respect to that principle; correct? | 11:11:36 |
| 17 | A    Yes. | 11:11:39 |
| 18 | Q    All right.  The next page makes reference to | 11:11:40 |
| 19 | certain studies on positional restraint versus oxygen | 11:11:47 |
| 20 | saturation and heart-rate recovery. | 11:11:51 |
| 21 | Do you see that? | 11:11:54 |
| 22 | A    Yes. | 11:11:55 |
| 23 | Q    Are you familiar with those studies? | 11:11:55 |
| 24 | A    Yes. | 11:11:57 |
| 25 | Q    Okay.  Are -- are those studies used to train | 11:11:57 |

50

Karla Keeley                                                          April 28, 2021

| | | |
|---|---|---|
| 1 | being able to grab an arm, leg, and -- and initiate a | 11:19:03 |
| 2 | takedown to restrain the individual. | 11:19:08 |
| 3 | Q   Okay.  And are deputies with the Fresno County | 11:19:10 |
| 4 | Sheriff's Department trained with respect to this | 11:19:16 |
| 5 | technique? | 11:19:18 |
| 6 | A   Yes. | 11:19:19 |
| 7 | Q   And that would include the deputies involved in | 11:19:20 |
| 8 | this incident as of the time of the incident? | 11:19:23 |
| 9 | A   Yes. | 11:19:26 |
| 10 | Q   Okay.  And turning the page to .8 under the SWARM | 11:19:26 |
| 11 | technique, it says, "Apply a hobble restraint to the | 11:19:36 |
| 12 | ankles and roll the subject into an upright, seated | 11:19:39 |
| 13 | position"; correct? | 11:19:43 |
| 14 | A   Right. | 11:19:43 |
| 15 | Q   And that's part of the training as it relates to | 11:19:44 |
| 16 | the SWARM technique; correct? | 11:19:47 |
| 17 | A   Yes. | 11:19:48 |
| 18 | Q   All right.  That -- that officers should do that | 11:19:49 |
| 19 | as soon as possible; correct? | 11:19:53 |
| 20 | A   As soon as safely possible, yes. | 11:19:55 |
| 21 | Q   Right.  And then turning the page to .10, it | 11:19:58 |
| 22 | says, "Position the subject so that he/she can lean back | 11:20:02 |
| 23 | against a fixed object.  This helps relieve pressure on | 11:20:06 |
| 24 | the diaphragm and makes breathing easier"; correct? | 11:20:11 |
| 25 | A   Yes. | 11:20:13 |

56

Karla Keeley                                                          April 28, 2021

```
 1        Q    And that's part of the training for these     11:20:14

 2   deputies as of the time of the incident; correct?       11:20:17

 3        A    Yes.                                           11:20:19

 4        Q    Okay.  So the person should be placed in a seated   11:20:19

 5   position and leaned back against a fixed object so that --   11:20:24

 6   so that that avoids respiratory compromise; correct?    11:20:29

 7        A    Yes.                                           11:20:34

 8        Q    All right.  Okay.                              11:20:34

 9             MS. O'LINN:  Counsel, before you move on to    11:20:44

10   another subject, would it be possible for us to take a   11:20:45

11   break?  We've been going for over an hour now.           11:20:48

12             MR. GEHLAWAT:  Sure.  Why don't we come back at   11:20:52

13   11:30.                                                   11:20:54

14             MS. O'LINN:  Okay.                             11:20:55

15             And I'll let the court reporter get us off the   11:20:56

16   record.  Then I have a question.                         11:21:00

17             THE VIDEOGRAPHER:  We're going off the record.   11:21:02

18   The time is 11:21.                                       11:21:03

19             (Break held)                                   11:31:32

20             THE VIDEOGRAPHER:  We're back on the record.  The   11:31:33

21   time is 11:31.                                           11:31:35

22   BY MR. GEHLAWAT:                                         11:31:36

23        Q    Okay.  Ms. Keeley, you understand you're still   11:31:37

24   under oath?                                              11:31:41

25        A    Yes.                                           11:31:41
```

57

Karla Keeley                                                          April 28, 2021

| | | |
|---|---|---|
| 1 | Q    Because that would -- that would -- that could | 11:35:58 |
| 2 | interfere with their ability to breathe; correct? | 11:36:01 |
| 3 | A    Yes. | 11:36:03 |
| 4 | Q    And that's -- that's been described in many of | 11:36:04 |
| 5 | the documents that we've gone through today; correct? | 11:36:07 |
| 6 | A    Yes. | 11:36:09 |
| 7 | Q    All right.  But is there any specific medical | 11:36:10 |
| 8 | literature that's used to train deputies on the topic of | 11:36:15 |
| 9 | positional or restraint asphyxia? | 11:36:19 |
| 10 | A    No. | 11:36:22 |
| 11 | Q    All right.  What about the studies that we | 11:36:23 |
| 12 | referenced earlier, the Reay study or the UCSD study by | 11:36:26 |
| 13 | Drs. Chan and Vilke?  Are those studies used at all to | 11:36:32 |
| 14 | train the deputies? | 11:36:35 |
| 15 | A    Only referred to in the slides, but I'm not | 11:36:36 |
| 16 | familiar with the actual -- the -- how in depth they go | 11:36:39 |
| 17 | into the studies themselves. | 11:36:43 |
| 18 | Q    Okay.  So what you're telling me is that the -- | 11:36:45 |
| 19 | the studies may be referenced in some training materials, | 11:36:49 |
| 20 | but they're not really used to train the deputies as -- as | 11:36:53 |
| 21 | it relates to positional asphyxia; correct? | 11:36:58 |
| 22 | A    Yes, yes. | 11:37:00 |
| 23 | Q    All right.  Okay.  Going to Topic No. 4, the | 11:37:01 |
| 24 | Fresno County Sheriff's Department's policies and | 11:37:12 |
| 25 | procedures in effect at the time of the incident with | 11:37:14 |

61

Karla Keeley                                                    April 28, 2021

```
 1    respect to officer duties relative to EMS personnel once      11:37:16

 2    EMS personnel are called to the scene of an incident          11:37:23

 3    involving an uncooperative subject.                           11:37:26

 4           Are there any policies and procedures to this          11:37:27

 5    effect?                                                       11:37:30

 6       A    Other than just primarily using reasonable force     11:37:31

 7    as far as keeping the safety of the personnel of -- the       11:37:37

 8    medical personnel that are arriving to the scene.  We just    11:37:40

 9    provide safety while we're in transition to packing them      11:37:43

10    into their custody.                                           11:37:49

11       Q    Okay.  But there's no specific policy at the         11:37:49

12    department that deals with the -- the deputies' duties        11:37:53

13    relative to EMS personnel; is that true?                      11:37:57

14       A    No.  I'm --                                          11:38:01

15       Q    They --                                              11:38:01

16       A    -- sorry.  There -- there is no specific policy.     11:38:02

17       Q    Understood.  Okay.                                   11:38:04

18           And are -- are deputies specifically trained with     11:38:05

19    respect to their duties relative to EMS personnel when        11:38:08

20    EMSs are called to the scene?                                 11:38:12

21       A    Yes.                                                 11:38:14

22       Q    Okay.  And what is that training?                    11:38:15

23       A    To aid and either applying restraints in order to    11:38:18

24    keep the safety of the -- everybody involved.  That --        11:38:23

25    that's our main concern.  Once we get them onto the           11:38:28
```

                                                                    62

Karla Keeley                                                                April 28, 2021

```
 1    gurney, if they need help with restraining the          11:38:31

 2    individual's limbs in order to get the proper leg -- leg 11:38:34

 3    restraints and arm restraints applied to them, then we   11:38:36

 4    assist them in that manner.                              11:38:40

 5         Q    Okay.  But safe to say that even after EMS     11:38:41

 6    personnel show up on a scene the deputies are still      11:38:47

 7    expected to comply with their own policies and procedures; 11:38:51

 8    correct?                                                 11:38:55

 9         A    Yes.                                           11:38:55

10         Q    Okay.  And that would include the policy and   11:38:56

11    procedure on handcuffing and restraints; correct?       11:38:59

12         A    Correct.                                       11:39:01

13         Q    So in other words, it's not like those policies 11:39:02

14    or that training goes out the door once EMS shows up on  11:39:05

15    scene; correct?                                          11:39:10

16         A    Correct.                                       11:39:10

17         Q    Okay.  And if EMS is asking them to do something 11:39:11

18    that's inconsistent with their own training, then they   11:39:17

19    should intervene under those circumstances?              11:39:21

20         MR. WEAKLEY:  Objection.  Vague.  Speculative.      11:39:23

21    Argumentative.                                           11:39:26

22         Go ahead and answer, if you can.                    11:39:26

23         THE WITNESS:  Yeah, I --                            11:39:28

24         (Simultaneous speakers)                             11:39:31

25         MS. O'LINN:  Object -- join in the objection and    11:39:31
```

                                                                        63

Karla Keeley                                                      April 28, 2021

```
 1      Q    What about at any level?                    11:55:36

 2      A    I -- I don't know what other investigators may or  11:55:38

 3  may not do.  I -- I can't answer to that.  I'm sorry.  11:55:43

 4      Q    Okay.  All right.  Okay.  And then -- okay.  The  11:55:46

 5  next set of -- the next category is 10 and 11.  This -- 10  11:56:00

 6  is the policies and procedures with respect to intervening  11:56:08

 7  when observing another deputy/officer to be violating his  11:56:11

 8  or her training in effect at the time of the incident.  11:56:15

 9          We covered that.  The policy that describes that  11:56:18

10  is Policy 300; correct?                              11:56:21

11      A    Yes.                                         11:56:23

12      Q    And then 11 is all documents reflecting any  11:56:24

13  training or any training provided to deputies with respect  11:56:30

14  to intervening.                                       11:56:33

15          Have we discussed the training in that respect?  11:56:35

16      A    Yes.                                         11:56:38

17      Q    Okay.  And the training is basically a recitation  11:56:39

18  of the policy, which is that if an officer observes  11:56:44

19  another deputy or officer to be using excessive force then  11:56:47

20  they have a responsibility to intervene; correct?  11:56:52

21      A    Yes.  If it's a clear matter of excessive force,  11:56:55

22  then yes, we do have a -- a duty to intercede.  11:56:58

23      Q    Okay.  And, actually, if you go -- if you -- can  11:57:01

24  you go back to Policy 300, which I think is Exhibit 3.  11:57:05

25      A    Uh-huh, yes.                                 11:57:09
```

77

```
 1                    REPORTER'S CERTIFICATION

 2

 3          I, Shandy Layne Bush, Certified Shorthand

 4    Reporter, in and for the State of California, do hereby

 5    certify:

 6

 7          That the foregoing witness was by me duly sworn;

 8    that the deposition was then taken before me at the time

 9    and place herein set forth; that the testimony and

10    proceedings were reported stenographically by me and later

11    transcribed into typewriting under my direction; that the

12    foregoing is a true record of the testimony and

13    proceedings taken at that time.

14

15          In witness whereof, I have subscribed my name

16    this 2nd day of May, 2021.

17

18

19

20

21          _____

22          Shandy Layne Bush, CSR No. 10213

23

24

25

                                                            82
```

**EXHIBIT 5**
K. Keeley
4/28/2021

1   James D. Weakley, Esq.      Bar No. 082853
    Ashley N. Reyes, Esq.       Bar No. 312120
2

3   WEAKLEY & ARENDT
    A Professional Corporation
    5200 N. Palm Ave., Suite 211
4   Fresno, California 93704
    Telephone: (559) 221-5256
5   Facsimile:  (559) 221-5262
    Jim@walaw-fresno.com
6   Ashley@walaw-fresno.com

7   Attorneys for Defendants, County of Fresno, Robert McEwen, Karlson Mansan, Jimmy Robnett,
    and Braithan Stoltenberg
8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11  ANTHONY PEREZ, individually,            ) CASE NO. 1:18-CV-00127-AWI-EPG
    CECILIA PEREZ, individually,            )
12  TERRALEE PEREZ, individually and as     ) **COUNTY OF FRESNO'S RESPONSES TO**
    successor in interest to Joseph Perez,  ) **PLAINTIFFS' REQUEST FOR**
13  JOSEPH PEREZ, JR., individually and as  ) **PRODUCTION OF DOCUMENTS , SET**
    successor in interest to Joseph Perez, and ) **TWO**
14  X.P., a minor, by and through his Guardian )
    ad Litem, MICHELLE PEREZ, individually  ) Complaint Filed: January 23, 2018
15  and as successor in interest to Joseph Perez, ) Trial Date: January 13, 2020
                                            )
16          Plaintiffs,                     )
                                            )
17                                          )
                                            )
18              vs.                         )
    CITY OF FRESNO, COUNTY OF               )
19  FRESNO, JAMES ROSSETTI, an              )
    individual, SEAN CALVERT, and           )
20  individual, CHRIS MARTINEZ, an          )
    individual, BRAITHAN STOLTENBERG,       )
21  an individual, ROBERT MCEWEN, and       )
    individual, KARLSON MANASAN, an         )
22  individual, JIMMY ROBNETT, an           )
    individual, and DOES 1-10 inclusive,    )
23                                          )
            Defendants.                     )
24  _____     )

25  **PROPOUNDING PARTY:**  Plaintiffs Anthony Perez, Cecilia Perez, Terralee Perez, Joseph

26                         Perez, Jr., and X.P. a minor, by and through his Guardian ad Litem,

27                         Michelle Perez

28  _____
    County of Fresno's Responses to Plaintiffs' Request for Production of
    Documents and Tangible Things to Defendant County of Fresno, Set Two

1   **RESPONDING PARTY:**    Defendant County of Fresno

2   **SET NO.:**    Two

3                 **<u>Preliminary Statement</u>**

4       In responding to these requests, the propounding party has been furnished with such

5 information as is presently available to the responding party which may include hearsay and other

6 forms of information which are neither reliable nor admissible as evidence. The responding party

7 reserves all objections relating to inadmissible evidence, reserves the right to introduce at trial

8 evidence which is presently unknown to it or is discovered subsequent to the date of these

9 responses, and reserves the right to amend these responses without motion at any time.

10       All the responses contained herein are based only on such information and documents

11 which are presently available to and specifically known to the responding party, and disclose only

12 those contentions which presently occur to it. It is anticipated that further discovery, independent

13 investigation, legal research and analysis will supply additional facts, add meaning to the known

14 facts, as well as establish entirely new factual conclusions and legal contentions, all of which may

15 lead to substantial additions to, changes in and variations from the responses herein set forth. The

16 following responses and objections are given without prejudice to the responding party's right to

17 produce evidence of any subsequently discovered fact or facts which the responding party may

18 later recall. The responding party accordingly reserves the right to change any and all responses

19 herein as additional facts are ascertained, analyses are made, legal research is completed and

20 contentions are made.

21       The responses contained herein are made in a good faith effort to supply as much factual

22 information as is presently known, but should in no way be to the prejudice of the responding party

23 in relation to further discovery, research or analysis. Further, the responses contained herein are

24 made without prejudice to the responding party's right to produce facts, witnesses and documents

25 omitted from these responses by oversight, inadvertence and good faith error, or mistake.

26       This preliminary statement is incorporated into each and every response set forth herein.

27   ///

28

**OBJECTIONS TO PLAINTIFFS' DEFINITIONS**

Defendant County objects to Plaintiffs' definition of "YOU", "YOUR" and "COUNTY" as being overly broad and unduly burdensome to the extent it attempts to extend the scope of the document requests to documents in the possession, custody, or control of individuals, agencies, or entities other than the County of Fresno and its present employees, principals, officials, and agents. These definitions are also objected to the extent it can be interpreted as seeking documents protected by the attorney-client privilege and as attorney work product.

Further, these requests are objected to on the grounds that they are overly broad, and unduly burdensome in that Plaintiffs' definition of "DOCUMENTS" includes drafts of, and amendments, or supplements to, and electronically stored data that Defendant County never had or would no longer have, or have access to, particularly relating to documents concerning events other than the subject incident. These drafts and electronically stored materials of any documents concerning events other than the subject incident are not reasonably calculated to lead to the discovery of admissible evidence in this case.

Objection is additionally made to the term "INCIDENT" insofar as Defendants do not agree to or adopt the allegations set out in the operative Complaint relating to the events that occurred on or about May 10, 2017. Subject to and without waiving this objection, Defendant County of Fresno response to those requests containing the term "INCIDENT" with the understanding that the term refers to the even surrounding the detainment of Decedent Joseph Perez on or about May 10, 2017.

These objections are incorporated into each response below. Subject to and without waiver of these objections, Defendant County of Fresno will provide responses and documents to the best of its ability and within its understanding of each request.

**REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 16:**

Please produce all policies, procedures, and training materials of the Fresno County Sheriff's Office that REFER OR RELATE TO the duties and responsibilities of their deputies relative to Emergency Medical Personnel (including EMTs and Paramedics) as of the time of the

1   INCIDENT. The request refers specifically to situations similar to the facts of this case, where

2   Emergency Medical Personnel are called to the scene of an incident by law enforcement officers

3   involving a restrained subject.

4   **RESPONSE:**

5        A diligent search and reasonable inquiry was conducted in an attempt to locate records

6   responsive to this request, however no responsive documents exist.

7   **REQUEST FOR PRODUCTION NO. 17:**

8        Please produce all policies, procedures, and training materials of the Fresno County

9   Sheriff's Office that REFER OR RELATE TO the terms "positional asphyxia," "restraint

10   asphyxia," and/or "compression asphyxia" as of the time of the INCIDENT.

11   **RESPONSE:**

12        A diligent search and reasonable inquiry was conducted in an attempt to locate records

13   responsive to this request and is produced as COF 1449.

15   DATE: April 9, 2019

16                         WEAKLEY & ARENDT
                             A Professional Corporation

18

19               By:    _____
                         James D. Weakley

20                       Ashley N. Reyes
                       Attorneys for Defendants, County of
                       Fresno, R. McEwen, K. Mansan,

21                       J. Robnett, and B. Stoltenberg



# RIPP RESTRAINTS

## RESPIRATORY COMPROMISE:

The three elements of respiration are:
1. Gas exchange function of lungs
2. The openness of the airway
3. The bellows action of the diaphragm that ventilates the lungs

The respiration bellows, or pump, depends upon the respiratory centers of the central nervous system to maintain and control respiratory activity. If a subject is placed in a compromising position, the neural centers may not be capable of responding to the body's oxygen demands. This is especially true if the neural centers are depressed because of intoxication due to drugs or alcohol.

If a subject is intoxicated, it is not only the neural centers governing these muscles that are impaired. The brain itself is so impaired that the subject may not even be aware that he is in danger of dying. Respiratory compromise may cause death through positional asphyxia when the position of the subject's body interferes with the muscular or mechanical elements of respiration.

## SUDDEN CUSTODY DEATH SYNDROME:

The victims usually have levels of identifiable foreign agents in their systems that trigger abnormal behavior, actions, reactions or personal conduct. They die in ambulances, emergency rooms; trauma centers and under the immediate care of trained and highly skilled medical personnel.

- Bizarre behavior
- Profuse sweating
- Dilated pupils
- Public disrobing
- Fear
- Self-inflicted injuries
- High body temperature
- Shivering
- Hiding behind objects
- Shouting
- Irrational speech seizures

- Seizures
- Incoherent speech
- Unexpected physical strength
- Jumping into water
- Violent behavior
- Panic
- Paranoia
- Violence toward others
- Violence toward objects

COF 1449

1

`` **PROOF OF SERVICE**

2

I, the undersigned, hereby certify that I am employed in the County of Fresno, State of

3

California, over the age of eighteen years and not a party to the within action; my business address is 5200 N. Palm Avenue, Suite 211, Fresno, California 93704.

4

On the date set forth below, I placed in a sealed envelope and served a true copy of the within

5

**COUNTY OF FRESNO'S RESPONSES TO PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS, SET TWO**

6

addressed as follows:

7

8

| Neil K. Gehlawat | Lynn Carpenter |
|---|---|
| Marni B. Folinsky | MANNING & KASS |
| Alder Law, P.C. | ELLROD, RAMIREZ, TRESTER LLP |
| 1875 Century Park East, Suite 1500 | 801 S. Figueroa Street, 15th Fl. |
| Los Angeles, CA 90067 | Los Angeles, CA 90017-3012 |
| Phone: (310) 275-9131 | Phone: (213) 624-6900 |
| Fax: (310) 275-9132 | FAX: (213) 624-6999 |
| E-Mail: ngehlewat@alderlaw.com | |
| | Attorneys for Defendant, City of Fresno |
| Attorneys for Plaintiffs | |

14

☒     BY MAIL     I am readily familiar with the business practice at my place of business for

15

collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited in the ordinary course of business.

16

I caused each envelope, with postage fully prepaid, to be placed in the United States mail, at

17

Fresno, California.

18

☐     BY FACSIMILE     I served the above-mentioned document from Facsimile Machine No.: (559) 221-5262 to the interested parties at the facsimile numbers listed above.

19

☐     BY FEDERAL EXPRESS I am readily familiar with the business practice at my place of

20

business for collection and processing of correspondence for overnight delivery with Federal Express. Such correspondence will be deposited with a facility regularly maintained by Federal Express for receipt on the same day in the ordinary course of business.

21

22

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the foregoing is true and

23

correct, and that this proof of service was executed at Fresno, California, on April 9, 2019.

24

*Marla Leon*

25

Marla J. Leon

26

27

28



**EXHIBIT 6**
K. Keeley
4/28/2021

# The Sheriff's Training Unit

## <u>2017 Annual Training Plan</u>

The Sheriff's Office Training Unit is planning and preparing for 2017 perishable skills training. This training will be two 10 hour days totaling 20 hours.

The 2017 perishable skills training will consist of:

- Blood Borne Pathogens
- Electronic weapons update
- COPPS
- RIPP
- Life Fitness /Mindset
- Arrest and Control
- Firearms
- Active Shooter

The Sheriff's Office Training Unit is well aware of the MOT and VOT shifts that are occurring in patrol on a daily basis. In 2016 deputies assigned to patrol were given the option of attending skills training on their day(s) off instead of their regular work day. The reasoning was there would be fewer shifts needed to be filled on MOT or VOT and instead of paying the overtime to backfill the shift it would be spent during training. This method was well received by patrol deputies and many took advantage of this option.

2015 skills training was presented from 1/28/15 to 5/28/15 with no option of attending skills on overtime. During this time period there was 3,460 hours of MOT filling vacant patrol shifts. In 2016 skills training was offered with the option of attending on their day off utilizing overtime. The training was offered from 1/26/16 to 6/9/16. During skills 2016 there were 1,990 hours of MOT filling vacant patrol shifts. During this same period 993 hours of overtime was spent on deputies attending skills on their RDO's. Mandatory overtime filling patrol shifts during skills training in 2016 was reduced by 58% largely because of the option to attend skills training on their day(s) off.

*COF005356*



# The Sheriff's Training Unit

The Training Unit believes that if overtime continues to be authorized for deputies to attend skills training on their days off (voluntary basis only), it could continue to reduce the amount of overtime for backfilling patrol shifts.  We believe that the MOT shifts that were created for perishable skills could continue to be reduced by offering this option.  We also believe that by reducing the amount of VOT shifts created by skills training, the deputies that usually backfill those shifts, would volunteer for other vacant shifts.  By those deputies volunteering for other vacant shifts, we believe more MOT shifts would be eliminated.

The Training Unit can again plan the 2017 perishable skills training schedule to accommodate all of the days during the week to capture as many deputies volunteering for skills on their RDO's as possible.   In the past, most skills training days have been scheduled for Monday thru Thursday.  We can again schedule any two days of the week to capture the days off of the deputies.  For example, we can schedule Friday/Saturday classes or Saturday/Sunday classes.

The Training Unit is open to modifying the schedule is anyway to help eliminate MOT and VOT shifts in patrol.



# The Sheriff's Training Unit

**DAY 1 Advanced Officer Training / Detac  10 Hours**

**Location: Range**

I. . **Registration/Course Overview**          20 minutes
    A. Registration
        1. POST Roster
        2. Fresno City College Subvention form
        3. Fresno Co. Sheriff's Equipment form
            a. Equipment Inventory (Firearms/Taser/radio/vest)
        4. Instructor(s) introduction
        5. Facility amenities
    B. Overview of Course
        1. Daily schedule (Day 1 & Day 2)
        2. Objectives

II. **Safety Briefing/Guidelines**          20 minutes
    A. Initial safety briefing for overall course(s)
    B. Safety briefing for location(s) of instruction
    C. Medical Emergency procedures
        1. Provide First Aid
        2. Activate EMS/Fire (911)
        3. Location of trauma kit
        4. Nearest medical facility locations

III. **OSHA Blood Borne Pathogens / N95 Mask Fitting-** (OSHA Mandate)          20 minutes
    A. Yearly update
        1. DVD presentation

IV. **COPPS**      1 Hour
    A. Definition
        1. How is it used within your department
    B. Types of Policing
        1. Proactive
        2. Reactive
        3. Predictive
    C. Goals
        1. Reduce crime
        2. Improve community relations
    D. Expectations
    E. Group Discussion
        1. Introduce COPPS Problem

*COF005358*



# The Sheriff's Training Unit

    2.      Groups present COPPS oriented Solution

**V. <u>Electronic Weapons Update-</u>** (Manufacturer Mandate)    **2 Hours**
- A. Goal
  1. The continuing and update training of all Fresno County Sheriff's personnel authorized to carry/use Electrical Weapons (Taser X26/X26P).
- B. Learning Objectives
  1. Demonstrate proper safety protocols associated with the TASER X26/P through proper handling of the device
  2. Articulate the department policy as it relates to the use of TASER
  3. Interpret Case Law associated with TASER in instructor facilitated discussion
  4. Demonstrate the ability to properly arm and disarm the TASER X26/P
  5. Perform a "spark" test
  6. Demonstrate the ability to load and reload cartridges in a safe manner
  7. Successfully deploy two X26/P cartridges at a stationary target
- C. Course Overview
  1. ECD Smart Use Guidelines: Legal Update
  2. Medical and Safety Refresher
  3. Tactical considerations
  4. Evidence.com/Sync
  5. Practical
- D. Legal Update
  1. 4th Amendment
  2. Risk benefit standard
  3. CEW Probe Mode & Guidance
  4. Drive-Stun Guidance
  5. Additional force factors
  6. Avoid CEW Excessive Force Liability
- E. Medical
  1. Cardiac Risks
  2. Durations of exposures
  3. Physiological or Metabolically Compromised Persons
- F. Tactical Considerations
  1. Trigger operations
  2. Targeting zones
  3. Probe placement
  4. NMI (Neuro Muscular Incapacitation)
- G. Injuries from falls
  1. Quantum Force
  2. Control and Cuffing under power
- H. Upload and storage of evidence
  1. Evidence.com
  2. Account
  3. Quarterly Sync/Firmware

*COF005359*



# The Sheriff's Training Unit

        4.  Upload and Tag Evidence
I.  Agency Policy
      1.  Purpose
      2.  Use of Force Continuum
      3.  Application of force
      4.  Medical Aid
      5.  Supervisor notification requirements
      6.  Documentation
      7.  Evidence
            a.  Evidence.com
            b.  Sync
J.  Practical application
      1.  Spark Testing (2 methods)
      2.  Students will demonstrate loading and re-loading of cartridges
      3.  Students will demonstrate deployment of device from holster/method of carry
      4.  Students will deploy two training cartridges

## VI.  RIPP Restrain System     1 Hour

A.  Sudden Custody Death
      1.  Causes
      2.  Prevention
B.  Hog Tie
      1.  Definition
      2.  Not an approved technique
C.  Symptoms and Behavioral Patterns that may lead to Sudden Custody Death
      1.  Bizarre and aggressive behavior
      2.  Dilated pupils
      3.  Fear
      4.  High body temp
      5.  Irrational speech
      6.  Paranoia
      7.  Seizures
      8.  Violent behavior
D.  Positional Asphyxia
      1.  Definition
      2.  Causes
      3.  Prevention
E.  Practical Applications
      1.  Vehicle
      2.  Truck
      3.  Sedan
      4.  Hobble
      5.  Seated
      6.  Walking / Escort

*COF005360*



# The Sheriff's Training Unit

LUNCH

**VII.**   **Life Fitness / Mindset**        **1 Hour**

    A.  Health and Nutrition
        1.  Fatigue
            a.  Sleep deprivation
            b.  Effects of alcohol
            c.  Overworked
            d.  Lack of physical energy
        2.  Nutrition
            a.  Alcohol
            b.  Tobacco
            c.  Soda
            d.  Water
            e.  Energy drinks
            f.  Fast food
            g.  Sugar
            h.  Caloric intake versus exercise
    B.  Fitness
        1.  Exercise
            a.  Aerobic
            b.  Anerobic
            c.  Benefits
    C.  Work performance
        1.  Physical altercations
        2.  Injuries
        3.  Calling in sick
        4.  Stress

**VIII.**   **Arrest and Control** (POST Mandate)        **4 Hours**

    A.  Safety Orientation
        1.  Expectations
        2.  Pre-existing injuries
        3.  Prior injuries
        4.  Rules
        5.  Medical emergency procedures
        6.  Equipment
    B.  Policies and Legal Issues
        1.  Authority
            a.  P&P 300
            b.  PC 12600

*COF005361*



# The Sheriff's Training Unit

      c.  PC 835(a)
      2.  Factors used to determine reasonableness of force
      3.  Medical attention after force application
      4.  Supervisor notification
C.  Use of Force Considerations
      1.  Passive resistive
      2.  Pain compliance
      3.  Less lethal
      4.  Lethal
D.  Stretching and warmup
E.  Principals of weaponless defense
      1.  Balance
      2.  Stance
      3.  Movement patterns
      4.  Awareness
F.  Body physics and Dynamics
      1.  Suspect response
      2.  Vulnerable areas
G.  Arrest and Control Techniques
      1.  Personal body weapons
      2.  Handcuffing Techniques
      3.  Gun takaways
      4.  Takedowns to prone and handcuffing
      5.  Officer escapes and weapon retention
H.  Use of Restraint Devices
      1.  Placement
      2.  Handcuffs
      3.  Ripp
I.  Scenarios
      1.  Students shall participate in a critical thinking scenario wherein they run about 50 yards (simulating the chase of a running suspect), and confront a striking dummy, a kick/strike bag, then an instructor in a protective suit. The student will be required to select and apply reasonable force options to include, verbal commands, escape techniques, gun takeaways, control holds, handcuffing, baton, or personal body strikes based on the level of resistance. The students will be tested under the conditions that simulate the effects of physical and mental stress. Instructors can base their level of resistance in a fashion to reduce the risk of injuries to the students.

**END OF DAY 1**

*COF005362*



# The Sheriff's Training Unit

**DAY 2  Firearms      10 Hours**

**Location: Range**

IX. <u>Firearms</u> (POST Mandate)    **5 Hours**
   A.  Safety Briefing
       1.  Range Rules
       2.  Medical Emergency Plan
       3.  Trauma Kit
   B.  Fundamentals of Shooting
       1.  Draw
       2.  Stance
       3.  Grip
       4.  Sight Picture
       5.  Sight Alignment
       6.  Trigger control
       7.  Breathing
       8.  Follow through
   C.  Moving and shooting
       1.  Forward
       2.  Reverse
       3.  Laterally
       4.  Running
       5.  Multiple shooters
   D.  Shooting from cover
       1.  Strong side
       2.  Support side
   E.  Combat Shooting Positions
       1.  Kneeling
       2.  Prone
       3.  Urban Prone
       4.  Supine
   F.  Multiple targets
       1.  Two or more
   G.  Hostage
       1.  Shoot / no shoot
   H.  Multiple Officers
       1.  Communication
       2.  Cover fire
       3.  Risks
   I.  Target Identification
   J.  Officer Down Rescue
       1.  Plan
       2.  Roles
       3.  Contact

*COF005363*



# The Sheriff's Training Unit

    4.   Extraction
    5.   First Aid

Lunch

**Location: Old Juvenile Hall 744 S. Tenth St.**

**X. <u>Active Shooter</u>**    **5 Hours**
  A.  Safety Briefing
      1.   Simmunition Safety Gear
      2.   No weapons allowed on the premises
      3.   Injuries
  B.  Mindset
      1.   Probabilities
      2.   Case Study
          a.   Statistics
          b.   Suicide
          c.   Engaging first responders
          d.   Gender differences
          e.   Shooter mindset
  C.  Contact Team Weapons
      1.   Long guns
      2.   Shotgun
      3.   Handgun
  D.  Weapon Manipulation
      1.   High ready
      2.   Low ready
      3.   Depressed muzzle
      4.   Sul carry position
      5.   Close quarter carry
      6.   Room entry position for long guns
      7.   Reloading
  E.  Contact Team Formations and Movements
      1.   One man
      2.   Two man
      3.   Three man
      4.   Four man
      5.   Five man
  F.  Target Acquisition
      1.   One suspect
      2.   Two suspects
      3.   Hostage
  G.  Target Assessment
      1.   Armed
      2.   Unarmed
  H.  Scenarios

*COF005364*



# The Sheriff's Training Unit

1. Disgruntled Employee
   a. Students will be given a short briefing of the call for service. A disgruntled employee has returned to their workplace and has opened fire. Students will then begin the course by hearing gun fire provided by an audio source. Students will use the formations learned earlier to pursue the gunfire and eliminate the threat. While on their way to the sound of gunfire students will have to pass doorways and rooms at their own discretion. During the scenario the sounds of gunfire may or may not cease which then the students will have to decide their next course of action. As part of their mission to stop the threat there will be mannequins or role players with clothing covered in blood simulating real life obstacles and decisions having to be made. Students will have to decide whether or not to provide first aid or continue towards the threat. Once they make their way to the threat there will be a hostage situation. Students will have to acquire their target and assess the scene. Students will then have to decide their next course of action of taking the shot or taking a position of cover.

2. School Shooting / Officer Rescue
   a. Students will be given a short briefing of the call for service. An officer has responded to an active shooter at an elementary school where the officer first on scene has entered the building but has not responded to any radio calls. It is believed the officer is down and in need of rescue. The students will begin the course needing to make a decision on proceeding in without a plan or making a plan by understanding what resources they have at their disposal. They will proceed through the course continuing to make difficult decisions with the sound of gunfire provided by an audio source and life like mannequins or role players covered in blood. Once they acquire the downed officer (weighted dummy) they will need to extract the downed officer to safety while providing cover fire or engaging the suspect.

## END OF DAY 2

\*\*\* All safety guidelines as submitted by FSO to POST for the PSP 2017 as well as safety protocols set by the training unit for this specific training shall be adhered to by all students and instructors.

*COF005365*

EXHIBIT 7
K. Keeley
4/28/2021

# RIPP™ Restraints International INC

## LAW ENFORCEMENT/SCDS
## INSTRUCTOR CERTIFICATION COURSE

### STUDENT MANUAL



RIPP™ RESTRAINTS INTERNATIONAL INC • LAW ENFORCEMENT/SCDS INSTRUCTORS CERTIFICATION COURSE • SECTION II / STUDENT

COF005366

*In order to meet the challenge of minimizing unnecessary deaths in the field, proper training is a must.*

At **RIPP™ RESTRAINTS INTERNATIONAL INC,** we are continually trying to find new and innovative ways to support and assist the law enforcement community through the development of new products and up-to-date training for law enforcement such as this Law Enforcement/SCDS Course.

We welcome you to share your information or comments with us...

We are always searching for new information in order to help you protect yourselves and your departments from litigation.  Any new information that you may have or any case histories that your department will allow to be shared with us is greatly appreciated and will assist us in our effort to educate departments like yours throughout the country.

# RIPP™ Restraints International INC

PO BOX 741392 ORANGE CITY FL 32774-1392  •  855 775 2812
WWW.RIPPINTERNATIONAL.COM  •  RIPP@RIPPINTERNATIONAL.COM

---

## DISCLAIMER

The founder of RIPP™, Bill DeVane Sr, was the sole author of the information contained in the *Sudden Custody Death Syndrome and Cocaine Psychosis* lesson plan/training materials which are now presented by RIPP™ Restraints International Inc.  His studies, coupled with the evident need for a restraint system specifically designed for violent, violent narcotized and violent mentally-disturbed subjects led to his creation of *ALL* the restraints presently produced by RIPP™ Restraints International Inc.

When a person is certified as an instructor for RIPP™, they are certified to utilize DeVane's lesson plans and materials to teach the proper techniques and uses of restraints *created and distributed by RIPP™ only.*

A RIPP™ instructor is *not* authorized to use *any* RIPP™ training materials in conjunction with any other restraint-type products that are not associated with nor authorized by RIPP™ Restraints International Inc.

*RIPP™ Restraints International Inc only authorizes the use of RIPP™ lesson materials in accordance to the proper use of RIPP™ products.*

Authorization will not ever be given for any RIPP™ instructor to use RIPP™ lesson plans/lectures to train in the use of any non-RIPP™ product.  *If this occurs, RIPP™ Restraints International Inc has the right to unilaterally terminate the certification of the instructor(s) and association with the department/agency and take legal action against the instructor.*

---

© 1994 Joelle DeVane
Revised 3/2016

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of RIPP™ Restraints International Inc.

Printed in the United States of America.

*COF005367*

# LAW ENFORCEMENT/SCDS INSTRUCTOR CERTIFICATION COURSE MANUAL

# SECTION II - STUDENT

Introduction - SCDS v PCDS . . . . . . . . . . . . . . . . . . . . .1

Remember . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Cocaine Psychosis . . . . . . . . . . . . . . . . . . . . . . . .3

    Physiological Symptoms. . . . . . . . . . . . . . . . . .4

Hog-Tied Defined - Cruz v Laramie. . . . . . . . . . . . . . . .5

Substance Induced Excited Delirium . . . . . . . . . . . . . . .6

    Identifiable Symptoms & Behavioral Patterns . . . . . . . . . . .7

    West Palm Beach v Lewis - Video . . . . . . . . . . . . . .8

    Caution . . . . . . . . . . . . . . . . . . . . . . . . . .9

Natural Sudden Deaths . . . . . . . . . . . . . . . . . . . . . 10

    A Clinical Picture . . . . . . . . . . . . . . . . . . . . . . 11

Case History

    #1 - 28 Year Old Male. . . . . . . . . . . . . . . . . . 12-13

    #2 - 30-35 Year Old Male . . . . . . . . . . . . . . . . 14-16

    Case Similarities. . . . . . . . . . . . . . . . . . . . . 17

Pain Compliance . . . . . . . . . . . . . . . . . . . . . . . . 18

Never... . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Positional Restraint Asphyxia . . . . . . . . . . . . . . . . . . 20

Repiratory Compromise. . . . . . . . . . . . . . . . . . . . . 21

Positional Restraint v Oxygen Saturation & Heart-Rate Recovery . . . . 22

    Anne Price v County of San Diego . . . . . . . . . . . . . 23-24

Case History

    #3 - 16 Year Old Male. . . . . . . . . . . . . . . . . . 25

    #4 - 28 Year Old Male. . . . . . . . . . . . . . . . . . 26

    #5 - 40 Year Old Male . . . . . . . . . . . . . . . . . 27-28

    Case Similarities. . . . . . . . . . . . . . . . . . . . . 29

Drugs, Death & Blame . . . . . . . . . . . . . . . . . . . 30-33

Building a Defensible Platform . . . . . . . . . . . . . . . . . 34-37

SWARM. . . . . . . . . . . . . . . . . . . . . . . . . . 38-41

    Jefferson Street Incident - Video . . . . . . . . . . . . . . 42

RIPP™ RESTRAINTS INTERNATIONAL INC - LAW ENFORCEMENT/SCDS INSTRUCTORS CERTIFICATION COURSE - SECTION II / STUDENT MANUAL
© RIPP™ RESTRAINTS INTERNATIONAL INC - DUPLICATION AND/OR DISTRIBUTION OF SECTION II MATERIAL IS PERMITTED FOR IN-HOUSE TRAINING ONLY.

COF005368

# *INTRODUCTION*

## Sudden Custody Death Syndrome *(SCDS)*

### *vs*

## Police Custody Death Syndrome *(PCDS)*

## REMEMBER

Perception is just as dangerous to you as reality because
every person's perception

### IS
their own reality

RIPP™ RESTRAINTS INTERNATIONAL INC - LAW ENFORCEMENT/SCDS INSTRUCTORS CERTIFICATION COURSE - SECTION II / STUDENT MANUAL
© RIPP™ RESTRAINTS INTERNATIONAL INC - DUPLICATION AND/OR DISTRIBUTION OF SECTION II MATERIAL IS PERMITTED FOR IN-HOUSE TRAINING ONLY.

COF005370

## COCAINE PSYCHOSIS

*OVERDOSE FATALITY*
6mg/l (milligrams per liter) of cocaine

*COCAINE PSYCHOSIS*
as low as .6 mg/l

COF005371

*COCAINE PSYCHOSIS continued*

### PHYSIOLOGICAL SYMPTOMS INCLUDE:

**Seizures**

**High body temperatures**

**Dilated pupils**

**A high percentage of fatalities in police custody had been restrained in the "hog-tied" position.**

### NEVER HOG-TIE ANYONE!

COF005372

## HOG-TIED DEFINED

### CRUZ v CITY OF LARAMIE

#### (US COURT OF APPEALS - 11th CIR-2001)

The court found that a "hog-tie" restraint involves the binding of the ankles to the wrists, behind the back, with a 12" or less separation.

The court held that officers may NOT apply such a technique, when a subjects capacity is diminished as a result of intoxication, under the influence of controlled substances, a discernable mental condition, or any other conditions.

### NEVER HOG-TIE ANYONE.

COF005373

## SUBSTANCE INDUCED EXCITED DELIRIUM

- CAT (Methcathinone)
- Ethanol (Alcohol)
- "Ice"
- LSD
- Ritalin
- Methamphetamines
- PCP
- Prescription Barbiturates
- THC

Sometimes, even the lack of having taken certain prescription drugs could cause a similar response in abnormal behavior (such as Lithium in the case of bipolar disorders).

## *IDENTIFIABLE SYMPTOMS & BEHAVIOR PATTERNS*

- Bizarre & aggressive behavior
- Dilated pupils
- Fear
- High body temperature–*(as high as 106-108)*
- Hiding behind cars, trees & bushes
- Irrational/Incoherent speech
- Jumping into Water
- Panic
- Paranoia
- Profuse sweating

- Public disrobing
- Self-inflicted injuries
- Shivering
- Shouting:  frequently irrationally
- Seizures
- Unexpected physical strength
- Violent behavior *(general)*
- Violence towards others
- Violence towards objects especially glass

COF005375



**VIDEO**

**WEST PALM BEACH v. LEWIS**

## CAUTION

Beware of the naked, sweating, screaming, irrational, 200-pound man.  You don't stand a chance against him...
*ALONE*

*CALL FOR BACK UP*

COF005377

## NATURAL SUDDEN DEATHS

In 1701 Dr. Lancisi published De Subitaneis Mortibus, a study of so-called Natural Sudden Deaths.

In 1849, Dr. Bell portrayed a typical attack of this particular malady. Sometimes referred to as "Bell's Mania" or "Fatal Catitonia".

In 1938, Dr. Shulack published a paper on a fatality and his behavioral patterns and physical aspect changes prior to death.

COF005378

## A CLINICAL PICTURE...

### ...OF A TYPICAL ATTACK OF A PSYCHOSIS RELATED SUDDEN DEATH:

**Sleep becomes difficult**

**Responsive aggressiveness increases**

**Perspiration becomes profuse**

**Continuous blood pressure fall**

**Fevers between 105° and 110° F**

**Self inflicted injuries**

**Violent psychotic behavior**

*In the end – THEY DIE*

## CASE HISTORY #1

### SUBJECT:  28 YEAR OLD MALE

1. Subject had been using cocaine.
2. He exhibited violence toward his girlfriend and residence.
3. Officers found him lying face down, naked on a bed.
4. Subject flipped over, leaped up and attacked one of the officers.
5. It ultimately took nine officers to subdue and handcuff the subject.
6. The subject repeatedly shouted, *"I'm Superman! You can't hurt me!"*

*CASE HISTORY #1 continued*

7. Impact weapons, including a police radio broken on the subject's head and a side-handled baton, had no effect on him.

8. It finally took two officers to apply a debilitating neck hold.

9. The subject broke a fabric belt, a leather belt and a plastic handcuff with his ankles.

10. The subject was "hog-tied" with a rope.

11. After being "hog-tied," the subject died almost immediately.

12. Toxicology revealed cocaine in a sufficient quantity for the Medical Examiners to rule the cause of death to be Cocaine Intoxication.

COF005381



**VIDEO**

CASE HISTORY #2

COF005382

## *CASE HISTORY #2*

### 30-35 YEAR OLD MALE

1. Two officers responded to a break-in at a barber shop with a residence above.
2. Officers had been advised of shots fired.
3. Subject was totally nude and had been shot at least twice by the owner/resident.
4. Subject could be heard on the stairway shouting, *"Kill me! Kill me!"*
5. When the officers got him onto the floor, three of them tried to hold him down and cuff him.

*CASE HISTORY #2 continued*

6. Subject saw the cameras and began shouting, "Put it in the papers! Put it in the papers!"

   *Note: This incident was aired nationally on "COPS."*

7. The subject was "wall-eyed" and covered with a sheen of sweat.

8. Subject threw the three officers off and bolted for the door.

9. Five officers tackled him at the door and managed to get handcuffs on him.

10. Subject was transported to a hospital in handcuffs only.  He was not "hog-tied."

11. Subject died in the emergency room later.

COF005384

## CASE 1 & 2 SIMILARITIES

- Bizarre & aggressive behavior
- Violence towards others
- Violence towards objects
- High body temperatures
- Profuse Sweating

- Public disrobing
- Shouting
- Irrational statements
- Unexpected physical strength

### CASE #1
Subject was hog-tied

### CASE #2
Subject was *not* hog-tied

COF005385

## PAIN COMPLIANCE

The following techniques and actions are usually
ineffective on these subjects:

- Pain compliance techniques
- Impact weapons
- Defensive tactics techniques
- O.C.

COF005386

## NEVER...

*NEVER* go one-on-one with these subjects unless a life depends on it.

*ALWAYS* call for back-up *AS SOON* as you suspect you are faced with a Substance Induced Excited Delirium subject.

*CALL* for as much back-up as you can get.

*TALK* to the subject in a calming, soothing manner.  When you have adequate man power, then take the subject into custody.

COF005387

# *POSITIONAL RESTRAINT ASPHYXIA*

**Positional Asphyxia occurs when the position of the body interferes with respiration.**

**This interference is increased when the subject is placed in a physically compromised position from which they cannot remove themselves.**

COF005388

## RESPIRATORY COMPROMISE

### THE THREE (3) ELEMENTS OF RESPIRATION ARE:



1. The *GAS EXCHANGE* - function of the *LUNGS*

2. The *PATENCY* - openness, of the *AIRWAY*

3. The *BELLOWS* - action of the *DIAPHRAGM* that ventilates the lungs

Respiratory compromise occurs when the position of the body interferes with respiration

# POSITIONAL RESTRAINT vs
# OXYGEN SATURATION & HEART-RATE RECOVERY

### Early study by Dr. Donald T. Reay
### King County, WA

vs

### UCSD Study by
### Dr.'s Chan, Vilke, Neuman and Clausen

REAY STUDY                  MID-GROUND                  UCSD STUDY

COF005390

## *ANNE PRICE v*
## *COUNTY OF SAN DIEGO*

*Price, et.al., v. San Diego, et.al.; 1998 WL 16007 (S.D. CA) 01313*

**The court found: That the use of the hogtie restraint technique did not constitute the use of excessive force by the deputies; that leaving the decedent, Mr. Price, lie on approximately 133.9° asphalt while performing other tasks, was not excessive force; that the deputies were entitled to qualified immunity; and, that the Sheriff did not fail to train his deputies regarding the dangers of hog-tying because a study conducted by the University of California – San Diego (UCSD) "has shown these dangers to be fictitious", plus other related findings.**

**However, the Judge stipulated *"In this case, I find..."***

COF005391

## NOTE...

In the two studies done by Dr. Reay and the Dr.'s of the UCSD study, neither study could effectively address:

- Fear
- Panic
- Elevated Body Temperature *(106°–108°)*
- Emotional Stress
- Elevated Heart Rate *(160 bpm & higher)*
- Effects of Drugs in the System

However, UCSD did take their inability to address these factors into their study into consideration.

COF005392

# CASE HISTORY #3

## 16 YEAR OLD MALE

1. Police responded to a call and found the subject acting in a bizarre and violent manner.
2. The subject was stripped down to just his underwear.
3. The subject was reported to be sweating profusely.
4. The subject was talking incoherently.
5. At one point, the subject broke away and rammed his own head through a wood fence.
6. Officers used batons, but they were ineffective.
7. Pain compliance techniques were ineffective.
8. The officers finally gained control by using a carotid neck restraint.
9. An ambulance was called to the scene.
10. Initially, during the time after arrest, the subject's vital signs were stable.  However, they soon deteriorated and the subject died.
11. The subject was not hog-tied.
12. Toxicology reports showed the presence of LSD.

RIPP™ RESTRAINTS INTERNATIONAL INC - LAW ENFORCEMENT/SCDS INSTRUCTORS CERTIFICATION COURSE - SECTION II / STUDENT MANUAL
© RIPP™ RESTRAINTS INTERNATIONAL INC - DUPLICATION AND/OR DISTRIBUTION OF SECTION II MATERIAL IS PERMITTED *FOR IN-HOUSE TRAINING ONLY.*

COF005393

# CASE HISTORY #4

## 28 YEAR OLD MALE

1. Fire personnel and paramedics responded to the scene and found the subject acting in a violent and bizarre manner.

2. When police arrived, they found four firemen holding the subject down.

3. The firemen refused to release the subject long enough for the officers to take control until handcuffs were applied.

4. The subject was placed face down on a gurney.

5. The subject was incoherent.

6. The subject was sweating profusely.

7. The subject had a heart rate of 180 beats per minute.

8. The subject died in the ambulance during transport to a medical facility.

9. Toxicology reports revealed high levels of cocaine.



VIDEO

CASE HISTORY #5

## CASE HISTORY #5

### 40 YEAR OLD MALE

1. Police responded to a prowler call and found the subject in the custody of the complainant.

2. The subject's pupils were dilated.

3. The subject was incoherent.

4. The subject was sweating profusely.

5. The subject was also shivering uncontrollably.

6. The subject was transported to the police station where he was strapped to an examining table to have blood drawn. (He was shivering so badly that the medical technician was afraid the needle might break if restraints were not used.)  After the blood draw, the subject was released to a seated position on the examining table.

7. During the ensuing conversation, the subject "passed out. "  CPR was administered, and he was revived.

8. During the ambulance transport to the hospital, the subject lapsed into unconsciousness again and died.

9. The cause of death was listed as "Acute Methamphetamine Intoxication."

## CASE 3, 4 & 5 SIMILARITIES

Bizarre and aggressive behavior

Violence towards others

Public Disrobing

Profuse Sweating

Talking incoherently

Self-inflicted injuries

Unexpected physical strength

Dilated pupils

Shivering

*CASE #3* – Batons and pain compliance techniques were ineffective. A drug LSD, was involved, and the subject died.

*CASE #4* – The subject was so strong and violent, that the fire personnel refused to trade control to the police. A drug, cocaine, was involved, and the subject died.

*CASE #5* – Drugs were involved, methamphetamines and the subject died.

*NONE OF THESE SUBJECTS WERE HOG-TIED.*

*ALL THREE OF THEM DIED.*

COF005397

## DRUGS, DEATH & BLAME

Always keep in mind that the subjects you confront on the street who exhibit symptoms and behavioral patterns suggesting Cocaine Psychosis or Substance Induced Excited Delirium are potentially dead prisoners.

According to Dr. Laposata, Substance Induced Excited Delirium is regarded as a *"medical emergency with a psychological presentation."*

COF005398

*DRUGS, DEATH & BLAME continued*

## SUDDEN TRANQUILITY

After a subject has been subdued, they may become extremely tranquil, appearing to have given up and accepted their fate. They may seem to be sleepy and resting.  This is the state of Sudden Tranquility and it usually occurs just prior to death.

COF005399

*DRUGS, DEATH & BLAME continued*

**Dr. Donald T. Reay**
**stated in a medical publication:**

*"The use of drugs is now being viewed as an explanation for the erratic and violent behavior of these individuals and not necessarily a contributor to their deaths."*

COF005400

*DRUGS, DEATH & BLAME continued*

**Hog-tying a subject who falls within the parameters of a potential SUDDEN CUSTODY DEATH SYNDROME victim will quite possibly be viewed as a contributing factor in their death by the:**

- Family
- Medical Examiner
- Media
- Lawyers
- Court

*NEVER HOG-TIE ANYONE!*

## BUILDING A DEFENSIBLE PLATFORM

When you take someone into custody, you remove them from *their* custody and place them in *your* custody.

It then becomes incumbent upon you to do everything within your power to help that person stay alive.  It does not matter what that person would have done had he remained in their own custody.

They are now in *YOUR* custody.

COF005402

*BUILDING A DEFENSIBLE PLATFORM continued*

### 1. RECOGNITION.
Recognition of a problem, such as the subject demonstrating Symptoms and Behavioral Patterns of Cocaine Psychosis or Substance Induced Excited Delirium.

### 2. TREATMENT IMMEDIATE TO POST-ARREST.
The subject is placed in a seated position...*NEVER* hog-tied.

### 3. TRANSPORT.
Either seated in your car or in an ambulance, if possible. *(it's cheap insurance)*.

COF005403

*BUILDING A DEFENSIBLE PLATFORM continued*

### 4. MEDICAL ATTENTION.
Preferably by a doctor at a hospital, as opposed to an EMT or paramedic. A doctor should determine if it is safe to incarcerate, if applicable.

### 5. COMMUNICATION.
If arrested, advise jail personnel of the circumstances throughout the entire incident, including the medical examination / treatment. They need to know.

### 6. OBSERVATION.
The jail should have an isolation and observation policy in place.

COF005404

*BUILDING A DEFENSIBLE PLATFORM* continued

**Step one through five should all be carefully set down in a well written report of the incident.**

**Stipulate and explain each symptom or behavior exhibited.**

**Remember that good report writing is your best first line of defense.**

COF005405

# SWARM

## DISCLAIMER

*This is an example tactic, not necessarily a recommended procedure to be trained and adopted by any department. If, however, your department does not already have a SWARM TECHNIQUE included in its' training program, it is suggested that you find one you like and train it in your own way.*

## SWARM

If *ONE* is not a good number,
perhaps *FOUR* will be.

*The following is only an example of a four-man
SWARM TECHNIQUE.*

1. Surround the subject-front (point), sides and rear using a six-foot separation.

2. Only the point officer talks. *(See diagram)*

3. One specific word is chosen as the "trigger" or "go" word for the take-down, and it is never used except for that purpose.
   *(i.e.: NOW "Sir, you will have to go with us NOW")*

4. The two side officers initiate an arm-bar take-down from their opposing sides.

5. The rear officer takes the legs at the knees and anchors them.

*SWARM continued*

6.   The point officer takes firm control of the head, between his or her hands, and continues the take-down effort of the two side officers (where the head goes, the body follows.)  The point officer protects the head from injury, turns it to the side and holds it stable.

7.   The two side officers handcuff the subject as quickly as possible.

8.   Apply a hobble restraint to the ankles and roll the subject into an upright, seated position.  If the subject kicks or attempts to use his or her legs as a weapon, attach the hobble snap to the handcuff chain at its' full extension

9.   If the subject appears to be as described in SCDS training, it is recommended that they be transported immediately to a medical facility for treatment.

RIPP™ RESTRAINTS INTERNATIONAL INC - LAW ENFORCEMENT/SCDS INSTRUCTORS CERTIFICATION COURSE - SECTION II / STUDENT MANUAL
© RIPP™ RESTRAINTS INTERNATIONAL INC - DUPLICATION AND/OR DISTRIBUTION OF SECTION II MATERIAL IS PERMITTED *FOR IN-HOUSE TRAINING ONLY.*

COF005408

*SWARM continued*

10. **Position the subject so that he/she can lean back against a fixed object.  This helps relieve pressure on the diaphragm and makes breathing easier.**

### *DO NOT HOG-TIE THE SUBJECT.*
### *Keep the subject seated upright at all times.*

RIPP™ RESTRAINTS INTERNATIONAL INC - LAW ENFORCEMENT/SCDS INSTRUCTORS CERTIFICATION COURSE - SECTION II / STUDENT MANUAL
© RIPP™ RESTRAINTS INTERNATIONAL INC - DUPLICATION AND/OR DISTRIBUTION OF SECTION II MATERIAL IS PERMITTED *FOR IN-HOUSE TRAINING ONLY.*

COF005409



*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 8

PEREZ

vs

CITY OF FRESNO

---

Deposition of: Karlson Manasan

Taken on: Tuesday, March 05, 2019

---



**CERTIFIED COPY**



Certified Shorthand Reporters

*A Professional Corporation*

Main Office: 900 Truxtun Avenue, Suite 320
Bakersfield, CA 93301
(800) 322-4595 Toll Free ● (661) 395-1050
www.woodrandall.com

Serving Central California - Bakersfield, Visalia & Fresno

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

_____

ANTHONY PEREZ, individually,  )
CECILIA PEREZ, individually,  )
TERRALEE PEREZ,               )
individually, and as          )
successor in interest to      )No. 1:18-cv-00127-AWI-EPG
Joseph Perez, JOSEPH PEREZ,   )
JR., individually and as      )
successor in interest to      )
Joseph Perez, and X.P. a      )
minor, by and through his     )
Guardian ad Litem, MICHELLE   )
PEREZ, individually and as    )
successor in interest to      )
Joseph Perez,                 )
                              )
          Plaintiffs,         )
                              )
      vs.                     )
                              )
CITY OF FRESNO, COUNTY OF     )
FRESNO, JAMES ROSSETTI, an    )
individual, SEAN CALVERT, an  )
individual, CHRIS MARTINEZ,   )
an individual, BRAITHAN       )
STOLTENBERG, an individual,   )
ROBERT MCEWEN, an             )
individual, KARLSON MANASAN,  )
an individual, JIMMY          )
ROBNETT, an individual, and   )
DOES 1-10, inclusive,         )
                              )
          Defendants.         )
_____)

VIDEOTAPED DEPOSITION

OF

KARLSON MANASAN

Tuesday, March 5, 2019

Fresno, California

Reported by:  Bree Mervin, CSR No. 13057, RPR, CRR

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

```
                                                                    2
 1                        APPEARANCES

 2

 3   For Plaintiffs:         Alder Law, P.C.
                             BY MR. NEIL GEHLAWAT
 4                           Attorney at Law
                             1875 Century Park East
 5                           Suite 1500
                             Los Angeles, California  90067
 6                           (310)275-9131
                             ngehlawat@alderlaw.com
 7

 8
     For County of Fresno:   Weakley & Arendt
 9                           BY MR. JAMES D. WEAKLEY
                             Attorney at Law
10                           5200 North Palm Avenue
                             Suite 211
11                           Fresno, California  93704
                             (559)221-5256
12                           jim@walaw-fresno.com

13

14   For City of Fresno:     Manning & Kass, Ellrod,
                             Ramirez, Trester, LLP
15                           BY MS. MILDRED K. O'LINN
                             Attorney at Law
16                           801 South Figueroa Street
                             15th Floor
17                           Los Angeles, California  90017
                             (213)624-6900
18                           mko@manningllp.com

19

20   The Videographer:       CHELCIE LEWIS

21

22   Also present:           DEPUTY SEAN CALVERT
                             OFFICER CHRIS MARTINEZ
23                           OFFICER JAMES ROSSETTI

24

25
```

3

1                    I   N   D   E   X

2

3 EXAMINATION BY                              PAGE

4

5 MR. GEHLAWAT                                  5

6

7 MS. O'LINN                                   71

8

9

10

11                  EXHIBIT INDEX

12 Plaintiffs' Exhibits

13 Exhibit 1 CONFIDENTIAL - Interview with

14 Karlson Manasan                            56

15

16

17

18

19

20

21

22

23

24

25

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

9

10:05:43  1        Q.   Okay.   And at the time of this incident,

10:05:48  2   which involved a Joseph Perez, do you recall that?

10:05:52  3        A.   Yes.

10:05:53  4        Q.   You were a trainee at the time?

10:05:55  5        A.   I was.

10:05:56  6        Q.   Okay.   So as of the time of that incident,

10:05:58  7   how long had you been with the sheriff's office?

10:06:00  8        A.   A year and about four months.

10:06:04  9        Q.   Okay.   And who was the training officer that

10:06:10 10   you were with that day or deputy?

10:06:12 11        A.   Deputy Robnett.

10:06:13 12        Q.   Had you worked with him prior to that day?

10:06:18 13        A.   No.

10:06:19 14        Q.   So first time?

10:06:20 15        A.   Yes.

10:06:21 16        Q.   And do you recall hearing some information

10:06:27 17   over dispatch about a subject in the area of Palm and

10:06:31 18   Santa Fe?

10:06:32 19        A.   I do.

10:06:33 20        Q.   Okay.   And what do you recall hearing about

10:06:35 21   over dispatch?

10:06:36 22        A.   It was a suspicious person running through

10:06:40 23   the street and hiding behind some bushes.

10:06:44 24        Q.   Anything else that you recall?

10:06:50 25        A.   I recall a Deputy Stoltenberg saying over

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

10

| | | |
|---|---|---|
| 10:07:00 | 1 | the radio that the subject was combative. |
| 10:07:09 | 2 | Q.   And how did you know it was Deputy |
| 10:07:12 | 3 | Stoltenberg who was providing that information to |
| 10:07:13 | 4 | you? |
| 10:07:13 | 5 | A.   He was -- he's, I believe, was on the call, |
| 10:07:19 | 6 | and he was the deputy working that area. |
| 10:07:23 | 7 | Q.   Did he identify himself by way of a call |
| 10:07:25 | 8 | sign? |
| 10:07:26 | 9 | A.   Yes. |
| 10:07:27 | 10 | Q.   And you know that off the top of your head? |
| 10:07:34 | 11 | A.   His call sign? |
| 10:07:35 | 12 | Q.   Yes. |
| 10:07:36 | 13 | A.   2 Lincoln 25. |
| 10:07:37 | 14 | Q.   And so after he relayed that information |
| 10:07:39 | 15 | over dispatch, is that when you and Deputy Robnett |
| 10:07:42 | 16 | headed towards the scene? |
| 10:07:43 | 17 | A.   Yes. |
| 10:07:44 | 18 | Q.   And where were you at the time that you |
| 10:07:46 | 19 | received that information? |
| 10:07:46 | 20 | A.   In the Fig Garden area. |
| 10:07:49 | 21 | Q.   So around here? |
| 10:07:51 | 22 | A.   Yes. |
| 10:07:56 | 23 | Q.   How long did it take for you to get from the |
| 10:07:59 | 24 | Fig Garden area to where the officers and deputies |
| 10:08:02 | 25 | were with Mr. Perez? |

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

21

10:19:22  1   in the handcuff position?  Were they on his low back,

10:19:26  2   were they resting on his low back, were they on his

10:19:29  3   butt, were they below his butt?  Do you know where?

10:19:33  4       A.  I believe they were on the lower portion of

10:19:38  5   his back.

10:19:39  6       Q.  Okay.  And at that time, when you first

10:19:47  7   observed him, was he screaming and yelling?

10:19:49  8       A.  Yes.

10:19:49  9       Q.  Could you make out anything that he was

10:19:51 10   saying?

10:19:52 11       A.  I recall him yelling, "Dad."

10:19:57 12       Q.  Okay.  Anything else that you recall him

10:19:59 13   yelling?

10:20:00 14       A.  No.

10:20:00 15       Q.  All right.  Did you ever hear him scream

10:20:04 16   profanity at any of the officers or deputies?

10:20:08 17       A.  I don't recall that.

10:20:09 18       Q.  Okay.  Do you recall him ever attempting to

10:20:15 19   kick any of the officers or deputies?

10:20:29 20       A.  No.

10:20:31 21       Q.  You recall him kicking his legs, is that

10:20:34 22   something that you recall?

10:20:36 23       A.  Yes.

10:20:36 24       Q.  But not at any particular deputy or officer;

10:20:39 25   is that fair?

22

10:20:39   1        A.   Yeah.

10:20:40   2        Q.   Is that a yes?

10:20:40   3        A.   Yes.

10:20:41   4        Q.   And when you observed him on the ground, was

10:20:46   5   he kicking his legs at that time?

10:20:50   6        A.   Yes.

10:20:51   7        Q.   Okay.  And so at that point, what did you do

10:20:55   8   next?

10:20:57   9        A.   We were walking over to see what Deputy

10:21:03  10   Stoltenberg needed, and he said we could just stand

10:21:07  11   by, and they were waiting for an ambulance.

10:21:08  12        Q.   Okay.  And when he told you to stand by, did

10:21:17  13   you take that to mean that the other officers and

10:21:19  14   deputies who were present had the situation under

10:21:22  15   control?

10:21:25  16        A.   Just -- I -- I don't know if they had it

10:21:27  17   under control, but we were not needed.

10:21:31  18        Q.   Okay.  So what you gathered from what Deputy

10:21:35  19   Stoltenberg told you was that you and Deputy Robnett

10:21:36  20   were not need --

10:21:37  21        A.   At this time.

10:21:40  22        Q.   -- at the time; is that true?

10:21:42  23        A.   Yes.

10:21:42  24        Q.   And he also told you that paramedics had

10:21:44  25   been summoned to the scene; true?

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

25

| | | |
|---|---|---|
| 10:23:46 | 1 | Q.   Okay.   And at that time when you first |
| 10:23:51 | 2 | observed him, was his head facing down? |
| 10:23:58 | 3 | A.   Yes. |
| 10:23:59 | 4 | Q.   Okay.   So once Deputy Stoltenberg asked you |
| 10:24:05 | 5 | if you had anything, did you have anything? |
| 10:24:07 | 6 | A.   No. |
| 10:24:08 | 7 | Q.   All right.   So did you tell him that? |
| 10:24:10 | 8 | A.   Yes. |
| 10:24:10 | 9 | Q.   All right.   And then did you get out of your |
| 10:24:13 | 10 | patrol vehicle to look to see if you had anything? |
| 10:24:17 | 11 | A.   No. |
| 10:24:18 | 12 | Q.   Okay.   So after you told him you didn't have |
| 10:24:20 | 13 | anything, what happened next? |
| 10:24:28 | 14 | A.   Deputy Robnett asked me to retrieve his RIPP |
| 10:24:36 | 15 | Restraint. |
| 10:24:36 | 16 | Q.   And did you do that? |
| 10:24:36 | 17 | A.   I did. |
| 10:24:37 | 18 | Q.   And where was the RIPP Restraint located? |
| 10:24:40 | 19 | A.   I believe it was on the driver side |
| 10:24:47 | 20 | doorjamb. |
| 10:24:48 | 21 | Q.   Okay.   And you retrieved it? |
| 10:24:51 | 22 | A.   Yes. |
| 10:24:51 | 23 | Q.   Did you take it to Deputy Robnett? |
| 10:24:54 | 24 | A.   Yes. |
| 10:24:54 | 25 | Q.   When he asked you to retrieve his RIPP |

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

28

```
10:27:10   1        A.   Yes.
10:27:11   2        Q.   Okay.  And one of the ways he was being
10:27:16   3   combative was by kicking his legs?
10:27:18   4        A.   Yes.
10:27:18   5        Q.   And was it your understanding that's why the
10:27:20   6   RIPP Restraint was being used?
10:27:22   7        A.   Yes.
10:27:23   8        Q.   Was he also being combative by moving his
10:27:29   9   body or trying to lift up?
10:27:32  10        A.   Yes.
10:27:33  11        Q.   Any other ways that you recall him being
10:27:36  12   combative?
10:27:43  13        A.   No.
10:27:43  14        Q.   All right.  And once you came over with the
10:27:51  15   RIPP Restraint and handed it to Deputy Robnett, did
10:27:53  16   you and Deputy Robnett begin to start applying the
10:27:58  17   RIPP Restraint around Mr. Perez's legs?
10:28:01  18        A.   Yes.
10:28:02  19        Q.   And so were you able to get it around both
10:28:05  20   of his ankles?
10:28:07  21        A.   Yes.
10:28:07  22        Q.   Okay.  How long did that process take?  Just
10:28:15  23   the process of getting it around his ankles.
10:28:19  24        A.   I believe around a minute.
10:28:24  25        Q.   Okay.  And then once you had it around his
```

Karlson Manasan, Tuesday, March 05, 2019

29

| | | |
|---|---|---|
| 10:28:28 | 1 | ankles, did you tighten it? |
| 10:28:29 | 2 | A. Yes. |
| 10:28:31 | 3 | Q. And after you tightened it, was there an |
| 10:28:34 | 4 | attempt to hook the RIPP Restraint to Mr. Perez's |
| 10:28:40 | 5 | handcuffs? |
| 10:28:42 | 6 | A. To the handcuffs? |
| 10:28:43 | 7 | Q. Yes. |
| 10:28:44 | 8 | A. No. |
| 10:28:47 | 9 | Q. Did the -- was there any discussion about |
| 10:28:49 | 10 | doing that? |
| 10:28:50 | 11 | A. No. |
| 10:28:56 | 12 | Q. Were his -- at the time that the RIPP |
| 10:28:59 | 13 | Restraint was placed around his ankles and tightened, |
| 10:29:03 | 14 | were his legs still flat on the ground? |
| 10:29:07 | 15 | A. No. |
| 10:29:07 | 16 | Q. So at some point were his legs from the |
| 10:29:11 | 17 | knees down lifted up off the ground? |
| 10:29:16 | 18 | A. Yes. |
| 10:29:16 | 19 | Q. Was that after the RIPP Restraint was placed |
| 10:29:19 | 20 | around his leg or before? |
| 10:29:22 | 21 | A. After. |
| 10:29:23 | 22 | Q. Okay. So after the RIPP Restraint was |
| 10:29:28 | 23 | placed around his legs and tightened, that's when his |
| 10:29:31 | 24 | legs were lifted off -- off the ground? |
| 10:29:32 | 25 | A. Yes. |

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

30

| | | |
|---|---|---|
| 10:29:33 | 1 | Q.   And when they were lifted off the ground, |
| 10:29:36 | 2 | did you use the RIPP Restraint to hold the -- well, |
| 10:29:38 | 3 | strike that. |
| 10:29:39 | 4 | Was it you or Deputy Robnett that lifted his |
| 10:29:41 | 5 | legs off the ground, or was it both of you? |
| 10:29:45 | 6 | A.   It was me and, I believe, a PD officer. |
| 10:29:49 | 7 | Q.   Okay.  Do you know which PD officer? |
| 10:29:50 | 8 | A.   I don't. |
| 10:29:55 | 9 | Q.   All right.  And once his legs were elevated, |
| 10:29:57 | 10 | they were elevated from the knee down; true? |
| 10:29:59 | 11 | A.   Yes. |
| 10:30:01 | 12 | Q.   Did they remain elevated because someone was |
| 10:30:02 | 13 | holding them up using the RIPP Restraint? |
| 10:30:09 | 14 | A.   They remained elevated because the RIPP |
| 10:30:14 | 15 | Restraint was not attached to the handcuffs, but |
| 10:30:16 | 16 | looped around the handcuffs and back onto itself. |
| 10:30:20 | 17 | Q.   Okay.  So, in other words, the RIPP |
| 10:30:24 | 18 | Restraint was connected to the handcuffs in some |
| 10:30:27 | 19 | fashion? |
| 10:30:28 | 20 | A.   Yes. |
| 10:30:29 | 21 | Q.   And that's what was keeping Mr. Perez's legs |
| 10:30:32 | 22 | from the knees down up in the air; true? |
| 10:30:36 | 23 | A.   Yes. |
| 10:30:38 | 24 | Q.   How long did Mr. Perez remain in that |
| 10:30:41 | 25 | position where his legs were up in the air from the |

31

10:30:50  1   knees down and the RIPP Restraint was connected in

10:30:52  2   some fashion to the handcuffs?

10:30:54  3        A.  Less than a minute.

10:30:55  4        Q.  Would you say 30 seconds to a minute is your

10:30:58  5   best estimate?

10:31:03  6        A.  Yes.

10:31:03  7        Q.  Okay.  And at some point after that period

10:31:08  8   of time, was the RIPP Restraint unconnected or

10:31:12  9   disconnected from his handcuffs?

10:31:14  10       A.  Yes.

10:31:14  11       Q.  Who did that?

10:31:17  12       A.  I don't recall who disconnected it.

10:31:19  13       Q.  Was it you?

10:31:20  14       A.  No, it wasn't me.

10:31:22  15       Q.  It was one of the other officers or

10:31:24  16   deputies?

10:31:25  17       A.  Yes.

10:31:25  18       Q.  And do you know why that was done?

10:31:26  19       A.  Because EMS had arrived.

10:31:30  20       Q.  So would it be the same 30 seconds to a

10:31:36  21   minute after the RIPP Restraint was -- strike that.

10:31:42  22           Would it be fair to say that EMS arrived 30

10:31:46  23   seconds to one minute after Mr. Perez's legs were in

10:31:50  24   that elevated position and connected to the RIPP

10:31:56  25   Restraint?

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

32

| | | |
|---|---|---|
| 10:31:56 | 1 | A.   Yes. |
| 10:31:57 | 2 | Q.   Okay.  And did you observe the EMS personnel |
| 10:32:02 | 3 | arriving on scene? |
| 10:32:03 | 4 | A.   Yes. |
| 10:32:03 | 5 | Q.   Do you recall how many EMS personnel were |
| 10:32:08 | 6 | present? |
| 10:32:08 | 7 | A.   I recall two. |
| 10:32:13 | 8 | Q.   Do you recall the genders of them? |
| 10:32:14 | 9 | A.   One was a male, one was a female. |
| 10:32:23 | 10 | Q.   Okay.  And when they came over to the scene, |
| 10:32:26 | 11 | did they come close to the area where Mr. Perez was? |
| 10:32:29 | 12 | A.   Yes. |
| 10:32:32 | 13 | Q.   Okay.  And what happened at that time? |
| 10:32:36 | 14 | A.   Someone, I believe it was EMS, said they |
| 10:32:41 | 15 | were going to place a backboard on Mr. Perez. |
| 10:32:48 | 16 | Q.   Okay.  Did they say they were going to place |
| 10:32:52 | 17 | the backboard on top of him while he was in the prone |
| 10:32:55 | 18 | position? |
| 10:32:55 | 19 | A.   Yes. |
| 10:32:56 | 20 | Q.   Was there any discussion about turning him |
| 10:32:59 | 21 | over in the supine position so that his back was on |
| 10:33:02 | 22 | the ground and his chest and stomach were facing up, |
| 10:33:06 | 23 | and then restraining him to the board while he was |
| 10:33:09 | 24 | supine? |
| 10:33:13 | 25 | A.   Not a discussion I was part of.  I don't |

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

33

10:33:18  1  recall.

10:33:18  2      Q.  Okay.  But you were present in the general

10:33:20  3  area where the EMS personnel were and the officers

10:33:25  4  and deputies and Mr. Perez were; correct?

10:33:28  5      A.  Yes.

10:33:28  6      Q.  And did you witness the backboard being

10:33:31  7  placed on top of Mr. Perez?

10:33:32  8      A.  Yes.

10:33:33  9      Q.  So in the 30 seconds to a minute before the

10:33:35 10  backboard was placed on top of Mr. Perez, do you

10:33:38 11  recall any conversation about doing it differently;

10:33:42 12  in other words, rolling Mr. Perez over and then

10:33:45 13  having him be placed on the backboard?

10:33:47 14      A.  No.

10:33:52 15      Q.  Do you know whose idea it was to place the

10:33:54 16  backboard on top of Mr. Perez?

10:34:00 17      A.  I believe it was EMS.

10:34:01 18      Q.  And what is that based on?

10:34:05 19      A.  The body cam footage that we reviewed.

10:34:10 20      Q.  So the body cam footage you reviewed, was

10:34:13 21  there something that was said or something that you

10:34:16 22  watched that made you believe that it was the EMS's

10:34:21 23  idea to have the backboard placed on top of

10:34:23 24  Mr. Perez?

10:34:24 25      A.  The -- I believe the statement was made off

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

35

```
10:35:39   1   BY MR. GEHLAWAT:
10:35:39   2        Q.   Sure.   Was there a portion of the backboard
10:35:41   3   that was placed on top of Mr. Perez's back?
10:35:44   4        A.   Yes.
10:35:44   5        Q.   And was there a portion of the backboard
10:35:46   6   that was placed on top of Mr. Perez's butt area?
10:35:50   7        A.   Yes.
10:35:50   8        Q.   Was there a portion of the backboard that
10:35:52   9   was placed on top of Mr. Perez's legs?
10:35:54  10        A.   Yes.
10:35:55  11        Q.   So the only thing you don't recall is
10:35:58  12   whether or not the backboard was placed on top of his
10:36:01  13   head or not; is that true?
10:36:04  14        A.   Yes.
10:36:05  15        Q.   At the time that the backboard was placed on
10:36:08  16   top of Mr. Perez's body, where were you relative to
10:36:11  17   Mr. Perez?
10:36:12  18        A.   I was at the bottom of Mr. Perez's feet.
10:36:16  19        Q.   So you were closer to that area of him?
10:36:18  20        A.   Yes.
10:36:19  21        Q.   And was Deputy Robnett next to you?
10:36:23  22        A.   Yes.
10:36:24  23        Q.   Okay.   Once the backboard was placed on top
10:36:29  24   of Mr. Perez's body in the manner you described, were
10:36:38  25   officers and deputies putting their hands on top of
```

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

36

```
10:36:42   1   the board and pushing down?

10:36:44   2        A.  I don't remember.

10:36:45   3        Q.  Do you recall putting your hands on top of

10:36:48   4   the board?

10:36:49   5        A.  No.

10:36:50   6        Q.  When the board was placed on top of his

10:36:53   7   body, did you just stand in the area where you were?

10:36:57   8        A.  I was making sure his feet didn't kick back

10:37:00   9   up.

10:37:00  10        Q.  Okay.  And so what were you doing in that

10:37:02  11   respect?

10:37:03  12        A.  I was holding his ankles down.

10:37:05  13        Q.  Okay.  So were you holding his ankles down

10:37:07  14   underneath the board?

10:37:08  15        A.  Yes.

10:37:09  16        Q.  So the board was over your hands?

10:37:13  17        A.  I don't recall if they were over, but they

10:37:16  18   were near.  And I was trying not to get in the way.

10:37:18  19        Q.  All right.  Did you recall from watching the

10:37:21  20   body cam footage, seeing your hands at one point

10:37:24  21   holding his ankles under the board?

10:37:27  22        A.  No.

10:37:27  23        Q.  Okay.  So you were trying to hold his

10:37:32  24   ankles, and were his ankles in a hogtie at that point

10:37:37  25   still?  I'm sorry --
```

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

37

10:37:38    1          MS. O'LINN:  Objection --

10:37:39    2   BY MR. GEHLAWAT:

10:37:39    3       Q.  In the RIPP Restraint.  I'm sorry.  Sorry.

10:37:41    4          MS. O'LINN:  We have no other question.  So

10:37:45    5   I won't even state my objection.

10:37:47    6   BY MR. GEHLAWAT:

10:37:47    7       Q.  Okay.  Were his ankles still in the RIPP

10:37:50    8   Restraint at that time?

10:37:50    9          MS. O'LINN:  Objection; vague.

10:37:50   10   BY MR. GEHLAWAT:

10:37:52   11       Q.  When you were holding them?

10:37:58   12       A.  No.

10:37:58   13       Q.  Okay.  Do you know where the RIPP Restraint

10:38:01   14   was at the time that you were holding his ankles?

10:38:04   15       A.  No.

10:38:06   16       Q.  Do you recall the RIPP Restraint being taken

10:38:09   17   off of his feet at some point before the backboard

10:38:11   18   was placed on top of his body?

10:38:18   19          MS. O'LINN:  Objection; vague and

10:38:19   20   argumentative.

10:38:28   21          THE WITNESS:  I don't remember when it was

10:38:29   22   removed, but -- yeah, prior.  It would be prior,

10:38:34   23   before the backboard.

10:38:35   24   BY MR. GEHLAWAT:

10:38:35   25       Q.  Okay.  So your best recollection as you sit

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

38

10:38:37  1   here today was that the RIPP Restraint was removed

10:38:40  2   from Mr. Perez's legs prior to the backboard being

10:38:44  3   placed on top of him; is that true?

10:38:45  4       A.  Yes.

10:38:46  5       Q.  Okay.  And then once the backboard was

10:38:50  6   placed on top of him, you were holding his -- his

10:38:53  7   ankles to try and prevent them from moving; is that

10:38:56  8   true?

10:38:57  9       A.  Yes.

10:38:58  10      Q.  Okay.  And at that time was he attempting to

10:39:00  11  move his ankles?

10:39:02  12      A.  Yes.

10:39:02  13      Q.  And you were holding them?

10:39:04  14      A.  Yes.

10:39:04  15      Q.  Was there any other officer or deputy that

10:39:07  16  was assisting you in attempting to hold his ankles or

10:39:11  17  legs?

10:39:12  18      A.  Yes.

10:39:15  19      Q.  And do you know who that was?

10:39:16  20      A.  No.

10:39:17  21      Q.  Do you know if it was an officer or a

10:39:19  22  deputy?

10:39:19  23      A.  I believe it was an officer.

10:39:24  24      Q.  And I think you have told me, but once the

10:39:29  25  board was placed on top of his body, you do not

46

| | |
|---|---|
| 10:48:11 | 1 |

    A.  I don't remember.

10:48:14   2       Q.  Do you recall whose idea it was to have

10:48:18   3   someone sit on the board?

10:48:21   4       A.  At the time, I don't know whose -- who gave

10:48:25   5   that instruction.

10:48:26   6       Q.  Okay.  Did you hear someone give that

10:48:28   7   instruction?

10:48:35   8          MR. WEAKLEY:  Are you asking if he was

10:48:36   9   hearing independent of what he had seen or heard on

10:48:40   10  the video --

10:48:41   11  BY MR. GEHLAWAT:

10:48:41   12      Q.  Sure.  Independent of what you saw on the

10:48:43   13  body cam footage or heard on the body cam footage,

10:48:46   14  just based on your recollection of the event, do you

10:48:48   15  recall someone giving that instruction?

10:48:49   16      A.  No.

10:48:50   17      Q.  All right.  When you reviewed the body cam

10:48:53   18  footage, did that refresh your recollection about

10:48:55   19  someone giving that instruction?

10:48:57   20      A.  Yes.

10:48:57   21      Q.  And could you tell from listening to the

10:49:01   22  voices on the body cam footage who it was that gave

10:49:04   23  that instruction?

10:49:06   24      A.  No.

10:49:07   25      Q.  Did you ever hear anyone, during the time

47

| | | |
|---|---|---|
| 10:49:19 | 1 | that you were present near the area where Mr. Perez |
| 10:49:23 | 2 | is, ask him if he could breathe? |
| 10:49:25 | 3 | A.  Yes. |
| 10:49:25 | 4 | Q.  Was that Deputy Robnett? |
| 10:49:27 | 5 | A.  Yes. |
| 10:49:27 | 6 | Q.  And when in relation to the events that we |
| 10:49:31 | 7 | have talked about did you hear him ask that question? |
| 10:49:45 | 8 | A.  I don't recall exactly when. |
| 10:49:47 | 9 | Q.  Okay.  Do you recall if it was before or |
| 10:49:51 | 10 | after the RIPP Restraint was applied to Mr. Perez's |
| 10:49:56 | 11 | legs? |
| 10:50:06 | 12 | A.  I believe it was after. |
| 10:50:08 | 13 | Q.  Okay.  Was it after the RIPP Restraint was |
| 10:50:13 | 14 | connected to Mr. Perez's handcuffs? |
| 10:50:17 | 15 | A.  Yes. |
| 10:50:18 | 16 | Q.  And before the backboard was placed on top |
| 10:50:21 | 17 | of his body? |
| 10:50:23 | 18 | A.  I don't remember if it was. |
| 10:50:25 | 19 | Q.  Okay.  And do you recall Mr. Perez |
| 10:50:29 | 20 | responding? |
| 10:50:31 | 21 | A.  After reviewing the video footage? |
| 10:50:34 | 22 | Q.  Independent of the video footage. |
| 10:50:37 | 23 | A.  No. |
| 10:50:37 | 24 | Q.  But after reviewing the video footage, did |
| 10:50:39 | 25 | you hear him say on the video footage, "Yes, I can |

60

| | | |
|---|---|---|
| 11:13:04 | 1 | And I think the "he" in that question refers |
| 11:13:06 | 2 | to Mr. Perez.  Is that your understanding? |
| 11:13:08 | 3 | A.  Yes. |
| 11:13:09 | 4 | Q.  And your answer was no; correct? |
| 11:13:10 | 5 | A.  Correct. |
| 11:13:11 | 6 | Q.  And that was what you observed; true? |
| 11:13:14 | 7 | A.  True. |
| 11:13:15 | 8 | Q.  Okay.  And then further down you're asked at |
| 11:13:20 | 9 | 264, "Was he kicking?"  Your response at 266 is, "He |
| 11:13:27 | 10 | was -- he wasn't kicking so much as, umm, he was |
| 11:13:29 | 11 | trying to move his legs." |
| 11:13:30 | 12 | That's what you said? |
| 11:13:31 | 13 | A.  Yes. |
| 11:13:32 | 14 | Q.  And that's the truth? |
| 11:13:33 | 15 | A.  Yes. |
| 11:13:34 | 16 | Q.  If you turn to Page 7, Lines 304 to 308, I |
| 11:13:44 | 17 | think you describe how the RIPP Restraint was applied |
| 11:13:48 | 18 | to Mr. Perez's ankles.  Do you see that? |
| 11:13:52 | 19 | A.  Yes. |
| 11:13:53 | 20 | Q.  Do you recall crossing his ankles before it |
| 11:13:55 | 21 | was applied? |
| 11:13:56 | 22 | A.  Yes. |
| 11:14:01 | 23 | Q.  If you turn to Page 8, Line 319, you're |
| 11:14:11 | 24 | asked, "Okay, and, umm, you restrained his feet.  Did |
| 11:14:14 | 25 | he do anything else with, uh -- with the restraint?" |

61

| | |
|---|---|
| 11:14:18 | 1 | Do you see that? |
| 11:14:19 | 2 | A. Yes. |
| 11:14:20 | 3 | Q. And towards the end, you say, "It wasn't |
| 11:14:25 | 4 | long enough to attach to the -- the clip area of the |
| 11:14:29 | 5 | restraint. So Deputy Robnett hooked it onto the |
| 11:14:32 | 6 | actual restraint itself, the rope are -- uh -- yeah, |
| 11:14:36 | 7 | the rope kind of." |
| 11:14:37 | 8 | What did you mean by that? |
| 11:14:41 | 9 | A. So we -- the RIPP Restraint has a portion |
| 11:14:47 | 10 | where the hook end can latch onto. |
| 11:14:53 | 11 | Q. Okay. |
| 11:14:54 | 12 | A. When we tried that, he, Mr. Perez, was too |
| 11:15:00 | 13 | tall or his legs were too long, and it bent his legs |
| 11:15:03 | 14 | back too far. So we lengthened the rope and looped |
| 11:15:10 | 15 | it around the handcuff chain and back onto the -- the |
| 11:15:15 | 16 | RIPP Restraint itself. |
| 11:15:17 | 17 | Q. Okay. |
| 11:15:18 | 18 | A. To give him more room. |
| 11:15:20 | 19 | Q. Okay. And -- okay. If you go back to |
| 11:15:56 | 20 | Page 4 at Line 165, do you see where you are asked, |
| 11:16:00 | 21 | "Okay. So you guys arrive, uh, what do you see when |
| 11:16:05 | 22 | you get there?" |
| 11:16:05 | 23 | Do you see that? |
| 11:16:06 | 24 | A. Yes. |
| 11:16:06 | 25 | Q. Your answer was, "Uh, as I'm pulling up on |

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

64

11:18:36  1          Do you see where it says that?

11:18:37  2      A.  Yes.

11:18:39  3      Q.  And then I think you're asked at 523, "Okay,

11:18:42  4  and was this, uh, shortly before or after they

11:18:45  5  flipped him over?"  And you say, "It was shortly

11:18:48  6  before they flipped him over."

11:18:49  7          Do you see that?

11:18:52  8      A.  Yes.

11:18:52  9      Q.  Do you recall now he stopped yelling and

11:18:54  10  stopped -- he stopped kicking and stopped talking

11:18:56  11  about he was flipped over?

11:18:57  12     A.  Yes.

11:18:57  13     Q.  And do you have any estimate as to how long

11:19:00  14  before he was flipped over that he stopped kicking

11:19:02  15  and stopped talking?

11:19:08  16     A.  I don't have an exact time.

11:19:10  17     Q.  Do you have any -- any estimate?

11:19:18  18     A.  One, two minutes.

11:19:20  19     Q.  Okay.  When you got to the scene, was there

11:19:28  20  any information communicated to you as to who was

11:19:31  21  handling the call?  In other words, whether the

11:19:35  22  sheriff's office was handling the call or Fresno PD

11:19:37  23  was handling the call?

11:19:40  24     A.  Yes.  Deputy Stoltenberg told us that Fresno

11:19:43  25  PD was taking the call.

PEREZ vs CITY OF FRESNO
Karlson Manasan, Tuesday, March 05, 2019

65

| | | |
|---|---|---|
| 11:19:46 | 1 | Q.   Okay.   And in your mind, does that mean that |
| 11:19:50 | 2 | they were the agency that was taking the lead? |
| 11:19:53 | 3 | A.   Yes. |
| 11:19:55 | 4 | Q.   Now, do you have training in the sheriff's |
| 11:20:02 | 5 | office with respect to your duties and |
| 11:20:06 | 6 | responsibilities once EMS is summoned to a scene |
| 11:20:11 | 7 | where there's a subject present? |
| 11:20:15 | 8 | A.   Yes. |
| 11:20:15 | 9 | Q.   Okay.   And what is your training in that |
| 11:20:17 | 10 | respect? |
| 11:20:18 | 11 | A.   That EMS takes over the medical portion, and |
| 11:20:28 | 12 | they dictate how they want their -- if he's being |
| 11:20:33 | 13 | transported, how the person is transported. |
| 11:20:37 | 14 | Q.   And that's based on training you received |
| 11:20:39 | 15 | through the sheriff's office? |
| 11:20:44 | 16 | A.   Yes. |
| 11:20:46 | 17 | Q.   Okay.   I want to show you portions of the |
| 11:20:51 | 18 | video, the body cam footage.   I think I -- I think |
| 11:21:00 | 19 | we're -- let me just make sure. |
| 11:21:02 | 20 | MS. O'LINN:   It just stopped working. |
| 11:21:04 | 21 | MR. GEHLAWAT:   It was working.   I think it's |
| 11:21:06 | 22 | back up. |
| 11:21:12 | 23 | All right.   And for the record, we'll just |
| 11:21:14 | 24 | state that Deputy Manasan is being asked to watch a |
| 11:21:19 | 25 | video that is to his left.   So when he's looking to |

75

```
1   STATE OF CALIFORNIA )
                        ) ss.
2   COUNTY OF FRESNO    )

3

4        I, Bree Mervin, a Certified Shorthand Reporter

5   in the State of California, holding Certificate

6   No. 13057, do hereby certify that KARLSON MANASAN, the

7   witness named in the foregoing deposition, was by me

8   duly sworn; that said deposition was taken Tuesday,

9   March 5, 2019, at the time and place set forth on the

10  first page hereof.

11       That upon the taking of the deposition, the

12  words of the witness were written down by me in

13  stenotype and thereafter transcribed by computer under

14  my supervision; that the foregoing is a true and correct

15  transcript of the testimony given by the witness.

16       Pursuant to Federal Rule 30(e), transcript

17  review was requested.

18       I further certify that I am neither counsel for

19  nor in any way related to any party to said action, nor

20  in any way interested in the result or outcome thereof.

21       Dated this 21st day of March, 2019, at Visalia,

22  California.

23

24       _____
         Bree Mervin, CSR No. 13057
25
```