*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 9

PEREZ

vs

CITY OF FRESNO

---

Deposition of: Chris Martinez

Taken on: Wednesday, March 06, 2019

---



## CERTIFIED COPY



Certified Shorthand Reporters

*A Professional Corporation*

Main Office: 900 Truxtun Avenue, Suite 320
Bakersfield, CA 93301
(800) 322-4595 Toll Free ● (661) 395-1050
www.woodrandall.com

Serving Central California - Bakersfield, Visalia & Fresno

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

_____

| | |
|---|---|
| ANTHONY PEREZ, individually, | ) |
| CECILIA PEREZ, individually, | ) |
| TERRALEE PEREZ, | ) |
| individually, and as | ) |
| successor in interest to | ) No. 1:18-cv-00127-AWI-EPG |
| Joseph Perez, JOSEPH PEREZ, | ) |
| JR., individually and as | ) |
| successor in interest to | ) |
| Joseph Perez, and X.P. a | ) |
| minor, by and through his | ) |
| Guardian ad Litem, MICHELLE | ) |
| PEREZ, individually and as | ) |
| successor in interest to | ) |
| Joseph Perez, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| CITY OF FRESNO, COUNTY OF | ) |
| FRESNO, JAMES ROSSETTI, an | ) |
| individual, SEAN CALVERT, an | ) |
| individual, CHRIS MARTINEZ, | ) |
| an individual, BRAITHAN | ) |
| STOLTENBERG, an individual, | ) |
| ROBERT MCEWEN, an | ) |
| individual, KARLSON MANASAN, | ) |
| an individual, JIMMY | ) |
| ROBNETT, an individual, and | ) |
| DOES 1-10, inclusive, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |


VIDEOTAPED DEPOSITION

OF

CHRIS MARTINEZ

Wednesday, March 6, 2019

Fresno, California



Reported by:  Bree Mervin, CSR No. 13057, RPR, CRR

2

```
 1                        APPEARANCES

 2

 3    For Plaintiffs:          Alder Law, P.C.
                               BY MR. NEIL GEHLAWAT
 4                             Attorney at Law
                               1875 Century Park East
 5                             Suite 1500
                               Los Angeles, California  90067
 6                             (310)275-9131
                               ngehlawat@alderlaw.com
 7

 8
      For County of Fresno:    Weakley & Arendt
 9                             BY MR. JAMES D. WEAKLEY
                               Attorney at Law
10                             5200 North Palm Avenue
                               Suite 211
11                             Fresno, California  93704
                               (559)221-5256
12                             jim@walaw-fresno.com

13

14    For City of Fresno:      Manning & Kass, Ellrod,
                               Ramirez, Trester, LLP
15                             BY MS. MILDRED K. O'LINN
                               Attorney at Law
16                             801 South Figueroa Street
                               15th Floor
17                             Los Angeles, California  90017
                               (213)624-6900
18                             mko@manningllp.com

19

20    The Videographer:        CHELCIE LEWIS

21

22    Also present:            DEPUTY SEAN CALVERT
                               OFFICER JAMES ROSSETTI
23

24

25
```

PEREZ VS CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

9

| | | |
|---|---|---|
| 13:08:47 | 1 | A.  Yes, I do. |
| 13:08:47 | 2 | Q.  And you'll have an opportunity to review it |
| 13:08:49 | 3 | down the road, and if you make changes of a |
| 13:08:52 | 4 | significant or substantive nature, that I or any |
| 13:08:55 | 5 | other attorney in the case could comment on those |
| 13:08:56 | 6 | changes.  And that may affect your credibility.  Do |
| 13:08:59 | 7 | you understand that? |
| 13:09:00 | 8 | A.  Yes, I do. |
| 13:09:00 | 9 | Q.  Are you feeling okay to give a deposition |
| 13:09:04 | 10 | today in terms of your health, well-being? |
| 13:09:06 | 11 | A.  Yes. |
| 13:09:07 | 12 | Q.  Okay.  At the time of this incident, you |
| 13:09:18 | 13 | were -- strike that. |
| 13:09:19 | 14 | On May 10th, 2017, you were on duty with |
| 13:09:26 | 15 | Fresno PD; correct? |
| 13:09:28 | 16 | A.  Yes, I was. |
| 13:09:28 | 17 | Q.  And were you wearing your uniform? |
| 13:09:31 | 18 | A.  Yes. |
| 13:09:31 | 19 | Q.  Were you also wearing a tactical vest? |
| 13:09:34 | 20 | A.  Yes, I was. |
| 13:09:35 | 21 | Q.  Do you have an estimate for me as to your |
| 13:09:37 | 22 | height and weight at the time of the incident? |
| 13:09:41 | 23 | A.  I was five-seven, about 165 pounds. |
| 13:09:48 | 24 | Q.  And with your tactical gear, do you know -- |
| 13:09:52 | 25 | do you have an estimate as to your total weight? |

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

11

| | | |
|---|---|---|
| 13:10:46 | 1 | seat of the patrol vehicle? |
| 13:10:48 | 2 | A. That's correct. |
| 13:10:50 | 3 | Q. Okay. At some point did you observe an |
| 13:10:53 | 4 | individual who you later learned to be Mr. Perez? |
| 13:10:57 | 5 | A. Yes. |
| 13:10:58 | 6 | Q. And when you first observed him, where was |
| 13:11:00 | 7 | he? |
| 13:11:02 | 8 | A. He was standing at Palm and Santa Fe in the |
| 13:11:06 | 9 | number two lane. |
| 13:11:07 | 10 | Q. Is that the number two lane -- when you say |
| 13:11:10 | 11 | the "number two lane," are you referring to the right |
| 13:11:13 | 12 | most lane? |
| 13:11:14 | 13 | A. Yes, and the southbound number two lane. |
| 13:11:16 | 14 | Q. Okay. So it was southbound on Palm Avenue |
| 13:11:19 | 15 | in the right lane; correct? |
| 13:11:20 | 16 | A. Correct. |
| 13:11:21 | 17 | Q. Are there two southbound lanes on -- at Palm |
| 13:11:25 | 18 | in that area? |
| 13:11:26 | 19 | A. There is. |
| 13:11:27 | 20 | Q. All right. And what did you observe him |
| 13:11:30 | 21 | doing at that point? |
| 13:11:32 | 22 | A. I saw Mr. Perez standing in the roadway. He |
| 13:11:37 | 23 | was walking in and out of the roadway, waving his |
| 13:11:41 | 24 | arms, and at the same time, he was yelling in our |
| 13:11:45 | 25 | direction as we were driving. |

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

15

| | | |
|---|---|---|
| 13:15:05 | 1 | A. He was mumbling different -- different |
| 13:15:09 | 2 | phrases. |
| 13:15:09 | 3 | Q. What were those phrases? |
| 13:15:11 | 4 | A. I don't recall. |
| 13:15:13 | 5 | Q. You don't recall the phrases that he was |
| 13:15:15 | 6 | mumbling? |
| 13:15:17 | 7 | A. Correct. |
| 13:15:17 | 8 | Q. Do you recall anything that he said at that |
| 13:15:20 | 9 | time? |
| 13:15:20 | 10 | A. From what I remember, what he was saying |
| 13:15:23 | 11 | wasn't really making any sense. |
| 13:15:25 | 12 | Q. Okay. And at the time that you first got |
| 13:15:32 | 13 | out and went to speak to him, did you have any |
| 13:15:37 | 14 | information that he had committed a crime? |
| 13:15:39 | 15 | A. Yes, I did. |
| 13:15:40 | 16 | Q. And what crime was that? |
| 13:15:42 | 17 | A. At that time, he was impeding traffic. When |
| 13:15:47 | 18 | I initially saw him, there was a vehicle that had |
| 13:15:49 | 19 | stopped in the middle of the number two lane because |
| 13:15:51 | 20 | he was two to four feet into the roadway. |
| 13:15:57 | 21 | Q. Okay. Would that be a Vehicle Code |
| 13:15:59 | 22 | infraction? |
| 13:16:00 | 23 | A. That is correct. |
| 13:16:01 | 24 | Q. Okay. |
| 13:16:03 | 25 | MS. O'LINN: Were you done with your answer? |

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

16

| | |
|---|---|
| 13:16:04 | 1 | THE WITNESS:  No, I wasn't. |
| 13:16:05 | 2 | BY MR. GEHLAWAT: |
| 13:16:05 | 3 | Q.  Were there other crimes you thought he |
| 13:16:06 | 4 | committed? |
| 13:16:07 | 5 | A.  Yes. |
| 13:16:07 | 6 | Q.  What were they? |
| 13:16:09 | 7 | A.  During contact with him, he was on probation |
| 13:16:13 | 8 | on AB 109, and I also started noticing signs and |
| 13:16:18 | 9 | symptoms of him being under the influence of a |
| 13:16:20 | 10 | controlled substance, which is violation of Health |
| 13:16:24 | 11 | and Safety Code 11550(a). |
| 13:16:27 | 12 | Q.  Okay.  Sir, my question is before you got |
| 13:16:29 | 13 | out of the vehicle, when you first observed Mr. Perez |
| 13:16:32 | 14 | in the road, was the only crime that you believed he |
| 13:16:36 | 15 | had committed at that time, the Vehicle Code |
| 13:16:39 | 16 | infraction that he was in the middle of the roadway? |
| 13:16:42 | 17 | MS. O'LINN:  So that's a little bit more |
| 13:16:44 | 18 | specific than you asked it the first time, but I |
| 13:16:46 | 19 | appreciate the clarification.  So before you got out |
| 13:16:49 | 20 | of your car. |
| 13:16:49 | 21 | BY MR. GEHLAWAT: |
| 13:16:51 | 22 | Q.  Yes. |
| 13:16:51 | 23 | A.  Before I got out of my car, the only |
| 13:16:54 | 24 | violation I saw at that time was him impeding |
| 13:16:59 | 25 | traffic, the Vehicle Code violation. |

PEREZ VS CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

17

13:17:01    1         Q.   Okay.   And then subsequently in the course

13:17:02    2   of talking to him, one of the things you learned was

13:17:05    3   that he was on probation?

13:17:07    4         A.   That is correct.

13:17:08    5         Q.   And did you learn that he was on probation

13:17:11    6   because that's what he told you?

13:17:12    7         A.   Yes, he did.

13:17:14    8         Q.   All right.   And did he tell you what he was

13:17:16    9   on probation for?

13:17:18   10         A.   No, he didn't.   He just told me he was on AB

13:17:22   11   109, which is a formal probation.

13:17:25   12         Q.   And you knew what AB 109 was at that time;

13:17:28   13   true?

13:17:29   14         A.   That is correct.

13:17:29   15         Q.   And during the time you were speaking to

13:17:33   16   him, you thought he was exhibiting symptoms of

13:17:36   17   someone that is under the influence of a controlled

13:17:38   18   substance?

13:17:38   19         A.   Yes.

13:17:38   20         Q.   Okay.   So as of the time that -- at some

13:17:43   21   point Mr. Perez was put in handcuffs; is that true?

13:17:52   22         A.   I'm sorry.   Can you repeat the question,

13:17:54   23   please?

13:17:54   24         Q.   Sure.   At some point Mr. Perez was placed in

13:17:57   25   handcuffs; true?

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

25

| 13:25:04 | 1 | BY MR. GEHLAWAT: |
| 13:25:06 | 2 | Q.  When you saw the T-shirt. |
| 13:25:08 | 3 | A.  It wasn't until after he had told me that |
| 13:25:13 | 4 | was his father. |
| 13:25:13 | 5 | Q.  After he told you that was his father, did |
| 13:25:15 | 6 | you then believe he was a plaintiff in this lawsuit? |
| 13:25:17 | 7 | A.  I did not. |
| 13:25:18 | 8 | Q.  If you had known he was a plaintiff in this |
| 13:25:25 | 9 | lawsuit, would that have changed how you interacted |
| 13:25:27 | 10 | with him on that date? |
| 13:25:28 | 11 | A.  Absolutely. |
| 13:25:29 | 12 | Q.  And how so? |
| 13:25:29 | 13 | A.  I had other MAGEC detectives with me.  I |
| 13:25:32 | 14 | would have immediately turned that over and notified |
| 13:25:34 | 15 | a supervisor and advised them of the circumstances as |
| 13:25:42 | 16 | far as allowing somebody else to take over the |
| 13:25:44 | 17 | investigation from that point forward. |
| 13:25:46 | 18 | Q.  Okay.  All right.  Okay.  So going back to |
| 13:25:50 | 19 | the incident on May 10th of 2017, when you were |
| 13:25:58 | 20 | speaking to Mr. Perez, did you at some point make a |
| 13:26:03 | 21 | decision to handcuff him? |
| 13:26:04 | 22 | A.  I did. |
| 13:26:05 | 23 | Q.  And what was that based on? |
| 13:26:08 | 24 | A.  There were several reasons why -- why I made |
| 13:26:12 | 25 | that determination. |

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

26

13:26:13   1      Q.   Okay.

13:26:15   2      A.   One of them being his behavior.   Two, being

13:26:18   3   the environment; and three, being the position the

13:26:22   4   officers were in.   The -- to start with, his

13:26:27   5   behavior, Mr. Perez, he was rocking back and forth,

13:26:30   6   and he kept -- it looked like he was trying to get up

13:26:33   7   from the seated position from the sidewalk or from

13:26:36   8   the curb where he was sitting.

13:26:41   9      At that location where he was seated,

13:26:45   10   Sergeant Rossetti was standing in front of him.   The

13:26:49   11   fact that he was kicking his feet out, rocking back

13:26:53   12   and forth, it appeared he was in a -- from my point

13:26:56   13   of view, it appeared that he was going to get up and

13:27:00   14   either run into traffic as he previously did when we

13:27:02   15   initially saw him, or he was going to charge toward

13:27:06   16   Sergeant Rossetti, which would have caused Sergeant

13:27:09   17   Rossetti to back into traffic into the number one

13:27:11   18   lane because he was standing in the number two lane

13:27:13   19   at that point.

13:27:13   20      I was also in fear due to the amount of

13:27:16   21   traffic at that location.   So Sergeant Rossetti's

13:27:21   22   vehicle was parked along the curb line, the west curb

13:27:26   23   line of South Palm Avenue in the number two lane.

13:27:29   24   There's two lanes going southbound at that location,

13:27:31   25   and there's heavy flow of traffic at that location at

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

27

13:27:35   1   that time.

13:27:36   2   So due to law enforcement being present, a

13:27:39   3   lot of people were kind of bottlenecking.  What they

13:27:43   4   were doing is merging from the number two lane into

13:27:46   5   the number one lane, which slowed down traffic

13:27:48   6   tremendously at that point.  Sergeant Rossetti's back

13:27:52   7   was to that traffic in the number one lane, and those

13:27:55   8   concerns, combined with Mr. Perez's behavior, led me

13:28:00   9   to believe that he might have jumped back into

13:28:03   10   traffic or charged toward Sergeant Rossetti, which

13:28:06   11   would have caused a major safety concern.

13:28:08   12   Q.   Okay.  He was seated on the curb when you

13:28:10   13   handcuffed him?

13:28:10   14   A.   Yes, he was.

13:28:12   15   Q.   Okay.  And so up until the point that you

13:28:14   16   handcuffed Mr. Perez, was he cooperative?

13:28:19   17   A.   To some extent.

13:28:21   18   Q.   Okay.  Was he not cooperative to some

13:28:23   19   extent?

13:28:25   20   A.   Correct.

13:28:25   21   Q.   Okay.  How was he not cooperative up until

13:28:29   22   that point?

13:28:30   23   A.   He kept trying to get up from the seated

13:28:32   24   position when he was asked to sit down.

13:28:34   25   Q.   Okay.

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

30

13:30:51  1   him to the ground?

13:30:53  2        A.   Counsel, I think I answered that last

13:30:55  3   question incorrectly.   May I correct my answer,

13:30:57  4   please?

13:30:58  5        Q.   Sure.

13:30:58  6        A.   So as far as how long he was handcuffed

13:31:03  7   seated on the ground, was roughly a little over one

13:31:05  8   minute.

13:31:06  9        Q.   Okay.

13:31:06  10       A.   One to two minutes I would say.

13:31:09  11       Q.   All right.   So in the one to two minutes

13:31:10  12  that -- so once he got up off the ground, is that

13:31:16  13  when you and Officer Calvert attempted to take him to

13:31:19  14  the ground?

13:31:22  15       MS. O'LINN:   You can explain.

13:31:25  16       THE WITNESS:   At that point he was seated.

13:31:28  17  At that point when he was handcuffed, he was still

13:31:30  18  rocking back and forth, kicking his feet out, and it

13:31:33  19  appeared that, like I said, he was either going to --

13:31:38  20  he was trying to get up at that point is what it

13:31:41  21  looked like.   I didn't want him to dart into traffic,

13:31:45  22  to run into traffic, and I did not want any other

13:31:48  23  officers to have to maneuver into traffic, you know,

13:31:52  24  which would cause a hazard towards them as well for

13:31:54  25  their safety.   So we --

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

31

| 13:31:55 | 1 | BY MR. GEHLAWAT: |
| 13:31:56 | 2 | Q.  Let me stop you real quick.  All I want to |
| 13:31:58 | 3 | know, sir, once he had gotten up off the ground, is |
| 13:32:04 | 4 | that when you and Officer Calvert attempted to take |
| 13:32:07 | 5 | him to the ground?  That's all I want to know. |
| 13:32:10 | 6 | A.  That's when I made the decision, correct. |
| 13:32:13 | 7 | Q.  Okay.  And so other than you and Officer |
| 13:32:16 | 8 | Calvert, was there any other law enforcement officer |
| 13:32:19 | 9 | that also assisted with taking Mr. Perez to the |
| 13:32:24 | 10 | ground? |
| 13:32:25 | 11 | A.  Yes. |
| 13:32:25 | 12 | Q.  And who was that? |
| 13:32:27 | 13 | A.  Deputy McEwen. |
| 13:32:28 | 14 | Q.  Did you know him by name at the time? |
| 13:32:30 | 15 | A.  I did not. |
| 13:32:31 | 16 | Q.  Okay.  Do you only know him by name now |
| 13:32:34 | 17 | because you were here for his deposition? |
| 13:32:35 | 18 | A.  No. |
| 13:32:36 | 19 | Q.  Okay.  Did you learn his name at some point |
| 13:32:39 | 20 | prior to his deposition? |
| 13:32:41 | 21 | A.  Yes, I did. |
| 13:32:43 | 22 | Q.  Okay. |
| 13:32:44 | 23 | MS. O'LINN:  By the way, were you done -- |
| 13:32:45 | 24 | counsel, you interrupted.  I'm not sure whether there |
| 13:32:48 | 25 | was anybody there other than McEwen.  I don't know -- |

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

38

| | | |
|---|---|---|
| 13:40:05 | 1 | Q.   Okay.   And was there a point in time where a |
| 13:40:11 | 2 | RIPP Restraint was applied to his ankles? |
| 13:40:16 | 3 | A.   Yes. |
| 13:40:17 | 4 | Q.   Okay.   How far along in this 18- to |
| 13:40:21 | 5 | 19-minute sequence of events was the RIPP Restraint |
| 13:40:24 | 6 | applied? |
| 13:40:26 | 7 | A.   It was just before medical services arrived. |
| 13:40:32 | 8 | Q.   Okay.   So I take it that when medical |
| 13:40:39 | 9 | services arrived, it was soon after that that the |
| 13:40:44 | 10 | backboard was placed on top of Mr. Perez's body; is |
| 13:40:47 | 11 | that true? |
| 13:40:48 | 12 | A.   Can you repeat that, please? |
| 13:40:49 | 13 | Q.   Sure.   It was soon after medical personnel |
| 13:40:51 | 14 | showed up that the backboard was placed on top of |
| 13:40:54 | 15 | Mr. Perez's body; true? |
| 13:40:56 | 16 | A.   About a minute after they arrived, they |
| 13:40:59 | 17 | placed the board onto his body. |
| 13:41:02 | 18 | Q.   Okay.   And so how long before they arrived |
| 13:41:06 | 19 | was the Ripp Restraint put around Mr. Perez's legs? |
| 13:41:12 | 20 | A.   Roughly around a minute and a half. |
| 13:41:20 | 21 | Q.   Okay.   And who applied the RIPP Restraint to |
| 13:41:26 | 22 | Mr. Perez's ankles? |
| 13:41:28 | 23 | A.   I believe it was Deputy Robnett, and also |
| 13:41:32 | 24 | Deputy Manasan, his trainee. |
| 13:41:35 | 25 | Q.   Okay.   And during the time that they apply |

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

43

| | | |
|---|---|---|
| 13:46:30 | 1 | pressure to Mr. Perez's back? |
| 13:46:33 | 2 | MS. O'LINN:  So objection; misstates the |
| 13:46:35 | 3 | testimony of the witness as to "sitting."  He |
| 13:46:37 | 4 | described it as squatting.  I'll let him explain, but |
| 13:46:40 | 5 | I want to make sure we have a record that he's not |
| 13:46:43 | 6 | necessarily agreeing with your characterization of |
| 13:46:47 | 7 | the action; is that correct? |
| 13:46:49 | 8 | THE WITNESS:  Correct.  I never saw him |
| 13:46:50 | 9 | seated completely down on the board.  Can you |
| 13:46:53 | 10 | rephrase the other part of your question, please? |
| 13:46:55 | 11 | BY MR. GEHLAWAT: |
| 13:46:55 | 12 | Q.  Okay.  So during this period of time where |
| 13:46:57 | 13 | you saw -- where you saw Detective Calvert squatting |
| 13:47:04 | 14 | over the board, prior to that point, did you see any |
| 13:47:09 | 15 | officer or deputy applying pressure to his back, to |
| 13:47:12 | 16 | Mr. Perez's back? |
| 13:47:13 | 17 | A.  From my point of view, I did not. |
| 13:47:19 | 18 | Q.  Okay.  Is it possible that could have |
| 13:47:21 | 19 | happened, but you just couldn't see it based on where |
| 13:47:24 | 20 | you were standing? |
| 13:47:24 | 21 | A.  Like I said, no.  From my angle, I did not |
| 13:47:27 | 22 | see that. |
| 13:47:28 | 23 | Q.  Okay.  Could you see hands that were |
| 13:47:31 | 24 | positioned on Mr. Perez's back when you were over by |
| 13:47:34 | 25 | his feet, prior to the backboard being placed on top |

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

44

13:47:37  1    of him?

13:47:38  2        A.  Yes, I could.

13:47:39  3        Q.  Okay.  And could you tell if those hands

13:47:41  4    that were on his back were pushing down or not?

13:47:45  5        A.  They were not pushing down.  They were

13:47:47  6    containing him as a reaction to his movements.

13:47:55  7        Q.  Have you been trained with respect to

13:48:00  8    positional asphyxia?

13:48:01  9        A.  Yes, I have.

13:48:02  10       Q.  Okay.  And did you receive training through

13:48:04  11   the Fresno Police Department?

13:48:06  12       A.  Yes, I did.

13:48:07  13       Q.  Okay.  And did you have training that if

13:48:13  14   someone is in a prone position and weight is applied

13:48:17  15   to their back for some period of time, that they

13:48:23  16   could asphyxiate and stop breathing?

13:48:24  17       A.  I was not trained that, no.  That was not

13:48:30  18   part of my training.

13:48:31  19       Q.  Did you have any training with respect to

13:48:34  20   the fact that someone in a prone position, if any

13:48:37  21   pressure was applied to their back, they could

13:48:40  22   asphyxiate?  Did you have any training to that

13:48:43  23   effect?

13:48:43  24            MS. O'LINN:  You can explain to the effect.

13:48:46  25   Go ahead.

57

| | | |
|---|---|---|
| 14:13:58 | 1 | McEwen were attempting to hold him down, at that |
| 14:14:02 | 2 | point your fear of getting hit by a motor vehicle on |
| 14:14:06 | 3 | Palm Avenue went away; is that true? |
| 14:14:11 | 4 | A.  Can you rephrase the question, please? |
| 14:14:13 | 5 | Q.  Sure.  The fear that you had of being hit by |
| 14:14:16 | 6 | a motor vehicle on Palm, that went away once |
| 14:14:21 | 7 | Mr. Perez was in a prone position, and you and |
| 14:14:24 | 8 | Officer Calvert and Deputy McEwen were attempting to |
| 14:14:28 | 9 | restrain him while he was prone? |
| 14:14:32 | 10 | A.  Yes.  The situation, the circumstances had |
| 14:14:35 | 11 | changed at that point. |
| 14:14:36 | 12 | Q.  Okay.  Did you hear Sergeant Rossetti call |
| 14:14:46 | 13 | for EMS at some point? |
| 14:14:48 | 14 | A.  I did. |
| 14:14:49 | 15 | Q.  And when you -- did you hear it on one |
| 14:14:52 | 16 | occasion or more than one occasion? |
| 14:14:53 | 17 | A.  More than one occasion from him. |
| 14:14:55 | 18 | Q.  Okay.  So the first time you heard it, did |
| 14:14:58 | 19 | he call for EMS code two? |
| 14:15:02 | 20 | A.  Yes, I did hear that. |
| 14:15:03 | 21 | Q.  And was that before or after Mr. Perez was |
| 14:15:09 | 22 | handcuffed? |
| 14:15:11 | 23 | A.  I believe that was as he was handcuffed. |
| 14:15:14 | 24 | Q.  Okay.  And then the second time you heard |
| 14:15:17 | 25 | him calling for EMS, was that when Mr. Perez was in a |

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

58

| 14:15:21 | 1 | prone position? |
| 14:15:23 | 2 | A.   Can you repeat the question, please? |
| 14:15:25 | 3 | Q.   Sure.   The second time that you heard |
| 14:15:29 | 4 | Sergeant Rossetti calling for EMS, was that when |
| 14:15:31 | 5 | Mr. Perez was in a prone position? |
| 14:15:34 | 6 | A.   Yes. |
| 14:15:35 | 7 | Q.   And what did you hear at that time? |
| 14:15:43 | 8 | A.   I -- I heard him request the EMS to respond |
| 14:15:47 | 9 | code three. |
| 14:15:48 | 10 | Q.   Okay.   Is code three in your mind, mean |
| 14:15:51 | 11 | lights and sirens? |
| 14:15:53 | 12 | A.   Per policy, yes, lights and sirens. |
| 14:15:56 | 13 | Q.   And in your prior experience when EMS is |
| 14:16:00 | 14 | requested code three, does that mean that there's a |
| 14:16:03 | 15 | medical emergency? |
| 14:16:05 | 16 | A.   Yes. |
| 14:16:06 | 17 | Q.   Okay.   And so that was what was in your mind |
| 14:16:09 | 18 | when you heard him call for code three on this date, |
| 14:16:13 | 19 | too; correct? |
| 14:16:14 | 20 | A.   Yes. |
| 14:16:15 | 21 | Q.   Okay.   When in the sequence of events was it |
| 14:16:21 | 22 | when you heard Sergeant Rossetti upgrade the call to |
| 14:16:25 | 23 | code three? |
| 14:16:27 | 24 | A.   As we were taking -- after we had taken |
| 14:16:33 | 25 | Mr. Perez down to the ground. |

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

60

| 14:17:45 | 1  | A.  Correct. |
| 14:17:45 | 2  | Q.  And so what I'm trying to find out is where |
| 14:17:48 | 3  | along the 18 to 19 minutes did EMS show up on scene? |
| 14:17:54 | 4  | A.  It took them about 14 minutes to get there. |
| 14:18:00 | 5  | Q.  Okay.  So and when they showed up, did you |
| 14:18:09 | 6  | see one or more than one employee from EMS? |
| 14:18:13 | 7  | A.  More than one. |
| 14:18:15 | 8  | Q.  Okay.  And how many did you see in total? |
| 14:18:17 | 9  | A.  Three. |
| 14:18:18 | 10 | Q.  Two men and one female? |
| 14:18:20 | 11 | A.  That's correct. |
| 14:18:21 | 12 | Q.  All right.  And did they come over to the |
| 14:18:26 | 13 | area to where Mr. Perez was in a prone position? |
| 14:18:29 | 14 | A.  Both males did. |
| 14:18:31 | 15 | Q.  Okay.  How about the female? |
| 14:18:34 | 16 | A.  I remember her standing off to the side. |
| 14:18:36 | 17 | Q.  Did you hear any of the EMS personnel say |
| 14:18:42 | 18 | that they were going to put a backboard on top of |
| 14:18:44 | 19 | Mr. Perez's body? |
| 14:18:46 | 20 | A.  I did. |
| 14:18:47 | 21 | Q.  And was there any discussion about doing it |
| 14:18:52 | 22 | a different way? |
| 14:18:54 | 23 | A.  Yes, there was. |
| 14:18:55 | 24 | Q.  And what was that discussion? |
| 14:18:58 | 25 | A.  When they initially walked up with the |

61

14:19:02  1  board, I couldn't determine if it was an officer or

14:19:05  2  deputy that asked the question if they were going to

14:19:07  3  slide the board underneath him, and that's when I

14:19:11  4  heard paramedic Morgan Anderson respond that they

14:19:16  5  were going to place the board on top of him.  And

14:19:18  6  that they were going to -- that we were going to sit

14:19:21  7  on it.

14:19:22  8       Q.   Okay.  How did you know it was paramedic

14:19:25  9  Morgan Anderson?

14:19:26  10      A.   Because I recognized his voice after I

14:19:28  11  watched the video.

14:19:29  12      Q.   Okay.

14:19:29  13      A.   From my body camera.

14:19:31  14      Q.   So he was the one -- let me ask, he was the

14:19:33  15  one who had the idea of placing the backboard on

14:19:37  16  Mr. Perez's body?

14:19:38  17           MS. O'LINN:  Objection; "idea."  Directive,

14:19:42  18  yes.  Had the idea, interesting.  So objection;

14:19:46  19  argumentative.

14:19:46  20           You can answer.

14:19:48  21           THE WITNESS:  I heard him give the

14:19:50  22  directions.

14:19:51  23  BY MR. GEHLAWAT:

14:19:52  24      Q.   Okay.  And was he also the one who said to

14:19:59  25  sit on top of the board?

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

65

14:23:38  1          Q.   Okay.  So how long before the board was

14:23:42  2     flipped over did you last have your hands on the

14:23:44  3     board?

14:23:50  4          A.   It was within five seconds or so.

14:23:52  5          Q.   Okay.  So in the five seconds prior to the

14:23:54  6     board being flipped over, could you still feel

14:23:58  7     Mr. Perez's legs moving?

14:24:05  8          A.   I still felt movement on the board the

14:24:08  9     entire time.

14:24:10  10         Q.   Okay.  And do you know where that movement

14:24:14  11    was coming from?

14:24:14  12         A.   At that time, I believe it was Mr. Perez

14:24:18  13    moving under the board.

14:24:22  14         Q.   Was there ever any discussion about flipping

14:24:28  15    Mr. Perez over into a supine position and then

14:24:32  16    placing him on the board, as opposed to putting the

14:24:35  17    board on top of his body?

14:24:37  18         A.   Yes.

14:24:39  19         Q.   And can you tell me about that discussion?

14:24:42  20         A.   It's -- I had already mentioned that

14:24:46  21    earlier.  When EMS walked up with the board, it was

14:24:50  22    asked by either an officer or deputy if they were

14:24:54  23    going to place the board underneath him, and that's

14:24:57  24    when Morgan Anderson, the paramedic, gave the

14:25:01  25    direction that they were going to place the board on

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

66

14:25:04   1   top, and that we were going to sit on it.

14:25:06   2       Q.   Okay.   So was it your understanding that

14:25:09   3   when there was that discussion, that if the board was

14:25:12   4   slid underneath him, that the next step would be for

14:25:16   5   his body to be turned over so that his back would

14:25:19   6   have been on the backboard?

14:25:22   7       A.   There was no further discussion.   So I would

14:25:25   8   be guessing.

14:25:26   9       Q.   Okay.   So I asked you if there was any

14:25:28  10   discussion about him being turned over into a supine

14:25:31  11   position before he was attached to the board, and I

14:25:34  12   think you said yes.   And then you went on to describe

14:25:36  13   this conversation where there was talk about the

14:25:39  14   board being slid underneath his body.

14:25:41  15           So I'm just asking you now, is it your

14:25:44  16   understanding that if the board was slid underneath

14:25:46  17   his body, that his body would have been turned over

14:25:50  18   so that it was supine and his back was on the board?

14:25:55  19       A.   I don't think I understand your question.

14:25:58  20       Q.   Okay.

14:25:58  21           MS. O'LINN:   I caught the difference after

14:26:00  22   you repeated it, counsel.   I didn't catch it the

14:26:02  23   first time either.

14:26:03  24   BY MR. GEHLAWAT:

14:26:05  25       Q.   Okay.   So was there ever any discussion

PEREZ vs CITY OF FRESNO
Chris Martinez, Wednesday, March 06, 2019

74

14:43:35  1      Q.   I take it that Fresno PD was not initially

14:43:52  2  dispatched to this call; is that true?

14:43:54  3      A.   That's correct.

14:43:56  4      Q.   Did you later understand that -- that it was

14:44:00  5  the sheriff's office that was dispatched to the call?

14:44:03  6      A.   Yes.

14:44:05  7      Q.   Okay.  Given that you and Sergeant Rossetti

14:44:09  8  and Officer Calvert or Detective Calvert showed up

14:44:12  9  first, were you sort of in charge of the call?

14:44:16  10          MS. O'LINN:  Objection; until when?

14:44:24  11  Objection; calls -- it's argumentative as phrased.

14:44:26  12          You can explain.

14:44:26  13  BY MR. GEHLAWAT:

14:44:28  14      Q.   Until EMS showed up, we'll put it that way.

14:44:31  15      A.   Until EMS showed up?

14:44:33  16      Q.   Yes.

14:44:34  17      A.   Yes.  My sergeant -- my supervisor was on

14:44:36  18  scene with me.  So he was supervising me.  At his

14:44:40  19  direction, we were taking over the call.

14:44:43  20      Q.   Okay.  And once EMS showed up, at least with

14:44:46  21  respect to how Mr. Perez was to be transported, that

14:44:52  22  was something you were going to defer to EMS about?

14:44:56  23      A.   I'm sorry.  Can you explain that again?

14:45:00  24      Q.   Sure.  Once EMS showed up in terms of how

14:45:02  25  Mr. Perez was going to be transported, that is

85

1   STATE OF CALIFORNIA )
                        ) ss.
2   COUNTY OF FRESNO    )

3

4          I, Bree Mervin, a Certified Shorthand Reporter

5   in the State of California, holding Certificate

6   No. 13057, do hereby certify that CHRIS MARTINEZ, the

7   witness named in the foregoing deposition, was by me

8   duly sworn; that said deposition was taken Wednesday,

9   March 6, 2019, at the time and place set forth on the

10  first page hereof.

11         That upon the taking of the deposition, the

12  words of the witness were written down by me in

13  stenotype and thereafter transcribed by computer under

14  my supervision; that the foregoing is a true and correct

15  transcript of the testimony given by the witness.

16         Pursuant to Federal Rule 30(e), transcript

17  review was requested.

18         I further certify that I am neither counsel for

19  nor in any way related to any party to said action, nor

20  in any way interested in the result or outcome thereof.

21         Dated this 28th day of March, 2019, at

22  Visalia, California.

23         _____

24         Bree Mervin, CSR No. 13057

25

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 10

PEREZ

vs

CITY OF FRESNO

---

Deposition of: Robert McEwen

Taken on: Monday, March 04, 2019

---



## CERTIFIED COPY



Certified Shorthand Reporters

A Professional Corporation

Main Office: 900 Truxtun Avenue, Suite 320
Bakersfield, CA 93301
(800) 322-4595 Toll Free ● (661) 395-1050
www.woodrandall.com

Serving Central California - Bakersfield, Visalia & Fresno

PEREZ vs CITY OF FRESNO
Robert McEwen, Monday, March 04, 2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

_____

ANTHONY PEREZ, individually,    )
CECILIA PEREZ, individually,    )
TERRALEE PEREZ,                 )
individually, and as            )
successor in interest to        )No. 1:18-cv-00127-AWI-EPG
Joseph Perez, JOSEPH PEREZ,     )
JR., individually and as        )
successor in interest to        )
Joseph Perez, and X.P. a        )
minor, by and through his       )
Guardian ad Litem, MICHELLE     )
PEREZ, individually and as      )
successor in interest to        )
Joseph Perez,                   )
                                )
          Plaintiffs,           )
                                )
      vs.                       )
                                )
City of Fresno, COUNTY OF       )
FRESNO, JAMES ROSSETTI, an      )
individual, SEAN CALVERT, an    )
individual, CHRIS MARTINEZ,     )
an individual, BRAITHAN         )
STOLTENBERG, an individual,     )
ROBERT MCEWEN, an               )
individual, KARLSON MANASAN,    )
an individual, JIMMY            )
ROBNETT, an individual, and     )
DOES 1-10, inclusive,           )
                                )
          Defendants.           )
_____ )

VIDEOTAPED DEPOSITION

OF

ROBERT McEWEN

Monday, March 4, 2019

Fresno, California

Reported by:  Bree Mervin, CSR No. 13057, RPR, CRR

2

1                         APPEARANCES

2

3    For Plaintiffs:        Alder Law, P.C.
                            BY MR. NEIL GEHLAWAT
4                           Attorney at Law
                            1875 Century Park East
5                           Suite 1500
                            Los Angeles, California  90067
6                           (310)275-9131
                            ngehlawat@alderlaw.com
7

8
     For County of Fresno: Weakley & Arendt
9                           BY MR. JAMES D. WEAKLEY
                            Attorney at Law
10                          5200 North Palm Avenue
                            Suite 211
11                          Fresno, California  93704
                            (559)221-5256
12                          jim@walaw-fresno.com

13

14   For City of Fresno:    Manning & Kass, Ellrod,
                            Ramirez, Trester, LLP
15                          BY MS. MILDRED K. O'LINN
                            Attorney at Law
16                          801 South Figueroa Street
                            15th Floor
17                          Los Angeles, California  90017
                            (213)624-6900
18                          mko@manningllp.com

19

20   The Videographer:      CHELCIE LEWIS

21

22   Also present:          DEPUTY SEAN CALVERT
                            OFFICER CHRIS MARTINEZ
23                          OFFICER JAMES ROSSETTI

24

25

PEREZ vs CITY OF FRESNO
Robert McEwen, Monday, March 04, 2019

13

| | | |
|---|---|---|
| 10:06:44 | 1 | Q.   Have you listened to the audio recording of |
| 10:06:47 | 2 | your interview with Detective Galindo? |
| 10:06:49 | 3 | A.   No. |
| 10:06:49 | 4 | Q.   How was it that you first learned about the |
| 10:07:04 | 5 | location of Mr. Perez on May 10th, 2017? |
| 10:07:08 | 6 | A.   A call for service came over the sheriff's |
| 10:07:12 | 7 | dispatch radio, and I heard the call for service. |
| 10:07:15 | 8 | Q.   Okay.  And do you recall what information |
| 10:07:18 | 9 | was transmitted over that? |
| 10:07:21 | 10 | A.   Dispatch advised that a Hispanic male adult |
| 10:07:24 | 11 | was running down the street in the area of Van Ness |
| 10:07:27 | 12 | and Saginaw. |
| 10:07:32 | 13 | Q.   And where were you at the time that you had |
| 10:07:37 | 14 | heard that over dispatch? |
| 10:07:39 | 15 | A.   I was near Dakota and Thorne. |
| 10:07:42 | 16 | Q.   So how far were you at the time you heard |
| 10:07:46 | 17 | the dispatch from the location where this Hispanic |
| 10:07:50 | 18 | male was being identified? |
| 10:07:51 | 19 | A.   Less than one half mile. |
| 10:07:53 | 20 | Q.   And were you alone when you received this |
| 10:08:00 | 21 | information? |
| 10:08:00 | 22 | A.   Yes. |
| 10:08:01 | 23 | Q.   Okay.  And you reported to the area where he |
| 10:08:06 | 24 | was described to be? |
| 10:08:07 | 25 | A.   Yes. |

PEREZ vs CITY OF FRESNO
Robert McEwen, Monday, March 04, 2019

15

| | | |
|---|---|---|
| 10:09:17 | 1 | Q.   Did you have pepper spray with you? |
| 10:09:19 | 2 | A.   Yes. |
| 10:09:20 | 3 | Q.   Did you have a Taser? |
| 10:09:22 | 4 | A.   No. |
| 10:09:25 | 5 | Q.   Did you have a hobble or a hogtie with you |
| 10:09:29 | 6 | on the day of the incident? |
| 10:09:30 | 7 | A.   No. |
| 10:09:38 | 8 | Q.   My understanding is that when you first |
| 10:09:41 | 9 | observed Mr. Perez, officers from the Fresno Police |
| 10:09:46 | 10 | Department were already present; is that true? |
| 10:09:48 | 11 | A.   Yes. |
| 10:09:51 | 12 | Q.   Based on the information that you received |
| 10:09:56 | 13 | over dispatch, at that time did you have any |
| 10:09:59 | 14 | information that Mr. Perez had committed a crime? |
| 10:10:04 | 15 | A.   No. |
| 10:10:13 | 16 | Q.   Once you arrived on scene, where exactly did |
| 10:10:18 | 17 | you park your vehicle? |
| 10:10:19 | 18 | A.   I parked off the roadway. |
| 10:10:21 | 19 | Q.   Okay.  And was that on Palm? |
| 10:10:24 | 20 | A.   More I went down Santa Fe and pulled into |
| 10:10:28 | 21 | the field.  There's an empty dirt lot directly behind |
| 10:10:31 | 22 | where they were at. |
| 10:10:32 | 23 | Q.   And was Mr. Perez in the general location of |
| 10:10:37 | 24 | Palm and Santa Fe? |
| 10:10:38 | 25 | A.   He was seated on the west side of Palm, |

PEREZ vs CITY OF FRESNO
Robert McEwen, Monday, March 04, 2019

16

| 10:10:40 | 1 | south of Santa Fe. |
| 10:10:43 | 2 | Q.   When you got out of your vehicle, was he |
| 10:10:45 | 3 | seated on the curb? |
| 10:10:47 | 4 | A.   Yes, he was. |
| 10:10:49 | 5 | Q.   Was he in handcuffs? |
| 10:10:52 | 6 | A.   Yes, he was. |
| 10:10:53 | 7 | Q.   How many officers did you observe to be |
| 10:10:54 | 8 | there at that time? |
| 10:10:57 | 9 | A.   Braithan arrived pretty much the exact same |
| 10:11:00 | 10 | time I did, and then Calvert, Martinez, and Rossetti. |
| 10:11:04 | 11 | Q.   So Calvert, Martinez, and Rossetti, did you |
| 10:11:08 | 12 | believe they were officers from the Fresno Police |
| 10:11:11 | 13 | Department? |
| 10:11:11 | 14 | A.   Yes. |
| 10:11:11 | 15 | Q.   And had you -- were any of them people you |
| 10:11:18 | 16 | had known prior to the day of this incident? |
| 10:11:20 | 17 | A.   I had met Rossetti before. |
| 10:11:23 | 18 | Q.   How about Calvert or Martinez? |
| 10:11:25 | 19 | A.   I don't recall meeting them before, but it's |
| 10:11:28 | 20 | possible. |
| 10:11:28 | 21 | Q.   And so in terms of the other deputies from |
| 10:11:31 | 22 | the sheriff's office, Deputy Stoltenberg arrived at |
| 10:11:37 | 23 | about the same time you did? |
| 10:11:38 | 24 | A.   Yes. |
| 10:11:38 | 25 | Q.   And there were additional deputies that |

PEREZ vs CITY OF FRESNO
Robert McEwen, Monday, March 04, 2019

18

| 10:12:50 | 1 | A.   Yes. |
| 10:12:50 | 2 | Q.   And what did you observe at that time? |
| 10:12:53 | 3 | A.   Rossetti was on the phone, and Calvert and |
| 10:12:58 | 4 | Martinez were behind Mr. Perez on the sidewalk.   I |
| 10:13:02 | 5 | stood next to them momentarily. |
| 10:13:05 | 6 | Q.   Okay.   Could you overhear any of the |
| 10:13:08 | 7 | conversation that Sergeant Rossetti was having over |
| 10:13:12 | 8 | the phone? |
| 10:13:12 | 9 | A.   Yes. |
| 10:13:13 | 10 | Q.   And what do you recall about that phone |
| 10:13:15 | 11 | conversation? |
| 10:13:16 | 12 | A.   He was trying to ascertain Mr. Perez's |
| 10:13:19 | 13 | probation status. |
| 10:13:20 | 14 | Q.   Okay.   Is that how you first learned that |
| 10:13:23 | 15 | Mr. Perez might have been on probation? |
| 10:13:26 | 16 | A.   Yes. |
| 10:13:26 | 17 | Q.   And over the course of the encounter with |
| 10:13:31 | 18 | Mr. Perez, did you learn what he was on probation |
| 10:13:34 | 19 | for? |
| 10:13:35 | 20 | A.   Just what I overheard, and it was possibly |
| 10:13:37 | 21 | for a gun possession. |
| 10:13:39 | 22 | Q.   Okay.   So your understanding was that he was |
| 10:13:41 | 23 | on probation for possession of a firearm; correct? |
| 10:13:46 | 24 | A.   Yes. |
| 10:13:46 | 25 | Q.   And that was AB -- AB 109 is more or less |

PEREZ vs CITY OF FRESNO
Robert McEwen, Monday, March 04, 2019

20

| | | |
|---|---|---|
| 10:14:59 | 1 | County Sheriff's office, if you know? |
| 10:15:01 | 2 | A. Yes. |
| 10:15:02 | 3 | Q. So once you got out of your vehicle and you |
| 10:15:11 | 4 | went over to the area where Mr. Perez was seated and |
| 10:15:15 | 5 | after you overheard the conversation that Sergeant |
| 10:15:19 | 6 | Rossetti was having over the phone, what happened |
| 10:15:24 | 7 | next? |
| 10:15:27 | 8 | A. When Sergeant Rossetti stepped closer to his |
| 10:15:30 | 9 | patrol vehicle, I moved into the street so that I was |
| 10:15:33 | 10 | directly in front of Mr. Perez, and Calvert and |
| 10:15:36 | 11 | Martinez were still on the sidewalk behind Mr. Perez. |
| 10:15:39 | 12 | Q. And is one of the reasons you stood in front |
| 10:15:41 | 13 | of him, to guard against the possibility he could |
| 10:15:45 | 14 | come into contact with traffic? |
| 10:15:46 | 15 | A. Yes. I didn't want him to stand up and run |
| 10:15:49 | 16 | into traffic. |
| 10:15:50 | 17 | Q. Okay. At some point, did Mr. Perez get up |
| 10:15:55 | 18 | from the seated position? |
| 10:15:57 | 19 | A. Yes. |
| 10:15:57 | 20 | Q. Did he rock backwards and stand up kind of |
| 10:16:03 | 21 | all in one motion? |
| 10:16:04 | 22 | A. Yes. |
| 10:16:05 | 23 | Q. So in terms of when you got to the scene to |
| 10:16:09 | 24 | the point when he got up in the manner that I just |
| 10:16:13 | 25 | described, how much time passed in that period of |

PEREZ vs CITY OF FRESNO
Robert McEwen, Monday, March 04, 2019

21

| 10:16:18 | 1 | time? |
| 10:16:18 | 2 | A.  Between five and ten minutes.  Less than |
| 10:16:23 | 3 | ten, more than five. |
| 10:16:24 | 4 | Q.  Okay.  So from the time you showed up to the |
| 10:16:27 | 5 | point that Mr. Perez got up off the ground, was |
| 10:16:30 | 6 | approximately five to ten minutes? |
| 10:16:32 | 7 | A.  To the best of my estimation, yes. |
| 10:16:35 | 8 | Q.  Prior to him getting up, did he say anything |
| 10:16:43 | 9 | to you? |
| 10:16:43 | 10 | A.  We were talking to him, but he was |
| 10:16:47 | 11 | talking -- he was saying things to people that |
| 10:16:51 | 12 | weren't there.  He was making statements like, "Give |
| 10:16:54 | 13 | me another chance.  I won't do this anymore.  Help me |
| 10:16:58 | 14 | out.  I can redeem myself."  And he was at one point, |
| 10:17:03 | 15 | he rocked back, and he would kick at people that |
| 10:17:06 | 16 | weren't there while he was talking. |
| 10:17:08 | 17 | Q.  Okay.  Prior to him getting up off the |
| 10:17:11 | 18 | ground, was he otherwise compliant? |
| 10:17:17 | 19 | A.  In what sense? |
| 10:17:20 | 20 | Q.  For example, did you observe any officer or |
| 10:17:23 | 21 | did you give him a command that he did not comply |
| 10:17:27 | 22 | with prior to him getting up off the ground? |
| 10:17:29 | 23 | MR. WEAKLEY:  I'm going to object as |
| 10:17:31 | 24 | compound, but go ahead and answer if you can. |
| 10:17:33 | 25 | THE WITNESS:  Nobody was telling him to do |

10:17:36   1   anything.   We were waiting for an answer on his

10:17:39   2   probation status and as to what the investigation was

10:17:44   3   going to entail, as to what we were going to do with

10:17:46   4   him.

10:17:46   5   BY MR. GEHLAWAT:

10:17:47   6       Q.   Okay.   And based on the -- on his behavior,

10:17:50   7   did you believe at that time that he might be under

10:17:55   8   the influence of drugs?

10:17:56   9       A.   Yes.

10:17:57   10       Q.   Did you believe he might be under the

10:18:00   11   influence of a stimulant?

10:18:01   12       A.   I believe he was under the influence of a

10:18:03   13   stimulant, yes.

10:18:03   14       Q.   Did you know which one, or did you have a

10:18:05   15   suspicion of which one?

10:18:06   16       A.   I wouldn't -- my best guess would have been

10:18:11   17   methamphetamines.   That's the most common.

10:18:13   18       Q.   The symptoms that he was displaying, were

10:18:17   19   they consistent with subjects you had encountered in

10:18:21   20   the past that were also under the influence of

10:18:22   21   methamphetamines?

10:18:24   22       A.   Yes.

10:18:25   23       Q.   Okay.   Once Mr. Perez got up off the ground,

10:18:41   24   at that point did you go to restrain him?

10:18:45   25       A.   Yes.

CURRENT 148-5 FRESNO
Robert McEwen, Monday, March 04, 2019

23

| | | |
|---|---|---|
| 10:18:46 | 1 | Q.  Okay.  And was Sergeant Rossetti still on |
| 10:18:49 | 2 | his phone at that time? |
| 10:18:50 | 3 | A.  At the very moment he stood up, I believe |
| 10:18:55 | 4 | Rossetti was still on his phone, and I moved in to |
| 10:18:58 | 5 | help restrain him. |
| 10:18:59 | 6 | Q.  Okay.  Were Deputies Robnett and Manasan in |
| 10:19:06 | 7 | there at that point? |
| 10:19:07 | 8 | A.  I don't recall.  I don't believe so. |
| 10:19:12 | 9 | Q.  But you know Deputy Stoltenberg was there at |
| 10:19:18 | 10 | that time; true? |
| 10:19:18 | 11 | A.  Yes. |
| 10:19:18 | 12 | Q.  And can you describe how you restrained him |
| 10:19:21 | 13 | at that point? |
| 10:19:21 | 14 | A.  I moved forward, I grabbed his left arm, and |
| 10:19:24 | 15 | placed an arm across his chest.  Calvert and Martinez |
| 10:19:27 | 16 | also assisted, and took Mr. Perez to the ground. |
| 10:19:32 | 17 | Q.  Okay.  At the time you observed him during |
| 10:19:37 | 18 | that five- to ten-minute period of time while he was |
| 10:19:40 | 19 | seated on the sidewalk and he was apparently talking |
| 10:19:44 | 20 | to people who did not exist or kicking at people that |
| 10:19:47 | 21 | did not exist, did you believe that he also may be |
| 10:19:52 | 22 | suffering from a mental disability? |
| 10:19:55 | 23 | A.  I wasn't sure what he was suffering from, |
| 10:19:58 | 24 | other than what I thought were the effects of a |
| 10:20:00 | 25 | stimulant or methamphetamines. |

24

```
10:20:02   1        Q.   One of the learning domains that you have
10:20:05   2   received training on in the academy is Learning
10:20:09   3   Domain 37 that deals with dealing with people with
10:20:12   4   mental disabilities; is that true?
10:20:17   5        A.   I don't recall what the learning domains
10:20:20   6   were in the academy.  That was 22 years ago.  If --
10:20:23   7   if you say that we learned Domain 37, then yes, I did
10:20:27   8   get training in that.
10:20:28   9        Q.   Okay.  Have you had training with your
10:20:32  10   department in terms of how to deal with -- with
10:20:37  11   subjects who have mental disabilities?
10:20:39  12        A.   Yes.
10:20:39  13        Q.   And is the training generally that you try
10:20:46  14   to have a calm demeanor when dealing with them?
10:20:51  15        A.   Yes.
10:20:51  16        Q.   And do deescalate the situation when
10:20:54  17   possible?
10:20:55  18        A.   Yes.
10:20:56  19        Q.   Did you believe at that time when he was
10:21:00  20   seated on the sidewalk and you observed him, that you
10:21:04  21   might be dealing with a subject who had a mental
10:21:07  22   disability?
10:21:08  23        A.   Again, I don't recall thinking if he had a
10:21:10  24   mental disability, but my belief was that he was
10:21:13  25   suffering from the effects of the drugs that he was
```

Robert McEwen, Monday, March 04, 2019

25

| | | |
|---|---|---|
| 10:21:15 | 1 | taking and whatever it is that he had on board. |
| 10:21:18 | 2 | Q.   Do you also have training with your |
| 10:21:20 | 3 | department in terms of how to deal with subjects that |
| 10:21:23 | 4 | might be under the influence of a stimulant? |
| 10:21:26 | 5 | A.   I don't recall. |
| 10:21:30 | 6 | Q.   There have been times in the past where you |
| 10:21:35 | 7 | have encountered subjects who were under the |
| 10:21:37 | 8 | influence of a stimulant; correct? |
| 10:21:39 | 9 | A.   Yes. |
| 10:21:40 | 10 | Q.   And so once you and Officers Calvert and |
| 10:21:49 | 11 | Martinez took Mr. Perez to the ground, was he on the |
| 10:21:56 | 12 | roadway when you had taken him to the ground, or |
| 10:21:59 | 13 | where was he if not? |
| 10:22:00 | 14 | A.   He was right on the sidewalk. |
| 10:22:02 | 15 | Q.   Okay.  How long did it take from the time |
| 10:22:10 | 16 | that you first started to restrain him, to the point |
| 10:22:14 | 17 | that you had been able to take him to the ground |
| 10:22:16 | 18 | along with the other officers? |
| 10:22:17 | 19 | A.   I believe it took less than 30 seconds for |
| 10:22:23 | 20 | us to get him back down to the ground. |
| 10:22:25 | 21 | Q.   And when you got him down to the ground, was |
| 10:22:27 | 22 | he on his stomach? |
| 10:22:29 | 23 | A.   Not initially. |
| 10:22:30 | 24 | Q.   Okay.  So initially can you describe his |
| 10:22:35 | 25 | body position on the ground when you had first taken |

26

| 10:22:37 | 1 | him to the ground? |
| 10:22:38 | 2 | A.  He ended up on his back with his knees bent |
| 10:22:41 | 3 | and his feet were close to his body.  So his knees |
| 10:22:43 | 4 | were kind of in a triangle shape.  His head was away |
| 10:22:48 | 5 | from the curb, and that was the position he ended up |
| 10:22:52 | 6 | in. |
| 10:22:53 | 7 | Q.  Okay.  I take it you have training with your |
| 10:23:02 | 8 | department in terms of restraints and the types of |
| 10:23:04 | 9 | restraints you can use on subjects; is that true? |
| 10:23:07 | 10 | A.  Yes. |
| 10:23:07 | 11 | Q.  And so when he was in that position, where |
| 10:23:13 | 12 | were you relative to his body when he was on his back |
| 10:23:16 | 13 | on the ground? |
| 10:23:20 | 14 | A.  I don't recall exactly where he ended up. |
| 10:23:23 | 15 | Initially when I assisted taking him down, I had |
| 10:23:25 | 16 | ahold of his left arm.  So I believe I ended up more |
| 10:23:29 | 17 | to his left side.  I immediately pulled his feet out |
| 10:23:34 | 18 | to straighten his legs out. |
| 10:23:38 | 19 | Q.  So you recall initially when he was on the |
| 10:23:40 | 20 | ground on his back, being more on his left side; |
| 10:23:43 | 21 | true? |
| 10:23:44 | 22 | A.  He was on his back.  I was near his left |
| 10:23:46 | 23 | side. |
| 10:23:46 | 24 | Q.  Right.  Okay.  And you said that you |
| 10:23:51 | 25 | straightened his legs out; true? |

Robert McEwen, Monday, March 04, 2019

27

| | | |
|---|---|---|
| 10:23:53 | 1 | A. Yes. |
| 10:23:53 | 2 | Q. And do you recall where Officers Calvert and |
| 10:23:57 | 3 | Martinez were during this period of time? |
| 10:23:59 | 4 | A. Officer Martinez was attempting to control |
| 10:24:02 | 5 | Mr. Perez's lower body, and Officer Calvert was |
| 10:24:06 | 6 | trying to control Mr. Perez's upper body. |
| 10:24:10 | 7 | Q. Okay. And when you say that Officer |
| 10:24:14 | 8 | Martinez was attempting to control his lower body, |
| 10:24:17 | 9 | what do you mean by that? |
| 10:24:18 | 10 | A. His legs and his feet. |
| 10:24:20 | 11 | Q. Okay. And how did you observe him to be |
| 10:24:24 | 12 | doing that? |
| 10:24:24 | 13 | A. Applying pressure across the thighs. |
| 10:24:27 | 14 | Q. Okay. How about Officer Calvert, when you |
| 10:24:31 | 15 | say that he was -- you observed him attempting to |
| 10:24:35 | 16 | hold down Mr. Perez's upper body, what did you |
| 10:24:39 | 17 | observe him to do specifically? |
| 10:24:40 | 18 | A. He was trying to hold Mr. Perez's chest down |
| 10:24:42 | 19 | with his hands. |
| 10:24:43 | 20 | Q. Do you know where he was -- where he was |
| 10:24:50 | 21 | standing relative to Mr. Perez's body; in other |
| 10:24:53 | 22 | words, was he above his head, off to his either side |
| 10:24:59 | 23 | while he was putting his hands on his upper body? |
| 10:25:01 | 24 | A. I don't recall. |
| 10:25:02 | 25 | Q. At some point did Mr. Perez move into a |

WOOD & RANDALL
(800) 322-4595

28

10:25:09  1      prone position where his stomach was on the ground?

10:25:11  2           A.   Yes.   He was able to turn himself over.

10:25:14  3           Q.   Okay.

10:25:15  4           A.   And lay on his stomach.

10:25:16  5           Q.   All right.   And was that something that you

10:25:20  6      were attempting to have him go into that prone

10:25:22  7      position, or was that something he had done on his

10:25:25  8      own?

10:25:26  9           A.   That was something he did on his own.

10:25:28  10          Q.   Okay.   So would it have been your preference

10:25:32  11     to keep him in a supine position?

10:25:37  12          A.   Our intent was to keep him from getting back

10:25:42  13     up and running back into traffic.   He was thrashing

10:25:45  14     about.   We were just trying to keep him from injuring

10:25:47  15     himself or us.

10:25:49  16          Q.   Okay.   So would it be fair to say that the

10:25:53  17     ultimate goal would have been to basically have him

10:25:57  18     in the position that he was in before he got up off

10:25:59  19     the sidewalk?

10:26:01  20          A.   I would prefer that he was seated, but he

10:26:04  21     was not complying with our request to remain calm or

10:26:08  22     to stop thrashing about.

10:26:13  23          Q.   Okay.   Did you ever recall him verbally

10:26:17  24     threatening yourself or any of the officers while you

10:26:19  25     were on scene?

Robert McEwen, Monday, March 04, 2019

29

```
10:26:20  1       A.  I do not recall him threatening me or the
10:26:22  2   other officers.
10:26:24  3       Q.  Okay.  And I take it he was not able to use
10:26:31  4   his -- his arms in any way to attempt a hit or punch
10:26:36  5   at the officers because he was handcuffed; is that
10:26:41  6   true?
10:26:41  7       A.  Correct.
10:26:41  8       Q.  So I take it the forms of resistance would
10:26:44  9   have been that he was yelling and screaming; is that
10:26:48  10  true?
10:26:49  11      A.  I'm not sure I understand.
10:26:50  12      Q.  Sure.  So you said that he was resisting,
10:26:53  13  and I think you said he was also thrashing.  When you
10:26:56  14  say that he was thrashing, would that be with his
10:27:01  15  legs?
10:27:01  16      A.  He was trying to kick with his feet.  He was
10:27:03  17  trying to roll up onto his side.  He was, you know,
10:27:07  18  moving his head about.
10:27:08  19      Q.  Okay.  During the time that he was in the
10:27:12  20  supine position and you and Officers Martinez and
10:27:18  21  Calvert were attempting to restrain him, could you
10:27:22  22  make out anything he was saying during that period of
10:27:26  23  time?
10:27:26  24      A.  Again, he repeated, you know, "Give me
10:27:30  25  another chance.  I can redeem myself.  I didn't do
```

Robert McEwen, Monday, March 04, 2019

31

10:28:51  1   a minute?

10:28:52  2        A.   Yes.

10:28:53  3        Q.   And once he was in the prone position, was

10:29:00  4   his stomach on the ground?

10:29:04  5        A.   Yes.

10:29:04  6        Q.   And once he was in the prone position, was

10:29:08  7   his head also facing the ground?

10:29:11  8        A.   He is -- the side of his head was on the

10:29:13  9   ground.  I mean, it alternated between the side of

10:29:17 10   his head or his face was on the ground.

10:29:22 11        Q.   Okay.  Once he was in the prone position,

10:29:25 12   where did you go relative to his body?

10:29:27 13        A.   I was on his left side, right near his lower

10:29:29 14   back.

10:29:30 15        Q.   Okay.  And were you applying pressure to his

10:29:36 16   body at that time?

10:29:36 17        A.   I was kneeling on the ground, and I was just

10:29:38 18   using my hand to push on his midback to keep him flat

10:29:41 19   or prevent him from rolling over.

10:29:43 20        Q.   And then do you have a recollection of where

10:29:48 21   Officers Martinez and Calvert were at that time?

10:29:50 22        A.   Martinez was still trying to keep Mr. Perez

10:29:53 23   from kicking his legs, and Officer Calvert was trying

10:29:58 24   to keep Mr. Perez from rolling over.  And also he was

10:30:02 25   trying to control his -- Mr. Perez's head because he

10:30:05  1  **started to bang it on the concrete.**

10:30:10  2      Q.  So your hands were on his midback, is that

10:30:14  3  what you said?

10:30:15  4      A.  Yes.

10:30:15  5      Q.  And you were attempting to hold him down by

10:30:19  6  pushing down on his midback; is that true?

10:30:22  7      A.  Yes.

10:30:22  8      Q.  And Officer Martinez was closer to his legs?

10:30:25  9      A.  Yes.

10:30:29 10      Q.  And your recollection is he was attempting

10:30:31 11  to hold his legs down or prevent him from kicking his

10:30:35 12  legs?

10:30:35 13      A.  Yes.

10:30:35 14      Q.  And Officer Calvert, do you know where his

10:30:39 15  hands were during this period of time?

10:30:41 16      A.  One hand was trying to keep Mr. Perez from,

10:30:45 17  you know, banging his head on the ground or scraping

10:30:48 18  his face on the concrete, and his other hand was on

10:30:50 19  his upper back trying to prevent Mr. Perez from

10:30:53 20  rolling over.

10:30:56 21      Q.  So at this point was deputy -- had Deputy

10:31:02 22  Stoltenberg also made contact with Mr. Perez?

10:31:03 23      A.  Deputy Stoltenberg did not assist at that

10:31:06 24  time or any time in helping us restraining Mr. Perez.

10:31:10 25      Q.  So the sum total of officers and deputies

Robert McEwen, Monday, March 04, 2019

36

| | | |
|---|---|---|
| 10:34:54 | 1 | MR. GEHLAWAT:  No problem. |
| 10:34:55 | 2 | BY MR. GEHLAWAT: |
| 10:34:56 | 3 | Q.  So we were talking about whether or not any |
| 10:35:01 | 4 | other officers were restraining Mr. Perez during that |
| 10:35:06 | 5 | five- to ten-minute period of time while he was in a |
| 10:35:09 | 6 | prone position on the ground.  Do you recall that? |
| 10:35:14 | 7 | A.  I don't recall if anybody else that -- I |
| 10:35:16 | 8 | know in the area where Calvert, myself, and Martinez |
| 10:35:20 | 9 | were, nobody else was assisting.  At some point |
| 10:35:23 | 10 | Deputy Robnett put the hobble on his ankles so he had |
| 10:35:26 | 11 | to assist in restraining him in that fashion, but |
| 10:35:30 | 12 | nobody else was helping us hold Mr. Perez down. |
| 10:35:34 | 13 | Q.  Okay.  And this was up until the point that |
| 10:35:38 | 14 | the paramedics showed up; true? |
| 10:35:40 | 15 | A.  Yes. |
| 10:35:41 | 16 | Q.  Do you know who called the paramedics? |
| 10:35:45 | 17 | A.  No. |
| 10:35:45 | 18 | Q.  Did you learn at some subsequent time, not |
| 10:35:49 | 19 | through your attorney, who called the paramedics? |
| 10:35:52 | 20 | A.  No. |
| 10:35:52 | 21 | Q.  Okay.  During this period of time that |
| 10:35:58 | 22 | Mr. Perez is in a prone position and you and the |
| 10:36:04 | 23 | other two officers are attempting to restrain him, he |
| 10:36:08 | 24 | was -- was he kicking his legs during that period of |
| 10:36:11 | 25 | time? |

WOOD & RANDALL
(800) 322-4595

Robert McEwen, Monday, March 04, 2019

37

10:36:11  1         A.   He was attempting to, yes.

10:36:13  2         Q.   Was he resisting in any other type of way?

10:36:19  3         A.   He continued to try to turn over, and he

10:36:24  4    would resist the efforts to keep him from injuring

10:36:28  5    himself by banging his head on the concrete.  He was

10:36:32  6    resisting the efforts of Calvert.

10:36:37  7         Q.   Would he attempt to lift up his body while

10:36:40  8    you and Officer Calvert were attempting to hold his

10:36:45  9    upper body down?

10:36:48  10        A.   Well, he was attempting to roll over, yes.

10:36:51  11        Q.   Okay.  So in the process of what you

10:36:54  12    believed was his attempt to roll over, he was

10:36:57  13    attempting to lift up his body while you and Officer

10:37:00  14    Calvert were attempting to hold it down; is that

10:37:02  15    true?

10:37:03  16        A.   I mean, I can't tell you what Mr. Perez was

10:37:06  17    attempting to do.  It's what he was attempting to do,

10:37:09  18    is what he was attempting to do.  It was my belief he

10:37:11  19    was trying to get up, and we just continued to hold

10:37:15  20    him down to the ground so that he would not get up.

10:37:17  21        Q.   Okay.  So -- just so we're clear, you

10:37:22  22    believed that Mr. Perez, during that period of time,

10:37:25  23    was attempting to get up; correct?

10:37:27  24        A.   Yes.

10:37:27  25        Q.   And did you believe that in part because he

38

```
10:37:32   1   was attempting to lift his body up off the ground?

10:37:34   2        A.   Again, I think I stated, he was trying to

10:37:36   3   roll over onto his side.

10:37:38   4        Q.   Okay.  All right.  And to prevent him from

10:37:41   5   doing that, you and Officer Calvert were applying

10:37:45   6   pressure to his back; is that true?

10:37:47   7        A.   Yes.

10:37:47   8        Q.   Okay.  In the five- to ten-minute estimate

10:37:56   9   you gave where he was in the prone position, when

10:38:03  10   along that five- to ten-minute period of time did you

10:38:07  11   observe Deputy Robnett attempt to put the hobble

10:38:11  12   around his legs?

10:38:12  13        A.   Deputy Robnett attempted to put the Ripp

10:38:18  14   Restraint on him toward the end of the encounter.  It

10:38:21  15   was right before the ambulance arrived.

10:38:23  16        Q.   I think you said Ripp Restraint.  Is that

10:38:26  17   R-I-P-P?

10:38:28  18        A.   Yes.

10:38:35  19        Q.   Would you say it was within one to two

10:38:37  20   minutes of the paramedics showing up that you

10:38:39  21   observed that?

10:38:44  22        A.   Yes.

10:38:44  23        Q.   And after you observed him attempt to put

10:38:48  24   the hobble around Mr. Perez's legs, did that help in

10:38:54  25   terms of preventing Mr. Perez from kicking his legs?
```

Robert McEwen, Monday, March 04, 2019

39

10:39:00  1          A.  No.

10:39:00  2          Q.  So he continued to kick during that period

10:39:06  3  of time?

10:39:06  4          A.  He was moving his legs, yes, in an attempt

10:39:09  5  to free himself from our, I guess, grasp.

10:39:13  6          Q.  Were the -- was the hobble around his legs

10:39:16  7  during the time that he was attempting to move his

10:39:18  8  legs?

10:39:20  9          A.  Right at the very end for a very short

10:39:22 10  period of time.

10:39:23 11          Q.  Okay.  So once the hobble, just generally in

10:39:30 12  terms of how it works, once it's placed around a

10:39:33 13  subject's feet, can it be tightened?

10:39:36 14          A.  Yes.  You lay the ankles over each other,

10:39:38 15  you tighten it up, and it keeps them from spreading

10:39:40 16  the feet apart.

10:39:41 17          Q.  Did that ever happen prior to the paramedics

10:39:43 18  showing up?

10:39:44 19          A.  I believe so, yes.

10:39:45 20          Q.  And what is your best estimate of when that

10:39:48 21  happened relative to when the paramedics showed up?

10:39:51 22          A.  Less than a minute before they arrived.

10:39:53 23          Q.  Once the paramedics arrived, did you

10:40:02 24  observe -- let me ask it this way, how many

10:40:05 25  paramedics or EMTs did you observe on scene?

Robert McEwen, Monday, March 04, 2019

44

| | |
|---|---|
| 10:44:37 | 1 | pressure to his back during the time you went over to |
| 10:44:40 | 2 | his head? |
| 10:44:41 | 3 | A.  I don't know. |
| 10:44:42 | 4 | Q.  But you did observe Officer Calvert applying |
| 10:44:48 | 5 | pressure to the top of his back; is that true? |
| 10:44:51 | 6 | A.  Yes. |
| 10:44:51 | 7 | Q.  And when you moved over to the area closer |
| 10:44:56 | 8 | to Mr. Perez's head, where was Officer Calvert at |
| 10:45:02 | 9 | that time? |
| 10:45:02 | 10 | A.  Officer Calvert was still attempting to |
| 10:45:05 | 11 | prevent Mr. Perez from injuring himself, and he was |
| 10:45:09 | 12 | still attempting to apply pressure to his lower back |
| 10:45:11 | 13 | to keep him from rolling over. |
| 10:45:13 | 14 | Q.  Was he more to the right side of Mr. Perez's |
| 10:45:16 | 15 | body when you were closer to Mr. Perez's head? |
| 10:45:19 | 16 | A.  Yes. |
| 10:45:19 | 17 | Q.  And when were you directly in front of |
| 10:45:23 | 18 | Mr. Perez's head or a little to the left? |
| 10:45:26 | 19 | A.  No, I was on his side, lower than his head, |
| 10:45:30 | 20 | but basically at the top of his shoulders. |
| 10:45:32 | 21 | Q.  Okay.  And so you were applying pressure to |
| 10:45:36 | 22 | the top of his shoulders at that point? |
| 10:45:38 | 23 | A.  No, I did not. |
| 10:45:39 | 24 | Q.  Okay.  So you were just in that area? |
| 10:45:42 | 25 | A.  I went there to assist Calvert in |

Robert McEwen, Monday, March 04, 2019

45

10:45:44  1    restraining Mr. Perez's head so he wouldn't injure

10:45:47  2    himself.

10:45:48  3        Q.   And one of the ways that you did that was by

10:45:54  4    placing a towel underneath his chin and face; is that

10:45:58  5    true?

10:45:59  6        A.   Correct.

10:45:59  7        Q.   I think you said in your statement that you

10:46:03  8    had a towel in your vehicle; is that true?

10:46:06  9        A.   Yes.

10:46:07 10        Q.   Do you know who retrieved that?

10:46:08 11        A.   I asked somebody to get it, and somebody got

10:46:12 12    it.  I believe it was Deputy Stoltenberg.

10:46:16 13        Q.   And once you -- once he came back with the

10:46:19 14    towel, is that around the time that you moved over

10:46:21 15    closer to Mr. Perez's head?

10:46:23 16        A.   I believe I moved closer to his head prior

10:46:26 17    to that.  Our efforts to keep Mr. Perez from injuring

10:46:31 18    himself, we weren't having enough success with it.  I

10:46:34 19    was trying to come up with alternate methods to

10:46:36 20    prevent him from injuring himself.

10:46:38 21        Q.   And were you the one who placed the towel

10:46:44 22    underneath his head and his chin?

10:46:46 23        A.   Yes.

10:46:46 24        Q.   And did you lift his head up off the ground

10:46:51 25    then, holding the towel on both sides?

Robert McEwen, Monday, March 04, 2019

46

| 10:46:53 | 1 | A.   Yes. |

10:46:54   2      Q.   And that was an effort you made to prevent

10:46:57   3   him from hitting his face on the ground?

10:46:59   4      A.   Yes.

10:47:00   5      Q.   At that time that you were holding his head

10:47:02   6   up, I -- was the rest of his body prone on the

10:47:08   7   ground?

10:47:09   8      A.   He was still in the prone position, yes.

10:47:11   9      Q.   And when you were holding his head up, was

10:47:15  10   he screaming?

10:47:16  11      A.   He was still talking, he was screaming and

10:47:18  12   repeating the same things he had been repeating since

10:47:21  13   the incident began.

10:47:22  14      Q.   The same things you have told me before?

10:47:25  15      A.   Yes.

10:47:25  16      Q.   And when officer or Deputy Robnett asked him

10:47:32  17   if he could breathe, was that before this point or

10:47:34  18   after?

10:47:35  19      A.   No.   While I had the towel across

10:47:37  20   Mr. Perez's face and was preventing him from hitting

10:47:40  21   himself on the concrete, Deputy Robnett asked

10:47:43  22   Mr. Perez if he could breathe, and he responded that

10:47:47  23   he could.

10:47:47  24      Q.   Do you remember what he said specifically?

10:47:49  25      A.   He said yes.

PEREZ v. CITY OF FRESNO
Robert McEwen, Monday, March 04, 2019

47

| | | |
|---|---|---|
| 10:47:50 | 1 | Q. And you heard that? |
| 10:47:52 | 2 | A. Yes. |
| 10:47:53 | 3 | Q. And did you observe any abrasions to his |
| 10:47:57 | 4 | face during the time you were holding his face up |
| 10:47:59 | 5 | with the towel? |
| 10:47:59 | 6 | A. I did not observe injuries to his face, but |
| 10:48:02 | 7 | I did see a small amount of blood on the sidewalk. |
| 10:48:07 | 8 | Q. In the general area where he was hitting his |
| 10:48:10 | 9 | head on the ground? |
| 10:48:11 | 10 | A. In that very area. |
| 10:48:15 | 11 | Q. Once the paramedics showed up, were you |
| 10:48:21 | 12 | still over by his head, attempting to hold up his |
| 10:48:25 | 13 | head with the towel? |
| 10:48:27 | 14 | A. Yes. |
| 10:48:28 | 15 | Q. Once the paramedics showed up, did both the |
| 10:48:34 | 16 | male and female paramedic come over to the area where |
| 10:48:37 | 17 | you and the other officers and deputies were |
| 10:48:40 | 18 | attempting to restrain Mr. Perez? |
| 10:48:42 | 19 | A. The male -- the male and female paramedic |
| 10:48:44 | 20 | came over with a back board. |
| 10:48:46 | 21 | Q. Okay. And so when they showed up -- let me |
| 10:48:51 | 22 | ask it this way, how long after they showed up do you |
| 10:48:56 | 23 | recall them bringing a backboard out attempting to |
| 10:49:00 | 24 | place it on Mr. Perez's back? |
| 10:49:03 | 25 | A. Immediately after arriving they were |

| | | |
|---|---|---|
| 10:49:05 | 1 | bringing the backboard with them. |
| 10:49:07 | 2 | Q. So it was more or less simultaneous with |
| 10:49:10 | 3 | their arrival? |
| 10:49:11 | 4 | A. Yes. |
| 10:49:11 | 5 | Q. And can you describe that board? |
| 10:49:15 | 6 | A. It was a brown backboard. |
| 10:49:17 | 7 | Q. Is that a backboard that you had seen |
| 10:49:21 | 8 | paramedics use in the past when they have responded |
| 10:49:24 | 9 | to calls of yours? |
| 10:49:25 | 10 | A. I have seen a variety of backboards. That |
| 10:49:28 | 11 | seemed consistent with the backboards I have seen |
| 10:49:30 | 12 | before. |
| 10:49:31 | 13 | Q. And was the backboard placed onto |
| 10:49:34 | 14 | Mr. Perez's back? |
| 10:49:36 | 15 | A. Yes. |
| 10:49:36 | 16 | Q. Okay. And once the backboard was placed -- |
| 10:49:41 | 17 | let me strike that. |
| 10:49:43 | 18 | Do you know whose idea it was to place the |
| 10:49:45 | 19 | backboard on his back? |
| 10:49:47 | 20 | A. No. |
| 10:49:47 | 21 | Q. Okay. Did you hear anyone say anything |
| 10:49:51 | 22 | like, "Let's put it on his back"? |
| 10:49:53 | 23 | A. No. |
| 10:49:53 | 24 | Q. When you reviewed the body cam footage to |
| 10:49:58 | 25 | prepare for your deposition, do you recall hearing |

52

| | | |
|---|---|---|
| 10:53:33 | 1 | anyone else? |
| 10:53:34 | 2 | A.   I don't recall. |
| 10:53:35 | 3 | Q.   Okay.  So you just recall those four being |
| 10:53:37 | 4 | present? |
| 10:53:38 | 5 | A.   Yes. |
| 10:53:39 | 6 | Q.   Do you recall if Deputy Stoltenberg was |
| 10:53:42 | 7 | attempting to restrain him as well? |
| 10:53:44 | 8 | A.   I don't recall if at any time Deputy |
| 10:53:48 | 9 | Stoltenberg assisted in restraining him. |
| 10:53:49 | 10 | Q.   Okay.  And so it would have been at minimum |
| 10:53:52 | 11 | the four of you, plus the male paramedic and the |
| 10:53:57 | 12 | female paramedic; is that true? |
| 10:53:59 | 13 | A.   Once the backboard was placed over |
| 10:54:01 | 14 | Mr. Perez, pretty much we released, you know -- |
| 10:54:06 | 15 | everybody got away from Mr. Perez, and we began |
| 10:54:08 | 16 | assisting the paramedics in attaching Mr. Perez to |
| 10:54:11 | 17 | the board. |
| 10:54:11 | 18 | Q.   Okay.  So you were doing -- you were |
| 10:54:16 | 19 | assisting by uncuffing his right hand, and assisting |
| 10:54:20 | 20 | the female paramedic in tying his right hand to the |
| 10:54:24 | 21 | board; true? |
| 10:54:25 | 22 | A.   No.  Once I removed the cuff, I stepped |
| 10:54:27 | 23 | away. |
| 10:54:28 | 24 | Q.   Okay.  Did you observe other officers |
| 10:54:33 | 25 | assisting by applying pressure to the board while it |

| 10:55:47 | 1 | A. My best estimate would be less than 30 |
| 10:55:50 | 2 | seconds. |
| 10:55:50 | 3 | Q. And is it your understanding that that was |
| 10:55:59 | 4 | done in order to help with Mr. Perez being attached |
| 10:56:07 | 5 | to the board? |
| 10:56:09 | 6 | A. Well, it was done at the behest of the |
| 10:56:11 | 7 | paramedic or EMT that asked him to do it. Quite |
| 10:56:14 | 8 | possibly since nobody was holding Mr. Perez down, it |
| 10:56:17 | 9 | would keep him from rolling or attempting to get up |
| 10:56:20 | 10 | or move about. |
| 10:56:20 | 11 | Q. So your testimony is that during the time |
| 10:56:24 | 12 | that the backboard was placed on his back, that the |
| 10:56:32 | 13 | only way in which pressure was applied to the |
| 10:56:35 | 14 | backboard would have been when the one officer sat on |
| 10:56:39 | 15 | his back or sat on the backboard? |
| 10:56:42 | 16 | MS. O'LINN: Objection; lack of foundation, |
| 10:56:44 | 17 | assumes facts not in evidence as to position of the |
| 10:56:48 | 18 | backboard on the back, overbroad, vague. |
| 10:56:48 | 19 | BY MR. GEHLAWAT: |
| 10:56:53 | 20 | Q. Go ahead. |
| 10:56:55 | 21 | A. As I stated, the backboard was in a position |
| 10:56:57 | 22 | on Mr. Perez's back. He was, you know, still in his, |
| 10:57:01 | 23 | you know, previous position, and nobody was holding |
| 10:57:04 | 24 | him down. They were -- the paramedics were |
| 10:57:07 | 25 | attempting to apply the restraints, and the paramedic |

Robert McEwen, Monday, March 04, 2019

55

| 10:57:11 | 1 | asked somebody to sit on the board to apply pressure |
| 10:57:14 | 2 | to keep him from moving.  And one officer did, and |
| 10:57:17 | 3 | they finished restraining his hands.  And that was |
| 10:57:20 | 4 | it. |
| 10:57:20 | 5 | Q.  Okay.  So during the period -- the backboard |
| 10:57:27 | 6 | was placed on Mr. Perez's back while he was in a |
| 10:57:30 | 7 | prone position; correct?  That is something you |
| 10:57:34 | 8 | observed? |
| 10:57:35 | 9 | A.  Yes. |
| 10:57:35 | 10 | Q.  Once the backboard was placed on his back, |
| 10:57:37 | 11 | did you observe any officers or deputies push down on |
| 10:57:41 | 12 | the board while it was on top of Mr. Perez's back? |
| 10:57:43 | 13 | A.  I don't recall if anybody did. |
| 10:57:47 | 14 | Q.  Is that no, you did not, or you don't recall |
| 10:57:51 | 15 | one way or another? |
| 10:57:51 | 16 | A.  Due to the time, I just don't recall. |
| 10:57:58 | 17 | Q.  During the time that the officer sat on the |
| 10:58:04 | 18 | backboard, was Mr. Perez still screaming and yelling? |
| 10:58:08 | 19 | A.  He was still moving about, which is why I |
| 10:58:13 | 20 | believe the paramedic asked him to do it.  So -- |
| 10:58:17 | 21 | Q.  Okay.  So during the time that he was seated |
| 10:58:19 | 22 | on the backboard, I think your best estimate was for |
| 10:58:24 | 23 | approximately 30 seconds.  During that 30 second |
| 10:58:27 | 24 | period of time, was Mr. Perez screaming and yelling |
| 10:58:30 | 25 | during that period of time? |

| | | |
|---|---|---|
| 10:58:31 | 1 | A.  I don't recall. |
| 10:58:39 | 2 | Q.  Okay.  After the time that you heard Deputy |
| 10:58:44 | 3 | Robnett ask Mr. Perez if he could breathe, did you |
| 10:58:49 | 4 | hear any other officer ask him if he could breathe at |
| 10:58:51 | 5 | any point after that? |
| 10:58:53 | 6 | A.  I don't recall if anybody else asked him |
| 10:58:55 | 7 | that.  Deputy Robnett asked him at the time that I |
| 10:58:57 | 8 | had the towel over his face, and we were trying to |
| 10:59:02 | 9 | keep Mr. Perez calm by, you know, telling him to |
| 10:59:06 | 10 | relax and breathe.  But I don't recall if anybody |
| 10:59:09 | 11 | specifically asked him if he could breathe. |
| 10:59:14 | 12 | Q.  Okay.  How about during the time that the |
| 10:59:15 | 13 | backboard was on his back?  Do you recall anyone |
| 10:59:19 | 14 | asking him if he could breathe during that period of |
| 10:59:21 | 15 | time? |
| 10:59:21 | 16 | A.  I do not recall if anybody asked him. |
| 10:59:24 | 17 | Q.  Okay.  And at some point his hands and legs |
| 10:59:32 | 18 | were attached to the backboard; is that true? |
| 10:59:37 | 19 | A.  Correct. |
| 10:59:37 | 20 | Q.  And it was at that point that he was turned |
| 10:59:41 | 21 | over? |
| 10:59:41 | 22 | A.  Yes. |
| 10:59:43 | 23 | Q.  At some point before he was turned over, did |
| 10:59:47 | 24 | you notice that he had stopped yelling and screaming? |
| 10:59:51 | 25 | A.  Yes. |

68

11:24:32  1      Q.  How far would he -- would the bus stop have

11:24:35  2  been from the location where Mr. Perez was being

11:24:40  3  restrained?

11:24:44  4      A.  50 to a hundred feet.

11:24:46  5      Q.  Did you ever do a report in connection with

11:24:49  6  this incident?

11:24:52  7      A.  I gave my statement to our homicide

11:24:55  8  detectives, and they would have authored the report.

11:24:58  9      Q.  If Mr. Perez had not passed away in custody,

11:25:06  10  would the protocol have been for you to author a

11:25:09  11  report?

11:25:09  12      A.  Yes.

11:25:10  13      Q.  Did you use any type of force during the

11:25:17  14  incident?

11:25:17  15      A.  Yes.

11:25:18  16      Q.  What type of force did you use?

11:25:20  17      A.  Shortly after taking Mr. Perez to the

11:25:25  18  ground, while he was attempting to turn or get up or

11:25:29  19  while he was moving about, I applied three knee

11:25:32  20  strikes to his left side.

11:25:33  21      Q.  And that was done in order to gain his

11:25:39  22  compliance?

11:25:39  23      A.  Yes.

11:25:40  24      Q.  Did it have that affect?

11:25:43  25      A.  It was completely ineffective.  So I stopped

69

```
11:25:47   1   doing it.
11:25:47   2        Q.  Did you observe any other officer or deputy
11:25:51   3   use force during the incident with Mr. Perez?
11:25:53   4        A.  No.
11:25:54   5        Q.  Was at any point during this encounter with
11:26:04   6   Mr. Perez, were you in fear for your life?
11:26:07   7        A.  No.
11:26:08   8        Q.  Did you -- strike that.
11:26:16   9            Okay.  What I'm going to do is I'm going to
11:26:23  10   hand you a copy of the transcript of the statement
11:26:26  11   that I believe you reviewed, and we'll go ahead and
11:26:31  12   mark this as Exhibit 1 to your deposition transcript.
11:26:36  13   And I've got a copy for you and one for your attorney
11:26:41  14   and one for Ms. O'Linn.
11:26:45  15            (Plaintiffs' Exhibit 1
11:26:46  16            marked for identification.)
11:26:50  17   BY MR. GEHLAWAT:
11:26:51  18        Q.  Have you seen Exhibit 1 before?
11:26:53  19        A.  Yes.
11:26:54  20        Q.  And does this appear to be the statement
11:26:57  21   that you reviewed to prepare for your deposition?
11:27:01  22        A.  Yes.
11:27:01  23        Q.  At the time --
11:27:02  24            MS. O'LINN:  Counsel, can I just -- sorry.
11:27:05  25            MR. GEHLAWAT:  Sure.
```

| | | |
|---|---|---|
| 11:35:16 | 1 | from the Fresno Police Department told you that they |
| 11:35:20 | 2 | were coming from an operation in Merced? |
| 11:35:23 | 3 | A.  Yes. |
| 11:35:23 | 4 | Q.  If you turn to Page 5, Lines 194 to 207, in |
| 11:35:37 | 5 | that paragraph or in that section, one of the things |
| 11:35:42 | 6 | you said is that he was flicking his hands very |
| 11:35:45 | 7 | rapidly.  Do you see where it says that? |
| 11:35:49 | 8 | A.  Yes. |
| 11:35:50 | 9 | Q.  Was that something you observed when his |
| 11:35:52 | 10 | hands were behind his back in handcuffs? |
| 11:35:55 | 11 | A.  Yes. |
| 11:35:58 | 12 | Q.  And further down on that page, I think you |
| 11:36:06 | 13 | describe the patrol vehicle that you observed and |
| 11:36:09 | 14 | that patrol vehicle would -- was to the north of |
| 11:36:14 | 15 | where Mr. Perez was seated; is that true? |
| 11:36:16 | 16 | A.  There was a vehicle to the north of us, yes. |
| 11:36:19 | 17 | Q.  And was that a patrol vehicle that you |
| 11:36:22 | 18 | believed to be a Fresno Police patrol vehicle? |
| 11:36:25 | 19 | A.  Yes. |
| 11:36:27 | 20 | Q.  I think at the bottom of Page 5, you |
| 11:36:33 | 21 | indicated that Mr. Perez was completely uninjured. |
| 11:36:36 | 22 | Is that true in terms of when you first saw him? |
| 11:36:38 | 23 | A.  I indicated that I saw no injuries on his |
| 11:36:41 | 24 | face. |
| 11:36:41 | 25 | Q.  And that's true? |

PERTINENT DEPOSITION
Robert McEwen, Monday, March 04, 2019

79

11:39:10  1      A.  Yes.

11:39:10  2      Q.  And that's true; correct?

11:39:12  3      A.  Yes.

11:39:13  4      Q.  All right.  And then moving down, you say to

11:39:22  5  the very end, the last sentence says, "I moved to his

11:39:26  6  left side, and I was applying some pressure to his

11:39:28  7  lower back in an effort to try to keep him flat."

11:39:33  8          Do you see where it says that?

11:39:34  9      A.  Yes.

11:39:34  10     Q.  And is that true?

11:39:36  11     A.  Yes.

11:39:40  12     Q.  Moving down a few lines, reviewing the

11:39:45  13  question and answers there, does that refresh your

11:39:47  14  recollection about you hearing someone calling for an

11:39:51  15  ambulance?

11:39:54  16     A.  Yes.

11:39:55  17     Q.  Lines 391 to 398, does that refresh your

11:40:10  18  recollection about using -- applying a wrist lock to

11:40:15  19  him?

11:40:15  20     A.  Yes.  After the knee strikes were

11:40:17  21  ineffective, I applied a wrist lock.

11:40:19  22     Q.  Is that considered a use of force?

11:40:22  23     A.  That's a control technique.

11:40:24  24     Q.  Okay.  Did you ever see -- at any point

11:40:43  25  during the encounter, did you ever see a weapon on

Robert McEwen, Monday, March 04, 2019

92

```
12:07:46  1   the incident with Mr. Perez, did you ever have
12:07:49  2   training with your department in terms of your duties
12:07:52  3   and responsibilities once medical personnel,
12:07:56  4   including all emergency providers, are summoned to
12:08:00  5   the scene of an incident with a subject?
12:08:03  6       A.  Not that I recall.
12:08:06  7       Q.  When the emergency personnel, including the
12:08:12  8   paramedics and EMTs, that arrived on scene showed up,
12:08:22  9   would you say either them or you or someone else was
12:08:25 10   in charge of what was going on with Mr. Perez?
12:08:30 11       A.  When they arrived, I let them be in charge.
12:08:34 12       Q.  Okay.  And the decision you made to let them
12:08:38 13   be in charge at that point, was that based on
12:08:42 14   training?
12:08:43 15       A.  No.
12:08:44 16       Q.  Okay.  What was it based on?
12:08:46 17       A.  Experience.
12:08:47 18       Q.  So your experience prior to the incident
12:08:50 19   with Mr. Perez is once emergency medical personnel is
12:08:56 20   summoned to the scene and they show up, you let them
12:08:59 21   take control?
12:09:01 22       A.  Correct.
12:09:01 23       Q.  Okay.  And that's how you have done it
12:09:04 24   before the incident, and that was your intention on
12:09:06 25   the day of the incident?
```

Robert McEwen, Monday, March 04, 2019

93

```
12:09:08   1        A.   Yes.

12:09:08   2        Q.   Okay.   So what I would like to do next is

12:09:13   3   show you the body cam footage that I believe you

12:09:17   4   already reviewed in preparation for your deposition.

12:09:19   5   You did review this; correct?

12:09:21   6        A.   Yes.

12:09:24   7        MR. GEHLAWAT:   And for the record, the

12:09:26   8   television where the video is being shown is to the

12:09:30   9   left and over the shoulder of the deponent, and so

12:09:34  10   when he looked over to his left-hand side, that's in

12:09:38  11   order for him to view the video; fair?

12:09:41  12        MR. WEAKLEY:   Fair.

12:09:41  13   BY MR. GEHLAWAT:

12:09:44  14        Q.   All right.   So I am going to play the video

12:09:47  15   not all the way through, but I'm going to just play

12:09:49  16   it in parts and see if I can ask you some questions

12:09:52  17   about it; okay?

12:09:53  18        A.   Okay.

12:09:53  19        Q.   All right.

12:10:24  20                 (Videotape played)

12:10:24  21   BY MR. GEHLAWAT:

12:10:25  22        Q.   Okay.   So I started the video from the

12:10:26  23   beginning and paused it at 32 seconds when we started

12:10:29  24   to hear some sound.   In the first 32 seconds, can you

12:10:34  25   tell what's depicted in the video?
```

Robert McEwen, Monday, March 04, 2019

126

```
1    STATE OF CALIFORNIA )
                         ) ss.
2    COUNTY OF FRESNO    )

3

4         I, Bree Mervin, a Certified Shorthand Reporter

5    in the State of California, holding Certificate

6    No. 13057, do hereby certify that ROBERT McEWEN, the

7    witness named in the foregoing deposition, was by me

8    duly sworn; that said deposition was taken Monday,

9    March 4, 2019, at the time and place set forth on the

10   first page hereof.

11        That upon the taking of the deposition, the

12   words of the witness were written down by me in

13   stenotype and thereafter transcribed by computer under

14   my supervision; that the foregoing is a true and correct

15   transcript of the testimony given by the witness.

16        Pursuant to Federal Rule 30(e), transcript

17   review was requested.

18        I further certify that I am neither counsel for

19   nor in any way related to any party to said action, nor

20   in any way interested in the result or outcome thereof.

21        Dated this 21st day of March, 2019, at Visalia,

22   California.

23   _____

24        Bree Mervin, CSR No. 13057

25
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 11

**ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.**
Jennifer Ortiz, EMT on 02/18/2019

```
1                    UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3


4     ANTHONY PEREZ, individually,
      CECILIA PEREZ, individually,
5     TERRALEE PEREZ, individually and
      as successor in interest to Joseph
6     Perez, JOSEPH PEREZ, JR.,

7                              Plaintiffs,

8             vs.                        Case No.
                                         1:18-CV-00127-AWI-EPG
9     CITY OF FRESNO, COUNTY OF FRESNO,
      JAMES ROSETTI, an individual, SEAN
10    CALVERT, an individual, CHRIS
      MARTINEZ, an individual, BRAITHAN
11    STOLTENBERG, an individual, ROBERT

12                             Defendants.
      _____
13

14

15         VIDEOTAPED DEPOSITION OF JENNIFER ORTIZ, EMT

16

17                       February 18, 2019

18                          1:36 p.m.

19

20               5200 North Palm, Suite 211

21                      Fresno, California

22

23    REPORTED BY:

24    Mikki L. Morse

25    CSR No. 13642
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Jennifer Ortiz, EMT on 02/18/2019                                    Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4    ANTHONY PEREZ, individually,
      CECILIA PEREZ, individually,
 5    TERRALEE PEREZ, individually and
      as successor in interest to Joseph
 6    Perez, JOSEPH PEREZ, JR.,
      individually and as successor in
 7    interest to Joseph Perez, and
      X.P., a minor, by and through his
 8    Guardian ad Litem, MICHELLE PEREZ,
      individually and as successor in
 9    interest to Joseph Perez,

10                              Plaintiffs,

11              vs.                      Case No.
                                         1:18-CV-00127-AWI-EPG
12    CITY OF FRESNO, COUNTY OF FRESNO,
      JAMES ROSETTI, an individual, SEAN
13    CALVERT, an individual, CHRIS
      MARTINEZ, an individual, BRAITHAN
14    STOLTENBERG, an individual, ROBERT
      MCEWEN, an individual, KARLTON
15    MANASAN, an individual, JIMMY
      ROBNETT, an individual, and DOES
16    1-10, inclusive,

17                              Defendants.
      _____
18

19

20

21

22

23

24

25
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Jennifer Ortiz, EMT on 02/18/2019                              Page 3

```
 1    APPEARANCES:

 2

 3              For Plaintiffs:

 4                   ALDER LAW, P.C.
                     NEIL K. GEHLAWAT
 5                   1875 Century Park East, Suite 1500
                     Los Angeles, California  90067
 6                   (310) 275-9131
                     ngehlawat@alderlaw.com
 7

 8              For Defendants CITY OF FRESNO, JAMES ROSETTI,
                CHRIS MARTINEZ and SEAN CALVERT:
 9
                     MANNING, & KASS, ELLROD, RAMIREZ,
10                   TRESTER, LLP
                     LYNN L. CARPENTER
11                   15th Floor at 801 Tower
                     801 South Figueroa Street
12                   Los Angeles, California  90017
                     (213) 486-2272
13                   llc@manningllp.com

14
                For Defendants COUNTY OF FRESNO, BRAITHAN
15              STOLTENBERG, ROBERT MCEWEN, KARLSON MANASAN
                and JIMMY ROBNETT
16
                     WEAKLEY & ARENDT
17                   JAMES D. WEAKLEY
                     5200 North Palm Avenue, Suite 211
18                   Fresno, California  93704
                     (559) 221-5256
19                   jim@walaw-fresno.com

20

21              Also Present:

22                   Sergeant James Rosetti, Defendant
                     Chris Martinez, Defendant
23                   Sean Calvert, Defendant
                     Loren Bogart, Videographer
24

25
```

**ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.**
Jennifer Ortiz, EMT on 02/18/2019                               Page 51

```
1    in a prone position on the ground?

2         A.   Did I personally restrain him?  Not that I can

3    recall.

4         Q.   How long was Mr. Perez in a face down prone

5    position on the ground before you noticed that he was

6    unresponsive after he was flipped over?

7         A.   Can you repeat that?

8         Q.   Yeah.

9              How long was Mr. Perez in a face down prone

10   position on the ground before you noticed that he was

11   unresponsive?

12        A.   I'm not too sure of time.  It all kind of -- to me,

13   it happened quick.  The video seems a lot longer.

14        Q.   Okay.  How long was Mr. Perez in a face down prone

15   position before Mr. Anderson took his pulse?

16        A.   I don't recall.  I don't believe his pulse was

17   taken in the prone position.

18        Q.   When you first arrived and Mr. Perez was in the

19   prone position on the ground, was he resisting the officers

20   and deputies?

21        A.   Yes.

22        Q.   And why do you say that?

23        A.   It just seemed like a big struggle, and you could

24   hear him screaming.

25        Q.   When you state "big struggle," what do you -- what
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Jennifer Ortiz, EMT on 02/18/2019                              Page 52

1   do you mean by that?

2        A.   Just a lot -- took a lot of guys around him to keep

3   him calm, it seemed like.

4        Q.   In your interview, you talked about deescalation

5   and about your training on deescalation.  And you stated at

6   line 24 --

7        A.   What page is that?

8        Q.   Line -- 24, line 18.  The detective asked you,

9   during training, what do they teach you guys for combative

10  subjects like that?  What do you guys -- what are you

11  supposed to do with -- or if there's any kind of protocol for

12  a situation like that?  And you answer, "um" there is a lot

13  of things we do, I guess.  We mostly try to deescalate, but

14  in a situation where -- and then the detective stated, if

15  it's not working?  And you answered, yeah, well, usually it's

16  easier to deescalate when there's not officers involved.

17       Do you recall saying that?

18       A.   Yes.

19       Q.   How are you trained on deescalation?

20       A.   We usually use one person to kind of talk them

21  down.  Usually someone they feel comfortable with or like to

22  be around, I guess you could say.  Sometimes they don't like

23  females or males or it just kind of depends on the patient.

24       Q.   And then you also stated, it was more of

25  restraining and getting him farther, and we usually

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Jennifer Ortiz, EMT on 02/18/2019                        Page 59

```
 1   on his back?

 2       A.   I believe I did.

 3       Q.   Okay.  At the point whenever the restraint board

 4   was first placed on Mr. Perez's back, was Mr. Perez still

 5   yelling and resisting the officers?

 6       A.   Yes.

 7       Q.   Was there a point in time at which you noticed that

 8   he was no longer yelling?

 9       A.   No.  I don't recall when.

10       Q.   Okay.  And then as far as the restraint process to

11   the board, apart from what you looked at on the video today,

12   what do you recall about that process?

13       A.   I don't recall much.  The video really is what

14   keeps popping in my head.

15       Q.   Okay.

16       A.   I don't recall much of where I was and what was

17   going on that day.

18       Q.   So other than Morgan Anderson, who you recognized

19   in the video, do you recall any of the other persons by name

20   who actually assisted in restraining him to the board?

21       A.   Just Joel Dines.

22       Q.   And then were you in a position at any time to see

23   any law enforcement officers who might have been holding the

24   board or touching the board?

25       A.   I know there was a lot.  I don't know what they
```

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Jennifer Ortiz, EMT on 02/18/2019                    Page 65

```
 1    Joel Dines?

 2         A.   I don't recall who it was.

 3         Q.   Okay.  Do you know if it was Morgan Anderson?

 4         A.   I don't recall.

 5         Q.   My understanding -- I may be wrong, but my

 6    understanding is that Morgan Anderson attached a leather

 7    restraint on Mr. Perez's right hand and that Joel Dines

 8    attached the leather restraint on Mr. Perez's left hand.

 9         A.   Okay.

10         Q.   If that's true, do you think that either -- that

11    Joel took over the restraint when you were trying to get it

12    on?

13         A.   Possibly, yeah.

14         Q.   During the time that you were trying to get the

15    restraint on, was Mr. Perez still resisting?

16         A.   I don't recall.  I believe so.

17         Q.   Okay.  Why don't you look at page 13 and just read

18    to yourself line 2 through line 10.

19         A.   Two through ten?

20         Q.   Yes.

21              You see that?

22         A.   Yes.

23         Q.   So at the time you were trying to get a restraint

24    on, Mr. Perez was back to resisting and fighting?

25         A.   Yes.
```

```
 1    STATE OF CALIFORNIA      )
                               )
 2    COUNTY OF FRESNO         )

 3

 4         I, Mikki L. Morse, CSR No. 13642, Certified

 5    Shorthand Reporter, certify:

 6         That the foregoing proceedings were taken before me

 7    at the time and place therein set forth, at which time the

 8    witness was put under oath by me;

 9         That the testimony of the witness, the questions

10    propounded, and all objections and statements made at the

11    time of the examination were recorded stenographically by me

12    and were thereafter transcribed;

13         That a review of the transcript by the deponent was

14    requested;

15         That the foregoing is a true and correct transcript

16    of my shorthand notes so taken.

17         I further certify that I am not a relative or

18    employee of any attorney of the parties, not financially

19    interested in the action.

20         I declare under penalty of perjury under the laws

21    of California that the foregoing is true and correct.

22         Dated this 21st day of February, 2019.

23

24         _____

25         Mikki L. Morse, CSR No. 13642
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 12

PEREZ

vs

CITY OF FRESNO

Deposition of: Jimmy Lee Robnett

Taken on: Tuesday, March 05, 2019



**CERTIFIED COPY**



Certified Shorthand Reporters

*A Professional Corporation*

Main Office: 900 Truxtun Avenue, Suite 320
Bakersfield, CA 93301
(800) 322-4595 Toll Free ● (661) 395-1050
www.woodrandall.com

Serving Central California - Bakersfield, Visalia & Fresno

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

_____

ANTHONY PEREZ, individually, )
CECILIA PEREZ, individually, )
TERRALEE PEREZ,              )
individually, and as         )
successor in interest to     )No. 1:18-cv-00127-AWI-EPG
Joseph Perez, JOSEPH PEREZ,  )
JR., individually and as     )
successor in interest to     )
Joseph Perez, and X.P. a     )
minor, by and through his    )
Guardian ad Litem, MICHELLE  )
PEREZ, individually and as   )
successor in interest to     )
Joseph Perez,                )
                             )
          Plaintiffs,        )
                             )
     vs.                     )
                             )
City of Fresno, COUNTY OF    )
FRESNO, JAMES ROSSETTI, an   )
individual, SEAN CALVERT, an )
individual, CHRIS MARTINEZ,  )
an individual, BRAITHAN      )
STOLTENBERG, an individual,  )
ROBERT MCEWEN, an            )
individual, KARLSON MANASAN, )
an individual, JIMMY         )
ROBNETT, an individual, and  )
DOES 1-10, inclusive,        )
                             )
          Defendants.        )
_____)

VIDEOTAPED DEPOSITION

OF

JIMMY LEE ROBNETT

Tuesday, March 5, 2019

Fresno, California

Reported by:  Bree Mervin, CSR No. 13057, RPR, CRR

2

```
 1                     APPEARANCES

 2

 3   For Plaintiffs:        Alder Law, P.C.
                            BY MR. NEIL GEHLAWAT
 4                          Attorney at Law
                            1875 Century Park East
 5                          Suite 1500
                            Los Angeles, California  90067
 6                          (310)275-9131
                            ngehlawat@alderlaw.com
 7

 8
     For County of Fresno:  Weakley & Arendt
 9                          BY MR. JAMES D. WEAKLEY
                            Attorney at Law
10                          5200 North Palm Avenue
                            Suite 211
11                          Fresno, California  93704
                            (559)221-5256
12                          jim@walaw-fresno.com

13

14   For City of Fresno:    Manning & Kass, Ellrod,
                            Ramirez, Trester, LLP
15                          BY MS. MILDRED K. O'LINN
                            Attorney at Law
16                          801 South Figueroa Street
                            15th Floor
17                          Los Angeles, California  90017
                            (213)624-6900
18                          mko@manningllp.com

19

20   The Videographer:      CHELCIE LEWIS

21

22   Also present:          DEPUTY SEAN CALVERT
                            OFFICER CHRIS MARTINEZ
23                          OFFICER JAMES ROSSETTI

24

25
```

Jimmy Lee Robnett, Tuesday, March 05, 2019

10

| | | |
|---|---|---|
| 14:13:55 | 1 | A.   Patrol. |
| 14:13:56 | 2 | Q.   And you responded to a -- the scene of an |
| 14:14:03 | 3 | incident in the area of Palm and Santa Fe; is that |
| 14:14:06 | 4 | true? |
| 14:14:07 | 5 | A.   Yes. |
| 14:14:07 | 6 | Q.   And you were with a trainee; is that |
| 14:14:11 | 7 | correct? |
| 14:14:11 | 8 | A.   Yes. |
| 14:14:11 | 9 | Q.   Do you remember his name? |
| 14:14:13 | 10 | A.   Manasan. |
| 14:14:15 | 11 | Q.   And was that the first day he had been your |
| 14:14:19 | 12 | trainee? |
| 14:14:20 | 13 | A.   I don't recall. |
| 14:14:21 | 14 | Q.   Okay.  Were the two of you in one patrol |
| 14:14:26 | 15 | vehicle that day? |
| 14:14:27 | 16 | A.   We were. |
| 14:14:28 | 17 | Q.   And was he the driver? |
| 14:14:29 | 18 | A.   He was. |
| 14:14:30 | 19 | Q.   All right.  And when you responded to the |
| 14:14:34 | 20 | location of the incident, did he drive the patrol |
| 14:14:37 | 21 | vehicle to that area? |
| 14:14:38 | 22 | A.   He did. |
| 14:14:39 | 23 | Q.   And prior to you responding to the scene, |
| 14:14:42 | 24 | did you have some information that you heard over |
| 14:14:47 | 25 | dispatch? |

11

14:14:48  1      A.   Yes.

14:14:48  2      Q.   And what was that information?

14:14:51  3      A.   That there was a combative subject at Palm

14:14:55  4  and Gettysburg.

14:14:57  5      Q.   Anything else that you recall hearing over

14:15:00  6  dispatch?

14:15:03  7      A.   I don't recall.

14:15:05  8      Q.   Prior to you hearing about a combative

14:15:11  9  subject in that area, did you hear any information

14:15:14  10  prior to that over dispatch about a subject in that

14:15:18  11  area?

14:15:19  12      A.   No.   I don't recall the call information

14:15:23  13  before that.   I just remember hearing a deputy saying

14:15:26  14  he had a combative subject at that area.   I think it

14:15:29  15  was Palm and Santa Fe, actually.

14:15:30  16      Q.   And is that Deputy Stoltenberg?

14:15:32  17      A.   Yes.

14:15:32  18      Q.   Had you worked with Deputy Stoltenberg prior

14:15:35  19  to the date of the incident?

14:15:36  20      A.   I know him, yes.

14:15:39  21      Q.   To prepare for your deposition today, did

14:15:42  22  you review the statement you gave to detectives from

14:15:44  23  the sheriff's office?

14:15:46  24      A.   I did.

14:15:46  25      Q.   And is that the only statement you have ever

14:23:14   1        Q.   And was that the first thing you did, once

14:23:16   2   you walked over to the area?

14:23:18   3        A.   Yes.  I went to find out what was going on.

14:23:20   4        Q.   Okay.

14:23:21   5        A.   Stoltenberg.

14:23:22   6        Q.   Go ahead -- and what did Stoltenberg tell

14:23:24   7   you in that respect?

14:23:25   8        A.   He told me that they were -- I'm trying not

14:23:29   9   to use cop words, if they were okay for the moment.

14:23:33   10        Q.   I guess what did he say to you in officer

14:23:39   11   lingo that you were going to say but you were kind

14:23:43   12   enough to put it in plain English for me.

14:23:45   13        A.   I think he said that we were code four, but

14:23:47   14   I could be mistaken, but he intimated they didn't

14:23:51   15   need any more assistance at that moment.

14:23:55   16        Q.   Okay.  And did you take that to mean that

14:23:58   17   the officers and deputies who were attempting to hold

14:24:01   18   down Mr. Perez were fine and did not need your

14:24:05   19   assistant -- assistance or your trainee's assistance?

14:24:09   20        A.   Yes.

14:24:10   21        Q.   Okay.  And at that time when you made

14:24:13   22   contact with Deputy Stoltenberg, was Mr. Perez

14:24:17   23   yelling?

14:24:18   24        A.   Yes.

14:24:18   25        Q.   Okay.  Could you make out anything he said

```
14:24:21  1   specifically?
14:24:22  2        A.  No.
14:24:22  3        Q.  Over the course of the entire time that you
14:24:26  4   were on scene, could you make out anything that
14:24:29  5   Mr. Perez said at all during that time?
14:24:34  6        A.  "I can breathe."
14:24:36  7        Q.  Okay.  That was when you asked him; correct?
14:24:38  8        A.  Correct.
14:24:38  9        Q.  And one of the concerns you had was making
14:24:40  10  sure he could breathe?
14:24:42  11       A.  Yes.
14:24:42  12       Q.  That's why you asked him if he could
14:24:44  13  breathe; right?
14:24:45  14       A.  Yes.
14:24:45  15       Q.  And did he say, "I can breathe," or did he
14:24:47  16  say, "Yes"?  What do you remember him saying?
14:24:51  17       A.  Either, "I can breathe," or, "Yes."
14:24:53  18       Q.  One of them, but in other words, he said
14:24:56  19  something to you that made you believe he could
14:24:58  20  breathe?
14:24:59  21       A.  He was screaming and yelling.  Obviously he
14:25:01  22  had air in his lungs.
14:25:02  23       Q.  Okay.  All right.  All right.  So once you
14:25:11  24  spoke to Deputy Stoltenberg, did he also tell you at
14:25:15  25  that time that EMS was -- was on the way?
```

Jimmy Lee Robnett, Tuesday, March 05, 2019

22

| | |
|---|---|
| 14:26:27 | 1  time. |
| 14:26:27 | 2      A.  Uh-huh. |
| 14:26:27 | 3      Q.  And that EMS was en route; correct? |
| 14:26:31 | 4      A.  No. |
| 14:26:32 | 5      Q.  Okay.  So what have I stated that is |
| 14:26:36 | 6  incorrect? |
| 14:26:37 | 7      A.  At the initial conversation, he just said |
| 14:26:39 | 8  they were okay and I didn't inquire any farther, and |
| 14:26:42 | 9  we went back to our patrol car and monitored. |
| 14:26:45 | 10      Q.  Okay.  So the initial time you spoke to him, |
| 14:26:49 | 11  he just said, you know, "We're all good."  And that's |
| 14:26:52 | 12  when you and Deputy Manasan went back to your patrol |
| 14:26:56 | 13  vehicle? |
| 14:26:56 | 14      A.  Correct. |
| 14:26:56 | 15      Q.  And when you say you monitored, were you |
| 14:26:59 | 16  watching what was transpiring between the other |
| 14:27:02 | 17  officers and deputies and Mr. Perez? |
| 14:27:04 | 18      A.  I was. |
| 14:27:04 | 19      Q.  And during that time you were witnessing |
| 14:27:09 | 20  what was going on was Mr. Perez still in the prone |
| 14:27:12 | 21  position? |
| 14:27:12 | 22      A.  Yes. |
| 14:27:14 | 23      Q.  And did you observe either of the officers |
| 14:27:17 | 24  or deputies applying pressure to his back while he |
| 14:27:22 | 25  was in the prone position? |

Jimmy Lee Robnett, Tuesday, March 05, 2019

23

| | | |
|---|---|---|
| 14:27:26 | 1 | A.  While he was actively resisting, they were |
| 14:27:28 | 2 | applying positive pressure to keep him controlled, |
| 14:27:31 | 3 | yes. |
| 14:27:32 | 4 | Q.  Okay.  And is positive pressure basically |
| 14:27:34 | 5 | mean they are pushing down? |
| 14:27:36 | 6 | A.  It means whatever pressure is necessary to |
| 14:27:38 | 7 | deescalate it.  So there's no way for me judging how |
| 14:27:42 | 8 | much pressure they are putting on him. |
| 14:27:44 | 9 | Q.  Understood.  But what you observed was them |
| 14:27:48 | 10 | putting pressure in part on his back as he was trying |
| 14:27:51 | 11 | to lift up? |
| 14:27:52 | 12 | A.  I would articulate as controlling, trying to |
| 14:27:55 | 13 | control. |
| 14:27:56 | 14 | Q.  Okay.  And either -- strike that. |
| 14:28:03 | 15 | Was -- did you observe Mr. Perez in this |
| 14:28:09 | 16 | process attempting to lift up his body during this |
| 14:28:11 | 17 | process? |
| 14:28:12 | 18 | A.  Yes, sir. |
| 14:28:12 | 19 | Q.  And was he lifting -- attempting to lift up |
| 14:28:15 | 20 | his body so his head and chest would kind of come up |
| 14:28:19 | 21 | off the ground? |
| 14:28:21 | 22 | A.  No.  He was fighting. |
| 14:28:22 | 23 | Q.  Okay.  When you say he was fighting, he was |
| 14:28:27 | 24 | handcuffed at that time; is that true? |
| 14:28:28 | 25 | A.  That's true. |

24

| | |
|---|---|
| 14:28:29 | 1 |
| 14:28:32 | 2 |
| 14:28:33 | 3 |
| 14:28:37 | 4 |

14:28:29  1      Q.   So his hands were behind his back?

14:28:32  2      A.   That's correct.

14:28:33  3      Q.   And I take it that he was not fighting with

14:28:37  4  his hands; is that true?

14:28:38  5      A.   No, he was using his head and back and feet.

14:28:42  6      Q.   And so how was he fighting with his head?

14:28:47  7      A.   It appeared he was trying to head butt, for

14:28:49  8  lack of a better term, Robert and trying to hurt

14:28:53  9  himself and the other officers at his feet.  It

14:28:56  10  looked like he was trying to kick them.  So that's

14:28:58  11  how it looked, appeared to me that he was being

14:29:00  12  combative.

14:29:01  13      Q.   And any other ways in which you observed him

14:29:08  14  being combative?

14:29:11  15      A.   Well, his whole behavior was disturbing and

14:29:16  16  concerning because, you know, he was trying to hit

14:29:21  17  somebody with his head and his feet and moving his

14:29:24  18  shoulders back and forth.  So his whole body was

14:29:27  19  working in conjunction to resist officers.

14:29:30  20      Q.   Okay.  Did you ever see a weapon on

14:29:32  21  Mr. Perez at any time while you were on scene?

14:29:34  22      A.   No, I did not.

14:29:35  23      Q.   Did you ever see anything that looked like a

14:29:37  24  weapon?

14:29:37  25      A.   No, I did not.

Jimmy Lee Robnett, Tuesday, March 05, 2019

29

14:34:11  1      Q.   And so when you asked what his name was, did

14:34:13  2   someone else tell you that his name was Joseph Perez?

14:34:15  3      A.   I think so, yes.

14:34:16  4      Q.   One of the officers or deputies?

14:34:19  5      A.   Correct.

14:34:19  6      Q.   You asked him if he could breathe and you

14:34:22  7   recall him saying yes?

14:34:23  8      A.   Yes.

14:34:24  9      Q.   And at that point, what did you do next?

14:34:30  10     A.   Well, then I made sure EMS was en route.  So

14:34:34  11  I asked dispatch if EMS was en route.  They told me

14:34:37  12  they were on scene.  Obviously they weren't.  So I

14:34:39  13  gave the correct cross of Palm and Santa Fe, and they

14:34:43  14  responded within a minute or so.

14:34:45  15     Q.   Did you believe that they had the wrong

14:34:48  16  address at the time that you were told over dispatch

14:34:51  17  they were on scene?

14:34:52  18     A.   They were obviously not where we were at.

14:34:55  19  So --

14:34:56  20     Q.   Okay.

14:34:57  21     A.   -- I don't know where they were at.

14:34:59  22     Q.   So after you asked Mr. Perez if he could

14:35:01  23  breathe and he said yes, that's when you radioed

14:35:04  24  dispatch and asked about whether or not -- when

14:35:08  25  paramedics were coming; true?

Jimmy Lee Robnett, Tuesday, March 05, 2019

30

14:35:10   1          A.   True.

14:35:10   2          Q.   And that's when -- after that, is that when

14:35:13   3     you went back over to where Mr. Perez's feet were?

14:35:16   4          A.   At that point, I was concerned for the

14:35:17   5     officer, the Fresno police officer, because I thought

14:35:20   6     he was going to get kicked in the face.

14:35:22   7          Q.   Okay.   And so what did you do at that point?

14:35:25   8          A.   I told my trainee to go get our RIPP

14:35:30   9     Restraint to see if we can control his feet, because

14:35:33   10    I didn't want the officer or anyone else to get hurt.

14:35:35   11         Q.   Okay.   So did your -- did Deputy Manasan get

14:35:38   12    the RIPP Restraint?

14:35:39   13         A.   He did.

14:35:40   14         Q.   And did you and him go over to where

14:35:42   15    Mr. Perez's feet were?

14:35:45   16         A.   Well, I was already at his feet trying to

14:35:47   17    help the other officer, and Manasan went to get the

14:35:50   18    RIPP.   And he came back, and we collectively tried to

14:35:53   19    put it on him.   It's kind of hard.

14:35:57   20         Q.   Okay.   And were you able to put the RIPP

14:36:00   21    Restraint around his ankles?

14:36:01   22         A.   Yes.

14:36:01   23         Q.   And did you cross over his ankles after it

14:36:07   24    was put around them or before?

14:36:09   25         A.   Say that again.

Jimmy Lee Robnett, Tuesday, March 05, 2019

31

14:36:10  1      Q.   Sure.   My understanding is that his ankles

14:36:12  2   were crossed when the RIPP Restraint was placed

14:36:17  3   around them; is that true?

14:36:18  4      A.   Possibly.   I don't recall, but that would

14:36:20  5   probably be a better way of doing it.

14:36:22  6      Q.   Is that generally how you are trained to do

14:36:24  7   it?

14:36:24  8      A.   I don't think there's any specifics on that,

14:36:27  9   actually.   Just to get it -- get it around their

14:36:29  10  ankles and cinch it up.   I could see crossing it

14:36:33  11  would be a very good idea.

14:36:35  12      Q.   And the purpose of applying a RIPP Restraint

14:36:38  13  is to control someone's feet who are kicking; is that

14:36:41  14  true?

14:36:42  15      A.   That's correct.

14:36:42  16      Q.   And that's what you had in mind when you

14:36:44  17  applied the RIPP Restraint to Mr. Perez's feet?

14:36:47  18      A.   Yes.

14:36:47  19      Q.   And so once you got it around him, did you

14:36:50  20  tighten it around his ankles?

14:36:53  21      A.   I -- I -- yeah, I made it as snug as

14:36:57  22  possible without cutting off circulation.   So --

14:36:59  23      Q.   Okay.   And then what did you do at that

14:37:02  24  point?

14:37:02  25      A.   Well, we tried to tether it, the other end

Jimmy Lee Robnett, Tuesday, March 05, 2019

33

| | | |
|---|---|---|
| 14:38:16 | 1 | maintain -- maintain some control and safety for |
| 14:38:19 | 2 | everybody on scene. |
| 14:38:20 | 3 | Q.   Okay.  So my question, though, is after the |
| 14:38:23 | 4 | RIPP Restraint was applied, did you lift -- did you |
| 14:38:27 | 5 | use the RIPP Restraint to lift his legs off the |
| 14:38:31 | 6 | ground? |
| 14:38:33 | 7 | A.   That wasn't the purpose. |
| 14:38:38 | 8 | Q.   Okay. |
| 14:38:38 | 9 | A.   No. |
| 14:38:38 | 10 | Q.   Can the restraint be used in a fashion where |
| 14:38:41 | 11 | the RIPP Restraint is attached to someone's |
| 14:38:43 | 12 | handcuffs? |
| 14:38:45 | 13 | A.   Yes. |
| 14:38:45 | 14 | Q.   Okay.  That's part of the training? |
| 14:38:48 | 15 | A.   Correct. |
| 14:38:48 | 16 | Q.   But that was not done on this occasion; |
| 14:38:51 | 17 | true? |
| 14:38:51 | 18 | A.   No, we tried it.  It didn't help. |
| 14:38:53 | 19 | Q.   Okay. |
| 14:38:53 | 20 | A.   So we took it off. |
| 14:38:54 | 21 | Q.   How long did you try that for? |
| 14:38:57 | 22 | A.   Long enough to see that it wasn't working. |
| 14:38:59 | 23 | So maybe five seconds, ten seconds. |
| 14:39:02 | 24 | Q.   Okay.  And so then his feet were back down |
| 14:39:05 | 25 | on the ground? |

Jimmy Lee Robnett, Tuesday, March 05, 2019

41

14:45:41 1      A.  No, I did not.

14:45:41 2      Q.  Do you know -- do you recall what they were

14:45:43 3  wearing in terms of their clothes?

14:45:45 4      A.  I think blue pants, white shirt.

14:45:48 5      Q.  And once the paramedics showed up, did they

14:45:54 6  come over to the area where you and the other

14:45:56 7  officers and deputies were restraining Mr. Perez?

14:45:59 8      A.  Yes, they did.

14:46:00 9      Q.  And what happened at that point?

14:46:06 10      A.  Well, they took over, as far as -- as far as

14:46:09 11  giving direction and directions, and they pulled out

14:46:13 12  the backboard.  And someone said put it on his back

14:46:16 13  the way he is.

14:46:17 14      Q.  Okay.  Do you have training or did you have

14:46:22 15  training prior to this incident with Mr. Perez about

14:46:25 16  what your roles and responsibilities are once EMS

14:46:29 17  shows up on scene?

14:46:31 18      A.  I think there's general understanding that

14:46:33 19  when EMS arrives, they are the subject matter

14:46:37 20  experts.  We take their -- their instruction.

14:46:39 21      Q.  Okay.  And so when they showed up on scene,

14:46:44 22  was there any discussion about turning Mr. Perez over

14:46:48 23  into an -- onto his back in a supine position before

14:46:53 24  he was placed on the backboard?

14:46:55 25      A.  I heard someone say just put the backboard

42

14:46:57  1   on his back the way he is.  I don't recall exactly

14:47:00  2   what was said.

14:47:01  3       Q.  Okay.  But before you heard that, was there

14:47:07  4   any discussion amongst the officers or deputies about

14:47:11  5   whether or not we should roll him over before the

14:47:13  6   backboard was placed on top of his back?

14:47:17  7       A.  I don't think anything came from any of the

14:47:19  8   officers or deputies about that part of it.

14:47:22  9       Q.  So what you heard in terms of we're going to

14:47:25  10  put the backboard on his back, was that something you

14:47:27  11  heard from one of the emergency medical personnel?

14:47:29  12      A.  That's my best understanding, yes.

14:47:31  13      Q.  Do you know if it was a male or female?

14:47:33  14      A.  I think it was a male.

14:47:34  15      Q.  So at that point was the backboard placed on

14:47:39  16  top of Mr. Perez?

14:47:41  17      A.  Yes.

14:47:42  18      Q.  All right.  And when it was placed on top of

14:47:44  19  him, was he prone?

14:47:46  20      A.  Yes.

14:47:47  21      Q.  Was his stomach on the ground?

14:47:50  22      A.  Prone, yes.

14:47:51  23      Q.  Okay.  And how about his head at that time?

14:47:53  24  Was his head also touching the ground?

14:47:56  25      A.  I couldn't see through the backboard.

Jimmy Lee Robnett, Tuesday, March 05, 2019

43

14:47:58 1   Q. But it was obviously not elevated the way it

14:48:01 2 was when Deputy McEwen was holding it up; is that

14:48:04 3 true?

14:48:07 4   A. I would say yes, but I don't -- I can't see

14:48:10 5 through the backboard, so I don't know what position

14:48:13 6 his head was.

14:48:13 7   Q. Okay. So was the backboard covering his

14:48:16 8 head?

14:48:16 9   A. Yes.

14:48:17 10   Q. Okay. And once the backboard was placed on

14:48:20 11 top of him, did the officers and deputies around

14:48:26 12 Mr. Perez apply positive pressure to the backboard?

14:48:33 13   A. Yes.

14:48:34 14   Q. And I take it that the officers and deputies

14:48:39 15 were positioned in different areas around the

14:48:41 16 backboard relative to Mr. Perez's body; true?

14:48:43 17   A. True.

14:48:44 18   Q. So there was some people applying pressure

14:48:47 19 more on -- towards his legs; correct?

14:48:52 20   A. Is that a question?

14:48:53 21   Q. Yes.

14:48:55 22   A. There were more -- there were people just --

14:48:58 23 all around him trying to control all different points

14:49:00 24 of him. So his feet, his head, his hands, his legs.

14:49:04 25   Q. Okay. So you were closer to his legs;

| | | |
|---|---|---|
| 14:49:06 | 1 | correct? |
| 14:49:07 | 2 | A.  Yes. |
| 14:49:07 | 3 | Q.  And were there other deputies or officers |
| 14:49:12 | 4 | closer to his low back and midback and upper back? |
| 14:49:15 | 5 | A.  Yes. |
| 14:49:16 | 6 | Q.  And there were deputies or officers that |
| 14:49:20 | 7 | were applying positive pressure to the board in the |
| 14:49:23 | 8 | area of his back; is that fair? |
| 14:49:26 | 9 | A.  I -- yes, of course. |
| 14:49:29 | 10 | Q.  Okay.  And is that something you also viewed |
| 14:49:32 | 11 | in the body cam footage that you reviewed for your |
| 14:49:34 | 12 | deposition? |
| 14:49:37 | 13 | A.  Yes. |
| 14:49:37 | 14 | Q.  And then at some point did one of the |
| 14:49:41 | 15 | officers sit on top of the board? |
| 14:49:45 | 16 | A.  I don't know if it was an officer or not. |
| 14:49:47 | 17 | Q.  Okay. |
| 14:49:48 | 18 | A.  I can't remember. |
| 14:49:49 | 19 | Q.  All right.  Do you know if it was -- are you |
| 14:49:55 | 20 | saying that because you're not sure if it was an |
| 14:49:57 | 21 | officer versus an emergency medical personnel, or are |
| 14:50:02 | 22 | you just not sure if it was between an officer or a |
| 14:50:05 | 23 | deputy? |
| 14:50:05 | 24 | A.  It wasn't a deputy. |
| 14:50:07 | 25 | Q.  Okay. |

63

15:22:03  1      Q.   And you respond, "Umm, they brought out the

15:22:05  2  backboard.  Somebody asked if we were going to turn

15:22:07  3  him over, and one of the medics said, 'We're just

15:22:09  4  going to put the backboard on his back and strap him

15:22:11  5  that way.'"  Do you see where it says that?

15:22:14  6      A.   Uh-huh, correct.

15:22:15  7      Q.   Does that refresh your recollection about

15:22:17  8  someone else asking if you were going to turn

15:22:20  9  Mr. Perez over?

15:22:22  10     A.   The medic gave the direction.

15:22:24  11     Q.   I understand the medic gave the direction to

15:22:26  12 put the backboard on his back, but what I want to ask

15:22:29  13 you about is where you say someone asked if we are

15:22:34  14 going to turn him over, what are you referring to

15:22:38  15 there?

15:22:38  16     A.   Someone asked.  I don't know who.

15:22:42  17     Q.   Okay.  And when you say "turn him over," I

15:22:44  18 assume that means from a prone position to a supine

15:22:46  19 position?

15:22:47  20     A.   Correct.

15:22:47  21     Q.   And you don't know who that someone was?

15:22:50  22     A.   Correct.

15:22:51  23     Q.   Do you know if it was one of the deputies,

15:22:54  24 officers, or if it was EMS?

15:22:56  25     A.   Again, I don't know.

77

```
1    STATE OF CALIFORNIA )
                         ) ss.
2    COUNTY OF FRESNO    )

3

4         I, Bree Mervin, a Certified Shorthand Reporter

5    in the State of California, holding Certificate

6    No. 13057, do hereby certify that JIMMY LEE ROBNETT, the

7    witness named in the foregoing deposition, was by me

8    duly sworn; that said deposition was taken Tuesday,

9    March 5, 2019, at the time and place set forth on the

10   first page hereof.

11        That upon the taking of the deposition, the

12   words of the witness were written down by me in

13   stenotype and thereafter transcribed by computer under

14   my supervision; that the foregoing is a true and correct

15   transcript of the testimony given by the witness.

16        Pursuant to Federal Rule 30(e), transcript

17   review was requested.

18        I further certify that I am neither counsel for

19   nor in any way related to any party to said action, nor

20   in any way interested in the result or outcome thereof.

21        Dated this 21st day of March, 2019, at Visalia,

22   California.

23        _____

24        Bree Mervin, CSR No. 13057

25
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 13

PEREZ

vs

CITY OF FRESNO

---

Deposition of: James Rossetti

Taken on: Wednesday, March 06, 2019

---



## CERTIFIED COPY



Certified Shorthand Reporters

*A Professional Corporation*

Main Office: 900 Truxtun Avenue, Suite 320
Bakersfield, CA 93301
(800) 322-4595 Toll Free ● (661) 395-1050
www.woodrandall.com

Serving Central California - Bakersfield, Visalia & Fresno

PEREZ v. CITY OF FRESNO
James Rossetti, Wednesday, March 06, 2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

_____

ANTHONY PEREZ, individually,       )
CECILIA PEREZ, individually,       )
TERRALEE PEREZ,                    )
individually, and as              )
successor in interest to           )No. 1:18-cv-00127-AWI-EPG
Joseph Perez, JOSEPH PEREZ,        )
JR., individually and as          )
successor in interest to           )
Joseph Perez, and X.P. a           )
minor, by and through his          )
Guardian ad Litem, MICHELLE        )
PEREZ, individually and as         )
successor in interest to           )
Joseph Perez,                      )
                                   )
          Plaintiffs,              )
                                   )
     vs.                           )
                                   )
CITY OF FRESNO, COUNTY OF          )
FRESNO, JAMES ROSSETTI, an         )
individual, SEAN CALVERT, an       )
individual, CHRIS MARTINEZ,        )
an individual, BRAITHAN            )
STOLTENBERG, an individual,        )
ROBERT MCEWEN, an                  )
individual, KARLSON MANASAN,       )
an individual, JIMMY               )
ROBNETT, an individual, and        )
DOES 1-10, inclusive,              )
                                   )
          Defendants.              )
_____)


VIDEOTAPED DEPOSITION

OF

JAMES ROSSETTI

Wednesday, March 6, 2019

Fresno, California


Reported by:  Bree Mervin, CSR No. 13057, RPR, CRR

2

```
 1                           APPEARANCES

 2

 3   For Plaintiffs:         Alder Law, P.C.
                             BY MR. NEIL GEHLAWAT
 4                           Attorney at Law
                             1875 Century Park East
 5                           Suite 1500
                             Los Angeles, California  90067
 6                           (310)275-9131
                             ngehlawat@alderlaw.com
 7

 8

     For County of Fresno: Weakley & Arendt
 9                           BY MR. JAMES D. WEAKLEY
                             Attorney at Law
10                           5200 North Palm Avenue
                             Suite 211
11                           Fresno, California  93704
                             (559)221-5256
12                           jim@walaw-fresno.com

13

14   For City of Fresno:     Manning & Kass, Ellrod,
                             Ramirez, Trester, LLP
15                           BY MS. MILDRED K. O'LINN
                             Attorney at Law
16                           801 South Figueroa Street
                             15th Floor
17                           Los Angeles, California  90017
                             (213)624-6900
18                           mko@manningllp.com

19

20   The Videographer:       CHELCIE LEWIS

21

22   Also present:           DEPUTY SEAN CALVERT
                             OFFICER CHRIS MARTINEZ
23

24

25
```

James Rossetti, Wednesday, March 06, 2019

6

| | | |
|---|---|---|
| 15:13:25 | 1 | Q. And what is your position? |
| 15:13:25 | 2 | A. Sergeant with the multiagency gang |
| 15:13:28 | 3 | enforcement consortium tactical team. |
| 15:13:31 | 4 | Q. Was that your position at the time of this |
| 15:13:33 | 5 | incident with Mr. Perez? |
| 15:13:34 | 6 | A. Yes. |
| 15:13:38 | 7 | Q. I think you have been sitting here for the |
| 15:13:41 | 8 | other depositions and other deputies and officers in |
| 15:13:46 | 9 | this case and probably heard the admonitions given to |
| 15:13:48 | 10 | them multiple times. In light of that, are you |
| 15:13:50 | 11 | comfortable with waiving the admonitions we typically |
| 15:13:53 | 12 | give to deponents in the beginning of the deposition? |
| 15:13:56 | 13 | A. Yes. |
| 15:13:57 | 14 | Q. I'll just give you one, which is if you |
| 15:13:59 | 15 | don't understand a question that I ask you, will you |
| 15:14:01 | 16 | let me know? |
| 15:14:02 | 17 | A. Yes. |
| 15:14:03 | 18 | Q. All right. How long have you worked for the |
| 15:14:04 | 19 | Fresno Police Department? |
| 15:14:06 | 20 | A. Approximately 22 years as an officer, and at |
| 15:14:09 | 21 | two more as a reserve. |
| 15:14:11 | 22 | Q. And back on May 10th of 2017, you were on |
| 15:14:19 | 23 | the job with the Fresno Police Department? |
| 15:14:21 | 24 | A. Yes. |
| 15:14:21 | 25 | Q. And you were present during this encounter |

James Rossetti, Wednesday, March 06, 2019

7

| 15:14:26 | 1 | with Mr. Perez; is that true? |
| 15:14:27 | 2 | A.  Yes. |
| 15:14:30 | 3 | Q.  You were operating a patrol vehicle, and |
| 15:14:32 | 4 | Officer Martinez was in the front passenger seat. |
| 15:14:36 | 5 | And Officer Calvert was in the rear passenger seat |
| 15:14:39 | 6 | just before you came into contact with Mr. Perez; |
| 15:14:43 | 7 | true? |
| 15:14:44 | 8 | A.  Yes. |
| 15:14:46 | 9 | Q.  And you were on Palm Avenue at the time? |
| 15:14:49 | 10 | A.  Yes. |
| 15:14:52 | 11 | Q.  And when you first saw Mr. Perez, was he in |
| 15:14:57 | 12 | the southbound lanes of Palm Avenue? |
| 15:14:59 | 13 | A.  Yes. |
| 15:15:01 | 14 | Q.  And where specifically? |
| 15:15:03 | 15 | A.  In the number two lane. |
| 15:15:05 | 16 | Q.  And that's the right most lane? |
| 15:15:08 | 17 | A.  Yes. |
| 15:15:09 | 18 | Q.  And did you pull your vehicle over in that |
| 15:15:12 | 19 | area? |
| 15:15:13 | 20 | A.  Yes. |
| 15:15:13 | 21 | Q.  And where specifically did you park your |
| 15:15:16 | 22 | patrol vehicle? |
| 15:15:16 | 23 | A.  In the area of Santa Fe and Palm, against |
| 15:15:20 | 24 | the west curb line. |
| 15:15:23 | 25 | Q.  Had you ever encountered Mr. Perez to your |

8

15:15:26  1    knowledge prior to the date of this incident?

15:15:28  2        A.   No.

15:15:28  3        Q.   Did you have any knowledge at that point if

15:15:33  4    he had committed a crime?

15:15:34  5        A.   Yes.

15:15:34  6        Q.   And was that the vehicle infraction?

15:15:36  7        A.   Yes.

15:15:37  8        Q.   The Vehicle Code infraction?

15:15:40  9        A.   Yes.

15:15:41  10       Q.   Any other crimes?

15:15:42  11       A.   Yes.  I believe he was under the influence

15:15:44  12   of a controlled substance, meth.

15:15:46  13       Q.   And was that something that you concluded

15:15:50  14   before you parked your patrol vehicle?

15:15:53  15       A.   Yes.

15:15:53  16       Q.   Was that based on his behavior?

15:15:55  17       A.   Yes.

15:15:55  18       Q.   And what specifically about his behavior led

15:15:57  19   you to believe that he was under the influence of a

15:15:59  20   controlled substance?

15:16:01  21       A.   One of the things was he was walking in the

15:16:03  22   roadway.  He kept on looking back towards traffic,

15:16:07  23   just his demeanor, and then other things I can't

15:16:11  24   articulate, but I believed he was under the

15:16:15  25   influence.

James Rossetti, Wednesday, March 06, 2019

9

| | | |
|---|---|---|
| 15:16:15 | 1 | Q.   Okay.   And any other crimes that you |
| 15:16:20 | 2 | suspected him of committing at that time? |
| 15:16:25 | 3 | A.   No. |
| 15:16:26 | 4 | Q.   Okay.   At some point while you were on scene |
| 15:16:28 | 5 | with Mr. Perez, did you learn that he was on |
| 15:16:29 | 6 | probation? |
| 15:16:30 | 7 | A.   Yes. |
| 15:16:30 | 8 | Q.   And did you learn he was on probation for |
| 15:16:33 | 9 | possession of a firearm? |
| 15:16:34 | 10 | A.   Yes. |
| 15:16:35 | 11 | Q.   And did you learn anything else about his |
| 15:16:38 | 12 | criminal history? |
| 15:16:40 | 13 | A.   No. |
| 15:16:40 | 14 | Q.   And how did you ascertain that he was on |
| 15:16:45 | 15 | probation for possession of a firearm? |
| 15:16:48 | 16 | A.   I don't know where that information came |
| 15:16:50 | 17 | from. |
| 15:16:55 | 18 | Q.   Okay.   Do you recall someone telling you |
| 15:16:57 | 19 | that? |
| 15:16:57 | 20 | A.   Not specifically, no. |
| 15:17:00 | 21 | Q.   Okay.   So when you got out of your patrol |
| 15:17:04 | 22 | vehicle, did you open the rear passenger door to let |
| 15:17:06 | 23 | Officer Calvert out of the patrol vehicle? |
| 15:17:09 | 24 | A.   I don't recall opening the door. |
| 15:17:13 | 25 | Q.   Okay.   And did you eventually go over to the |

10

```
15:17:17   1   area where Mr. Perez was?
15:17:19   2        A.   Yes.
15:17:19   3        Q.   And when you went over to that area, was
15:17:22   4   Officer Martinez already with Mr. Perez?
15:17:25   5        A.   Yes.
15:17:26   6        Q.   And did you have a conversation with
15:17:29   7   Mr. Perez at that time?
15:17:31   8        A.   Yes.
15:17:31   9        Q.   And can you tell me generally what that
15:17:33  10   conversation was about?
15:17:35  11        A.   He told me he was on probation, or I heard
15:17:39  12   he was on probation, AB 109.
15:17:42  13        Q.   Okay.  Anything else that you recall about
15:17:43  14   the conversation?
15:17:44  15        A.   No.
15:17:52  16        Q.   And how long did that conversation last with
15:17:55  17   Mr. Perez?
15:17:58  18        A.   In relation to?
15:17:59  19        Q.   So you went over to him and Officer Martinez
15:18:03  20   was with him; correct?
15:18:04  21        A.   Yes.
15:18:04  22        Q.   And you asked him if he was on probation,
15:18:08  23   and he told you he was?
15:18:11  24        A.   That's not exactly what I said or meant.  He
15:18:16  25   had said he was on probation, AB 109.  I'm not
```

11

| | | |
|---|---|---|
| 15:18:19 | 1 | certain if I asked it or if one of the officers asked |
| 15:18:22 | 2 | it. |
| 15:18:23 | 3 | Q.  Okay.  Was there anything else that you |
| 15:18:26 | 4 | recall as you sit here today about any conversations |
| 15:18:28 | 5 | between the officers and Mr. Perez at that time? |
| 15:18:33 | 6 | A.  No. |
| 15:18:34 | 7 | Q.  Okay.  Did you review the interview |
| 15:18:39 | 8 | transcript of your interview to the sheriff's office |
| 15:18:42 | 9 | detectives to prepare for your deposition? |
| 15:18:43 | 10 | A.  Yes. |
| 15:18:44 | 11 | Q.  And did you also review the body cam |
| 15:18:46 | 12 | footage? |
| 15:18:46 | 13 | A.  Yes. |
| 15:18:47 | 14 | Q.  And did you review any other materials? |
| 15:18:50 | 15 | A.  Yes. |
| 15:18:50 | 16 | Q.  Did you review some of your training |
| 15:18:54 | 17 | materials? |
| 15:18:54 | 18 | A.  Yes. |
| 15:18:55 | 19 | Q.  And did you also review some of the CAD |
| 15:19:00 | 20 | information? |
| 15:19:01 | 21 | A.  Yes. |
| 15:19:02 | 22 | Q.  You -- and what I mean when I say "you," I |
| 15:19:06 | 23 | mean the Fresno Police Department, was not dispatched |
| 15:19:09 | 24 | to this call; is that true? |
| 15:19:10 | 25 | A.  That's true. |

James Rossetti, Wednesday, March 06, 2019

16

| | | |
|---|---|---|
| 15:26:01 | 1 | record.   The time is 3:26 p.m. |
| 15:26:05 | 2 | BY MR. GEHLAWAT: |
| 15:26:05 | 3 | Q.   Okay.   Sergeant, you understand you are |
| 15:26:07 | 4 | still under oath? |
| 15:26:08 | 5 | A.   Yes. |
| 15:26:08 | 6 | Q.   Okay.   So when Mr. Perez was handcuffed, and |
| 15:26:16 | 7 | I think you said that you believe it was Officer |
| 15:26:20 | 8 | Martinez who did that, were you in the general |
| 15:26:23 | 9 | vicinity where that occurred? |
| 15:26:26 | 10 | A.   Yes. |
| 15:26:27 | 11 | Q.   And did you observe -- were you standing in |
| 15:26:33 | 12 | front of Mr. Perez when he was seated on the curb and |
| 15:26:41 | 13 | handcuffed? |
| 15:26:42 | 14 | A.   Yes. |
| 15:26:42 | 15 | Q.   And were Officers Martinez and Calvert more |
| 15:26:47 | 16 | behind him? |
| 15:26:48 | 17 | A.   Yes. |
| 15:26:52 | 18 | Q.   And at some point did you observe Mr. Perez |
| 15:26:55 | 19 | get up off the ground? |
| 15:26:56 | 20 | A.   Yes. |
| 15:26:57 | 21 | Q.   Did he rock backwards and then get up kind |
| 15:27:00 | 22 | of all in one motion? |
| 15:27:01 | 23 | A.   No. |
| 15:27:03 | 24 | Q.   All right.   Can you describe how he got up? |
| 15:27:04 | 25 | A.   Sure.   He sprung up. |

29

15:39:14  1        Q.   Okay.   And at some point did you have a

15:39:20  2   conversation with Deputy Stoltenberg?

15:39:25  3        A.   I don't remember a conversation with him.

15:39:28  4        Q.   Did you call for EMS at some point?

15:39:31  5        A.   Yes.

15:39:31  6        Q.   Was that -- did you do that on one occasion

15:39:33  7   or more than one occasion?

15:39:34  8        A.   Two occasions.

15:39:36  9        Q.   And the first time you did it, was Mr. Perez

15:39:42 10   seated on the sidewalk?

15:39:43 11        A.   It was -- no.

15:39:44 12        Q.   Was he -- was it before he was seated on the

15:39:47 13   sidewalk?

15:39:50 14        A.   No.

15:39:51 15        Q.   Okay.   Was he in handcuffs when you first

15:39:54 16   called?

15:39:54 17        A.   Yes.

15:39:56 18        Q.   And when he was handcuffed, wasn't he

15:40:00 19   handcuffed on the curb?

15:40:01 20        A.   Yes.

15:40:01 21        Q.   So would it be fair to say when you first

15:40:03 22   call for paramedics, he was handcuffed on the curb?

15:40:06 23        A.   Yes.

15:40:09 24        Q.   And initially when you called for EMS, you

15:40:12 25   requested code two; correct?

James Rossetti, Wednesday, March 06, 2019

30

| 15:40:14 | 1 | A.   Yes. |
| 15:40:14 | 2 | Q.   And that was because you thought Mr. Perez |
| 15:40:18 | 3 | was 50150? |
| 15:40:19 | 4 | A.   Yes. |
| 15:40:20 | 5 | Q.   And he would need to be transported to a |
| 15:40:23 | 6 | hospital? |
| 15:40:23 | 7 | A.   Yes. |
| 15:40:26 | 8 | Q.   Okay.  And the second time you called for |
| 15:40:29 | 9 | paramedics, was Mr. Perez in a prone position? |
| 15:40:32 | 10 | A.   Yes. |
| 15:40:34 | 11 | Q.   And was it before or after you had your |
| 15:40:36 | 12 | initial conversation with the witness? |
| 15:40:42 | 13 | A.   I can't recall. |
| 15:40:50 | 14 | Q.   Okay.  And the second time you elevated the |
| 15:40:53 | 15 | response to code three? |
| 15:40:55 | 16 | A.   Uh-huh. |
| 15:40:55 | 17 | Q.   Is that a yes? |
| 15:40:56 | 18 | A.   Yes. |
| 15:40:56 | 19 | Q.   And is that because you felt at that time it |
| 15:40:59 | 20 | was a medical emergency? |
| 15:41:04 | 21 | A.   No. |
| 15:41:04 | 22 | Q.   Why did you elevate the response to code |
| 15:41:09 | 23 | three? |
| 15:41:09 | 24 | A.   Because I did not want my officers |
| 15:41:12 | 25 | struggling with this guy for any period, length of |

31

15:41:17  1    time -- any length of time.  I wanted to get EMS

15:41:21  2    there quicker.

15:41:21  3         Q.  How long after the first time that you

15:41:23  4    called paramedics, did you call for the second time?

15:41:25  5         A.  Approximately, a minute and a half.

15:41:27  6         Q.  Okay.  So would it be fair to say that the

15:41:32  7    second time you called for paramedics was shortly

15:41:35  8    after Mr. Perez was taken to the ground?

15:41:37  9         A.  Yes.

15:41:40 10         Q.  Okay.  And after you had this initial

15:41:44 11    conversation with the witness, what did you do at

15:41:49 12    that point?

15:41:49 13         A.  I believe -- or ask that question again,

15:41:54 14    please.

15:41:55 15         Q.  After you have the initial conversation with

15:41:56 16    the witness, what did you do at that point?

15:41:58 17         A.  I don't recall exactly what I did.

15:42:02 18         Q.  Okay.  Can you describe the witness?

15:42:06 19         A.  Yes.

15:42:06 20         Q.  And how?  Can you give us a description?

15:42:11 21         A.  Black male, glasses, approximately 50 to

15:42:15 22    late 40s, about five-five.

15:42:18 23         Q.  And did you obtain his contact information?

15:42:21 24         A.  No.

15:42:21 25         Q.  Did you ask for it at that time?

67

```
1    STATE OF CALIFORNIA )
                          ) ss.
2    COUNTY OF FRESNO     )

3

4          I, Bree Mervin, a Certified Shorthand Reporter

5    in the State of California, holding Certificate

6    No. 13057, do hereby certify that JAMES ROSSETTI, the

7    witness named in the foregoing deposition, was by me

8    duly sworn; that said deposition was taken Wednesday,

9    March 6, 2019, at the time and place set forth on the

10   first page hereof.

11         That upon the taking of the deposition, the

12   words of the witness were written down by me in

13   stenotype and thereafter transcribed by computer under

14   my supervision; that the foregoing is a true and correct

15   transcript of the testimony given by the witness.

16         Pursuant to Federal Rule 30(e), transcript

17   review was requested.

18         I further certify that I am neither counsel for

19   nor in any way related to any party to said action, nor

20   in any way interested in the result or outcome thereof.

21         Dated this 28th day of March, 2019, at

22   Visalia, California.

23         _____

24         Bree Mervin, CSR No. 13057

25
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 14

PEREZ

vs

CITY OF FRESNO

---

Deposition of: Braithan Stoltenberg

Taken on: Monday, March 04, 2019

---



## CERTIFIED COPY



Certified Shorthand Reporters

*A Professional Corporation*

Main Office: 900 Truxtun Avenue, Suite 320
Bakersfield, CA 93301
(800) 322-4595 Toll Free ● (661) 395-1050
www.woodrandall.com

Serving Central California - Bakersfield, Visalia & Fresno

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

—————————————

ANTHONY PEREZ, individually, )
CECILIA PEREZ, individually, )
TERRALEE PEREZ,              )
individually, and as        )
successor in interest to    ) No. 1:18-cv-00127-AWI-EPG
Joseph Perez, JOSEPH PEREZ, )
JR., individually and as    )
successor in interest to    )
Joseph Perez, and X.P. a    )
minor, by and through his   )
Guardian ad Litem, MICHELLE )
PEREZ, individually and as  )
successor in interest to    )
Joseph Perez,               )
                            )
          Plaintiffs,       )
                            )
     vs.                    )
                            )
CITY OF FRESNO, COUNTY OF   )
FRESNO, JAMES ROSSETTI, an  )
individual, SEAN CALVERT, an )
individual, CHRIS MARTINEZ, )
an individual, BRAITHAN     )
STOLTENBERG, an individual, )
ROBERT MCEWEN, an           )
individual, KARLSON MANASAN, )
an individual, JIMMY        )
ROBNETT, an individual, and )
DOES 1-10, inclusive,       )
                            )
          Defendants.       )
_____)

VIDEOTAPED DEPOSITION

OF

BRAITHAN STOLTENBERG

Monday, March 4, 2019

Fresno, California

Reported by:  Bree Mervin, CSR No. 13057, RPR, CRR

2

1                              APPEARANCES

2

3      For Plaintiffs:           Alder Law, P.C.
                                 BY MR. NEIL GEHLAWAT
4                                Attorney at Law
                                 1875 Century Park East
5                                Suite 1500
                                 Los Angeles, California  90067
6                                (310)275-9131
                                 ngehlawat@alderlaw.com
7

8
       For County of Fresno:     Weakley & Arendt
9                                BY MR. JAMES D. WEAKLEY
                                 Attorney at Law
10                               5200 North Palm Avenue
                                 Suite 211
11                               Fresno, California  93704
                                 (559)221-5256
12                               jim@walaw-fresno.com

13

14     For City of Fresno:       Manning & Kass, Ellrod,
                                 Ramirez, Trester, LLP
15                               BY MS. MILDRED K. O'LINN
                                 Attorney at Law
16                               801 South Figueroa Street
                                 15th Floor
17                               Los Angeles, California  90017
                                 (213)624-6900
18                               mko@manninllp.com

19

20     The Videographer:         CHELCIE LEWIS

21

22     Also present:             DEPUTY SEAN CALVERT
                                 OFFICER CHRIS MARTINEZ
23                               OFFICER JAMES ROSSETTI

24

25

13

14:22:45 1     A.   No.

14:22:45 2     Q.   Just by way of educational background, are you

14:22:54 3  a high school graduate?

14:22:55 4     A.   I am.

14:22:55 5     Q.   Any college?

14:22:57 6     A.   Little bit.

14:22:58 7     Q.   Okay.  Any degrees?

14:22:59 8     A.   No.

14:23:00 9     Q.   Where did you go to -- where did you go to

14:23:03 10  college, briefly?

14:23:03 11    A.   City College in Fresno here.

14:23:05 12    Q.   Back on the day of the incident, you responded

14:23:12 13  to a call over dispatch; is that true?

14:23:16 14    A.   Yes.

14:23:16 15    Q.   And were you by yourself when you responded?

14:23:19 16    A.   I was.

14:23:20 17    Q.   In a marked patrol vehicle?

14:23:23 18    A.   I was.

14:23:23 19    Q.   And when you arrived to the area where the

14:23:30 20  subject was located, were other officers present there?

14:23:36 21    A.   They were.

14:23:38 22    Q.   Do you know how many other officers or deputies

14:23:42 23  were present when you arrived?

14:23:45 24    A.   When I arrived, there were three on scene and

14:23:49 25  an additional deputy had arrived with me.

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

14

14:23:51 1      Q.   Okay.  And when you say "with me," I take it
14:23:54 2   that he arrived at the same time as you did, not that
14:23:59 3   the two of you were in one vehicle; is that true?
14:24:01 4      A.   Yes.
14:24:01 5      Q.   Is that true?
14:24:02 6      A.   It is true.
14:24:03 7      Q.   Okay.  And was that other deputy Deputy McEwen?
14:24:08 8      A.   It was.
14:24:10 9      Q.   And the other three officers who were present,
14:24:17 10  were they from the Fresno Police Department?
14:24:19 11     A.   They were.
14:24:19 12     Q.   And how could you tell that?
14:24:20 13     A.   They were identified by their uniforms.
14:24:23 14     Q.   And had you ever met any of those officers or
14:24:28 15  sergeants before the day of this incident?
14:24:31 16     A.   Yes.
14:24:32 17     Q.   Which of the officers?
14:24:34 18     A.   Chris Martinez and Sergeant Rossetti.
14:24:38 19     Q.   And how had you met them before?
14:24:40 20     A.   Sergeant Rossetti in passing.  I can't remember
14:24:43 21  exactly when.  And Chris Martinez, previously working
14:24:48 22  with Avenal PD.
14:24:49 23     Q.   So you and Mr. Martinez worked together for the
14:24:53 24  Avenal Police Department?
14:24:55 25     A.   Yes.

Braithan Stoltenberg, Monday, March 04, 2019

15

14:24:55 1      Q.    And was that during the three-month period that

14:24:58 2   you were an officer there?

14:24:59 3      A.    Yes.

14:25:02 4      Q.    Okay.  Were you provided with a physical

14:25:08 5   description of the subject over dispatch?

14:25:12 6      A.    Yes.

14:25:12 7      Q.    And did you see the subject that matched that

14:25:19 8   description when you got to the scene?

14:25:20 9      A.    I did.

14:25:21 10     Q.    Do you have any recollection of what the

14:25:24 11  subject was wearing or can you provide us with any

14:25:27 12  description of him?

14:25:28 13     A.    It was a Hispanic male with a dark shirt on and

14:25:33 14  brown shorts.

14:25:34 15     Q.    Okay.  And what was your height and weight at

14:25:37 16  the time of the incident?

14:25:39 17     A.    The time, I was 5'7" and about 160 pounds.

14:25:48 18     Q.    Okay.  Information was transmitted to you over

14:25:51 19  dispatch in terms of this subject?

14:25:57 20     A.    Are you asking prior to my arrival?

14:25:59 21     Q.    Prior to your arrival, yes.

14:26:01 22     A.    Dispatch had provided me with the description I

14:26:04 23  just provided you: a male acting erratic, screaming, and

14:26:10 24  hiding in the bushes, and walking in the area of Palm

14:26:15 25  and Griffith.

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

17

14:27:42 1    A.   No.

14:27:42 2    Q.   Did you see anything on him that looked like a

14:27:44 3  weapon?

14:27:45 4    A.   No.

14:27:45 5    Q.   During the time that you were on scene, did

14:27:51 6  Mr. Perez ever verbally threaten any of the officers or

14:27:55 7  deputies?

14:27:57 8    A.   I can't recall.

14:27:58 9    Q.   Did you recall him ever attempting to punch any

14:28:06 10  one of the officers or deputies?

14:28:10 11    A.   From what I had seen, no.

14:28:13 12    Q.   Did you ever see him attempt to kick any one of

14:28:16 13  the officers or deputies?

14:28:17 14    A.   I observed him kicking, but I did not believe

14:28:21 15  it was a specific officer or deputy.

14:28:24 16    Q.   So you observed him kicking his legs, but not

14:28:27 17  kicking at any particular officer or deputy; is that

14:28:29 18  fair?

14:28:30 19    A.   Yes.

14:28:31 20    Q.   So once you arrived on scene, what did you

14:28:36 21  observe in terms of the subject, in terms of where he

14:28:38 22  was located?

14:28:39 23    A.   When I arrived, I saw Mr. Perez was seated on

14:28:45 24  the curb, and he was handcuffed.  And he was surrounded

14:28:50 25  by the officers I had just mentioned previously.

WOOD & RANDALL
(800) 322-4595

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

18

14:28:53 1     Q.   Okay.  And he was -- his hands were behind his

14:28:59 2  back?

14:29:00 3     A.   Yes.

14:29:00 4     Q.   And can you describe for me where the officers

14:29:14 5  were located relative to him on the curb?

14:29:14 6     A.   I can't give an exact placement, but I believe

14:29:14 7  two were in front of his person, blocking him from going

14:29:17 8  into the street, and another one was standing somewhere

14:29:19 9  else.

14:29:19 10     Q.   Do you remember which of the two officers were

14:29:21 11  standing in front of him?

14:29:23 12     A.   I do not.

14:29:25 13     Q.   Okay.  And once you observed him, did you go up

14:29:30 14  and talk to him?

14:29:31 15     A.   Mr. Perez?

14:29:32 16     Q.   Yes.

14:29:33 17     A.   No.

14:29:33 18     Q.   Okay.  Did you ever attempt to go up and talk

14:29:40 19  to Mr. Perez?

14:29:41 20     A.   No.

14:29:41 21     Q.   Did you obtain some information through some

14:29:45 22  other means about his name and identity and things of

14:29:47 23  that sort?

14:29:48 24     A.   I did.

14:29:48 25     Q.   And how did you do that?

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

19

14:29:50 1      A.   I spoke to Sergeant Rossetti who was on scene,

14:29:52 2   and I asked him who he was.

14:29:54 3      Q.   And what did he tell you?

14:29:55 4      A.   He gave me his name and date of birth.

14:29:58 5      Q.   Okay.  And at that point, when he gave you his

14:30:02 6   name and date of birth, was Mr. Perez still seated on

14:30:05 7   the curb?

14:30:06 8      A.   Yes.

14:30:06 9      Q.   And did you go back into your patrol vehicle at

14:30:12 10  that time?

14:30:12 11     A.   I did.

14:30:13 12     Q.   When you were back in your patrol vehicle, did

14:30:16 13  you sit in the driver seat?

14:30:17 14     A.   I did.

14:30:17 15     Q.   And from where you were sitting in your driver

14:30:20 16  seat, did you have a view of Mr. Perez?

14:30:23 17     A.   No.

14:30:23 18     Q.   Is that because the officers who were standing

14:30:28 19  around him were obstructing your view of him?

14:30:30 20     A.   No.

14:30:30 21     Q.   Why was -- why were you not able to see him?

14:30:33 22     A.   My patrol car was facing southbound, and in

14:30:38 23  order to look at him, I would have to look away from

14:30:40 24  where I was and I was focused on my computer in the car.

14:30:43 25     Q.   What direction would you have to look towards

20

14:30:45 1    in order to have a view of Mr. Perez?

14:30:48 2        A.    Eastbound.

14:30:48 3        Q.    Okay.  And so when you got back into your

14:30:54 4    vehicle, I take it the purpose of that was to find

14:30:58 5    background information on Mr. Perez?

14:31:00 6        A.    Yes.

14:31:01 7        Q.    At the time that you first arrived on scene,

14:31:04 8    did you know his name?

14:31:06 9        A.    No.

14:31:06 10       Q.    Did you know any information about whether or

14:31:10 11   not he had ever committed a crime?

14:31:12 12       A.    No.

14:31:12 13       Q.    And so did you use -- strike that.

14:31:18 14           What did you do with his identifying

14:31:21 15   information; in other words, his name and his date of

14:31:24 16   birth?

14:31:24 17       A.    I searched his information in the local FSO

14:31:28 18   database.

14:31:31 19       Q.    Okay.  What did you learn upon searching that

14:31:34 20   combination?

14:31:34 21       A.    I learned he was on post-release community

14:31:36 22   supervision for possession of a firearm.

14:31:38 23       Q.    Okay.  So in other words, he was on probation

14:31:39 24   for possession of a firearm?  Was that your

14:31:41 25   understanding?

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

27

14:39:11 1       A.   I have.

14:39:16 2       Q.   So Mr. Perez was -- the two officers and Deputy

14:39:22 3   McEwen were attempting to restrain Mr. Perez while he

14:39:27 4   was face down; is that true?

14:39:29 5       A.   Yes.

14:39:30 6       Q.   Okay.  And at that point, what did you do next?

14:39:38 7       A.   I was standing by, directing radio traffic to

14:39:44 8   our dispatch, as far as what was going on.

14:39:47 9       Q.   Okay.  So in other words, you were

14:39:49 10  communicating with sheriff's office dispatch about what

14:39:53 11  was transpiring?

14:39:54 12      A.   Yeah.

14:39:54 13      Q.   And what information did you communicate over

14:39:57 14  dispatch?

14:39:57 15      A.   I communicated that -- I communicated the

14:40:03 16  suspect's behavior and what was going on.  I also

14:40:06 17  communicated that Sergeant Rossetti had told me they

14:40:11 18  were taking over the scene, and that they had called for

14:40:16 19  EMS.

14:40:16 20      Q.   Okay.  So prior to you arriving on scene, given

14:40:24 21  the information you had over dispatch, were you under

14:40:29 22  the impression that it was going to be your call; in

14:40:32 23  other words, a sheriff's office call?

14:40:34 24      A.   I was.

14:40:34 25      Q.   And you determined that it was not your call or

30

14:43:17 1  the point that you got into your vehicle to look up

14:43:22 2  Mr. Perez's information, how much time transpired

14:43:25 3  between those two?  What's your best estimate?

14:43:29 4      A.   Within three to four minutes.

14:43:31 5      Q.   Okay.  And after you got into your vehicle, how

14:43:37 6  long was it before you started to realize that there was

14:43:40 7  a scuffle?

14:43:46 8      A.   A minute or two.

14:43:49 9      Q.   And after you communicate with dispatch about

14:44:05 10 what you have observed and that EMS is on its way, what

14:44:09 11 did you do next?

14:44:10 12     A.   I walked over to see if I could assist --

14:44:14 13 assist the officers, Deputy McEwen, in any way and also

14:44:19 14 watch over the scene.

14:44:20 15     Q.   Okay.  And is that when Deputy McEwen asked you

14:44:24 16 to bring a towel from his truck?

14:44:28 17     A.   Yes.

14:44:28 18     Q.   Okay.  And did you go do that?

14:44:31 19     A.   I did.

14:44:32 20     Q.   Were you able to find it pretty easily?

14:44:34 21     A.   Yes.  It was where he directed me it was at.

14:44:36 22     Q.   Okay.  And then you brought the towel back over

14:44:39 23 to him?

14:44:39 24     A.   Yes.

14:44:40 25     Q.   When he told you to get a towel, was he on the

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

32

14:45:54 1    communicated with dispatch, you talked to Deputy McEwen,

14:45:59 2    you went and got the towel, and you brought it back to

14:46:02 3    him?

14:46:03 4        A.   No.  Within a minute of me going over to see

14:46:05 5    how I could assist them, I went and got the towel.

14:46:08 6        Q.   Okay.  Okay.  My question was a little

14:46:12 7    different, which is when you were in the car looking up

14:46:17 8    information about Mr. Perez, and you first heard sounds

14:46:21 9    that made you believe there was some scuffle, from that

14:46:25 10   point to the point that you brought the towel to Deputy

14:46:29 11   McEwen, what is your best estimate of that time frame?

14:46:36 12       A.   Within four minutes.

14:46:39 13       Q.   And once you brought the towel over to Deputy

14:46:54 14   McEwen, did he take it from you?

14:46:56 15       A.   He did.

14:46:57 16       Q.   All right.  And did you see him do something

14:47:00 17   with the towel?

14:47:00 18       A.   I did.

14:47:01 19       Q.   And what did you see?

14:47:02 20       A.   I saw him take the towel in a -- and wrap it

14:47:08 21   around Mr. Perez's face.

14:47:11 22       Q.   Okay.  Was it under his chin?

14:47:14 23       A.   No.

14:47:14 24       Q.   Was he -- once he had wrapped the towel around

14:47:21 25   Mr. Perez's face, was he holding -- was he using the

14:47:24  1   towel to hold Mr. Perez's face up off the ground?

14:47:27  2       A.   Yes.

14:47:27  3       Q.   And prior to that happening, did you observe

14:47:31  4   Mr. Perez hitting his face on the ground?

14:47:35  5       A.   Yes.

14:47:35  6       Q.   Did you see any abrasions to his face?

14:47:40  7       A.   I saw blood on the ground.  I didn't -- I

14:47:43  8   wasn't in a position of vantage to see his face.

14:47:47  9       Q.   And you believed the blood was from Mr. Perez?

14:47:52 10       A.   Yes.

14:47:54 11       Q.   Okay.  Did you have training through the

14:47:55 12   sheriff's office that if you observe another officer to

14:48:00 13   be doing something inappropriate, that you have a

14:48:03 14   responsibility to intervene?

14:48:05 15       A.   Yes.

14:48:05 16       Q.   Okay.  And you had that training before the

14:48:09 17   incident with Mr. Perez; correct?

14:48:11 18       A.   Yes.

14:48:12 19       Q.   So once you got back over with the towel, after

14:48:22 20   you handed the towel to Deputy McEwen, what did you do

14:48:28 21   next?

14:48:32 22       A.   I was still standing by.

14:48:34 23       Q.   Okay.  And when you say "standing by," did you

14:48:40 24   put your hands on Mr. Perez at any point?

14:48:44 25       A.   At some point I did.  I don't remember if it

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

39

| | | |
|---|---|---|
| 14:55:04 | 1 | or compression asphyxiation? |
| 14:55:06 | 2 | MR. WEAKLEY:  Other than from your attorney. |
| 14:55:10 | 3 | THE WITNESS:  Yes. |
| 14:55:11 | 4 | BY MR. GEHLAWAT: |
| 14:55:14 | 5 | Q.   Okay.  And what do you understand any of those |
| 14:55:16 | 6 | terms to mean? |
| 14:55:22 | 7 | A.   I understand they mean the heart stops because |
| 14:55:38 | 8 | of the position the body is in. |
| 14:55:41 | 9 | Q.   Okay.  Did you have training with respect to |
| 14:55:43 | 10 | any of those terms? |
| 14:55:46 | 11 | A.   I remember excited delirium in training, but |
| 14:55:50 | 12 | specifically with those terms, no. |
| 14:55:55 | 13 | Q.   In terms of excited delirium, is that training |
| 14:55:59 | 14 | you had through the sheriff's office? |
| 14:56:00 | 15 | A.   Yes. |
| 14:56:00 | 16 | Q.   And were you trained that people who were under |
| 14:56:06 | 17 | the influence of a stimulant can become excited or come |
| 14:56:11 | 18 | into this excited delirium state? |
| 14:56:14 | 19 | A.   Yes. |
| 14:56:20 | 20 | Q.   And did you believe Mr. Perez was under the |
| 14:56:22 | 21 | under the influence of a stimulant at the time of this |
| 14:56:24 | 22 | incident? |
| 14:56:25 | 23 | A.   I did. |
| 14:56:25 | 24 | Q.   And what was that based on? |
| 14:56:29 | 25 | A.   Based on my previous experience with |

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

40

14:56:31  1    individuals under the influence of narcotics and his

14:56:33  2    objective symptoms.

14:56:46  3        Q.   Okay.  Do you have training or did you have

14:56:47  4    training with the sheriff's office in terms of how to

14:56:50  5    deal with subjects that might be under -- that might be

14:56:52  6    in a state of excited delirium?

14:56:59  7        A.   I don't understand your question.

14:57:01  8        Q.   Sure.  So you said that you had some training

14:57:04  9    with respect to excited delirium; is that true?

14:57:09 10        A.   Yes.

14:57:10 11        Q.   So what I'm trying to find out is what that

14:57:12 12    training might have consisted of.  Was that like a

14:57:15 13    policy?  Was it training you received through a

14:57:19 14    presentation?  What form did that training take?

14:57:21 15        A.   I believe that it was in a skills training

14:57:27 16    atmosphere.

14:57:29 17        Q.   And in that skills training atmosphere, did --

14:57:34 18    were you trained with respect to how to deal with

14:57:37 19    someone who is in excited delirium?

14:57:41 20        A.   I was trained with some of the causes that it

14:57:45 21    could -- that could contribute to excited delirium.  I

14:57:48 22    wasn't trained in how to deal with it.

14:57:51 23        Q.   Okay.  So in other words you received training

14:57:53 24    in order to identify when someone might be in excited

14:57:57 25    delirium, but not how to deal with someone who is in it;

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

43

15:01:26 1   members of their staff?

15:01:27 2       A.   I saw two.

15:01:30 3       Q.   And do you know their genders?

15:01:35 4       A.   A male and a female.

15:01:36 5       Q.   And can you describe what they were wearing?

15:01:39 6       A.   Well, I think they were in their -- from my

15:01:40 7   recollection, white pants -- I'm sorry -- white shirt

15:01:43 8   and blue pants.

15:01:44 9       Q.   Okay.  Both the male and the female?

15:01:4710       A.   Yes.

15:01:4711       Q.   Okay.  And once the paramedics arrived on

15:01:5112   scene, what happened next?

15:01:5313       A.   They -- they took over the scene, and they

15:01:5914   brought -- they saw that Mr. Perez was yelling and

15:02:0515   writhing around.  They soon after got a blue brace board

15:02:1216   and moved to put it over his back.

15:02:1717       Q.   Okay.  When you said they got there and they

15:02:2218   took over, what do you mean by that?

15:02:2419       A.   Well, when we -- when EMS arrives on scene for

15:02:3020   a variety of reasons, we -- we divert to them and their

15:02:3621   judgment on how to handle a call.

15:02:4022       Q.   Okay.  Obviously, with some parameters.  For

15:02:4523   example, if they told you to use a certain kind of

15:02:4724   force, you're obviously going to follow your own

15:02:4925   training in that respect, too; is that true?

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

44

15:02:52 1        A.   Yes.

15:02:53 2        Q.   But in terms of how to deal with Mr. Perez at

15:02:59 3   that time, based on your training, you thought it was --

15:03:02 4   that the paramedics were taking over?

15:03:05 5        A.   Yes.

15:03:06 6        Q.   So once the paramedics showed up and you said

15:03:12 7   they evaluated what was going on and then they brought

15:03:15 8   out the backboard, from the time that they first showed

15:03:18 9   up to the point they brought out the backboard, what is

15:03:20 10  your best estimate of that time?

15:03:23 11       A.   I would say around a minute.

15:03:25 12       Q.   And when they brought out the backboard, was

15:03:27 13  the backboard placed on top of Mr. Perez?

15:03:33 14       A.   Yes.

15:03:34 15       Q.   Okay.  And he was in a prone position at that

15:03:39 16  time?

15:03:39 17       A.   Yes.

15:03:39 18       Q.   And I take it once the backboard was placed

15:03:41 19  over his body his head was not elevated in the way that

15:03:46 20  it was when Deputy McEwen was holding it up with a

15:03:50 21  towel; is that true?

15:03:51 22       A.   Yes.

15:03:53 23       Q.   Okay.  So once the paramedics put the -- well,

15:03:58 24  let me ask it this way:  Whose idea was it to have the

15:04:02 25  backboard placed on to Mr. Perez's back?

46

15:05:19 1      A.   I recall a discussion about the best way to put

15:05:23 2  him on the backboard.  I don't remember the specifics as

15:05:26 3  far as what was discussed.

15:05:29 4      Q.   Okay.  Do you recall how long that discussion

15:05:31 5  lasted?

15:05:33 6      A.   I don't.

15:05:35 7      Q.   Do you know who all was involved in the

15:05:37 8  discussion?  Would it have been everyone who was present

15:05:40 9  at the time?

15:05:41 10     A.   Yeah, I don't remember who talked about it.

15:05:44 11     Q.   But a decision was made to put the backboard on

15:05:47 12 his back; true?

15:05:49 13     A.   True.

15:05:49 14     Q.   And you believe it was one of the emergency

15:05:54 15 medical employees' decisions to do that?

15:06:00 16     A.   Yes.

15:06:00 17     Q.   And so this was a blue backboard?

15:06:04 18     A.   Yes.

15:06:04 19     Q.   And once the blue backboard was placed onto his

15:06:10 20 back, was everyone around attempting to push down the

15:06:16 21 backboard to hold down Mr. Perez?

15:06:23 22     A.   I had my hands on the backboard stabilizing it,

15:06:26 23 holding it down.  And it appeared that the other

15:06:31 24 officers and deputies involved did the same.

15:06:34 25     Q.   Okay.  And I take it everyone's hands were in

59

15:31:29 1      Q.   Okay.  We'll get to the video in a second.

15:31:31 2           Okay.  So you gave a statement on May 12th;

15:31:36 3  correct?

15:31:37 4      A.   Correct.

15:31:37 5      Q.   And you were being honest and truthful when you

15:31:39 6  gave that statement; true?

15:31:41 7      A.   True.

15:31:43 8      Q.   I am going to hand you a copy of your

15:31:46 9  statement, which we'll mark as Exhibit 1 to your

15:31:50 10 deposition transcript.  I've got a copy for you.

15:31:56 11     A.   Thank you.

15:32:01 12          (Plaintiffs' Exhibit 1

15:32:03 13          marked for identification.)

15:32:03 14 BY MR. GEHLAWAT:

15:32:05 15     Q.   Okay.  Have you seen Exhibit 1 before?

15:32:07 16     A.   I have.

15:32:08 17     Q.   Is this the transcript that you reviewed to

15:32:10 18 prepare for your deposition?

15:32:11 19     A.   Yes.

15:32:16 20     Q.   Okay.  So on Page 2 of Exhibit 1, so at Line 76

15:32:38 21 or so, you're asked then, "Can you tell me a little bit

15:32:41 22 more about that incident or that response to that call?"

15:32:44 23 Do you see where it says that?

15:32:45 24     A.   I do.

15:32:45 25     Q.   And then your answer is, "Yes.  At around 10:30

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

60

15:32:49  1  in the morning, I was writing reports in the area of

15:32:52  2  Gettysburg and Wilson, and I was dispatched to report of

15:32:55  3  a suspicious person, uh, walking westbound in the area

15:32:58  4  of Van Ness and Saginaw.  Um, Hispanic male acting

15:33:03  5  bizarre.  Umm, he was sprinting through the street and

15:33:07  6  screaming."  Do you see that?

15:33:08  7      A.   I do.

15:33:09  8      Q.   That's what you said?

15:33:11  9      A.   Yes.

15:33:11 10      Q.   And that's the truth?

15:33:14 11      A.   Yes.

15:33:16 12      Q.   Okay.  So how long did it take for you to get

15:33:19 13  from where you were to the area where Mr. Perez was when

15:33:23 14  the officers from the Fresno Police Department?

15:33:25 15      A.   Around -- around 30 seconds.

15:33:28 16      Q.   And do you recall approximately what time you

15:33:32 17  arrived on scene?

15:33:34 18      A.   I don't.

15:33:35 19      Q.   Would it have been sometime between 10:30 and

15:33:40 20  11:00 a.m.?

15:33:42 21      A.   Yes.

15:33:42 22      Q.   Okay.  If you can turn to Page 5 at Line 205,

15:34:39 23  do you see where you're asked, "Okay, you mean, and what

15:34:42 24  happened after that?"

15:34:43 25      A.   Yes.

61

15:34:43  1      Q.    Okay.  Go ahead and read the answer to

15:34:47  2   yourself.  Not out loud.

15:34:51  3      A.    Yes, okay.

15:35:20  4      Q.    All right.  When you say in the first line,

15:35:23  5   "Umm, I asked him how I could assist him," who is the

15:35:27  6   "him" in that?

15:35:29  7      A.    Sergeant Rossetti.

15:35:30  8      Q.    So you asked Sergeant Rossetti how you could

15:35:33  9   assist him; correct?

15:35:35 10      A.    Correct.

15:35:36 11      Q.    And then when you say, "Umm, he was still

15:35:39 12   seated even though he was kicking," I take it you mean

15:35:42 13   the "he" is Mr. Perez; correct?

15:35:46 14      A.    Correct.

15:35:49 15      Q.    If you can turn to Page 7.  Okay.  At page --

15:36:35 16   on Line 282, do you see where it says, "Okay.  So when

15:36:39 17   you observed him on the ground, was he on his side?  On

15:36:40 18   his back?  On his stomach?"  Do you see where it says

15:36:43 19   that?

15:36:43 20      A.    I do.

15:36:44 21      Q.    And then essentially you said that he was going

15:36:51 22   back and forth, writhing around, trying to get up, on

15:36:53 23   his stomach at one point or on his side, kind of going

15:36:56 24   back and forth between the two things.  That's generally

15:36:59 25   what you said; right?

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

62

15:36:59 1      A.   Yes.

15:36:59 2      Q.   And that's what you observed when you were at

15:37:01 3  the scene?

15:37:02 4      A.   Yes.

15:37:02 5      Q.   Turning to Page 8, Line 33, Mr. Perez's head

15:37:23 6  was pointed east when he was being restrained on the

15:37:27 7  ground?

15:37:29 8      A.   Yes.

15:37:30 9      Q.   Were you in fear for your life at any point

15:37:51 10  during this encounter?

15:37:53 11      A.   No.

15:37:53 12      Q.   Okay.  If you could turn to Page 9, starting at

15:38:04 13  Line 381, do you see where it says, "Okay.  At any

15:38:06 14  point, umm, during that incident, does EMS get called

15:38:09 15  out or dispatched?"  Do you see where it says that?

15:38:12 16      A.   Yes.

15:38:12 17      Q.   And your response was, "Yes, umm, we determined

15:38:15 18  that -- well, I'm sorry, Fresno PD determined they were

15:38:18 19  going to place -- they were gonna place him on mental

15:38:21 20  health holds.  They requested EMS respond to our

15:38:24 21  location."  Do you see where it says that?

15:38:27 22      A.   Yes.

15:38:27 23      Q.   Does that refresh your recollection that you

15:38:30 24  learned from Fresno PD that they were going to place

15:38:35 25  Mr. Perez on mental health hold?

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

64

15:40:30 1   you were saying, umm, how did they resolve the issue

15:40:33 2   with, umm, his face?" Do you see that?

15:40:33 3        A.   Yes.

15:40:37 4        Q.   Just go ahead and read the answer that you gave

15:40:39 5   to yourself.

15:41:22 6        A.   Okay.

15:41:22 7        Q.   Okay.  So does reading the answer refresh your

15:41:27 8   recollection that one of the concerns that you and other

15:41:32 9   deputies and officers had was wanting to make sure that

15:41:35 10  Mr. Perez could breathe?

15:41:37 11       A.   Yes.

15:41:38 12       Q.   Okay.  To that end, one of the things you

15:41:44 13  observed was Deputy Robnett asking him if he could

15:41:46 14  breathe; correct?

15:41:47 15       A.   Yes.

15:41:47 16       Q.   And he said, "Yes, I can breathe, I can

15:41:51 17  breathe."

15:41:51 18       A.   Yes.

15:41:52 19       Q.   Was that something you heard Mr. Perez say?

15:41:54 20       A.   Yes.

15:41:54 21       Q.   And where were you positioned at the time you

15:41:56 22  heard him say that?

15:41:57 23       A.   I was positioned around the middle of his body,

15:42:02 24  on his left side.

15:42:03 25       Q.   In that same position you were in after you

PEREZ vs CITY OF FRESNO
Braithan Stoltenberg, Monday, March 04, 2019

87

1   STATE OF CALIFORNIA )
                        ) ss.
2   COUNTY OF FRESNO    )

3

4          I, Bree Mervin, a Certified Shorthand Reporter

5   in the State of California, holding Certificate

6   No. 13057, do hereby certify that BRAITHAN STOLTENBERG,

7   the witness named in the foregoing deposition, was by me

8   duly sworn; that said deposition was taken Monday,

9   March 4, 2019, at the time and place set forth on the

10  first page hereof.

11         That upon the taking of the deposition, the

12  words of the witness were written down by me in

13  stenotype and thereafter transcribed by computer under

14  my supervision; that the foregoing is a true and correct

15  transcript of the testimony given by the witness.

16         Pursuant to Federal Rule 30(e), transcript

17  review was requested.

18         I further certify that I am neither counsel for

19  nor in any way related to any party to said action, nor

20  in any way interested in the result or outcome thereof.

21         Dated this 21st day of March, 2019, at Visalia,

22  California.

23         _____

24         Bree Mervin, CSR No. 13057

25

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 15

Adrian Villegas                                                           April 28, 2021

```
 1                    UNITED STATES DISTRICT COURT

 2           EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4
                                              )
 5     ANTHONY PEREZ, individually,           )
       CECELIA PEREZ, individually,           )
 6     TERRALEE PEREZ, individually, and )
       as Successor in Interest to            )
 7     Joseph Perez, JOSEPH PEREZ, JR.,   )
       individually and as Successor in   )
 8     Interest to Joseph Perez, and          )
       X.P., a minor, by and through his )
 9     Guardian Ad Litem, MICHELLE PEREZ,)
       individually and as Successor in   )
10     Interest to Joseph Perez,             )
                                              )
11             Plaintiffs,                   )
                                              )
12        vs.                            )Case No. 1:18-cv-00127
                                              )        AWI (EPG)
13     CITY OF FRESNO, COUNTY OF FRESNO, )
       AMERICAN AMBULANCE,                    )
14     JAMES ROSSETTI, an individual,     )
       SEAN CALVERT, an individual,           )
15     CHRIS MARTINEZ, an individual,      )
       BRAITHAN STOLTENBERG, an             )
16     individual, ROBERT MCEWEN, an        )
       individual, KARLSON MANASAN, an      )
17     individual, JIMMY ROBNETT, an        )
       individual, MORGAN ANDERSON, and   )
18     DOES 1-10, inclusive,                 )
                                              )
19             Defendants.                   )

20

21           VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

22         30(B)(6) WITNESS DEPUTY ADRIAN VILLEGAS

23         WEDNESDAY, APRIL 28, 2021; 1:26 P.M.

24

25     Reported by Shandy Layne Bush, CSR No. 10213, RPR
```

1

```
 1                    UNITED STATES DISTRICT COURT

 2           EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4                                        )
        ANTHONY PEREZ, individually,      )
 5      CECELIA PEREZ, individually,      )
        TERRALEE PEREZ, individually, and )
 6      as Successor in Interest to       )
        Joseph Perez, JOSEPH PEREZ, JR.,  )
 7      individually and as Successor in  )
        Interest to Joseph Perez, and     )
 8      X.P., a minor, by and through his )
        Guardian Ad Litem, MICHELLE PEREZ,)
 9      individually and as Successor in  )
        Interest to Joseph Perez,         )
10                                        )
                     Plaintiffs,          )
11                                        )
            vs.                           )Case No. 1:18-cv-00127
12                                        )         AWI (EPG)
        CITY OF FRESNO, COUNTY OF FRESNO, )
13      AMERICAN AMBULANCE,               )
        JAMES ROSSETTI, an individual,    )
14      SEAN CALVERT, an individual,      )
        CHRIS MARTINEZ, an individual,    )
15      BRAITHAN STOLTENBERG, an          )
        individual, ROBERT MCEWEN, an     )
16      individual, KARLSON MANASAN, an   )
        individual, JIMMY ROBNETT, an     )
17      individual, MORGAN ANDERSON, and  )
        DOES 1-10, inclusive,             )
18                                        )
                     Defendants.          )
19

20

21         VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF 30(B)(6)

22      WITNESS DEPUTY ADRIAN VILLEGAS, taken on Wednesday,

23      April 28, 2021, at 1:26 p.m., before Shandy Layne Bush,

24      Certified Shorthand Reporter, in and for the State of

25      California.
```

Adrian Villegas                                                              April 28, 2021

```
 1    APPEARANCES OF COUNSEL:

 2        For the Plaintiffs:

 3            TAYLOR & RING
              BY:  NEIL K. GEHLAWAT, ESQ.
 4            (VIA REMOTE ZOOM)
              1230 Rosecrans Avenue, Suite 360
 5            Manhattan Beach, California  90266
              (310) 209-4100 / gehlawat@taylorring.com
 6
          For the Defendants COUNTY OF FRESNO, BRAITHAN
 7        STOLTENBERG, ROBERT McEWEN, KARLSON MANASAN and
          JIMMY ROBNETT:
 8
              WEAKLEY & ARENDT
 9            BY:  JAMES D. WEAKLEY, ESQ.
              (VIA REMOTE ZOOM)
10            5200 North Palm Avenue, Suite 211
              Fresno, California  92704
11            (559) 221-5256 / jim@walaw-fresno.com

12        For the Defendants CITY OF FRESNO, OFFICERS JAMES
          ROSSETTI, SEAN CALVERT and CHRIS MARTINEZ:
13
              MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
14            BY:  MILDRED K. O'LINN, ESQ.
              (VIA REMOTE ZOOM)
15            801 South Figueroa Street, Fifteenth Floor
              Los Angeles, California  90017-3012
16            (213) 624-6900 / mko@manningllp.com

17        For the Defendants MORGAN ANDERSON and K.W.P.H.
          ENTERPRISES, INC., a California corporation dba
18        AMERICAN AMBULANCE:

19            R.J. RYAN LAW, APC
              BY:  NIKKO S. STEVENS, ESQ.
20            (VIA REMOTE ZOOM)
              500 North Brand Boulevard, Suite 950
21            Glendale, California  91203
              (818) 956-2407 / nikko@rjryanlaw.com
22

23    ALSO PRESENT:   CAPTAIN JOE ALVAREZ
                      JASON PATSALIS, VIDEOGRAPHER
24                    (VIA REMOTE ZOOM)

25
```

3

Adrian Villegas                                                    April 28, 2021

| | | |
|---|---|---|
| 1 | Q     Okay.  And you understand that you're here today | 01:30:03 |
| 2 | on behalf of the County of Fresno; right? | 01:30:10 |
| 3 | A     Yes, I do. | 01:30:14 |
| 4 | Q     And that your testimony today is on behalf of the | 01:30:14 |
| 5 | County of Fresno?  You understand that? | 01:30:17 |
| 6 | A     Yes, sir. | 01:30:19 |
| 7 | Q     Okay.  And as I understand it, the document that | 01:30:20 |
| 8 | you have in front of you, which is Exhibit 1, lists | 01:30:25 |
| 9 | certain categories on pages 2 and 3; correct? | 01:30:30 |
| 10 | A     That's correct. | 01:30:33 |
| 11 | Q     And you are the 30(b)(6) designee for the County | 01:30:34 |
| 12 | of Fresno for Categories 8 and 9; is that true? | 01:30:42 |
| 13 | A     Yes, sir. | 01:30:44 |
| 14 | Q     Okay.  To prepare for your deposition today, did | 01:30:45 |
| 15 | you review any documents? | 01:30:50 |
| 16 | A     Yes, at my office. | 01:30:53 |
| 17 | Q     And what documents did you review? | 01:30:57 |
| 18 | A     I read over the Peace Officer Bill of Rights | 01:30:59 |
| 19 | Section 3304 Subsection (f), and I looked over the notes | 01:31:05 |
| 20 | that the prior detective who was assigned to this case had | 01:31:09 |
| 21 | written in his case notes. | 01:31:13 |
| 22 | Q     Okay.  Can you just tell me briefly what the -- | 01:31:17 |
| 23 | what the gist of the notes were from the prior detective | 01:31:21 |
| 24 | on the case? | 01:31:25 |
| 25 | A     Just -- it showed the date -- the date that he | 01:31:27 |

9

Adrian Villegas                                              April 28, 2021

1    was assigned the case, who assigned it, which at that time    01:31:30

2    was Lieutenant Lucas, who was present during the -- the    01:31:33

3    briefing that they -- they went to at the scene, and that    01:31:38

4    the case had been -- had been tolled.    01:31:44

5         Q    Okay.  Do you have an understanding if the case    01:31:50

6    is still tolled or not?    01:31:53

7         A    Yes, sir, it is.  It's currently being tolled.    01:31:55

8         Q    And that's the internal affairs investigation    01:31:58

9    into the deputies' conduct as it relates to the death of    01:32:00

10   Mr. Perez?    01:32:03

11        A    Yes, sir.    01:32:05

12        Q    Do you have an understanding as to why that    01:32:06

13   investigation is being tolled?    01:32:08

14        A    So collectively, yeah, the unit prior to -- prior    01:32:11

15   to my assignment to the unit, the detective that was    01:32:14

16   assigned the case -- the sergeant at the time and    01:32:18

17   lieutenant, they all had a briefing.  They -- as they    01:32:22

18   usually do for every case they have.  And based -- based    01:32:25

19   on the situation where this case falls under the POBOR    01:32:29

20   Section 3304 (f), it was decided that this case should be    01:32:33

21   tolled until the completion of the civil portion of the    01:32:37

22   litigation.  That was presented to the Undersheriff Steve    01:32:41

23   Wilkins, and he granted the -- the tolled.    01:32:45

24        Q    Okay.  And what does that provision of POBOR    01:32:49

25   refer to?    01:32:54

10

Adrian Villegas                                                    April 28, 2021

```
1    capacity.                                              01:39:42

2            MS. O'LINN:  And objection.  Assumes facts not in  01:39:43

3    evidence.  Lack of foundation as to the existence of an IA  01:39:46

4    investigation being conducted.                        01:39:49

5    BY MR. GEHLAWAT:                                       01:39:54

6        Q    Okay.  Go ahead, sir.                         01:39:54

7        A    My understanding is any -- any interview he was  01:39:56

8    privileged to would have been for the -- on the criminal  01:40:01

9    aspect of the investigation, and he is just doing a mirror  01:40:06

10   for the -- for the administrative portion.            01:40:13

11       Q    Okay.  So as to Category No. 8, the results of  01:40:18

12   the Fresno County Sheriff's Department internal affairs  01:40:23

13   investigation into this incident, including whether or not  01:40:26

14   any of the involved deputies were disciplined,        01:40:30

15   reprimanded, suspended, or retrained as a result of the  01:40:32

16   incident, your testimony here on behalf of the County  01:40:36

17   today is that investigation is not yet complete; correct?  01:40:39

18       A    No, it's still an open case.                 01:40:43

19       Q    It's -- it's tolled until the completion of the  01:40:46

20   civil litigation?                                      01:40:48

21       A    That's correct.                               01:40:49

22       Q    Okay.  Have any of the involved deputies been  01:40:50

23   retrained, disciplined, reprimanded, or suspended as a  01:40:54

24   result of their conduct in the incident?              01:40:59

25       A    No, sir.  This still -- this -- like I said, this  01:41:01
```

16

Adrian Villegas                                                              April 28, 2021

```
 1     still is an open investigation.                      01:41:04

 2          Q    Okay.                                      01:41:06

 3          A    It has not been concluded.                 01:41:06

 4          Q    So that issue in terms of, you know, whether or  01:41:08

 5     not there would be any form of discipline, that would come  01:41:10

 6     after the investigation was concluded; correct?     01:41:14

 7          A    Yes, sir.                                  01:41:17

 8          Q    All right.  And the -- the plan for the sheriff's  01:41:18

 9     department is to resume this internal affairs       01:41:23

10     investigation after the civil case concludes?       01:41:26

11          A    Yes.                                       01:41:30

12          Q    Okay.  And that decision was made pursuant to  01:41:31

13     sections of the Government Code that allow such an   01:41:38

14     investigation to be tolled pending a civil case?    01:41:42

15          A    Yes, sir.                                  01:41:45

16          Q    Okay.  Category No. 9 is whether or not the  01:41:47

17     conduct of the involved deputies was determined to be  01:41:54

18     within policy or not and all of the reasons for such  01:41:59

19     determination.                                      01:42:01

20               I take it that since the investigation has been  01:42:03

21     tolled that there's been no determination one way or  01:42:06

22     another as to whether or not the conduct of the deputies  01:42:09

23     was within policy or not.                           01:42:12

24          A    That's correct.                           01:42:14

25          Q    Okay.  So even though this incident happened back  01:42:15
```

17

| | | |
|---|---|---|
| 1 | A    Jonas Motter. | 01:45:33 |
| 2 | Q    How do you spell that? | 01:45:36 |
| 3 | A    J-o-n-a-s, and the last name is Motter, | 01:45:37 |
| 4 | M-o-t-t-e-r, and me and him actually started the same week | 01:45:46 |
| 5 | in the unit.  So prior to our -- prior to us getting into | 01:45:53 |
| 6 | that unit this case was assigned to Detective Juan Rivera. | 01:46:00 |
| 7 | Q    Okay.  And so the two of you are now assigned | 01:46:05 |
| 8 | this case? | 01:46:12 |
| 9 | A    It's actually Detective Motter's case. | 01:46:14 |
| 10 | Q    Okay.  And so the plan is assuming that he's back | 01:46:17 |
| 11 | from leave, when the civil litigation is complete for him | 01:46:21 |
| 12 | to resume his internal affairs investigation? | 01:46:25 |
| 13 | A    That's correct. | 01:46:28 |
| 14 | Q    Just in general, anytime there's an in-custody | 01:46:29 |
| 15 | death, does that prompt an internal affairs investigation | 01:46:34 |
| 16 | to be conducted? | 01:46:38 |
| 17 | A    Yes. | 01:46:39 |
| 18 | Q    Okay.  And that's -- that's the policy of the | 01:46:40 |
| 19 | sheriff's department? | 01:46:43 |
| 20 | A    Yes. | 01:46:46 |
| 21 | MR. GEHLAWAT:  Okay.  All right.  Okay.  I would | 01:46:47 |
| 22 | propose that we take a short break, and I'll see if I have | 01:46:53 |
| 23 | any other questions, and then we'll conclude if I don't. | 01:46:59 |
| 24 | MR. WEAKLEY:  Okay. | 01:47:03 |
| 25 | MR. GEHLAWAT:  Why don't we come back at 1:50. | 01:47:04 |

20

Adrian Villegas                                                    April 28, 2021

```
 1                      REPORTER'S CERTIFICATION

 2

 3          I, Shandy Layne Bush, Certified Shorthand

 4     Reporter, in and for the State of California, do hereby

 5     certify:

 6

 7          That the foregoing witness was by me duly sworn;

 8     that the deposition was then taken before me at the time

 9     and place herein set forth; that the testimony and

10     proceedings were reported stenographically by me and later

11     transcribed into typewriting under my direction; that the

12     foregoing is a true record of the testimony and

13     proceedings taken at that time.

14

15          In witness whereof, I have subscribed my name

16     this 2nd day of May, 2021.

17

18

19

20

21          _____

22               Shandy Layne Bush, CSR No. 10213

23

24

25

                                                             26
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 16

```
 1                  UNITED STATES DISTRICT COURT

 2         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3
       ANTHONY PEREZ, individually, )
 4     CECELIA PEREZ, individually, )
       TERRALEE PEREZ, individually,)
 5     and as Successor in Interest )
       to Joseph Perez, JOSEPH      )
 6     PEREZ, JR., individually and )
       as Successor in Interest to  )
 7     Joseph Perez, and X.P., a     )
       minor, by and through his     )
 8     Guardian Ad Litem, MICHELLE   )
       PEREZ, individually and as    )
 9     Successor in Interest to      )
       Joseph Perez,                 )
10                                   )
                 Plaintiff,          )
11                                   )
          vs.                        )Case No. 1:18-cv-00127
12                                   )        AWI (EPG)
       CITY OF FRESNO, COUNTY OF     )
13     FRESNO, AMERICAN AMBULANCE,   )
       JAMES ROSSETTI, an            )
14     individual, SEAN CALVERT, an )
       individual, CHRIS MARTINEZ,   )
15     an individual, BRAITHAN       )
       STOLTENBERG, an individual,   )
16     KARLSON MANASAN, an           )
       individual, JIMMY ROBNETT, an)
17     individual, MORGAN ANDERSON, )
       and DOES 1-10, inclusive,     )
18                                   )
                 Defendants.         )
19     _____)

20          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

21                 ANDREW S. WACHTEL, M.D.

22                 Thursday, August 19, 2021

23

24     Reported by:  Suzanne M. Pulver
                      CSR No. 13643
25     Job No.:       241111
```

                                                                    1

1                    UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3
        ANTHONY PEREZ, individually, )
4       CECELIA PEREZ, individually, )
        TERRALEE PEREZ, individually,)
5       and as Successor in Interest )
        to Joseph Perez, JOSEPH       )
6       PEREZ, JR., individually and  )
        as Successor in Interest to   )
7       Joseph Perez, and X.P., a     )
        minor, by and through his     )
8       Guardian Ad Litem, MICHELLE   )
        PEREZ, individually and as    )
9       Successor in Interest to      )
        Joseph Perez,                 )
10                                     )
                  Plaintiff,           )
11                                     )
            vs.                        )Case No. 1:18-cv-00127
12                                     )           AWI (EPG)
        CITY OF FRESNO, COUNTY OF      )
13      FRESNO, AMERICAN AMBULANCE,    )
        JAMES ROSSETTI, an             )
14      individual, SEAN CALVERT, an   )
        individual, CHRIS MARTINEZ,    )
15      an individual, BRAITHAN        )
        STOLTENBERG, an individual,    )
16      KARLSON MANASAN, an            )
        individual, JIMMY ROBNETT, an  )
17      individual, MORGAN ANDERSON,   )
        and DOES 1-10, inclusive,      )
18                                     )
                  Defendants.          )
19      _____)

20

21          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
            ANDREW S. WACHTEL, M.D., taken on behalf
22          of the plaintiffs, conducted remotely via
            Zoom, beginning at 3:04 p.m. and ending at
23          4:13 p.m., on Thursday, August 19, 2021,
            before Suzanne M. Pulver, Certified Shorthand
24          Reporter No. 13643, in and for the State of
            California.

25

                                                                    2

```
 1     APPEARANCES:

 2     For Plaintiffs:

 3             TAYLOR & RING, LLP
               BY:  NEIL K. GEHLAWAT, ESQ. (Via Zoom)
 4             1230 Rosecrans Avenue, Suite 360
               Manhattan Beach, California 90266
 5             310.209.4100
               gehlawat@taylorring.com

 6

 7     For Defendants MORGAN ANDERSON and K.W.P.H.
       ENTERPRISES, INC., a California corporation dba
 8     AMERICAN AMBULANCE:

 9             R.J. RYAN LAW, APC
               BY:  RICHARD J. RYAN, ESQ. (Via Zoom)
10             500 North Brand Boulevard, Suite 950
               Glendale, California 91203
11             818.956.2407
               Rick@rjryanlaw.com

12

13     For Defendants COUNTY OF FRESNO, BRAITHAN
       STOTENBERG, ROBERT McEWEN, KARLSON MANASAN and JIMMY
14     ROBNETT:

15             WEAKLEY & ARENDT
               BY:  JAMES D. WEAKLEY, ESQ. (Via Zoom)
16             5200 North Palm Avenue, Suite 211
               Fresno, California 93704
17             559.221.5256
               jim@walaw-fresno.com

18

19     For Defendants CITY OF FRESNO, JAMES ROSSETTI, SEAN
       CALVERT, and CHRIS MARTINEZ:
20
               MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
21             BY:  LYNN CARPENTER, ESQ. (Via Zoom)
               801 South Figueroa Street, 15th Floor
22             Los Angeles, California 90017
               213.624.6900
23             llc@manningllp.com

24     Also Present:

25             CHRISTOPHER CHAIN
```

3

Andrew S. Wachtel, M.D.                                                                                    August 19, 2021

```
 1        A    Yes.                                          03:45:52

 2        Q    Okay.  And when you are referring to the      03:45:53

 3   unproven risk, you believe that's an unproven risk      03:45:54

 4   based on the studies that you reviewed; correct?        03:45:59

 5        A    That's correct.                               03:46:02

 6        Q    Okay.                                         03:46:03

 7        A    And my knowledge of physiology.               03:46:05

 8        Q    Okay.  And then your final opinion in the     03:46:07

 9   case is that Mr. Perez's death was due to a fatal       03:46:10

10   arrhythmia which was a result of methamphetamine        03:46:16

11   abuse, preexisting cardiac disease, and exertion;       03:46:20

12   correct?                                                03:46:23

13        A    Yes.                                          03:46:25

14        Q    Okay.  So in terms of the preexisting         03:46:25

15   cardiac disease, you obviously looked at the --         03:46:29

16   the -- the heart disease that was noted by              03:46:35

17   Dr. Chambliss in his autopsy; correct?                  03:46:39

18        A    Yes.                                          03:46:42

19        Q    Do you have an opinion about whether or not   03:46:42

20   that heart disease would have killed Mr. Perez on       03:46:45

21   the day of the incident if he was not restrained by     03:46:48

22   the officers or deputies?                               03:46:54

23             MR. RYAN:  I'm going to object to the         03:46:56

24   question.  Foundation.  Incomplete hypothetical.        03:46:57

25   Vague and ambiguous.  Form.                             03:46:59
```

                                                                                                                39

1  foregoing deposition, review of the transcript was

2  not requested;

3         I further certify that I am not a relative

4  or employee or attorney or counsel of any of the

5  parties, nor am I a relative or employee of such

6  attorney or counsel, nor am I financially interested

7  in the outcome of this action.

8

9         IN WITNESS WHEREOF, I have subscribed my

10  name this _____ day of _____, _____.

11

12

13  _____

14         SUZANNE M. PULVER, CSR No. 13643

15

16

17

18

19

20

21

22

23

24

25

                                                                61

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 17

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ANTHONY PEREZ, individually, )
CECILIA PEREZ, individually, )
TERRALEE PEREZ, individually )
and as successor in interest )
to Joseph Perez, JOSEPH      )
PEREZ, JR., individually and )
as successor in interest to  )
Joseph Perez, and X.P., a    )
minor, by and through his    )
Guardian ad Litem, MICHELLE  )
PEREZ, individually and as   )
successor in interest to     )
Joseph Perez,                )
                             )
          Plaintiffs,        )
                             )
     v.                      )   CASE NO. 1:18-cv-00127
                             )        -AWI-EPG
CITY OF FRESNO, COUNTY OF    )
FRESNO, et al.,              )
                             )
          Defendants.        )
_____)

**CERTIFIED COPY**

VIDEO RECORDED VIDEO CONFERENCE DEPOSITION OF

ALON ABRAHAM STEINBERG, M.D.

APPEARING REMOTELY VIA ZOOM WEBCAM

SEPTEMBER 10, 2021

Reported by:
DEBBIE STRICKLAND
CSR 9036
No. 21-103183



THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860  |  323.938.8750

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ANTHONY PEREZ, individually, )
CECILIA PEREZ, individually, )
TERRALEE PEREZ, individually )
and as successor in interest )
to Joseph Perez, JOSEPH      )
PEREZ, JR., individually and )
as successor in interest to  )
Joseph Perez, and X.P., a    )
minor, by and through his    )
Guardian ad Litem, MICHELLE  )
PEREZ, individually and as   )
successor in interest to     )
Joseph Perez,                )
                             )
         Plaintiffs,         )
                             )
    v.                       )   CASE NO. 1:18-cv-00127
                             )        -AWI-EPG
CITY OF FRESNO, COUNTY OF    )
FRESNO, et al.,              )
                             )
         Defendants.         )
_____)

**CERTIFIED COPY**

VIDEO RECORDED VIDEO CONFERENCE DEPOSITION OF

ALON ABRAHAM STEINBERG, M.D.

APPEARING REMOTELY VIA ZOOM WEBCAM

SEPTEMBER 10, 2021

Reported by:
DEBBIE STRICKLAND
CSR 9036
No. 21-103183

1                  UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3


4    ANTHONY PEREZ, individually, )
     CECILIA PEREZ, individually, )
5    TERRALEE PEREZ, individually )
     and as successor in interest )
6    to Joseph Perez, JOSEPH      )
     PEREZ, JR., individually and )
7    as successor in interest to  )
     Joseph Perez, and X.P., a    )
8    minor, by and through his    )
     Guardian ad Litem, MICHELLE  )
9    PEREZ, individually and as   )
     successor in interest to     )
10   Joseph Perez,                )
                                  )
11           Plaintiffs,          )
                                  )
12       v.                       )   Case No. 1:18-cv-00127
                                  )               -AWI-EPG
13   CITY OF FRESNO, COUNTY OF    )
     FRESNO, et al.,              )
14                                )
             Defendants.          )
15   _____)

16

17

18           VIDEO RECORDED VIDEO CONFERENCE DEPOSITION

19           OF ALON ABRAHAM STEINBERG, M.D., taken on

20           behalf of DEFENDANTS, AMERICAN AMBULANCE

21           and MORGAN ANDERSON, all parties appearing

22           remotely via Zoom Webcam, commencing at 1:30

23           p.m., Friday, September 10, 2021, before

24           Debbie Strickland, CSR 9036.

25

```
 1    A P P E A R A N C E S :      (Via Webcam)

 2          FOR PLAINTIFFS:

 3               TAYLOR & RING, LLP
                 By:  NEIL K. GEHLAWAT, Attorney at Law
 4               1230 Rosecrans Avenue, Suite 360
                 Manhattan Beach, California 90266
 5               310.209.4100
                 gehlawat@taylorring.com

 6

 7          FOR DEFENDANTS, K.W.P.H. ENTERPRISES, INC., a
            California corporation dba AMERICAN AMBULANCE
 8          and MORGAN ANDERSON:

 9               R.J. RYAN LAW, APC
                 By:  RICHARD J. RYAN, Attorney at Law
10               500 North Brand Boulevard, Suite 950
                 Glendale, California 91203
11               818.956.3600
                 rick@rjryanlaw.com

12

13          FOR DEFENDANTS COUNTY OF FRESNO; BRAITHAN
            STOLTENBERG; ROBERT McEWEN; KARLSON MANASAN; and
14          JIMMY ROBNETT:

15               WEAKLEY & ARENDT
                 By:  JAMES D. WEAKLEY, Attorney at Law
16               5200 North Palm Avenue, Suite 211
                 Fresno, California 93704
17               559.221.5256
                 jim@walaw-fresno.com

18

19          FOR DEFENDANTS, CITY OF FRESNO; JAMES ROSSETTI;
            SEAN CALVERT; and CHRIS MARTINEZ:
20
                 MANNING & KASS, ELLROD, RAMIREZ, TRESTER,
21               LLP
                 By:  LYNN L. CARPENTER, Attorney at Law
22               801 South Figueroa Street, 15th Floor
                 Los Angeles, California 90017
23               213.624.6900
                 llc@manningllp.com

24

25
```

1      Q     Okay.  Well, he was hot an hour after death;

2    correct?

3      A     Yes.

4      Q     Now, you've reviewed the, the coroner's

03:53    5    pathologist depositions, both volumes, and the report

6    of Dr. Chambliss; correct?

7      A     As I recall, yes.

8      Q     And you largely agree with Dr. Chambliss'

9    description of the cause of death; correct?

03:53   10     A     Correct.

11     Q     Dr. Chambliss described what you thought was

12   a positional asphyxia with significant contribution by

13   methamphetamine toxicity; correct?

14     A     I don't know if he particularly used that --

03:53   15   those, those words.  I think he used compressive

16   asphyxia.

17     Q     Let's try compressive asphyxia.

18           Isn't it true that you agree with

19   Dr. Chambliss' cause of death being attributed to

03:54   20   compressive asphyxia in the presence of high

21   methamphetamine toxicity; correct?

22     A     That is correct.  But I, I -- I would add

23   just a little bit to it.

24     Q     Well, I'm, I'm -- what would you add to his

03:54   25   opinion that I didn't repeat in that question?

```
 1        A    Well, I would just say that just -- beyond
 2   just position -- beyond asphyxia, the prone restraint
 3   weight on him would have also caused a decrease in
 4   cardiac output.  So there was some component of
 5   decreased cardiac output besides on top of the
 6   asphyxia.
 7        Q    Right.  But that's -- that's your opinion.
 8   You're adding decreased cardiac output to that of
 9   Dr. Chambliss'; correct?
10        A    Yes.  But I, I -- I do agree with
11   Dr. Chambliss' opinion.
12        Q    Okay.  Well, that's what I wanted to --
13   that's what I want to figure out.  I want to figure
14   out what you agree with, what you don't agree with,
15   and what you would add to it.  Those are three areas,
16   so let me break it down; fair enough?
17        A    Yes.
18        Q    So isn't it true that you agree with
19   Dr. Chambliss' cause of death being attributed to
20   compressive asphyxia with a significant contributing
21   factor of high methamphetamine toxicity?
22        A    Yes.
23        Q    In addition to that, you would add cardiac
24   output being decreased due to the weight of the
25   backboard and the officer?
```

03:54 (line 5)
03:55 (line 10)
03:55 (line 15)
03:55 (line 20)
03:55 (line 25)

```
 1    STATE OF CALIFORNIA    )
                             )   SS.
 2    COUNTY OF LOS ANGELES )

 3

 4          I, Debbie Strickland, a Certified Shorthand

 5    Reporter of the State of California, do hereby certify;

 6          That the foregoing proceedings were taken before

 7    me remotely at the time and place herein set forth; that

 8    any witnesses in the foregoing proceedings, prior to

 9    testifying, were administered an oath; that a record of

10    the proceedings was made by me using machine shorthand

11    which was thereafter transcribed under my direction; that

12    the foregoing transcript is a true record of the

13    testimony given.

14          Further, that if the foregoing pertains to the

15    original transcript of a deposition in a Federal Case,

16    before completion of the proceedings, review of the

17    transcript [ ] was [X] was not requested.

18          I further certify I am neither financially

19    interested in the action nor a relative or employee of

20    any attorney or any party to this action.

21

22          Dated this _23rd_ day of _September , 2021.

23

24                         Debbie Strickland

25                    DEBBIE STRICKLAND, CSR 9036
```

*PEREZ V. COUNTY OF FRESNO, ET AL.*

# EXHIBIT 18

PEREZ, Joseph                                                    17-05.109

## FRESNO SHERIFF – CORONER – AUTOPSY REPORT

Case:                 17-05.109
Name:                 PEREZ, Joseph
Age:                  41-year-old male
Date of Death:        05/10/2017; 1122 hours
Date Performed:       05/11/2017; 1015-1030 hours
Performed At:         Fresno County Morgue
Performed By:         Michael J. Chambliss, M.D.
Deputy Coroner:       Leticia Funderburk
Present at Autopsy:   Mark Chapman, Fresno County Sheriff's Office
                      Ashley Vargas, Crime Scene Technician, Fresno Sheriff's
                      Office

## SCENE INVESTIGATION:

Deputy Coroner Funderburk responded to the hospital emergency room to examine the subject and gather information plus take photographs. She returned to the scene to gather information there (see her report for details).

## PERSONAL EFFECTS:

The body is received on the autopsy cart in 2 white body bags. The body is unclothed except for a black sock on the right foot. A white bath towel with some red staining is present with the body. Brown paper bags cover the hands secured by tape. No personal effects accompany the body.

## IDENTIFICATION:

The subject is a well-developed slightly obese adult Mexican-American male weighing 241 pounds, measuring 72-1/2" in length with an appearance consistent with the recorded age of 41 years. Moderate-to-well-developed rigor mortis is noted equally in the arms, legs, and neck region. Postmortem lividity is seen in the back surface of the body. The lividity is unfixed.

The head has the usual configuration and the scalp has curly black hair measuring 9-1/2" in maximum length. The scalp area has no injuries. Multiple facial injuries are seen to be described later. The eyes are brown with clear corneas and congested scleral areas. The conjunctival areas show no petechiae. The face is free of petechiae. The eyelids are unremarkable. The external ear canals are patent. The mouth has natural teeth in good repair with no significant injuries on the inner lips or gum line. A black mustache and a black goatee are noted.

**Page 1**

PLTF 000007

PEREZ, Joseph                                                      17-05.109

The left side of the face and neck shows 3 hickey marks.

**GENERAL APPEARANCE:**

The body overall has multiple bruises and abrasions.  No lacerations are seen.

The external appearance will be documented followed by a flaying process through the skin and underlying soft tissues down to the muscle layers.  Additional dictation will follow.

The chest area has signs of attempted medical treatment with a few blunt trauma injuries.  The breasts are normal male.

The abdomen is slightly obese, diffusely protuberant, but depressible.  Bruises are present over the anterior abdominal wall.

All fingers are present and the nails are short and slightly dirty.  The arms have normal muscle development. The hands and arms have blunt trauma injuries, which will be documented.

The external genitalia show a normal circumcised penis with both testicles normally situated. The inguinal area is free of injury.

All toes are present and the feet, ankles and lower legs show multiple blunt trauma injuries.  The legs show no fractures or deformities.

The back surface of the body has a bruise on the back of the right shoulder but the skin of the back is otherwise unremarkable.

**TATTOOS:**

   **(Numerous tattoos are documented but some may not be recorded).**

1.      "Perez" written horizontally across the upper abdomen.
2.      The left flank has a tattoo of the head of a bull dog.
3.      A collage tattoo of multiple names, the head of a bull dog and praying hands with a cross passes across the front of the upper chest near the clavicles. At least 4 names are present in the collage tattoo.
4.      A tattoo of a dog collar encircles the lower neck.
5.      The left cheek area of the face has a tattoo of a head of an Indian.
6.      The entire left arm has a collage tattoo.
7.      The left leg has multiple tattoos including a clown face, demon face.
8.      The left knee has the tattoo "your name".
9       "Vida Loca" and a ribbon along the left leg area.
10.     The entire right arm has a collage tattoo.  The name "Cecilia" is present in the

Page 2

PLTF 000008

PEREZ, Joseph                                                          17-05.109

collage with "Loyalty" on top of the right hand.

11.     The right leg above the knee has a tattoo of eyes and a nose with the word
        "Mob" and a dollar sign.  The shin and calf area have a tattoo of eyes with
        tears coming out.
12.     The upper back area has a tattoo of the words "My dogg Thang" with the
        head of a bull dog.  The left side of the upper back has the word "Pookie."

**SCARS:**

None.

**EVIDENCE OF INJURY:**

A.      HEAD REGION:

The internal examination of the head region has a few areas of hemorrhage on the inner
scalp and outer table of the skull.  A 4 x 3-1/2" area of hemorrhage is present on the
inner left frontal and temporal regions of the head.  There is hemorrhage on the outer
left temporalis muscle measuring 1-1/4" x 1".  The inner right frontal scalp has
hemorrhage with hemorrhage of the adjacent front bone.

The brain shows diffuse edema with no external injuries.  It was saved in formaldehyde
and cut at later time. The dura is completely normal.  The floor of the skull is normal.
(See separate neuropathology report).

The following items are a list of the external injuries to the head and neck region:

1.      The right forehead has a 4-1/2" x 2-3/4" abrasion.
2.      The left forehead has a 2-1/4" x 1" abrasion.
3.      The right cheek has a 1-3/4" x 1-1/2" abrasion.
4.      The nose has a 1-1/4" x 3/4" abrasion near the tip.
5.      The left cheek has a 1-1/4" x 1" abrasion.
6.      The midline of the front of the neck has a single bruise which measures
        1" x 1-1/2".
7.      In the chin region within the goatee is a 2-1/4" x 2" abrasion.
8.      An additional purple bruise 1-3/4" x 1" is present over the right cheek.

There are 3 purple bruises over the left face and neck which are consistent with the
subject's recent history of hickeys in that location.  They measure approximately 1/2" x
1/2" in greatest size.

B.      CHEST, ABDOMEN AND BACK: (includes findings during flaying process)

The flaying process in the back region identifies injuries beneath the skin. The lower
back has a large horizontal band of hemorrhage in the fat. The location is below the

Page 3

PEREZ, Joseph                                                    17-05.109

level of the diaphragm.  This area measures 12" horizontally x 4" in width.  An additional separate area of fat hemorrhage is located just above the horizontal band.  This area measures 3" x 1".  No skin discoloration is noted.

The following items would be external injuries to the chest, abdominal wall and back region:

1.  There is a chest compression bruise from resuscitation noted over the sternum at the breast line.
2.  There is a 2" x 1-1/2" bruise along the right costal cartilage margin.
3.  A 3/4" x 3/4" bruise is noted above the right breast.
4.  A 1" x 1/2" bruise is present above and right of the umbilicus.
5.  A 1-1/4" x 1-1/4" bruise is present below and right of the umbilicus.
6.  Three bruises are noted over the right anterior abdomen in an area measuring 2-1/2" x 2".
7.  Bruises are present beneath each clavicle.  On the left it measures 3/4" x 1/2" and the right measures 3/4" x 3/4".
8.  A bruise is located above the pelvic region measuring 1/2" x 1/8".

C.   ARMS AND LEGS: (includes findings during flaying process)

The flaying process of the arms and legs involves the skin and underlying soft tissues.

1.  The subcutaneous fat in the left arm and left leg shows isolated areas of hemorrhage.
2.  The right arm and left leg have isolated areas of hemorrhage to a lesser degree.  No deep injuries or deep areas of hemorrhage are noted.

The following items are a list of external injuries to the arms and legs.

1.  There is a 1-1/4" x 1" bruise over the front of the right arm at the junction of the arm with clavicle.
2.  A 1/2" x 1/2" bruise is present over the front of the left shoulder at the clavicle-arm junction.
3.  There is an abrasion over the right elbow measuring 2-1/4" x 2".
4.  Each wrist area has combination bruises and abrasions associated with the handcuffs or some form of restraint.  The right wrist area has a combination abrasion and bruise measuring 2-1/2" x 1/4".  The left wrist area has a combination bruise and abrasion measuring 8-3/4" x 1/4".
5.  The back of the right shoulder has a 2-3/4" x 2" bruise.
6.  The right elbow has a 2-1/4" x 2" abrasion.
7.  A linear combination abrasion and bruise (1-1/2" x 1/4") is noted on top of the right hand.
8.  The front of the left ankle has a combination bruise and abrasion measuring 1-1/4" x 1".

Page 4

PLTF 000010

PEREZ, Joseph                                                    17-05.109

9.    There is an abrasion over the front of the lower right leg above the ankle
      measuring 3/4" x 1/2" with a combination abrasion and bruise on top of the foot
      measuring 1" x 1/2".
10.   There is a bruise on the inner lower left thigh measuring 1-1/2" x 1".
11.   There is a 1/4" x 1/2" bruise on the inner left calf.
12.   A 2-1/4" x 1-1/4" abrasion is seen on the inner right knee.
13.   A 1-1/4" x 1-1/2" bruise is seen over the front of the lower left leg.
14.   Scattered superficial abrasions are noted over the outer lower left leg in a
      3" x 1-3/4" area.
15.   The outer left ankle has a 1/4" x 1/4" abrasion.

## SUMMARY OF FLAYING PROCESS:

The flaying process involved the chest, abdomen, back, arms and legs. The depth of
cutting was skin, subcutaneous tissue (fat) and muscles where necessary. Isolated
areas of hemorrhage involve the arms and legs; right side greater than left. The back
region has 2 noticeable areas of dark hemorrhage 1 below the diaphragm and 1 just in
the region above the location of the diaphragm.

## EVIDENCE OF ATTEMPTED MEDICAL TREATMENT:

1.    An endotracheal tube is noted in the mouth.
2.    EKG pads are noted on the body. They include 2 over the front of each
      shoulder, 1 in the xiphoid region, 1 over the right lower chest, 2 over the
      lower sides of the abdomen with 1 over the right abdomen near the inguinal
      area.
3.    Single ostomy tube (soft tip catheters) are present in the lateral chest wall.
4.    Defibrillator abrasions are present over the midline at the breast level.
5.    The left side of the base of the neck has a needle puncture site with an
      IV line in place.
6.    Two white hospital identification bands encircle the left wrist.
7.    The middle left anterior rib cage has three (3) sequential rib fractures resulting
      from the resuscitation process.

## INTERNAL EXAMINATION:

The usual autopsy incision is made.  The skin, subcutaneous fat and muscles of the
chest wall were flayed showing no significant hemorrhage. The resuscitation fractures
are noted.

BODY CAVITIES: The anterior chest plate is removed. The left lung is partially
collapsed with the heart displaced into the left thoracic cavity.  The right lung is well
expanded. Both diaphragm leaflets are intact. The chest and abdominal organs are free
of injury.

PLTF 000011

PEREZ, Joseph                                                        17-05.109

**NECK STRUCTURES:**

Layer-wise dissection of the neck region shows no muscle or soft tissue hemorrhage. The tongue, thyroid gland, prevertebral fascia and cervical spine are intact. There is congestion of the pharyngeal muscles. The mucosa of the larynx has mild hemorrhage in the recesses of the thyroid cartilage. No fractures are present. Two small hemorrhages are present in the vocal cord region. The epiglottis has mild hemorrhage along the front. The inlet region of the epiglottis has a normal mucosa. No petechiae are seen over the larynx or epiglottis. The upper trachea is free of petechiae.

**RESPIRATORY SYSTEM:** The right lung is well expanded and the entire lung has prominent edema. The upper lobe of the right lung has areas of aspiration. A benign cystic structure is attached to the pleural surface of the right lung. No pleural petechiae are seen. The mucosa of the lower trachea and main bronchi has a dark purple appearance. The pulmonary vessels are normal.

**CARDIOVASCULAR SYSTEM:** The heart is mildly enlarged. The epicardial fat distribution is normal over the front and back of the heart. The atria are enlarged. The coronary arteries arise normally and pursue their usual anatomic courses. Serial sections of the right coronary artery show moderate/severe luminal narrowing with a few areas of narrowing on the upper posterior ventricular septum. Sections of the left anterior descending coronary have focal moderate luminal narrowing. The circumflex coronary artery has mild-moderate luminal narrowing. No coronary thrombosis is seen. The right ventricle is normal with left ventricular hypertrophy. There is mild thickening of the mitral valve with normal chordea. All other valves are normal. The heart is cut in a bread loaf fashion. The endocardium and myocardium are free of fibrosis. The aorta has focal mild atherosclerosis.

**HEPATOBILIARY SYSTEM:** The liver has a dark purple smooth capsule. No injuries are seen. The parenchyma is dark purple and congestion is seen. The gallbladder and biliary tract are distended with 3 olive sized yellow-green gallstones with a small amount of bile present.

**HEMOLYMPHATIC SYSTEM:** The spleen is completely normal. No lymphadenopathy is seen.

**GASTROINTESTINAL SYSTEM:** The esophagus is normal. The stomach is distended with mostly air and contains approximately 100 mL of tan liquid. The mucosa is normal. The intestines and appendix are normal.

**GENITOURINARY SYSTEM:** The kidneys have the usual red-brown smooth external cortical surfaces. Cut surfaces have a similar normal appearance. The urinary bladder contains less than 125 mL of urine with a normal bladder mucosa. The prostate gland is normal.

PLTF 000012

PEREZ, Joseph                                                17-05.109

ENDOCRINE SYSTEM:  The pancreas and adrenal glands are completely normal. The thyroid gland is also normal.

MUSCULOSKELETAL SYSTEM:  The flaying process shows prominent dark hemorrhage of the subcutaneous fat in two locations of the back.  Isolated areas of subcutaneous fat hemorrhage are noted in the arms and legs.  Three resuscitation rib fractures are present.

CENTRAL NERVOUS SYSTEM: (See **EVIDENCE OF INJURY**) Injuries on the inner scalp and outer skull have been described above. No fractures are seen.  No subdural or epidural blood is present.  The brain has no external injuries.  No acute or old injuries are seen.  The leptomeninges are transparent.  The brain has a diffuse edematous appearance with prominent flattening of all surfaces.  After preservation in formaldehyde, the brain is photographed, sliced and sections are taken for microscopic study.  The cut slices of the brain show no areas of hemorrhage in the white matter, gray matter with a normal ventricular system.  The floor of the skull is intact. A separate neuropathology report is part of the total autopsy report.

**DISPOSITION OF EVIDENCE:**

An autopsy blood sample and any clothing items present with the body are turned over to Ashley Vargas, Crime Scene Technician with the Fresno Sheriff's Office at the completion of the autopsy.

**MATERIALS SAVED FOR PATHOLOGY:**

Representative tissue sections of the internal organs are taken and saved.  Microscopic sections are prepared.

**MATERIALS SAVED FOR TOXICOLOGY:**

The entire brain and the entire heart are saved plus the neck structures.  Blood, urine and vitreous humor.  Additional samples of blood are saved in the morgue freezer.

**MICROSCOPIC:**

LUNGS: Sections have diffuse congestion with focal edema and intra-alveolar hemorrhage.

HEART AND CORONARIES: Sections of the myocardium has papillary muscles with mild interstitial fibrosis. Areas away from the papillary muscles show some hypertrophy of the muscle fibers with no fibrosis. Sections of the left anterior descending coronary artery have areas of severe luminal narrowing (80% or more) with postmortem clot in the lumen. Sections from the right coronary artery have a few with severe luminal narrowing. The circumflex coronary artery sections are widely patent.

Page 7

PLTF 000013

PEREZ, Joseph                                                        17-05.109

LIVER: Sections of liver has prominent centrilobular congestion, more than 30% fatty change and portal tracts with minimal chronic inflammation.

SPLEEN:  Sections show congestion.

KIDNEYS: Sections have autolyzed tubules with fairly well-preserved glomeruli. The blood vessels are normal.

PANCREAS: Section shows autolysis.

ADRENALS: Sections show hemorrhage at the junction of the cortical and medullary layers.

BRAIN: Sections are essentially unremarkable.

**ORGAN WEIGHTS:**

| Heart = 436 | Liver = 1180 | Spleen = 121 | |
|---|---|---|---|
| Right lung = 868 | Right kidney = 156 | Pancreas = 220 | |
| Left lung = 647 | Left kidney = 185 | Brain = 1492 | |

**PATHOLOGIC DIAGNOSES:**

1.  Blunt force injuries:
    a.  Torso: back region has two areas of hemorrhage of subcutaneous fat found during the flaying process.
    b.  Flaying process: arms and legs with isolated areas of subcutaneous fat hemorrhage; right side greater than left.
    c.  Multiple abrasions and bruises over the front surface of the body including the head, torso, arms, and legs (see protocol for listing).
2.  Neck structures show:
    a.  Mild hemorrhage of the mucosa of the larynx with 2 small hemorrhages in the area of the vocal cords.
    b.  Prominent congestion of the pharyngeal muscles.
    c.  Mild hemorrhage along the front of the epiglottis.
3.  Lungs with prominent edema and areas of aspiration seen (right 868; left 647).
4.  Liver with congestion (1180).
5.  Cerebral edema (1492).
6.  Methamphetamine toxicity:
    a.  Autopsy blood sample with methamphetamine level of 2459ng/ml and amphetamine level of 95ng/ml.
    b.  Autopsy blood sample negative for opiates, cocaine, benzodiazepines, barbiturates, cannabinoids and phencyclidine
    c.  Autopsy blood sample with ethanol level of 0.02%.

PLTF 000014

PEREZ, Joseph                                                    17-05.109

     d. Autopsy urine sample with methamphetamine level of 294535ng/ml and
       amphetamine level of 9855ng/ml.
     e. Autopsy urine sample negative for cocaine, barbiturates, opiates,
       benzodiazepines, cannabinoids and phencyclidine.
     f. Autopsy urine sample with ethanol level of 0.03%.
7.   Cardiomegaly (436) with left ventricular hypertrophy
     a. Left anterior descending and right coronary arteries with a few areas of
       severe luminal narrowing (greater than 80%).
     b. Myocardium without fibrosis.

**CAUSE OF DEATH:**

A.    Compressive asphyxia, during
B.    Restraint

**OTHER SIGNIFICANT CONDITIONS:**

Methamphetamine toxicity

**MANNER:**

Homicide

MICHAEL J. CHAMBLISS, M.D.
Forensic Pathologist
MJC/acu- 1004/kp/ap
MJC - 51431599
d: 07/30/2017
t: 08/03/2017

Page 9

PLTF 000015



## Toxicology Report

TRMC-Mineral King Laboratory, 880 E. Merritt Ave. STE 107-108, Tulare, CA 93274
Phone: (559) 685-3456  Fax: (559) 685-8745
Directors: Gary Walter M.D. - Jue-Rong Zhang M.D. Ph.D - Duane Iwamura CRA CRT



Collected By: Dr. Chambliss
Date/Time Collected: 5/11/2017 11:30
Date/Time Received: 5/12/2017 09:40
Completion date: 6/1/2017 12:05

Name/DOB: **PEREZ, JOSEPH** (00/00/00)
Accession #: 1703658
Case Number: 17-05,109

**FRESNO COUNTY SHERIFF CORONER**
3333 E. American #G
Fresno, CA  93725
(559) 600-3400

Specimen Type:  BLOOD

CORONER BOTTLE/PERIPHERAL BLOOD

### Blood Drug Screen (by ELISA)  Results

Approved by: SM

| | |
|---|---|
| Amphetamines | See Amphetamine Confirmation |
| Barbiturates | Negative |
| Cannabinoids | Negative |
| Cocaine (Metabolite) | Negative |
| Benzodiazepines | See Benzodiazepine Confirmation |
| Opiates | Negative |
| Phencyclidine | Negative |

### Amphetamine Confirmation (GC/MS)  Results

Approved by: SC

| | | |
|---|---|---|
| Amphetamine | 25 | ng/mL |
| Methamphetamine | 2459 | ng/mL |
| Ephedrine | Not detected | |
| Pseudoephedrine | Not detected | |
| Phenylpropanolamine | Not detected | |
| Phentermine | Not detected | |
| MDMA, MDA, MDEA | Not detected | |

### Benzodiazepine Confirmation (GC/MS) Results

Approved by: SC

| | |
|---|---|
| Alprazolam | Not detected or below reporting level |
| Diazepam | Not detected or below reporting level |
| Nordiazepam | Not detected or below reporting level |
| Oxazepam | Not detected or below reporting level |
| Temazepam | Not detected or below reporting level |
| Alpha-hydroxyalprazolam | Not detected |
| Lorazepam | Not detected |

Accession #: 1703658/1
This report continues... (Final)

Reviewed by:



## Toxicology Report

TRMC-Mineral King Laboratory, 880 E. Merritt Ave, STE 107-108, Tulare, CA 93274
Phone: (559) 685-3456  Fax: (559) 685-8745
Directors: Gary Walter M.D. - Jue-Rong Zhang M.D. Ph.D - Duane Iwamura CRA CRT



| | |
|---|---|
| Collected By: Dr. Chambliss | Name/DOB: **PEREZ, JOSEPH** (00/00/00) |
| Date/Time Collected: 5/11/2017 11:30 | Accession #: 1703658 |
| Date/Time Received: 5/12/2017 09:40 | Case Number: 17-05.109 |
| Completion date: 6/1/2017 12:05 | |
| FRESNO COUNTY SHERIFF CORONER | Specimen Type:  **BLOOD** |
| 3333 E. American #G | |
| Fresno, CA 93725 | |
| (559) 600-3400 | |

### Blood Drug Toxic Levels and GC/MS Lower Quant Levels[1] (cont'd)

Approved by: [1]

| Phencyclidine | >90 ng/mL | [1] | 1 | ng/mL |
|---|---|---|---|---|
| Delta-9-THC | N/A | | 1 | ng/mL |
| THC-COOH | N/A | | 5 | ng/mL |

Sources:

1. Dimaio, Vincent J., DiMaio Dominick, Forensic Pathology, 2nd Edition, CRC Press LLC,
2000 N.W. Corporate Blvd.,Boca Raton, Florida 33431, 2001.

2. Baselt, Randall C., Ph.D Disposition of Toxic Drugs and Chemicals in Man, 7th Edition,
Biochemical Publications, PO Box 8299, Foster City, CA 94404, 2004.

3. Moffat, Anthony C, Osselton, David, Widdop, Brian, Clarke's Analysis of Drugs and
Poisons, 3rd Edition, Vol.2, Pharmaceutical Press, 2004.

Accession #: 1703658/3
END OF REPORT (Final)

Reviewed by:
Page 3

PLTF 000017

5/26/2017 10:50          Orchard      ORCHARDM→FRESNO COUNTY SHERIFF CORONER          2/6

# Toxicology Report

TRMC-Mineral King Laboratory, 880 E. Merritt Ave., STE 107-108, Tulare, CA 93274
Phone: (559) 685-3456  Fax: (559) 685-8745
Directors: Gary Walter M.D. - Jue-Rong Zhang M.D. Ph.D - Duane Iwamura CRA CRT



Collected By: Dr. Chambliss
Date/Time Collected: 5/11/2017 11:30
Date/Time Received: 5/12/2017 09:40
Completion date: 5/26/2017 10:43

Name/DOB: PEREZ, JOSEPH (00/00/00)
Accession #: 1703659
Case Number: 17-05.109

**FRESNO COUNTY SHERIFF CORONER**
**3333 E. American #G**
**Fresno, CA 93725**
**(559) 600-3400**

Specimen Type:  BLOOD

GRAY TOP/PERIPHERAL BLOOD

**Blood Alcohol (by GC) Results - Units: % (g/100ml)**

Approved by: SM
TESTED BY:                    SM
TEST DATE:                    5/25/17
Blood Alcohol (Ethanol)=      0.02                                    %
Alcohol testing performed on gray top tube (containing preservative and anti-coagulant),
unless otherwise specified.

Legal limit 0.08% for motor vehicle operation.

I certify, under penalty of perjury, under the laws of the state of California, that the
attached blood alcohol analysis was performed during the regular course of my duties, and is
a true and correct copy thereof.  I further certify that I am an approved FORENSIC ALCOHOL
ANALYST or SUPERVISOR by the state of California, that I am qualified to perform this
analysis pursuant to Title 17 of the California Code of Regulations, and that the equipment
used in arriving at the result was in proper working order at the time the analysis was
performed and that the recording of the result was done at the time of the analysis.  The
lab accepted policy and procedures for Forensic Alcohol Analysis have been accepted by the
State of CA and were followed during this analysis.

Signature:_____

Accession #: 1703659/1                                              Reviewed by:_____
END OF REPORT (Final)

PLTF 000018

'¥ 5/26/2017 10:50          Orchard      ORCHARDM→FRESNO COUNTY  SHERIFF CORONER          3/6

# Toxicology Report

TRMC-Mineral King Laboratory, 880 E. Merritt Ave., STE 107-108, Tulare, CA 93274
Phone: (559) 685-3456 Fax: (559) 685-8745
Directors: Gary Walter M.D. - Jue-Rong Zhang M.D. Ph.D - Duane Iwamura CRA CRT



Collected By: Dr. Chambliss
Date/Time Collected: 5/11/2017 11:30
Date/Time Received: 5/12/2017 09:40
Completion date: 5/26/2017 10:43

Name/DOB: **PEREZ, JOSEPH** (00/00/00)
Accession #: 1703660
Case Number: 17-05.109

Specimen Type:   URINE

**FRESNO COUNTY SHERIFF CORONER**
3333 E. American #G
Fresno, CA 93725
(559) 600-3400

CORONER BOTTLE/URINE

## Urine Drug Screen 10 Panel (by EMIT) Results

Approved by: SM

| | |
|---|---|
| **Amphetamines** | See Amphetamine Panel (GC/MS) |
| Barbiturates | Negative |
| **Benzodiazepines** | See Benzodiazepine Panel (GC/MS) |
| Cocaine (Metabolite) | Negative |
| Methadone | Negative |
| Methaqualone | Negative |
| Opiates | Negative |
| Phencyclidine | Negative |
| Propoxyphene | Negative |
| Cannabinoids (THC-COOH) | Negative |
| Creatinine (mg/dL) | 142.20 |
| Specific Gravity | 1.021 |
| PH | 5.7 |

Expected: >20 mg/dL
Expected: 1.003 - 1.030
Expected: 4.0 - 9.0

## Screen Alcohol (by EMIT) Result

Approved by: SM

| | |
|---|---|
| **Alcohol Screen-EMIT** | See Urine Alcohol Confirmation (by GC) |

Screen Cutoff: 10 mg/dL (0.01%)

## Amphetamine Confirmation (GC/MS) Results

Approved by: SC

| | | |
|---|---|---|
| **Amphetamine** | 9855 | ng/mL |
| **Methamphetamine** | 294535 | ng/mL |
| Ephedrine | Not detected | |
| Pseudoephedrine | Not detected | |
| Phenylpropanolamine | Not detected | |
| Phentermine | Not detected | |
| MDMA, MDA, MDEA | Not detected | |

## Benzodiazepine Confirmation (GC/MS) Results

Approved by: SC

| | |
|---|---|
| Alprazolam | Not detected or below reporting level |
| Diazepam | Not detected or below reporting level |
| Nordiazepam | Not detected or below reporting level |
| Oxazepam | Not detected or below reporting level |
| Temazepam | Not detected or below reporting level |

Accession #: 1703660/1
This report continues... (Final)

Reviewed by: _____

PLTF 000019

'¥ 5/26/2017 10:50          Orchard      ORCHARDN→FRESNO COUNTY SHERIFF CORONER          4/6

## Toxicology Report

TRMC-Mineral King Laboratory, 880 E. Merrit Ave., STE 107-108, Tulare, CA 93274
Phone: (559) 685-3456 Fax: (559) 685-8745
Directors: Gary Walter M.D. - Jue-Rong Zhang M.D. Ph.D - Duane Iwamura CRA CRT



| | |
|---|---|
| Collected By: Dr. Chambliss | Name/DOB: **PEREZ, JOSEPH** (00/00/00) |
| Date/Time Collected: 5/11/2017 11:30 | Accession #: 1703660 |
| Date/Time Received: 5/12/2017 09:40 | Case Number: 17-05.109 |
| Completion date: 5/26/2017 10:43 | |

FRESNO COUNTY SHERIFF CORONER                    Specimen Type:   URINE
3333 E. American #G
Fresno, CA 93725
(559) 600-3400

**Benzodiazepine Confirmation (GC/MS) Results (cont'd)**

Approved by: SC
Alpha-hydroxyalprazolam          Not detected
Lorazepam                        Not detected

Accession #: 1703660/2                              Reviewed by: _____
This report continues... (Final)                   Page 2

PLTF 000020

✔ 5/26/2017 10:50          Orchard     ORCHARDM→FRESNO COUNTY SHERIFF CORONER          5/6

# Toxicology Report

TRMC-Mineral King Laboratory, 880 E. Merritt Ave., STE 107-108, Tulare, CA 93274
Phone: (559) 685-3456 Fax: (559) 685-8745
Directors: Gary Walter M.D. - Jue-Rong Zhang M.D. Ph.D - Duane Iwamura CRA CRT



| | |
|---|---|
| Collected By: Dr. Chambliss | Name/DOB: PEREZ, JOSEPH (00/00/00) |
| Date/Time Collected: 5/11/2017 11:30 | Accession #: 1703660 |
| Date/Time Received: 5/12/2017 09:40 | Case Number: 17-05.109 |
| Completion date: 5/26/2017 10:43 | |

FRESNO COUNTY SHERIFF CORONER                   Specimen Type:   URINE
3333 E. American #G
Fresno, CA 93725
(559) 600-3400

## Urine Screen Cutoff Levels and GC/MS Lower Quant Levels []

Approved by: []

| DRUG/PANEL | DRUG SCREEN CUTOFF LEVEL |
|---|---|
| Amphetamines | 500 ng/mL |
| Barbiturates | 200 ng/mL |
| Benzodiazepines | 200 ng/mL |
| Cocaine (Metabolite) | 150 ng/mL |
| Opiates | 300 ng/mL |
| Phencyclidine | 25 ng/mL |
| THC (Metabolite) | 20 ng/mL |
| Methadone | 300 ng/mL |
| Methaqualone | 300 ng/mL |
| Propoxyphene | 300 ng/mL |
| Ethanol | 0.01% (10 mg/dL) |

| DRUG/PANEL | MXL GC/MS LOWER QUANTITATION LEVEL |
|---|---|
| Amphetamine | 125 ng/mL |
| Methamphetamine | 125 ng/mL |
| Barbiturates | 100 ng/mL |
| Benzodiazepines | 100 ng/mL |
| Cocaine | 50 ng/mL |
| Benzoylecgonine | 50 ng/mL |
| Codeine | 150 ng/mL |
| Hydrocodone | 150 ng/mL |
| Hydromorphone | 150 ng/mL |
| Morphine | 150 ng/mL |
| Methadone | 300 ng/mL |
| Methaqualone | 300 ng/mL |
| Phencyclidine | 12 ng/mL |
| Propoxyphene | 300 ng/mL |
| THC (Metabolite) | 8 ng/mL |

Note: GC/MS Confirmations Detect at Lower Levels than Screen.

Accession #: 1703660/3                            Reviewed by: _____
This report continues... (Final)                  Page 3

5/26/2017 10:50          Orchard      ORCHARDM→FRESNO COUNTY SHERIFF CORONER          6/6

# Toxicology Report

TRMC-Mineral King Laboratory, 880 E. Merritt Ave., STE 107-108, Tulare, CA 93274
Phone: (559) 685-3456 Fax: (559) 685-8745
Directors: Gary Walter M.D. - Jue-Rong Zhang M.D. Ph.D - Duane Iwamura CRA CRT



| | |
|---|---|
| Collected By: Dr. Chambliss | Name/DOB: **PEREZ, JOSEPH** (00/00/00) |
| Date/Time Collected: 5/11/2017 11:30 | Accession #: 1703660 |
| Date/Time Received: 5/12/2017 09:40 | Case Number: 17-05.109 |
| Completion date:  5/26/2017 10:43 | |

FRESNO COUNTY SHERIFF CORONER          Specimen Type:   URINE
3333 E. American #G
Fresno, CA 93725
(559) 600-3400

## Urine Alcohol (by GC) Results - Units in % (g/100mL)

Approved by: SM

TESTED BY:              SM
TEST DATE:              5/25/17
Blood Equivalents       0.03                              %
(Ethanol)=
Legal limit 0.08% for motor vehicle operation.

I certify, under penalty of perjury, under the laws of the state of California, that the
attached urine alcohol analysis was performed during the regular course of my duties, and is
a true and correct copy thereof.  I further certify that I am an approved FORENSIC ALCOHOL
ANALYST or SUPERVISOR by the state of California, that I am qualified to perform this
analysis pursuant to Title 17 of
the California Code of Regulations, and that the equipment used in arriving at the result
was in proper working order at the time the analysis was performed and that the recording of
the result was done at the time of the analysis.  The lab accepted policy and procedures for
Forensic Alcohol Analysis have been accepted by the State of CA and were followed during
this analysis.


Signature:_____


Accession #:  1703660/4                                    Reviewed by: _____
END OF REPORT (Final)                                       Page 4

PLTF 000022



**MARGARET MIMS**
**Sheriff-Coroner**
**3333 E. American Avenue, Suite G**
**Fresno, CA 93725**

Fresno, California, 05/10/2017 11:22:00     )
                   )
IN THE MATTER OF INVESTIGATION HELD   )
                   )
UPON THE BODY OF JOSEPH PEREZ       )
                   )
DECEASED.................................................................)

**Initial Report:**
On 05/10/2017 at 11:37 hours, while on duty at the Fresno County Sheriff Coroner's Office, I received a call from Janelle Trujillo, RN at Community Regional Medical Center to report a death that occurred in the Emergency Room. The decedent was identified by his driver's license and later confirmed by fingerprints to be Joseph Perez, a 41 year old Mexican male. Death was pronounced by Dr. James Davis at 11:22 hours.

**Circumstances:**
RN Trujillo reported that the decedent arrived to the Emergency Room via ambulance at 11:15 hours. He became unresponsive in the field after being restrained by law enforcement officials. Hospital staff administered two rounds of ACLs medications before pronouncing death. RN Trujillo reported external injuries including abrasions to the decedent's head, nose and chin and bruises to the decedent's neck, shoulders and chest.

**Scene Description and Body Examination:**
I responded first to Community Regional Medical Center with Lt. Mark Padilla at 12:50 hours. I conducted a liver temperature reading and recorded temperatures for Dr. Michael Chambliss to interpret at a later time. I observed life saving devices still attached to the decedent including an intubation tube and EKG pads. He did have abrasions across his forehead, on the bridge of his nose and just under his bottom lip. There was bruising across his upper chest and across and under his neck. He had an abrasion to his right elbow. I observed a bruise to the top of his left hand. There were abrasions around the decedent's wrists. I placed the decedent's hands in brown paper bags per protocol.

Livor mortis was present with blanching and rigor mortis was in beginning stages. The decedent was still warm to the touch. The decedent was placed in a white coroner bag and sealed with seal # 29377.

I then responded to the place of incident, located on Palm and Santa Fe Avenue. I arrived at 14:25 hours with Lt. Mark Padilla. Detective Chapman with the Fresno County Sheriff's Office briefed us on the circumstances known at the time. He reported that law enforcement received a call regarding a suspicious person in the area. The decedent was

JOSEPH PEREZ                                                                17-05.109

walking south on Palm Avenue and acting erratically.  He was first approached by Officers
with the Fresno Police Department.  When they approached he began acting erratically
and walking away from them.  He was cuffed and seated on the curb to await ambulance
arrival for assessment.  During this time, Fresno County Deputy Sheriffs and additional
Fresno Police Department Officers began arriving on scene.  At some point the decedent
attempted to sprint into the street and at that time was restrained with additional force by
law enforcement officials.  He was prone with his arms behind his back.  It was reported
that he resisted and began scraping and banging his head on the ground.  A towel was
used to keep hold his head up and off the ground.  When American Ambulance staff
arrived a backboard was placed on the decedent's back to secure him for transport.  It was
during this time he became unresponsive and was transported to the hospital with CPR in
progress. (See Fresno County Sheriff's Office, Report # 17-29377 for additional
information.)

On scene, I observed a vacant dirt lot north of the railroad tracks.  The incident took place
near the bus stop between a railroad crossing street sign and the railroad tracks.  Per
Detective Chapman the decedent was mainly in the dirt but on the edge of the sidewalk
when the incident took place.  I observed disturbed dirt where the incident took place and
what appeared to be blood on the sidewalk.  The towel used to hold the decedent's head
up had been collected by the time I arrived.  I photographed the towel in the evidence bag.

**Next of Kin Notification:**
Fresno County Sheriff Detectives notified the decedent's parents of Joseph Perez's death
in person.

**Additional Information:**
A review of the decedent's medical records showed that he was admitted to Community
Regional Medical Center the day prior for a W&I 5150 hold.  The Fresno Police
Department reported to hospital staff that the decedent was shadowboxing in the middle of
the street.  It's noted that he was "fidgety, taking things off."  He was referred to speak with
one of the counselors at the hospital where it noted "he does admit to drinking ETOH last
night but not sure how much and continues to deny illicit substance use."  It's also noted
that he was in tachycardia but refusing to have an EKG done stating he wanted nothing
done.  Hospital records show a urine test for drugs and alcohol was cancelled for the
5/9/17 admission.

I spoke with Detective Galindo on 5/16/2017 following the interviews with first responders.
He reported that when he spoke with the decedent's family they were aware he was at the
hospital the day prior.  After he was released from the hospital he went to his sister's
house where he stayed overnight with a woman.  That woman indicated she had left
markings on the decedent's upper chest and neck during romantic relations.

**Cause and Manner of Death:**
The decedent was transported to the Fresno County Sheriff Coroner's Office where Dr.
Michael Chambliss ordered X-rays, collected specimens for toxicology testing and
conducted an Autopsy.  Manner of Death was determined to be a Homicide.  Cause of
Death was determined to be Compressive Asphyxia during Restraint with
Methamphetamine Toxicity listed under Other Conditions.

2 of 2

PLTF 000024

JOSEPH PEREZ                                                      17-05.109

**Toxicology:**
Specimens collected were sent to Mineral King Laboratory for processing.  They
determined the decedent was positive for Methamphetamines and had a blood alcohol
level of 0.02.  See attached toxicology reports.

**Incident Information:**
On 5/10/2017 at 10:40 hours, the decedent sustained fatal injuries when he was restrained
by law enforcement officials on Palm Avenue, South of Santa Fe in Fresno.

**Disposition and Property:**
Chapel of the Light Funeral Home handled final arrangements for Joseph Perez at the
request of family.  The decedent's property was collected by Fresno County Sheriff's Office
and released to the funeral home.


                    Leticia Funderburk, DEPUTY CORONER

PLTF 000025



**Juan Galindo**
Homicide Unit
Detective Bureau

**Sheriff-Coroner's Office**
Margaret Mims, Sheriff-Coroner

2200 Fresno Street
P.O. Box 1788 (93717)
Fresno, California 93721

Phone: (559) 600-8215
Cell: (559) 360-9280
Fax: (559) 488-6880
Email: juan.galindo@fresnosheriff.org

**Hector Palma**
Homicide Unit
Detective Bureau

**Sheriff-Coroner's Office**
Margaret Mims, Sheriff-Coroner

DEPUTY CORONER LETICIA FUNDERBURK
(559) 6003400

2200 Fresno Street
P.O. Box 1788 (Zip 93717)
Fresno, California 93721

Phone: (559) 600-8204
Fax: (559) 488-6880
Cell: (559) 367-4734
Email: Hector.Palma@fresnosheriff.org

PLTF 000026

For Information about our agency:
**www.fresnosheriff.org**

To request Information about a career:
**recruitment@fresnosheriff.org**

To find job listings and to apply:
**www.co.fresno.ca.us**

Report # 17 - 6634

To report a non-emergency crime online, visit:
**www.fresnosheriff.org**

To report an Agricultural crime, send an email to:
**agcrimes@fresnosheriff.org**

To sign up for crime alerts in your area, visit:
**www.crimereports.com**

PLTF 000027