1  John C. Taylor, State Bar No. 78389
   Neil K. Gehlawat, State Bar No. 289388
2  TAYLOR & RING, LLP
   1230 Rosecrans Avenue, Suite 360
3  Manhattan Beach, California 90266
   Telephone: (310) 209-4100
4  Facsimile: (310) 208-5052

5  Thomas C. Seabaugh, State Bar No. 272458
   THE LAW OFFICE OF THOMAS C. SEABAUGH
6  333 South Grand Ave, 42nd Floor
   Los Angeles, CA 90071
7  Telephone: (213) 225-5850

8  Attorneys for Plaintiffs

9              UNITED STATES DISTRICT COURT

10            EASTERN DISTRICT OF CALIFORNIA

11

12 ANTHONY PEREZ, individually,              CASE NO. 1:18-cv-00127-AWI-EPG
   CECILIA PEREZ, individually,              [Hon. Anthony W. Ishii]
13 TERRALEE PEREZ, individually, and
   as successor in interest to Joseph Perez, **PLAINTIFFS' NOTICE OF**
14 JOSEPH PEREZ, JR., individually and       **MOTION AND MOTION *IN***
   as successor in interest to Joseph Perez, ***LIMINE* TO EXCLUDE**
15 and X.P. a minor, by and through his      **TESTIMONY AND OPINIONS OF**
   Guardian ad Litem, MICHELLE PEREZ,        **DR. GARY VILKE AND DR.**
16 individually and as successor in interest **THEODORE CHAN**
   to Joseph Perez,
17                                           **DECLARATION OF THOMAS C.**
18           Plaintiffs,                      **SEABAUGH AND EXHIBITS**

19      vs.
                                             Date: December 6, 2021
20 CITY OF FRESNO, COUNTY OF                 Time: 1:30 p.m.
   FRESNO, JAMES ROSSETTI, an               Ctrm: 2
21 individual, SEAN CALVERT, an
   individual, CHRIS MARTINEZ, an
22 individual, BRAITHAN
   STOLTENBERG, an individual,
23 ROBERT MCEWEN, an individual,
   KARLSON MANASAN, an individual,
24 JIMMY ROBNETT, an individual, and
   DOES 1-10, inclusive,
25
             Defendants.
26

27

28

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE that Plaintiffs, on December 6, 2021 at 1:30 p.m.,

3   or as soon thereafter as this matter may be heard before the above-entitled Court,

4   will and hereby do move the Court by way of this motion to exclude the testimony

5   and opinions of Dr. Gary Vilke and Dr. Theodore Chan in this matter.  Plaintiffs

6   make this Motion under Federal Rules of Evidence 702 and 403 and pursuant to

7   *Daubert*.

8          This Motion is based on this Notice of Motion, the Memorandum of Points

9   and Authorities, the accompanying Declaration of Thomas C. Seabaugh and

10   attached exhibits, the records and files of this Court, and upon such other oral and

11   documentary evidence as may be presented at the time of the hearing.

12          Respectfully Transmitted,

13   Dated: November 3, 2021          TAYLOR & RING, LLP
                                                    THE LAW OFFICE OF THOMAS C. SEABAUGH

14

15

16                                                   By_____/s/ Thomas C. Seabaugh_____
17                                                        Thomas C. Seabaugh
                                                         Attorneys for Plaintiffs
18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................5

II.  LEGAL STANDARD ..........................................................6

III.  DISCUSSION ...................................................................7

  A.  The studies on which Dr. Vilke and Dr. Chan rely are limited and do not support their opinions in this case. ...................................................8

  B.  The grand non-sequitur: applying these studies in civil rights cases ......14

  C.  There is no scientific basis for disputing the findings of the forensic pathologist who performed the autopsy. ...................................................16

  D.  Dr. Vilke opines that "the restraint itself, the method it was done wouldn't have caused it, it's his reaction to the restraint." .........................18

  E.  Dr. Vilke has no business testifying about where the backboard was touching Mr. Perez or rendering any other opinions "based on a review of the video." ...................................................20

  F.  Dr. Vilke's opinions as to the standard of care for paramedics. ..............21

IV.  CONCLUSION ........................................................24

1

# <u>TABLE OF AUTHORITIES</u>

2

*A.B. v. Cty. Of San Diego*, No. 18CV1541-MMA-LL
   2020 WL 4431982 (S.D. Cal. July 31, 2020) ............................................19,20

3

*Aguilar v. City of Los Angeles,* No. CV 17-4382-CBM-MRW
   2018 WL 10017349 (C.D. Cal. Oct. 2, 2018) ........................................20

4

*Bourjaily v. United States*
   483 U.S. 171 (1987)......................................................................7

5

*Daubert v. Merrell Dow Pharm., Inc.*
   509 U.S. 579 (1993)...............................................................7,18

6

*Daubert v. Merrell Dow Pharm., Inc.*
   43 F.3d 1311 (9th Cir. 1995) .......................................................9

7

*Hendrix v. Evenflo Co.*
   609 F.3d 1183 (11th Cir. 2010) ..................................................21

8

*Iko v. Galley*, No. CV DKC 2004-3731
   2007 WL 9758426 (D. Md. Sept. 17, 2007) ..................................15

9

*Krechman v. Cty. of Riverside*
   723 F.3d 1104 (9th Cir. 2013) ....................................................15

10

*Kumho Tire Co., Ltd v. Carmichael*
   526 U.S. 137 (1999).........................................................6,7,19

11

*Meirs v. Ottawa Cty.*, No. 1:15-CV-866
   2018 WL 9815859 (W.D. Mich. Jan. 8, 2018)..............................20

12

*Moore v. City of Berkeley*, No. C14-00669 CRB
   2016 WL 6024530 (N.D. Cal. Oct. 14, 2016) ..............................15

13

*Murphy v. City of Farmington*, No. CIV 19-0639 RB/JFR
   2021 WL 1517939 (D.N.M. Apr. 16, 2021) .................................15

14

*Todero v. Blackwell*, No. 117CV01698JPHMJD
   2021 WL 4472550 (S.D. Ind. Sept. 30, 2021) ..............................20

15

*United States v. Alatorre*
   222 F.3d 1098 (9th Cir. 2000) ....................................................25

16

*U.S. v. Ward*
   169 F.2d 460 (3d Cir. 1948) .......................................................21

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY AND OPINIONS OF VILKE AND CHAN

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.    INTRODUCTION**

On May 25, 2020, George Floyd was murdered by a Minneapolis police officer who knelt on his neck while he asphyxiated and died. When Floyd said that he could not breathe, an officer mocked him saying that it takes "a lot of oxygen" to talk. When bystanders objected, an officer responded that Floyd was "talking, so he can breathe." The incident prompted mass protests in which an estimated 15 to 25 million people participated, the largest protest movement in US history.[1]

The murder of George Floyd underscored the widespread, false, and deadly belief among many police officers—and even some paramedics—that they can disregard a restrained person's statement that "I can't breathe," purportedly because "if you can talk, you can breathe." This false belief in turn can be traced to a handful of pseudo-scientific studies that were developed over the preceding decades for the purposes of defending police officers from civil rights lawsuits, the authors of which include Dr. Gary Vilke and Dr. Theodore Chan, who have been retained as experts by Defendants in this case.

On the basis of these studies—accompanied by quips like "if you can talk, you can breathe"—defense experts in civil rights cases have been testifying for decades that individuals who were asphyxiated during police restraint actually spontaneously died of natural or unrelated causes. These false conceptions masquerading as "science," which courts often admitted over plaintiffs' vigorous objections, have now trickled down into the conceptions of front-line police officers,

---

[1] Buchanan, Larry; Bui, Quoctrung; Patel, Jugal K. (July 3, 2020). "Black Lives Matter May Be the Largest Movement in U.S. History." *The New York Times*. Retrieved October 27, 2021.

1 where they can have deadly results—as in the George Floyd case as well as in this

2 case.

3       In this case, a backboard was placed on Joseph Perez while he was

4 handcuffed, hobbled and in a prone position on the ground. It is undisputed that

5 Perez stated that he could not breathe. But downward pressure was applied to the

6 board until Perez asphyxiated and died. The forensic pathologist at the Fresno

7 County Sheriff-Coroner's Office, Dr. Michael Chambliss, determined that Perez

8 asphyxiated because a "backboard was placed on Mr. Perez in such a fashion as he

9 is also being placed in a hobble type condition, and during that particular process,

10 greater than a ten minute restraining process, he becomes unresponsive," finding the

11 cause of death to be "compression asphyxia during restraint." Chambliss Dep.,

12 125:5-14. Other than compression asphyxia resulting from restraint, Dr. Chambliss

13 found there was no other proximate cause of death present for Mr. Perez. Chambliss

14 Dep., 126:21-24. Dr. Chambliss reviewed the case with the chief medical examiner

15 for the county and the chief medical examiner's opinion was the same. Chambliss

16 Dep., 175:15-24.  Dr. Chambliss concluded that the manner of death was

17 "homicide." Chambliss Dep., 239:12-15.

18       In this case, as in countless others, Dr. Vilke and Dr. Chan have been brought

19 forward to opine, contrary to the opinion of the coroner's office, that the person who

20 asphyxiated during police restraint actually died for reasons other than asphyxia. It

21 is high time, at long last, for a federal court to put its foot down and label these

22 false, misleading, and lethal conceptions what they are: "junky." *See*, *generally,*

23 *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J.,

24 concurring).

25 **II.    LEGAL STANDARD**

26       Rule 702 of the Federal Rules of Evidence provides:

27     A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion

28 or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The court's "gatekeeping role" to screen expert testimony involves an assessment of its reliability and relevance in light of the above principles.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-97 (1993); *Kumho*, 526 U.S. at 147 (1999).  "[T]he law grants the [court] broad latitude" in analyzing and determining the reliability of proffered expert witness testimony. *Kumho*, 526 U.S. at 139, 142.  Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," whereas relevance depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592–593.

The Supreme Court has stressed that there is no "definitive checklist or test," and that the analysis must be tailored to the facts of a particular case.  *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593). Defendants have the burden of establishing that each proffered expert opinion is supported by a preponderance of the evidence.  *See Bourjaily v. United States*, 483 U.S. 171, 176 (1987).

## III.   DISCUSSION

While the forensic pathologist who performed the autopsy in this case determined that the cause of Perez's death was "compression asphyxia during restraint" and stood by that determination in his deposition, Defendants have brought forward two experts to opine otherwise. While Dr. Vilke was retained by American Ambulance defendants and Dr. Chan was retained by the City of Fresno and County of Fresno defendants, the two experts have been retained to offer essentially the same opinion regarding the cause of Perez's death.

Dr. Vilke disagrees with the forensic pathologist: "I am not of the opinion that there was mechanical asphyxia. So from that perspective, I will not be agreeing with him." Vilke Dep. II, 82:15-22. Instead, Dr. Vilke opines that Perez died as a result of methamphetamine use in combination with a diseased heart, agitation and "resistance." Vilke Dep. II, 59:9-15. Dr. Vilke opines that Perez experienced a "sudden cardiac event" that was caused by a "diseased heart," "methamphetamine," and "agitation," under conditions where "his heart rate was up" and "his temperature was up." Vilke Dep. II, 59:15-60:6.

Chan likewise disagrees with Dr. Chambliss, opining that Perez did not die from restraint or compressional asphyxia. Chan Dep., 22:8-11. Chan opines that Perez suffered a cardiac arrest that was "driven by his use of methamphetamine" and "the extent that he was exerting himself during restraint." Chan Dep., 55:23-56:4.

There is nothing remotely scientific about these tendentious and provocative conclusions. Specifically, they do not follow from the handful of "studies" that these experts cite in support of their conclusions, which are addressed in more detail below.

### A.   The studies on which Dr. Vilke and Dr. Chan rely are limited and do not support their opinions in this case.

The study that marked the entry of Dr. Vilke and Dr. Chan into the police defense business was a paper entitled "Restraint Position and Positional Asphyxia," which they published together with two other authors in the Annals of Emergency Medicine in 1997. Seabaugh Decl., ¶ 2, Exh "A." This study was commissioned and funded by the County of San Diego to the tune of $33,000. Chan Dep., 69:22-70:21; *see also* Vilke Dep. II, 108:9-12. At the time this study was commissioned, a lawsuit was pending against the County of San Diego. Vilke Dep. II, 109:22-110:18 ("I assume they were doing it for the purpose of winning a lawsuit.").

As a preliminary matter, the Ninth Circuit has urged courts in this district to consider, as part of the *Daubert* analysis, whether an expert's proposed theory and conclusions were developed for the purposes of litigation or whether they grew out of scientific pursuits wholly unrelated to litigation.

> "One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (Ninth Circuit opinion following *Daubert*), cert. denied 516 U.S. 869 (1995). Here, the fact that the County of San Diego funded the original study that created this field of expertise *ex nihilo* "for the purpose of winning a lawsuit" points to the fact that Dr. Vilke and Dr. Chan developed their theories for the purposes of litigation, which is a consideration that weighs strongly against admissibility. *Daubert*, 43 F.3d at 1317.

This original 1997 study was conducted with a test group of healthy men aged 18 to 40, who were exercised for four minutes. Chan Dep., 74:16-23. Then the subjects were positioned in a sitting position to measure pulse, oxygen saturation, and arterial blood gases. Chan Dep., 74:23-75:1. These measurements were then compared with similar measurements taken in the supine (face-up), prone (face-down), and the "restraint" (hog-tie) position.

What the empirical results showed was entirely unsurprising and consistent with common sense: the maximal voluntary ventilation, for example, which is a measurement of the volume of air moved over time, "decreased in a statistically significant fashion" from the sitting position, down 10 percent in the supine position, down 15 percent in the prone position, and down 23 percent in the

"restraint" position, even with no weight on the subject's back. Seabaugh Decl., ¶ 2, Exh. "A," *3-4; Vilke Dep., II, 112:6-12 ("Q. And in terms of the empirical data that you gathered from this study, in the prone maximal restraint position, the MVV, which is maximal voluntary ventilation, declined 23 percent in the restrained position as opposed to the sitting position; is that right? A. That is correct.").

Even so, Dr. Chan acknowledged that this study did not attempt to replicate field conditions under which restraint deaths have occurred. Chan Dep., 81:18-82:10. The study itself notes: "It is possible that a combination of factors, including underlying medical condition, intoxication, agitation, delirium, and struggle as well as body position, may result in respiratory compromise that would not be detected by our study." Chan Dep., 82:11-83:4. Obviously, Dr. Chan did not place any backboards on the backs of any participants in the study and sit on them. Chan Dep., 75:22-76:3.

The 1997 study was followed by a 1998 study entitled, "Reexamination of Custody Restraint Position and Positional Asphyxia," published in the American Journal of Forensic Medicine and Pathology. Seabaugh Decl., ¶ 3, Exh. "B." This study included no new empirical data, it merely presented some analysis and commentary on the data that had already been gathered in responding to other positions. Vilke Dep. II, 114:2-18.

The next of the studies, published in 2004, was entitled, "Weight Force During Prone Restraint and Respiratory Function." Seabaugh Decl., ¶ 4, Exh. "C." Unlike the 1997 study, in this study, weights of 25 and 50 pounds were placed on the backs of the restrained test subjects. Vilke Dep. II, 115:12-19. During this study, the participants were positioned on a hospital gurney, such that there was padding underneath their chests. Vilke Dep. II, 115:20-116:2.

The results of the 2004 study were consistent with the 1997 study and likewise consistent with common sense: the more weight was added to the test subject's back—and the longer the period of time the weight was applied—the more

1  the measurable indicators of the person's ability to breathe declined. Vilke Dep. II,

2  116:3-7.



FIGURE 2. Mean %predFVC for subjects at 1 and 5 minutes into each position.

FIGURE 3. Mean %predFEV1 for subjects at 1 and 5 minutes into each position.

Figures 2 and 3 from the 2004 study, at the left, show FVC (forced vital capacity) and FEV1 (forced expiratory volume in one second) declining from a sitting position to a prone position, a prone restraint position with 25 pounds of weight on the back, and a prone restraint position with 50 pounds of weight on the back, with additional decreases as time passes. The authors noted that the measurements were "significantly lower for all 3 [prone] position[s] compared with sitting." Chan Dep., 89:15-22.

15  At the time of that study, the authors again acknowledged its limitations,

16  noting, "We did not simulate trauma, struggle, drug intoxication, and other

17  physiological and psychologic stresses." Chan Dep., 95:1-14. The authors also

18  indicated that the amount of the weights selected for the study may not reproduce

19  the actual amount of weight force used on individuals during the restraint process,

20  referring to encounters with police in the field. Chan Dep., 95:16-21.

21  A 2007 study, likewise authored by Dr. Vilke and Dr. Chan, involved placing

22  over 200 pounds of weight on a subject's back while in a prone restraint position.

23  Seabaugh Decl., ¶ 5, Exh. "D."  In his report in this case, in support of his claim that

24  Perez did not die from asphyxiation, Dr. Vilke referenced this 2007 study with the

25  following statement: "Studies applying 220 pounds of weight over the upper back of

26  individuals for a similar duration of time did not show any clinically significant

27  reduction in ability to breathe or ventilate." Vilke Dep. II, 119:15-120:9.

28

The empirical data gathered in that study, titled "Ventilatory and Metabolic Demands During Aggressive Physical Restraint in Healthy Adults," does not actually support Dr. Vilke's statement. The study, in fact, found that maximal voluntary ventilation declined by 18 percent from a sitting position in a prone position, and that in a prone position with more than 200 pounds of weight on a subject's back, maximal voluntary ventilation declined by 30 percent. Seabaugh Decl., ¶ 5, Exh. "D," *4. Dr. Vilke acknowledged the 30 percent reduction in his deposition. Vilke Dep. II, 124:12-17 ("Q. And specifically, they were able to move 30 percent less air through their lungs in the prone maximum restraint position with 220 pounds of weight on their back versus the seated position; is that right? A. That's the average there, yes.").

Dr. Vilke's tendentious interpretation of his own data involves a creative use of the phrase "clinically significant." Seabaugh Decl., ¶ 5, Exh. "D," *5; *see also* Vilke Dep. II, 112:6-16 (in reference to the 1997 study, Dr. Vilke opining that the decrease of maximal voluntary ventilation by 23 percent was not "clinically significant"). This interpretation implicitly incorporates circular logic, since it would be unethical for Dr. Vilke's studies to produce a "clinically significant" effect—i.e., asphyxiation—in a human subject. *See* Vilke Dep. II, 126:18-23 ("Q. It would not be possible to—ethically to conduct a study where you continued to put weight on someone's back until they died to see how much weight it took to kill someone; true? A. That's true, sure. I think that would not be appropriate."). In other words, the studies for ethical and safety reasons must be designed such that they do not asphyxiate m the human subjects, and since the subjects do not asphyxiate, the results are declared clinically insignificant.

No study—for obvious ethical reasons—has ever been conducted where weight was placed on the back of a human test subject until that person asphyxiated and died. *See* Chan Dep., 101:9-24.

The last of the principal studies by these authors, published in 2017, was a review of data provided by the San Diego County Sheriff's Department (the same county that had commissioned the original study). Seabaugh Decl., ¶ 6, Exh. "E." This data, based on self-reports by deputies employed by the department, indicated that subjects had been restrained in a prone position on more than 1,500 occasions and none had died. *Id*. The study noted, "Because of the low rate of fatalities in our study [i.e., zero], we were unable to statistically differentiate the rates of fatalities based on the modalities of restraint." *Id.*, *2. In other words, since (thankfully) nobody died while this data was being gathered, it was not possible to identify any particular restraint process as being correlated with in-custody deaths relative to any other restraint process.

Taking these studies together, one is struck by the paucity of the data from which Dr. Vilke and Dr. Chan purport to reach conclusions to a scientific certainty as to the cause of a person's death in civil rights cases. The meagre data gathered by these studies, added together, amount to three or four high school science fair projects over a period of nearly two-and-a-half decades. The empirical data that was gathered, to the extent that it has any limited value one may attach to it, itself shows statistically significant declines in every index of a person's ability to breathe when that person is in a prone position with weight on that person's back: a 23 percent decline in maximal voluntary ventilation in the 1997 study and a 30 percent decline with heavy weight on the back in the 2007 study.

Finally, the studies themselves describe limitations that *prima facie* render them inapposite in a civil rights case arising from conditions in the field. The 2007 study, for example, notes that "this study has a number of limitations." Seabaugh Decl., ¶ 5, Exh. "D," *4. As a preliminary matter, the "subjects were young and generally healthy may not reflect the population of individuals who are restrained in the field setting." *Id*. In fact, they performed so well that their baseline measured maximal voluntary ventilation was 122 percent of expected. *Id; see also Goode v.*

1  *City of Southaven*, No. 3:17-CV-60-DMB-RP, 2018 WL 4698100, at *3 (N.D. Miss.

2  Sept. 27, 2018) (Dr. Vilke admitted that the decedent in that case "would have been

3  excluded from a study he conducted, as [decedent] suffered from asthma.")

4        The study also conceded that "we could not reproduce all conditions during

5  which this type of restraint method is used in the field" and "while we had subjects

6  restrained and maximally exerting themselves, we could not reproduce the

7  psychological or other physiologic stresses associated with a field pursuit, struggle,

8  or trauma." Seabaugh Decl., ¶ 5, Exh. "D," *4. Clearly, in a field setting, the authors

9  noted, "individuals are unlikely to have such a choice as to whether they are

10  restrained or not," and indeed, "a small number of our subjects did opt out of the

11  study out of fear of the restraint," which essentially excluded from the test group

12  anyone who was psychologically unable to tolerate restraint. *See id*.

13        No force was used on subjects in the study, further distinguishing it from field

14  conditions. *Id*. Since the subjects of the study were volunteers, its "voluntary nature

15  may not exactly reflect field situations where individuals are often under the

16  influence of drugs or are mentally incapacitated." *Id*.

17        None of the test subjects used illicit drugs. *Id.*, *5. The testing took place on a

18  "gymnastic mat," which provided padding under the test subjects' chests during the

19  restraint, likely providing them with a better ability to breathe. *See id*. Finally,

20  summarizing these limitations in the study, the authors suggest that "it will await

21  future studies to determine whether these factors play any role in" in-custody deaths.

22  *Id.*

23        **B.    The grand non-sequitur: applying these studies in civil rights cases**

24        There is a striking gap between the handful of shallow empirical studies

25  discussed above, which cautiously present their limited findings and limitations, and

26  the testimony of the authors in civil rights cases in which they are retained experts,

27  which often consists of strident and unequivocal conclusions that, in light of these

28  studies, it can be stated with scientific certainty that the individual who died while

being restrained did not asphyxiate. *See, e.g., Murphy v. City of Farmington*, No. CIV 19-0639 RB/JFR, 2021 WL 1517939, at *1 (D.N.M. Apr. 16, 2021) (Dr. Vilke opining that the decedent did not die from asphyxia but from "a sudden cardiac arrest due to an enlarged heart along with the effects of methamphetamine and physiologic stress"); *Iko v. Galley*, No. CV DKC 2004-3731, 2007 WL 9758426, at *4 (D. Md. Sept. 17, 2007) (Dr. Vilke opining that "that the cause of death was actually cardiac arrest, not asphyxia"); *Krechman v. Cty. of Riverside*, 723 F.3d 1104, 1108 (9th Cir. 2013) ("Defendants presented a theory that [decedent] died suddenly of natural causes, specifically kidney failure that caused cardiac arrhythmia, unrelated to the altercation with the police" and "Dr. Gary Vilke testified in support of this theory."); *Moore v. City of Berkeley*, No. C14-00669 CRB, 2016 WL 6024530, at *2 (N.D. Cal. Oct. 14, 2016) ("Dr. Gary Vilke also concluded that the officers did not cause or contribute to Moore's death").

While many courts have admitted this testimony—a trend that Plaintiffs submit must be reversed—not every court has been willing to accept the attempt to draw a line from these limited studies to civil rights cases.

In a 2010 decision in the case of *Weigel v. Cox* in the District of Wyoming (Case No. 04-CV-355-J), district judge Alan B. Johnson considered a defense expert's opinion, based on the studies conducted by Dr. Vilke and Dr.Chan, that the decedent in that case did not die from asphyxiation during restraint, finding the "Defendants' reasoning regarding the science to be flawed." Seabaugh Decl., ¶ 7, "F."

"Defendants claim that the current state of the research on positional asphyxia shows that it is impossible that [decedent's] breathing was sufficiently restricted to be the cause of his death," the district court wrote in Weigel, continuing:

> For support, they present various studies in which test subjects were placed prone, sometimes restrained, or with weights up to 225 pounds placed on their backs. In some experiments, the subjects exercised beforehand …

> The difficulty is that none of the experiments cited purport to replicate the conditions of an actual struggle and arrest in a subject like [decedent]. Dr. Chan, during his testimony and in his published research, explicitly acknowledges that the two situations are not comparable. … The experiments conducted in controlled circumstances simply cannot stand for the proposition that the restraint imposed by the troopers could not have restricted his breathing to such a degree that it contributed to his death."

Id., *9. Finding the "reasoning regarding the science to be flawed," the district court in the context of a motion by the defendants for summary judgment went on to consider it nevertheless admissible under *Daubert* and deny the summary judgment motion, but left open the possibility of excluding it on other grounds at trial. *Id.*, *5, 9-10.

In this case, as in the *Weigel* case, it is an obvious fact that no experiment has ever been conducted that replicated in any way the conditions under which Perez asphyxiated. Indeed, Plaintiffs submit that no expert could perform such an experiment without violating the Nuremberg Code, which prohibits experiments on human beings where death or disabling injury is likely to occur. At any rate, Dr. Vilke conducted no studies after being retained in this case. Vilke Dep. II, 106:6-9. Dr. Chan likewise did no studies that attempted to replicate the conditions under which Perez died.  Chan Dep., 62:1-9. In the absence of any scientific studies that replicate the conditions in this case, the studies performed by Dr. Vilke and Dr. Chan in the past cannot establish the proposition that Perez did not asphyxiate in this case.

**C.    There is no scientific basis for disputing the findings of the forensic pathologist who performed the autopsy.**

The forensic pathologist who performed the autopsy in this case determined that Perez died from "compression asphyxia during restraint." Chambliss Dep., 125:5-14. Other than compression asphyxia resulting from restraint, Dr. Chambliss ruled out all other possible proximate causes of death. Chambliss Dep., 126:21-24.

Dr. Chambliss, unlike Dr. Vilke or Dr. Chan, actually performed the autopsy on Perez. Chan Dep., 46:8-10. Dr. Chan has no dispute as to Dr. Chambliss' qualifications to make a determination as to the cause and manner of death. Chan Dep., 46:11-13. Nor did he have any disagreements with the methods he employed. Chan Dep., 46:14-16 ("Q. Do you have any disagreements with the methods he employed in terms of performing the autopsy? A. I'm not a forensic pathologist. No."). Dr. Chan has never performed an autopsy, never authored an autopsy report, and never examined the body of Perez. Chan Dep., 46:24-47:4. As to Dr. Chambliss's finding that the manner of death was homicide, Dr. Chan conceded that he has no opinion on that issue. 49:17-21.

Dr. Vilke likewise had no disagreements with the qualifications of Dr. Chambliss to perform the autopsy in this case. Vilke Dep. II, 82:1-3. He did not disagree with his qualifications to render an opinion about the cause of Perez's death. Vilke Dep. II, 82:4-7. Nor did he have any disagreements with the methods he used to perform the autopsy. Vilke Dep. II, 82:8-10. Importantly, he did not have any disagreements with the methods that Dr. Chambliss used to reach his conclusions as to the cause of death: "I think his methods were reasonable." Vilke Dep. II, 82:11-14.

Given all of the above, one is entitled to ask, what did Dr. Chambliss fail to consider, according to these defense experts, in rendering his opinion that Perez asphyxiated? Asked that very question at his deposition, Dr. Vilke was incoherent: "I'd have to go back specifically and look at how he -- how he created -- how he came to that specific conclusion. But he came to the conclusion there was weight force being placed on him at the time that he went unresponsive. And I think that was a big piece of why he made that conclusion. Though the temperature of 105 was significant to agitation, he noted but not necessarily gave much contribution to the cause of death of that contributory." Vilke Dep. II, 83:24-84:10.

1    Plaintiff submits that there is no scientific basis for disputing the findings of

2  the forensic pathologist who performed the autopsy, who determined that Perez was

3  asphyxiated.

4       **D.      Dr. Vilke opines that  "the restraint itself, the method it was done**

5           **wouldn't have caused it, it's his reaction to the restraint."**

6    Expert testimony " 'can be both powerful and quite misleading because of the

7  difficulty in evaluating it.' " *Daubert*, 509 U.S. at 595 (quoting Weinstein, *Rule 702*

8  *of the Federal Rules of Evidence is Sound: It Should Not Be Amended,* 138 F.R.D.

9  631, 632 (1991)). The Supreme Court has stressed that "subject of an expert's

10  testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a

11  grounding in the methods and procedures of science.  Similarly, the word

12  'knowledge' connotes more than subjective belief or unsupported speculation."

13  *Daubert*, 509 U.S. at 589-90 (citations omitted).  "[I]n order to qualify as 'scientific

14  knowledge,' an inference or assertion must be derived by the scientific method." *Id.*

15    Here, the reports and testimony of Dr. Vilke and Dr. Chan do not in any

16  manner constitute the application of scientific knowledge to the facts of this case.

17  What they provide is tendentious advocacy, not "scientifically valid" principles

18  "properly … applied" to the facts of the case. *Daubert*, 509 U.S. at 594-95

19    Having acknowledged that his own theory involved Perez dying from a

20  cardiac arrythmia, Dr. Vilke acknowledged that metabolic acidosis would have been

21  a substantial factor in causing that arrythmia. Vilke Dep. II, 64:14-17.  When asked

22  if the officers' struggle with Perez contributed to the metabolic acidosis, Dr. Vilke

23  testified: "The acidosis is produced by the movement of his muscles and activity. So

24  the officers' movement doesn't create acidosis in somebody else. It is the resistance

25  or the movement of the individual against the attempts to be held that create that

26  acidosis." Vilke Dep. II, 66:14-20. Dr. Vilke went on to testify that "the restraint

27  itself, the method it was done wouldn't have caused it, it's his reaction to the

28

-18-

1  restraint." 87:3-18. Dr. Chan likewise opines that Perez's "exertion," but not the

2  restraint, contributed to his death. Chan Dep., 58:57:24-58:21.

3         Opinions such as these should alert the Court to the profoundly "junky"

4  nature of the "science" going on here. *See Kumho*, 526 U.S. at 159. This testimony

5  resembles the old joke about the police officer who says that the suspect "repeatedly

6  struck my fist with his face." In other words, according to these defense experts, if

7  the restraint was a factor in Perez's death, he was doing it to himself by pushing up

8  against the officers who were asphyxiating him, and it was not the result of the

9  officers pushing down. This is not science, it is just provocative sophistry laundered

10  through the mouth of an expert with authoritative credentials.

11         The fact is that <u>Dr. Vilke has never studied metabolic acidosis in the context

12  of restraint</u>. Confronted with his own statement cited in a media article that he and

13  his fellow researchers "have not really looked at acidosis from the perspective of my

14  particular research" he acknowledged that he has never "<u>looked at specifically

15  metabolic acidosis with regards to restraints</u>." Vilke Dep. II, 91:8-16 (emphasis). In

16  other words, when he was testifying that Perez was causing the acidosis by

17  supposedly resisting the officers, Dr. Vilke was speculating without any foundation.

18  This tendentious speculation cannot not meet the standard of "scientifically valid"

19  principles "properly … applied" to the facts of the case. *Daubert*, 509 U.S. at 594-

20  95.[2]

21

22         At least one court excluded Dr. Vilke's opinions they mischaracterized the

23  conclusions of the medical examiner. *A.B. v. Cty. Of San Diego*, No. 18CV1541-

24  _____

25         [2] In another example of tendentious argument being presented in the place of
   science, whereas multiple witnesses described Defendant Calvert sitting on the

26  board in this case, Dr. Vilke describes the "use of weight to stabilize the
   backboard." Vilke Dep. II, 19:17-20:10.

27

28

MMA-LL, 2020 WL 4431982, at *8 (S.D. Cal. July 31, 2020) ("Plaintiffs argue that Dr. Vilke's medical examiner opinion is unreliable and unhelpful because it is actually inconsistent with the medical examiner's conclusions … The Court agrees with Plaintiffs"); *see also Aguilar v. City of Los Angeles*, No. CV 17-4382-CBM-MRW, 2018 WL 10017349, at *1 (C.D. Cal. Oct. 2, 2018) (excluding under *Daubert* Dr. Vilke's opinion that the "drugs that [Decedent] had in his system, including methamphetamine and heroin, likely caused him to act in an irrational and impulsive manner, contributing to his death"); *Meirs v. Ottawa Cty*., No. 1:15-CV-866, 2018 WL 9815859, at *1 (W.D. Mich. Jan. 8, 2018) (the court noting that Dr. Vilke's report "satisfies Rule 26 by the barest of margins"); *Todero v. Blackwell*, No. 117CV01698JPHMJD, 2021 WL 4472550, at *7 (S.D. Ind. Sept. 30, 2021) ("Dr. Vilke therefore may not opine that drug intoxication caused [decedent's] Excited Delirium Syndrome … Dr. Vilke may not opine about any pain that [decedent] may have experienced, whether the Taser 'was functioning properly or made a good connection,' or about police practices.").

> **E.    Dr. Vilke has no business testifying about where the backboard was touching Mr. Perez or rendering any other opinions "based on a review of the video."**

In his report, Dr. Vilke includes a photograph showing a backboard on top of a person who is supposed to represent Perez, showing the backboard touching the person's heels but not touching the person's shoulders or head, and Dr. Vilke purports to have an opinion that the backboard was in this configuration "based on the review of the video." Vilke Dep. II, 75:9-25; Vilke Report, *16.

Any juror can review the video and make his or her own determinations as to what it shows based on common sense and their own life experience. Determinations as to where the backboard was positioned "based on the review of the video" is not the proper subject of any expert testimony in this case, and it is also far outside the scope of the doctor's medical expertise and qualifications. *See,*

1  *generally, U. S. v. Ward*, 169 F.2d 460, 462 (3d Cir. 1948) ("[I]t is . . . axiomatic

2  that the 'expert' may not go far as to usurp the exclusive function of the jury to

3  weigh the evidence and determine credibility [nor] may expertness be the medium

4  for injecting into the record material and information not a part of the expert's

5  qualifications and otherwise inadmissible through his lips.").  Any such opinions Dr.

6  Vilke has as to where the backboard was positioned on Perez should be excluded.

7         **F.**     **Dr. Vilke's opinions as to the standard of care for paramedics.**

8       In determining that the conduct of the American Ambulance defendants was

9  consistent with the standard of care for paramedics, Vilke relies on his own medical

10  background. But while courts in other cases may have found that Dr. Vilke was

11  qualified to offer similar opinions, "demonstrating that an expert has experience

12  does not automatically render every opinion and statement by that expert reliable."

13  *Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1201 (11th Cir. 2010).  The witness must

14  still explain "how that experience leads to the conclusion reached, why that

15  experience is a sufficient basis for the opinion, and how that experience is reliably

16  applied to the facts."  The trial court's gatekeeping function requires more than

17  simply "taking the expert's word for it."  *Id.* (citing FED. R. EVID. 702, Advisory

18  Committee Note, 2000 Amendment).  Dr. Vilke's testimony that the conduct of the

19  American Ambulance defendants meets the professional standard of care does not

20  satisfy this standard.

21       Dr. Vilke acknowledged that there is no training manual, protocol, policy, or

22  procedure that relates to EMS care or paramedics that "says you can put weight on a

23  backboard." Vilke Dep. 20:11-22. Nor is he aware of any treatise, manual or peer-

24  reviewed article, training materials, training bulletin, policy, procedure, health and

25  safety code regulation that authorizes placing a backboard on a prone patient or

26  applying downward pressure. Vilke Dep. II, 57:7-58:16.

27       Dr. Vilke's opinions contradict the testimony of the individual American

28  Ambulance defendants. Initially, when he was deposed, Anderson claimed not to

recall saying "sit on the board," and he claimed that he could not tell whether it was his voice and that this is not "something I would normally do." Anderson Dep., 70:24-71:13. He claimed not to know who gave the instruction to "sit on the board." Anderson Dep., 72:21-23.

At his deposition, Anderson himself acknowledged that "sitting on top of a patient … is generally not a good idea." Anderson Dep., 104:1-8. He acknowledged that one of the reasons that it is not a good idea to sit on people is that they could asphyxiate and stop breathing. Anderson Dep., 104:15-23. Anderson testified: "Yes, you don't sit on people." *Id*.

An inference is that Anderson was disavowing any connection to the statement "sit on that board" at the time of his deposition because he knew that "you don't sit on people." It was only later in the case, in verified discovery responses, that he admitted he was the one who said it.

All of the involved law enforcement and medical personnel who were asked denied ever having placed a board on top of a prone patient in the past. For example, this was the first time Dines had ever restrained a patient to a backboard in a prone position chest down. Dines Dep., 66:7-10. After the incident and to the present day, there was never a case where Dines applied a backboard to the back of someone while they were in a prone position. Dines Dep., 83:21-25. Dines was trained that he should have the patient in a supine position before applying the backboard ("Based on the training, yes.") because that method helps medical personnel visualize the airway. Dines Dep., 84:9-12.

Nor had Ortiz had never seen it happen that a backboard was placed on top of a patient in a prone position, with the patient restrained to the backboard, and this was the only incident in her career where this was done. Ortiz Dep., 71:8-14. Likewise, Calvert had never ever seen it done before, where the board was placed on top of someone's back while the person was in a prone position. Calvert Dep., 62:8-11. Prior to the date of this incident, in Calvert's experience there had never been a

circumstance where a backboard was placed on top of a subject in a prone position, and one or more of the officers or deputies was instructed to sit on top of the board. Calvert Dep., 63:15-22.

The effect of Dr. Vilke's testimony would be as much as to say: "Even though Anderson himself said it is not a good idea to sit on people is that they could asphyxiate and stop breathing, even though Dines said she was trained to have the patient supine before using the backboard, even though none of the training materials or policies authorize it, even though none of the involved personnel ever described doing this in the past, and even though it caused the patient to asphyxiate and die—you should take my word for it that it was consistent with the standard of care." This conclusion does not rest on any concrete foundations, and is simply created by Dr. Vilke out of thin air.

From the standpoint of the standard of care for paramedics, Dr. Vilke's opinions in this case constitute a repetition of what Steve Cole, a training captain with the Ada County Paramedics, called "perhaps one of the most lethal misconceptions in both EMS and law enforcement" in a 2015 article in Calibre Press (one of the largest publishers of police media). "A major misconception is: if he can say that he can't breathe, he can speak; and if he can speak then he has to be breathing. This is both true, and horribly wrong. … Because they are working real hard at breathing, they are often yelling. The officer and/or paramedic may assume the subject is just fine. They will continue to yell and scream, until they don't." Seabaugh Decl., ¶ 7; Exh. "F" (emphasis original).

The forensic pathologist who performed the autopsy determined that Perez asphyxiated as a result of the restraint, and actions that constitute homicide are obviously not consistent with the standard of care for any medical professional. In the absence of any plausible basis for contending that use of the backboard was within the standard of care, and in light of the admissions of the individual

1 defendants, the Court is not required to "take Dr. Vilke's word for it" and should
2 exclude his opinion on this subject.

## IV.   CONCLUSION

In this case, Perez was handcuffed, hobbled, and restrained in a prone position chest down with weight on his back, while a backboard was positioned on his back and an officer sat on it. Perez stated, "I can't breathe," then asphyxiated and died. The medical examiner's unimpeached determination is that Perez asphyxiated and that the manner of death was a homicide.

Dr. Vilke, by his own admission, has testified in around eight to ten other cases where a person said "I can't breathe" and then died while being restrained, and in each case, his opinion was that the person did not asphyxiate. Vilke Dep., 31:2-18. In fact, he has never testified that when a person said "I can't breathe" and then died in the context of an encounter with law enforcement, that the person asphyxiated.  Vilke Dep., 31:19-24.

Before choke holds were banned in California statewide, Dr. Vilke and Dr. Chan were publishing articles claiming that they could be used safely because they are used in judo.[3] Notwithstanding these articles, choke holds were banned by 2020 amendments to Section 7286.5 of the Government Code (Assembly Bill No. 1196). Further amendments in 2021 (Assembly Bill No. 490), notwithstanding the studies of Dr. Vilke and Dr. Chan, ban any manner of restraint that can lead to positional asphyxia. At long last, the tide is beginning to turn against the junk science that has repeatedly been used to cover up excessive force and wrongful death at the hands of the police. Plaintiffs contend that it is high time for federal courts to shut the courthouse doors to Dr. Vilke and Dr. Chan.

_____

[3] *See, e.g.,* Vilke GM: *Neck Holds*. In: *Sudden Deaths in Custody*. Ross DL, Chan TC (Eds.); New Jersey: Humana Press, 2006, pp 15-38.

1    While Plaintiff does not oppose a formal *Daubert* hearing to determine the

2    admissibility of the testimony and opinions of Dr. Vilke and Dr. Chan, Plaintiff

3    submits that the instant motion may be granted without such a hearing. *See United*

4    *States v. Alatorre*, 222 F.3d 1098 (9th Cir. 2000) (trial courts are not compelled to

5    conduct pretrial hearings in order to discharge the gatekeeping function under

6    *Daubert* as to expert testimony).

7

8    Respectfully Submitted,

9    Dated: November 3, 2021      TAYLOR & RING, LLP

10                                THE LAW OFFICE OF THOMAS C. SEABAUGH

11

12                               By_____*/s/ Thomas C. Seabaugh*_____

13                                     Thomas C. Seabaugh
                                       Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Thomas C. Seabaugh, hereby declare as follows:

1.      I am an attorney licensed to practice law in this Court.  I am an attorney of record for the Plaintiffs in this action.  I have personal knowledge of the matters stated herein and would and could testify competently thereto if called. I make this declaration in support of the foregoing motion.

2.      Attached as Exhibit A is a true and correct copy of a published document entitled "Restraint Position and Positional Asphyxia," which was an exhibit in the depositions of defense experts Dr. Gary Vilke and Dr. Theodore Chan in this case and is referenced in the above motion.

3.      Attached as Exhibit B is a true and correct copy of a published document entitled "Reexamination of Custody Restraint Position and Positional Asphyxia," which was an exhibit in the depositions of defense experts Dr. Gary Vilke and Dr. Theodore Chan in this case and is referenced in the above motion.

4.      Attached as Exhibit C is a true and correct copy of a published document entitled "Weight Force During Prone Restraint and Respiratory Function," which was an exhibit in the depositions of defense experts Dr. Gary Vilke and Dr. Theodore Chan in this case and is referenced in the above motion.

5.      Attached as Exhibit D is a true and correct copy of a published document entitled "Ventilatory and Metabolic Demands During Aggressive Physical Restraint in Healthy Adults," which was an exhibit in the depositions of defense experts Dr. Gary Vilke and Dr. Theodore Chan in this case and is referenced in the above motion.

6.      Attached as Exhibit E is a true and correct copy of a published document entitled "Proning: Outcomes of Use of Force Followed With Prone Restraint," which was an exhibit in the depositions of defense experts Dr. Gary Vilke and Dr. Theodore Chan in this case and is referenced in the above motion.

7.      Attached as Exhibit F is a true and correct copy of an order in the District of Wyoming case of Weigel v. Cox, Case No. 04-CV-355-J, which I retrieved from PACER and which is referenced in the above motion.

8.      Attached as Exhibit G is an article entitled "Screaming Their Last Breath: Why first responders must never ignore the words 'I can't breathe,'" which I retrieved on September 8, 2021 from the following URL: https://calibrepress.com/2015/12/screaming-their-last-breath/.

8.      Attached as Exhibit H is a true and correct copy of the referenced excerpts of the deposition of Dr. Gary Vilke in this matter.

9.      Attached as Exhibit I is a true and correct copy of the referenced excerpts of the deposition of Dr. Theodore Chan in this matter (referenced as "Chan Dep.").

10.      Attached as Exhibit J is a true and correct copy of the Rule 26 Report of Dr. Theodore Chan in this matter (referenced as "Chan Report").

11.      Attached as Exhibit K is a true and correct copy of the referenced excerpts of the deposition of Dr. Gary Vilke in this matter (referenced as "Vilke Dep.").

12.      Attached as Exhibit L is a true and correct copy of the Rule 26 Report of Dr. Theodore Chan in this matter (referenced as "Vilke Report").

13.      Attached as Exhibit M is a true and correct copy of the referenced excerpts of the deposition of Defendant Anderson in this matter (referenced as "Anderson Dep.").

14.      Attached as Exhibit N is a true and correct copy of the referenced excerpts of the deposition of Joel Dines in this matter (referenced as "Dines Dep.").

15.      Attached as Exhibit O is a true and correct copy of the referenced excerpts of the deposition of Jennifer Ortiz in this matter (referenced as "Ortiz Dep.").

16.     Attached as Exhibit P is a true and correct copy of the referenced excerpts of the deposition of Defendant Calvert in this matter (referenced as "Calvert Dep.").

17.     Attached as Exhibit Q is a true and correct copy of the referenced excerpts of the deposition of Dr. Michael Chambliss in this matter (referenced as "Chambliss Dep.").

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct, and that this declaration was executed this 3rd day of November 2021 at Los Angeles, California.

*s/ Thomas C. Seabaugh*

Thomas C. Seabaugh

PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY AND OPINIONS OF VILKE AND CHAN