# Exhibit A

GENERAL CLINICAL INVESTIGATION/ORIGINAL CONTRIBUTION

# Restraint Position and Positional Asphyxia

From the Department of Emergency Medicine* and the Division of Pulmonary Medicine, Department of Medicine,[†] University of California San Diego Medical Center, San Diego, California.

Received for publication November 11, 1996. Revision received March 24, 1997. Accepted for publication May 8, 1997.

An abstract of this study was presented at the Society for Academic Emergency Medicine annual conference, Washington DC, May 1997.

Supported in part by grant No. 94-1974R from the County of San Diego and by grant MO1 RR0087 from the General Clinical Research Center, National Center for Research Resources, National Institutes of Health.

Copyright © by the American College of Emergency Physicians.

Theodore C Chan, MD*
Gary M Vilke, MD*
Tom Neuman, MD*,‡
Jack L Clausen, MD[†‡]

**Study objective:** To determine whether the "hobble" or "hogtie" restraint position results in clinically relevant respiratory dysfunction.

**Methods:** This was an experimental, crossover, controlled trial at a university-based pulmonary function laboratory involving 15 healthy men ages 18 through 40 years. Subjects were excluded for a positive urine toxicology screen, body mass index (BMI) greater than 30 kg/m$^2$, or abnormal screening pulmonary function testing (PFT). Forced vital capacity (FVC), forced expiratory volume in 1 second (FEV$_1$), and maximal voluntary ventilation (MVV) were obtained with subjects in the sitting, supine, prone, and restraint positions. After a 4-minute exercise period, subjects rested in the sitting position while pulse, oxygen saturation, and arterial blood gases were monitored. The subjects repeated the exercise, then were placed in the restraint position with similar monitoring.

**Results:** There was a small, statistically significant decline in the mean FVC (from 5.31±1.01 L [101%±10.5% of predicted] to 4.60±.84 L [88%±8.8% of predicted]), mean FEV$_1$ (from 4.31±.53 L [103%±8.4%] to 3.70±.45 L [89%±7.7%]), and mean MVV (from 165.5±24.5 L/minute [111%±17.3%] to 131.1±20.7 L/minute [88%±16.6%]), comparing sitting with restraint position (all, $P$<.001). There was no evidence of hypoxia (mean oxygen tension [Po$_2$] less than 95 mm Hg or co-oximetry less than 96%) in either position. The mean carbon dioxide tension (Pco$_2$) for both groups was not different after 15 minutes of rest in the sitting versus the restraint position. There was no significant difference in heart rate recovery or oxygen saturation as measured by co-oximetry and pulse oximetry.

**Conclusion:** In our study population of healthy subjects, the restraint position resulted in a restrictive pulmonary function pattern but did not result in clinically relevant changes in oxygenation or ventilation.

[Chan TC, Vilke GM, Neuman T, Clausen JL: Restraint position and positional asphyxia. *Ann Emerg Med* November 1997;30:578-586.]

## INTRODUCTION

Prehospital medical and law enforcement personnel often confront and care for violent, agitated individuals who must be subdued in order to prevent injury to themselves or others. A variety of physical restraints are used in this setting to accomplish these goals. Certain physical restraints used by field personnel have been reported to be detrimental to the restrained individual, possibly resulting in significant morbidity and even mortality for the apprehended person. In the early 1980s, widespread reports of deaths from police neck "choke holds" resulted in changes in physical restraint policies nationwide.[1,2]

Recent attention has focused on the use of the "hogtie" or "hobble" restraint position and its possible role in the sudden deaths of individuals placed in this custody restraint position.[3-6] In this restraint, individuals are placed in the prone position with their wrists handcuffed or tied together behind their backs and their ankles bound together and secured to their wrists. It has been suggested that this position adversely affects a person's ability to breathe by interfering with chest wall and abdominal movements necessary for normal breathing.[7]

As a result, sudden, unexpected deaths in persons so restrained have been attributed to hypoventilatory respiratory failure from body position or "positional asphyxia."[3-6] This theory has been based primarily on the work of Reay et al,[7] who reported that healthy individuals placed in the restraint position after periods of exercise had prolonged recovery times for heart rate and oxygen saturation as measured by pulse oximetry.

We sought to investigate "positional asphyxia" and respiratory compromise in subjects held in the restraint position. A two-phase study was conducted in healthy men. In the first phase, pulmonary function was measured with the subject in various body positions, including the restraint position, to determine whether any compromise in ventilatory mechanics occurred. In the second phase, oxygenation and ventilation were monitored by arterial blood gas measurements, heart rate monitoring, and pulmonary function testing (PFT) to determine whether any ventilatory compromise or alteration in gas exchange occurred when the subject was placed in the restraint position after exercise.

## MATERIALS AND METHODS

The experimental study design and protocol were reviewed and approved by the Human Subjects Committee of the University of California, San Diego. Fifteen healthy male volunteers between the ages of 18 and 40 years were enrolled

in the study. Informed consent was obtained from all individuals who agreed to participate in the study. Subjects who completed the study were financially compensated.

Exclusion criteria included any history of pulmonary disease (including asthma), cardiac disease, recreational drug use, or other significant illness or disability that would limit the ability to perform the exercise regimen required for the study. Individuals with a body mass index (BMI, defined as the weight in kilograms divided by the square of the height in meters) greater than 30 $kg/m^2$ were also excluded.

Potential subjects underwent both a urine toxicologic screening and screening PFT before acceptance into the study. Urine specimens were collected and tested by means of toxicologic immunoassay for the presence of urinary metabolites for the following drugs: marijuana, cocaine, amphetamines, phencyclidine, benzodiazepines, and opiates. Individuals were excluded if the immunoassay detected any of these substances in the urine.

Initial screening PFT were performed with spirometry as outlined in the next paragraph. Peak expiratory flow rates and lung volumes were measured while potential subjects were in the sitting position. Forced vital capacity (FVC) and forced expiratory volume in 1 second ($FEV_1$) were measured while the subject was in the sitting position with feet flat on the floor and back against the chair. Spirometry was performed in accordance with the American Thoracic Society criteria, including reproducibility within 5% variability on three repeat measurements.[8] Abnormal PFT results (FVC and $FEV_1$) were defined as measurements below the fifth percentile of the normal range (1.65 times the SD for Student's one-tailed $t$ test) for each subject with a given height, age, and race.[9,10] Abnormal results were verified with repeated measurements, and subjects with confirmed FVC or $FEV_1$ values lower than 80% of predicted were excluded.

In phase 1 of the study, subjects underwent PFT in the following positions: sitting, supine, prone, and restraint. In the sitting position, the subject sat in a chair with his feet flat on the floor and his back upright against the back of the chair. In the supine position, the subject lay flat on his back on a medical examination table with his arms at his sides and his legs in full extension with the feet together. In the prone position, the subject lay flat on his stomach on a medical examination table with his head turned to the side, his arms at his sides, and his legs in full extension with the feet together. In the restraint position, the subject lay on his stomach. To allow secure placement of a radial artery line, each wrist and hand were taped to an armboard, which was then taped to the sole of the ipsilateral shoe with the knee flexed behind the subject (Figure 1). The metacarpal-phalangeal joints of the hands were placed in line with the heels

of the feet. This position closely approximates the restraint position noted in previous studies and case reports in the prehospital setting.[3,4,7] The subject's feet were then taped together and his head was turned to the side. The order of positions (supine, prone, or restrained) was randomized to prevent any potential influence of serial testing on the measurements obtained. The sitting position was used last in all cases to allow for comparison with the initial screening PFT results and to ensure that no significant change had occurred (because of repeated measurements) since the initial screening PFT values. Measurements obtained in each of the four positions included FVC, $FEV_1$, $FEV_1$/FVC% (calculated), and maximal voluntary ventilation (MVV). MVV was repeated twice for a duration of at least 6 seconds to ensure reproducibility.

In phase 2 of the study, subjects underwent two exercise periods and two rest periods. The first rest period occurred with the subject in the sitting position and the second in the restraint position; the order of positions was not randomized. During each rest period, serial arterial blood gas (ABG) measurements, pulse rate, and oxygen saturation by co-oximetry and pulse oximetry were recorded according to the protocol described in the following paragraphs. Additional PFT measurements were also performed during the rest periods, as described.

To allow for multiple blood gas samples, a 20-gauge radial arterial line was placed in one of the subject's wrists. Three-lead ECG monitor leads were placed for continuous heart rate monitoring. Transcutaneous oximetry was measured by pulse oximeter probes placed on the ear lobe ipsilateral

to the side of the radial arterial line and on the index finger of the hand contralateral to the radial arterial line.

In the first exercise period, subjects exercised on a cycle ergometer at 175 W for 4 minutes. ABG samples were drawn immediately before the start of exercise and immediately after the end of exercise. Oxygen saturation by ear and finger probes and pulse rate by ECG tracing were recorded at the start of exercise, at 2 minutes into exercise, and at the end of exercise.

After the first exercise period the subject rested in the sitting position for 15 minutes. During this first rest period, blood samples for ABG analysis were obtained at 1.5 minutes and 15 minutes into rest. PFT was performed at 3 minutes into the first rest period. Oxygen saturation by both ear and finger probes and pulse rate by ECG tracing were recorded every 3 minutes during the first rest phase.

Once the heart rate had returned to less than 100 beats/minute, the subject underwent a second exercise period, performing the same level of exercise as in the first period. Blood samples for ABG analysis were obtained before the start of exercise and immediately after the end of exercise. Oxygen saturation by both ear and finger probes and pulse rate by ECG tracing were recorded at the start of exercise, at 2 minutes into exercise, and at the end of exercise.

The subject was placed in the restraint position immediately after the second exercise period and remained in this position for 15 minutes. Blood samples for ABG analysis were obtained at 1.5 minutes and 15 minutes into the restraint period. PFT was performed at 3 minutes into the restraint period. Oxygen saturation by both ear and finger probes and pulse rate by ECG tracing were recorded every 3 minutes during this period. All ABG sampling and analyses were performed in a uniform manner, and results were verified by repeated testing of each sample on separate machines that were both internally and manually calibrated on a daily basis.

Raw PFT measurements were converted to percentages of predicted values (% predicted) for each subject to allow for normalization for age, height, and race.[9,10] Results are reported as mean±SD. For phase 1 of the study, one-way ANOVA for repeated measures, with position as the factor, and Student's *t* test were used to detect any statistically significant difference in the randomized PFT measurements. A probability value of less than .05 was considered statistically significant. For phase 2 of the study, two-way ANOVA for repeated measures, with position and time as the factors, and Student's *t* test were used to detect any statistically significant difference in $PO_2$, co-oximetry, $PCO_2$, and pulse rate between the two rest periods (ie, sitting versus restrained position). A probability value of less than .05 was considered



**Figure 1.**
*Diagram of restraint position. Subjects were placed in the prone position with hands and wrists taped to armboards behind the back and secured to the feet with knees flexed. Diagram by S Manitsas.*

statistically significant. We used a computerized statistical package (PCinfo! [Retriever Data Systems] and Biomedical Data Programs [Statistical Packages for the Social Sciences]) for these analyses.

## RESULTS

Two potential subjects were excluded for abnormal screening PFT measurements, and another individual was excluded for BMI greater than 30 kg/m$^2$. None of our potential subjects had a urine toxicology screen result that was positive for recreational drug use.

The results of this study demonstrated significant changes in both static and dynamic pulmonary function testing with position and exercise. FVC was significantly decreased (P<.001) in the supine position (mean, 4.95±.93 L [94% ±9.9% of predicted]; range, 3.21 to 7.20 L), the prone position (4.92±.95 L [94%±10.2%]; range, 3.28 to 7.18 L), and the restraint position (4.60±.84 L [88%±8.8%]; range, 3.34 to 6.54 L), compared with the sitting position (5.31 ±1.01 L [101%±10.5%]; range, 3.65 to 7.90 L). FVC was also significantly less (P<.001) in the restraint position compared with the supine or the prone position, but the difference between the supine and prone positions was not significant. Exercise appeared to have no effect on the FVC in the sitting position (5.32±1.03 L [101%±10.5%]; range, 3.88 to 8.00 L; P>.30). However, in the restraint position, exercise caused a statistically significant increase in the FVC (4.74±.84 L [91%± 8.7%]; range, 3.47 to 6.89 L; P<.028). The Table reveals FVC results in terms of percentage of predicted value and the magnitude of change by position.

$FEV_1$ decreased similarly to FVC with change in position. $FEV_1$ was significantly less (P<.001) in the supine position (3.99±.54 L [95%±8.7%]; range, 2.81 to 4.79 L), the prone position (3.94±.52 L [94%±8.8%]; range, 2.83 to 4.63 L), and the restraint position (3.70±.45 L [89%±7.7%]; range, 2.90 to 4.44 L), compared with the sitting position (4.31± .53 L [103%±8.4%]; range, 3.19 to 4.95 L). The $FEV_1$ was also less in the restraint position compared with the supine or the prone position (P<.001), but the difference between the supine and prone positions was not significant. Exercise appeared to increase the $FEV_1$ in both the sitting position

**Table.**

*Changes in static and dynamic pulmonary function tests in various positions. Percentages of predicted values were determined after normalization for height, age, and race in sitting position.[9,10] Probability values reflect significance compared with pre-exercise sitting values.*

| Parameter | Measurement (Mean±SD) | % of Predicted | | Change From Sitting | P |
| --- | --- | --- | --- | --- | --- |
| | | Mean±SD | Range | | |
| **FVC (L)** | | | | | |
| Sitting | 5.31±1.01 | 101±10.5 | 91–124 | — | — |
| Postexercise sitting | 5.32±1.03 | 101±10.5 | 97–125 | 0 | >.30 |
| Supine | 4.95±.93 | 94±9.9 | 80–113 | –7 | <.001 |
| Prone | 4.92±.95 | 94±10.2 | 82–112 | –7 | <.001 |
| Restraint | 4.60±.84 | 88±8.8 | 83–102 | –13 | <.001 |
| Postexercise restraint | 4.74±.84 | 91±8.7 | 87–108 | –10 | <.001 |
| **FEV$_1$ (L)** | | | | | |
| Sitting | 4.31±.53 | 103±8.4 | 94–124 | — | — |
| Postexercise sitting | 4.47±.52 | 107±9.1 | 101–103 | +4 | <.001 |
| Supine | 3.99±.54 | 95±8.7 | 83–96 | –8 | <.001 |
| Prone | 3.94±.52 | 94±8.8 | 83–97 | –9 | <.001 |
| Restraint | 3.70±.45 | 89±7.7 | 85–93 | –14 | <.001 |
| Postexercise restraint | 3.93±.38 | 94±8.7 | 93–113 | –9 | <.001 |
| **FEV$_1$/FVC%** | | | | | |
| Sitting | 82.0±6.41 | 102±7.1 | 80–108 | — | — |
| Postexercise sitting | 85.1±8.08 | 106±9.2 | 82–118 | +4 | <.001 |
| Supine | 81.4±5.61 | 101±6.0 | 85–103 | –1 | >.15 |
| Prone | 81.1±6.14 | 101±6.8 | 81–102 | –1 | >.15 |
| Postexercise restraint | 81.2±6.34 | 101±7.0 | 81–106 | –1 | >.15 |
| Postexercise restraint | 83.4±8.68 | 104±9.8 | 76–114 | +2 | >.15 |
| **MVV** | | | | | |
| Sitting | 165.5±24.5 | 111±17.3 | 90–123 | — | — |
| Supine | 151.5±22.2 | 101±13.9 | 73–113 | –10 | <.001 |
| Prone | 143.5±20.0 | 96±14.8 | 76–128 | –15 | <.001 |
| Restraint | 131.1±20.7 | 88±16.6 | 65–120 | –23 | <.001 |

(4.47±.52 L [107%±9.1%]; range, 3.19 to 4.95 L; $P<.001$) and the restraint position (3.93±.83 L [94%±8.7%]; range, 3.17 to 4.51 L; $P<.001$). Because there were similar decreases in $FEV_1$ and FVC, there were no significant changes in $FEV_1/FVC\%$ ($P>.15$). The Table reveals $FEV_1$ and $FEV_1/FVC\%$ results in terms of percentage of predicted value and the magnitude of change by position.

MVV decreased in a statistically significant fashion ($P<.001$) from the sitting (165.5±24.5 L/minute [111%±17.3%]; range, 128 to 210 L/minute), to the supine (151.5±22.2 L/minute [101%±13.9%]; range, 105 to 185 L/minute), to the prone (143.5±20.0 L/minute [96%±14.8%]; range, 109 to 185 L/minute), to the restraint positions (131.1±20.7 L/minute [88%±16.6%]; range, 93 to 173 L/minute). The Table reveals MVV results in terms of percentage of predicted value and the magnitude of change by position.

This study also revealed significant changes in gas exchange with exercise in both the sitting and the restraint position. In the sitting position, gas exchange improved with exercise ($P<.001$). The $Po_2$ increased from a baseline of 91.4±7.2 mm Hg (range, 81 to 105 mm Hg) to 108.7±8.0 mm Hg (range, 96 to 125 mm Hg) after 4 minutes of exercise. After 1.5 minutes of rest the $Po_2$ was 122.7±5.8 mm Hg (range, 110 to 132 mm Hg); after 15 minutes of rest it had fallen back toward baseline and was 102.4±8.7 mm Hg (range, 84 to 115 mm Hg). The $Pco_2$ also changed significantly with exercise ($P<.001$). From a baseline of 38.5±2.8 mm Hg (range, 31 to 41 mm Hg), $Pco_2$ fell to 34.5±3.9 mm Hg (range, 29 to 41 mm Hg) after 4 minutes of exercise. The $Pco_2$ was 31.3±2.6 mm Hg (range, 28 to 36 mm Hg) after 1.5 minutes of rest; after 15 minutes of rest the $Pco_2$ remained lower than baseline at 32.9±2.7 mm Hg (range, 28 to 37 mm Hg). Because the changes in both $Pco_2$ and $Po_2$ were statistically significant, the change in the alveolar-arterial oxygen gradient across time was also significant ($P<.001$).

Immediately after exercise, just before the subject was placed in the restraint position, the $Po_2$ had again improved ($P<.012$), from a baseline of 102.4±8.7 mm Hg (range, 84 to 115 mm Hg) to 109.8±9.3 mm Hg (range, 93 to 128 mm Hg) after 4 minutes of exercise. As the subjects were being placed in the restraint position (1.5 minutes after the

**Figure 2.**

*Heart rate recovery during resting periods: sitting versus restraint positions. The X-axis indicates time into each rest period (in minutes) after cessation of exercise. The Y-axis indicates mean heart rate in beats/minute for the 15 subjects. Standard deviation of the mean is shown by error bars.*



end of exercise) the $Po_2$ increased further to 114.0±7.6 mm Hg (range, 103 to 128 mm Hg), and after 15 minutes in the restraint position the $Po_2$ was 99.1±9.3 mm Hg (range, 86 to 120 mm Hg). Likewise, the $Pco_2$ fell ($P<.001$) with exercise, from an initial 32.9±2.7 mm Hg (range, 28 to 37 mm Hg) to 30.7±3.8 mm Hg (range, 24 to 37 mm Hg) after 4 minutes of exercise, just before the subject was placed in the restraint position. As the subjects were being placed in the restraint position the $Pco_2$ was 31.0±3.4 mm Hg (range, 26 to 37 mm Hg); after 15 minutes in this position the $Pco_2$ remained lower than baseline at 32.7±3.2 mm Hg (range, 26 to 38 mm Hg).

Comparing the ABG results in the sitting position to the results as the subjects were being placed in the restraint position (ie, 1.5 minutes into rest in the sitting position versus 1.5 minutes into the restraint position), the $Po_2$ increased to a smaller value with restraint than with sitting (114.0±7.6 mm Hg versus 122.7±5.8 mm Hg; $P<.01$), whereas the $Pco_2$ was the same in both groups (31.3±2.6 mm Hg versus 31.0±3.4 mm Hg; $P>.28$). Comparison of ABG results after 15 minutes in the sitting position with those after 15 minutes in the restraint position revealed no significant differ-

ences in either the $Po_2$ (102.5±8.7 mm Hg versus 99.1 ±9.3 mm Hg; $P>.234$) or the $Pco_2$ (32.9±2.7 mm Hg versus 32.7±3.2 mm Hg; $P>.30$).

Changes in heart rate also occurred with exercise, with a maximum heart rate of 164±18.9 beats/minute (range, 218 to 180) at the beginning of the sitting rest period and 174±15.3 beats/minute (range, 146 to 198) at the beginning of the restraint rest period. Throughout the two rest periods, there was no statistically significant difference in mean heart rate recovery (Figure 2).

Examination of oxygen saturation as measured by co-oximetry revealed only minor, nonsignificant increases over the initial baseline. Comparison between oxygen saturation values measured by co-oximetry and by pulse oximetry also revealed no statistically significant differences for any time period (Figure 3).

## DISCUSSION

The term "positional or mechanical asphyxia" has been used to explain the deaths of certain individuals. Bell et al[11] described 30 such cases of individuals whose bodies were found in positions that caused either external airway obstruc-

**Figure 3.**

*Oxygen saturation over time. The X-axis indicates the various time periods (Ex1, first exercise period; R1, first rest period in sitting position; Ex2, second exercise period; R2, second rest period in restraint position). The Y-axis indicates mean oxygen saturation by pulse oximetry (both finger and ear monitors) for the 15 subjects. Standard deviation of the mean is shown by error bars.*



**Ex1,** first exercise period; **R1,** first rest period; **Ex2,** second exercise period; **R2,** restraint period.

Case 1:18-cv-00127-AWI-EPG   Document 153-1   Filed 11/03/21   Page 8 of 177
RESTRAINT AND ASPHYXIA
Chan et al

tion or inadequate ventilatory function. In all cases, there were no other significant life-ending pathologic findings and the deaths were attributed to "positional asphyxiation." Similar asphyxiation deaths have been described involving the use of vest, jacket, or posey restraints that were accidentally wrapped around the necks of nursing home and geriatric patients and resulted in strangulation.[12-15] There have been a few reports of ventilatory failure and asphyxiation caused by restraints that reportedly compressed the chest and abdomen to the point that mechanical ventilatory function was impaired.[16-18] Recently, attention has focused on the possible role of "positional asphyxia" in deaths that have occurred in persons restrained in the "hobble" or "hogtie" position by law enforcement or prehospital field personnel. This position places the individual prone with the wrists and ankles bound behind the back.[2-6] Reay et al[3] suggested that this position prevents adequate chest wall expansion and abdominal and diaphragmatic excursion for normal ventilatory function and breathing. They postulated that this inability to expand the thoracic cavity, and disadvantage in pulmonary mechanics, leads to hypoventilatory respiratory compromise, asphyxiation, and death.

Hirsh[18] argued that the employment of this restraint position constitutes use of a "potentially lethal force" and that such deaths should be classified as homicides. However, most of the reported cases have involved young men in a state of "excited" or "agitated delirium" as a result of intoxication from recreational drugs or psychiatric illness. In addition, these individuals had often suffered traumatic injuries before and during placement in the restraint position. Many have argued that these other factors (ie, intoxication, stress, and trauma), as opposed to asphyxiation strictly due to body positioning, played a greater role in causing these deaths.[19,20]

Reay et al[7] studied 10 healthy individuals and found measurable physiologic effects with application of the restraint position after exercise. They reported that prolonged times were required for recovery to baseline in the restraint position after exercise, both for heart rate (mean, .40 minutes longer) and for peripheral oxygen saturation measured by transcutaneous ear probe (mean, .33 minutes longer). Based on these findings, they suggested that positional asphyxia plays an important role in the deaths of persons placed in the restraint position.

A number of concerns exist with the work of Reay et al. First, there was no assessment of actual ventilatory function and respiratory mechanics in subjects placed in the restraint position. Second, although Reay et al reported a drop in oxygen saturation (to 85% to 90%) with exercise in their subjects, previous work has demonstrated improvements in arterial oxygenation with mild to moderate levels of exer-

cise in healthy individuals.[21] Third, the preferred method for assessing arterial blood oxygenation remains ABG measurements. Oxygen saturation measurement by pulse oximetry has been shown to be a potentially inaccurate measure of arterial oxygenation, particularly during exercise.[22-25]

In this study, we assessed ventilatory function by PFT with subjects in various body positions. We found a restrictive pulmonary function pattern in healthy subjects placed in the restraint position, with small but significant decreases in the percentage of predicted FVC and $FEV_1$. Associated with these drops in lung volumes was a corresponding 23% decrease in percentage of predicted MVV. There was no evidence of obstruction and no significant change in $FEV_1$/FVC% from baseline.

Given the fact that PFT measurements as low as 80% of predicted values are still considered clinically normal, these changes, although statistically significant, are not clinically relevant.[26] In reviewing the ranges of PFT data we obtained, none of our subjects had results for FVC and $FEV_1$ lower than 80% of predicted in any of the positions, including the restraint position. The range of data for MVV did fall below 80% of predicted for certain outlier individuals in the restraint position, although similar decreases below 80% of predicted were also seen in the supine and prone positions.

In contrast to the studies of Reay et al, arterial oxygenation measurements were obtained in this study by both ABG sampling and transcutaneous finger and ear oxygen saturation probes. Based on arterial $Po_2$ and co-oximetry, we found that oxygenation increases, rather than decreases, with exercise. This finding is consistent with previous, well-established work on exercise physiology.[21,27] In addition, despite our PFT findings, we found no evidence of hypoxia while subjects were in the restraint position after exercise. The improvements in oxygenation occurred in the face of a more vigorous exercise regimen than that described by Reay et al. Reay required subjects to exercise on a cross-country skiing machine only until their heart rates reached a maximum of 120 beats/minute. The subjects in this study exercised for 4 minutes continuously on an exercise bicycle, and the mean heart rate at the end of exercise was 169 beats/minute.

Equally important, despite decreases in MVV, there was no evidence of hypercapnia either during exercise or during rest in the restraint position. In fact, mean $Pco_2$ levels decreased during exercise and remained lower than 40 mm Hg for as long as 15 minutes during the restraint rest position. Despite the restrictive pattern demonstrated by PFT, there was no evidence for ventilatory failure, significant hypoventilation, or asphyxiation as a result of body positioning while subjects were in the restraint position.

Case 1:18-cv-00127-AWI-EPG   Document 153-1   Filed 11/03/21   Page 9 of 177
RESTRAINT AND ASPHYXIA
*Chan et al*

Based on these findings in healthy subjects, we suggest that factors other than body positioning are more important determinants for the sudden, unexpected deaths that occur in individuals who are placed in the restraint position. Recreational drug use (including sympathomimetic, hallucinogenic, and psychomotor stimulant drugs), physiological stress, hyperactivity, hyperthermia, catechol hyperstimulation, and trauma resulting from struggle may be more important factors in the deaths of these individuals.[19,20,28,29] Although restraints in general increase the psychological and physiologic stresses on the individual,[28,30] there is no evidence that body position while in the "hogtie" or "hobble" restraint position as a factor in and of itself causes hypoventilation or asphyxiation.

There are limitations to this study. First, we restricted subjects to healthy men between the ages of 18 and 40 years with a BMI less than 30 kg/m², most cases reported in the literature involve this population. It is not known what effect positional restraint may have on women, the young, the elderly, or other individuals with underlying cardiopulmonary disease or disability. It is possible that extremely obese individuals with large abdominal girths and BMIs greater than 30 kg/m² may be at greater risk for development of restrictive pulmonary function pattern as a result of abdominal compression from body position.

We specifically excluded potential subjects who had a positive result on urine toxicology screening for recreational drug use. As noted previously, many of the deaths of restrained individuals involved subjects who were intoxicated or under the influence of recreational drugs. Stimulants, such as cocaine and amphetamines, may increase oxygen demand and muscle fatigue, affecting overall respiratory function.

Although we randomized the order of positions for PFT, we did not randomize the sitting and restraint position rest phases after exercise in our study. All subjects rested in the sitting position first, after the initial exercise period, then exercised again and rested in the restraint position. We believe that 15 minutes of sitting rest should have been adequate time for values to return to baseline after 4 minutes of exercise. Any residual metabolic or respiratory derangements remaining after the first rest period would bias our study in favor of detecting significant abnormalities in the restraint position. In addition, we did not measure respiratory rate as an indicator of ventilatory status. We believe that the combination of MVV and serial $P_{CO_2}$ provides a more appropriate measure of ventilatory status than does respiratory rate.

This study did not attempt to duplicate exact field conditions under which restraint position deaths have occurred. Although many such deaths have occurred on gurney mattresses or cushioned car seats in the field, some deaths have occurred while persons were in the restraint position on the ground.[3] Deaths have also occurred on the floors of police cars, where the contoured surface may have increased abdominal compression.[3] In addition, these individuals may have been subject to forceful apprehension, during which pressure may have been exerted on their backs while they were in the restraint position. What effects these differences may have remain to be determined.

We kept our subjects in the restraint position for 15 minutes after the exercise period. We believe that this was adequate time to detect any physiologic or respiratory impairment in subjects. It is possible that had our subjects remained in the restraint position for a longer period we may have detected more significant alterations in respiratory physiology. However, most death of individuals in the restraint position have occurred after only a short period (often less than 10 minutes) in restraint,[3-6] and it has been suggested by others that this short duration of restraint positioning should not be fatal.[19]

We attempted to reproduce the physiologic effects of struggle by requiring our subjects to exercise for 4 minutes before being placed in the restraint position. It is unlikely that this period of exercise will simulate all the physiologic alterations that may occur with struggle and agitation. In addition, we did not reproduce the effects of trauma and psychological stress that often occur with apprehended individuals. However, the respiratory mechanics of our subjects (as evidenced by increased FVC and $FEV_1$) improved with exercise.

It is possible that a combination of factors, including underlying medical condition, intoxication, agitation, delirium, and struggle as well as body position, may result in respiratory compromise that would not be detected by our study. We sought to examine only the role of body position as a factor affecting pulmonary function and respiratory physiology. Although we found that body position by itself does not result in significant respiratory compromise, further research is needed on the role of these other factors in the deaths of individuals placed in the restraint position.

In conclusion, although we found a small restrictive pulmonary function pattern by PFT parameters in subjects who were placed in the restraint position, we found no evidence of hypoxia or hypercapnia on serial ABG measurements. By itself, the restraint position was not associated with any clinically relevant changes in respiratory or ventilatory function in our study population of healthy individuals with preserved ventilatory reflexes and normal pulmonary physiology. There is no evidence to suggest that hypoventilatory respiratory failure or asphyxiation occurs as a direct result

of body restraint position in healthy, awake, nonintoxicated individuals with normal cardiopulmonary function at baseline.

## REFERENCES

1. Reay DT, Eisele JW: Deaths from law enforcement neck holds. *Am J Forensic Med Pathol* 1982;3:253.

2. Luke JL, Reay DT: The perils of investigating and certifying deaths in police custody. *Am J Forensic Med Pathol* 1992;13:98.

3. Reay DT, Fligner CL, Stilwell AD, et al: Positional asphyxia during law enforcement transport. *Am J Forensic Med Pathol* 1992;13:90.

4. O'Halloran RL, Lewman LV: Restraint asphyxiation in excited delirium. *Am J Forensic Med Pathol* 1993;14:289.

5. Stratton SJ, Rogers C, Green K: Sudden death in individuals in hobble restraints during paramedic transport. *Ann Emerg Med* 1995;25:710.

6. Cowen AR: In a bind. A lawsuit forces LA medics and police to reexamine their policy on applying restraints. Emergency Medical Services 1995;24:54-8.

7. Reay DT, Howard JD, Fligner CL, Ward RJ: Effects of positional restraint on oxygen saturation and heart rate following exercise. *Am J Forensic Med Pathol* 1988;9:16.

8. American Thoracic Society: Standardization of spirometry: 1994 Update. *Am J Respir Crit Care Med* 1995;152:1107.

9. Morris JF: Spirometric standards for healthy non-smoking adults. *Am Rev Respir Dis* 1971;103:57.

10. Bass H: The flow volume loop: Normal standards and abnormalities in chronic obstructive pulmonary disease. *Chest* 1973;63:171.

11. Bell MD, Rao VJ, Wetli CV, et al: Positional asphyxiation in adults: A series of 30 cases from the Dade and Broward county Florida medical examiner offices from 1982 to 1990. *Am J Forensic Med Pathol* 1992;13:101.

12. Dube AH, Mitchell EK: Accidental strangulation from vest restraints. *JAMA* 1986;256:2725.

13. Katz L: Accidental strangulation from vest restraints. *JAMA* 1987;257:2032.

14. DiMaio VJM, Dana SE, Bux RC: Deaths caused by restraint vests. *JAMA* 1986;256:905.

15. Miles S: A case of death by physical restraint: New lessons from a photograph. *J Am Geriatr Soc* 1996;44:291.

16. Miles HS, Irvine P: Deaths caused by physical restraints. *Gerontologist* 1992;32:762.

17. Emson HE: Death in a restraint jacket from mechanical asphyxia. *Can Med Assoc J* 1994;151:985.

18. Hirsh CS: Restraint asphyxiation. *Am J Forensic Med Pathol* 1994;15:266.

19. Laposata EA: Positional asphyxia during law enforcement transport. *Am J Forensic Med Pathol* 1993;14:86.

20. Karch SB: Agitated delirium versus positional asphyxia. *Ann Emerg Med* 1995;26:760.

21. Wasserman K, Hansen JE, Sue DY, et al: Normal values, in Wasserman K, Hansen JE, Sue DY, et al (eds): *Principles of Exercise Testing and Interpretation*, ed 2. Philadelphia: Lea & Febiger, 1994:127-128.

22. Biebuyck JF: Pulse oximetry. *Anesthesiology* 1989;70:98.

23. Norton LH, Squires B, Craig NP, et al: Accuracy of pulse oximetry during exercise stress testing. *Int J Sports Med* 1992;13:523.

24. Hansen JE, Casaburi R: Validity of ear oximetry in clinical exercise testing. *Chest* 1987;91:333.

25. Brown DD, Knowlton RG, Sanjab PB, et al: Re-examination of the incidence of exercise-induced hypoxaemia in highly trained subjects. *Br J Sports Med* 1993;27:167.

26. Clausen JL: Pulmonary function testing, in Bordow RA, Moser KM (eds): *Manual of Clinical Problems in Pulmonary Medicine*, ed 4. Boston: Little, Brown, 1996:9-19.

27. Comroe JH (ed): Respiratory adjustments in health, in *Physiology of Respiration*, ed 2. Chicago: Yearbook Medical, 1975:234-241.

28. Mirchandani HG, Rorke LB, Sekuia-Perlman A, et al: Cocaine-induced agitated delirium, forceful struggle, and minor head injury. *Am J Forensic Med Pathol* 1994;15:95.

29. Robinson BE, Sucholeiki R, Schocken DD: Sudden death and resisted mechanical restraint: A case report. *J Am Geriatr Soc* 1993;41:424.

30. Pudiak CM, Bozarth MA: Cocaine fatalities increased by restraint stress. *Life Sci* 1994;55:379.

The authors thank Jeffrey Johnson, Carlos Lopez, and Paul Schragg for their assistance.

**Reprint no. 47/1/85377**

**Address for reprints:**

Theodore Chan, MD

Department of Emergency Medicine

University of California San Diego Medical Center

200 West Arbor Drive #8676

San Diego, California 92103

619-543-6463

Fax 619-543-3115

E-mail tcchan@ucsd.edu

Exhibit B





The American Journal of Forensic Medicine and Pathology: Volume 19(3) September 1998 pp 201-205

# Reexamination of Custody Restraint Position and Positional Asphyxia

Chan, Theodore C. M.D.; Vilke, Gary M. M.D.; Neuman, Tom M.D.

From the Department of Emergency Medicine, University of California San Diego Medical Center, San Diego, California, U.S.A.

Received June 20, 1997; accepted June 25, 1997.

Address correspondence and reprint requests to Theodore Chan, University of California San Diego Medical Center, 200 West Arbor Drive #8676, San Diego, CA 92103, U.S.A.

Abstract

The use of the hogtie restraint (also known as hobble or prone maximal restraint) by law enforcement and prehospital personnel has come under scrutiny because of reports of sudden deaths in persons placed in this restraint position. Some contend that this body position restricts chest and abdominal movement to the point that individuals are at risk for hypoventilatory respiratory compromise and "positional" asphyxiation. We review case reports of custody deaths in subjects placed in the hogtie position, as well as related medical literature regarding positional asphyxia. We also review the current research findings from human physiology studies that have investigated the effects of the hogtie position on respiratory and pulmonary function. We conclude that the hogtie restraint position by itself does not cause respiratory compromise to the point of asphyxiation and that other factors are responsible for the sudden deaths of individuals placed in this position.

Physical restraints are commonly used by law enforcement and prehospital medical personnel to subdue violent, combative individuals. Certain methods and techniques of physical restraint have been found to be potentially harmful to individuals. For example, the use of neck "choke holds" has been banned by most law enforcement agencies as a result of studies documenting the risks and dangers of this restraint technique(1,2).

The "hogtie" or "hobble" custody restraint position has come under scrutiny because of reports of sudden deaths of persons placed in this restraint position. In the hogtie position, subjects are placed in the prone position with wrists and ankles bound behind the back and secured together by means of a cord or "hobbling" device. Investigators have proposed that this position impairs normal respiratory function and places individuals at risk for asphyxiation from body position or "positional asphyxia."

Normal respiration depends on three critical components: a patent airway; the lungs, where gas exchange occurs; and a ventilatory apparatus or bellows that moves gases between the external environment and the lungs. Ventilation depends on the movement of the chest wall, rib cage, diaphragm, abdominal wall, and other accessory muscles of

respiration to generate intrathoracic pressures that move gases through the airway to and from the lungs (3,4).

Respiratory failure occurs when one of these three components fails. Lung disease leads to gas exchange abnormalities and increased alveolar-arterial oxygen gradient, manifested by decreases in oxygenation and resultant hypoxemia. Ventilatory bellows failure leads to alveolar hypoventilation and retention of carbon dioxide, manifested primarily by hypercapnia. The three major causes of ventilatory pump failure are decreased central respiratory drive, such as with barbiturate over-doses, chest wall mechanical defects, such as with flail chest injuries, and respiratory muscle fatigue and failure (3-5).

The term positional(also "postural") asphyxia has been used to describe the deaths of individuals who were reportedly found in body positions that interfered with normal breathing. In these cases, investigators found the deceased in a position that resulted in failure to maintain a patent airway or failure to maintain adequate ventilatory function. In addition to the actual body position, other criteria suggesting the diagnosis of positional asphyxia have been proposed: (a) evidence that circumstances prevented the individual from escaping the fatal body position; (b) historical information indicating that the individual had "difficulty in breathing"; and (c) absence of other pathologic or toxicologic findings clearly suggesting another cause of death(6).

Bell et al. reviewed 30 cases of positional asphyxiation occurring during a 9-year period. In all cases, victims had no other significant life-ending pathologic findings. Most commonly, victims were found in positions that resulted in upper airway obstruction, including head-neck hyperflexion and lying face down on a suffocating object. Acute alcohol intoxication was a major risk factor for asphyxiation and explained why many of these individuals were unable to alter the body position that led to positional asphyxiation (7). A similar asphyxiation phenomenon, termed "mechanical asphyxia," has been described with the use of vest, jacket, and chest posey restraints, particularly in the geriatric nursing home population. Asphyxiation occurs when these restraints accidentally wrap around the necks of individuals and result in strangulation (8-11).

Although most of these cases involved airway obstruction, reports exist of asphyxiation from ventilatory bellows failure. In their review, Bell et al. reported on four victims found in confined positions that restricted chest and diaphragmatic movement and thus may have resulted in hypoventilatory respiratory failure (7). In addition to the reports of strangulation from vest, jacket, and posey chest restraints are reports of ventilatory compromise and asphyxiation from these devices. In these cases, subjects became suspended from a bed or chair by their restraints, with resulting chest constriction to the point of mechanical ventilatory impairment (12,13).

Similarly, investigators have suggested that the hogtie restraint position places subjects at risk for asphyxiation from their body position. Numerous case reports in the medical literature describe deaths occurring in individuals placed in this restraint position while in

law enforcement custody. In many of these cases, the deaths have been attributed to positional asphyxia (6,14-17).

CASE REPORTS

In 1985, Wetli and Fishbain reported 7 cases of death in cocaine users. In their report, they noted that 5 individuals were in police custody at the time, and 4 were placed in a hogtie-like restraint position. The authors attributed these deaths to cocaine intoxication, possibly complicated by other factors including "restraint stress" (18).

In 1992, Reay et al. first reported 3 cases of positional asphyxia occurring in individuals placed in the prone restraint position in the back seat of police patrol cars. In all cases, the subjects were violent and agitated, either from drug and alcohol intoxication or from psychiatric illness, and required multiple law enforcement officers to subdue them. During transport, the subjects became unresponsive and were subsequently found in cardiopulmonary arrest. On autopsy, no clear lethal anatomic or toxicologic findings were noted, and, as a result, all the deaths were attributed to positional asphyxia. Reay et al. assert that the deaths were the result of adverse physiologic effects created by the semiprone and hogtie positions in a confined space (6).

In 1993, O'Halloran and Lewman reported 11 cases of sudden death occurring in subjects placed in the prone position, 9 of whom were in the hogtie restraint position. All the subjects were combative, violent, and in an "excited delirious state" as a result of acute psychosis or drug intoxication (most commonly cocaine). Violent confrontation and struggle occurred in all cases. Two of these individuals were subjected to stun gun shocks shortly before death. Although the authors admit drug intoxication could cause death without positional asphyxiation from restraint position, nevertheless they assert that the position "clearly impairs breathing in situations of high oxygen demand by inhibiting chest wall and diaphragmatic movement" (14).

In 1995, Stratton et al. were the first to report 2 cases of unexpected deaths in individuals who were placed in the restraint position and subsequently died while being transported by prehospital medical personnel. Both cases involved men who were agitated, combative, and under the influence of illegal drugs. The authors proposed that the restraint position leads to "restriction of motion of the diaphragm and chest" and that such positioning "can lead to asphyxia" (15).

In 1996, Ross reviewed 22 cases of sudden death in the prone or hogtie position reported in the medical literature from 1988 through 1993. Of these, 18 occurred in individuals in the hogtie restraint position, 2 were restrained prone on gurneys, and 2 were manually restrained in a prone position. All exhibited violent, combative behavior and fought or struggled with the police. Drug use and alcohol intoxication were noted in 16 cases. Cocaine use was noted in 12 subjects. Positional asphyxia was listed as the sole cause of death in 5 cases and as a contributing cause of death along with drug intoxication in another 6 cases. The author concluded that placing a subject in a "confining position which restricts the natural respiration process" can be fatal, and that "based on the risk of

sudden death, the practice of hogtying and transporting subjects in a prone position should be discontinued" (16).

In 1992, the San Diego Police Department in conjunction with the County Medical Examiner's Office formed a Custody Death Task Force to examine the issues surrounding in-custody deaths. Spurred by 7 cases of in-custody death in San Diego, 3 of which occurred in individuals placed in the hogtie restraint position, the Task Force conducted a national survey of law enforcement agencies, 39% of which reported experiencing incustody deaths. The task force was able to confirm 94 cases of restraint-associated in-custody deaths across the country during the previous decade, though the actual number of deaths was likely higher because of incomplete or insufficient data collection. Forty-three agencies or 30% of those responding at that time authorized the use of the hogtie restraint position by their officers in subduing violent individuals. The number of hogtie custody restraint fatalities was not determined (17).

POSITIONAL ASPHYXIA

Although deaths clearly have occurred in individuals placed in the restraint position, the role of actual body position and of positional asphyxia in these situations is unclear. As noted in the case report literature, investigators have postulated that the restraint position prevents adequate chest wall, abdominal, and diaphragmatic movement for normal ventilatory function and breathing. This inability to expand the thoracic cavity and the resultant disadvantage in pulmonary mechanics lead to hypoventilatory respiratory failure, asphyxiation, and death. Hirsh argued that the evidence suggesting "postural compromise of ventilation and respiration" is sufficient and that it is "prudent and appropriate for medicolegal officials to consistently classify as homicide the type of deaths" associated with custody restraint positions (19).

Yet, no clear data support many of the conclusions drawn in the case report literature regarding positional asphyxia and the hogtie restraint position. Many have argued that factors unrelated to the restraint position may play a greater role in causing these deaths. Most reported cases involve young men in an "excited" state or one of "agitated delirium" as a result of psychiatric illness or intoxication from illegal drugs. These individuals were combative, violent, and often struggled or suffered traumatic injuries as a result of confrontation with law enforcement before their placement in the restraint position.

Investigators have argued that these other factors, such as delirium, intoxication, stress, trauma, catecholamine hyperstimulation, hyperthermia, muscle fatigue, and exhaustion, as opposed to asphyxiation from body positioning, are more important in explaining the deaths of these individuals (20-22). Laposata suggested that the evidence to cite positional asphyxia alone as a cause of death is insufficient, and the position "is not in itself a position that would be expected to be fatal within minutes," as has been reported in many cases (20).

In addition, the level of chest and abdominal constriction that may result in significant ventilatory or respiratory dysfunction is unclear. Ward and Macklem suggested that,

although significant chest restriction may impede ventilation, restriction of abdominal motion should not influence ventilatory bellows function because diaphragmatic movement may in fact occur at a more efficient length (4).

PHYSIOLOGIC STUDIES

Where then is the scientific data supporting the occurrence of positional asphyxia in individuals placed in the hogtie restraint position? The theory of positional asphyxia is based primarily on the work of Reay et al. (23). Reay studied 10 healthy individuals who were placed in the hogtie restraint position after a period of exercise on a stationary cross-country ski machine to a maximum heart rate of 120 beats per minute. These authors found statistically significant physiologic differences in the subjects in the restraint position versus those in a sitting position after exercise. Overall, subjects in the restraint position had prolonged recovery times after exercise for both heart rate (mean duration of recovery 0.40 minutes longer in the restraint position) and peripheral oxygen saturation measured by transcutaneous ear probe (mean duration of recovery 0.33 minutes longer). Based on these findings, Reay et al. postulated that deaths occurring in individuals in the hogtie restraint position were the result of adverse physiologic and respiratory effects from body position. They further argued that the prone restraint position restricts chest and abdominal movement and thereby reduces respiratory tidal volumes, placing an individual at risk for hypoventilation, hypercapnia, hypoxemia, and asphyxiation(6,23).

Several points must be considered when evaluating this work. First, oxygenation in the experimental subjects was measured by transcutaneous pulse oximetry. This method has been shown to be a potentially inaccurate measure of arterial oxygenation, particularly during exercise. The preferred method for assessing arterial blood oxygenation remains arterial blood gas measurements, which are more accurate and reliable (24-26).

Reay et al. also reported decreases in oxygen saturation to 85% to 90% with exercise in his healthy subjects. This finding is surprising because mild-to-moderate levels of exercise improves ventilation-perfusion ratios throughout the lung zones, decreases the arterial-alveolar gas exchange gradient, and improves pulmonary blood flow. Moreover, minute ventilation increases with exercise and results in lower arterial $Pco_2$ levels (27). Accordingly, in contrast to Reay's findings, previous well-established work in exercise physiology has demonstrated that arterial oxygenation improves, rather than decreases, with exercise in healthy individuals (27,28).

Second, although heart rate and pulse oximetry were monitored in these subjects, no direct measure of ventilatory function was performed. Ventilatory function while in the restraint position is crucial to the theory of positional asphyxia, because investigators have postulated that the position prevents adequate chest and abdominal diaphragmatic movement to the point of hypoventilatory respiratory failure.

Schmidt et al. completed a study similar to that of Reay et al., with significantly different results(29). Schmidt studied 18 healthy subjects, monitoring heart rate and oxygen

saturation by pulse oximetry after exercise (stationary bicycle to a heart rate of 120 beats per minute) in the sitting versus restraint position. Unlike Reay et al., Schmidt et al. found no difference in mean heart rate and no evidence of oxygen desaturation in either position after exercise. Schmidt et al. further monitored subjects after a more vigorous simulated pursuit and physical struggle regimen. Again, no physiologic differences were found in either position (29).

Another recent study further examined the respiratory and physiologic effects of the hogtie restraint position (30). Fifteen healthy volunteers underwent a 2-phase crossover controlled trial. In phase 1, subjects underwent pulmonary function testing (PFT) in four different body positions: sitting, supine, prone, and restraint(hogtie position). In the second phase, subjects underwent a 4-minute exercise period followed by a 15-minute period in either the sitting or the restraint position. During the postexercise period, serial arterial blood gas measurements were obtained, subjects underwent electrocardiographic and pulse oximetry monitoring, and PFTs were performed.

A progressive restrictive pattern of PFTs was observed as subjects were in the sitting to supine to prone to restraint positions. Mean forced vital capacities fell with each position compared to sitting (declines of 7%, 7%, and 13% of predicted values for the supine, prone, and restraint positions, respectively). Mean forced expiratory volumes in 1 second fell in a similar fashion (declines of 8%, 9%, 14% of predicted values, respectively), as did maximal voluntary ventilation (declines of 10%, 15%, and 23% of predicted values, respectively). Exercise itself resulted in no further restrictive impairment in PFTs (30).

These findings in isolation appear to support the theory of positional asphyxia from the restraint position. However, PFT measurements as low as 80% of predicted values are still normal, and these changes, although statistically significant, are of little clinical relevance(31). Furthermore, PFT changes consistent with a restrictive pattern were also seen simply by placing subjects in a supine or prone position. If one were to argue that certain individuals may be at greater risk of hypoventilation in the restraint position, then one would also have to conclude that these individuals were at risk even in the supine or prone position.

Most important, no evidence of respiratory compromise was noted during either the exercise or the postexercise period in the restraint position. Based both on serial arterial Po2 and co-oximetry monitoring, oxygenation increased rather than decreased with exercise (30). This improvement in oxygenation occurred in the face of vigorous exercise to a mean heart rate of 169 beats per minute. These findings are consistent with previous studies in exercise physiology (27,28).

Moreover, despite the PFT findings, no evidence of hypoxia, hypercapnia, or delay in heart rate recovery was noted while subjects were in the restraint position after exercise. In fact, mean Pco2 levels decreased during exercise and remained lower than 40 mm Hg for as long as 15 minutes after exercise while subjects were in the restraint position(30). These findings demonstrated that, despite the restrictive PFT pattern, no evidence

indicated hypoventilation or ventilatory compromise as a result of body positioning in the restraint position.

CONCLUSIONS

Based on these findings, factors other than body positioning appear to be more important determinants for sudden, unexpected deaths in individuals in the hogtie custody restraint position. Illicit drug use (including sympathomimetic, hallucinogenic, and psychomotor stimulant drugs), physiologic stress, hyperactivity, hyperthermia, catechol hyperstimulation, and trauma from struggle may be more important factors in the deaths of these individuals. Although restraints in general increase the psychological and physiologic stress on the individual, no evidence suggests that body position alone causes hypoventilation, respiratory compromise, or positional asphyxia in the hogtie custody restraint position.

## REFERENCES

1. Reay DT, Eisele JW. Deaths from law enforcement neck holds. *Am J Forensic Med Pathol* 1982;3:253.
[Medline Link] [Context Link]
2. Reay DT, Holloway GA. Changes in carotid blood flow produced by neck compression. *Am J Forensic Med Pathol* 1982;3:199.
[Medline Link] [Context Link]
3. Roussos C, Macklem PT. The respiratory muscles. *N Engl J Med* 1982;307:786.
[Medline Link] [Context Link]
4. Ward M, Macklem PT. The act of breathing and how it fails. *Chest* 1990;97:36S.
[Medline Link] [Context Link]
5. Roussos C. Respiratory muscle fatigue and ventilatory failure. *Chest* 1990;97:89S.
[Medline Link] [Context Link]
6.Reay DT, Fligner CL, Stilwell AD, Arnold J. Positional asphyxia during law enforcement transport. *Am J Forensic Med Pathol* 1992;13:90.
[Medline Link] [Context Link]
7.Bell MD, Rao VJ, Wetli CV, Rodriguez RN. Positional asphyxiation in adults: a series of 30 cases from the Dade and Broward county Florida medical examiner offices from 1982-1990. *Am J Forensic Med Pathol* 1992;13:101.
[Medline Link] [Context Link]
8.Dube AH, Mitchell EK. Accidental strangulation from vest restraints. *JAMA* 1986;256:2725.
[Medline Link] [CrossRef] [Context Link]
9. Katz L. Accidental strangulation from vest restraints. *JAMA* 1987;257:2032.
[Medline Link] [CrossRef] [Context Link]
10. DiMaio VJM, Dana SE, Bux RC. Deaths caused by restraint vests. *JAMA* 1986;256:905.
[Context Link]
11. Miles S. A case of death by physical restraint: new lessons from a photograph. *J Am Geriatr Soc* 1996;44:291.
[Fulltext Link] [Medline Link] [Context Link]
12.Miles HS, Irvine P. Deaths caused by physical restraints. *Gerontologist* 1992;32:762.
[Medline Link] [Context Link]
13. Emson HE. Death in a restraint jacket from mechanical asphyxia. *Can Med Assoc J* 1994;151:985.
[Medline Link] [Context Link]
14. O'Halloran RL, Lewman LV. Restraint asphyxiation in excited delirium.*Am J Forensic Med Pathol* 1993;14:289.
[Medline Link] [Context Link]
15. Stratton SJ, Rogers C, Green K. Sudden death in individuals in hobble restraints during paramedic transport. *Ann Emerg Med* 1995;25:710.
[Context Link]
16. Ross DL. An analysis of in-custody deaths and positional asphyxiation. *Police Marksman* 1996;March/April:16.
[Context Link]

17. Burgreen B, Krosch C, Binkerd V, Blackbourne B. *Final report of the custody death task force.* San Diego: San Diego Police Department, 1992.
[Context Link]

18. Wetli CV, Fishbain DA. Cocaine-induced psychosis and sudden death in recreational cocaine users. *J Forensic Sci* 1985;30:873.
[Context Link]

19. Hirsh CS. Restraint asphyxiation [letter]. *Am J Forensic Med Pathol* 1994;15:266.
[Medline Link] [Context Link]

20. Laposata EA. Positional asphyxia during law enforcement transport [letter]. *Am J Forensic Med Pathol* 1993;14:86.
[Medline Link] [Context Link]

21. Karch SB. Agitated delirium versus positional asphyxia. *Ann Emerg Med* 1995;26:760.
[Medline Link] [Context Link]

22. Mirchandani HG, Rorke LB, Sekula-Perlman A, Hood IC. Cocaine-induced agitated delirium, forceful struggle, and minor head injury. *Am J Forensic Med Pathol* 1994;15:95.
[Medline Link] [Context Link]

23. Reay DT, Howard JD, Fligner CL, Ward RJ. Effects of positional restraint on oxygen saturation and heart rate following exercise. *Am J Forensic Med Pathol* 1988;9:16.
[Medline Link] [Context Link]

24. Biebuyck JF. Pulse oximetry.*Anesthesiology* 1989;70:98.
[Context Link]

25. Norton LH, Squires B, Craig NP, et al. Accuracy of pulse oximetry during exercise stress testing.*Int J Sports Med* 1992;13:523.
[Medline Link] [Context Link]

26. Hansen JE, Casaburi R. Validity of ear oximetry in clinical exercise testing. *Chest* 1987;91:333.
[Medline Link] [Context Link]

27. Levitzky MG. *Pulmonary physiology,* 4th ed. New York: McGraw-Hill, Inc, 1995.
[Context Link]

28. Wasserman K, Hansen JE, Sue DY, Whipp BJ, Casaburi R. Normal values. In: Wasserman K, Hansen JE, Sue DY, Whipp BJ, Casaburi R, eds. *Principles of exercise testing and interpretation,* 2nd ed. Philadelphia: Lea & Febiger, 1994:127.
[Context Link]

29. Schmidt MA, Snowden T, Clin J. The effects on oxygen saturation and heart rate of persons due to positional restraint [unpublished report]. San Diego: San Diego Regional Public Safety Training Institute, 1996.
[Context Link]

30. Chan TC, Vilke GM, Neuman T, Clausen JL. Restraint position and positional asphyxia. *Ann Emerg Med* 1997;30:578.
[Context Link]

31.Clausen JL. Pulmonary function testing. In: Bordow RA, Moser KM, eds. *Manual of clinical problems in pulmonary medicine,* 4th ed. Boston: Little, Brown, 1996:9.
[Context Link]

**Keywords:**

Physical restraint; Hogtie; Positional asphyxia; Law enforcement; Review
© 1998 Lippincott Williams & Wilkins, Inc.

Exhibit C

ORIGINAL ARTICLE

# Weight Force During Prone Restraint and Respiratory Function

*Theodore C. Chan, MD,\* Tom Neuman, MD,\*† Jack Clausen, MD,†*
*John Eisele, MD,‡ and Gary M. Vilke, MD\**

**Abstract:** Prone maximal restraint position (PMRP, also known as hogtie or hobble) is often used by law enforcement and prehospital personnel on violent combative individuals in the field setting. Weight force is often applied to the restrained individual's back and torso during the restraint process. We sought to determine the effect of 25 and 50 lbs weight force on respiratory function in human subject volunteers placed in the PMRP. We performed a randomized, cross-over, controlled trial on 10 subjects placed in 4 positions for 5 minutes each: sitting, PRMP, PRMP with 25 lbs weight force (PMRP+25), and PRMP with 50 lbs weight force placed on the back (PMRP+50). We measure pulse oximetry, end-tidal $CO_2$ levels, and forced vital capacity (FVC) and forced expiratory volume in 1 second (FEV1). FVC and FEV1 were significantly lower in all restraint positions compared with sitting but not significantly different between restraint positions with and without weight force. Moreover, mean oxygen saturation levels were above 95% and mean end-tidal $CO_2$ levels were below 45 mm Hg for all positions. We conclude that PMRP with and without 25 and 50 lbs of weight force resulted in a restrictive pulmonary function pattern but no evidence of hypoxia or hypoventilation.

**Key Words:** restraint, weight force, respiratory function

*(Am J Forensic Med Pathol 2004;25: 185–189)*

L aw enforcement and prehospital care personnel often confront violent, dangerous individuals who must be physically restrained to insure the safety of the individual, as well as those around them. A number of physical restraint techniques have been developed to subdue and control such individuals in the field.[1–3] The prone maximal restraint position (PMRP, also known as hobble or hogtie) position has been used extensively by field personnel. This position places a subject prone with wrists handcuffed behind the back, ankles bound together, and wrists and ankles secured together by means of as strap or other device.

Because of reports of the sudden deaths of individuals placed in this restraint position, controversy has arisen regarding the PMRP.[4–7] Some have argued the position adversely impacts respiratory function and places individuals at risk for a so-called "positional" or "restraint" asphyxiation by restricting chest and abdominal movement.[5,8] We previously conducted a study which found that PMRP by itself resulted in a small restrictive pattern on spirometry but had no impact on oxygenation or ventilation in healthy subjects.

It has been suggested that additional weight force pressure placed on the back of individuals during the restraint process can impede chest and abdominal movement further. Some have argued that it is this additional pressure on the torso, along with the PMRP, that causes chest and abdominal constriction and respiratory compromise leading to asphyxiation.[9] In this study, we sought to investigate the impact of weight force on the back on the respiratory function and physiology of individuals placed in PMRP.

## METHODS

We conducted a randomized, cross-over, controlled trial at a University Medical Center pulmonary function laboratory. Ten volunteer male subjects between the ages of 18 and 45 years were recruited to participate in the study. Potential subjects were excluded if they were unable to be placed in PMRP. No exclusion was made on the basis of pulmonary or cardiovascular disease or function, or based on body size and weight.

Each subject was placed into 4 different positions: sitting, PMRP with no weight force, PMRP with 25 lbs of weight force on the back (PMRP+25), and PMRP with 50 lbs of weight force on the back (PMRP+50). Subjects were placed in these positions in random order. For the sitting

Manuscript received November 15, 2003; accepted February 4, 2004.

From the \*Department of Emergency Medicine; the †Division of Pulmonary and Critical Care Medicine, Department of Internal Medicine; and the ‡Department of Pathology, University of California, San Diego School of Medicine and Medical Center, San Diego, California.

This study was supported by a grant from the American Academy of Forensic Sciences (AAFS 98-2).

Reprints: Theodore C. Chan, MD, Department of Emergency Medicine, UCSD Medical Center, 200 West Arbor Drive #8676, San Diego, CA 92103. E-mail: tcchan@ucsd.edu.

Copyright © 2004 by Lippincott Williams & Wilkins

ISSN: 0195-7910/04/2503-0185

DOI: 10.1097/01.paf.0000136639.69128.bc

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

FPD 002217

Chan Depo RRFP

*Chan et al*                    *The American Journal of Forensic Medicine and Pathology* • Volume 25, Number 3, September 2004

position, the subject sat in a chair with feet flat on the floor and back upright against the back of the chair. In the PMRP without weight force, the subject was placed prone on their stomach with head turned to the side on a medical examination table. The subject's wrists were bound together behind the back by means of law enforcement handcuffs. The subject's ankles were bound together and drawn up near the wrists be means of a police restraining cuff device used by local law enforcement, known as the maximal restraint cuff. In PMRP+25, the subject was placed in PMRP and a 25-lb sandbag was placed on the back of the subject between the scapulas. In PMRP+50, the subject was placed in PMRP and a 40-lb sandbag was placed on the back of the subject between the scapulas (Fig. 1). Subjects remained in each position for 5 minutes. After each 5-minute period, the subject rested in the sitting position for 10 minutes before starting the next trial.

Spirometric pulmonary function testing was performed at 1 and 5 minutes into each position for every subject. Measurements of forced vital capacity (FVC) and forced





**FIGURE 1.** Top, Bottom, Subject placed in PMRP with weight force on back.

expiratory volume in 1 second (FEV1) were obtained using a Medgraphics Cardiopulmonary Diagnostic System (Medical Graphics Corporation, St. Paul, MN) in accordance with the American Thoracic Society's standards for reproducibility and acceptability.[10] Raw spirometric data were converted to percent predicted (%predFVC and %predFEV1) for each subject to normalize for height, gender, age, and race as per standard practice.[11]

Oxyhemoglobin percent saturation (SpO$_2$) was monitored using a pulse oximeter sensor placed on the index finger (Ohmeda Biox 3740 Pulse Oximeter, Datex-Ohmeda, Helsinki, Finland). Expired end-tidal CO$_2$ (etCO$_2$) levels were monitored by means of a quantitative CO$_2$ detector using a Medgraphics Cardiopulmonary Exercise System CPX/D, Medical Graphics Corporation, St. Paul, MN). SpO$_2$ and etCO$_2$ measurements were recorded every 30 seconds during the 5-minute period for each position.

Statistical analysis was performed using an analysis of variance for repeated measures, with position and time as factors. A probability value of less than 0.05 was considered statistically significant. Data analysis was performed by means of a computerized statistical software package software package (STATA 6.0).

Clinically, data were also analyzed as absolute values in comparison with normal values defined prior to the start of the study. Hypoxemia was defined as SpO$_2$ less than 95%. Hypercapnia was defined as etCO$_2$ levels greater than 45 mm Hg. Spirometric measurements were considered abnormal if they fell below 1.65 standard deviations of established predicted values. The research design and methods of this study were approved by our University Human Subjects Committee and institutional review board.

## RESULTS

All 10 subjects recruited for this study completed each of the 4 position trials. Subjects ranged in age from 21 to 40 years, and body mass index ranged from 21.3 to 35.3 kg/m². There were no exclusions of any participant or subject data. At 1 minute into each position, mean %predFVC was lower for all restraint positions when compared with sitting: 101% [95% confidence interval (CI) 91.6%-110%] for sitting compared with 87.1% [CI 79.7%-94.6%] for PMRP, 84.7% [CI 76.9%-92.5%] for PMRP+25, and 84.2% [CI 75.5%-93.0%] for PRMP+50. However, there was no difference in mean %predFVC in the PMRP or PMRP with additional weight force of 25 or 50 lbs (Fig. 2). Similarly, mean %predFEV1 was lower for all restraint positions when compared with sitting: 98.2% [CI 89.6%-107%] for sitting compared with 83.4% [77.6%-89.2%] for PMRP, 81.0% [CI 73.5%-88.6%] for PMRP+25, and 80.1% [72.1%-88.1%] for PMRP+50. Again, there was no difference in mean %predFEV1 in the PMRP with and without additional weight force of 25 or 50 lbs (Fig. 3).

186

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

FPD 002218

Chan Depo RRFP

*The American Journal of Forensic Medicine and Pathology* • Volume 25, Number 3, September 2004 *PMRP*



**FIGURE 2.** Mean %predFVC for subjects at 1 and 5 minutes into each position.



**FIGURE 4.** $SpO_2$ during each 5-minute restraint period.



**FIGURE 3.** Mean %predFEV1 for subjects at 1 and 5 minutes into each position.



**FIGURE 5.** $SpO_2$ during each 5-minute restraint period

At 5 minutes into the position, mean %predFVC was significantly lower for all 3 PMRP position compared with sitting, but there was no difference between the restraint positions with and without weight force: 103% [CI 92.6%-112%] for sitting, 86.8% [CI 79.7%-93.8%] for PMRP, 82.5% [CI 74.0–90.9%] for PMRP+25, and 80.5% [CI 72.5%-88.5%] for PMRP+50 (Fig. 2). Similar findings were seen for % predFEV1 at 5 minutes: 99.3% [CI 90.1%-108%] for sitting, 82.2% [CI 75.0%-88.9%] for PMRP, 79.5% [CI 70.9%-88.0%] for PMRP+25, and 75.0% [CI 66.6%-82.8%] for PRMP+50 (Fig. 3).

Clinically, mean $SpO_2$ levels remained above 95% and revealed no evidence of hypoxemia throughout the 5-minute trials for each position (Fig. 4). Similarly, $etCO_2$ levels remained below 45 mm Hg and revealed no evidence of hypercapnia throughout the 5-minute trails for each position (Fig. 5).

## DISCUSSION

Although sudden deaths have clearly occurred in individuals placed in the hobble, hogtie, or PMRP, the cause of death and the actual role of body position remain controver-sial. Some have argued that the PMRP prevents adequate chest wall, abdominal, and diaphragmatic movement, leading to hypoventilatory respiratory compromise and risk for death from so-called positional asphyxia.[12] However, case reports and case series of the sudden deaths of restrained individuals do not clearly indicate a specific mechanism.[4–7] Historical as well as autopsy evidence is often unrevealing as to a clear cause of death. Importantly, similar sudden deaths have been reported in patients who were not restraint in the PMRP, but simply in the prone, supine, lateral side, and even sitting positions.[13,14] As a result, some have argued that factors such as drug intoxication, excited delirium, trauma, stress, and catecholamine hyperstimulation are more important causes of sudden death rather than asphyxiation from body position.[15,16]

The theory of positional asphyxia as it relates to sudden deaths in restraint cases has been based primarily on the physiologic study of Reay et al,[8] who found that healthy

© 2004 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

FPD 002219

Chan Depo RRFP

individuals had a delayed recovery in oxygen saturation following mild exercise. However, this study was limited by the fact that a decrease in oxygen saturation was documented during mild exercise, in opposition to well-established exercise physiology work that has shown arterial oxygenation improves with exercise.[17]

We conducted a more comprehensive randomized physiologic study measuring arterial oxygenation as well as ventilation parameters, including spirometry and $CO_2$ levels. We found no evidence of desaturation or hypoxia during exercise or PMRP. More importantly, while there was a progressive restrictive pattern on spirometric measurements from sitting to supine to prone to PMRP positions, there was no evidence of hypoventilation or hypercapnia.[18] Other studies have confirmed our spirometric and respiratory measures in relation to PMRP.[19] Additionally, other investigators have not shown evidence of hypoxia or oxygen desaturation as a result of PMRP or restraint body position.[20–22] As a result, many now argue that "the hog-tied prone position should be viewed as not producing significant physiologic respiratory compromise, and it does not produce any serious or life-threatening respiratory effects."[9]

While body position by itself may not cause asphyxiation, others now argue that PMRP in combination with additional chest and abdominal compression during the restraint process could cause hypoventilatory respiratory compromise.[9] Proponents of this "restraint asphyxia" theory (as opposed to "positional asphyxia") argue that weight force often applied to the back of an individual restrained in the prone position during the restraint "take-down" process could potentially cause greater constriction of the torso and decrement in ventilatory function to the point of asphyxiation.[23]

Deaths from the application of weight to the torso have been described in the medical literature.[23] The term *traumatic* or *mechanical asphyxiation* has been applied to cases in which extreme weight force was applied to individuals, such as when an automobile runs over the torso of an individual. However, in these cases, there is often pathologic evidence of chest trauma (pulmonary contusion, rib fractures) or increased intrathoracic pressure affecting venous return and cardiovascular function (plethoric facies, edema, and ruptured small blood vessels above the shoulders).[24]

In this study, we sought to determine if additional weight force on the back of an individual in the PMRP resulted in any evidence of respiratory compromise or risk for asphyxiation. Similar to previous studies, we found a restrictive pulmonary function pattern with PMRP but no significant further detriment in spirometric measures of FVC and FEV1 with the addition of 25 and 50 lbs of weight force on the back. More importantly, we found no evidence of hypoxia, oxygen desaturation, hypercapnia, or $CO_2$ retention from hypoventilation in the PMRP with the additional weight force.

Our study has limitations. First, as this was a laboratory physiology study, we could not reproduce all conditions encountered in the field setting with such cases. In particular, we did not simulate trauma, struggle, drug intoxication, and other physiologic and psychologic stresses that commonly occur with individuals who are being restrained in the field setting.

Second, the amount of weights selected for this study may not reproduce the actual amount of weight force used on individuals during the restraint process. It is possible that heavier amounts of weights would have impacted respiratory function to a greater degree. Similar to traumatic or mechanical asphyxia cases, extreme amounts of weights could have resulted in significant chest wall trauma and marked elevations in intrathoracic pressure that could have impacted cardiovascular function. To our knowledge, this is the first laboratory investigation studying the effects of weight force during restraint. As a result, we chose weight amounts which we felt would approximate weight force used in the field setting, heavy enough to indicate any trends if respiratory function was impacted, but not so heavy as to potentially place our subjects at risk for injury.

## CONCLUSION

We conducted a study on the impact of weight force placed on the back of individuals in the PMRP on pulmonary and respiratory function. We found that weight force of 25 and 50 lbs did not result in evidence of hypoxia or hypoventilatory respiratory compromise in our study subjects.

## REFERENCES

1. Mittleman RE, Davis JJ. Deaths from custody? *Forensic Pathol.* 1991; 22:98.
2. Luke JL, Reay DT. The perils of investigating and certifying deaths in police custody. *Am J Forensic Med Pathol.* 1992;13:98–100.
3. Lifshultz BD, Donoghue ER. Deaths in custody. *Legal Med.* 1991;45:1.
4. Reay DT, Fligner CL, Stilwell AD, et al. Positional asphyxia during law enforcement transport. *Am J Forensic Med Pathol.* 1992;13:90–97.
5. Stratton SJ, Rogers C, Green K. Sudden death in individuals in hobble restraints during paramedic transport. *Ann Emerg Med.* 1995;25:710–712.
6. Stratton SJ, Rogers C, Brickett K, et al. Factors associated with sudden death of individuals requiring restraint for excited delirium. *Am J Emerg Med.* 2001;19:187–191.
7. Ross DL. Factors associated with excited delirium deaths in police custody. *Mod Pathol.* 1998;11:1127–1137.
8. Reay Dt, Howard JD, Fligner CL, et al. Effects of positional restraint on oxygen saturation and heart rate following exercise. *Am J Forensic Med Pathol.* 1989;9:16–18.
9. Reay DT. Death in custody. *Clin Lab Med.* 1998;18:1–22.
10. American Thoracic Society. Standardization of spirometry: 1994 update. *Am J Respir Crit Care Med.* 1995;152:1107–1136.
11. Morris JF. Spirometric standards for health, non-smoking adults. *Am Rev Respir Dis.* 1971;103:57.
12. Hirsh CS. Restraint asphyxiation [letter]. *Am J Forensic Med Pathol.* 1994;15:266.
13. Park KS, Korn CS, Henderson SO. Agitated delirium and sudden death: two case reports. *Prehosp Emerg Care.* 2001;5:214–216.
14. Hick JL, Smith SW, Lynch MT. Metabolic acidosis in restraint-associated cardiac arrest: a case series. *Acad Emerg Med.* 1999;6:239–243.

© 2004 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

FPD 002220

Chan Depo RRFP

*The American Journal of Forensic Medicine and Pathology* • Volume 25, Number 3, September 2004 *PMRP*

15. Karch SB. Agitated delirium versus positional asphyxia. *Ann Emerg Med*. 1995;26:760–761.

16. Mirchandani HG, Rorke LB, Sekula-Perlman A, et al. Cocaine-induced agitated delirium, forceful struggle, and minor head injury. *Am J Forensic Med Pathol*. 1994;15:95–99.

17. Chan TC, Vilke GM, Neuman T. Reexamination of custody restraint position and positional asphyxia. *Am J Forensic Med Pathol*. 1998;19: 201–205.

18. Chan TC, Vilke GM, Neuman T, et al. Restraint position and positional asphyxia. *Ann Emerg Med*. 1997;30:578–586.

19. Chan TC, Vilke GM, Clausen J, et al. The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function. *J Forensic Sci*. 2002; 47:299–304.

20. Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. *J Emerg Med*. 1999;17:777–782.

21. Parkes J. Sudden death during restraint: a study to measure the effect of restraint positions on the rate of recovery from exercise. *Med Sci Law*. 2000;40:39–44.

22. Roeggla M, Wagner A, Muellner M, et al. Cardiorespiratory consequences to hobble restraint. *Wien Klin Wochenschr*. 1997;109:359–361.

23. O'Halloran RL, Frank JG. Asphyxial death during prone restraint revisited: a report of 21 cases. *Am J Forensic Med Pathol*. 2000;21: 39–52.

24. Lee MC, Wong SS, Chu JJ, et al. Traumatic asphyxia. *Ann Thoracic Surg*. 1991;51:86–88.

*© 2004 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

FPD 002221

Chan Depo RRFP

Exhibit D

J Forensic Sci, January 2007, Vol. 52, No. 1
doi:10.1111/j.1556-4029.2006.00296.x
Available online at: www.blackwell-synergy.com

*Betty A. Michalewicz,[1] M.S.; Theodore C. Chan,[2] M.D.; Gary M. Vilke,[2] M.D.; Susan S. Levy,[1] Ph.D.;
Tom S. Neuman,[2] M.D.; and Fred W. Kolkhorst,[1,3] Ph.D.*

# Ventilatory and Metabolic Demands During Aggressive Physical Restraint in Healthy Adults

**ABSTRACT:** We investigated ventilatory and metabolic demands in healthy adults when placed in the prone maximal restraint position (PMRP), i.e., hogtie restraint. Maximal voluntary ventilation (MVV) was measured in seated subjects ($n = 30$), in the PMRP, and when prone with up to 90.1 or 102.3 kg of weight on the back. MVV with the heaviest weight was 70% of the seated MVV ($122 \pm 28$ and $156 \pm 38$ L/min, respectively; $p < 0.001$). Also, subjects ($n = 27$) were placed in the PMRP and struggled vigorously for 60 sec. During the restrained struggle, ventilatory function ($\dot{V}_E$/MVV) was 44% of MVV in the resting PMRP. While prone with up to 90.1 or 102.3 kg on the back, the decrease in MVV was of no clinical importance in these subjects. Also, while maximally struggling in the PMRP, $\dot{V}_E$ was still adequate to supply the ventilatory needs.

**KEYWORDS:** forensic sciences, maximal voluntary ventilation, minute ventilation, oxygen consumption, positional asphyxia

Law enforcement and prehospital care personnel often confront violent, dangerous individuals who must be physically restrained to ensure safety to themselves and to those around them. Authorities have developed a number of physical restraint techniques to control and subdue such individuals in the field (1,2). One of these, the prone maximal restraint position (PMRP), also referred to as the hogtie or hobble restraint, has been used extensively by field personnel (3,4). When in the PMRP, an individual is prone with his/her wrists secured behind the back, ankles bound together, and wrists and ankles tied together using handcuffs, cords, chains, or hobble devices (3,5).

Reports of sudden deaths in individuals in the PMRP have appeared at least since the 1980s, which have created controversy regarding the safety of these restraint positions (3,6–8). Some authors have suggested that the PMRP may prevent adequate chest and abdominal movement, which places the individual at risk of asphyxiation (7–9). Asphyxiation that is caused by body position has been referred to as "positional asphyxia" (10). However, a recent study reported that, although PMRP by itself resulted in a small, restrictive ventilatory pattern compared with seated measurements, there was no evidence of hypoventilation, hypercapnia, or hypoxemia (11).

Additionally, police officers often apply force to the back to better control an agitated person during the restraint process. This additional force has been hypothesized to constrict the chest and abdomen more than the PMRP alone (12–14) and lead to asphyxiation (15). Chan et al. (3) examined the effects on pulmonary function from 11.4 to 22.7 kg applied to the back of prone subjects. Although the PMRP with or without force applied to the back led to a restrictive pattern on pulmonary function testing, there was no evidence of hypoxia or hypercapnia.

Nevertheless, it would be safe to assume that law enforcement officers are able, and do, apply more than 22.7 kg of force to the back of suspects placed in the PMRP, particularly if the individuals are violent. Cases of sudden death of restrained individuals often involve those who continued to struggle after being restrained (8). This study was undertaken to determine whether the use of force greater than 22.7 kg might inhibit ventilatory function such that it became a clinically important consideration in the analyses of such deaths. Moreover, we were interested in whether individuals struggling during periods of physical restraint were able to approach the limits of their ventilatory function. This study, which utilized a randomized, cross-over, controlled design, had two parts. For the first part, the effects on maximal voluntary ventilation (MVV) in subjects were examined while in the PMRP and while prone with up to 102.3 kg of weight positioned on their back. The second part of the study was an investigation of maximally struggling subjects while in the PMRP on cardiopulmonary measurements to determine the effect of PMRP on ventilatory function.

## Methods

### Subjects

Thirty volunteer male and female subjects were recruited to participate in the study. Exclusionary criteria included any history of pulmonary or cardiac disease (as screened with the *Physical Activity Readiness-Questionnaire*), current recreational drug use, or other significant illness or disability that would limit the ability to perform the exercise regimen required for the study. Each potential participant was screened before testing by a physician investigator to ensure that he/she was free of acute illness or injury. Also, urine specimens were collected and tested for the presence of the major metabolites of common drugs of abuse (i.e., phencyclidine, benzodiazepines, cocaine, amphetamines, THC, morphine, and barbiturates) and tricyclic antidepressants (Triage[R] Drugs of Abuse Panel plus Tricyclic Antidepressants Test, Biosite[R] Inc., San Diego, CA). Individuals were excluded if the immunoassay detected any of these substances in the urine. Informed consent was obtained from each individual before participation,

[1]Department of Exercise and Nutritional Sciences, San Diego State University, San Diego, CA 92182.
[2]Department of Emergency Medicine, Medical Center, University of California, San Diego, CA 92103.
[3]San Diego State Heart Institute, San Diego State University, San Diego, CA 92182.
Received 11 Dec. 2005; and in revised form 19 June 2006; accepted 1 July 2006; published 8 Dec. 2006.

Copyright © 2006 by American Academy of Forensic Sciences

and subjects who completed the study were given financial compensation. The experimental study design and protocol were approved by the San Diego State University and the University of California, San Diego Institutional Review Boards (IRB), and procedures were followed in accordance with the ethical standards established by the IRBs.

### Part 1—Position and Weight Effects on Maximal Voluntary Ventilation (MVV)

The first part of the study evaluated the effects of subjects in the PMRP and when prone with varying weights on the back upon the MVV. A licensed American Thoracic Society (ATS) respiratory technician conducted all MVV testing (MedGraphics CPX/D System, Medical Graphics Corporation, St. Paul, MN), and each trial was repeated at least twice. Measurements were obtained in accordance with ATS standards for reproducibility and acceptability (16). Raw MVV data were normalized for age, height, gender, and race (17).

MVV was measured with subjects seated and while in the PMRP. In addition, MVV was measured with subjects prone and three different weights placed on the back. The order of these measurements was randomly chosen to negate possible order effects of repetitive testing. For the seated position, subjects sat on a chair without restraint with their feet flat on the ground and their back upright against the chair back. During the PMRP trial, subjects were placed prone on a gymnastic mat with the head turned to the side. The subjects' wrists and ankles were tightly bound together behind the back using a restraining fabric cuff (Fig. 1). The ankles and wrists were then bound together. This position was similar to the PMRP used in previous studies and case reports (11). For the prone trials with weights, a light (LW), moderate (MW), and heavy weight (HW) in the form of canvas bags, each filled with 11.4 kg of lead shot, were placed on subjects' backs. The canvas bags were evenly positioned between the posterior shoulders and mid back and secured by a custom-made vest worn by the subject that had straps to hold the canvas bags in place. As we theorized that law enforcement officials would apply less weight to the back when restraining a lighter individual, we used differing weights depending on the subject's weight. Subjects who weighed less than 68 kg were tested with 22.7 kg (LW), 56.8 kg (MW), and 90.9 kg (HW) while subjects weighing more than 68 kg were tested with 34.1 kg (LW), 68.2 kg (MW), and 102.3 kg (HW). In all five conditions, MVV was measured immediately upon positioning the subject. Between the trials, subjects rested in a seated position for *c.* 15 min.

### Part 2—Cardiopulmonary Measurements During Maximal Struggle

For the second part of the study, oxygen consumption ($\dot{V}O_2$), minute ventilation ($\dot{V}_E$; respiratory rate × tidal volume), and heart rate (HR) were measured during a 60-sec maximal struggle while subjects were in the PMRP. Pulmonary $\dot{V}O_2$ is a measure of systemic oxygen utilization, which reflects the metabolic rate, and the maximal $\dot{V}O_2$ ($\dot{V}O_{2max}$) quantifies the aerobic capacity. Subjects were placed prone on a mattress elevated *c.* 40 cm from the floor. A face mask with a low-resistance two-way breathing valve was placed over the mouth and nose, and the subject was positioned, such that his/her head hung over the edge of the mattress and would not strike the floor or mattress during the struggle. An adhesive gel applied to the edge of the mask was used to prevent air leaks. The subjects' wrists and ankles were tightly bound together behind the back similar to the PMRP described above. Subjects then performed a maximal struggle—in an attempt to escape the restraint—for 60 sec while cardiopulmonary measurements were taken (TrueMax 2400, Parvo Medics Inc., Sandy, UT). Verbal encouragement was provided throughout each test. Following the 60-sec struggle, subjects laid quietly on the mattress for 5 min to recover while expired air continued to be analyzed. Before each test, the gas analyzers and pneumotachometer were calibrated. HR was monitored using a telemetry transmitter attached to the chest (Polar Electronics, Kempele, Finland). All measurements were recorded as the average of 15-sec intervals.

For comparison, the same cardiopulmonary parameters were measured during a maximal treadmill test. On a separate day, subjects performed a treadmill test at 1.61 m/sec while cardiopulmonary functions were measured. The initial elevation was 0% and was increased 2% every minute until the subject reached volitional fatigue. Verbal encouragement was also provided during testing. The criteria for reaching $\dot{V}O_{2max}$ were achieving: (1) a plateau in $\dot{V}O_2$ ($\pm 2$ mL/kg/min); (2) an HR $\pm$ 15 bpm of the age-predicted maximal HR; and/or (3) a respiratory exchange ratio (RER) of 1.10 or above. All subjects achieved at least two of the criteria.

### Statistics

To analyze the effect of the PMRP and weight force on MVV, a one-way repeated measures ANOVA was conducted. *Post hoc* Bonferroni's *t*-tests were used to follow up significant differences. α was set at 0.05 for all tests of significance. All statistical analyses were performed using SPSS v. 11.0 (SPSS Inc., Chicago, IL). Ninety-five percent confidence intervals ($CI_{95}$) were calculated to compare MVV values in the various positions with the predicted MVV and to MVV measured in the seated position. To analyze cardiopulmonary measurements during maximal struggle, we compared $\dot{V}O_2$ during PRMP struggle with $\dot{V}O_{2max}$ to assess the impact of restraint on oxygen consumption. In addition, we compared $\dot{V}_E$ and $\dot{V}_E$/MVV ratio to assess ventilatory capacity and reserve during PRMP struggle and the maximal treadmill test.

### Results

Thirty subjects (15 men and 15 women) completed the first part of the study examining the effects of the PMRP and weight on MVV. Data from two subjects were excluded from the study



FIG. 1—*Illustration of a subject in the prone maximal restraint position (PMRP).*

TABLE 1—*Subject characteristics (mean ± SD).*

|              | Total ($n = 30$) | Men ($n = 15$) | Women ($n = 15$) |
| ------------ | ---------------- | -------------- | ---------------- |
| Age (year)   | 24.5 ± 3.5       | 25.0 ± 4.2     | 28.9 ± 6.2       |
| Weight (kg)  | 72.6 ± 14.2      | 81.4 ± 13.9    | 63.9 ± 7.3       |
| Height (m)   | 1.72 ± 0.09      | 1.76 ± 0.10    | 1.67 ± 0.06      |
| BMI          | 24.5 ± 3.5       | 26.1 ± 3.5     | 22.9 ± 2.7       |

because they were psychologically unable to tolerate restraint (neither subject left the trial for any complaint other than they were frightened of being restrained. Both these subjects elected to withdraw from the study before the exercise period commenced and before any data were collected). Subject characteristics are presented in Table 1. All subjects were healthy and at least moderately active [$\dot{V}O_{2max}$ = 50.2 ± 7.8 mL/kg/min; body mass index (BMI) = 24.5 ± 3.4]. Overall, 50% of the subjects weighed less than 68 kg, which included 12 women and three men.

### Part 1—Position and Weight Effects on MVV

The results of the MVV measurements under various conditions are presented in Table 2. Because there was a significant departure from sphericity ($p = 0.001$; $\varepsilon = 0.646$), Greenhouse–Geisser adjusted values were used to evaluate the significance of the main effects. Confidence intervals that included 100% were not considered different from the predicted or the seated MVV. MVV in the seated position was 156 ± 38 L/min, which was 122% higher than predicted ($CI_{95}$ = 104–140). Conversely, MVV while prone with the HW was lower (85%) than predicted MVV ($CI_{95}$ = 72–98).

All measured MVVs differed from each other ($p < 0.001$), except the comparison of the PMRP and MW trials. MVVs of the treatment trials were also compared with the seated MVV. MVV of the PMRP trial and when prone with MW and HW were significantly less than the seated MVV, although the $CI_{95}$ from the LW trial suggested no difference from the seated MVV ($CI_{95}$ = 77–100).

### Part 2—Cardiopulmonary Measurements During Maximal Struggle

Valid data were obtained from only 27 subjects for this part of the study. The struggle was physically difficult for subjects. In spite of continued verbal encouragement, the intensity of movement was visibly waning in all subjects by the end of the 60-sec trial. This was supported by the RER—calculated as $\dot{V}CO_2$: $\dot{V}O_2$—that averaged 1.16 ± 0.14. Only one subject, a female, failed to achieve an RER greater than 1.05 during the maximal



FIG. 2—*Percent differences of cardiopulmonary values from peak treadmill values during and after the restrained struggle trial.*

restrained struggle. Values in excess of 1.0 indicated that an individual was hyperventilating, and the values observed at the end of the maximal struggle were similar to those observed at the end of their maximal treadmill test (1.21 ± 0.07). At the end of the struggle, $\dot{V}O_2$ and $\dot{V}_E$ were 40% and 42%, respectively, of the peak values achieved during the maximal treadmill test (Fig. 2). Also, HR at the end of the struggle was 84% of peak HR from the treadmill test. The $\dot{V}_E$/MVV ratios (using MVV measured in the seated position) of peak $\dot{V}_E$ during the treadmill test and at the end of the restrained struggle were 89% and 44%, respectively (Table 3).

### Discussion

Although sudden death has occurred in individuals placed in the PMRP, the cause of death and whether body position was a factor remain controversial. Some have suggested that PMRP prevents adequate chest wall, abdominal, and diaphragmatic movement, leading to hypoventilatory respiratory compromise and risk for death from positional asphyxia (8,18). Prior studies in healthy subjects have found no evidence of significant hypoventilation when subjects were placed in the PMRP (2,8). Our results in this study appear to support these findings. MVV in all of the treatment conditions remained above 80% of predicted, well within the normal range (19,20).

While by itself the PMRP does not appear to compromise ventilatory capacity unduly, the restraining process also frequently includes applying force to the back. Weight applied in the prone position has been hypothesized to further compress the chest and

TABLE 2—*Measured MVV values ($n = 30$).*

|          | MVV (L/min) |         | Percentage of Seated MVV |           | Percentage of Predicted MVV |           |
| -------- | ----------- | ------- | ------------------------- | --------- | ---------------------------- | --------- |
| Position | Mean ± SD   | Range   | %                         | $CI_{95}$ | %                            | $CI_{95}$ |
| Seated   | 156 ± 38    | 75–243  | —                         | —         | 122                          | 104–140   |
| PMRP     | 128 ± 29    | 65–193  | 82*                       | 68–96     | 100                          | 99–102    |
| LW       | 137 ± 27    | 85–189  | 88                        | 77–100    | 107                          | 97–117    |
| MW       | 122 ± 31    | 61–197  | 78*                       | 64–93     | 95                           | 87–103    |
| HW       | 109 ± 28    | 57–167  | 70*                       | 54–86     | 85[†]                        | 72–98     |

*Below MVV measured in the seated position.

[†]Below predicted MVV.

Note: All measured MVV values differed from each other except for the PMRP and MW comparison ($p < 0.001$). PMRP, prone maximal restraint position; LW, prone position with low weight (22.7 or 34.1 kg) applied on subject's back; MW, prone position with moderate weight (56.8 or 68.2 kg); HW, prone position with heavy weight (90.2 or 102.3 kg); MVV, maximal voluntary ventilation. For the three conditions in which weight was placed on the back, the lighter weight was used for subjects who weighed less than 68 kg ($n = 15$) and the heavier weight for those who weighed more than 68 kg ($n = 15$).

TABLE 3—*Cardiopulmonary peak values during maximal treadmill test and at the end of the restrained struggle (n = 27).*

| | Treadmill | | Restrained Struggle | |
|---|---|---|---|---|
| | Mean ± SD | Range | Mean ± SD | Range |
| $\dot{V}O_2$ (mL/kg/min) | 50.2 ± 7.8 | 29.1–65.8 | 19.8 ± 5.4 | 11.6–30.9 |
| $\dot{V}_E$ (L/min) | 140.1 ± 36.7 | 84.2–206.5 | 57.6 ± 23.3 | 29.4–113.3 |
| $V_T$ (L) | 2.8 ± 0.7 | 1.8–4.7 | 1.0 ± 0.4 | 0.6–2.3 |
| RR (breaths/min) | 56 ± 8 | 39–70 | 60 ± 14 | 35–88 |
| HR (beats/min) | 190 ± 12 | 166–221 | 160 ± 19 | 105–196 |
| RER | 1.21 ± 0.07 | 1.09–1.35 | 1.16 ± 0.14 | 0.92–1.35 |

HR, heart rate; RER, respiratory exchange ratio.

abdomen, which might lead to hypoventilatory respiratory compromise (15) and diminished ventilatory function to the point of asphyxiation (20). One of the goals of this paper was to isolate the effects of weight applied in the prone position. Our results indicated that with 90.2–102.3 kg of weight applied to the back of our subjects, MVV was decreased to 85% ($CI_{95} = 72$–98) and 70% ($CI_{95} = 54$–86) of the predicted and previously measured MVVs, respectively. Despite these decreases, these MVVs are still within published $CI_{95}$ for men (12) and women (14).

Even though the decreases in pulmonary function as a result of weight force applied to the back remain with the normal clinical parameters for a healthy person at rest, the circumstances of PMRP-related sudden death cases are very different. Sometimes, the victim has been involved in high-intensity exercise (e.g., running, fighting) before being restrained and, afterwards, will continue to resist the restraint violently. It has been suggested that under these circumstances, oxygen consumption may exceed ventilatory capacity in individuals placing them at risk for respiratory compromise (21). As such, we also measured $\dot{V}O_2$ and $\dot{V}_E$ while in the PMRP and compared them with similar measurements from maximal treadmill tests. Our results indicated that with maximal struggle while in the PMRP, $\dot{V}O_2$ and $\dot{V}_E$ were less than 42% of peak values obtained from a maximal treadmill test. In general, the most metabolically and ventilatory demanding type of exercise resulting in the highest $\dot{V}O_2$ occurs when large muscle groups work in a rhythmic fashion (e.g., running, cycling). It is likely that PRMP limits subjects from using these large muscle groups in rhythmic movements, thus resulting in the low $\dot{V}O_2$ and $\dot{V}_E$ we observed.

Ventilatory constraint is often determined by measuring how close $\dot{V}_E$ at maximal exercise intensity approaches MVV (18). At $\dot{V}O_{2max}$, individuals with normal lung function ventilate at 60–70% of their MVV (22). Accordingly, in our study, the peak $\dot{V}_E/$MVV during the maximal treadmill test was 72% of the measured MVV. On the other hand, during PRMP struggle, $\dot{V}_E/$MVV was only 36% of the measured MVV. Our findings of clinically normal MVVs with PMRP and prone weight in phase 1, as well as the lower $\dot{V}O_2$ and $\dot{V}_E/$MVV during PRMP struggle suggest that our subjects appeared to have adequate ventilatory reserve while struggling while restrained. Furthermore, the extremely low $\dot{V}_E/$MVV ratio at the end of maximal struggle, compared with the actual MVV measured with weight on the back, suggests that should weight be applied while individuals were in the PMRP it would be well tolerated as well. Clearly, this remains to be proven in future studies.

Based on these findings, as well as previously published studies, we suggest that factors other than ventilatory failure associated with the restraining process may be responsible for the sudden unexpected deaths of restrained individuals. Although autopsy evidence is often unrevealing as to the cause of the death, those individuals who die at times seem to succumb suddenly (23), which is a pattern generally inconsistent with a respiratory death. Some individuals have been reported to die suddenly while restrained without force applied to the back (6,7,10,23), restrained in a supine, sitting, or side position (9, 17), or even without being restrained (24). Other factors, such as excited delirium, drug intoxication, stress, trauma, and catecholamine hyperstimulation, are considered to be the most likely factors in these sudden deaths (2,3,19). In addition, studies indicate that many of these individuals have an abnormally enlarged heart on autopsy, likely related to chronic stimulant drug abuse (5). Not only is there a greater risk for cardiac dysrhythmias and sudden death in those with cardiomyopathy, but recent investigations suggest that individuals with this condition have decreased capillary density in their endocardium, placing them at risk for chronic and perhaps acute cardiac ischemia (25). Our results, as well as those of others (2,3,15), suggest that in deaths associated with the PMRP, factors other than ventilatory compromise may play a more important role.

Clearly, this study has a number of limitations. First, our subjects were young and generally healthy and may not reflect the population of individuals who are restrained in the field setting. It should be noted that the baseline-measured MVVs of subjects were 122% of predicted, suggesting that our subjects were both highly motivated, and had a high aerobic fitness level (26). In the actual field setting, underlying medical conditions and other differences from our subject population (e.g., age, weight, etc.) might theoretically influence the outcome.

Second, we could not reproduce all conditions during which this type of restraint method is used in the field. In particular, while we had subjects restrained and maximally exerting themselves, we could not reproduce the psychological or other physiologic stresses associated with a field pursuit, struggle, or trauma. During the trials with weight applied to the back, the weight was distributed evenly over the back, unlike in a field situation in which force is applied to the back frequently with a knee that focuses the force over a smaller area. In addition, a small number of our subjects did opt out of the study out of fear of the restraint. Clearly, in the field setting, individuals are unlikely to have such a choice as to whether they are restrained or not; however, it is difficult to understand how such factors might affect ventilation.

Therefore, how such factors may or may not contribute to these deaths will require future study; however, an animal model suggests that restraint alone (without affecting an animal's ability to breathe) increases the death rate in animals treated with cocaine (27). This implies that the physiologic effects of restraint involve more than ventilation alone, which is consistent with the results of this and prior studies (3,11). Second, we placed weight on subjects' back when MVV was measured in the prone position, but no force was applied on subjects when positioned in the PMRP. Such a model has limitations and does not necessarily duplicate the sequence of events that may take place in any given field situation; however, we do feel this represents a first step in investigating a very complex arena. Third, the exertion and struggle of our subjects in PMRP was of short duration and also may not reflect a field situation where prolonged struggles can occur. Furthermore, our subjects exerted themselves on a voluntary basis, although they were verbally encouraged by the investigators to struggle as much as possible throughout the 1-min period. This voluntary nature may not exactly reflect field situations where individuals are often under the influence of drugs or are mentally incapacitated. On the other hand, our subjects did exercise to exhaustion or near

exhaustion and their significantly increased HR suggests high levels of exertion on their part.

Finally, of course, none of our subjects used illicit drugs. However, none of the illicit drugs frequently used in the setting we are trying to simulate have an effect upon ventilation and therefore it appears to be more likely that the role such drugs play in these deaths is through some other mechanism than their effect upon ventilation. There are other factors in the field that that are also different from our setting that might theoretically affect our results (e.g., a gymnastic mat rather than the actual outside surface, and the even distribution of the weight force we used across the back rather than it being localized to a smaller area); however, it will await future studies to determine whether these factors play any role in such deaths.

In summary, this study attempted to investigate the impact of varying weight force upon the back in healthy individuals in the prone position. We recognize the differences between the laboratory setting and actual field conditions; nonetheless, we found no clinically important restriction of ventilatory reserve when subjects were placed in the PMRP or when prone with up to 90.2 or 102.3 kg of weight on their back. Likewise, when subjects were maximally struggling for 60 sec while in the PMRP, there were no clinically important limitations of metabolic or ventilatory functions. Based on these observations in healthy subjects, we conclude that PMRP and prone positioning with moderate weight force on the back do not in and of themselves restrict metabolic or ventilatory demands to any clinically important degree. As such, factors other than isolated ventilatory failure should be considered when evaluating deaths occurring in the setting of restraint in the field.

*Acknowledgments*

The authors wish to acknowledge the contribution of Mohammed Najeed, RT, UCSD Medical Center, for performing the MVV measurements in this study.

This study was funded in part by an unrestricted grant from the University of California, San Diego, Department of Emergency Medicine Research Fund. Portions of this study were presented at the Society for Academic Emergency Medicine, New York, NY, May 2005.

## References

1. Chan TC, Vilke GM, Neuman T. Reexamination of custody restraint position and positional asphyxia. Am J Forensic Med Pathol 1998;19:201–5.
2. Chan TC, Vilke GM, Neuman T. Restraint position and positional asphyxia. Am J Forensic Med Pathol 2000;21:3.
3. Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM. Weight force during prone restraint and respiratory function. Am J Forensic Med Pathol 2004;25:185–9.
4. Eisele J, Chan T, Vilke G, Neuman T, Clausen J. Comparison of respiratory function in the prone maximal restraint position with and without additional weigh force on the back. In: Proceedings of the 52nd annual meeting of the American Academy of Forensic Sciences; 2000. February 21–26; Reno, NV. Colorado Springs, CO: American Academy of Forensic Sciences, 2000.
5. Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777–82.
6. Pollanen MS, Chiasson DA, Cairns JT, Young JG. Unexpected death related to restraint for excited delirium: a retrospective study of deaths in police custody and in the community. Can Med Assoc J 1998;158:1603–7.
7. Reay DT, Fligner CL, Stilwell AD, Arnold J. Positional asphyxia during law enforcement transport. Am J Forensic Med Pathol 1992;13:90–7.
8. Stratton SJ, Rogers C, Brickett K, Gruzinski G. Factors associated with sudden death of individuals requiring restraint for excited delirium. Am J Emerg Med 2001;19:187–91.
9. Ross DL. Factors associated with excited delirium deaths in police custody. Mod Pathol 1998;11:1127–37.
10. O'Halloran RL, Frank JG. Asphyxial death during prone restraint revisited: a report of 21 cases. Am J Forensic Med Pathol 2000;21:39–52.
11. Chan TC, Vilke GM, Neuman T, Clausen L. Restraint positional asphyxia. Ann Emerg Med 1997;30(5):578–86.
12. Lifschultz BD, Donoghue ER. Deaths in custody. In: Welch C, editor. Legal Medicine annual. Salem, NH: Butterworth; 1991:45–70.
13. Mittleman R, Davis J. Deaths from custody? Forensic Pathol 1991; 22(2):98.
14. Reay DT, Howard JD. Restraint position and positional asphyxia. Am J Forensic Med Pathol 1999;20:300–1.
15. Reay DT. Death in custody. Clin Lab Med 1998;18:1–22.
16. American Thoracic Society. Standardization of spirometry, 1994 update. Am J Respir Crit Care Med 1995;152:1107–36.
17. Bass H. The flow volume loop: normal standards and abnormalities in chronic obstructive pulmonary disease. Chest 1973;63:171–6.
18. Johnson BD, Weisman IM, Zeballos JR, Beck KC. Emerging concepts in the evaluation of ventilatory limitation during exercise: the exercise tidal flow loop. Chest 1999;116:488–503.
19. Kory RC. The VA Administration—army cooperative study of pulmonary function I: clinical spirometry in normal men. Am J Med 1961;30: 243–58.
20. Lindall A, Medina A, Grisner JT. A re-evaluation of normal pulmonary function measurements in the adult female. Am Rev Resp Dis 1967;95:1061–4.
21. Parkes J. Sudden death during restraint: a study to measure the effect of restraint positions on the rate of recovery from exercise. Med Sci Law 2000;40:39–44.
22. Stratton SJ, Rogers C, Green K. Sudden death in individuals in hobble restraints during paramedic transport. Ann Emerg Med 1995;25: 710–2.
23. Hick JL, Smith SW, Lynch MT. Metabolic acidosis in restraint-associated cardiac arrest: a case series. Acad Emerg Med 1999;6:239–43.
24. Ruttenber AJ, Lawler-Heavner J, Yin M, Wetli CV, Hearn WL, Mash DC. Fatal excited delirium following cocaine use: epidemiologic findings provide new evidence for mechanisms of cocaine toxicity. J Forensic Sci 1997;42(1):25–31.
25. Karch R, Neumann F, Ullrich R, Neumuller J, Podesser BK, Neumann M, et al. The spatial pattern of coronary capillaries in patients with dilated, ischemic, or inflammatory cardiomyopathy. Cardiovasc Pathol 2005;14: 135–44.
26. Babb TG, Rodarte JR. Estimation of ventilatory capacity during submaximal exercise. J Appl Physiol 1993;74(4):2016–22.
27. Pudiak CM, Bozarth MA. Cocaine fatalities increased by restraint stress. Life Sci 1994;55(19):379–82.

Additional information and reprint requests:
Fred W. Kolkhorst, Ph.D.
Department of Exercise and Nutritional Sciences
San Diego State University
5500 Campanile Drive
San Diego
CA 92182-7251
E-mail: fred.kolkhorst@sdsu.edu

Exhibit E

Lasoff et al., J Forensic Med 2017, 2:2
DOI: 10.4172/2472-1026.1000119

**Journal of Forensic Medicine**

Research Article

Open Access

# Proning: Outcomes of Use of Force Followed With Prone Restraint

Daniel Lasoff[1], Christine A Hall[2], William P Bozeman[3], Theodore C Chan[4], Edward M Castillo[4] and Gary M Vilke[5]*

[1]University of Calgary, Canada
[2]Vancouver Island Health Research, Canada
[3]Wake Forest University, USA
[4]San Diego Medical Center, University of California, USA
[5]Department of Emergency Medicine, San Diego Medical Center, USA

## Abstract

**Background:** EMS and police are often faced with violent subjects that require the use of force and the application of restraints. After gaining control and restraining subjects, he or she can be physically placed into a number of positions including prone, supine, on their side or sitting. However, due to cases of sudden death of restrained individuals, there has been scrutiny towards the positions in which a subject is left after he is restrained.

**Methods:** This was an evaluation of prospectively collected data from a single law enforcement agency for all subjects in which a use of force was utilized during a one year study period. Data collected includes whether the patient was agitated, resisting arrest, the level of resistance the subject demonstrated and how long the subject resisted for after being placed in his final restraining position.

**Results:** Of 2431 use of force incidents, 1535 (63.1%) patients ended up being placed in a prone restraint position, 43 (1.7%) were restrained lying face up, 64 (2.7%) were placed on their sides and 224 (9.2%) were placed in a sitting position. Of all of the subjects who were restrained, 1863 (76.6%) incurred no injuries. 354 (14.6%) subjects were treated at a hospital and then cleared for discharge. No fatalities were noted in any subjects of the research population.

**Conclusion:** Use of force incidents commonly result in individuals placed in a prone restraint position, however, we found no fatalities of individuals placed in a prone restraint position.

**Keywords:** Use of force; Restraint position; Proning; Restraint; Prone

## Introduction

Emergency Medical Services (EMS) and police are often faced with violent subjects that require the use of force and the application of restraints. Many techniques are available to restrain patients including simple hand cuffing, to hobbling or hogtying or other manufactured devices. After gaining control and restraining the subject, the subject can be physically placed into a number of positions including prone, supine, on their side or sitting. Due to sudden deaths of individuals in police custody after restraint, there has been increased scrutiny towards the positions in which a subject is left after he is restrained, and it has been suggested that leaving a subject prone can be associated with increased risk for sudden death [1-7]. In fact, many law enforcement agencies and EMS systems have polices that do not allow for a restrained individual to be kept prone and must be placed in a "recovery position" on their side.

It has previously been reported that individuals who were placed in the prone position during police restraint were at risk for sudden death secondary to positional asphyxia [8-10]. Positional asphyxia has been described as respiratory compromise due to interference to the chest wall and diaphragm, impacting airway during sustained abnormal positioning of the body [5,8,10,11]. Since the 1980's, several reports have been published that had implicated positional asphyxia as a cause of death for several individuals restrained in a prone or hogtie position [12,13]. Previous case reports and studies published by Reay and Stratton have attributed this to the inability to self-rescue due to restraints. Several more recent studies have evaluated physiological responses to healthy volunteers being placed in a proned position and having weight placed on the backs of volunteer's while proned [14,15]. Though most feel that proning is physiologically neutral, some individuals still question whether proning is a factor of sudden death for individuals in police custody as all of the research that demonstrates

physiological neutrality were done in healthy research subjects [16]. Multiple studies have shown no deleterious physiological changes with proning and weight placed on one's back, however, to date, only one other study has prospectively evaluated outcomes of real world subjects in a field setting restrained in a proned position [17-19].

We sought to prospectively evaluate outcomes in subjects who were placed in the prone position during use of force incidents in San Diego County.

## Methods

This was an evaluation of prospectively collected data from a single law enforcement agency, the San Diego Sheriff's Organization (SDSO). All subjects in which a Use of Force (UOF), defined as any physical contact during arrest that involved more than a simple joint lock application by sheriff's department officers or deputies during the calendar year 2009 were evaluated. When UOF was utilized, the involved officer completed a standardized data collection tool.

Data were collected from all UOF events during 2009 in San Diego and the method of restraint utilized, including handcuffs, hobble, leg core cuffs and neck restraint were documented as well as final resting

**\*Corresponding author:** Vilke GM, Department of Emergency Medicine, San Diego Medical Center, California, USA, Tel: 6195436463; Fax: 6195433115; E-mail: gmvilke@ucsd.edu

**Received** June 14, 2017; **Accepted** June 27, 2017; **Published** July 04, 2017

**Citation:** Lasoff D, Hall CA, Bozeman WP, Chan TC, Castillo EM, et al. (2017) Proning: Outcomes of Use of Force Followed With Prone Restraint. J Forensic Med 2: 119. doi: 10.4172/2472-1026.1000119

**Copyright:** © 2017 Lasoff D, et al. This is an open-access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

**Citation:** Lasoff D, Hall CA, Bozeman WP, Chan TC, Castillo EM, et al. (2017) Proning: Outcomes of Use of Force Followed With Prone Restraint. J Forensic Med 2: 119. doi: 10.4172/2472-1026.1000119

position. After each UOF event, the arresting officer would be required to submit a data collection form. Data collected included whether the subject was agitated, resisting arrest, the level of resistance the subject demonstrated and how long the subject resisted for after being placed in his final restraining position. Documentation also included whether or not the subject and any deputies were injured and if so what was the extent of the treatment were noted. Characteristics of the subject were also reported such as perceived intoxication, substance use or mental illness.

### Study location and population

The SDSO sworn staff operate in the field setting covering approximately 4200 square miles with a population in San Diego County of 3.2 million people. The SDSO also operates in the County's six jail detention facilities that collectively have an average daily census in excess of 5000 inmates and over 100,000 bookings a year. The SDSO employs approximately 4200 staff of which 1200 are assigned to the law enforcement bureau and respond to over 200,000 911 calls annually and another half million that are non-emergency.

### Human subject's approval

Human subjects' committee approval was obtained at the University of California, San Diego Human Research Protection Program.

### Statistics

Data were entered into a database and spreadsheet (Access, Microsoft Corporation, Redmond, WA). Descriptive analysis was performed and observed proportions were determined with standard methods.

### Results

Over the twelve-month study period, the SDSO had 524,427 documented subject encounters, of which 2431 (0.0046%) resulted in UOF being utilized [20]. In our population, 1934 (79.6%) subjects were males with a median age of 28 years. Of these subjects, 1079 (44.3%) appeared to be under the influence of alcohol or drugs per arresting officer. Three hundred forty seven (14.3%) appeared to be mentally impaired per arresting officers. Of the subject population, 2287 (94%) were unarmed at time of arrest. Fifty subjects were armed with a gun, 55 with a knife/blade and other weapons included bats, sticks, objects present on scene.

Differing levels of intensity in UOF included 1513 episodes of empty hand control actions such as grabbing/pushing, restraining holds, pressure points and striking. There were 1137 episodes of using tools or devices such as oleoresin capsicum (OC) agents, impact weapons, and canines. There were 299 episodes of less lethal weapons such as pepper bell launchers, TASER electronic control devices, 12 gauge super sock and NOVA shield. Numerous encounters required more than one type of UOF action. In these 2431 UOF events, 1808 initial uses of force were effective. Six hundred fifty two subjects required a second method of force.

Of these UOF incidents, 1535 (63.1%) patients ended up being placed in a prone restraint position, 43 (1.7%) were restrained lying face up, 64 (2.7%) were placed on their sides and 224 (9.2%) were placed in a sitting position. Of all of the subjects who were restrained, 1863 (76.6%) incurred no injuries. Three hundred fifty four (14.6%) subjects were treated at a hospital and then cleared for discharge. Two hundred eight (8.6%) subjects required hospitalization. No fatalities were noted in any subjects of the research population.

### Discussion

A number of theories have been put forward as being responsible for the deaths in subjects placed in the prone position including underlying heart disease, obesity, respiratory disease, drug and alcohol toxicity and positional asphyxia. To date there have been numerous case reports of patients suffering sudden death while restrained [2-5]. Prone and hogtie positions were previously described as high risk [4,5]. Though subsequent research has since debunked the original work published by Reay, leading to the determination that the prone position is physiologically neutral with respect to ventilation [8,15,17,18]. Previous studies have even evaluated pulmonary function in individuals placed in a prone position and with up to 100 kg of weight on their backs [18]. These studies have shown no clinically significant changes in an individual's respiratory status. But criticisms have been that these are volunteers and do not reflect real world scenarios where subjects may be have been using drugs, alcohol or been involved in physical altercations prior to being restrained [21].

One similar study had been conducted in Canada to date. This was another prospective study which showed 42.8% of a subject set of 1255 subjects placed in a prone position without a single fatality. During that study, only one subject suffered a fatality and that subject was in a non-prone position. Our findings are similar in that there was not a single fatality and the Hall study also showed a profoundly low rate of sudden death for individuals after UOF incidents in police custody in general (1/1255). The incidence of sudden death is extremely low when looking at all police encounters and even in the subgroup of those who had UOF used against them.

### Study Limitations

The data collected in this study were prospectively collected by the involved law enforcement officers and documented immediately after the event, however are subject to potential recall bias accuracies. Our study is likely to have been limited by the number of subjects enrolled. Because of the low rate of fatalities in our study, we were unable to statistically differentiate the rates of fatalities based on the modalities of restraint. However, our study does not seem to show an increased danger of the prone position in a restrained individual.

### Conclusion

UOF incidents commonly result in individuals placed in a prone restraint position. Through our large population, we noted no fatalities of individuals placed in a prone restraint position. Likely there are numerous factors that place an individual in police custody at risk for sudden death including a history of mental illness, underlying heart disease, the presence of excited delirium syndrome and drug and alcohol intoxication. Future research should focus on high risk populations, including those suffering from drug intoxication, heart disease, obesity and chronic lung diseases.

#### Acknowledgement

The authors would like to thank the National Institute of Justice (Grant number 2006-DE-BX-K002) and the Canadian Police Research Centre (Contract #W7714-091131\001\SQ) for the provision of unrestricted financial assistance for this project. This project could not have been successfully completed without the full participation and support deputies and administration of the San Diego Sheriff's Organization.

#### References

1. Pollanen MS, Chiasson DA, Cairns JT, Young JG (1998) Unexpected death related to restraint for excited delirium: A retrospective study of deaths in police custody and in the community. Can Med Assoc J 158: 1603-1607.

2. Leigh A, Johnson G, Ingram A (1998) Deaths in police custody: Learning the lessons. Home Office Police Research Group.

**Citation:** Lasoff D, Hall CA, Bozeman WP, Chan TC, Castillo EM, et al. (2017) Proning: Outcomes of Use of Force Followed With Prone Restraint. J Forensic Med 2: 119. doi: 10.4172/2472-1026.1000119

3. Howard JD, Reay DT (1998) Positional asphyxia. Ann Emerg Med 32: 116-118.

4. Reay DT, Fligner CL, Stilwell AD, Arnold J (1992) Positional asphyxia during law enforcement transport. Am J Forensic Med Pathol 13: 90-97.

5. Stratton SJ, Rogers C, Green K (1995) Sudden death in individuals in hobble restraints during paramedic transport. Ann Emerg Med 25: 710-712.

6. O'Halloran RL, Frank JG (2000) Asphyxial death during prone restraint revisited: A report of 21 cases. Am J Forensic Med Pathol 21: 39-52.

7. Ross DL (1996) An analysis of in custody deaths and positional asphyxiation.

8. Reay DT, Howard JD, Fligner CL, Ward RJ (1998) Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol 9: 16-18.

9. Hirsh CS (1994) Restraint asphyxiation. Am J Forensic Med Pathol 15: 266.

10. Reay DT, Howard JD (1999) Restraint position and positional asphyxia. Am J Forensic Med Pathol 20: 300-301.

11. Reay DT (1996) Suspect restraint and sudden death. FBI L Enforcement Bull 65: 22-25.

12. O'Halloran RL, Lewman LV (1993) Restraint asphyxiation in excited delirium. Am J Forensic Med Pathol 14: 289-295.

13. Morrison A, Sadler D (2001) Death of a psychiatric patient during physical restraint: Excited delirium-a case report. Med Sci Law 41: 46-50.

14. Chan TC, Vilke GM, Neuman T (1998) Reexamination of custody restraint position and positional asphyxia. Am J Forensic Med Pathol 19: 201-205.

15. Vilke GM, Chan TC, Neuman T, Clausen JL (2000) Spirometry in normal subjects in sitting, prone and supine positions. Respir Care 45: 407-410.

16. Laposata EA (1993) Positional asphyxia during law enforcement transport. Am J Forensic Med Pathol 14: 86-87.

17. Chan TC, Vilke GM, Neuman T (2000) Restraint position and positional asphyxia. Am J Forensic Med Pathol 21: 93.

18. Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM (2004) Weight force during prone restraint and respiratory function. Am J Forensic Med Pathol 25: 185-189.

19. Hall CA, McHale AM, Kader AS, Stewart LC, MacCarthy CS, et al. (2012) Incidence and outcome of prone positioning following police use of force in a prospective, consecutive cohort of subjects. J Forensic Leg Med 19: 83-89.

20. Gore WD (2012) Use of force/internal affairs statistical report. San Diego County Sheriff's Department.

21. Reay DT, Howard JD (1999) Restraint position and positional asphyxia. Am J Forensic Med Pathol 20: 300-301.

Exhibit F

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

MAR 18 2010

Stephan Harris, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| GLENN WEIGEL, Individually and as Co-Personal Representative of the Estate of BRUCE JAMES WEIGEL; and DAVID WEIGEL, Individually and as Co-Personal Representative of the Estate of BRUCE JAMES WEIGEL, <br><br> Plaintiffs, <br><br> vs. <br><br> JOHN COX, JOHN K. BROAD, and DEVAN HENDERSON, <br><br> Defendants. | Case No. 04-CV-355-J |

## ORDER DENYING MOTIONS TO EXCLUDE TESTIMONY AND FOR SUMMARY JUDGMENT

This matter comes before the court as a result of the parties' cross-motions to exclude

as unreliable expert testimony offered by the other side and Defendants' motion for summary

judgment in their favor. Defendants seek to exclude trial testimony offered by Plaintiffs of

Dr. Stephen Cina, the pathologist who performed the autopsy of Bruce Weigel. Plaintiffs

opposed this motion, and in turn moved to exclude the testimony of two defense experts,

Christopher Lawrence and Dr. Vincent Di Maio. Defendants also contend that, without their expert witnesses, Plaintiffs will be unable to show a genuine issue of material fact, and summary judgment should be entered in Defendants' favor.

The Court held a two-day hearing on these issues on March 4 and 5, and closing arguments on March 11. Based on the evidence and arguments presented by the parties, the Court finds that Drs. Cina and Di Maio, as well as Mr. Lawrence, should be permitted to testify at trial.

## *FACTS*

The basic facts of this case have been discussed extensively throughout these proceedings. *E.g.*, *Weigel v. Broad*, 544 F.3d 1143, 1147-49 (10th Cir. 2008). In short, Bruce Weigel collided with the rear of Trooper Broad's patrol vehicle while both were traveling northbound on Interstate 25. Following the collision, Mr. Weigel's car went through the median and came to a stop on the right shoulder of the southbound lane. Trooper Henderson was following both colliding vehicles in his patrol car and stopped at the accident scene.

The troopers approached Mr. Weigel's car and asked him about the accident. They reported smelling alcohol on his breath. Mr. Weigel agreed to take a field sobriety test. As Trooper Henderson was walking Mr. Weigel to his patrol car across the intersection, he noticed a van approaching and told Mr. Weigel to stop. Mr. Weigel continued to cross, and

2

despite an additional warning, ran in front of the van. He was struck by one of the van's side mirrors.

Trooper Henderson went after Mr. Weigel, tackled him, and brought him to the ground. After a significant struggle, Mr. Weigel was face down on the ground, with Troopeer Broad on his upper body and applying at least one knee, trooper Henderson straddling Mr. Weigel's upper thighs and buttocks and holding his arms, and a bystander on his legs. Another bystander bound Mr. Weigel's feet, and he was handcuffed. Trooper Henderson returned to his patrol vehicle briefly, and returned to the scene of the struggle. When he returned to the scene, Trooper Broad told him that Mr. Weigel had stopped breathing. The troopers rolled Mr. Weigel on his back and found his heart had stopped. Attempts to revive him were unsuccessful.

### *DISCUSSION*

Admission of expert testimony is governed by Federal Rule of Evidence 702, which was amended in 2000 in response to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). The Supreme Court requires district courts to act as "gatekeepers," ensuring that expert testimony is reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999); *Daubert*, 509 U.S. at 509. Nevertheless, the proper evidentiary standard is not infallibility; experts are humans, not robots. *See*, *e.g.*, *Mitchell v. Gencorp Inc.*, 165 F.3d 778,

3

781 (10th Cir.1999) ("The plaintiff need not prove that the expert is undisputably correct.").

The Court is charged with the task of ensuring that the expert's opinion is based in sound

reasoning and methodology, and that it is valid given the particular facts of a case. *U.S. v.*

*Gabaldon*, 389 F .3d 1090, 1098 (10th Cir.2004).

Rule 702 itself sets forth several bases for evaluating the testimony. Foremost among

them is the requirement that the expert testimony "assist the trier of fact to understand the

evidence or to determine a fact in issue." Fed. R. Evid. 702. The rule also requires the Court

to assess whether "(1) the testimony is based upon sufficient facts or data, (2) the testimony

is the product of reliable principles and methods, and (3) the witness has applied the

principles and methods reliably to the facts of the case." In addition, courts have found other

factors to be relevant in determining whether expert testimony may be admitted. For

example, in *General Electric Co. v. Joiner*, the Supreme Court explicitly permitted a court

to "conclude that there is simply too great an analytical gap between the data and the opinion

proffered." 522 U.S. 136, 146 (1997).

Because this case involves cross-motions to exclude expert testimony, it is important

to stress that it is not the Court's task to assess which expert is "right." The proper analysis

involves only the admissibility of the evidence, not the weight—and the two are distinct

concepts. *See Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000). "Vigorous

4

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Furthermore, the issue before the Court involves only the admissibility of the expert testimony pursuant to Rule 702 and *Daubert*. By ruling as it does, that the testimony should not be excluded pursuant to this authority, the Court is making no ruling or finding of admissibility on any other basis.

<u>Christopher Lawrence</u>

The easiest witness to discuss is Mr. Lawrence. Plaintiffs object to any medical testimony Mr. Lawrence might offer, correctly arguing that medicine and physiology are outside his area of expertise. Defendants agree, and maintain that Mr. Lawrence's testimony will be limited to generally accepted law enforcement practices. Presumably he will address the specific question of whether Troopers Broad and Henderson adhered to these practices. The Court agrees that Mr. Lawrence's testimony should be limited to this subject and, if the limitation is observed, is admissible.

It is worth noting that Defendants specifically mentioned that Mr. Lawrence should be permitted to testify regarding the bases of his opinion. The Court assumes this means that Mr. Lawrence's opinion regarding the standard police procedures is based, at least in part, on information he has been given regarding positional asphyxia as a cause of sudden in-

custody death. Testimony offered to this effect will be treated as any other expert testimony about the basis of the experts opinion.

Excited Delirium

There are two significant areas of excited delirium testimony at issue. The first is whether the phenomenon of excited delirium in general is admissible. The second is whether Dr. Vincent Di Maio's opinion that excited delirium caused Mr. Weigel's death is admissible.

There is little need to discuss the question of whether a general discussion of excited delirium in general is admissible. Both Dr. Di Maio and Dr. Cina agreed that excited delirium is widely recognized in the area of pathology. The development of this diagnosis, according to the exhibits submitted to the Court, is based on observation of subjects who generally display a particular suite of symptoms including erratic behavior, hyperthermia, and great strength. The condition has been observed in connection with various presumed causes, most frequently cocaine use, but also including several mental illnesses. The precise mechanism has been largely unknown, but researchers have recently observed a correlation between excited delirium and several biological markers. Ex. A (Mash et al. study).

As Plaintiffs point out, none of the supporting science involves a controlled experiment, that is, testing one variable against a control group in order to disprove a

hypothesis. This is not surprising, given the potentially great risk of harm to experimental subjects. Accordingly, the current understanding of excited delirium derives almost exclusively from a process of inductive reasoning. Although this process may, arguably, be less reliable than a controlled experiment, it is clear to the Court that no experimental alternative is realistically available.

In summary, given the documented history of observed symptoms of excited delirium, the undisputed testimony from both witnesses that it is generally accepted in the field of pathology, and documented connection between excited delirium and certain biological characteristics, the Court finds that the phenomenon meets the requirements of Rule of Evidence 702 and *Daubert*. Testimony regarding excited delirium will not be excluded as unreliable.

The issue of Dr. Di Maio's diagnosis of Mr. Weigel presents a closer question. As Plaintiffs argued in closing, Dr. Di Maio essentially diagnosed Mr. Weigel of schizophrenia that developed shortly before his death. Dr. Di Maio then testified that Mr. Weigel's schizophrenia was the precipitating cause of Mr. Weigel's excited delirium. Defendants contend that Dr. Di Maio's underlying claim—that Mr. Weigel was exhibiting symptoms of schizophrenia—was without foundation because he failed to use the diagnostic criteria set forth in the *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Text Revision

(DSM-IV-TR).

As an initial matter, it is worth noting that the testimony from both Dr. Di Maio and

Dr. Cina indicated that pathologists routinely rely on reports by observers of the

circumstances of a death when determining the cause of that death. Whether Dr. Di Maio was

correct regarding Mr. Weigel's schizophrenia, the fact remains that he relied upon reports

of some erratic behavior in the days leading up to the death, and used that information to

draw his conclusion. Plaintiffs may have several arguments regarding why Dr. Di Maio is

incorrect in his conclusion, but those arguments relate to credibility more than admissibility.

Plaintiffs are free to reprise them before the jury.

Positional Asphyxia

Defendants claim that the current state of the research on positional asphyxia shows

that it is impossible that Mr. Weigel's breathing was sufficiently restricted to be a cause of

his death. For support, they present various studies in which test subjects were placed prone,

sometimes restrained, or with and weights up to 225 pounds placed on their backs. In some

experiments, the subjects exercised beforehand. The Court need not discuss the specific

details and results of each experiment. It is sufficient to note that the research indicated that

in no tested condition were the subjects affected to the degree that their ability to oxygenate

their blood was compromised. In other words, their ability to breathe was sometimes reduced,

but their bodies were receiving sufficient oxygen. Dr. Chan—who conducted several of these studies with his colleagues—hypothesized that the reason was that human respiration has a great deal of reserves, so even significantly taxing a person's respiration will not generally prevent a person from supplying the body with adequate oxygen.

The difficulty is that none of the experiments cited purport to replicate the conditions of an actual struggle and arrest in a subject like Mr. Weigel. Dr. Chan, during his testimony and in his published research, explicitly acknowledges that the two situations are not comparable. Mr. Weigel had been in a collision with a Highway Patrol vehicle, was confronted by two Troopers, had been struck by a moving vehicle, attempted to flee, may have been afflicted with excited delirium, and when tackled, engaged in a powerful struggle. The experiments conducted in controlled circumstances simply cannot stand for the proposition that the restraint imposed by the troopers could not have restricted his breathing to such a degree that it contributed to his death.

Having found Defendants' reasoning regarding the science to be flawed, the Court is left with the question of whether Dr. Cina's expert testimony is otherwise sufficiently reliable to be admitted. The Court finds that it is.

Dr. Cina testified that he arrived at his conclusion of mechanical asphyxia after ruling out other potential causes of death. 2 Trans. at 180. This is precisely the

technique—differential diagnosis—that Dr. Di Maio used to conclude that Mr. Weigel died as a result of excited delirium. 1 Trans. at 47. The Court infers, then, that this diagnostic technique is considered reliable in the field of pathology. The fact that they arrived at different conclusions does not mean that the testimony of either expert should be excluded. As the Court of Appeals for the Third Circuit has stated, proponents of expert testimony "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994) (emphasis in original).

Conclusion

The Court finds by a preponderance of the evidence that the expert testimony of Dr. Di Maio, Mr. Lawrence, and Dr. Cina are all sufficiently reliable to satisfy the requirements of Rule of Evidence 702 as well as *Daubert* and its progeny. In addition, as Defendants' motion for summary judgment depends on grant of their *Daubert* motion to exclude Plaintiffs' expert testimony, the Court finds that genuine issues of material fact remain and summary judgment is not appropriate. Accordingly:

IT IS ORDERED that Defendants' *Motion to Strike Expert Witnesses* and *Motion for Summary Judgment*, Docket No. 100, is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' *Motion to Exclude Portions of the Testimony of Christopher Lawrence*, Docket No. 101, is DENIED.

IT IS FINALLY ORDERED that Plaintiffs' *Motion to Exclude Testimony of Vincent Di Maio, M.D.*, Docket No. 102, is DENIED.

Dated this _____ day of March, 2010.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

Exhibit G

Case 1:18-cv-00127-AWI-EPG   Document 153-1   Filed 11/03/21   Page 50 of 177



# Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe"

*By Steve Cole, NRP, FTO* | Jun 2, 2020



**Editor's note:** *Calibre Press first published this article in 2015. In light of current events, we felt it was important to share this information, which is consistent with our training, again.*

Every officer has heard "I can't breathe!" yelled at the top of a subject's lungs, usually as they are being handcuffed and detained after a vigorous struggle. I certainly know that I, as a paramedic responding to those calls to "check the subject" out, have heard it too. After a while, we all become a bit cavalier to the condition known as "jail-itis" or "allergic response to handcuffs," or simply put: the subject maybe faking a medical

emergency to get out of jail. Invariably someone will say, "If you can talk, you're breathing." I have said it. And, sadly, I have been wrong.

Let me say that I understand that a substantial majority of these patients are likely exaggerating their discomfort or trying to manipulate the situation. But the cost of assuming that's the case is also unacceptably high. One case in a thousand is still one case that can result in a million-dollar lawsuit, criminal prosecution, loss of your job, and seeing your name all over CNN.

I want to share with you why the words "I can't breathe" should be a red flag to the officer, just as much as the subject who has a clenched fist, or who is pacing a room erratically.

A major misconception is: *if he can say that he can't breathe, he can speak; and if he can speak then he has to be breathing.* This is both true, and horribly wrong. This is perhaps one of the **most lethal** misconceptions in both EMS and law enforcement. To understand this, a little bit of boring physiology is needed. We must understand that *respiration* (breathing) is different than *phonation* (speaking).

### Breathing

A "breath" is a **single** inspiration and exhalation, and in medicine this is typically called a normal tidal breath. The amount/volume of this breath is called the tidal volume. The typical tidal volume for an adult male is typically 10-15 cc/kg, or about 500 – 700 cc total each breath (just over half a liter bottle of coke). I know this may be boring, but bear with me.

Now this tidal volume is total air movement with a *normal resting* breath. If you force yourself to take a deeper breath, it will of course be more, and visa versa.  This breath is the volume to move air not only in the business-end of the lungs (the aveoli) but also the "airways" in between your lips/nose and the lungs.

This is important: The airways involve everything from the tip of your mouth, down

Case 1:18-cv-00127-AWI-EPG   Document 153-1   Filed 11/03/21   Page 52 of 177

your throat, through your larynx (voice box) and trachea, and down and down further through increasingly small tubes to the outside of the aveoli where actual breathing (cellular respiration: gas exchange of oxygen and carbon dioxide) takes place.

These passages are called "dead air" space, **because no actual gas exchange occurs.** It's best to think of this space as "highway" and the alveoli as the actual destination. The volume of this space is typically about 150 cc in the adult male (give or take). In other words, of the 500 – 700  cc typically required to breath, *the first* 150 cc are required to move air before the first cc of air reaches the first aveoli.

**Phonation**

Now let's look at *phonation* (making sounds; speaking). The larynx, where sound is produced, only requires about 50 – 100 cc of air movement to produce sound. And the volume produced is related to the speed and force of air moving through the larynx, rather than the volume of air that reaches the alveoli. Therefore, phonation and respiration are two separate processes.

Why is this important? Most officers know that when a patient is prone, their respirations may be impeded. To be precise, the tidal volume may be reduced, sometimes significantly. A tidal volume breath in some circumstances may be decreased by up to 40%, and the work the subject must do to get that remaining 60% is much higher. At the same time that their tidal volume is reduced, their need for oxygen is dramatically increased because of their muscle activity (fighting, drugs, etc).

**Oxygen Demand**

Finally, let's look at oxygen *demand*. Oxygen demand is the amount of oxygen the body needs for the activity it is undertaking. If the subject does not have enough oxygen to meet this demand, they function at an oxygen *deficit*. Even if the subject is getting good airflow to the aveoli, are they getting enough to meet their needs? We all have run laps and found ourselves having to breath heavily to "catch our breath" afterward. This is because our oxygen demand exceeded our ability to meet that need.

We have all done this and our bodies have an ability to tolerate this for short periods. But add restraints, drugs, poor health, pre-existing medical conditions, obesity, and position to the mix, and bad things can happen. This results in an internal homeostasis (physiological state) that is thrown horribly out of balance, and in some cases may push subjects over the cliff into **cardiac arrest.**

In short, they literally cannot breathe (enough) *despite* moving air in and out. So when they say can't breath, in a very real sense—*they can't.*

**Past the Point of No Return**

Because they are moving at least 100 cc of air across their vocal chords, the subject can speak/scream/etc. Because they are working real hard at breathing, they are often yelling. The officer and/or paramedic may assume the subject is just fine. They will continue to yell and scream, **until they don't.** By then its almost too late to recover.

Now this pertains to the concepts of excited delirium and positional asphyxia, both of which most LEOs are familiar with. But it also applies to a subject having an asthma attack and other medical emergencies as well. In other words, it doesn't have to be drug related. This is a physiologic issue.

Yes, subjects are manipulative. Yes, they are "subjects" and being detained for a reason, and often they are restrained in the best way officers can in the circumstances of the moment. But every time an officer or paramedic passes on the myth that *if they are speaking, they are breathing*, I resist the urge rip out their lungs and show them why they are wrong. Because the reality is some of these patients may be speaking the truth **with their last breath**.

What actions should an officer take when this happens? Well, that's a complex question dependent on the circumstances. I offer the following suggestions.

· Never ignore the statement. One should treat it like a "medical threat cue," sometimes serious and sometimes not, but always considered.

Case 1:18-cv-00127-AWI-EPG   Document 153-1   Filed 11/03/21   Page 54 of 177

· Make sure the subject is in a position to maximize his tidal volume. Is he sitting up or on his side? A subject should never be left prone.

· Strongly consider having the patient checked out by your local EMS. Decrease his stress, struggle, and oxygen demand by allowing/coaching him to calm down while you wait.

· What does your agency policy say? Does it address this?

**Conclusion**

Please do not pass on this myth to your trainees. It's a flawed assumption that, while rare, can have potentially life threatening and career ending results.

Understanding a little bit of respiratory physiology will help you, the LEO, avoid potentially catastrophic pitfalls, and help you have a long career in this field. It will also benefit your agency. The subject, while he or she may not thank you, will certainly appreciate it as well.

I know that LEO's do a difficult job, and I hope this article provides you with a few tools to do that job a little bit better.

---

**Steve Cole, NRP, FTO:**

Steve Cole, NRP, FTO, is a training captain with the Ada County Paramedics.

---

## Related Posts



**FREE WEBINAR: Top Things Law Enforcement Leaders MUST Do Before & After an Officer Involved Shooting**



**VIDEO: A Confused Elderly Woman, a Dislocated Shoulder, and an Over-Zealous Cop. What's Your Immediate Goal?**



**Where Do You Carry Your O.C.? Cops Weigh In...**



**O.C. on the Strong or Weak Side: What Do YOU Think?**



**Don't Be Stalked at Home: More Tips**

Comments are closed.

# Signup for Newsline

Email:

[                    ]

[ Subscribe ]

2021 © Calibre Press
Powered by **Invex Design**

Exhibit H

Exhibit H

1               UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3

4

  ANTHONY PEREZ, individually,  )
5  et al.,                       )
                                 )
6               Plaintiffs,      )
                                 )
7      vs.                       ) CASE NO.:
                                 ) 1:18-cv-00127
8  CITY OF FRESNO, COUNTY OF     ) AWI (EPG)
  FRESNO, et al.,                )
9                                )
                Defendants.      )
10 _____)

11

12

13

14          VIDEOTAPED DEPOSITION VIA ZOOM OF

15              GARY MICHAEL VILKE, M.D.

16             VOLUME II, PAGES 46 - 155

17               SAN DIEGO, CALIFORNIA

18      WEDNESDAY, SEPTEMBER 8, 2021, 1:04 P.M.

19

20

21

22

23

24  Reported by:  Carina Valles, CLR
              CSR No. 12605
25  Job No. 243637

                                                         46

| | | |
|---|---|---|
| 1 | up as a potential way of trying to restrain somebody | 01:10:45 |
| 2 | to get them into a position on their back on a | 01:10:49 |
| 3 | backboard, but at this moment, I'm not aware of any | 01:10:51 |
| 4 | specifically. | 01:10:55 |
| 5 | Q.  That's the question I was asking.  I'm just | 01:10:56 |
| 6 | looking for a yes-or-no answer. | 01:10:58 |
| 7 | Are you aware of any treatise, manual or | 01:11:00 |
| 8 | peer-reviewed article that specifically recommends a | 01:11:03 |
| 9 | backboard to be placed on to a prone patient? | 01:11:07 |
| 10 | A.  That recommends, no. | 01:11:10 |
| 11 | Q.  Are you aware of any training bulletin or | 01:11:13 |
| 12 | training materials from American Ambulance that | 01:11:16 |
| 13 | specifically authorize or recommend the use of this | 01:11:18 |
| 14 | type of board on a prone patient? | 01:11:21 |
| 15 | A.  That authorizes, no. | 01:11:26 |
| 16 | Q.  Are you aware of any policy or procedure | 01:11:27 |
| 17 | that you reviewed from American Ambulance that | 01:11:32 |
| 18 | specifically authorizes or recommends the -- this | 01:11:35 |
| 19 | type of board to be placed on to a prone patient? | 01:11:39 |
| 20 | A.  No. | 01:11:43 |
| 21 | Q.  Are you aware of any health and safety code | 01:11:43 |
| 22 | regulation, treatise, manual, peer-reviewed article, | 01:11:49 |
| 23 | training bulletin, training materials, policy or | 01:11:53 |
| 24 | procedure that specifically authorizes a first | 01:11:56 |
| 25 | responder to sit on a board that's been placed on to | 01:11:59 |

57

| | | |
|---|---|---|
| 1 | a prone patient? | 01:12:03 |
| 2 | A.  That authorizes, no. | 01:12:04 |
| 3 | Q.  Are you aware of any health and safety | 01:12:05 |
| 4 | code, California regulation, treatise, manual, | 01:12:10 |
| 5 | peer-reviewed article, training bulletin, training | 01:12:13 |
| 6 | materials, policy or procedure that specifically | 01:12:17 |
| 7 | authorizes a backboard to be used as a restraint | 01:12:20 |
| 8 | device? | 01:12:25 |
| 9 | A.  That authorizes, no. | 01:12:25 |
| 10 | Q.  Are you aware of any health and safety code | 01:12:26 |
| 11 | provision, California regulation, treatise, manual, | 01:12:30 |
| 12 | peer-reviewed article, training bulletin, training | 01:12:33 |
| 13 | manual, policy or procedure that specifically | 01:12:36 |
| 14 | authorizes a backboard to be used to apply pressure | 01:12:40 |
| 15 | to a patient who is in a prone patient? | 01:12:44 |
| 16 | A.  No. | 01:12:47 |
| 17 | Q.  Okay.  With respect to your assignment in | 01:12:47 |
| 18 | this case, when you were retained in this case, what | 01:12:52 |
| 19 | questions did you understand that you were going to | 01:12:56 |
| 20 | be asked to answer? | 01:12:58 |
| 21 | A.  I was looking -- I was asked to review the | 01:12:58 |
| 22 | paramedics' and EMTs' care on behalf of American | 01:13:04 |
| 23 | Ambulance to determine if they deviated from the | 01:13:08 |
| 24 | standard of care in the management of the patient. | 01:13:11 |
| 25 | Also, I was asked to evaluate, from a perspective of | 01:13:13 |

1    asphyxiation, whether there was -- whether there was        01:13:18

2    the possibility that mechanical or positional               01:13:24

3    asphyxia participated or played a role in the               01:13:28

4    cardiac arrest in this case.                                01:13:32

5           I was also asked to look at the patient             01:13:34

6    himself in as far as if there's a cause of death            01:13:39

7    that could be elicited based on the review of               01:13:47

8    materials.  And if so, to review and opine on that.         01:13:51

9       Q.  In your opinion with respect to the latter           01:13:54

10   category of questions was that Mr. Perez died as a          01:13:57

11   result of methamphetamine use in combination with a         01:14:01

12   diseased heart, agitation and continued resistance;         01:14:07

13   is that right?                                              01:14:10

14      A.  It's a summary of my opinion, yes.                   01:14:10

15      Q.  So in -- in your opinion, why does -- if             01:14:13

16   you could perhaps explain it in laymen's terms, why         01:14:19

17   and how did Mr. Perez die, according to you?                01:14:23

18      A.  Sure.                                                01:14:26

19          In laymen's terms, he was very agitated due         01:14:26

20   to his methamphetamine use.  He was hypermetabolic,         01:14:30

21   meaning he was very -- his heart rate was up, his           01:14:37

22   temperature was up.  He was agitated and resisting          01:14:40

23   and struggling.  And on top of that, he had an              01:14:43

24   abnormal heart, which was enlarged and also had             01:14:50

25   significant atherosclerotic disease to two of the           01:14:50

                                                                      59

1    vessels that were up to 80 percent blocked.          01:14:53

2          And by his agitation, which creates an          01:14:56

3    acidosis, his diseased heart and the methamphetamine  01:14:59

4    with the irritation that also can cause the heart --   01:15:04

5    all those things contribute to causing a sudden        01:15:08

6    cardiac event.                                         01:15:11

7       Q.  Do you believe or is it your opinion to any    01:15:13

8    degree of scientific certainty that Mr. Perez would    01:15:16

9    have died of his abnormal heart condition regardless   01:15:21

10   of the encounter with law enforcement?                 01:15:27

11      A.  With his temperature of 105 and his degree      01:15:31

12   of agitation and his behavior, I believe he would      01:15:34

13   have died at some point, yes.                          01:15:37

14      Q.  Well, would he have died that day?              01:15:40

15      A.  Basically, he was to be restrained and          01:15:45

16   resisting restraints, I guess the hypothetical is if   01:15:49

17   nobody did anything at that time, they let him walk    01:15:54

18   around, at some point, his behavior would have         01:15:57

19   gathered attention, he would have been needing to be   01:15:59

20   restrained, he would have continued to resist as he    01:15:59

21   did in this case and would have died during that       01:16:02

22   process of the lactic acid production and the          01:16:04

23   agitation.                                             01:16:08

24      Q.  So let me pose the hypothetical perhaps         01:16:09

25   more precisely.  Suppose that Mr. Perez was            01:16:12

| | | |
|---|---|---|
| 1 | Go ahead and respond, please. | 01:19:23 |
| 2 | THE WITNESS:  All right.  Again, I think | 01:19:24 |
| 3 | that's -- I think that's the answer -- or the | 01:19:27 |
| 4 | question I answered earlier, assuming he still has | 01:19:30 |
| 5 | the same physiology of his heart disease and his big | 01:19:34 |
| 6 | heart and his methamphetamine and the elevated body | 01:19:34 |
| 7 | temperature. | 01:19:38 |
| 8 | But if you take away the law enforcement | 01:19:39 |
| 9 | and EMS, I can't say for certain he would have died | 01:19:41 |
| 10 | that day, unless there was another event where he | 01:19:44 |
| 11 | was in a struggle and had resisted and created that | 01:19:46 |
| 12 | agitation and acidosis. | 01:19:51 |
| 13 | BY MR. SEABAUGH: | 01:19:53 |
| 14 | Q.  So a substantial factor in causing his | 01:19:53 |
| 15 | death was the metabolic acidosis that irritated his | 01:19:57 |
| 16 | heart and caused the cardiac arrhythmia; right? | 01:20:01 |
| 17 | A.  That is a component, yes. | 01:20:06 |
| 18 | Q.  And you're -- in terms of what caused the | 01:20:07 |
| 19 | acidosis, the officers' struggle with Mr. Perez in | 01:20:12 |
| 20 | your view contributed to the metabolic acidosis | 01:20:16 |
| 21 | that, in turn, contributed to the cardiac | 01:20:22 |
| 22 | arrhythmia; is that right? | 01:20:26 |
| 23 | MR. RYAN:  I'm going to object to the | 01:20:26 |
| 24 | question.  It assumes facts not in evidence. | 01:20:27 |
| 25 | Foundation. | 01:20:29 |

64

1    involvement would have added additional acidosis to      01:21:36

2    what he was already having prior to their                01:21:39

3    involvement.                                             01:21:42

4    BY MR. SEABAUGH:                                         01:21:43

5        Q.  So is it your opinion that Mr. Perez's           01:21:43

6    struggle with the officers contributed to his           01:21:47

7    metabolic acidosis, but the officers' struggle with     01:21:50

8    Mr. Perez did not contribute to his metabolic           01:21:53

9    acidosis?                                                01:21:56

10            MR. RYAN:  I'm going to object to the           01:21:57

11   question as compound.  Foundation.  Hypothetical.       01:21:58

12   Form.                                                    01:22:02

13           Go ahead and respond.                           01:22:02

14           THE WITNESS:  The acidosis is produced by       01:22:03

15   the movement of his muscles and activity.  So the       01:22:05

16   officers' movement doesn't create acidosis in           01:22:08

17   somebody else.  It is the resistance or the movement    01:22:11

18   of the individual against the attempts to be held       01:22:14

19   that create that acidosis.  So I'm trying to make       01:22:20

20   sure I answer your question.                            01:22:22

21           You said the officers' struggle.  Well, the     01:22:24

22   officers were holding him.  The officers would get      01:22:26

23   acidosis themselves by struggling, but they weren't     01:22:26

24   giving acidosis to the individual, Mr. Perez.           01:22:30

25   ///

                                                                  66

1    based on the body position, what would have happened    01:31:12

2    with the backboard.  You know, does it put a            01:31:15

3    significant amount of weight on the upper torso or      01:31:18

4    not, based on hand position and, you know, the          01:31:20

5    position of the simulated Detective Calvert?  So        01:31:23

6    that was the purpose, to see where the weight forces    01:31:29

7    seem to be applied from the backboard being             01:31:31

8    transmitted down.                                       01:31:34

9        Q.  Okay.  Who are these two individuals who        01:31:35

10   are depicted in the photograph?                         01:31:38

11       A.  These are two individuals, I believe, from      01:31:39

12   Mr. Ryan's office.                                      01:31:42

13       Q.  Okay.  And in this photograph, the              01:31:43

14   backboard is not touching the shoulders or head of a    01:31:49

15   person who is standing in for Mr. Perez; is that        01:31:56

16   right?                                                  01:31:59

17       A.  That is correct.                                01:31:59

18       Q.  And the backboard is touching that person's     01:32:00

19   heels; is that right?                                   01:32:05

20       A.  Heels, maybe the calves.  But, yes, the         01:32:05

21   heels and the buttocks.                                 01:32:10

22       Q.  Okay.  Is it your belief that during the        01:32:11

23   incident in this case the backboard was not touching    01:32:14

24   Mr. Perez's shoulders or head?                          01:32:17

25       A.  Based on the review of the video, it's          01:32:23

| | | |
|---|---|---|
| 1 | Do you have any disagreements with his | 01:42:18 |
| 2 | qualifications to perform the autopsy in this case? | 01:42:21 |
| 3 | A.  No, I do not. | 01:42:24 |
| 4 | Q.  Any disagreements with his qualifications | 01:42:25 |
| 5 | to render an opinion about the cause of Mr. Perez's | 01:42:28 |
| 6 | death? | 01:42:30 |
| 7 | A.  I do not. | 01:42:30 |
| 8 | Q.  Any disagreements with the methods that he | 01:42:31 |
| 9 | used to perform the autopsy? | 01:42:33 |
| 10 | A.  I do not. | 01:42:36 |
| 11 | Q.  Any disagreements with the methods he used | 01:42:37 |
| 12 | to reach his conclusions as to what the cause of | 01:42:41 |
| 13 | death was? | 01:42:44 |
| 14 | A.  I think his methods were reasonable. | 01:42:44 |
| 15 | Q.  And do you disagree with the conclusion | 01:42:52 |
| 16 | that he reached? | 01:42:56 |
| 17 | A.  His conclusion was that the cause of death | 01:42:57 |
| 18 | was compressed asphyxia during restraint with | 01:43:00 |
| 19 | methamphetamine toxicity elicited as a significant | 01:43:04 |
| 20 | condition.  And I am not of the opinion that there | 01:43:08 |
| 21 | was mechanical asphyxia.  So from that perspective, | 01:43:10 |
| 22 | I will not be agreeing with him. | 01:43:14 |
| 23 | Q.  So why do you think that the coroner was | 01:43:16 |
| 24 | wrong to reach the conclusion of mechanical | 01:43:20 |
| 25 | asphyxia? | 01:43:24 |

82

1       A.  I think that in looking at the medical          01:43:25

2    examiner's -- or the review, he obviously took into   01:43:29

3    account the methamphetamine and the components of     01:43:38

4    that as part of it, but he also looked at the         01:43:40

5    specifics of where things were located, but I don't   01:43:43

6    think he went through it with the details of how      01:43:46

7    long and the positions and specifically where weight  01:43:49

8    forces were being placed.                             01:43:51

9       And so that is what my analysis looks at           01:43:53

10   specifically, is how much weight is being placed in   01:43:57

11   what position for how long and what's going on with   01:43:59

12   the individual during those times to make that        01:44:02

13   determination.  So by doing that analysis, using the  01:44:04

14   materials I have, I think we came to a different       01:44:10

15   conclusion.                                           01:44:12

16      Q.  Okay.  So in your view, Dr. Chambliss          01:44:13

17   failed to consider the length of time during which    01:44:18

18   Mr. Perez was restrained before he died?              01:44:21

19      A.  I think it's a combination, not just one       01:44:27

20   specific.  There's the length of time, the location   01:44:29

21   of weight, the impact of the weight at that time      01:44:31

22   that needed to be all put together to determine, can  01:44:34

23   this be a mechanical asphyxia?                        01:44:38

24      Q.  So what specifically did Dr. Chambliss fail    01:44:41

25   to consider in that regard?                           01:44:46

                                                              83

```
 1        A.  I'd have to go back specifically and look    01:44:48

 2   at how he -- how he created -- how he came to that    01:44:50

 3   specific conclusion.  But he came to the conclusion   01:44:55

 4   there was weight force being placed on him at the     01:44:58

 5   time that he went unresponsive.  And I think that     01:45:01

 6   was a big piece of why he made that conclusion.       01:45:03

 7        Though the temperature of 105 was               01:45:06

 8   significant to agitation, he noted but not            01:45:09

 9   necessarily gave much contribution to the cause of    01:45:12

10   death of that contributory.                           01:45:16

11        Q.  In general, if you are trying to determine   01:45:17

12   whether someone died of compressive asphyxia, you     01:45:20

13   would want to know the history; right?                01:45:24

14        A.  You'd want to know certain details of the    01:45:27

15   history, yes, specifically.                           01:45:30

16        Q.  You would want to know, for example, how     01:45:31

17   long that person was restrained in a prone position;  01:45:34

18   true?                                                 01:45:34

19        A.  That would be part of the history you would  01:45:37

20   want to know, yes.                                    01:45:39

21        Q.  You would want to know how long there was    01:45:40

22   weight that was placed on that person's back, if any  01:45:42

23   weight was placed on the back; true?                  01:45:46

24        A.  Well, the duration of prone positioning --   01:45:48

25   back to your previous question -- you should know     01:45:51
```

1          Do you see where it says that, Doctor?        01:47:57

2      A.  I do, yes.                                      01:47:58

3      Q.  Now, with respect to A, I understand that      01:47:59

4  you disagree with compressive asphyxia as a cause of   01:48:02

5  death, but with respect to B, restraint, do you        01:48:06

6  believe that restraint was a cause of Mr. Perez's      01:48:10

7  death?                                                  01:48:14

8      A.  The restraint process, no.  The actions        01:48:15

9  that he was resisting against and struggling           01:48:19

10  against, as we talked about earlier, would produce    01:48:23

11  some acidosis and that potentially have some          01:48:26

12  component to his -- a component to his cardiac        01:48:29

13  arrest.                                               01:48:33

14          So in the sense of having a restraint there  01:48:33

15  versus holding him versus letting him run around,     01:48:37

16  all those things would have contributed, but the      01:48:41

17  restraint itself, the method it was done wouldn't     01:48:43

18  have caused it, it's his reaction to the restraint.   01:48:48

19      Q.  So are you drawing from a medical             01:48:51

20  standpoint a difference between Mr. Perez resisting   01:48:53

21  and officers restraining him?                         01:48:57

22      A.  If he did not resist against the restraint,   01:49:00

23  then we would have a different -- I'd have a          01:49:04

24  different opinion.  But the idea that he was being    01:49:07

25  restrained and he resisted against it is why I feel   01:49:10

                                                              87

```
 1   just looking at page 5.  I noticed this quotation    01:52:39

 2   that was attributed to you that I wanted to ask you   01:52:42

 3   about.  I've highlighted it here on page 5.  It       01:52:45

 4   says, "We have not really looked at acidosis from     01:52:48

 5   the perspective of my particular research."           01:52:52

 6         Do you see where it says that?                  01:52:54

 7      A.  I do.                                           01:52:55

 8      Q.  First, let me ask you:  Is this something      01:52:56

 9   that you ever told a reporter?                         01:52:59

10      A.  I don't remember the context of it, but        01:53:00

11   it's certainly a possibility because we -- as I said  01:53:04

12   earlier, we don't really look at metabolic acidosis   01:53:07

13   in that context.  We've looked at the acidosis from   01:53:10

14   pHs initially with the ABG research we did            01:53:14

15   initially, but haven't looked at specifically         01:53:17

16   metabolic acidosis with regards to restraints.        01:53:20

17      Q.  Well, I'm going to try to -- I appreciate      01:53:21

18   that, but I want to ask two separate questions.       01:53:24

19         My first question is just whether you said      01:53:28

20   this.  And it sounds like -- so did you say this?     01:53:30

21      A.  It's certainly possible, depending on the      01:53:33

22   context again.                                        01:53:37

23      Q.  But you don't specifically recall one way      01:53:37

24   or the other?                                         01:53:41

25      A.  I do not.                                       01:53:41
```

1       A.   Yes.  In part, yes.                          02:19:01

2       Q.   And these were studies that you had         02:19:02

3   conducted before being retained in this case; is     02:19:08

4   that right?                                           02:19:11

5       A.   That is correct.                             02:19:11

6       Q.   You did not perform or carry out any         02:19:13

7   studies after being retained in this case on which   02:19:15

8   you base your opinions; is that right?                02:19:15

9       A.   That is correct.                             02:19:18

10      Q.   And you, therefore, did not do any studies   02:19:19

11  that attempted to replicate the conditions under     02:19:22

12  which Mr. Perez died after being retained in this    02:19:25

13  case; is that right?                                  02:19:28

14      A.   I did not do any studies after being        02:19:29

15  retained for this case in this area of ventilatory   02:19:32

16  and restraints, no.                                   02:19:36

17      Q.   Have you ever performed any studies that     02:19:39

18  attempted to replicate the conditions under which    02:19:41

19  Mr. Perez died?                                       02:19:44

20      A.   Meaning, using methamphetamine and getting   02:19:45

21  a body temperature up to 105?  I would never be able  02:19:48

22  to do that through a human subjects committee, so    02:19:53

23  no.                                                   02:19:53

24      Q.   And that's because a human subjects          02:19:56

25  committee would not allow you to perform a test on a  02:20:01

106

```
 1    Asphyxia."  Is that right?                        02:21:53

 2        A.  Yes.                                       02:21:54

 3            (Vilke, M.D. Exhibit 6 was marked for      02:21:54

 4            identification and is attached hereto.)    02:21:54

 5    BY MR. SEABAUGH:                                   02:21:54

 6        Q.  This study was published in 1997; is that  02:21:54

 7    right?                                             02:21:59

 8        A.  That is correct.                           02:21:59

 9        Q.  And this study indicates on the left-hand  02:22:00

10    side of this page, was supported, in part, by a    02:22:10

11    grant from the County of San Diego; is that right? 02:22:13

12        A.  That is correct.                           02:22:15

13        Q.  Now, wasn't this study funded for the      02:22:16

14    purposes of a lawsuit?                             02:22:22

15        A.  It was funded because of a lawsuit in order 02:22:23

16    to better define what the physiology was of        02:22:26

17    restraints, but a lawsuit had been filed, which    02:22:29

18    inspired the questions of what the research needs to 02:22:31

19    be to identify it.                                 02:22:35

20        Q.  And at the time that you were doing this   02:22:36

21    study, you were aware that a lawsuit had been filed 02:22:40

22    against the County of San Diego and that this study 02:22:43

23    was going to be used in the context of that lawsuit? 02:22:48

24        A.  It was -- it was being performed to        02:22:51

25    identify whether there's a ventilatory component of 02:22:54
```

                                                          108

```
1   restraint that was in question because the Donald    02:22:59

2   Ray paper that had been used as an exhibit for this   02:23:04

3   study -- I'm sorry -- for the lawsuit.  So it was to  02:23:08

4   better identify physiologies for the purpose of what  02:23:12

5   this was.                                             02:23:16

6        Q.  Wasn't it your understanding that the       02:23:16

7   County of San Diego was funding the study to try to  02:23:18

8   help them win the lawsuit?                            02:23:21

9        A.  They're funding the study to identify        02:23:23

10  whether there was an effect of physiology.  It could 02:23:27

11  have just as well shown that Don Ray's work was       02:23:28

12  correct.  So if it was that, then it wouldn't have    02:23:31

13  changed anything from their lawsuit perspectives.     02:23:34

14  They were trying to get better science out there to   02:23:37

15  identify does position and hobbling and handcuffing   02:23:41

16  the hands to the feet cause any physiological         02:23:45

17  changes?  They didn't know what the results were      02:23:47

18  going to be.                                          02:23:49

19          (Vilke, M.D. Exhibit 7 was marked for         02:23:49

20          identification and is attached hereto.)        02:23:49

21  BY MR. SEABAUGH:                                      02:23:49

22       Q.  I'll refer you -- I'm going to show you      02:23:49

23  briefly Exhibit 7, which I'll represent to you was    02:23:53

24  your testimony in a case called Gary Rich from 2005,  02:23:57

25  in which you are described having -- the transcript   02:24:00
```

109

1    indicates the following exchange -- this is on          02:24:09

2    page 2.  Do you see it on the screen?                   02:24:13

3            "Question:  Wouldn't that be correct, they       02:24:16

4            did it to win the lawsuit; right?"               02:24:17

5             And your answer, in part, was,                  02:24:19

6            "They funded it to win the lawsuit,              02:24:22

7            but we didn't have to accept it if               02:24:24

8            we thought it was solely for that                02:24:28

9            purpose in our minds."                           02:24:29

10           Do you see where it says that?                   02:24:31

11       A.  I see that, yes.                                 02:24:31

12       Q.  And isn't it true that the County of            02:24:32

13   San Diego funded the study to win the lawsuit?          02:24:37

14       A.  You know, that's what it says there.  To be     02:24:40

15   honest, I don't know -- I assume they were doing it     02:24:42

16   for the purpose of winning a lawsuit.  But if the       02:24:44

17   study did not show anything that was positive, it       02:24:45

18   wouldn't have helped them any, so...                    02:24:48

19       Q.  Okay.  So now turning back to Exhibit 6.        02:24:50

20   In terms of this study and its results, you             02:25:02

21   observed -- and here I'm referring to the middle of     02:25:05

22   the first page -- "a small statistically significant    02:25:08

23   decline in the mean FVC."                               02:25:12

24           Do you see where it says that?                   02:25:17

25       A.  Yes.                                             02:25:18

                                                              110

```
1        A.  Yes, that's the position that they were in    02:26:43

2   for our study, which simulates the position.           02:26:46

3   There's no handcuffs on them in this study here, but    02:26:50

4   it was the idea of the legs pulled back and the arms    02:26:53

5   pulled back.                                            02:26:57

6        Q.  And in terms of the empirical data that you    02:26:58

7   gathered from this study, in the prone maximal          02:27:04

8   restraint position, the MVV, which is maximal           02:27:08

9   voluntary ventilation, declined 23 percent in the       02:27:14

10  restrained position as opposed to the sitting          02:27:19

11  position; is that right?                               02:27:22

12       A.  That is correct.                              02:27:22

13       Q.  But you determined -- your analysis of this    02:27:23

14  data was that that was not clinically significant;     02:27:28

15  is that right?                                         02:27:33

16       A.  That is correct.                              02:27:33

17       Q.  In terms of the limitations of this study,    02:27:34

18  you indicate on the second to last page here that      02:27:37

19  the study did not attempt to duplicate exact field     02:27:43

20  conditions under which restraint position deaths       02:27:49

21  have occurred; is that right?                          02:27:50

22       A.  That is correct.                              02:27:51

23       Q.  And you also indicate in the study, you       02:27:51

24  say, quote, "In addition, these individuals may        02:27:59

25           have been subject to forceful                 02:28:02
```

                                                            112

```
 1   BY MR. SEABAUGH:                                02:28:50

 2        Q.  Subsequent to this study, there's another   02:28:50

 3   publication on which I understand you rely, which is  02:28:51

 4   the following year.  And we'll mark this as       02:28:56

 5   Exhibit 8.  This is a document we've marked as     02:29:01

 6   Exhibit 8.  At the top it says, "Reexamination of   02:29:21

 7   Custody Restraint Position and Positional Asphyxia."  02:29:26

 8   This was from the American Journal of Forensic      02:29:29

 9   Medicine and Pathology, September 1998.          02:29:33

10        Do you see that in front of you?           02:29:36

11        A.  I do, yes.                            02:29:37

12        Q.  Now, with respect to this document, no --   02:29:38

13   you did not gather any additional empirical data    02:29:41

14   with respect to the publication of this article?    02:29:46

15   This is some analysis and commentary on the data    02:29:48

16   that had already been gathered in responding to     02:29:53

17   other positions; is that right?                 02:29:54

18        A.  That's a good summary, yes.            02:29:54

19        (Vilke, M.D. Exhibit 9 was marked for       02:29:54

20        identification and is attached hereto.)     02:29:54

21   BY MR. SEABAUGH:                                02:29:57

22        Q.  Okay.  So the next study, which added    02:29:57

23   empirical data to the sum is -- will be Exhibit 9   02:30:06

24   and that is the article, "Weight Force During Prone  02:30:13

25   Restraint and Respiratory Function" from 2004; is   02:30:20
```

114

```
 1   that right?                                      02:30:23

 2        A.  I'm not seeing it right now.            02:30:23

 3        Q.  Oh, I'm sorry.                          02:30:25

 4            Do you see Exhibit 9 on the screen?     02:30:30

 5        A.  I do now, yes.                          02:30:31

 6        Q.  And this was a return to the issue of the   02:30:32

 7   prone maximum restraint position or what you use the   02:30:36

 8   acronym for here, PMRP?                          02:30:42

 9        A.  Correct.                                02:30:44

10        Q.  On the second page of this document -- let   02:30:46

11   me strike that.                                  02:30:46

12            In this study, unlike the 1997 study, you   02:30:49

13   put weight on the back of the person who is      02:30:53

14   restrained in that position; is that right?      02:30:56

15        A.  That's correct.                         02:30:58

16        Q.  So there was a 25-pound -- you studied the   02:30:58

17   effects of 25 pounds and also 50 pounds; is that   02:31:02

18   right?                                           02:31:05

19        A.  That is correct.                        02:31:05

20        Q.  And on the second page of this exhibit, we   02:31:06

21   have an image of the person in that position with   02:31:11

22   weight on their back; is that right?             02:31:14

23        A.  That's one of the subjects, yes.        02:31:16

24        Q.  Is this subject on a hospital gurney?   02:31:18

25        A.  I believe that is the case, yes.        02:31:21
```

115

1    Q.   And is that hospital gurney padded?        02:31:23

2    A.   There's a small pad on there, yes.         02:31:26

3    Q.   And what you observed is that the more      02:31:28

4    weight that was added to the person's back, their  02:31:35

5    mean percentage predicted FVC declined; is that   02:31:41

6    right?                                            02:31:45

7    A.   There were smaller changes that you can     02:31:45

8    measure with the spirometry, but, yes, they did   02:31:47

9    decline.                                          02:31:53

10   Q.   So that the longer they were in the         02:31:54

11   position and the more weight that was applied to  02:31:55

12   their back, the lower their percentage predicted FVC  02:31:57

13   was; is that right?                               02:32:06

14   A.   The more weight that was placed, you could  02:32:06

15   see a small change in FVC.  And then as far as time  02:32:10

16   goes, there was some small change with that as well,  02:32:16

17   yes.                                              02:32:20

18   Q.   And I'm looking here at page 3 of this      02:32:20

19   study.  There are some very helpful bar charts here  02:32:22

20   that -- I'm just looking at the one in the top    02:32:29

21   right-hand corner.  There's a black bar and the gray  02:32:35

22   bar and the word "Sitting."                       02:32:38

23        Do you see where it says that?              02:32:40

24   A.   I do.                                        02:32:41

25   Q.   And that is their percentage predicted FVC  02:32:42

116

```
 1   BY MR. SEABAUGH:                                    02:34:52

 2       Q.  Okay.  Then the next study I'll ask you    02:34:52

 3   about, mark this Exhibit 10.  Let me get it up on   02:34:59

 4   the screen.  Let's see.                             02:35:13

 5          Do you have Exhibit 10 in front of you?      02:35:24

 6       A.  I do, yes.                                  02:35:25

 7       Q.  Okay.  And this is titled, "Ventilatory and 02:35:26

 8   Metabolic Demands During Aggressive Physical        02:35:29

 9   Restraint by Healthy Adults."                       02:35:32

10          Is that right?                               02:35:34

11       A.  That is correct.                            02:35:34

12       Q.  And in this study, you went over 50 pounds; 02:35:34

13   is that right?                                      02:35:42

14       A.  Correct.                                    02:35:42

15       Q.  And in this study -- I think in your report 02:35:43

16   in this case, you referred to a study that had been 02:35:46

17   done with over 200 pounds of weight on someone's    02:35:49

18   back.                                               02:35:53

19          Do you recall making that reference in your  02:35:53

20   report in this case?                                02:35:55

21       A.  Yes, I do.  I referenced that -- 220 pounds 02:35:56

22   in my report, 225 pounds.                           02:36:00

23       Q.  On page 17 of your report, you say,         02:36:02

24          "Studies applying 220 pounds of              02:36:04

25          weight over the upper back of                02:36:07
```

119

| | | | |
|---|---|---|---|
| 1 | | individuals for a similar duration | 02:36:08 |
| 2 | | of time did not show any clinically | 02:36:10 |
| 3 | | significant reduction in ability to | 02:36:12 |
| 4 | | breathe or ventilate." | 02:36:14 |
| 5 | | Do you recall saying that in your report? | 02:36:15 |
| 6 | A. | I do, yes. | 02:36:17 |
| 7 | Q. | And is this the study that you're referring | 02:36:18 |
| 8 | | to in that sentence? | 02:36:20 |
| 9 | A. | It is, yes. | 02:36:22 |

10     Q.  And in this study, subjects were restrained     02:36:23

11  chest down in the manner depicted on Figure 1 of     02:36:31

12  page 2 of this exhibit; is that right?              02:36:34

13     A.  That was the prone maximal restraint         02:36:36

14  position, correct.                                  02:36:43

15     Q.  And that is before weight was applied to     02:36:43

16  their back; is that right?                          02:36:46

17     A.  That is correct.                             02:36:47

18     Q.  In this figure, it appears there's some      02:36:47

19  padding under the chest of the person being         02:36:49

20  restrained; is that right?                          02:36:51

21     A.  That is correct.                             02:36:52

22     Q.  You understand there was no padding under    02:36:52

23  Mr. Perez's chest during the incident in this case; 02:36:55

24  is that right?                                       02:36:58

25     A.  I do understand that, yes.                   02:36:58

                                                        120

1    individuals in the prone restraint position with      02:40:16

2    heavy weight on their back were able -- or their MVV   02:40:20

3    figures were 70 percent of the seated position; is    02:40:26

4    that right?                                            02:40:28

5        A.  Correct.  They were able to move              02:40:28

6    about 109 liters per minute versus 156 liters per     02:40:31

7    minute, which is where that 70 percent comes from.    02:40:34

8        Q.  So they were able to move less air through    02:40:36

9    their lungs while they were in this position than if  02:40:39

10   they were in a seated position; is that right?        02:40:43

11       A.  That's correct.                               02:40:44

12       Q.  And specifically, they were able to           02:40:44

13   move 30 percent less air through their lungs in the   02:40:46

14   prone maximum restraint position with 220 pounds of   02:40:52

15   weight on their back versus the seated position; is   02:40:55

16   that right?                                            02:40:59

17       A.  That's the average there, yes.                02:40:59

18       Q.  So you are making adjustments for the size    02:41:02

19   and body weights of the individuals who were          02:41:09

20   participating in the study?                           02:41:12

21       A.  MVV is not -- is being based on their         02:41:13

22   baseline, so it's not actually measuring a percent    02:41:17

23   predicted.  So, no, there's no prediction in here.    02:41:19

24   It's just basically what they were able to do seated  02:41:22

25   compared to what they were able to do in the other    02:41:26

124

```
1     A.  That is true, that's what it says.        02:42:42

2     Q.  You indicate, quote, "Clearly in a         02:42:47

3         field setting, individuals are             02:42:49

4         unlikely to have" a choice -- "have        02:42:51

5         such a choice as to whether they          02:42:53

6         are restrained or not.  However,          02:42:55

7         it's difficult to understand how          02:42:56

8         such factors might affect                 02:42:58

9         ventilation."                              02:43:00

10        Is that true?                              02:43:00

11    A.  That is true, somebody might breathe faster 02:43:03

12  if they're restrained.  It's hard to say what     02:43:06

13  actually happens.                                 02:43:09

14    Q.  You also indicate, "Of course, none of the  02:43:10

15        subjects used illicit drugs."               02:43:13

16        Is that right?                              02:43:16

17    A.  That is correct.                            02:43:16

18    Q.  It would not be possible to -- ethically to 02:43:17

19  conduct a study where you continued to put weight on 02:43:23

20  someone's back until they died to see how much    02:43:27

21  weight it took to kill someone; true?             02:43:30

22    A.  That's true, sure.  I think that would not  02:43:32

23  be appropriate.                                   02:43:35

24    Q.  That would violate the Nuremberg Code,      02:43:36

25  among other ethical provisions; is that right?    02:43:40
```

126

Exhibit I

Exhibit I

```
 1                  UNITED STATES DISTRICT COURT

 2       EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3       ANTHONY PEREZ, individually;         )
         CECELIA PEREZ, individually;         )
 4       TERRALEE PEREZ, individually, and    )
         as Successor in Interest to Joseph   )
 5       Perez; JOSEPH PEREZ, JR.,            )
         individually and as Successor in     )
 6       Interest to Joseph Perez; and        )
         X.P., a minor, by and through his    )
 7       Guardian Ad Litem, MICHELLE PEREZ,   )
         individually and as Successor in     )
 8       Interest to Joseph Perez,            )
                                              )
 9            Plaintiffs,                     )
                                              )
10       vs.                                  )
                                              ) Case No.
11       CITY OF FRESNO; COUNTY OF FRESNO;    ) 1:18-cv-00127
         AMERICAN AMBULANCE; JAMES            ) AWI(EPG)
12       ROSSETTI, an individual; SEAN        )
         CALVERT, an individual; CHRIS        )
13       MARTINEZ, an individual; BRAITHAN    )
         STOLTENBERG, an individual; ROBERT   )
14       MCEWEN, an individual; KARLSON       )
         MANASAN, an individual; JIMMY        )
15       ROBNETT, an individual; MORGAN       )
         ANDERSON, an individual; and DOES    )
16       1-10, inclusive,                     )
                                              )
17            Defendants.                     )
         _____)

18

19    VIDEOTAPED REMOTE DEPOSITION OF THEODORE CHAN, M.D.

20                   Monday, August 23, 2021

21

22     STENOGRAPHICALLY REPORTED BY:

23     CLAUDIA CASOTTI-STEVENSON

24     CSR NO. 13617

25     JOB NO.:  241116
```

                                                                    1

```
 1    compound, foundation.                            10:19:48

 2           You can answer.                           10:19:49

 3           THE WITNESS:  Well, I don't really opine on  10:19:51

 4    whether restraint is appropriate.  I -- I opine on  10:19:54

 5    the physiologic impact of restraint.  Does that  10:19:59

 6    help?                                            10:19:59

 7    BY MR. SEABAUGH:                                 10:19:59

 8       Q    In this case your opinion is that Mr. Perez  10:20:02

 9    did not die from restraint or compressional    10:20:04

10    asphyxia; is that true?                          10:20:08

11       A    Yes.                                     10:20:09

12       Q    How many times have you offered the same  10:20:09

13    opinion in another case?                         10:20:13

14           MS. CARPENTER:  Objection.  Vague,       10:20:15

15    argumentative, foundation.                       10:20:17

16           You can answer.                           10:20:18

17           THE WITNESS:  I would -- you know, I --  10:20:18

18    this would be venturing a guess because I haven't  10:20:20

19    looked at my files in time -- some -- in some time  10:20:23

20    to look at all the opinions that I've provided in  10:20:25

21    the cases that I've testified in.  So I would say --  10:20:27

22    you know, I -- this -- I'd be venturing a guess  10:20:32

23    here.  But --                                    10:20:36

24    BY MR. SEABAUGH:                                 10:20:36

25       Q    Well, I mean, in -- in the case where I  10:20:37
```

                                                                    22

1    deposition?                                              10:43:43

2         A    I can't recall.  Let me look at my list.  I   10:43:44

3    just can't recall off the top of my head.               10:43:50

4         Q    Do you recall reading a deposition at least   10:43:53

5    of -- of Dr. Chambliss?                                 10:43:57

6         A    I remember reading a report.  Yes.  I         10:44:06

7    believe so, yes.                                        10:44:07

8         Q    And you understand that he performed the      10:44:08

9    autopsy on Mr. Perez?                                   10:44:10

10        A    Yes.                                          10:44:15

11        Q    Do you have any disagreements with his        10:44:15

12   qualifications as -- as a doctor?                       10:44:16

13        A    Sorry.  No.  No.                              10:44:18

14        Q    Do you have any disagreements with the        10:44:19

15   methods he employed in terms of performing the          10:44:25

16   autopsy?                                                10:44:28

17        A    I'm not a forensic pathologist.  No.          10:44:28

18        Q    And so you -- as you are not a forensic       10:44:33

19   pathologist, you have not -- or have you ever           10:44:36

20   performed an autopsy in your career?                    10:44:39

21        A    I've -- yeah.  As a medical student, I've     10:44:41

22   participated in autopsies, but I have not performed     10:44:44

23   an autopsy where I was responsible for the report.      10:44:47

24        Q    Okay.  Have you ever -- so you've never       10:44:49

25   authored an autopsy report?                             10:44:52

46

| | | |
|---|---|---|
| 1 | A    Correct. | 10:44:54 |
| 2 | Q    Did you ever examine Mr. Perez's body in | 10:44:54 |
| 3 | this case? | 10:44:59 |
| 4 | A    Not directly, no. | 10:45:00 |
| 5 | Q    Okay.  When you say "not directly," you're | 10:45:02 |
| 6 | relying on the information that's included in the | 10:45:08 |
| 7 | report prepared by Dr. Chambliss; is that right? | 10:45:10 |
| 8 | A    Well, actually I was provided photos -- | 10:45:13 |
| 9 | autopsy photos and -- as well as his report and some | 10:45:15 |
| 10 | other -- yes. | 10:45:24 |
| 11 | Q    Outside of your work as a professional | 10:45:24 |
| 12 | witness -- as an expert witness -- in your | 10:45:28 |
| 13 | professional work outside your work as a -- as an | 10:45:34 |
| 14 | expert witness, have you ever been asked to opine on | 10:45:36 |
| 15 | the cause of a person's death? | 10:45:38 |
| 16 | A    Yes. | 10:45:41 |
| 17 | Q    And in what context? | 10:45:41 |
| 18 | A    While completing death certificates. | 10:45:44 |
| 19 | Q    Okay.  And you complete death certificates | 10:45:47 |
| 20 | in your capacity as a medical doctor? | 10:45:49 |
| 21 | A    Yes. | 10:45:51 |
| 22 | Q    When you read Dr. Chambliss's report, were | 10:45:51 |
| 23 | you inclined to defer to him given that he was the | 10:46:00 |
| 24 | one who had performed the autopsy? | 10:46:03 |
| 25 | MS. CARPENTER:  Objection.  Vague as to | 10:46:05 |

47

```
1        Q     And he indicated that the manner of death      10:46:57

2    was homicide.  Do you understand that?                   10:46:59

3        A     Yes.                                            10:47:01

4        Q     And in this context that means death at the    10:47:01

5    hands of another.  Do you understand that?               10:47:05

6        A     Yes.                                            10:47:07

7        Q     Okay.  And you disagree with these             10:47:08

8    findings; is that right?                                 10:47:12

9              MS. CARPENTER:  Objection to the extent it     10:47:13

10   misstates his prior testimony and/or his opinions in     10:47:15

11   his report.                                              10:47:17

12             You can answer.                                10:47:17

13             THE WITNESS:  I disagree with the opinion      10:47:17

14   that Mr. Perez dies -- that the cause of death was       10:47:20

15   compression asphyxia.                                    10:47:24

16   BY MR. SEABAUGH:                                         10:47:24

17       Q     Do you -- do you disagree with his opinion     10:47:25

18   that the manner of death was a homicide?                 10:47:29

19       A     I don't usually make that determination,       10:47:32

20   and I was not asked to make that determination in        10:47:37

21   this case.  So I have no opinion.                        10:47:39

22       Q     Okay.  With respect to the cause of death      10:47:40

23   being compressive asphyxia during restraint, or at       10:47:44

24   least that being Dr. Chambliss's opinion, do you         10:47:48

25   think that that is an illegitimate finding for a         10:47:53
```

                                                                      49

```
 1  handcuffed for the entire 12 to 15 minutes during    10:52:49

 2  which he was prone?                                   10:52:52

 3         MS. CARPENTER:  Objection.  Foundation, may    10:52:52

 4  misstate the record evidence in this case.           10:52:54

 5         You can answer.                                10:52:56

 6         THE WITNESS:  Well, he was handcuffed.  At     10:52:57

 7  some point he was -- the handcuffs were removed to    10:53:01

 8  secure his wrist to the board.  So that -- that was   10:53:02

 9  in the 15 or so minutes on the videotape as well.     10:53:05

10  BY MR. SEABAUGH:                                      10:53:11

11    Q   Okay.  Did -- do you have an understanding      10:53:12

12  based on your review of the video and all of the      10:53:14

13  materials in this case as to when Mr. Perez died?     10:53:17

14    A   Well, I think he has his cardiac arrest --      10:53:23

15  yes.  The answer's yes.                               10:53:26

16    Q   Okay.  Well, let me ask this question:  Why     10:53:29

17  and how did Mr. Perez die according to you?           10:53:31

18         MS. CARPENTER:  Objection.  Compound.          10:53:33

19         You can answer.                                10:53:35

20         THE WITNESS:  Well, I think Mr. Perez dies     10:53:35

21  of a cardiac arrest while he was being restrained.    10:53:38

22  BY MR. SEABAUGH:                                      10:53:45

23    Q   Did the -- did the restraint in any way        10:53:47

24  contribute to the cardiac arrest, do you think?      10:53:49

25    A   Well, I think his cardiac arrest primarily     10:53:54
```

1    is driven by his use of methamphetamine, the amount        10:53:59

2    of exertion he was having.  To the extent that he          10:54:02

3    was exerting himself during restraint, that was            10:54:04

4    probably contributing as well.                             10:54:05

5         Q    Okay.  Well, I don't think you refer to it       10:54:07

6    in your report.  Perhaps you do.  But are you              10:54:13

7    familiar with the -- this phrase metabolic acidosis?       10:54:15

8         A    Yes.                                             10:54:18

9         Q    And what is metabolic acidosis?                  10:54:18

10        A    Well, the body maintains a certain PH level      10:54:20

11   or acid level.  When you exercise, your -- your            10:54:25

12   cells are working harder.  They -- through both            10:54:30

13   anaerobic and aerobic metabolism -- through the            10:54:37

14   metabolism they produce acid.  That is -- is what we       10:54:38

15   sometimes measure, acid levels.                            10:54:45

16        Q    And when that balance is off, that can           10:54:47

17   irritate the heart; is that right?                         10:54:50

18        A    Yes.                                             10:54:53

19        Q    And it can cause a cardiac arrhythmia and        10:54:53

20   death?                                                     10:54:57

21        A    Yes.                                             10:54:57

22        Q    And do you think that the struggle of the        10:54:57

23   officers with Mr. Perez contributed to metabolic           10:55:05

24   acidosis?                                                  10:55:07

25        A    I think the large majority of his metabolic      10:55:07

                                                                        56

1    acidosis was generated by his methamphetamine use          10:55:11

2    and his exert -- exertion prior to restraint.  He          10:55:13

3    was generate -- he was also generating some acidosis       10:55:19

4    while struggling and exerting himself with                 10:55:23

5    restraint.  But if you look at studies of -- in            10:55:27

6    exercise physiology, the greatest amount of acidosis       10:55:29

7    is actually generated by the movement of -- and            10:55:32

8    coordinated movement of large muscles such as when         10:55:37

9    you run or you exert yourself.  And it's been shown        10:55:40

10   that when people are actually restrained, they             10:55:41

11   generate less metabolic acidosis because they cannot       10:55:46

12   move those larger muscle that would generate the           10:55:49

13   acidosis.                                                  10:55:52

14       Q    So you think -- your opinion is that the          10:55:53

15   officers' struggle with Mr. Perez may have                 10:55:55

16   contributed to his metabolic acidosis, but that was        10:56:00

17   not sufficient in itself to cause his death?  Is           10:56:03

18   that your opinion?                                         10:56:06

19           MS. CARPENTER:  Objection.  Misstates his          10:56:07

20   testimony.                                                 10:56:09

21           You can answer.                                    10:56:09

22           THE WITNESS:  Yes.                                 10:56:10

23   BY MR. SEABAUGH:                                           10:56:10

24       Q    Do you think that Dr. Chambliss was wrong         10:56:12

25   to include restraint as a cause of death all              10:56:15

                                                                        57

Case 1:18-cv-00127-AWI-EPG   Document 153-1   Filed 11/03/21   Page 93 of 177

```
 1   together, or was he just wrong to include it as the    10:56:18

 2   only cause of death?                                    10:56:21

 3           MS. CARPENTER:  Objection.  Counsel, I          10:56:24

 4   think you're misstating the autopsy report.             10:56:26

 5           MR. SEABAUGH:  Well --                           10:56:29

 6           MR. RYAN:  Wait, wait, wait.  Sorry, Tom,       10:56:29

 7   to interrupt.  But it also misstates his testimony.     10:56:31

 8   So it lacks foundation.                                 10:56:35

 9           MS. CARPENTER:  Can we have the question        10:56:42

10   read back.                                              10:56:44

11           THE WITNESS:  Yeah, please.  I was just         10:56:45

12   going to say I lost it.                                 10:56:46

13           (Record read.)                                  10:56:46

14           MS. CARPENTER:  Same objections.  Compound.     10:57:10

15           MR. WEAKLEY:  Join.                             10:57:13

16           MR. RYAN:  I join.                              10:57:15

17           THE WITNESS:  So -- so I think                  10:57:16

18   Dr. Chambliss was wrong to list it as the cause of      10:57:18

19   death.  I think it's fair to say exertion, which        10:57:23

20   would include before restraint and after restraint,     10:57:28

21   had a contributory role.                                10:57:31

22   BY MR. SEABAUGH:                                        10:57:33

23      Q    Okay.  And so when you're -- when you're        10:57:33

24   talking about the -- the exertion, you're talking       10:57:34

25   about Mr. Perez's efforts to lift himself up while      10:57:39
```

58

| | | |
|---|---|---|
| 1 | Q    Let me turn to another aspect of your | 11:11:33 |
| 2 | report.  Let me ask you this question:  After being | 11:11:36 |
| 3 | retained in this case, did you conduct any studies | 11:11:40 |
| 4 | that attempted to replicate the conditions under | 11:11:43 |
| 5 | which Mr. Perez died? | 11:11:48 |
| 6 | A    No.  You know, I'm always involved in | 11:11:49 |
| 7 | different research studies.  So let me just qualify | 11:11:54 |
| 8 | it.  I did note studies that were specific to this | 11:11:58 |
| 9 | case. | 11:12:01 |
| 10 | Q    Any studies after being retained in this | 11:12:01 |
| 11 | case that would bear on this case in any way? | 11:12:04 |
| 12 | MS. CARPENTER:  Objection.  Vague. | 11:12:07 |
| 13 | You can answer. | 11:12:08 |
| 14 | THE WITNESS:  I would have to look at some | 11:12:09 |
| 15 | of the dates of some of the publications.  We -- you | 11:12:15 |
| 16 | know, we've done some research and some publications | 11:12:18 |
| 17 | related to law enforcement, but nothing that comes | 11:12:21 |
| 18 | in mind right now. | 11:12:24 |
| 19 | BY MR. SEABAUGH: | 11:12:25 |
| 20 | Q    Okay.  And this isn't intended to be a | 11:12:27 |
| 21 | trick question.  I'm just trying to establish, you | 11:12:30 |
| 22 | have done some studies in the past, before being | 11:12:31 |
| 23 | retained in this case, that you're relying on in | 11:12:34 |
| 24 | your report; is that right? | 11:12:36 |
| 25 | A    Yes. | 11:12:37 |

Network Deposition Services, Inc. ● networkdepo.com ● 866-NET-DEPO

1    something more specific, I really can't speak to        11:18:41

2    that.  I do know what he has written subsequent to      11:18:44

3    this study.                                             11:18:47

4    BY MR. SEABAUGH:                                        11:18:47

5        Q    Okay.  When you are -- what -- let me ask      11:18:48

6    it this way:  You have cited this study in your         11:18:52

7    report as among the materials that you reviewed and     11:18:56

8    relied upon in terms of formulating your opinions in    11:19:00

9    this case.  And so let me just ask, what is the         11:19:03

10   significance of this report to you in terms of your     11:19:05

11   opinions in this case?                                  11:19:08

12       A    Well, it -- I think the study provides some    11:19:09

13   historical context as to this concept of positional     11:19:16

14   asphyxia.  In the first article that you cited by       11:19:21

15   Bell, it should be pointed out that none of those       11:19:27

16   cases involved prone restraint in terms of              11:19:28

17   positional asphyxia.                                    11:19:33

18            And it was really the work of Dr. Reay in      11:19:33

19   this study, which has a number of methodologic          11:19:34

20   flaws, and -- inot something to consider positional     11:19:40

21   asphyxia in restraint.                                  11:19:42

22       Q    Okay.  So let -- okay.  That brings us then    11:19:44

23   to the third end note, and this is a study that         11:19:46

24   you -- on which you were the lead author in the         11:19:52

25   Annals of Emergency Medicine in 1997 called             11:19:57

                                                                    69

```
 1    "Restraint Position and Positional Asphyxia."  You      11:20:01

 2    see where it says that in your report?                  11:20:03

 3         A    Yes.                                           11:20:05

 4         Q    Okay.  And this study was funded by a grant   11:20:06

 5    from the County of San Diego; is that right?            11:20:09

 6         A    Yes.                                           11:20:12

 7         Q    And you indicate in your report that you      11:20:13

 8    are the co-principal investigator with Dr. Tom          11:20:16

 9    Newman for a study entitled, quote, "Restraint          11:20:19

10    Position and Positional Asphyxia.  Study funded by      11:20:21

11    the County of San Diego, grant number 94-1974R,         11:20:24

12    1995, amount $33,900."                                  11:20:30

13         You see where it says that?                        11:20:33

14         A    I don't have it in front of me actually.      11:20:34

15    Do you want me to try and pull it up.  I have it        11:20:37

16    electronically.  I just --                              11:20:40

17         Q    Well, I'll represent to you that that's       11:20:41

18    what your report says.  Does that sound accurate to     11:20:42

19    you?                                                    11:20:45

20         A    Okay.  I have nothing to disagree with        11:20:45

21    that.                                                   11:20:47

22         Q    Okay.  And you understood that that study     11:20:48

23    was created for the purpose of -- or that the           11:20:50

24    county -- strike that.                                  11:20:54

25         You understand that the County of San Diego        11:20:55
```

                                                                        70

| | | |
|---|---|---|
| 1 | You can answer. | 11:23:34 |
| 2 | THE WITNESS:  I don't recall.  I have had | 11:23:36 |
| 3 | interactions with Mr. Sanchez, but I don't know when | 11:23:39 |
| 4 | that occurred.  I know -- so that was, what, | 11:23:45 |
| 5 | 15 years ago?  Longer actually.  So I don't -- I | 11:23:53 |
| 6 | don't recall the timing of that interaction with | 11:23:58 |
| 7 | Mr. Sanchez. | 11:24:01 |
| 8 | BY MR. SEABAUGH: | 11:24:01 |
| 9 | Q    Do you recall him indicating to you at any | 11:24:02 |
| 10 | point why the County of San Diego was funding the | 11:24:04 |
| 11 | study? | 11:24:06 |
| 12 | MS. CARPENTER:  Objection.  Foundation. | 11:24:07 |
| 13 | You can answer. | 11:24:09 |
| 14 | THE WITNESS:  I don't recall specifically. | 11:24:10 |
| 15 | BY MR. SEABAUGH: | 11:24:11 |
| 16 | Q    Okay.  This particular 1997 study was | 11:24:13 |
| 17 | conducted with healthy men aged 18 to 40 years as | 11:24:18 |
| 18 | the test subjects; is that right? | 11:24:23 |
| 19 | A    That sounds correct. | 11:24:24 |
| 20 | Q    And you exercised people for 4 minutes to | 11:24:26 |
| 21 | get their heart rate up; is that right? | 11:24:28 |
| 22 | A    Yes. | 11:24:31 |
| 23 | Q    And you had them in a sitting position to | 11:24:31 |
| 24 | measure pulse, oxygen saturation, and arterial blood | 11:24:35 |
| 25 | gases? | 11:24:38 |

74

```
 1      A    Yes.                                        11:24:38

 2      Q    And you did the same thing in a restraint   11:24:38

 3   position?                                           11:24:40

 4      A    Yes.                                        11:24:40

 5      Q    Did you actually hog-tie the participants   11:24:40

 6   of that study?                                      11:24:44

 7           MS. CARPENTER:  Objection.  It's vague.     11:24:45

 8           You can answer.                             11:24:46

 9           THE WITNESS:  Well, hog-tie is somewhat of  11:24:47

10   a vague term.  What we did do was place people in   11:24:51

11   that approximated position with their wrists and    11:24:54

12   ankles secured behind while in a prone position that 11:24:57

13   approximated that body position.                    11:25:02

14   BY MR. SEABAUGH:                                    11:25:04

15      Q    Okay.  And in that position, you measured   11:25:04

16   their pulse, oxygen saturation, and arterial blood  11:25:07

17   gases?                                              11:25:12

18      A    Yes.                                        11:25:12

19      Q    Did you have any weight pushing down on     11:25:12

20   their backs during this particular study?           11:25:15

21      A    No.                                         11:25:17

22      Q    Did you, for example, put any backboards on 11:25:17

23   the backs of any participants in the study and sit  11:25:21

24   on them?                                            11:25:25

25           MS. CARPENTER:  Objection.  Foundation,     11:25:25
```

                                                              75

| 1  | Rule 26, relevance. | 11:25:26 |
| 2  | You can answer. | 11:25:29 |
| 3  | THE WITNESS:  No. | 11:25:29 |
| 4  | BY MR. SEABAUGH: | 11:25:29 |
| 5  | Q    Okay.  Now, did you see an empirical | 11:25:30 |
| 6  | difference in the prone position as opposed to the | 11:25:35 |
| 7  | sitting position? | 11:25:37 |
| 8  | MS. CARPENTER:  Objection.  It's | 11:25:38 |
| 9  | speculation, foundation, vague. | 11:25:40 |
| 10 | THE WITNESS:  Are you referring to the -- | 11:25:42 |
| 11 | the part of the study that you just talked about. | 11:25:46 |
| 12 | BY MR. SEABAUGH: | 11:25:49 |
| 13 | Q    Well, I'll -- I'll ask it more directly. | 11:25:49 |
| 14 | In this particular study you observed a | 11:25:52 |
| 15 | statistically significant decline in the mean FVC, | 11:25:55 |
| 16 | mean FEV, and mean "FVV" comparing sitting with | 11:26:02 |
| 17 | restraint position; isn't that true? | 11:26:09 |
| 18 | A    Yes. | 11:26:11 |
| 19 | MS. CARPENTER:  Counsel, if you're going to | 11:26:11 |
| 20 | read from his studies, can you please put it up on | 11:26:13 |
| 21 | the screen? | 11:26:16 |
| 22 | MR. SEABAUGH:  Let's make it an exhibit. | 11:26:17 |
| 23 | So we haven't marked any exhibits yet in this | 11:26:19 |
| 24 | deposition.  So I will mark as Exhibit 1 -- and I | 11:26:22 |
| 25 | believe that I can put it in the chat, and everyone | 11:26:24 |

76

| 1  | in the restraint position, that their FEV1 declined | 11:30:48 |
| 2  | to 89 percent; is that right? | 11:30:53 |
| 3  | A    Let's see.  FEV1, yes. | 11:30:54 |
| 4  | Q    All right.  And what does MVV refer to? | 11:30:59 |
| 5  | A    Maximal voluntary ventilation. | 11:31:01 |
| 6  | Q    Okay.  And -- and how do you measure that? | 11:31:05 |
| 7  | A    Well, that is where I'd ask you to breathe | 11:31:06 |
| 8  | fast and hard for a minute and see how much air you | 11:31:09 |
| 9  | move. | 11:31:13 |
| 10 | Q    Okay.  And so that is -- the unit of | 11:31:13 |
| 11 | measurement is volume over time; is that right? | 11:31:15 |
| 12 | A    Yes.  Yes. | 11:31:17 |
| 13 | Q    Okay.  And that declined in your | 11:31:18 |
| 14 | measurement from the sitting to the restraint | 11:31:22 |
| 15 | position from 111 percent to 88 percent; is that | 11:31:24 |
| 16 | right? | 11:31:28 |
| 17 | A    Yes. | 11:31:28 |
| 18 | Q    Okay.  And in terms of your conclusions in | 11:31:28 |
| 19 | this study -- and I'm going to turn now to page 585 | 11:31:31 |
| 20 | of this particular journal entry -- you indicated in | 11:31:38 |
| 21 | this particular study that the study did not attempt | 11:31:43 |
| 22 | to duplicate exact field conditions under which | 11:31:45 |
| 23 | restraint position deaths have occurred.  Do you see | 11:31:51 |
| 24 | where it says that? | 11:31:53 |
| 25 | A    Yes. | 11:31:54 |

81

1    Q    And you indicated also, at the top of the    11:31:55

2    second column on this page, that individuals who    11:31:56

3    died in custody may have been subject to forceful    11:32:03

4    apprehension, during which pressure may have been    11:32:07

5    exerted on their backs while they were in the    11:32:09

6    restraint position.  What effects these differences    11:32:12

7    may have remain to be determined.    11:32:15

8         That was your conclusion at the time of    11:32:15

9    this study in 1997; is that right?    11:32:16

10   A    Yes.    11:32:18

11   Q    You also indicated, "It is possible that a    11:32:18

12   combination of factors, including underlying medical    11:32:24

13   condition, intoxication, agitation, delirium, and    11:32:27

14   struggle as well as body position, may result in    11:32:32

15   respiratory compromise that would not be detected by    11:32:34

16   our study."    11:32:38

17        Do you see where it says that?    11:32:39

18   A    Yes.    11:32:39

19   Q    And that was a conclusion of this 1997    11:32:39

20   study as well?    11:32:42

21   A    Well, I think it's in our discussion    11:32:42

22   section, not our conclusion section, but, yes, we    11:32:42

23   did discuss this in our discussion section.    11:32:47

24   Q    And you discussed it as a limitation of    11:32:48

25   that particular 1997 study; is that right?    11:32:49

82

| 1 | MS. CARPENTER:  Objection. | 11:32:52 |
| 2 | THE WITNESS:  Yes. | 11:32:53 |
| 3 | MS. CARPENTER:  Vague, argumentative. | 11:32:55 |
| 4 | THE WITNESS:  Yes. | 11:32:56 |

5    BY MR. SEABAUGH:                                          11:32:56

6        Q    Okay.  Moving along, No. 6 in your end          11:32:59

7    notes refers to a study by Dr. Parks, who --             11:33:06

8    entitled, "Sudden Death During Restraint:  A Study       11:33:13

9    to Measure the Effect of Restraint Positions on the      11:33:15

10   Rate of Recovery from Exercise."  Do you see where       11:33:18

11   it says that?                                            11:33:21

12       A    Yes.                                            11:33:22

13       Q    And does -- didn't Dr. Parks in this study      11:33:22

14   argue that restraint positions should be considered      11:33:29

15   a risk factor for sudden death during restraint?         11:33:31

16           MS. CARPENTER:  Objection.  Foundation.          11:33:34

17           THE WITNESS:  I don't have the study right       11:33:36

18   in front of me.  I think we refer to it as a fact        11:33:39

19   that other -- other investigators have found similar     11:33:41

20   findings as ours.  So -- but I don't recall his          11:33:46

21   exact conclusions in this particular study.              11:33:49

22   BY MR. SEABAUGH:                                         11:33:51

23       Q    Do you recall him discussing the                11:33:51

24   limitations of that study?  This is a -- from the --     11:33:53

25   this is a -- an article in the -- in a journal in        11:33:56

                                                                        83

```
 1   these standards are within a range that there is no    11:39:40

 2   trend or significant difference that would suggest     11:39:42

 3   that there is inherent difference between the two      11:39:44

 4   measurements.                                          11:39:47

 5        Q    Okay.  So you -- as a result of this         11:39:48

 6   study -- I'm just going to refer to this text here.    11:39:51

 7   I can see if we can translate -- translate it into     11:39:56

 8   something a layperson might be able to understand.     11:39:57

 9   But you indicate that 5 minutes into the position,     11:40:00

10   mean -- and then you have this -- this text.  There    11:40:04

11   is a percentage symbol "pred" and then capital        11:40:10

12   "FVC."  Is that referring to percentage of the        11:40:17

13   predicted FVC?                                         11:40:18

14        A    Yes.                                          11:40:18

15        Q    Okay.  And you noted that this figure was    11:40:18

16   "significantly lower for all 3 PMRP position          11:40:24

17   compared with sitting."  Do you see where it says     11:40:30

18   that?                                                  11:40:33

19        A    Yes.                                          11:40:33

20        Q    And PR -- PMRP stands for prone maximum      11:40:33

21   restraint position; is that right?                     11:40:38

22        A    Yes.                                          11:40:39

23        Q    And then you indicate there was no           11:40:40

24   difference between the restraint positions with and   11:40:50

25   without weight force.  Do you see where it says       11:40:52
```

                                                            89

| | | |
|---|---|---|
| 1 | exhibit.  You indicated, "We did not simulate | 11:46:07 |
| 2 | trauma, struggle, drug intoxication, and other | 11:46:11 |
| 3 | physiological and psychologic stresses"; is that | 11:46:15 |
| 4 | right? | 11:46:17 |
| 5 | MS. CARPENTER:  Objection.  Foundation. | 11:46:17 |
| 6 | You can answer. | 11:46:18 |
| 7 | THE WITNESS:  Yes. | 11:46:18 |
| 8 | BY MR. SEABAUGH: | 11:46:18 |
| 9 | Q    And that's -- you agree that's an accurate | 11:46:19 |
| 10 | characterization of the limitations of this study? | 11:46:22 |
| 11 | MS. CARPENTER:  Objection.  Vague | 11:46:24 |
| 12 | argumentative. | 11:46:26 |
| 13 | You can answer. | 11:46:26 |
| 14 | THE WITNESS:  Yes. | 11:46:27 |
| 15 | BY MR. SEABAUGH: | 11:46:27 |
| 16 | Q    And you also indicated that the amount of | 11:46:28 |
| 17 | weights selected for the study may not reproduce the | 11:46:32 |
| 18 | actual amount of weight force used on individuals | 11:46:37 |
| 19 | during the restraint process.  Do you see where it | 11:46:38 |
| 20 | says that? | 11:46:41 |
| 21 | A    Yes. | 11:46:41 |
| 22 | Q    And that's also an accurate | 11:46:42 |
| 23 | characterization of the limitations of this study? | 11:46:45 |
| 24 | MS. CARPENTER:  Objection.  Vague. | 11:46:47 |
| 25 | THE WITNESS:  Yes. | 11:46:48 |

```
 1   there is a substantial risk that the human test      11:59:42

 2   subject might die; is that right?                     11:59:44

 3        MS. CARPENTER:  Objection.  Vague,               11:59:46

 4   speculation, and foundation.                          11:59:47

 5        THE WITNESS:  Well, I think the study can't      11:59:50

 6   have as its intent to cause somebody to die in        11:59:54

 7   general.                                              11:59:56

 8   BY MR. SEABAUGH:                                      11:59:57

 9     Q    Right.  So -- and that's why you can't do a    11:59:57

10   study where you put weight on somebody's back and     12:00:00

11   see how long it takes for them to asphyxiate.  That   12:00:02

12   would not be -- you could not do that on a human      12:00:05

13   subject for obvious ethical reasons is the point I'm  12:00:07

14   making.  Is that -- is that right?                    12:00:09

15     A    Well --                                        12:00:09

16        MS. CARPENTER:  Objection.  Foundation,          12:00:09

17   argumentative.                                        12:00:11

18        Go ahead.                                        12:00:12

19        THE WITNESS:  You would not get a study          12:00:12

20   approved to say we're going to asphyxiate.  However,  12:00:15

21   you could get a study approved that says what is the  12:00:19

22   physiologic impact of weight force and whether or     12:00:21

23   not any of those physiologic findings would be        12:00:23

24   consistent as potentially placing somebody at risk.   12:00:26

25   BY MR. SEABAUGH:                                      12:00:30
```

101

Exhibit J

*Theodore C. Chan, MD, FACEP*
1627 Bahia Vista Way
La Jolla, CA  92037
tcchan@ucsd.edu

July 1, 2021

Lynn L. Carpenter, Esq.
Manning & Kass, Ellrod, Ramirez, Trester, LLP
801 S. Figueroa St.
15th Floor at 801 Tower
Los Angeles, CA  90017-3012

Ashley N. Reyes, Esq.
Weakley & Arendt
5200 N. Palm Ave., Ste. 211
Fresno, CA 93704

RE:     Perez, et al. v. City of Fresno et al.

Dear Ms. Carpenter & Ms. Reyes:

At your request, and pursuant to Federal Rule of Civil Procedure 26, below is a written summary of my opinions regarding the above-named case.

## 1.     Overview of Expert Background and Methodology.

My opinions are based on my training, experience and research as a Professor and Chair of the Department of Emergency Medicine at the University of California San Diego School of Medicine and Health System.

I have conducted numerous human research studies on the topic of restraint physiology and less-lethal weapons that have been published in peer-reviewed medical journals and presented at national medical meetings and scientific assemblies.  I am also a practicing emergency physician, board-certified in the specialty of emergency medicine, and a Fellow of the American College of Emergency Physicians and American Academy of Emergency Medicine.

### A.     Records and Information Reviewed.

In formulating my opinions regarding the specific issues of this case, I have relied upon my own scientific and clinical research on restraint physiology and less lethal weapons, a review of the current medical and scientific literature relevant to this case, and the specific materials you forwarded me regarding the above-named case as indicated below. If additional pertinent information is revealed and provided to me subsequent to this letter, my opinions may change.

1

*Theodore C. Chan, MD, FACEP*
1627 Bahia Vista Way
La Jolla, CA  92037
tcchan@ucsd.edu

The extended list follows:

| |
|---|
| CD: FPD Radio Traffic Ch 4 -051017 103613 through 103812 |
| CD: FSO Radio Traffic 17 6634 |
| CD: Aerial Video of Scene |
| CD: Audio re Call from RP Stacey Hutson re Male Chasing her in the Street |
| CD: Bodycam Video |
| CD: Voice Message left for FSO re male chasing Stacy Hudson for her Cell |
| CD: Audio Interview of Anthony Perez and Cecilia Perez by Det. Galindo; 05/10/17 |
| Audio Transcription Interview of Anthony Perez and Cecilia Perez by Det. Galindo; 05/10/17 |
| Audio Transcription Interview of Antoinette Perez by Det. Galindo; 05/11/17 |
| CD: Audio Interview of Dep. Braithan Stoltenberg by Det. Galindo; 05/12/17 |
| CD: Video Interview of Dep. Braithan Stoltenberg by Det. Galindo; 05/12/17 Camera 1&2 |
| Audio Transcription Interview of Dep. Braithan Stoltenberg by Det. Galindo; 05/12/17 |
| CD: Audio Interview of Chris Martinez by Det. Galindo; 05/12/17 |
| CD: Video Interview of Chris Martinez by Det. Galindo; 05/12/17 Camera 1&2 |
| Audio Transcription Interview of Chris Martinez by Det. Galindo; 05/12/17 |
| CD: Audio Interview of Sgt. James Rossetti by Det. Galindo; 05/12/17 |
| CD: Video Interview of Sgt. James Rossetti by Det. Galindo; 05/12/17 Camera 1&2 |
| Audio Transcription Interview of Sgt. James Rossetti by Det. Galindo; 05/12/17 |
| CD: Audio Interview of EMT Jennifer Ortiz by Det. Galindo; 05/17/17 |
| CD: Video Interview of EMT Jennifer Ortiz by Det. Galindo; 05/17/17 Camera 1&2 |
| Audio Transcription Interview of EMT Jennifer Ortiz by Det. Galindo; 05/17/17 |
| CD: Audio Interview of Dep. Jimmy Robnett by Det. Galindo; 05/12/17 |
| CD: Video Interview of Dep. Jimmy Robnett by Det. Galindo; 05/12/17 Camera 1&2 |
| Audio Transcription Interview of Dep. Jimmy Robnett by Det. Galindo; 05/12/17 |
| CD: Video Interview of EMT Joel Dines by Det. Galindo; 05/11/17 Camera 1&2 |
| Audio Transcription of EMT Joel Dines by Det. Galindo; 05/11/17 |
| CD: Audio telephone Interview of John Hutson by Det. Galindo; 05/10/17 |
| Audio Transcription telephone Interview of John Hutson by Det. Galindo; 05/10/17 |
| Audio Transcription Interview of Joseph Perez Jr. & Antoinette Perez by Det. Galindo; 05/10/17 |
| CD: Audio Interview of Joseph Perez & Antoinette Perez by Det. Galindo; 05/10/17 |
| CD: Audio Interview of Deputy Karlson Manasan by Det. Galindo; 05/12/17 |
| CD: Video Interview of Deputy Karlson Manasan by Det. Galindo; 05/12/17 Camera 1&2 |
| Audio Transcription Interview of Deputy Karlson Manasan by Det. Galindo; 05/12/17 |
| CD: Audio Interview of Michael Antonsen by Det. Galindo; 05/10/17 |

2

**Theodore C. Chan, MD, FACEP**
1627 Bahia Vista Way
La Jolla, CA  92037
tcchan@ucsd.edu

| |
|---|
| Audio Transcription Interview of Michael Antonsen by Det. Galindo; 05/10/17 |
| CD: Audio Interview of EMT Morgan Anderson by Det. Galindo |
| CD: Video Interview of EMT Morgan Anderson by Det. Galindo Camera 1&2 |
| Audio Transcription Interview of EMT Morgan Anderson by Det. Galindo |
| CD: Audio Interview of Dep. Robert McEwen by Det. Galindo; 05/12/17 |
| CD: Video Interview of Dep. Robert McEwen by Det. Galindo; 05/12/17 Camera 1&2 |
| Audio Transcription Interview of Dep. Robert McEwen by Det. Galindo |
| CD: Video Interview of Sgt. Scott Moore by Det. Galindo; 05/11/17 Camera 1&2 |
| Audio Transcription Interview of Sgt. Scott Moore by Det. Galindo; 05/11/17 |
| CD: Audio Interview of Officer Sean Calvert by Det. Galindo; 05/12/17 |
| CD: Video Interview of Officer Sean Calvert by Det. Galindo; 05/12/17 Camera 1&2 |
| Audio Transcription Interview of Officer Sean Calvert by Det. Galindo; 05/12/17 |
| CD: Phone Interview of Stacey Hudson by Det. Galindo; 05/11/17 |
| Audio Transcription of Phone Interview of Stacey Hudson by Det. Galindo; 05/11/17 |
| Photos re Sock taken at Coroner's Office by Officer Vargas; 05/12/17 |
| Photos re Autopsy taken by Officer Vargas; 05/10/17 |
| Photos re Clothing and Property taken by Officer Vargas; 05/11/17 |
| Photos re Suspect taken at CRMC by Officer Vargas; 05/10/17 |
| Photos re Officer Chris Martinez; 05/10/17 |
| Photos re Officer Sean Calvert; 05/10/17 |
| Photos re Scene from FSO Det. Files; 05/10/17 |
| Photos re Sheriff Officers at Scene taken from FSO Det. Files; 05/10/17 |
| FPD Event Report re Palm and Santa Fe; 05/10/17 |
| Incident Recall Log; 05/12/17 |
| DNA Report for Jesus Perez |
| FPD Master Name Search |
| Booking Sheet for Joseph Perez |
| Lab Report re Meth Residue for Joseph Perez; 05/17/17 |
| Evidence Exam Report; 05/17/17 |
| AELE Monthly Law Journal re Restraint and Asphyxia Part One 2008 |
| AELE Monthly Law Journal re Restraint Ties and Asphyxia Part Two 2009 |
| Force Science Institute re Compression Asphyxia; 04/18/17 |
| Central EMS Report for Joseph Perez; 05/09/17 |
| Central EMS Report for Joseph Perez; 05/10/17 |
| In-Custody Death Notification Sheet re Joseph Perez; 05/10/17 |
| In-Custody Death Notification Form re Joseph Perez; 05/10/17 |
| Fresno News Release re Detectives Investigating In Custody Death; 05/10/17 |
| Fresno News Release In Custody Death Suspect Identified; 05/11/17 |
| Medical Treatment Report by Dr. Huh re Joseph Perez; 05/10/17 |
| FPD Report re FSO case occurring COF by Officer Martinez; 05/10/17 |
| FPD Report re Follow-up by Officer Booth; 05/10/17 |
| FSO Report re Crime Log by Deputy Tucker; 05/10/17 |
| FSO Report re Evidence Collection by Deputy Bawcom; 05/10/17 |

Theodore C. Chan, MD, FACEP
1627 Bahia Vista Way
La Jolla, CA  92037
tcchan@ucsd.edu

| |
|---|
| FSO Report re Evidence Taken by Suspect by Deputy Vargas; 05/11/17 |
| FSO Report re Witness Information by Suspect by Deputy Chapman; 05/11/17 |
| FSO Report re Autopsy by Deputy Vargas; 05/12/17 |
| FSO Report re Investigation by Det. Galindo; 05/16/17 |
| FSO Report re Canvass Interviews by Det. Martinez; 05/17/17 |
| FSO Report re Canvass Interviews by Det. Diaz; 05/17/17 |
| FSO Report re Canvass Interviews by Det. Hamilton; 05/17/17 |
| FSO Report re Scene and Hospital by Det. Maldonado; 05/25/17 |
| FSO Report re Investigation by Det. Palma; 05/31/17 |
| FSO Report re Suspect Tattoos and Injuries by Dep. Chapman; 06/01/17 |
| FSO Report re Aerial Video of Scene by Dep. Chapman; 06/02/17 |
| FSO Report re Recording/Scene from Aerial View by Dep. Cunha; 06/05/17 |
| FSO Report re Follow-up with FPD Officer Booth by Dep. Chapman; 10/25/17 |
| FSO Report re Coroner's Report by Det. Galindo; 12/02/17 |
| Training Records for Chris Martinez |
| Training Records for James Rossetti |
| Training Records for Sean Calvert |
| Fresno County Autopsy Report re Joseph Perez' 05/10/17 |
| Autopsy of Jesus Perez; 05/05/17 |
| Claim for Wrongful Death; 09/25/17 |
| Medical Records from CRMC for Joseph Perez |
| Billing Records from CRMC for Joseph Perez |
| Photos of Family – Produced by P |
| Video re Joseph & Terralee Wedding Ceremony – Produced by P |
| Video re Joseph & Terralee Singing In the Car – Produced by P |
| Video re Joseph & Terralee On Road Trip – Produced by P |
| Video re Joseph & Terralee With Grandkids Drive through – Produced by P |
| Video re Funeral – Produced by P |
| Video re Message from Fresno to Mom – Produced by P |
| Video re One Year Anniversary Memorial – Produced by P |
| Video re Slide show from Funeral Service  – Produced by P |
| Community Med Center Records for Decedent; 05/10/17 – Produced by P |
| Post on Social Media related to Incident-Produced by P |
| Court Party Search for Joseph Perez-Produced by P |
| Photos of Terralee and Joseph-Produced by P |
| FPD Event Report- Produced by P |
| Autopsy Report – Produced by P |
| Death Certificate w-Amendment –Produced by P |
| Birth Certificate for Joseph Perez -Produced by P |
| CDL ID for Joseph Perez - Produced by P |
| Funeral Expenses - Produced by P |
| List of Youtube Video Links |
| Photos of Family-Produced by P |

4

Theodore C. Chan, MD, FACEP
1627 Bahia Vista Way
La Jolla, CA  92037
tcchan@ucsd.edu

| |
|---|
| Birth Certificate for Joseph Perez Jr. - Produced by P |
| Order Granting Petition for Guardian Ad Litem- Produced by P |
| Marriage Certificate for Terralee and Joseph -Produced by P |
| Hospital Certificate of Birth for Joseph Perez - Produced by P |
| Certificate of Birth for Terralee Perez - Produced by P |
| CDL ID for Terralee Perez - Produced by P |
| Marriage Certificate for Anthony and Cecilia Perez - Produced by P |
| Certificate of Birth and CDL for Anthony Perez - Produced by P |
| Certificate of Birth and CDL for Cecilia Perez - Produced by P |
| Slip-sheet for I.D. of Joseph Perez Jr. & Michelle Perez - Produced by P |
| Claim for Wrongful Death - Produced by P |
| Claim for Damages Rejection Letters for All Pltfs- Produced by P |
| Board of Supervisors Rejection to Claim for Damages -Produced by P |
| Witness Statement by Enrico Perez -Produced by P |
| Witness Statement by Christina Ramirez -Produced by P |
| Statement for Natalie Sendejas - Produced by P |
| Birth Certificate of Michelle Marie Perez – Produced by P |
| CA I.D. for Michelle Pacheco - Produced by P |
| EMS Report; 05/10/17 – Produced by P |
| D's Initial Disclosure; 05/22/18 |
| P's Initial Disclosure; 07/09/18 |
| P's RRFP-1; 08/13/18 |
| P Cecilia Perez's RSROGS; 08/13/18 |
| P Terralee Perez's RSROGS; 08/13/18 |
| P Anthony Perez's RSROGS; 08/13/18 |
| P Joseph Perez Jr.'s RSROGS; 08/13/18 |
| P X.P. Minor's RSROGS; 08/13/18 |
| P Terralee Perez's RRFP; 08/13/18 |
| P's RFP to the City; 11/20/18 |
| P's RFP to the County; 11/20/18 |
| Deputy McEwen's RFP to Anthony Perez; 11/27/18 |
| Deputy Robnett's RFP to Joseph Perez Jr.; 11/27/18 |
| Deputy Stoltenberg's RFP to X.P; 11/27/18 |
| Deputy Manasan's RFP to Cecilia Perez; 11/27/18 |
| County of Fresno RFP-2; 11/27/18 |
| City of Fresno's RFP-1; 06/12/18 |
| City of Fresno's ROGS to Anthony Perez-1; 06/12/18 |
| City of Fresno's ROGS to Cecilia Perez-1; 06/12/18 |
| City of Fresno's ROGS to Joseph Perez Jr.-1; 06/12/18 |
| City of Fresno's ROGS to Terralee Perez-1; 06/12/18 |
| City of Fresno's ROGS to X.P.-1; 06/12/18 |
| County of Fresno SROGS to Terralee Perez-1; 11/27/18 |
| Deputy Manasan's SROGS to Cecilia Perez-1; 11/27/18 |

**Theodore C. Chan, MD, FACEP**
*1627 Bahia Vista Way*
*La Jolla, CA  92037*
*tcchan@ucsd.edu*

| |
|---|
| Deputy McEwen's SROGS to Cecilia Perez-1; 11/27/18 |
| Deputy Robnett's SROGS to Cecilia Perez-1; 11/27/18 |
| Deputy Stoltenberg's SROGS to Cecilia Perez-1; 11/27/18 |
| FPD Policy 300 UOF |
| FPD Policy 306 Handcuffing and Restraints |
| FPD Policy 308 Force Options |
| FPD Policy 355 Custody of Adults |
| FPD Policy 417 Crisis Intervention Incidents |
| FPD Policy 418 Mental Illness Commitments |
| Personnel File for Sean Calvert Redacted |
| Personnel File for Christopher Martinez Redacted |
| Personnel File for James Rossetti Redacted |
| IA File 2017-0050 – REDACTED |
| CD: Audio re AMS Dispatch; 05/10/17 |
| EMS CAD Report; 05/10/17 |
| Prior - EMS CAD Report; 07/28/15 |
| Prior - CD: Audio re EMS Dispatch; 07/28/15 |
| Prior - FPD Event Report; 07/28/15 |
| Prior - FPD Report re Suspicious Person by Officer B. Garcia; 07/28/15 |
| Prior - CD: Audio re Call from Mother to AMS for Transport of Son to Hospital; 07/28/15 |
| Deposition of Morgan Anderson – Paramedic |
| Deposition of Michael Antonsen |
| Deposition of Sean Calvert (Fresno Police Dept) |
| Deposition of Coroner Chambliss |
| Deposition of Steve Comstock – toxicologist |
| Deposition of Joel Dines – EMT |
| Deposition of Leticia Funderburk – Deputy Coroner |
| Deposition of Stacy Hutson |
| Deposition of Karlson Manasan (Fresno Sheriff Dept) |
| Deposition of Chris Martinez (Fresno Police Dept) |
| Deposition of Robert McEwen  (Fresno Sheriff Dept) |
| Deposition of Jennifer Ortiz – EMT |
| Deposition of Anthony Perez – Plaintiff Dad |
| Deposition of Cecilia Perez – Plaintiff Mom |
| Deposition of Enrico Perez |
| Deposition of Joseph Perez Jr – Son |
| Deposition of Terrallee Perez – wife |
| Deposition of X.P. Perez – son |
| Deposition of Christina Ramirez |
| Deposition of Jimmy Rossetti  (Fresno Police Dept) |
| Deposition of Natalie Sendejas |
| Deposition of Cynthia Sepeda – EMT |
| Deposition of Stoltenberg, Braithan (Fresno Sheriff Dept) |

6

*Theodore C. Chan, MD, FACEP*
*1627 Bahia Vista Way*
*La Jolla, CA  92037*
*tcchan@ucsd.edu*

| Deposition of Jimmy Robnett (Fresno Police Dept) |
| Deposition of Tarik Tihan (Medical Physician) |

In the event that any items reviewed were inadvertently omitted from the foregoing list, this expert will gladly supplement this list upon questioning under oath and reserves the right to supplement this list in a supplemental report.

## 2.    Right to Supplement.

Except as noted, my opinions and testimony will be to a reasonable degree of medical certainty.  If additional pertinent information is revealed and provided to me subsequent to this letter, my opinions may change.

## 3.    Factual Summary.

*This summary is provided for convenience and does not necessarily itemize every single fact relied upon in the formation of my opinions-conclusions in this matter, it is based on my review of the aforementioned records-materials.  I do not contend to have direct personal knowledge of the incident facts.*

Briefly, on May 10, 2017, Mr. Joseph Perez was a 41-year-old man with methamphetamine in his system who became involved in a combative struggle with law enforcement personnel.

Mr. Perez was acting in an agitated and altered manner when law enforcement personnel were summoned and suspected he was under the influence of illicit drugs.  He became combative with officers who attempted to restrain him.  During this process, officers attempted to utilize a number of different compliance and restraint techniques including verbal de-escalation, knee strikes, a wrist lock, handcuffs, and a RIPP restraint.  A towel was also used to protect Mr. Perez's head and face from injury from contact with the pavement.

Eventually, Mr. Perez was restrained in the prone position on the ground.  Prehospital EMS personnel also arrived on the scene and a decision was made to secure a backboard to Mr. Perez.  The board was placed on Mr. Perez's back while he was in the prone position and personnel secured his wrists and ankles to the board with leather restraints. For a short time during this process, one officer placed his weight on the board while Mr. Perez resisted.  Once secured, the board and Mr. Perez were turned over to the supine position.

7

*Theodore C. Chan, MD, FACEP*
*1627 Bahia Vista Way*
*La Jolla, CA  92037*
*tcchan@ucsd.edu*

Shortly thereafter, he was found to be unresponsive, in asystolic cardiopulmonary arrest. EMS personnel initiated CPR and other resuscitative measures including intubation and advanced cardiac life support medications.  Mr. Perez was transported to the CRMC Emergency Department (ED). where he was re-intubated and advanced resuscitative efforts continued.  Unfortunately, he did not respond to these efforts and was subsequently pronounced dead in the ED.

An autopsy conducted by the County Coroner attributed the cause of death to compression asphyxia during restraint with other significant condition of methamphetamine toxicity.  The autopsy also found blunt force injuries to the torso, head, arms, legs, and neck; lung edema and aspiration; cerebral edema, and cardiomegaly with left ventricular hypertrophy.

## 4.     Opinions (Summary).

I have been asked to provide an opinion in this case as to whether the manner in which Mr. Perez was restrained by first responder personnel may have caused respiratory compromise and asphyxiation, or so-called positional, restraint or compression asphyxia that could have led to his subsequent demise.

### A.     Background of Positional Asphyxia Allegations in General.

By way of background, positional or restraint asphyxia is a term that was initially used to describe the deaths of individuals who were found in body positions that compromised respiratory function.  Most commonly, these cases involved individuals in whom their position led to obstruction of the upper airway (such as from extreme head-neck hyperflexion) and who were alcohol intoxicated (to the point of being unable to remove themselves from the lethal position).  In none of these original cases was the individual restrained in the prone position by law enforcement.[1]

In the late 1980s, the term positional asphyxia was then applied as a cause of death in reports of sudden deaths that occurred to persons who were being restrained while in custody.  Proponents of this theory argued that individuals placed in the hobble position (hobble or prone restraint position in which individuals are placed prone on their stomach with wrists handcuffed behind the back and ankles secured to the handcuffs – a position some proponents of this theory reference as a "hogtie" even though such terminology is not used by law enforcement to describe the hobble position) were unable to breathe because the position caused chest wall and abdominal restriction that prevented adequate expansion or ventilation of the lungs and subsequently led to asphyxiation.

There is little scientific evidence to support the notion that prone restraint and body position results in respiratory compromise or asphyxiation.  The theory of positional asphyxia as applied to custody restraint was largely based on the work of Reay et al, who

8

*Theodore C. Chan, MD, FACEP*
*1627 Bahia Vista Way*
*La Jolla, CA 92037*
*tcchan@ucsd.edu*

studied 10 healthy subjects after exercise and found delayed recovery of blood oxygen levels and heart rate in the hobble position.[2]

### B.   Scientific Positional Asphyxia Medical Study.

With my colleagues, I conducted a more comprehensive study investigating the effects of body position on respiratory function after exertion: this peer-reviewed study was published in the Annals of Emergency Medicine and reviewed in another article published in the American Journal of Forensic Medicine and Pathology.[3,4]

In our study involving 15 human volunteers, we studied respiratory function in the sitting, supine (laying on the back), prone (laying on the stomach), and hobble position. While we found a slight progressive decrease in pulmonary function (the amount of air movement in the lungs), these changes were within normal range. Accordingly, we found no evidence of decreased blood oxygen levels or increased carbon dioxide levels (to suggest inadequate ventilation) in the hobble position. These findings have been confirmed by other independent investigators who found no significant decrease in blood oxygen levels in individuals placed in similar restraint positions.[5,6] In other words, we have found no scientific evidence supporting the proponents' notion that a restraint position in a prone, chest-down, or prone hobbled position causes or contributes to asphyxiation or associated death.

As a result of this evidence, Dr. Reay, one of the chief proponents of the positional asphyxia theory with prone restraint, has written that "the hog-tied prone position should be viewed as not producing significant physiologic respiratory compromise, and it does not produce any serious or life-threatening respiratory effects".[7]

In addition, we have conducted two studies on human volunteers investigating the effect of weight force on persons who were restrained. In our initial study, we found no evidence of hypoxia (decrease in oxygen levels) or hypoventilation (increase in carbon dioxide levels) in human subjects on whom moderate amounts of weight were placed on their back in the prone restraint position.[8] In our subsequent study, we placed up to 225 pounds of weight force on human subjects in the prone restraint position and found no life-threatening abnormalities in ventilation.[9]

These results are consistent with other investigators who have conducted similar weight force studies on the prone restraint position and found no evidence of hypoxia to indicate risk for asphyxiation.[10] Moreover, additional modelling research on the role of restraint weight force on respiratory and pulmonary function also indicate little risk for asphyxiation.[11,12] In other words, we have found no evidence supporting the proponents' notion that force weight on a prone subject causes or contributes to asphyxiation or associated death.

9

*Theodore C. Chan, MD, FACEP*
1627 Bahia Vista Way
La Jolla, CA  92037
tcchan@ucsd.edu

In addition, large epidemiologic field studies, including research conducted by our own group, and involving thousands of actual law enforcement restraint incidents found no association between prone positioning and death or asphyxiation.[13,14,15,16]

### D.    Case-Specific Conclusions (Perez).

I.    Potential Asphyxia Contentions & Response.

In Mr. Perez's case, he was not placed in a hog-tie or hobble position (other than briefly during the use of the RIPP restraint), but in the less restrictive prone position.  In addition, he was noted to be verbalizing and moving during much of the time while being restrained, indicating that he was not at risk for significant respiratory compromise that would have resulted in asphyxiation.

While he was being restrained, additional force was applied by law enforcement including during the time period when a backboard was placed on top of him.  Some have argued that such force could cause compressive or mechanical asphyxia, the notion that such restraint force causes respiratory compromise on a prone restraint individual.  However, the time period during which this additional force was placed by the officer was brief (just a little over 1 minute), during which Mr. Perez was described as moving, and would not be expected to result in an asphyxiation death.  In addition, there was no clinical or autopsy evidence that Mr. Perez suffered significant increase in intrathoracic pressure that is seen in cases of mechanical or compression asphyxia.

II.    Potential Airway Obstruction & Response.

During the prone restraint struggle with officers, a towel was placed over Mr. Perez's face and head to protect him from injury against the pavement.  There is no evidence, however, that the placement of the towel obstructed his airway such that he would have been at risk for asphyxiation.  In fact, while the towel was placed on his face, officers asked Mr. Perez if he could breathe and he responded verbally that he was able to do so.

In conclusion, it is my opinion to a reasonable degree of medical probability or certainty that Mr. Perez's death was not caused or contributed to by positional, restraint or compression asphyxiation as a result of the manner in which he was restrained.

10

Theodore C. Chan, MD, FACEP
1627 Bahia Vista Way
La Jolla, CA  92037
tcchan@ucsd.edu

.        **Fees & Prior Testimony.**

In accordance with the Rules of Civil Procedure, my compensation for services rendered in association with this case are $500/hour, including travel time and expenses.

Prior cases in which I have provided testimony over the past four years are: *Abrego v. City of Los Angeles*, 2016; *Mears v. City of Los Angeles*, 2017; *Salazar v. San Bernardino*, 2017; *Sexton v. Phillips, et al., Cape May, New Jersey*, 2017; *Lopez v. City of Inglewood*, 2017-18; *Hernandez v. City of Los Angeles*, 2018; *Landeros v. Elk Grove*, 2019; and *Hagood (Lovett) v. Kern County*, 2020; *Alves v. Riverside County*, 2021; Sanders v. Mississippi County, et al, Missouri, 2021.

Should you have any further questions, please do not hesitate to contact me at any time.

Sincerely,

Theodore C. Chan, MD
Professor and Chair
Department of Emergency Medicine
University of California San Diego

11

# Exhibit K

Exhibit K

1                    UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3          ANTHONY PEREZ, individually;          )
           CECELIA PEREZ, individually;          )
4          TERRALEE PEREZ, individually, and     )
           as Successor in Interest to Joseph    )
5          Perez; JOSEPH PEREZ, JR.,             )
           individually and as Successor in      )
6          Interest to Joseph Perez; and         )
           X.P., a minor, by and through his     )
7          Guardian Ad Litem, MICHELLE PEREZ,    )
           individually and as Successor in      )
8          Interest to Joseph Perez,             )
                                                 )
9               Plaintiffs,                      )
                                                 )
10         vs.                                   )   Case No.
                                                 )   1:18-cv-00127
11         CITY OF FRESNO; COUNTY OF FRESNO;     )   AWI(EPG
           AMERICAN AMBULANCE; JAMES             )
12         ROSSETTI, an individual; SEAN         )
           CALVERT, an individual; CHRIS         )
13         MARTINEZ, an individual; BRAITHAN     )
           STOLTENBERG, an individual; ROBERT    )
14         MCEWEN, an individual; KARLSON        )
           MANASAN, an individual; JIMMY         )
15         ROBNETT, an individual; MORGAN        )
           ANDERSON, an individual; and DOES     )
16         1-10, inclusive,                      )
                                                 )
17              Defendants.                      )
           _____)

18

19       VIDEOTAPED REMOTE DEPOSITION OF GARY VILKE, M.D.

20                  VOLUME I, PAGES 1 - XXX

21                  Tuesday, August 24, 2021

22

         STENOGRAPHICALLY REPORTED BY:
23

         CLAUDIA CASOTTI-STEVENSON
24       CSR NO. 13617

25       JOB NO.:  241117

                                                                              1

 1    local or state level.                              11:19:07

 2        Q    Okay.  And among the areas about which you  11:19:08

 3    have had opinions in this case is the question of   11:19:12

 4    the standard of care for paramedics; is that right?  11:19:16

 5        A    Correct.                                    11:19:20

 6        Q    And your opinion in this case is that the   11:19:20

 7    conduct of the paramedics in this case did not       11:19:24

 8    violate the standard of care as you understood it;   11:19:29

 9    is that right?                                        11:19:33

10        A    That is correct.                            11:19:33

11        Q    So I'm going to look on page 8 of your      11:19:34

12    report, and there's a sentence -- the second         11:19:39

13    sentence on -- on the top of the page, it says,      11:19:43

14    "Whenever there is significant agitation."  Do you   11:19:48

15    see where it says that?                              11:19:50

16        A    Yes.                                        11:19:51

17        Q    And so your opinion is that where --        11:19:51

18    whenever there is significant agitation, resistance,  11:19:54

19    and aggressiveness, the use of weight to stabilize    11:19:57

20    the backboard is appropriate and reasonable and      11:20:00

21    within the standard of care.                          11:20:01

22            Do you see where it says that?               11:20:02

23        A    Yes.                                        11:20:04

24        Q    And when you say "weight to stabilize the   11:20:04

25    backboard," this is referring to putting the         11:20:08

                                                              19

| | | |
|---|---|---|
| 1 | backboard on top of a patient who is in a prone | 11:20:11 |
| 2 | position and applying weight to the back of the | 11:20:11 |
| 3 | backboard?  Is that what you're referring to here? | 11:20:17 |
| 4 | A    Right.  If somebody is placing a backboard | 11:20:17 |
| 5 | to use it to try to get them secured to the | 11:20:19 |
| 6 | backboard, there will need to be the weight -- some | 11:20:22 |
| 7 | weight to be able to hold them in position. | 11:20:26 |
| 8 | Otherwise they'll fall off or slide off.  So it | 11:20:28 |
| 9 | would be appropriate to place some weight to | 11:20:31 |
| 10 | maintain that. | 11:20:33 |
| 11 | Q    Okay.  Are you familiar with any bulletin, | 11:20:33 |
| 12 | training manual, protocol, policy, or procedure that | 11:20:37 |
| 13 | relates to EMS care or paramedics that authorize | 11:20:41 |
| 14 | weight on the backboard? | 11:20:45 |
| 15 | A    That authorize it?  I am not aware of any | 11:20:47 |
| 16 | that authorize it in the sense that it specifically | 11:20:56 |
| 17 | says you can put weight on a backboard, but | 11:21:01 |
| 18 | certainly there are policies or protocols or | 11:21:04 |
| 19 | guidelines that recommend that the EMS environment | 11:21:07 |
| 20 | is austere, and sometimes the patients there need to | 11:21:11 |
| 21 | have -- or agitated patients require certain | 11:21:15 |
| 22 | maneuvers to be done to gain control. | 11:21:19 |
| 23 | Q    Okay.  But you would agree with me that | 11:21:21 |
| 24 | you're not familiar with any written training, | 11:21:26 |
| 25 | material, policy, book, guideline that refers to | 11:21:28 |

20

```
 1   possible that was the case.                          11:34:14

 2        Q    Okay.  Other than this case and the Barrera  11:34:16

 3   case, how many other times would you say that you    11:34:20

 4   have authored a report, testified, or given          11:34:23

 5   deposition testimony in a case where the person said 11:34:29

 6   they couldn't breathe before they died?             11:34:32

 7        A    Oh, it was probably somewhere around eight  11:34:36

 8   to ten cases over the time.                          11:34:40

 9        Q    And in each of those eight to ten cases     11:34:42

10   where the person said "I can't breathe" and          11:34:47

11   subsequently died, your opinion in each of those     11:34:49

12   cases was that the person did not asphyxiate; is     11:34:52

13   that right?                                          11:34:54

14        A    I'd have to review the cases specifically,  11:34:54

15   but if there is an opinion about asphyxiation,       11:34:57

16   then -- and I gave a report, then that is likely     11:35:00

17   the -- that I would have said that the person did    11:35:02

18   not asphyxiate.                                      11:35:06

19        Q    Have you ever given testimony in a case     11:35:06

20   where a person said "I can't breathe" and            11:35:09

21   subsequently died where your opinion was that the    11:35:12

22   person asphyxiated in the context of an encounter    11:35:16

23   with law enforcement?                                11:35:22

24        A    Not that I can recall.                     11:35:22

25        Q    You mentioned that you had had some         11:35:26
```

Exhibit L

*Gary M. Vilke, M.D., FACEP, FAAEM*
*11582 Normanton Way*
*San Diego, California 92131*
*(619) 666-8643*

July 2, 2021

Rick Ryan
R.J. Ryan Law, APC
500 North Brand Blvd, Suite 950
Glendale, CA 91203

*RE: Anthony Perez, et al vs. American Ambulance*
*Case No. 1:18-CV-00127-AWI-EPG*

**Introduction**

I am a board-certified emergency department physician with substantial experience in

sudden cardiac arrest and sudden cardiac death.  I am also an independent researcher on the effects

of restraints on human physiology and in-custody cardiac arrest and deaths. My specific

qualifications will be outlined in more detail at the end of this report.

I have been retained as an expert to review relevant materials and consider and render expert

opinion on whether the actions of the emergency medical team of American Ambulance met the

standard of care and whether the procedure to secure the backboard utilized by this medical team on

May 10, 2017, was contributory to Mr. Joseph Perez's cardiac arrest and death.  After careful

review, it is my opinion to a reasonable degree of medical probability that the emergency medical

team of American Ambulance met the standard of care at all times.  Further, it is my opinion to a

reasonable degree of medical probability that Mr. Perez's cardiac arrest and death were not caused

by the actions of American Ambulance personnel or the procedure to secure Mr. Perez to the

backboard for medical treatment and safe transport to the hospital for a 5150 evaluation.  Mr. Perez'

death was caused by his methamphetamine use in combination with a diseased heart, agitation and continued resistance.  These opinions and related opinions are set forth in the expert report.

## Materials Reviewed

I have reviewed extensive materials pertaining to the above referenced case.  This includes, but is not limited to:

### A.    Medical and Scientific Literature

Chan TC, Vilke GM, Neuman T, Clausen JL:  Restraint position and positional asphyxia.  Ann Emerg Med 1997;30(5):578-586.

Chan TC, Vilke GM, Neuman T:  Reexamination of custody restraint position and positional asphyxia.  Am J Forensic Med Pathol 1998;19(3):201-205.

Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  The impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions, final report.  NCJ 182433.  Washington, DC: United States Department of Justice, National Institute of Justice, 2000, 68 pages.

Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T:  The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function.  J Forensic Sci 2002; 47(2):299-304.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM:  Weight force during prone restraint and respiratory function.  Am J Forensic Med Pathol 2004;25(3):185-189.

Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.  J Forensic Sci 2007;52(1):171-175.

Reay DT, Howard JD, Fligner CL, Ward RJ.  Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol. 1988 Mar;9(1):16-8.

Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777-782.

Vilke GM, Sloane C, Castillo EM, Kolkhorst FW, Neuman TS, Chan TC. Evaluation of the Ventilatory Effects of a Restraint Chair on Human Subjects.  J Emerg Med. 2011;40(6):714-8. Epub 2010 Jan 13.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC.  The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures.  J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM.  Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR: Effect of position and weight force on inferior vena cava diameter--implications for arrest-related death. Forensic Sci Int. 2011 Oct 10;212(1-3):256-9.

Kroll MW, Still GK, Neuman TS, Graham MA, Griffin LV. Acute forces required for fatal compression asphyxia: A biomechanical model and historical comparisons. Med Sci Law. 2017 Apr;57(2):61-68. doi: 10.1177/0025802417695711. Epub 2017 Apr 3. PMID: 28372525.

Kroll MW, Brave MA, Kleist SR, Ritter MB, Ross DL, Karch SB. Applied Force During Prone Restraint: Is Officer Weight a Factor? Am J Forensic Med Pathol. 2019 Mar;40(1):1-7. doi: 10.1097/PAF.0000000000000457. PMID: 30586338.

### B.    Case-Specific Materials

1.  Autopsy Report

2.  Body Worn Camera Video from FPD

3.  Surgical Pathology Report of Brain

4.  Partial Forensic Report

5.  Decedent's Medical Records Community Regional Medical Center

6.  American Ambulance Handbooks & Training Materials

7.  Medical Records from Fresno Community Medical Center

8.  Central California EMS behavioral emergencies treatment protocol

9.  Deposition & Exhibits of Morgan Anderson

10. Deposition & Exhibits of Joel Dines

11. Deposition & Exhibits of Jennifer Ortiz

12. Deposition & Exhibits of Cynthia Sepeda

13. Deposition & Exhibits of Chris Martinez

14. Deposition & Exhibits of Sean Calvert

15. Deposition of Michael Antonson

16. Deposition & Exhibits of Michael Chambliss, MD

17. Deposition & Exhibits of Braithan Stoltenberg

18. Deposition & Exhibits of Jimmy Robnett

19. Deposition & Exhibits of Karlson Manasan

20. Deposition & Exhibits of Robert McEwen

21. Deposition & Exhibits of Leticia Funderburk

22. Deposition & Exhibits of Anthony Perez

23. Deposition of & Exhibits Cecelia Perez

24. Deposition of & Exhibits Enrico Perez

25. Deposition of & Exhibits Xavier Perez

26. Deposition of Terralee Perez

27. Deposition of & Exhibits Christina Ramirez

28. Deposition of & Exhibits James Rosetti

29. Deposition of Joseph Perez, Jr.

30. Deposition of & Exhibits Stacy Hutson

31. Deposition of & Exhibits Natalie Sendejas

32. Deposition of & Exhibits Joe Alvarez

33. Deposition of & Exhibits Adrian Villegas

34. Deposition of & Exhibits Juan Galindo

35. Deposition of & Exhibits Karla Keeley

36. Deposition & Exhibits Rick Carvalho

37. City of Fresno video press release

38. Transcript of joint interview of Antoinette Perez and Joseph Perez, Jr.

39. Transcript of interview of Antoinette Perez

40. Transcript of interview of Sgt. Scott Moore

41. Central California Emergency Medical Services General Procedures Policy No. 530.02

42. Central California Emergency Medical Services Behavioral Emergencies Policy No. 530.27

43. Central California Emergency Medical Services Pediatric Primary Survey Policy No. 530.32

44. X-rays of chest from 5/15/2014, 8/18/2016, and 3/6/2017

45. Medical records from Health Records Center.

46. Fresno County Sheriff Follow-Up Report Case Report No. 170006634.6

47. Fresno County Sheriff Follow-Up Report Case Report No. 170006634.11

48. Fresno Police Department Internal Affairs File

49. Video with transcribed audio synched

50. Transcript of interview of Michael Antonsen

51. Audio of 9-1-1 call with Michael Antonsen

52. Documents, produced in discovery, concerning a prior incident with the decedent, Joseph Perez, from 2015

53. Audio of 9-1-1- call from Decedent's mother, plaintiff, Cecilia Perez RE Decedent's prior incident from 2015

54. Audio of dispatch call from City of Fresno to American Ambulance RE Decedent's prior incident from 2015

55. Five draft demonstrative medical legal illustrative boards

56. Memorandum describing demographics

57. Deposition & Exhibits of Steve Comstock

I reserve the right to review the Rule 26 reports, and depositions, of the other experts in this case and any additional materials that they may be provided to me which may add to my opinions.

### Overview of Opinions

**(All opinions within this report are to a reasonable degree of medical or scientific probability)**

An overview of my opinions is as follows with more description of each below:

1. *The care provided by the emergency medical team of American Ambulance was appropriate and reasonable at all times and did not deviate from the standard of care.*

2. *The actions of the emergency medical team of American Ambulance to safely secure Mr. Perez to the backboard did not cause or contribute to Mr. Perez' cardiac arrest and death.*

3. *Mr. Perez was exhibiting clinical signs of methamphetamine intoxication, consistent with the findings in his toxicological screen.*

*4. Mr. Perez's death was caused by a fatal arrhythmia due to his methamphetamine use, enlarged heart, underlying coronary artery disease, and his agitation to a reasonable degree of medical probability.*

## Overview

After reviewing the above listed materials, it appears that on May 10, 2017, in the morning hours, law enforcement received a call regarding a person acting in a bizarre manner.  Officers arrived to find Mr. Joseph Perez who was 41 years of age, 72.5 inches tall and weighed 241 lbs. at the time.  Mr. Perez was approached by officers from the Fresno Police Department, but he acted erratically and walked away from them. Mr. Perez was taken into custody and was handcuffed and seated on the curb to await ambulance arrival for medical assessment. At some point, Mr. Perez attempted to sprint into the street, and the police restrained him in a prone position with his arms behind his back. Mr. Perez resisted and began scraping and banging his head against the ground, and officers placed a towel under his face to keep him from injuring his face against the ground.

When the emergency medical team arrived, a backboard was placed on Mr. Perez's back so that the handcuffs could safely be converted to medical restraints thereby safely securing the patient to the backboard. This was done to secure Mr. Perez so that he could be safely transported to the hospital. During the transition of the handcuffs to the medical restraints, Mr. Perez became unresponsive.  He was found to be in cardiac arrest and was treated with advanced cardiac life support measures but could not be resuscitated and was pronounced dead at the hospital at 11:22 a.m.  An autopsy was performed, and the cause of death was reported as compressive asphyxia during restraint with methamphetamine toxicity listed as a significant condition.

Given this history, there are several issues that need to be addressed in more detail below. All opinions given are to a reasonable, or higher, degree of medical probability based on the

information currently available.

**Detailed discussion and basis of opinions**

1. ***The care provided by the emergency medical team of American Ambulance was appropriate and reasonable at all times and did not deviate from the standard of care.***

Paramedic Anderson and EMTs Dines and Ortiz are licensed healthcare providers. Healthcare providers are required to act reasonably under the standard of care.

American Ambulance was contacted by law-enforcement for the purpose of rendering care and safe transportation of Mr. Perez to the hospital for evaluation under Welfare & Institutions Code Section 5150 as it appeared that Mr. Perez was in a mental health crisis, or a danger to others or himself, or gravely disabled.

On arrival to the scene, Paramedic Anderson and EMTs Dines and Ortiz found Mr. Perez to be handcuffed in a prone position and in the custody of law-enforcement.  Mr. Perez was agitated, aggressive, and actively resisting law enforcement.  The standard of care under these circumstances allowed Paramedic Anderson broad discretion without violating policy and procedures, including the use of reasonable alternatives, to provide for the safety of his colleagues and the patient and to safely render care and transport this patient to the hospital.

Paramedic Anderson acted appropriately and reasonably under these circumstances by assessing the scene, including having discussion with the law enforcement personnel about how to safety secure and transport the patient to the hospital for further evaluation.

Paramedic Anderson's instruction to law enforcement and his EMTs to place the backboard on the prone patient was a reasonable exercise of judgment under these circumstances as Mr. Perez continued to be agitated, aggressive, and actively resisting attempts to secure his safety.  Attempting to restrain the patient to the backboard in the supine position would have required him to be rolled over, among other things, but doing so would have raised a safety issue.

Paramedic Anderson's instruction to law enforcement to sit on the backboard to help stabilize it was reasonable given the circumstances.   Whenever there is significant agitation, resistance and aggressiveness, the use of weight to stabilize the backboard is appropriate and reasonable and within the standard of care.

The other medical procedures and directives, including placement of the leather restraints, was also reasonable and within the standard of care.  The use of leather restraints, which are medical devices, are appropriate for a patient presenting clinically like Mr. Perez.

Once the restraints had been applied, the medical team rolled the patient over and then CPR was rendered timely and reasonably once Mr. Perez was determined to be in cardiac arrest.

I have also reviewed policies and procedures of American Ambulance produced in discovery and attached to the deposition of Rick Carvalho.  These policies and procedures are appropriate and reasonable and complied with the standard of care.

2. ***The actions of the emergency medical team of American Ambulance to secure Mr. Perez to the backboard did not cause or contribute to Mr. Perez' cardiac arrest and death.***

When the emergency medical team of American Ambulance arrived on scene, Mr. Perez was handcuffed with his hands behind his back and continued to be agitated and resistive. Paramedic Anderson wanted to change out the handcuffs to medical restraints and secure the patient with medical restraints to a backboard.  This is a common practice so that the patient can be transported in a supine (on their back) position and allows for paramedics to have easier communication and access to the patient during the transport.  By removing the handcuffs, the patient laying on their back will be more comfortable with hands secured to their side rather than cuffed behind their back and having body weight placing pressure on the hands.

Often when trying to convert handcuffs to medical restraints in patients who are under the influence of drugs and are aggressive and struggling, like the patient in this case, when the

handcuffs are removed, the patients often try to get free. And this often results in a protracted time course as well as with a significant physical struggle. In highly intoxicated and agitated patients, like Mr. Perez, a prolonged physical struggle is not optimal in that the struggle from his resisting will create more lactic acid and result in a metabolic acidosis. A metabolic acidosis is when the person's pH (acid-base status) is pushed to the acidic level and the pH is lower. This lowering of the pH can result in cardiac irritability and subsequent cardiac arrest.

In the case of Mr. Perez, Paramedic Anderson opted to leave Mr. Perez prone (on his stomach) and bring the backboard to be placed on his back, rather than turning Mr. Perez over onto his back. To keep Mr. Perez and the backboard in place, an appropriate instruction was given to an officer to sit on the backboard, which was done for a total 74 seconds. Mr. Perez had his legs restrained to the backboard during this time and then the handcuffs were removed, and his hands were converted to medical restraints attached to the backboard.

From the beginning of the body worn camera video until EMS arrives around the 12-minute mark, Mr. Perez was maintained on the ground by law-enforcement with his hands handcuffed behind his back in a prone position. He was yelling and talking repeatedly throughout this time. At some point, Mr. Perez was trying to grind his face into the ground and one of the law enforcement officers placed a towel under his face to protect him. A brief timeline of events from the arrival of EMS until being moved to the gurney as I understand them is as follows based on the body worn camera video:

        12:00   EMS discussion
        12:05   hobble is placed around ankles
        12:20   EMS planning to put backboard on Mr. Perez while still prone
        12:26   backboard placed and several hands are holding the backboard in place
        12:35   officer steps over backboard to get off from the straddle position
        12:39   Perez says "I can't breathe"
        12:43   an officer is told to "sit on that board"
        12:44   officer sits on backboard
        12:54   Perez still grunting
        12:58   Perez makes an additional grunt sound
        13:21   Officer told Perez to try to relax

13:43   "Joseph, you okay, Joseph, you alright?" - no response
13:58   Officer gets off the backboard
14:12   someone states, "He's moving"
14:46   right hand being placed into medical restraint
15:15   someone states, "He's out"
15:17   second restraint placed to left arm and right restraint being adjusted
15:59   last hand off the backboard
16:03   restraint board and Perez are flipped over
16:08   EMS assessing
16:30   being carried to gurney on backboard

During the time before EMS arrived and the officers were maintaining Mr. Perez in a prone position with his hands cuffed, Mr. Perez was ventilating and moving air in and out of his lungs without difficulty. He was talking, yelling, and had no evidence from my review of respiratory difficulty.

Based on the review of the body worn camera video, the approximate timing and weight used to hold the backboard on Mr. Perez was as follows: several people had hands on the backboard for 18 seconds to maintain the board in position, then Detective Calvert, who weighed approximately 190-195 pounds including his gear, sat down on the backboard at the approximate position of Mr. Perez's buttocks for approximately 74 seconds and then he gets off. The image below demonstrates the position of Detective Calvert sitting on the backboard.



After he gets off, the only remaining weight essentially being placed on Mr. Perez was the weight of the backboard (approximately 12 lbs.) and a few hands moving around various positions to maintain the position of the backboard. Several images of the hand positions over this approximately two-minute period after Detective Calvert got up from the backboard are shown below:















What these images demonstrate is that although there were hands holding the backboard, there was not much in the way of pressure being applied, and the hands are moving and changing positions throughout the two-minute time period, thus the weight force was not constant.

When looking closely at the video, it is evident that Detective Calvert placed his weight over the buttocks region of Mr. Perez. In the first image below, the red circle represents the position of Detective Calvert when he was sitting on the backboard. Based on the location of the handles of the

backboard, the second two images demonstrate the location of where Detective Calvert was sitting previously. When you look at the body position and hands of Mr. Perez, this demonstrates the location of Detective Calvert was in fact over the buttocks region of Mr. Perez.







The time that Mr. Perez was handcuffed prone before the arrival of EMS would have had no impact on his ventilations or his ability to breathe. This position is physiologically neutral. Once the backboard was placed, the majority of the body weight was not on Mr. Perez in such a position that would have created the potential to limit ventilation. The bodyweight of Detective Calvert placed over the buttocks of Mr. Perez would have very little impact, if any, over his ventilatory system. The weight of Detective Calvert being diffused out across the backboard would have most of the pressure being placed on Mr. Perez's buttocks and hands that were at the small of the back. A small amount of weight might be on the calves or heels as well as possibly on the shoulders. But this will be a fraction of the total body weight. A demonstrative image with similar weight and height of Mr. Perez and Detective Calvert is below. What is notable is that the position of the handcuffed hands causes the backboard to ramp up and not even place any weight on the upper torso where the ventilatory structures are located.



And again, this weight was only placed for approximately 74 seconds.  The total time of any weight being placed on Mr. Perez was approximately 3 ½ minutes. This included the initial placement of the board, the 74 seconds of time with Detective Calvert sitting on the board, and an additional two minutes of hands holding the board position while the medical restraints were being secured. Studies applying 220 pounds of weight over the upper back of individuals for a similar duration of time did not show any clinically significant reduction in ability to breathe or ventilate. In this case, 3 ½ minutes of very modest weight is not enough weight or long enough to cause asphyxiation.

The weight on Mr. Perez's legs and buttocks would not have had any impact on breathing or the ability for Mr. Perez to ventilate effectively.  If the application of weight that was over his torso/upper back had impacted Mr. Perez's ability to ventilate to the point of causing a cardiac arrest and sudden death by asphyxiation, the ventilations would have had to be restricted long enough to where blood oxygen levels would drop because there was not enough oxygen getting into Mr. Perez's lungs.  When this occurs, the low blood oxygen levels will cause the heart to become irritable and eventually slow and then stop causing the subject to go into cardiac arrest.  This takes time and essentially a complete blockage of air movement in and out of the lungs.

In summary, there was no evidence that the short period of modest weight applied to Mr. Perez caused the cascade of physiologic changes from asphyxia to result in a cardiac arrest.  The weight was insufficiently applied to significantly restrict ventilations.  There is no evidence that position, restraint, or body weight caused or contributed to Mr. Perez's cardiac arrest and death.

3. ***Mr. Perez was exhibiting clinical signs of methamphetamine intoxication, consistent with the findings in his toxicological screen.***

Mr. Perez had methamphetamine and its breakdown product, amphetamine reported in his blood toxicology evaluation on autopsy.  Methamphetamine is a sympathomimetic illicit drug that

acts as a stimulant.  Methamphetamine has a number of physiologic effects, including increasing heart rate and blood pressure.  It can cause delusions, paranoia, and increased agitation, as well as sweatiness, elevated temperatures, and jitteriness. Mr. Perez was exhibiting a number of these clinical signs of methamphetamine intoxication including erratic behavior, jitteriness, and impulsiveness.  Mr. Perez's behavior in the body worn camera video was consistent with an individual who is under the influence of methamphetamine.

### 4. Mr. Perez's death was caused by a fatal arrhythmia due to his methamphetamine use, abnormally enlarged heart, underlying coronary artery disease, and his agitation to a reasonable degree of medical probability

Mr. Perez was noted to have left ventricular hypertrophy of the heart noted on his autopsy. His heart was mildly enlarged, weighing 436 grams.  The normal sized heart for a male is typically 300-350g and some sources note possibly up to 400g depending on body size.  This noted physical enlargement of the heart in and of itself can place an individual at increased risk for sudden cardiac arrest and death from an irregular heartbeat.

Mr. Perez was also noted on autopsy to have narrowing of two of his major coronary arteries.  The coronary arteries are the blood vessels that bring blood flow to the heart itself, supplying the heart with oxygen and nutrients.  As reflected in the County of Fresno Sheriff-Coroner autopsy report, Mr. Perez had the left anterior descending (LAD) coronary artery and the right coronary artery (RCA) with a few areas of severe luminal narrowing noted to be greater than 80%.

 The significant 80% narrowing, as reflected in the County of Fresno Sheriff-Coroner autopsy report, of the LAD and RCA would have limited blood flow through these arteries, meaning that the majority of the coronary blood flow would be limited to the heart in Mr. Perez. An image showing the distribution of these coronary arteries is shown below. These significant blockages, according to the County of Fresno Sheriff-Coroner, of the heart arteries place an

individual at significantly increased risk for sudden cardiac arrest and death from an irregular

heartbeat.



It should be noted that the LAD is one of the major coronary arteries, so important that it is

nicknamed "the widow maker" because blockage of this vessel will typically result in cardiac arrest

and sudden death.

So, Mr. Perez, unbeknownst to him or the paramedic and EMTs on scene, had two life

threatening cardiac conditions, an enlarged heart and severe coronary artery narrowing of not one,

but two major arteries, each with an increased risk for sudden cardiac arrest.  In combination, they

are even more dangerous.  This creates cardiac stress and significantly increases the risk of sudden

cardiac arrest.

In addition to this combined cardiac risk, Mr. Perez added methamphetamine to his system.

Methamphetamine is an often-unpredictable stimulant that, regardless of the amount ingested,

increases the work of the heart.  It increases the heart rate and contraction strength of the cardiac

muscles.  Additionally, methamphetamine will cause the blood to be more acidic, caused by a

metabolic acidosis.  This increased acidosis (lower pH of the blood) is irritating to the cardiac muscle, increasing the risk of an irregular heartbeat (dysrhythmia) and sudden cardiac arrest. Methamphetamine can also raise core body temperature, which acts as a physiologic stressor as well. In the case of Mr. Perez, his body temperature was noted to be 105.4 degrees Fahrenheit an hour and a half after he died.  Typically, a body cools after death, so in all likelihood, his core body temperature was likely even higher at death.



And finally, Mr. Perez was agitated and resisted physically and exerted himself.  This is an additional physiologic stressor compounded to the methamphetamine and anatomic anomalies that increases lactic acid production of muscles and demands more cardiac blood flow.  The lactic acid production is additive to the metabolic acidosis from the methamphetamine use and worsens the irritability of the cardiac muscle, increasing the risk of sudden cardiac arrest.

It should be noted that in the video Mr. Perez could be heard at least once saying, "I can't breathe" right after the backboard was placed on his back before Detective Calvert sat on the board. At face value, one might think this evidence that Mr. Perez could not breathe or ventilate. However, when evaluating the video, Mr. Perez was clearly moving air in and out of his lungs at this time, talking loudly, and had no clinical evidence of ventilatory restriction at the time he was saying this. What was likely happening is that Mr. Perez was having a cardiac event not a pulmonary event.

Patients who come to the emergency department in the process of having a heart attack often describe the feeling of an elephant sitting on their chest or feeling like they can't breathe. This is because the heart is not getting enough blood flow and the symptoms feel like loss of breath. In these cardiac patients, their ventilations are normal, and the oxygenation is normal. The underlying issue is that the heart is not getting enough blood flow.

So, when Mr. Perez said he could not breathe, it is likely that his heart was becoming ischemic by not getting enough blood flow which then led to the sudden cardiac arrest moments later. There was nothing that the emergency medical team of American Ambulance could have done to prevent the cardiac arrest. Changing position or putting the modest amount of weight on the backboard was not going to change the blood flow issues to Mr. Perez's diseased heart that was being aggravated by the methamphetamine and acidosis from his exertion and ongoing struggle.

In summary, Mr. Perez had a heart that was abnormal and at increased risk to go into cardiac arrest. Added to this increased risk was the methamphetamine he ingested and the physical exertion and resistance which made the heart more volatile and worsened all physiologic parameters. It was this combination of events that increased the physiologic demands of the heart that was limited in how much blood could flow through the narrowed "widow maker" and RCA and more likely than not, this was the cause of Mr. Perez's sudden cardiac arrest and death.

### Background

My background is that I am a full-time faculty member in the department of emergency medicine at the University of California, San Diego Medical Center. I am residency trained and board certified in Emergency Medicine. I work full time as a practicing clinician in the Emergency Department of a busy urban hospital and serve as the clinical operations chief for our two

emergency departments with a combined annual census of approximately 75,000 visits.  I currently serve as the Medical Director for Risk Management for UC San Diego Health.  I also serve as the UCSD Medical Center's Medical Risk Management Committee Chair and Allocation Committee Co-Chair, as well as previously having served as the Chair of the Patient Care and Peer Review Committee, each of which are charged with the task of reviewing medical records and making determinations of standard of care. I am also the former Chief of Staff for UC San Diego Health.

As a physician working at an urban based emergency department at a Level 1 trauma center, I have evaluated thousands of patients over the last 25 years who have been intoxicated on drugs and agitated.

I am knowledgeable of peer-reviewed medical and scientific research on the physiological effects of positional restraint and positional asphyxia conducted by others. I have also performed extensive clinical research on human subjects who have been restrained in various positions and with various amounts of weight being placed (articles included in my curriculum vitae) which includes having directly been involved with hundreds of subjects being restrained and studied, hundreds of patients restrained during my work in the emergency department and have personally been restrained with weights placed on me as well.   I have been invited to lecture nationally and internationally on this subject.  Given my own interests in this area, I regularly perform a complete review of the literature regarding restraints and in custody death.

My Emergency Medical Services (EMS)/prehospital background and experience includes having been a flight physician with Lifeflight of San Diego and with Mercy Air, taking care of acutely injured patients at the scene.  My EMS administrative roles include having been the Base Station Medical Director for UCSD, the Medical Director for the Palomar and Southwestern Paramedic College Training Programs, and the former Medical Director for the County of San Diego Emergency Medical Services (EMS) one of the largest EMS systems in the nation. In this

role, I was responsible for protocols and quality assurance of over 1000 paramedics and 4000 EMT's.  I started the UCSD EMS/Disaster Medicine Fellowship Training Program and was the first Fellowship Director and currently serve as the associate Director of the EMS/Disaster Medicine Division in the UCSD Department of Emergency Medicine and as the Medical Director for the North County Fire Protection District, which is a Joint Powers Authority that involves the EMS/fire agencies of 18 municipalities.  I have been a paramedic base hospital physician in San Diego County for over 25 years.  Other previous EMS roles include having been the Medical Director for the Chula Vista Fire Department, the Carlsbad Fire Department, and the Aeromedevac, Aviamedix and AirLink USA Air Ambulance Services.  I was also the Medical Director for the San Diego County Metropolitan Medical Strike Team (MMST) and the UCSD Base Hospital Medical Director, and I also served as EMS medical back up for many SWAT operations. I have written numerous peer reviewed papers on prehospital medicine and operations as well as many book chapters and have lectured nationally and internationally on prehospital care.  I was also the Principal Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study consortium that evaluated treatment options for out of-hospital cardiac arrest and severe traumatic injury for over a decade.

As per Rule 26 formatting, Appendix A is a copy of my current Curriculum Vitae, which includes a list of all publications authored by me.  Appendix B is a list of all cases in which I have testified as an expert in trial or deposition within the preceding four years.  Appendix C is my fee schedule.   The knowledge base that I utilize has been developed over time from my years of clinical practice and experience, reading and training as well as research.  Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability based on the information currently available to me. The opinions may be updated as additional information is provided for review.

Respectfully submitted,

Gary M. Vilke, M.D., FACEP, FAAEM
Professor of Clinical Emergency Medicine
Vice-Chair, Clinical Operations Emergency Medicine
Medical Director, Risk Management, UC San Diego Health System
Medical Director, North County Dispatch JPA

Exhibit M

Exhibit M

ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.
Morgan Anderson on 03/27/2019

```
1              UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

3                   ---oOo---

4   ANTHONY PEREZ, individually,    )
    CECILIA PEREZ, individually,    )
5   TERRALEE PEREZ, individually and )
    as successor in interest to     )
6    Joseph Perez, JOSEPH PEREZ, JR., )
    individually and as successor in )
7    interest to Joseph Perez, and   )
    X.P., a minor, by and through his)
8    Guardian ad Litem, MICHELLE     )
    PEREZ, individually and as       )
9    successor in interest to Joseph )
    Perez.,                         )
10                                  )
         Plaintiffs,                )
11                                  )
       vs.              )Case No.
12                      )1:18-cv-00127-AWI-EPG
    CITY OF FRESNO, COUNTY OF FRESNO,)
13   JAMES ROSSETTI, an individual,  )
    SEAN CALVERT, an individual,    )
14   CHRIS MARTINEZ, an individual,  )
    BRAITHAN STOLTENBERG, an        )
15   individual, ROBERT MCEWEN, an   )
    individual, KARLSON MANASAN, an )
16   individual, JIMMY ROBNETT, an   )
    individual, and DOES 1-10,      )
17   inclusive.,              )
                            )
18       Defendants.        )
19   _____)

20                   ---oOo---

21        DEPOSITION OF MORGAN ANDERSON

22            FRESNO, CALIFORNIA

23        WEDNESDAY, MARCH 27, 2019

24    REPORTED BY:  FLORENCE A. COLBY, CSR NO. 12433

25
```

1       Q.  So that point where the officer stands up

2    off of the restraint board, do you recall where you

3    were positioned whenever that happened?

4       A.  Between the head and the right arm.

5       Q.  Okay.  And was that the point in time

6    whenever you noticed Mr. Perez go unresponsive?

7       A.  I don't remember particularly the exact

8    moment what I was doing at that the exact time.

9       Q.  So, could have been before then, it could

10   have been after?

11      A.  Yes.

12      MS. CARPENTER:  Do you two have questions

13   about the video?

14      MS. REYES:  I do not.

15      MR. GEHLAWAT:  I do.  Do you want me to just

16   go on video?

17      MS. CARPENTER:  Yes.

18      MR. GEHLAWAT:  Okay.

19      MS. CARPENTER:  Because then we can just put

20   it away.

21      MR. GEHLAWAT:  Sure.

22                   EXAMINATION

23   BY MR. GEHLAWAT:

24      Q.  Sir, when we were playing the portion of

25   the video that predated the officer sitting on top of

1   the board, do you recall hearing a voice say, "Sit on

2   top top of that board, sit on that board," did you hear

3   words to that effect when with you were watching the

4   video and listening to it?

5          A.  Yeah, it sounded like someone said, "Sit

6   on it," or "Sit on the board," or something like that.

7          Q.  Okay.  And, as I understand your

8   testimony, it's not that you can't tell if it's your

9   voice, your testimony is that's definitely not your

10  voice; correct?

11         A.  I do not recall telling anybody to sit on

12  an individual because it's not something that I would

13  normally do.

14         Q.  Okay.  So that's different from what I

15  understood your answer to be.  Let me ask it

16  differently.  From what you heard on video as you were

17  sitting here, did that sound like your voice?

18         A.  I can't tell.

19         Q.  Okay.  I am going to play it for you one

20  last time --

21         A.  All right.

22         Q.  And see if you can tell, do you have the

23  time line of exactly what this is, is it 12:00

24         MS. CARPENTER:  I think it's like 12:43.

25         MR. GEHLAWAT:  Okay.  I am going play it

 1   forward now, and I am going to try to put the volume up

 2   on this.

 3          (Whereupon, the recording was played.)

 4          THE RECORDING:  "All right.  You need to un

 5   cuff this left one here.  You've got to -- sit on that

 6   board."

 7   BY MR. GEHLAWAT:

 8          Q.  Okay.  Did you hear, "Get on that board,"

 9   "Sit on the board," or "Get on that board"?

10          A.  Yeah, I heard that.

11          Q.  Okay.  And based on what you just heard,

12   does that sound like your voice?

13          MS. CARPENTER:  Objection.  Asked and

14   answered.  You can answer.

15          THE WITNESS:  I can't tell, no.

16   BY MR. GEHLAWAT:

17          Q.  Okay.  So, as you listen to it, you can't

18   tell if it's your voice, and you don't think you would

19   have said something like that; is that fair?

20          A.  Yes.

21          Q.  Okay.  Do you have any idea who did say

22   that?

23          A.  No.

24          Q.  Do you have any reason to believe that any

25   one person whether it be an EMT, an officer, or a

1        Q.  Okay.  Do you have any training with

2   respect to whether or not it's appropriate to have

3   someone sit on top of a board while someone is

4   underneath the board, and they are in a prone position?

5        A.  Sitting on top of a patient --

6        Q.  Yes.

7        A.  Is generally not a good idea.

8        Q.  Okay.  So, in terms of what transpired in

9   the video that you viewed with one of the officers

10  sitting on top of the board, that would be inconsistent

11  with your training?

12       A.  I have never been in a class or training

13  where they have covered law enforcement or EMS

14  personnel sitting on a person.

15       Q.  Okay.  So that would not be a good idea at

16  least according to you based on your training and

17  experience?

18       A.  It's something generally I would really

19  shy away unless it's absolutely possible.  Yes, you

20  don't sit on people.

21       Q.  And is that because one of the risks is

22  they could asphyxiate and stop breathing?

23       A.  That it one of them, yes.

24       Q.  Did it ever occur to you at some point

25  with respect to this incident that that's something

Exhibit N

Exhibit N

```
 1                UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4   ANTHONY PEREZ, individually,
     CECILIA PEREZ, individually,
 5   TERRALEE PEREZ, individually and
     as successor in interest to Joseph
 6   Perez, JOSEPH PEREZ, JR.,

 7                          Plaintiffs,

 8            vs.                         Case No.
                                         1:18-CV-00127-AWI-EPG
 9   CITY OF FRESNO, COUNTY OF FRESNO,
     JAMES ROSETTI, an individual, SEAN
10   CALVERT, an individual, CHRIS
     MARTINEZ, an individual, BRAITHAN
11   STOLTENBERG, an individual, ROBERT

12                          Defendants.
     _____
13

14

15         VIDEOTAPED DEPOSITION OF JOEL DINES, EMT

16

17                    February 18, 2019

18                       9:50 a.m.

19

20             5200 North Palm, Suite 211

21                  Fresno, California

22

23   REPORTED BY:

24   Mikki L. Morse

25   CSR No. 13642
```

1   BY MS. CARPENTER:

2       Q.   At any time during this incident, did you ever

3   observe any law enforcement officers ever strike, punch,

4   kick, baton, or use any other type of contact weapon on

5   Mr. Perez?

6       A.   No.

7       Q.   In your training and experience, besides the day of

8   the incident, have you ever restrained someone to a restraint

9   board who was in a face down prone position?

10      A.   I believe that was the first time.

11      Q.   During the incident, did you ever place any weight

12  on the board while it was on top of Mr. Perez?

13      A.   No.

14      Q.   On the date of the incident, when you arrived at

15  the Palm and Santa Fe Avenue location, who was with you?

16      A.   It was me, Morgan Anderson, and Jennifer Ortiz.

17      Q.   And where were you at right before you began to

18  respond to that location, like when you first received the

19  call for service?

20      A.   I'm not -- I can't recall if we were at a post or

21  driving.  I can't recall.

22      Q.   That's fine.

23           Tell me everything that you remember carrying or

24  having on your person whenever you first arrived on scene

25  that day.

 1   point where you said that, most of the time, in a situation

 2   like this one, the deescalation occurs after the patient is

 3   placed into the back of the ambulance.  Is that -- do you

 4   remember saying that?

 5          MS. CARPENTER:  I believe that misstates his

 6   testimony.

 7          MR. GEHLAWAT:  Okay.

 8          MS. CARPENTER:  Can you cite to where you're

 9   referring to?

10          MR. GEHLAWAT:  I don't have it specifically, and I

11   can look at it at a break.

12   BY MR. GEHLAWAT:

13      Q.   But do you generally remember that?

14      A.   I'd have to read the transcript.

15      Q.   Okay.  I'll try to get that for you at a break.

16          Now, you indicated that up to the point of this

17   incident, you had never restrained a subject while he or she

18   was in a prone position by applying the -- by putting the

19   backboard on his or her back.  True?

20      A.   That's correct.

21      Q.   How about since this incident up until the present

22   day?  Have you ever responded to a call where you've applied

23   a backboard to the back of someone while they were in a prone

24   position?

25      A.   No.

**ANTHONY PEREZ, ET AL. vs CITY OF FRESNO, ET AL.**
Joel Dines, EMT on 02/18/2019                                    Page 84

```
 1        Q.   And that's in the thousands of calls where you've
 2   responded.  True?
 3        A.   That is correct.
 4        Q.   Have there been situations where you've reported to
 5   a call where someone is in a prone position and then that
 6   person is turned over into the supine position before they're
 7   restrained?
 8        A.   That's correct.
 9        Q.   So the general training you have is to have the
10   person be in a supine position before they're restrained.
11   True?
12        A.   Based on the training, yes.
13        Q.   And is one of the reasons why you're trained that
14   way is because if they're restrained in a prone position,
15   they could asphyxiate and stop breathing?
16             MS. CARPENTER:  Objection.  Calls for speculation.
17             THE WITNESS:  We're trained the best method is to
18   be able to visualize their airway.
19   BY MR. GEHLAWAT:
20        Q.   And I think you indicated that when the backboard
21   was placed onto the back of Mr. Perez's body, you could not
22   visualize his airway.  True?
23        A.   That's correct.
24        Q.   Because before the backboard was placed onto his
25   back, his head was elevated, correct?
```

Exhibit O

Exhibit O

```
 1                  UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3

 4     ANTHONY PEREZ, individually,
       CECILIA PEREZ, individually,
 5     TERRALEE PEREZ, individually and
       as successor in interest to Joseph
 6     Perez, JOSEPH PEREZ, JR.,

 7                              Plaintiffs,

 8              vs.                       Case No.
                                          1:18-CV-00127-AWI-EPG
 9     CITY OF FRESNO, COUNTY OF FRESNO,
       JAMES ROSETTI, an individual, SEAN
10     CALVERT, an individual, CHRIS
       MARTINEZ, an individual, BRAITHAN
11     STOLTENBERG, an individual, ROBERT

12                              Defendants.
       _____
13

14

15         VIDEOTAPED DEPOSITION OF JENNIFER ORTIZ, EMT

16

17                      February 18, 2019

18                          1:36 p.m.

19

20                  5200 North Palm, Suite 211

21                     Fresno, California

22

23     REPORTED BY:

24     Mikki L. Morse

25     CSR No. 13642
```

1    right?

2        A.   Yes.

3        Q.   Okay.  In total, in the course of your career as an

4    EMT with American Ambulance, would you say that you've

5    probably reported to more than a thousand calls over the

6    course of your career?

7        A.   Yeah.

8        Q.   Okay.  Have you ever seen it happen where the

9    backboard's placed on top of someone while they're in a prone

10   position and they're restrained to the backboard?

11       A.   No.  I don't believe so.

12       Q.   So this was the only time in your career that you

13   witnessed it being done that way?

14       A.   I believe so, yes.

15       Q.   Are you trained to have the person restrained to

16   the backboard when they're in a supine position?

17       A.   I don't know that we've ever had training like

18   that.

19       Q.   Okay.  Are you trained that if the board is placed

20   on top of someone in a prone position, that if pressure is

21   applied to the board when they're on -- when it's placed on

22   top of the person, that the person could stop breathing?

23       A.   Have we had training on that?

24       Q.   Yes.

25       A.   No.

Exhibit P

Exhibit P

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

_____

ANTHONY PEREZ, individually,      )
CECILIA PEREZ, individually,      )
TERRALEE PEREZ,                   )
individually, and as             )
successor in interest to          )No. 1:18-cv-00127-AWI-EPG
Joseph Perez, JOSEPH PEREZ,       )
JR., individually and as          )
successor in interest to          )
Joseph Perez, and X.P. a          )
minor, by and through his         )
Guardian ad Litem, MICHELLE       )
PEREZ, individually and as        )
successor in interest to          )
Joseph Perez,                     )
                                  )
          Plaintiffs,             )
                                  )
     vs.                          )
                                  )
CITY OF FRESNO, COUNTY OF         )
FRESNO, JAMES ROSSETTI, an        )
individual, SEAN CALVERT, an      )
individual, CHRIS MARTINEZ,       )
an individual, BRAITHAN           )
STOLTENBERG, an individual,       )
ROBERT MCEWEN, an                 )
individual, KARLSON MANASAN,      )
an individual, JIMMY              )
ROBNETT, an individual, and       )
DOES 1-10, inclusive,             )
                                  )
          Defendants.             )
_____)


VIDEOTAPED DEPOSITION

OF

SEAN CALVERT

Wednesday, March 6, 2019

Fresno, California


Reported by:  Bree Mervin, CSR No. 13057, RPR, CRR

62

```
10:12:14   1        A.   Yes.

10:12:15   2        Q.   And were they attached to the backboard in a

10:12:19   3   way that they were supine?

10:12:22   4        A.   Yes.

10:12:22   5        Q.   So the back of the person was on the board;

10:12:26   6   is that true?

10:12:28   7        A.   That is true.

10:12:28   8        Q.   Had you ever seen it done before, where the

10:12:32   9   board was placed on top of someone's back while he or

10:12:37  10   she was in a prone position?

10:12:39  11        A.   I had not.

10:12:42  12        Q.   But you recall with respect to this

10:12:47  13   incident, that it was one of the EMS workers who said

10:12:52  14   that the board was going to be placed on top of

10:12:55  15   Mr. Perez's back?

10:12:56  16        A.   Yes.

10:12:57  17        Q.   Was there any discussion prior to that or at

10:13:03  18   that time about sliding the board underneath

10:13:05  19   Mr. Perez's body, as opposed to placing it on top of

10:13:08  20   him?

10:13:09  21        A.   Yes.

10:13:09  22        Q.   Okay.  And who had that discussion?

10:13:13  23        A.   I do not recall.

10:13:14  24        Q.   Were you participating in that discussion?

10:13:16  25        A.   I was not.
```

10:13:17   1        Q.   Were you the one who suggested that the

10:13:19   2   board be placed underneath Mr. Perez's body?

10:13:22   3        A.   No.

10:13:22   4        Q.   Once that idea was proposed, do you recall

10:13:30   5   what, if anything, was said in response?

10:13:35   6        A.   Which idea?

10:13:36   7        Q.   The idea of placing the board underneath

10:13:39   8   Mr. Perez's body instead of on top, was anything said

10:13:44   9   in response?

10:13:44  10        A.   Yes.

10:13:45  11        Q.   What was said?

10:13:47  12        A.   Someone had said, I believe it was the

10:13:49  13   paramedic said, "We're just going to place the board

10:13:53  14   on his back so you guys can sit on him."

10:13:57  15        Q.   Okay.  Prior to the date of this incident,

10:14:01  16   talking about all of the encounters that we had

10:14:05  17   mentioned just previously, had there ever been a

10:14:10  18   circumstance where that happened, where a backboard

10:14:14  19   was placed on top of a subject in a prone position,

10:14:17  20   and one or more of the officers or deputies was

10:14:20  21   instructed to sit on top of the board?

10:14:23  22        A.   No.

10:14:24  23        Q.   Okay.  And so when you heard that being said

10:14:31  24   by the paramedics, did that give you concern?

10:14:38  25        A.   No.

Exhibit Q

```
 1                UNITED STATES DISTRICT COURT

 2         EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

 3                        ---oOo---

 4

 5  ANTHONY PEREZ, individually,      )
    CECILIA PEREZ, individually,      )
 6  TERRALEE PEREZ, individually and  )
    as successor in interest to       )
 7  Joseph Perez, JOSEPH PEREZ, JR.,  )
    individually and as successor in  ) Case No.
 8  interest to Joseph Perez, and     ) 1:18-CV-00127-AWI-
    X.P., a minor, by and through his ) EPG
 9  Guardian ad Litem, MICHELLE       )
    PEREZ, individually and as        )
10  successor in interest to Joseph   )
    Perez,,

11
             Plaintiffs,
12
             -vs-
13
    CITY OF FRESNO, COUNTY OF FRESNO,
14  JAMES ROSSETTI, an individual,
    SEAN CALVERT, an individual,
15  CHRIS MARTINEZ, an individual,
    BRAITHAN STOLTENBERG, an
16  individual, ROBERT MCEWEN, an
    individual, KARLSON MANASAN, an
17  individual, JIMMY ROBNETT, an
    individual, and DOES 1-10,
18  inclusive,

19             Defendants.

20
    Fresno, California               February 28, 2019
21

22                        ---oOo---

23          DEPOSITION OF MICHAEL CHAMBLISS, M.D.

24  Reported by:
    Brooke Meyer, CSR
25  License No. 13886
```

1          MR. GEHLAWAT:  Vague.

2          THE WITNESS:  The ones I see die.  I can't

3  respond to a clinical setting for that.

4  BY MR. SAIN:

5      Q.  Mechanically, based on your examination of

6  Mr. Perez, mechanically what happened to cause him to

7  asphyxiate?

8      A.  Mechanically, a backboard was placed on Mr. Perez

9  in such a fashion as he is also being placed in a hobble

10  type condition, and during that particular process,

11  greater than a ten minute restraining process, he becomes

12  unresponsive.

13      Q.  Anything else?

14      A.  Compression asphyxia during restraint.

15      Q.  In terms of -- is there any other mechanics than

16  what we just said, that caused Mr. Perez to die by

17  asphyxia in your opinion?

18      A.  I'm utilizing the information I had in this case.

19      Q.  I am trying to find out if there is anything more

20  than what you just said?

21      A.  I just stated it.

22      Q.  To be clear, we need it on the record.  Other

23  than what you stated on the record, are there any other

24  mechanical means that you're aware of, that in your

25  opinion caused Mr. Perez to suffer from an asphyxial

1  death?

2      A.  I have no other mechanical findings there.  I

3  have to relate the information I have to what I see from

4  the autopsy to what the information is from the

5  interviews.  I utilize the interviews with what my autopsy

6  findings were, and that's what I'm basing my opinion on.

7      Q.  According to the information that was relayed to

8  you, was Mr. Perez in a flat, prone position for the

9  entire period of time he was restrained on the ground?

10      A.  He was wobbling back and forth from what I can

11  recall from reading the different individuals who were

12  being interviewed.

13      Q.  Okay.  According to the information provided to

14  you, were there periods of time where Mr. Perez was on his

15  side, restrained on the ground?

16      A.  On his side?

17      Q.  Restrained on the ground on his side as opposed

18  to being in a flat, prone position?

19      A.  There's no individual that I recall reading that

20  said he was on his side for any specific period of time.

21      Q.  Other than compression asphyxia associated with

22  restraint, was there any other proximate cause of death

23  that you found to be present for Mr. Perez?

24      A.  No.

25      Q.  Other than methamphetamine toxicity, was there

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

ANTHONY PEREZ, individually,       )
CECILIA PEREZ, individually,       )
TERRALEE PEREZ, individually       )
and as successor in interest to    )
Joseph Perez, JOSEPH PEREZ, JR.,   )
individually and as successor      )
in interest to Joseph Perez,       )
and X.P., a minor, by and          )   No. 1:18-cv-00127-
through his Guardian ad Litem,     )       AWI-EPG
MICHELLE PEREZ, individually       )
and as successor in interest to    )
Joseph Perez,                      )
                                   )
            Plaintiffs,            )
                                   )
       vs.                         )
                                   )
CITY OF FRESNO, COUNTY OF          )
FRESNO, AMERICAN AMBULANCE,        )
etc., et al.,                      )
                                   )
            Defendants.            )
_____)

CERTIFIED COPY

VOLUME II

VIDEO CONFERENCE DEPOSITION OF

MICHAEL CHAMBLISS, M.D.

APPEARING REMOTELY FROM FRESNO, CALIFORNIA

FEBRUARY 19, 2021

Reported By:
SUSAN MARIE BOGGS
CSR NO. 5170, RPR
NO. 21-97306



THE SULLIVAN GROUP OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860 | 323.938.8750

01:37  1       A     Yes.

       2       Q     There are many practitioners of forensic

       3  pathologists such as yourself who do not believe that

       4  there's a causal relationship between restraints and

01:37  5  mechanical asphyxial compression-type death; true?

       6       A     It's a case-by-case situation.  I still believe

       7  that there are certain cases where you can have a

       8  restraint asphyxia, but you have to sort through

       9  multiple factors before you finally get to that

01:38 10  conclusion.

      11       Q     Okay.  And that's the conclusion that you came

      12  to in this case, that it was a restraint-related

      13  asphyxial death; correct?

      14       A     That's correct.

01:38 15       Q     And none of the literature that you reviewed

      16  recently or in the past can shake you off that opinion;

      17  true?

      18       A     True.  I actually -- one additional thing is I

      19  reviewed the case with my colleague here, Dr. Gopal,

01:38 20  who's the chief medical examiner.  And his opinion was

      21  the same as mine on this case.

      22            And he has just as extensive amount of

      23  experience as I do.  So in this case I would say it is a

      24  case of compressive asphyxia during restraint.

01:39 25       Q     And my earlier question was that there are a

03:16   1        Q     No gun was used; correct?

        2        A     That's correct.

        3        Q     There was no chokehold applied; correct?

        4        A     Not from anything I've read.  I'll put it that

03:16   5    way.  No.

        6        Q     We have no evidence of some officer putting his

        7    knee or his heel -- his knee or his heel on the neck of

        8    this individual; true?

        9        A     That's true.

03:16   10       Q     You saw no evidence of knee strikes; true?

        11       A     That's true.

        12       Q     And in terms of the cause of death here, you

        13   ascribed it to homicide meaning by the hand of another;

        14   correct?

03:17   15       A     That is correct.

        16       Q     And by labeling it homicide, you have not

        17   ascribed and have no opinion concerning intent; correct?

        18       A     That's -- it has no legal aspect to it.  It's

        19   what we do from the medical examiner's categories of

03:17   20   classifications of death we have.

        21       Q     Right.

        22       A     It's a classification of death.

        23       Q     Right.  You don't determine intent, do you?

        24       A     No, we don't.

03:17   25       Q     And you don't have any opinion regarding