1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANTHONY PEREZ, et al.,<br><br>**Plaintiffs**<br><br>v.<br><br>CITY OF FRESNO, et al.,<br><br>**Defendants** | CASE NO. 1:18-CV-0127 AWI EPG<br><br>**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND THE PARTIES' RESPECTIVE MOTIONS TO EXCLUDE**<br><br>(Doc. No. 142, 144, 145, 147, 148, 153, 157) |

This case stems from a fatal encounter between decedent Joseph Perez ("Perez") and members of the City of Fresno Police Department, the County of Fresno Sheriff's Department, and American Ambulance.  In their First Amended Complaint ("FAC"), the Plaintiffs, who are Perez's family and successors in interest, allege claims under 42 U.S.C. § 1983 for violations of the Fourth Amendment, Fourteenth Amendment, and *Monell* liability, as well as state law claims for battery, negligence, gross negligence, and Cal. Civ. Code § 52.1.  The claims are alleged against the "the City Defendants," who are the City of  Fresno ("the City") and police officers James Rosetti ("Rosetti"), Sean Calvert ("Calvert"), and Chris Martinez ("Martinez") (collectively the "City Officers"), the "County Defendants," who are the County of Fresno ("the County"), and sheriff deputies Braithan Stoltenberg ("Stoltenberg"), Robert McEwen ("McEwen"), Karlson Manasan ("Manasan"), and Jimmy Robnett ("Robnett") (collectively the "County Deputies"), and the "AA Defendants," who are American Ambulance ("AA") and AA paramedic Morgan Anderson ("Anderson").  Currently before the Court are three motions for summary judgment, one by the City Defendants, one by the County Defendants, and one by the AA Defendants.  For the reasons that follow, the Court will grant the individual Defendants qualified immunity, grant summary judgment in favor of the City and the County with respect to the *Monell* claima, and decline to exercise supplemental jurisdiction over the remaining state law claims.

1 ### <u>SUMMARY JUDGMENT FRAMEWORK</u>

2 Summary judgment is proper when it is demonstrated that there exists no genuine issue as

3 to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.

4 Civ. P. 56; <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Fortyune v. American Multi-</u>

5 <u>Cinema, Inc.</u>, 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears

6 the initial burden of informing the court of the basis for its motion and of identifying the portions

7 of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

8 issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Soremekun v. Thrifty</u>

9 <u>Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome

10 of the suit under the governing law. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49

11 (1986); <u>United States v. Kapp</u>, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to

12 a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-

13 moving party. <u>Anderson</u>, 477 U.S. at 248; <u>Freecycle Sunnyvale v. Freecycle Network</u>, 626 F.3d

14 509, 514 (9th Cir. 2010).

15 Where the moving party will have the burden of proof on an issue at trial, the movant must

16 affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

17 <u>Soremekun</u>, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an

18 issue at trial, the movant may prevail by presenting evidence that negates an essential element of

19 the non-moving party's claim or by merely pointing out that there is an absence of evidence to

20 support an essential element of the non-moving party's claim. <u>See James River Ins. Co. v. Herbert</u>

21 <u>Schenk, P.C.</u>, 523 F.3d 915, 923 (9th Cir. 2008); <u>Soremekun</u>, 509 F.3d at 984. If a moving party

22 fails to carry its burden of production, then "the non-moving party has no obligation to produce

23 anything, even if the non-moving party would have the ultimate burden of persuasion at trial."

24 <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the

25 moving party meets its initial burden, the burden then shifts to the opposing party to establish that

26 a genuine issue as to any material fact actually exists. <u>See Matsushita Elec. Indus. Co. v. Zenith</u>

27 <u>Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Nissan Fire</u>, 210 F.3d at 1103. The opposing party cannot

28 "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence

1  that 'sets forth specific facts showing that there is a genuine issue for trial.'"  <u>Estate of Tucker v.</u>

2  <u>Interscope Records</u>, 515 F.3d 1019, 1030 (9th Cir. 2008).

3        The opposing party's evidence is to be believed, and all justifiable inferences that may be

4  drawn from the facts placed before the court must be drawn in favor of the opposing party.  <u>See</u>

5  <u>Anderson</u>, 477 U.S. at 255; <u>Narayan v. EGL, Inc.</u>, 616 F.3d 895, 899 (9th Cir. 2010).  While a

6  "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable

7  inference" must still be rational or reasonable.  <u>See</u> <u>Narayan</u>, 616 F.3d at 899.  Summary judgment

8  may not be granted "where divergent ultimate inferences may reasonably be drawn from the

9  undisputed facts."  <u>Fresno Motors, LLC v. Mercedes Benz USA, LLC</u>, 771 F.3d 1119, 1125 (9th

10  Cir. 2015).  Inferences are not drawn out of the air, and it is the opposing party's obligation to

11  produce a factual predicate from which the inference may be drawn.  <u>See</u> <u>Sanders v. City of</u>

12  <u>Fresno</u>, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008).  "A genuine issue of material fact does not

13  spring into being simply because a litigant claims that one exists or promises to produce

14  admissible evidence at trial."  <u>Del Carmen Guadalupe v. Agosto</u>, 299 F.3d 15, 23 (1st Cir. 2002);

15  <u>see</u> <u>Bryant v. Adventist Health System/West</u>, 289 F.3d 1162, 1167 (9th Cir. 2002).  The parties

16  have the obligation to particularly identify material facts, and the court is not required to scour the

17  record in search of a genuine disputed material fact.  <u>Simmons v. Navajo Cnty.</u>, 609 F.3d 1011,

18  1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be defeated . . . by

19  evidence that is 'merely colorable' or 'is not significantly probative.'"  <u>Anderson</u>, 477 U.S. at 249-

20  50; <u>Hardage v. CBS Broad. Inc.</u>, 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party

21  fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is

22  entitled to summary judgment.  <u>Nissan Fire</u>, 210 F.3d at 1103.

23

24                                    **FACTUAL BACKGROUND**[1]

25        On May 17, 2017, City police officers Rosetti, Calvert and Martinez encountered Perez at

26

27  [1] "CiJF" refers to "City's Joint Undisputed Fact," "CoJF" refers to "County's Joint Undisputed Fact," "CiSF" refers to "City's Separate Fact," "CoSF" refers to "County's Separate Fact," "AASF" refers to "AA Defendants' Separate

28  Fact," and "PSF" refers to "Plaintiffs' Separate Fact."  Plaintiffs submitted the same separate facts in opposition to the three summary judgment motions.

10:30 a.m.  CiJF No. 1; CoJF No. 1.  The City Officers had not been dispatched regarding Perez. CiJF No. 2; CoJF No. 2.  When the City Officers first encountered Perez, he was standing in the right lane of Palm Ave. in Fresno, but was walking in and out of the roadway waiving his arms and yelling what sounded like "help" in the direction of the officers.  <u>See</u> CiSF No. 2; CoSF No. 2; PSF No. 1; Martinez Depo. 11:20-12:4.  Perez was a little over 6' tall and weighed 241 lbs.  <u>See</u> Doc. No. 152-2 at ECF p. 220.  The City Officers had no information that Perez had committed a crime.  <u>See</u> PSF No. 3.  Martinez spoke to Perez, but what Perez "was saying wasn't really making any sense."  <u>See</u> PSF No. 4.  Perez was talking to himself and believed that people were chasing and hitting him.  <u>See</u> CiSF No. 3; Calvert Depo. 54:20-24.  Nevertheless, Perez was cooperative with the City Officers.  <u>See</u> PSF No. 6.  Perez was asked to sit down, and he sat down on the curb. <u>See</u> Martinez Depo. 25:18-26:8, 27:12-14, 28:21-25.  After three to five minutes, Martinez handcuffed Perez while Perez was sitting on the curb.  <u>See</u> CiSF No. 6; CoSF No. 3; PSF No. 5; Martinez Depo. 27:12-14.  Martinez testified that he decided to handcuff Perez because Perez was kicking his feet out and rocking back and forth and looked like he was trying to get up, there was traffic in the area, and Rosetti was standing in front of Perez and Rosetti could have been in danger from the traffic if Perez got up suddenly.  <u>See</u> Martinez Depo. 25:18-27:11; <u>see also</u> CiSF No. 6.  Perez was cooperative during the handcuffing process.  <u>See</u> Calvert Depo.  21:3-7. Martinez patted Perez down after the handcuffing and no weapons were found.  <u>See</u> PSF No. 8.

The County Sheriff's Office received a call for service regarding a Hispanic male that was acting erratic, sprinting through the street, screaming, and hiding in bushes.  CiSF No. 1; CoSF No. 1.[2]  Stoltenberg and McEwen responded to the call and arrived on the scene at the same time. CoJF No. 3.  McEwen and Stoltenberg saw Perez handcuffed and seated on a curb with Rosetti, Calvert, and Martinez present.  <u>See</u> CoJF No. 4; PSF No. 21.

---

[2] Plaintiffs object that this fact is "undisputed as to the nature of the call," but disputed "as to what the officers observed when they first encountered Perez."  <u>See</u> Doc. No. 152-1 at 2.  Plaintiffs' response creates no genuine dispute.  The proposed fact relates exclusively to the call received by the Sheriff's Department.  The fact in no way discusses what any officer or deputy observed when they encountered Perez.  Plaintiffs make similar objections to many other proposed facts and argue that a dispute exists for reasons that do not actually address the proposed fact.  In other words, the response addresses a straw man, not the actual proposed fact.  The Court will not expressly address each instance when Plaintiffs make this kind of objection or purported dispute.  It is enough to globally hold that such responses are improper and create no genuine disputes.

Rosetti told Stoltenberg that City police officers would be taking over the scene and that EMS had been called.[3]  See Stoltenberg Depo. 27:13-19; AASF No. 10.  The City Officers and County Deputies all believed that Perez was under the influence of a controlled substance.  CiJF No. 3; CoJF No. 5.  Perez was saying things to people who were not there, made statements like "give me another chance.  I won't do this anymore.  Help me out.  I can redeem myself.", kicked at people who weren't there while he was talking, and was flicking his hands rapidly while they were cuffed behind his back.  See CoSF No. 6;[4] McEwen Depo. 21:8-16, 77:4-11.  Although Perez was still cooperative, McEwen stood directly in front of Perez to prevent him from standing up and possibly running into traffic.  See CiSF No. 8; Doc. No. 150-1 at 5-6; Doc. No. 164 at 7.  A bystander briefly saw Perez sitting on the curb and described Perez as "sitting there looking around" and "looked either delusional or something was wrong with him," while the law enforcement officers were talking near him.  See Ramirez Depo. 12:10-23.

Approximately five minutes after the City officers made contact with Perez, Rosetti made his first of two calls for EMS assistance.  See CiJF No. 4; CoJF No. 6.  Rosetti requested a "Code Two" because he believed that Perez was a danger to himself and others, i.e. a "5150."[5]  CiJF No. 4; CoJF No. 6.  Rosetti made this call while Perez was seated on the curb in handcuffs.  See Rosetti Depo. 29:21-23.

Perez on his own then rocked backwards and stood up in one motion.  See Calvert Depo.

---

[3] Rossetti was a sergeant and Calvert and Martinez's supervisor.  See PSF No. 133.  If Rossetti felt that at any point in the encounter with Perez that an officer was doing something inappropriate or inconsistent with City training, then he would have a duty to intervene and stop the improper conduct.  See PSF No. 134.

[4] Plaintiffs dispute/object to this proposed fact, and to others, because Fresno Police Department policy required that interactions with Perez be recorded and this interaction (as well as others) was not recorded.  However, the County Defendants correctly respond that this is a City policy and thus, has no application or relevance to the actions of the County Defendants.  Further, that an interaction was not recorded does not mean that all descriptions of the interaction are disputed.  While the Court will consider the City's recording policy with respect to the City Defendants and in the analysis of the City Defendants' motion, the Court does not view any apparent violation of that policy to create a *per se* genuine dispute of material fact.

[5] "§ 5150" refers to Cal. Wel. & Inst. Code § 5150, and "is a well-recognized code for a person who is potentially a danger to themselves or others due to mental illness and/or being under the influence of alcohol or drugs."  S.B. v. County of San Diego, 864 F.3d 1010, 1011 (9th Cir. 2017).  Section 5150 allows peace officers "upon probable cause to take into custody for evaluation or treatment, for up to 72 hours, a person who is a danger to himself or others due to a mental health disorder."  Isayeva v. Sacramento Sheriff's Dept., 872 F.3d 938, 943 (9th Cir. 2017).  That is, a "detention under § 5150 is warranted if there is probable cause that an individual is a danger to others, or to himself or herself."  Bias v. Moynihan, 508 F.3d 1212, 1222 (9th Cir. 2007).

23:22-24:15; McEwen Depo. 20:20-22.  Calvert instructed Perez to sit back down, but Perez did not do so.  CoSF No. 11.  Calvert grabbed Perez's shirt from behind.  PSF No. 17.  Calvert, Martinez, and McEwen then took Perez to the ground, which took between 30 seconds and one minute.  Se Calvert Depo. 29:1-10; see also PSF No. 19.  Perez was face down with his stomach on the ground, but kept rocking back and forth from his left to his right.  See id. at 29:11-18; see also PSF No. 19.  Martinez turned on his body camera after Perez was prone on the ground.  PSF No. 26.[6]

While on the ground, Perez was kicking, attempting to roll, and scraping and banging his head on the cement.  See McEwen Depo. 29:12-18, 36:21-37:6; Calvert Depo. 30:11-13, 39:15-23. Martinez was attempting to control Perez's legs by applying pressure across Perez's thighs.  See Calvert Depo. 32:5-6; McEwen Depo. 27:2-13.  Calvert put his hand between Perez's shoulder blades and applied "positive pressure."  See PSF Nos. 30, 31.  McEwen was applying pressure to Perez's back.  See PSF No. 38.  McEwen and Calvert applied pressure on Perez's back to prevent Perez from getting up.  PSF No. 38.  Stoltenberg observed McEwen, Martinez, and Calvert with their hands on Perez and attempted to hold Perez down by pressing down on Perez's left shoulder and left upper back.  See PSF Nos. 35, 36.  McEwen believed that Perez was trying to get up, and the officers and deputies "just continued to hold him down to the ground so that he would not get up."[7]  PSF No. 37.  McEwen testified that Perez was attempting to turn or get up and that, in order to gain compliance, McEwen applied three knee strikes to Perez's left side, but the strikes were completely ineffective.  See McEwen Depo. 68:16-69:1.  McEwen also applied a wrist lock on Perez.  See PSF No. 47.  Rosetti observed Calvert strike Perez twice in the lower right side of the body with his knees.  PSF No. 45.  McEwen testified that Perez was not complying with requests

---

[6] Fresno Police Department policy calls for body cameras to be activated to record situations where officers reasonably believe they will effect an arrest or detention, including traffic stops and consensual encounters made with the intent to develop reasonable suspicion to detain.  PSF No. 27.  The written policy provides that officers "shall record interactions including, but not limited to . . . arrests and detentions."  PSF No. 28.  Martinez failed to activate his body camera during the initial encounter with Perez.  PSF No. 26.  Martinez testified that he attempted to activate the body camera when he first contacted Perez, but because the power switch on the camera was off, the camera did not record.  See Martinez Depo. 49:7-17.

[7] At the time of the incident, Martinez and Calvert estimated that they weighed 190 lbs. with their gear on, and Stoltenberg estimated that he weighed 160 lbs.  See PSF Nos. 32, 33, 34.

1   to stop thrashing about and to remain calm.  See McEwen Depo. 28:20-22.  McEwen, Martinez,

2   and Calvert testified that they were attempting to stop Perez from injuring himself and/or others.

3   See Calvert Depo. 39:17-23; McEwen Depo. 28:12-15, 44:7-45:2; Martinez Depo. 35:2-6, 40:21-

4   24; see also Robnett Depo. 25:5-8.  About a minute and half after Rosetti had called for EMS

5   under a "Code Two," and while Perez was in a prone position, Rosetti made his second call to

6   EMS.  See CiJF No. 4; CoJF No. 6; Rosetti Depo. 30:8-10.  Rosetti's second call elevated the

7   response to a "Code Three."  CiJF No. 4; CoJF No. 6.

8        Stoltenberg advised dispatch that Perez was being combative.  CoSF No. 18.  Deputies

9   Robnett and Manasan heard Stoltenberg's advisement of a combative suspect and headed towards

10  the scene.  See CoSF No. 19.  Manasan was a trainee, and Robnett was Manasan's training officer

11  that day.  See Manasan Depo. 9:4-11.  Upon their arrival at the scene, Robnett and Manasan were

12  told to standby as they were not needed at that time and an ambulance was on its way.  CoSF No.

13  20.  Robnett observed that Perez was in a prone position and that McEwen was on Perez's back.

14  See PSF No. 39.  Robnett testified that Perez was screaming/yelling.  See Robnett Depo. 19:21-24,

15  34:10-13.  Robnett observed the officers and deputies applying "positive pressure" to Perez's back

16  while Perez was lying prone and attempting to lift his (Perez's) body.  See PSF Nos. 40, 41.

17  Manasan also observed Perez in a prone position.  See PSF No. 42.  Manasan did not observe

18  Perez hitting his head against the ground, but did hear Perez yelling "dad."  See PSF Nos. 43, 44.

19  Robnett and Manasan went back to their patrol vehicle where Robnett stood and monitored the

20  situation.  CoSF No. 21.

21        McEwen testified that he and Calvert were attempting to restrain Perez's head so that Perez

22  would not injure it on the cement, but their efforts were not working so he directed Stoltenberg to

23  retrieve a towel.  See McEwen Depo. 44:24-45:20.  Perez was still screaming and yelling.  See id.

24  at 46:9-13; see also Robnett Depo. 34:10-13.  Stoltenberg retrieved a towel from McEwen's

25  vehicle.  See Stoltenberg Depo. 30:15-19.  McEwen, Calvert, and Stoltenberg observed blood on

26  the ground that they believed was from Perez's face or head.  See id. at 33:3-10; Calvert Depo.

27  40:2-41:2; McEwen Depo. 47:6-7.

28        About eight minutes after Perez was in a prone position, a towel was wrapped around

Perez's face/forehead area.  See PSF No. 48; Calvert Depo. 41:8-13.  McEwen placed the towel under Perez's chin and face and then lifted Perez's head off the ground with it, holding the towel in each hand.  PSF No. 51.  With the towel wrapped around Perez's head, McEwen held one end of the towel in each hand and pulled on the towel to keep Perez's head off the ground so that Perez would not damage his head any further.  See PSF No. 52; CoSF No. 25;[8] Calvert Depo. 41:8-42:6.  Robnett saw McEwen holding Perez's head up with a towel and walked over to see what was happening.  See Robnett Depo. 28:2-8.  Robnett saw that the towel completely covered Perez's face and he could only see the top of Perez's head.  See PSF No. 49.  Robnett asked Perez what his name was and if he could breathe, to which Perez respond "yes" and that his name was Joseph.  See Robnett Depo. 28:9-15; McEwen Depo. 46:16-47:2; see also CiSF No. 18; CoSF No. 28.  Stoltenberg and McEwen heard Robnett ask Perez if he could breathe, and McEwen or others told Perez to relax and breathe.  See McEwen Depo. 56:2-10; Stoltenberg Depo. 64:7-11.  Perez also continued to talk and scream, saying the same things that he had been repeating since the officers and deputies encountered him.  See McEwen Depo. 46:9-13.  Robnett then asked dispatch if EMS was in route and was informed that EMS had gone to the wrong location.  See CoJF No. 8; CoSF No. 29; see also CoJF No. 5.

Perez's cousin, Enrico Perez ("Enrico"), drove by the scene.  See Perez Depo. 12:2-5, 26:10-12.  Enrico estimated that he was 40 feet away from the scene, see id. at 19:20-24, and observed the scene for "probably 10 seconds at most."  Id. at 22:10-12.  Enrico slowed down and saw four law enforcement officers restraining Perez while Perez was on his belly, although he did not know that it was Perez on the ground.  See id. at 12:10-12, 13:11-12.  Enrico observed a white "shirt-like object" completely wrapped around Perez's head and face.  See id. at 12:12-14.  Enrico saw two officers were at Perez's arms, it appeared that Perez was handcuffed, one officer was on Perez's legs, one officer was on Perez's shoulder blades with the white object, and Perez was not moving.  See id. at 12:14-13:2.  Enrico testified that the officer at Perez's legs was actually sitting

---

[8] Plaintiffs argue that this proposed fact, along with others, are disputed because McEwen or other officers did not prevent Perez from injuring himself since McEwen or other officers participated in the killing by asphyxiation of Perez.  This is argumentative and does not actually address the proposed fact.  The proposed fact addresses the reasons that McEwen placed a towel on Perez's head/face.  Plaintiffs' position is a point of advocacy that is properly suited to arguments in an opposition brief, it does not actually address or dispute the specific assertion of CoSF No. 25.

on the calf-area of the legs, see id. at 20:18-24, and the officer with the white object actually had his knees on Perez's shoulder blades or perhaps near Perez's spine.  See id. at 20:18-19, 21:2-13. Enrico also observed Perez slightly moving his "shoulders to head area" around/back and forth. Id. at 18:15-19:13.

Robnett was concerned that a City officer (Martinez) would get kicked in the face by Perez, so he ordered Manasan to retrieve a Ripp restraint[9] to try and control Perez's feet.  See Robnett Depo. 30:2-10, 31:12-18.  Martinez contained Perez's feet while the Ripp restraint was applied by Robnett and Manasan.  PSF No. 55.  Perez was kicking his legs and trying to lift his chest up.  See Manasan Depo. 28:2-13; PSF No. 61.  Manasan and Robnett wrapped the Ripp restraint around Perez's ankles and tightened it.  See Manasan Depo. 29:19-24; Robnett Depo. 30:20-22.  The Ripp restraint was looped around the handcuffs and back onto itself.  See PSF No. 63; see also CoSF No. 34.  After the Ripp restraint was applied and tightened, Perez's legs from the knee down (i.e. shins and feet)[10] were lifted up off the ground.  See Manasan Depo. 29:16-25. It was the Ripp restraint being looped around the handcuffs that were keeping Perez's shins and feet elevated.  See id. at 30:9-31:3.  However, it appears that Perez was still able to move or kick his legs.  See CiSF No. 20; CoSF No. 33; McEwen Depo. 38:23-39:10.  Perez remained in a position with shins and feet lifted off the ground between 30 seconds and one minute. PSF No. 65.

AA had received a call for assistance at 10:39 a.m. and made contact with Perez at approximately 10:52 a.m.  See AASF No. 10.  Three AA personnel were on scene, paramedic Anderson,[11] EMT Joel Dines ("Dines"), and trainee Jennifer Ortiz ("Ortiz").  See PSF No. 75.  AA personnel noticed that officers were holding Perez's face up with a white towel and Perez was "actively resisting" the officers.  See Dines Depo. 26:7-22.  Perez was screaming and there

---

[9] A Ripp restraint is a kind of ankle or knee hobble.  See Harris v. University of Ariz. Police Dept., 2017 U.S. Dist. LEXIS 129421, *10 (D. Ariz. Aug. 14, 2017); Defoe Expert Report at p.15.  A "Ripp restraint" appears to refer to a particular form of restraint manufactured by Ripp International.  See https://www.rippinternational.com; Defoe Expert Report at p.15

[10] The parties do not use the term "shins and feet," rather, that is the Court's description because using the term "legs" could be ambiguous in this context.

[11] Anderson is a paramedic who is a licensed health care provider, subject to the applicable standard of care.  AASF No. 19.  For purposes of this motion only, the AA Defendants do not dispute that Anderson was acting under color of law.  See Doc. No. 147 at 11 n.1.

appeared to be a "big struggle."  <u>See</u> Ortiz Depo. 51:18-24.  Anderson described Perez as

thrashing, flailing, and bucking.  <u>See</u> Anderson Depo. 38:19-25.  Anderson was concerned about

the towel because it was going to restrict how much a person can breathe. PSF No. 53. Also, when

the AA paramedics arrived, the Ripp restraint was unlooped from the handcuffs.  <u>See</u> CoSF No. 35.

The looped Ripp restraint had been on Perez between 30 seconds and one minute.  <u>See</u> <u>id.</u>

The AA personnel took the lead in making medical and related hospital transport

decisions, and the law enforcement officers deferred to the paramedics.  <u>See</u> AASF No. 15; CiSF

No. 23; McEwen Depo. 92:7-11; Robnett Depo. 41:5-20; Stoltenberg Depo. 43:11-16.  Through

training and experience, the County Deputies defer to paramedics and the paramedics' judgment

on how to handle a call.  <u>See</u> CoSF No. 38. City officers are trained to defer to medical responders

and the responders' judgment on how to handle a call.  <u>See</u> CiSF No. 24.  However, the officers

and deputies would not defer to emergency medical personnel, but instead would refer to their

own training in terms of the use of force.  <u>See</u> Calvert Depo. 64:21-65:4; Stoltenberg 43:22-44:1.

Anderson asked about the white towel and was informed that Perez kept banging his head

on the ground.  <u>See</u> Anderson Depo. 50:16-21.  Anderson ordered the officers to uncover Perez's

mouth area and to either use the towel to hold Perez on the forehead or for an officer to use his

hands to keep ahold of Perez's forehead.  <u>See</u> <u>id.</u> at 50:21-25.  Anderson testified that Perez's

actions were creating too many barriers for Anderson to render medical treatment and perform a

full assessment of Perez.  <u>See</u> Anderson Depo. 37:13-39:3.  AA personnel brought out a blue

backboard.  <u>See</u> CoSF No. 39.  There was a discussion about the best way to put Perez on the

backboard. <u>See</u> PSF No. 89; Stoltenberg Depo. 46:1-3. Anderson instructed the deputies and

officers that they were going to restrain Perez to a backboard while Perez was in a prone position.

PSF No. 77. Anderson informed the officers and deputies that "[W]e're going to put it on his back

and you guys can sit on this." PSF No. 81.  AA personnel placed the backboard on Perez's back

while Perez was on his stomach.  <u>See</u> PSF No. 87; CoSF No. 39. The backboard was placed on

Perez in such a way that it covered his legs, buttocks, and lower back.[12]  PSF No. 90.  Perez was

---

[12] From the time that Perez was taken down and first in a prone position to the time that the backboard was placed between 15 and 16 minutes had elapsed.  <u>See</u>  PSF No. 93.

still handcuffed and the white towel was still elevating Perez's head.  See PSF Nos. 88, 91.

McEwen removed the white towel, and then stepped aside.  See CoSF Nos. 40.  Perez was still

yelling and acting resistant after the backboard was placed.  See Dines Depo. 99:1-14; Ortiz Depo.

59:3-6; Anderson Depo. 38:19-39:8.  While placing the backboard, Perez continued to yell and

vocalize and then stated, "I can't breathe."  CiJF No. 7; see PSF No. 99.  Anderson instructed

Calvert to "sit on that board," indicating the backboard.[13]  CoJF No. 8; PSF No. 82.  Calvert sat on

the backboard on Perez's upper buttocks/hip area.[14]  See Calvert Depo. 75:2-9.  It was consistent

with City training for Calvert to follow the instructions of Anderson by sitting on the backboard.

See Alvarez Depo. 30:12-18.  Calvert sat on the board for about one minute.  See PSF No. 103.

After Calvert stood up from the backboard, the officers and deputies asked Perez questions and it

was determined that Perez was still moving.  See CiSF No. 30.

The AA paramedics continued the process of restraining Perez to the backboard for about

two minutes and five seconds.  See CiSF No. 31.  Once the backboard was placed, McEwen

assisted Ortiz with removing the handcuffs and then stepped out of the way.  See CoSF No. 42.

Manasan did not put his hands on the backboard, but continued to hold Perez's ankles.  CoSF No.

43.  The officers and deputies around Perez applied positive pressure to the backboard in an

attempt to hold Perez down so that the paramedics could restrain Perez to the backboard.  See PSF

No. 97; CoSF No. 47.  Perez was moving his body by trying to lift up off the ground.  See PSF

No. 101.  Perez was under the backboard for about four minutes.  PSF No. 94.  However, while

the backboard was on Perez's back, Perez stopped vocalizing.  See PSF No. 107.  During the

---

[13] At his deposition, Anderson testified that "sitting on top of a patient is generally not a good idea," and that one of the risks of doing so is asphyxiation.  See Anderson Depo. 104:15-23.  Apart from this incident, neither Dines nor Ortiz have ever restrained a person to a backboard while the person was in a prone position.  See PSF Nos. 83, 84, 85.  Dines was trained to have a patient in a supine position before applying the backboard because that method helps medical personnel to visualize the airway.  PSF No. 85.

[14] Defendants contend that Calvert did not put his whole weight on the backboard and that insignificant pressure was applied to Perez while the backboard was on and/or being placed on Perez.  However, other witnesses testified that they saw Calvert sit on the board, which indicates his entire weight was placed on the backboard.  Moreover, Dr. Chambliss's opinion regarding Perez's cause of death indicates that the pressure was significant at a minimum from the time the backboard was placed to the time Perez stopped breathing.  Therefore, the Court concludes that the precise amount pressure applied by the City Officers and County Deputies is genuinely disputed.  Because Plaintiffs are the non-moving party, the Court will view the evidence as demonstrating that Calvert sat with his full weight on Perez and that the City Officers' and County Deputies' application of positive pressure on Perez were at times (particularly during the placement of the backboard) significant.

restraining process, Perez went limp, flaccid, and unresponsive.  See PSF No. 111; Anderson

Depo. 80:17-24.  Stoltenberg began to suspect that Perez was unconscious about 30 seconds

before the backboard was flipped over because Perez had stopped screaming and yelling.  PSF No.

110.  Stoltenberg was not sure if Perez was unconscious, choosing not to respond, or faking being

unconscious.  See Stoltenberg Depo. 69:11-22; see also PSF No. 116.  Robnett realized that

Perez's legs had gone limp because he felt no more resistance from Perez.  See PSF No. 113.

After the backboard was attached to Perez, Perez was turned over.  See Anderson Depo.

89:1-2.  Martinez estimated that Perez had been under the backboard for about four minutes before

being turned over.  See PSF No. 94.  Calvert believed that Perez appeared to be unconscious.  See

Calvert Depo. 81:3-7.  Paramedic Dines observed that Perez was unconscious and blueish in the

face.  PSF No. 114.  Anderson stated that it did not appear that Perez was breathing.  See

Anderson Depo. 109:21-24.  Robnett and Stoltenberg did not see anyone check Perez's pulse.  See

Robnett Depo. 35:5-7; Stoltenberg Depo. 54:16-17.  However, once Anderson and Dines saw that

Perez was unconscious, they both testified that Anderson checked Perez's pulse and was unable to

detect one.  See Anderson Depo. 32:3-14, 109:21-110:2; Dines Depo. 36:1-37:5; see also CiSF

No. 32; AASF No. 27.[15]  Because Perez was blueish in the face and had no pulse, the paramedics

initiated a cardiac arrest protocol.  See Dines Depo. 36:17-37:5.  Perez was placed on a gurney,

moved inside the ambulance, and CPR was initiated.  See CiSF No. 33.[16]  Ortiz hooked Perez up

to a heart monitor in the ambulance and he was asystole, i.e. without a heartbeat.  See PSF No.

[15] Plaintiffs dispute CiSF No. 32 and AASF No. 27 through reference to Stoltenberg's and Robnett's respective testimonies that they did not observe anyone check for a pulse when Perez was flipped over.  See Doc. No. 150-1 at 26.  However, the cited testimony asked for the observations of two deputies and does not state that no one actually took Perez's pulse.  Further, the bodycam video appears to depict Anderson and Dines checking on Perez and leaning down towards Perez's head immediately after the backboard was flipped over, which is consistent with checking for a pulse.  Given the testimony of Dines and Anderson, the bodycam video, and the situation that was transpiring, clearer testimony is required for a contention that Perez's pulse was never taken.  See Anderson, 477 U.S. at 249-50 (noting that a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"); Hardage, 427 F.3d at 1183 (same).

[16] Plaintiffs dispute CiSF No. 33 through reference to Stoltenberg's testimony that he did not observe anyone perform CPR.  See Doc. No. 150-1 at 27.  However, this section of Stoltenberg's deposition refers to the point in time in which he observed that Perez appeared to be unconscious.  See Stoltenberg Depo. 54:8-17.  The cited deposition testimony is limited temporally and by its terms would not cover the period in time in which Perez was lifted onto a gurney and into the ambulance.  The testimony is insufficient to support a contention that CPR was never initiated or attempted on Perez.  See Anderson, 477 U.S. at 249-50 (noting that a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"); Hardage, 427 F.3d at 1183 (same).

118; Ortiz Depo. 46:4-14.  Shortly after arrival at the hospital, Perez was pronounced dead.  See CiJUF No. 9; CoJUF No. 11.[17]

One and a half hours after death, Perez's temperature was noted to be 105.4° F.  AASF No. 15.  Perez also had a methamphetamine level of 2,459 ng/ml.  CiJF No. 11; CoJF No. 13.  Perez had pre-existing cardiac disease, see CoJF No. 14, including severe (80% or more) luminal narrowing of the left anterior descending coronary artery and myocardium without fibrosis.  See CoSF No. 48.  The County Coroner, Dr. Chambliss, attributed the cause of Perez's death to compression asphyxia during restraint with other significant condition of methamphetamine toxicity.  CiJF No. 10; CoJF 12; AASF No. 16.  Specifically, Dr. Chambliss opined that Perez was asphyxiated because a "backboard was placed on [Perez] in such a fashion as he is also being placed in a hobble type condition, and during that particular process, greater than a ten minute restraining process, he becomes unresponsive . . . ."  PSF No. 119.[18]  Dr. Chambliss concluded that the manner of death was a "homicide."  See PSF No. 122.

The County Sheriff's Office maintains formal written policies on *inter alia* the use of force, handcuffing, and restraints.  See CoSF No. 49.  The County's Use of Force policy states that deputies should only use as much force as they believe is reasonable in any given situation.  CiSF No. 50.  There are different levels of force that an officer can use depending on what is objectively reasonable under the totality of the circumstances in order to effect an arrest, overcome resistance, prevent escape, or overcome a threat of harm to the officers or others.  See CoSF Nos. 66, 67, 68.  If a subject is being taken into custody pursuant to § 5150 and is exhibiting signs of being under

---

[17] Plaintiffs have cited to the deposition testimony of Natalie Sendejas, who saw six to seven law enforcement personnel piled on top of something, that the person on the bottom of the pile was not moving, and one of the officers made an expression that made her feel that something was not right.  See PSF Nos. 71, 72, 73.  The Court does not find Sendejas's evidence to be probative.  Sendejas testified that she drove by when the ambulance had already arrived, she passed by for "brief seconds" while on her way to work, she did not know what was on under the pile of officers, and because she could not tell if a person was under the pile, she could not tell body position, arm position, or leg position (assuming there was a person underneath the pile).  See Sendejas Depo. 10:13-11:3, 18:6-15, 24:15-25:7.

[18] The AA Defendants contend that there is no evidence that Anderson's acts caused harm and that their expert has established that Perez's death was caused by methamphetamine related arrhythmia, an enlarged heart, an underlying coronary condition, and agitation.  See AASF Nos. 36, 37.  The Court finds that Dr. Chambliss's opinions regarding the cause of death, as well as Anderson's direction of law enforcement personnel (particularly the direction of Calvert to sit on the backboard) create a genuine disputed issues of material fact regarding causation.  Therefore, AASF Nos. 36 and 37 are not established for purposes of this motion.

the influence of methamphetamine, deputies are trained to restrain that individual for the safety of the subject and the officers.  See CoSF No. 69.  If properly used or employed:  manual restraints are considered low level, non-deadly force; control holds such as wrist locks are typically lower levels of force; controlled take-down maneuvers are considered low to intermediate levels of force; and body strikes or knee strikes applied to the abdomen or knee area of a prone subject are considered intermediate levels of force.  See CoSF Nos. 70, 71, 72, 73.  County policy also provides that if a deputy observes another deputy or an officer from an outside law enforcement agency use excessive or unreasonable force, then the deputy has a duty to intervene.  See CiSF Nos. 51, 52.  This policy also applies to observations of medical personnel, such as paramedics, who use excessive force.  See Keely Depo. 33:14-34:5.  However, deputies are not trained on the methods used by paramedics and would not be able to identify *per se* unreasonable techniques. See CoSF No. 54; Keely Depo. 33:14-25.  The County Deputies were trained on this policy at the time of the incident.  See CoSF No. 55.

As to restrains, County policy provides that once a leg restraint is secured, the person should be placed in a seated or upright position, secured with a seat belt, and shall not be placed on his stomach for an extended period of time (which varies depending on the circumstances), as this could reduce the person's ability to breathe.  See CoSF No. 56.  It also provides that a restrained person should be continually monitored while in the leg restraint, which means that deputies should continue to make sure that the person is able to breathe.  See CoSF Nos. 57, 58. The County Deputies were trained on this policy at the time of the incident.  See CoSF No. 59. The County Deputies were also trained that if someone is placed on his stomach for an extended period of time, that could interfere with the person's ability to breathe.  See CoSF No. 60.  The County trains its deputies that positional asphyxia is a real phenomenon, that it can occur, and that it can occur if someone is placed in a prone position that interferes with his or her ability to breathe.  PSF No. 153.  The County Deputies were trained to look for signs of labored breathing and take appropriate steps to relieve and minimize any obvious factors contributing to this condition and to asphyxia.  See CoSF No. 61.  Manasan and McEwen testified that they were trained that if a subject is in a prone position and pressure was applied to his back for an extended

period of time, that could interfere with his ability to breathe and he could die.  See PSF Nos. 143, 144.  Robnett testified that he was trained it is "very unlikely" that applying downward pressure on someone's back while they are in a prone position could cause asphyxiation and death, but it was nevertheless something that deputies were required to monitor.  See PSF No. 144; Robnett Depo. 50:3-51:3.  The County Deputies were trained with respect to the application of Ripp restraints, respiratory compromise, and sudden death syndrome.  See CoSF No. 62.  County policy prohibits "hog-tying" a suspect, which occurs when a Ripp restraint is connected to handcuffs with 12 inches or less between the handcuffs and the Ripp restraint.  See PSF No. 154; Keely Depo. 47:7-24.

The City Police Department had the following policy that dealt with positional asphyxia: "Once secured, the person should be placed in a seated or upright position, and shall not be placed on his/her stomach, as this could reduce the person's ability to breathe (e.g. 'positional asphyxia')."  PSF No. 150.  City policy requires that, when using a Ripp restraint, the subject is to be put in a seated upright position once secured so as not to reduce the person's ability to breathe.  See PSF No. 151.  Regarding restraining someone in a prone position, the City trains its officers regarding placement of the officers and a detainee, to monitor the suspect in case anything arises regarding the airway or breathing, and to render aid or obtain medical assistance.  See Alvarez Depo. 21:5-23.  The City also trains its officers that if a person's body is put in a position that they can't breathe that the person can die.  See id. at 93:5-10.  The City Officers did not have specific training as to whether it is appropriate for an officer to sit on a backboard placed on an individual's back when the individual is in a prone position.  See CiSF No. 25.  Calvert and Martinez had never before seen a backboard placed on top of someone while in a prone position on the ground.  See PSF Nos. 123, 132.  Calvert had reviewed training materials regarding handcuffing and restraints and saw no mention of terms like "positional asphyxia," but had heard that or similar terms used while at the police academy and during briefing training.  See Calvert Depo. 90:10-22.  Calvert was trained that, if an "enormous weight" is applied to a prone person's back over an extended period of time, the person could asphyxiate and stop breathing.  See id. at 91:17-24.  Calvert was trained to monitor a person's breathing in such circumstances, but that

15

recent medical studies indicated that it was unlikely for a person to stop breathing.  See id. at

91:24-92:3.  Calvert was trained to monitor breathing by asking the person questions because if

they are able to talk back, they are breathing.  See id. at 96:2-13.  Calvert did not know if someone

could be deprived of oxygen but still be talking.  See id. at 96:14-16.  Rossetti and Martinez were

not trained that if someone is in a prone position on the ground, and that if enough pressure is

applied to that person's back over some period of time, then it is possible for that person to

asphyxiate and stop breathing.  See PSF Nos. 131, 137.  Rossetti was not trained that if someone is

restrained in a prone position, then officers should try and turn that person on his side as soon as

possible.  See PSF No. 138.

      According to standard police practices, the most efficient way to restrain an individual is in

a prone position as long as it is not extensive in time and as long as it is only necessary to

complete the goal of controlling a resistive and violently struggling individual.  See CoSF No.

74.[19]  Peace officers can apply body weight for purposes of stabilization to a prone subject who is

being restrained.  CoSF No. 75.  Peace officers are generally trained that applying pressure to

somebody's back while in a prone position can interfere with their ability to breathe.  See CoSF

No. 76.  Once the individual is restrained, controlled, and no longer a threat, officers are trained to

turn the subject over into the recovery position.  CoSF No. 77.  If someone is in a prone position

during a restraint process and says, "I can't breathe," law enforcement are at a minimum trained to

take that comment seriously.  See PSF No. 100.

---

[19] Plaintiffs refute this proposed fact, as well as CoSF Nos. 75 and 77, by arguing that "Officers and deputies are trained not to position subjects on their stomachs because of the danger of asphyxia."  See Doc. No. 152-1 at 42-44. In support of this assertion, Plaintiffs cite deposition testimony from the County's Rule 30(b)(6) witness that the County trains its officers that positional asphyxia is a real phenomenon that can occur if someone is placed in a prone position; the City policy that once a person is secured he should be seated upright and not placed on his stomach because this could result in positional asphyxia; Manasan testified that he was trained that applying pressure to a prone individual's back for a period of time could cause asphyxia; and McEwen's testimony that subjects should not be left on their backs for extended periods of time as this could interfere with breathing.  See id.  However, none of the cited evidence supports Plaintiffs' assertion/dispute.  First, the City policy begins with the assumption that the subject is already secured, it does not discuss the process of securing the subject.  Second, the County's policy merely recognizes that positional asphyxia is a real phenomenon, it does not prohibit placing a subject on his stomach. Finally, Manasan and McEwen's testimony discuss asphyxia or difficulty breathing if a person is prone "for some period of time," their respective testimonies do no indicate that subjects could never be prone for any period of time. Therefore, CoSF Nos. 74, 75, and 77 are undisputed.

**I.    COUNTY DEFENDANTS' & CITY DEFENDANTS' MOTIONS – FEDERAL CLAIMS**

    **A.    First Cause of Action – 42 U.S.C. § 1983 – Fourth Amendment**

    *Defendants' Argument*

The County Defendants argue that none of their individual applications of force on Perez was excessive.  While none of the potential crimes at issue were significant, Perez was a danger to himself and others.  If Perez had not been restrained, he would have likely continued to run into the roadway with resulting injuries to himself and possibly others.  Perez was actively resisting by thrashing his body about, kicking his feet, and trying to lift his body up, despite the officers' commands.  To deal with Perez, the deputies utilized a physical take down, knee strikes, a wrist lock, verbal commands, a Ripp restraint, and positive pressure (both before and during placement of the backboard), all of which are low to intermediate levels of force.  These uses of force were all reasonable and cannot support liability for excessive force or failure to intervene. Alternatively, qualified immunity is appropriate as the law was not so clearly established that the officers used excessive force or failed to intervene, particularly as they are not medical experts.

The City Defendants make similar arguments.  The City Defendants argue that the level of force used by Calvert and Martinez were low-level hands-on force.  The City Officers used reasonable amounts of force to attempt to restrain Perez who was continuing to resist.  Moreover, Calvert was only squatting on the backboard for approximately one minute and thirteen seconds, and both during and after the time that Calvert was on the backboard, Perez was moving. Alternatively, City Defendants argue that they are entitled to qualified immunity.

    *Plaintiffs' Opposition*

Plaintiffs argue that Defendants are attempting to obtain summary judgment by viewing the evidence in the light most favorable to them, even though this is an obvious case of excessive force.  It is obvious that it is unconstitutional for deputies to kill an unarmed and defenseless detainee by asphyxiating him.  Since the deputies asphyxiated and killed Perez by restraining him in a prone position and sitting on his back until he died, the deputies used deadly force.  In terms of the *Graham* factors and other relevant considerations, first, the crimes potentially involved were not severe (public intoxication or darting in and out of traffic) or not a crime at all (the § 5150

hold).  Second, Perez was not an immediate threat to the officers since he was handcuffed from the beginning of the encounter, he did not punch, kick, or threaten any deputy or officer, and McEwen admitted that he was not in fear of his life during the incident.  When he was asphyxiated and killed, Perez was chest-down on the ground, handcuffed, hobbled, had a board on his back, was struggling to breathe, and was surrounded by numerous officers, deputies, and medical personnel. Perez was not a threat to anyone.  Third, although the deputies describe Perez as combative or resistant, a jury could reasonably infer that the deputies were witnessing Perez's involuntary reactions to being asphyxiated.  The Supreme Court in *Lombardo v. City of St. Louis*, 141 S.Ct. 2239 (2021) recognized training that indicated the struggles of a prone suspect may be due to oxygen deficiency rather than a desire to resist or disobey commands.   Fourth, the deputies created a dangerous situation by positioning Perez in such a manner that he could not adequately breathe.  As a result of being positioned in a way that he could not adequately breathe, he attempted to lift his body so that he could breathe, which the deputies interpreted as resistance. Fifth, in terms of alternative means, the deputies could have simply positioned Perez on his side or in a seated position.  Lastly, the deputies violated their training regarding hog-tying, spit-masks or spit mask substitutes, restraining a subject on his stomach, and restraint asphyxiation.  The balance of these factors clearly indicate that excessive for was used.  Moreover, because all deputies either participated in the excessive force or observed excessive force and violations of policy and training, they are liable for their own conduct and for failing to intervene.  It is not an answer that paramedics were on the scene or that the deputies were deferring to the deputies.  The deputies are to follow their own training when it comes to the application of force on a suspect.

Finally, Plaintiffs argue that qualified immunity is inappropriate.  First, this is a case in which it is obvious that it is unconstitutional to for a group of officers to asphyxiate and kill a handcuffed and defenseless man who tells them he cannot breathe.  Second, *Drummond v. City of Anaheim*, 343 F.3d 1042 (9th Cir. 2003) demonstrates that when officers continue to place pressure on the back or neck of an individual who is having trouble breathing, the Constitution is violated.  Third, the County Deputies were trained against hog-tying an individual, against placing spit-masks or substitutes for spit-masks such as a towel, against restraining a subject on their

1  stomach, and that restraint asphyxia was real.  Despite this training, the deputies violated each of

2  these policies in restraining and Perez.

3  *Legal Standards*

4     1.    Fourth Amendment Excessive Force

5          All claims that law enforcement officers used excessive force, either deadly or non-deadly,

6  in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under

7  the Fourth Amendment and its standard of objective reasonableness.  See Scott v. Harris, 550 U.S.

8  372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989).  Cases that involve deadly

9  force do not fit into their own separate category with their own set of "rigid pre-conditions" that

10  must be met, rather the key is whether the officer's actions were reasonable.  See Scott, 550 U.S.

11  at 382-83; Hooper v. County of San Diego, 629 F.3d 1127, 1133 (9th Cir. 2011).  The pertinent

12  question in excessive force cases is whether the use of force was "objectively reasonable in light

13  of the facts and circumstances confronting [the officers], without regard to their underlying intent

14  or motivation."  Graham, 490 U.S. at 397; Hooper, 629 F.3d at 1133.  The objective inquiry into

15  reasonableness is highly fact specific.  See Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d

16  546, 551 (9th Cir. 2010).  "We first assess the quantum of force used to arrest [the plaintiff]" and

17  then "measure the governmental interests at stake by evaluating a range of factors."  Davis v. City

18  of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  Factors that are considered in assessing the

19  government interests at stake include, but are not limited to, "the severity of the crime at issue,

20  whether the suspect poses an immediate threat to the safety of the officers or others, and whether

21  he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396;

22  Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010); Davis, 478 F.3d at 1054.  Where it is or

23  should be apparent that an individual is emotionally or mentally unstable, that is a factor that must

24  be considered in determining the reasonableness of the force employed.  See Luchtel, 623 F.3d at

25  980; Drummond v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003).  Courts also are to

26  consider whether it was feasible to give a warning before using force, and whether a warning was

27  actually given.  See Bryan v. MacPherson, 630 F.3d 805, 831 (9th Cir. 2010).  "In some cases . . .

28  the availability of alternative methods of capturing or subduing a suspect may be a factor to

consider." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005); see Luchtel, 623 F.3d at 980. "[P]olice are required to consider what other tactics if any were available, and if there were clear, reasonable, and less intrusive alternatives to the force employed that militate against finding the use of force reasonable." Nehad v. Browder, 929 F.3d 1125, 1138 (9th Cir. 2019) (internal quotations omitted). However, police officers "are not required to use the least intrusive degree of force possible" as long as the force actually used was reasonable. Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994); see Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir. 2008). That is, a reasonable use of force "encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable." Wilkinson, 610 F.3d at 551. It may also be appropriate to consider the parties' "'relative culpability,' i.e. which party created the dangerous situation and which party is more innocent, may also be considered." Espinosa v. City & County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010); see Scott, 550 U.S. at 384. Finally, in some cases, it may be appropriate to consider whether the officer failed to identify himself as a law enforcement officer. See Nehad, 929 F.3d at 1138. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; Wilkinson, 610 F.3d at 550. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments ฿ in circumstances that are tense, uncertain, and rapidly evolving ฿ about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; Wilkinson, 610 F.3d at 550. "Force is excessive when it is greater than is reasonable under the circumstances." Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).

    2.   Qualified Immunity

       Qualified immunity applies when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. White v. Pauly, 137 S. Ct. 548, 551 (2017). Qualified immunity may apply regardless of whether the officer makes a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. Pearson v. Callahan, 555 U.S. 223, 231 (2009). Officers are entitled to qualified immunity under § 1983 unless (1) the officers violate a federal a federal statutory or constitutional right, and (2) the

unlawfulness of their conduct was "clearly established at the time." District of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018); White, 137 S.Ct. at 551.  "Clearly established" means that the statutory or constitutional question was "beyond debate," such that every reasonable official would understand that what he is doing is unlawful. See Wesby, 138 S.Ct. at 589; Vos v. City of Newport Beach, 892 F.3d 1024, 1035 (9th Cir. 2018).  This is a "demanding standard" that protects "all but the plainly incompetent or those who knowingly violate the law." Wesby, 138 S.Ct. at 589 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)).  To be "clearly established," a rule must be dictated by controlling authority or by a robust consensus of cases of persuasive authority. Id.; see also Perez v. City of Roseville, 882 F.3d 843, 856-57 (9th Cir. 2018) (noting that Ninth Circuit precedent is sufficient to meet the "clearly established" prong of qualified immunity).  In examining whether a rule/right is clearly established, courts are to define the law to a "high degree of specificity," and not "at a high level of generality." Wesby, 138 S.Ct. at 590. The key question is "whether the violative nature of the particular conduct is clearly established" in the specific context of the case. Vos, 892 F.3d at 1035 (quoting Mullenix v. Luna, 136 S.Ct. 305, 308 (2015)). Although it is not necessary to identify a case that it is "directly on point," generally the plaintiff needs to identify a case where an officer acting under similar circumstances was held to have violated a federal right. Rivas-Villegas v. Cortesluna, 142 S.Ct. 4, 8 (2021); Wesby, 138 U.S. at 577; Vos, 892 F.3d at 1035; Felarca v. Birgeneau, 891 F.3d 809, 822 (9th Cir. 2018).  Whether a constitutional right was violated is generally a question of fact for the jury, while whether a right was clearly established is a question of law for the judge. Morales v. Fry, 873 F.3d 817, 823 (9th Cir. 2017).

*Discussion*

Initially, it is necessary to determine which applications of force are at issue.

There is no dispute that Deputy McEwen, Calvert, and Martinez physically took Perez to the ground.  There is also no dispute that McEwen administered knee strikes to Perez's side while Perez was prone and attempted to utilize a wrist lock.  Plaintiffs do not dispute that the take down and the wrist lock are considered low quantum's of force, nor do Plaintiffs challenge the assertion that the knee strikes were intermediate levels of force.  More importantly, Plaintiffs do not argue

1   that these individual applications of force were excessive or unreasonable.  At the time these

2   applications of force were utilized, Perez had been acting erratic (including walking in a busy

3   street), appeared to be under the influence of a controlled substance, was not following

4   instructions (stop, sit down, or calm down), was not adequately restrained by the deputies, and the

5   decision to place Perez under a § 5150 hold for his own safety had already been made.  In the

6   absence of an opposition from Plaintiffs that expressly addresses these three applications of force,

7   the Court can only conclude that, under the totality of the circumstances, these low to intermediate

8   levels of force were reasonable.  To the extent that Plaintiffs premise any claims on McEwen,

9   Calvert, and Martinez's physical take down, or McEwen's knee strikes or wrist lock, summary

10   judgment in favor of McEwen, Calvert, and Martinez is appropriate.[20]

11        The remaining applications of force that are addressed to a more significant degree by the

12   parties are the use of a towel by McEwen, application of the Ripp restraint by Robnett and

13   Manasan, and positive pressure and use of the backboard by the County Deputies and City

14   Officers while Perez was in a prone position.  The Court will examine each of these applications

15   of force separately.

16            1.    Towel

17        The County Deputies indicate that using a towel around Perez's face was a low level of

18   force.  Plaintiffs criticize the use of the towel around Perez's face because it could have interfered

19   with Perez's breathing (a concern identified by Anderson) and that it was the equivalent of a spit

20   mask that was used in violation of County policy.

21        After review, the Court cannot conclude that use of the towel by itself constitutes excessive

22   force.  The officers' testimony and the video make it apparent that the towel was not meant to *per*

23   *se* restrain Perez.  McEwen testified that Perez kept moving and scraping his head and face on the

24   concrete.  McEwen testified that he was concerned and trying to protect Perez's head and face

25

---

26   [20] There is no dispute that Calvert utilized two knee strikes to Perez's side.  Plaintiffs mention that Calvert did this, but

27   the City Defendants did not specifically address this use of force, and Plaintiffs have not indicated that it was excessive.  The Court sees no material distinction between McEwen's knee strikes and Calver's knee strikes, other than Calvert only administered two knee strikes as opposed to McEwen's three.  Therefore, to the extent that Calvert's

28   knee strikes may be at issue, for the reasons that McEwen's knee strikes were reasonable, the Court concludes that Calvert's knee strikes were reasonable under the Fourth Amendment.

from injury.  This is supported by the bodycam video.  At several points in the video prior to the time that AA personnel arrive, McEwen and/or other deputies and officers can be heard either telling Perez not to scrape/move his head against the concrete or mentioning that Perez keeps moving his head against the concrete.  Deputies and Officers saw blood from Perez's head on the concrete.  Further, when Robnett saw the towel around Perez's face, he asked McEwen for an explanation and McEwen explained that Perez was injuring his (Perez's) head.  Robnett also asked if Perez could breathe while McEwen held the towel, and Perez replied "yes."  Finally, there does not appear to be a decrease in the volume or nature of Perez's yelling from the time the towel was placed to the time that AA personnel arrived and Anderson ordered the towel to be either readjusted or that Perez's head be held by hand instead.  From this evidence, the towel was meant to protect Perez and there is not a sufficient indication that the towel itself harmed Perez.  To the extent that the use of the towel can be classified as a use of force, it was an exceptionally low level of force.  Considering that Perez had been acting erratic, appeared to be under the influence of a controlled substance, was not following instructions (stop, sit down, or calm down), was not adequately restrained by the deputies, Perez's movements were injuring his head/face, and that the decision to place Perez under a  § 5150 hold for his own safety had already been made, the Court concludes that the use of the towel by McEwen was not excessive or unreasonable under the Fourth Amendment.[21]

Plaintiffs argue that the County has a policy against using spit masks on suspects who are

---

[21] Liability under an integral participation theory is appropriate if an officer has some fundamental involvement in the conduct that caused the constitutional violation.  See Nicholson v. City of L.A., 935 F.3d 685, 691-92 (9th Cir. 2019); Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007).  Liability under an integral participation theory requires the existence of an underlying constitutional violation. Shellabarger v. Hale, 2018 U.S. Dist. LEXIS 147573, *16 (E.D. Cal. Aug. 28, 2018); Gillen v. Arizona, 279 F.Supp.3d 944, 961 n.21 (D. Ariz. 2017), rev'd on other grounds, Gillen v. Town of Hayden, 765 F. App'x 300 (9th Cir. 2019); see also Nicholson, 935 F.3d at 691-92 (discussing integral participation for the constitutional violation at issue).  Similarly, so long as the officer has a reasonable opportunity to intercede, law enforcement officers have a duty to intercede when their fellow officers are violating the constitutional rights of others.  See Tobias v. Arteaga, 996 F.3d 571, 583-84 (9th Cir. 2021); Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000).  Liability under a failure to intervene or intercede theory requires an underlying constitutional violation.  Greene v. Crawford Cnty., 22 F.4th 593, 616 (9th Cir. 2022); see also Tobias, 996 F.3d at 584.  Because the Court concludes that McEwen did not violate Perez's constitutional rights by using a towel in the restraining process to protect Perez's head, no City Officers or other County Deputies can be liable as an integral participant or for failing to intercede.

having trouble breathing and that use of the towel on Perez in place of a spit mask was a violation

of that policy.  The Court does not find Plaintiffs' arguments persuasive.  The County does have a

policy against using spit masks/hoods on a suspect who is bleeding profusely from the mouth or

nose or if the suspect has a medical condition such as difficulty breathing or vomiting.  <u>See</u> Keely

Depo. 59:10-21.  A spit mask or spit hood is "properly applied not only to prevent spitting but

whenever there is a threat of transmission of bodily fluid."  <u>Allen v. Rivera</u>, 626 F. App'x 710, 712

(9th Cir. 2015); <u>see also</u> <u>Robinson v. County of Shasta</u>, 384 F.Supp.3d 1137, 1158-59 (E.D. Cal.

May 1, 2019).  Spit masks can be made of a tight spandex, <u>see</u> <u>Cunningham v. City of L.A.</u>, 2021

U.S. Dist. LEXIS 245730, *4 (C.D. Cal. Oct. 28, 2021), or loose mesh.  <u>See</u> <u>Silva v. Walker</u>, 2021

U.S. Dist. LEXIS 41770, *16 (W.D. Wash. Jan. 4, 2021).  In this case, however, the towel was not

placed on Perez to prevent him from spitting on the deputies and officers, nor was it placed to

prevent Perez from somehow transferring bodily fluids to the deputies or officers.  The towel was

placed and held by McEwen in an attempt to protect Perez's head from the concrete because of the

way that Perez was moving.  Further, at the time McEwen used the towel, it was not apparent that

Perez was having difficulty breathing.  Perez responded to Robnett that he could breathe, and the

video indicates that Perez was moving and vocalizing the same sort of things (none of which dealt

with his ability to breathe) at a similar volume from the time that the towel was placed by

McEwen to the time that AA personnel arrived.  Therefore, the Court cannot conclude that the use

of the towel by McEwen against Perez is sufficiently analogous to a deputy's use of a spit mask

against a suspect who is spitting at or possibly transferring bodily fluids on a deputy.

2.    Hog-Tying

Plaintiffs' expert Scott Defoe opined that use of the Ripp restraint to hog-tie Perez was

excessive because the technique can cause difficulty breathing and carries a significant risk of

positional asphyxia.  <u>See</u> Defoe Expert Report at 15.  Defoe points out that Ripp International

warns that its restraints should never be used to hog-tie a prisoner, County policy/training

prohibits hog-tying, and publications from 1995 and 2008 warn against hog-tying.  <u>See</u> <u>id.</u>  Defoe

states that to address Perez's kicking, the deputies could have simply applied the Ripp restraint to

Perez's ankles or knees and then rolled Perez on his side or sat him upright to recover.  <u>See</u> <u>id.</u>

From Defoe's report and Plaintiffs' briefing, the Court takes Defoe and Plaintiffs to argue that use of the Ripp restraint to effectuate a hog-tie was excessive.  That is, the Ripp restraint itself was not excessive, rather, the problem was the act of hog-tying Perez.

The Ninth Circuit does not forbid the use of Ripp or hobble restraints.  See Blankenhorn v. City of Orange, 485 F.3d 463, 479 (9th Cir. 2007).  Further, the Court is unaware of any Ninth Circuit opinion (and the parties cite none) that has adopted any *per se* rules regarding "hog-tying."[22]  In some circumstances, some form of hobbling or Ripp restraint that appears similar to "hog-tying" may not be excessive.  See Slater v. Deasey, 789 F. App'x 17, 20-21 (9th Cir. 2019) (finding first application of hobble restraint in which ankles were hobbled and connected to handcuffs from the back was not excessive); cf. Blankenhorn, 485 F.3d at 479 ("We agree with [the Eighth Circuit] that, in some situations, the need to maintain control of a person who physically struggled while being taken into custody might reasonably call for the use of hobble restraints.").  In other situations, application of a hobble or Ripp restraint that appears similar to "hog-tying" may constitute excessive force.  Cf. Slater, 789 F. App'x at 21 (finding that application of a second and third hobble restraint to a person who was already "hog-tied" was excessive); Blankenhorn, 485 F.3d at 478 (finding that if the plaintiff could prove his version of events, then the defendants use of hobble restraints would be excessive).  Similarly, the Court is unaware of the Ninth Circuit defining the term "hog-tie."  However, other courts have defined "hog-tying" as a technique whereby a person's wrists and ankles are bound behind their back, and there is twelve inches or less between the ankles and wrists.  See Gunter v. Township of Lumverton, 535 F. App'x 144, 148 (3d. Cir. 2013); Cruz v. City of Laramie, 239 F.3d 1183, 1188 (10th Cir. 2001); Hines v. City of Columbus, 2015 U.S. Dist. LEXIS 73874, *21-*22 (S.D. Ohio June 5, 2015); Oakley v. Adrian, 2012 U.S. Dist. LEXIS 38229, *10 n.3 (S.D. Ill. Jan. 24, 2012); see also Lewis v. City of West Palm Beach, 561 F.3d 1288, 1290 n.2 (11th Cir. 2009) (explaining that a hogtie position "is one where the hands and feet are strapped *relatively closely together* behind the back, rendering the subject immobile.") (emphasis added); Norris v. Engles, 494 F.3d

---

[22] The Tenth Circuit has held officers may not apply a hog-tie restraint on a suspect who has apparent diminished mental capacity.  See Cruz v. City of Laramie, 239 F.3d 1183, 1188 (10th Cir. 2001).

634, 639 n.5 (8th Cir. 2007) (parenthetically noting *Cruz*'s definition of "hog-tie").  This is the same definition utilized by the County as part of a policy that prohibits hog-tying.  See PSF No. 154; Keely Depo. 47:7-24.  Given this persuasive authority, as well as the County's policy, the Court defines "hog-tie" as a restraint technique whereby a person's wrists and ankles are bound behind their back with twelve inches of space or less between the ankles and wrists.

There is no dispute that Perez was kicking and/or moving his legs while he was seated, after he was taken down, and even after the Ripp restraint was applied.  As explained above, Defoe does not appear to fault the deputies for attempting to utilize the Ripp restraint to control Perez's legs.  See Defoe Expert Report at p.15.  The problem, according to Defoe, is using the Ripp restraint to hog-tie Perez.  See id.  However, it does not appear that Defoe's definition of a hog-tie is the same as the definition adopted by the Court.  Defoe's report includes a definition of hog-tying that is:  "placing the suspect into a prone position with his or her hands secured by the handcuffs, and legs together with restraints.  The hands and leg restraints are then connected, resulting in the slight elevation of the suspects upper and lower body."  Defoe Expert Report at p.17.  Similarly, at his deposition, Defoe explained hog-tying as:  "when the person is in a prone position, the legs are typically restrained by the use of a Ripp hobble restraint device, the legs are pushed towards the buttocks where there's pressure put on there.  Then the Ripp hobble restraint device . . . is used to attach the actual ankles to the handcuffs and/or the belt, putting that person in a position where their breathing or respiratory – ability to breathe is compromised based on the position, in conjunction with the force that may be applied to that individual when they're in the prone position and while being hog-tied."  Defoe Depo. at 60:11-61:1.

Defoe's failure to utilize a definition of "hog-tie" that comports with the County policy or the above judicially accepted definition is problematic.  A personal belief that does not actually comport with the applicable definition of/standard for a hog-tie does not make the technique utilized by the Deputies an actual "hog-tie."  Defoe's deposition testimony indicates that he believes a hog-tie occurred because of what he heard on the bodycam video in reference to controlling or bending Perez's legs and attaching the Ripp restraint in some fashion to the handcuffs.  However, simply because Perez's legs were bent to some degree during application of

the Ripp restraint, or that the Ripp restraint was attached in some form to the handcuffs, does not mean that Perez was "hog-tied,"  particularly when there is no discussion about the distance between the ankles and the wrists.  It is true that Manasan testified that the hog-tie kept Perez's legs "from the knees down" elevated/up in the air.  As indicated above, the Court takes this to mean that Perez's shins and feet were raised up in the air.  However, Manasan did not testify that Perez's legs and ankles were bent backwards towards his (Perez's) buttocks, nor did he estimate the distance between Perez's ankles and wrists.  Since Perez was a little over 6' tall (72.5"), see Doc. No. 142-2 at ECF p.220, a distance of over twelve inches between ankles and wrists with shins and feet in the air would be likely.  Further, with respect to the cited explanation of a hog-tie in Defoe's report, there is no testimony or evidence that the Ripp restraint connected to the handcuffs caused any elevation in Perez's upper body or lower body (except for the shins and feet).

In sum, connecting ankles to wrists irrespective of the distance between the two does not result in a *per se* hog-tie situation.  Nevertheless, that appears to be the import of Defoe's opinion.  Because Defoe's opinion is not consistent with the definition of "hog-tie" that is found in the County's policy, judicially recognized definitions, or the cited definition in his expert report, the Court cannot conclude that there is sufficient evidence that Perez was "hog-tied."  Because the evidence does not sufficiently indicate that Perez was "hog-tied," Plaintiffs have not submitted evidence that shows the County Deputies' use of the Ripp restraint or connection of the Ripp restraint to the handcuffs was excessive or unreasonable under the Fourth Amendment.

      3.    Pressure While Prone

           a.    Quantum of Force

From the time that Perez was taken to the ground to the time that he was flipped over on the backboard, it appears that the County Deputies and the City Officers applied some form or amount of pressure to Perez while Perez was in a prone position.  That time frame was between ten and fifteen minutes.  Some amount of varying degrees of pressure appears to have been placed on Perez's legs, back, shoulders, and neck areas in order to stabilize or restrain Perez.  Such individual applications of pressure on different points of Perez's body would seem to be a low

1  quantum of force.  However, while the amount of pressure varied, the greatest amount of pressure

2  applied by an individual officer/deputy was by Calvert.  Calvert weighed about 190 pounds and

3  sat on the backboard around Perez's lower back area.  While Calvert sat for one minute and

4  thirteen seconds, other officers/deputies applied positive pressure either on the backboard or Perez.

5      The weight of Calvert, when combined with the positive pressure applied by other

6  officers/deputies as well as the weight of the backboard itself, is a far more significant quantum of

7  force.  Although the high level of methamphetamine was a significant factor, Dr. Chambliss

8  determined that Perez died due to "compression asphyxia during restraint . . . ."  CiJF No. 10;

9  CoJF 12; AASF No. 16.  Of particular relevance, Dr. Chambliss opined that Perez was

10  asphyxiated because a "backboard was placed on [Perez] in such a fashion as he is also being

11  placed in a hobble type condition, and during that particular process, greater than a ten minute

12  restraining process, he becomes unresponsive . . . ."  PSF No. 119.  In other words, it was how the

13  backboard was placed that appears to have directly lead to Perez's death.  Therefore, the Court

14  concludes that the pressure utilized by the officers/deputies during the placement of the backboard,

15  including Calvert sitting on the backboard, was "severe force" that was capable of causing death.

16  Drummond, 343 F.3d at 1056-57 (holding that the weight of two officers pressed down against the

17  neck and torso of a prone, handcuffed, mentally agitated individual was "severe force and, under

18  the circumstances, capable of causing death or serious injury.").

19              b.    Severity of the Crime

20      There are several crimes potentially at issue – public intoxication (Cal. Pen. Code §

21  647(f)), darting in and out of traffic,[23] and obstructing an officer (Cal. Pen. Code § 148).[24]  No

22  party argues that any crime that was potentially at issue could be considered "serious" or severe

23  for purposes of an excessive force analysis.  Cf. Young v. County of L.A., 655 F.3d 1156, 1164

24  (9th Cir. 2012) (Penal Code § 148); Santos v. Gates, 287 F.3d at 854 (public intoxication).

25

26  [23] The parties do not identify a particular statutory provision for this offense, but appear to accept that Perez's conduct
    could implicate a criminal provision.  Therefore, the Court accepts that Perez's conduct in darting in and out of traffic

27  implicates a crime.

28  [24] The parties do not identify Cal. Crim. Code § 148.  Nevertheless, it is apparent that Perez was obstructing the
    officers in their attempt to effectuate a § 5150 hold.

Additionally, although not a crime, § 5150 will support a lawful detention.  See Bias, 508 F.3d at 1220.  There is an important governmental interest in getting an individual medical attention who appears to be a risk to himself due to a mental disorder.  Booke v. County of Fresno, 98 F. Supp. 3d 1103, 1119 (E.D. Cal. 2015).  But "the use of force that may be justified by that interest [i.e. the interest to provide psychiatric help] necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community."  Bryan v. MacPherson, 630 F.3d 805, 829 (9th Cir. 2010).

c.     Threat Posed By Perez

The threat posed to others by Perez was very low.  Perez was surrounded by seven officers and deputies, was handcuffed and on his back, and his ankles were hobbled.  It is true that Perez had been acting erratic, he appeared to be talking to people who were not there, and had been kicking his feet out (possibly also at people who were not there).  However, Perez never acted out or directed any obviously dangerous actions towards any officer.

Perez was, however, a threat to himself.  There was more than sufficient probable cause to take Perez into custody under § 5150 given Perez's erratic behavior, apparent drug use, his uncertain ability to perceive reality, and his moving in and out of lanes on Palm Ave. (which is commonly known in Fresno to be a busy street).  By definition, a § 5150 detention means that a person is a danger to himself or others.  See Cal. Welf. & Inst. Code § 5150; S.B., 864 F.3d at 1011; Bias, 508 F.3d at 1222.  Some degree of force was necessary to effectuate the § 5150 detention.  See Drummond, 343 F.3d at 1059.  Nevertheless, because the purpose of the detention is to get help for Perez due to a mental disorder and/or drug use, the interests and kinds of force that could be applied is different than what may be applied in a purely criminal situation.  Bryan, 630 F.3d at 829.

d.     Resistance or Flight

Perez was not in flight.  Rather, Perez had flagged the City Officers down in an apparent attempt to get help.

Once he was taken to the ground, Perez appeared to resist.  The City Officers, County Deputies, and AA personnel all describe Perez as struggling or resisting because he was moving

29

around, attempting to get up, yelling, and was not complying with instructions to be calm and stop struggling.  The Court agrees with Plaintiffs that some of the struggling was Perez trying to breathe, particularly since Perez vocalized his inability to breathe when the backboard was placed.  However, as illustrated by Perez's affirmation to Robnett that he could breathe, Perez's struggles were not all related to attempts to breathe.  Considering the things that Perez was saying and how loud he was saying them through most of the time that he was prone, as well as Perez's statement when the backboard was placed that he could not breathe, it does not seem likely that most of Perez's movements were due to difficulty breathing.  Nevertheless, be it some form of active resistance or attempts to breathe, Perez's behavior made the process of a § 5150 detention more difficult.

### e.   Mental Instability

Perez was mentally unstable, either from drug use, a separate psychological condition, or both.  The City Officers and County Deputies all perceived Perez's mental instability, believed that he was under the influence of drugs (likely methamphetamine), and there is no indication that any officer or deputy believed that a § 5150 detention was inappropriate.

### f.   Feasibility of a Warning

No party has indicated that the City Officers or County Deputies should have given some kind of warning.  Because the parties do not address it, the Court finds this to be a neutral consideration.

### g.   Alternative Methods

Defoe has indicated that, after applying the Ripp restraint to Perez's ankles, the City Officers and County Deputies could have simply sat Perez upright or rolled him on his side and not connected Perez's ankles to his wrists.  Defoe indicates that Perez's movement would have been sufficiently restrained and the danger of positional asphyxiation lessoned.  Although Perez was moving in some manner from the time the City Officers and County Deputies took him to the ground to the time that he went limp after the backboard was placed, it is unclear why Perez could not have at least been rolled to his side after placement of the Ripp restraint around his ankles.

1      h.      Perez's Statement

2          There is no dispute that while the backboard was being placed and Perez was being

3  secured to it, Perez vocalized that he could not breathe.  See PSF No. 99; CiJF No. 7.  The

4  statement, while not necessarily clear, can nevertheless be heard on the bodycam video.  For

5  purposes of the summary judgment motion, it is reasonable to assume that all of the County

6  Deputies and City Officers heard the statement.  In *Drummond*, the Ninth Circuit noted that

7  Drummond told the officers that he could not breathe while the weight of two officers were on his

8  back and neck.  See Drummond, 343 at 1054, 1062.  Further, County policy warned that positional

9  asphyxia was a real phenomenon, see PSF No. 153, and both City and County policy required that

10  officers and deputies monitor a suspect's breathing while the suspect is in a prone position.  See

11  CoSF 63; Alvarez Depo. 21:5-23.  Moreover, it appears to be standard training that law

12  enforcement are to take seriously a detainee's statement that he cannot breathe while he is in a

13  prone position.  See PSF No. 100.  Despite these policies and training, no officer or deputy

14  appears to have actually checked to see whether Perez was able to breathe or having difficulty

15  breathing.  Instead, while the evidence indicates that the officers questioned Perez, all that appears

16  to have been determined was that Perez was still moving to some unknown degree.  See CiSF No.

17  30.  There does not appear to have been follow up regarding Perez's actual ability to breathe, and

18  the restraining process simply continued.  The Court is unaware of any evidence that indicates an

19  ability to move to some degree is sufficient to determine whether an individual in a prone position

20  with weight on his back can adequately breathe.

21      i.      Conclusion

22          From the above, and viewing the evidence in the light most favorable to Plaintiffs, there

23  were no serious crimes involved and Perez was being taken into custody under § 5150 for his own

24  safety.  Perez was resisting for most of the encounter, which means that some amount of force was

25  necessary to successfully detain and transport Perez for medical aide.  However, the various

26  degrees of pressure/positive pressure combined with the placement of the backboard (which

27  entailed a 190 lbs. officer sitting on the backboard with Perez underneath) and the amount of time

28  that law enforcement had struggled with Perez in a prone position, constitutes severe force.

Instead of keeping Perez prone, it appears that law enforcement personnel could have rolled Perez on his side.  Finally, it appears that the City Officers and County Deputies did not adequately check on Perez's ability to breathe after he said that he could not breathe, despite having struggled in an agitated state for more than 10 minutes and despite municipal policies that appear to recognize the danger of positional asphyxia and require officers and deputies to monitor breathing.  Therefore, the evidence is sufficient for a jury to conclude that the City Officers and County Deputies used excessive force against Perez in violation of the Fourth Amendment.[25]

### 4.   Qualified Immunity

#### a.   Pressure While Prone

Having found that the evidence could support a finding that the City Officers and County Deputies' conduct violated the Fourth Amendment, it is Plaintiffs' burden to demonstrate that the law was clearly established.  See Rivas-Villegas v. Cortesluna, 142 S.Ct. 4, 8 (2021); Wesby, 138 U.S. at 577; Vos, 892 F.3d at 1035; Felarca, 891 F.3d at 822.  Plaintiffs indicate that qualified immunity is inappropriate because either this was an "obvious case" in which the officers violated Perez's Fourth Amendment rights, or because *Drummond* put the officers on notice that their conduct was unconstitutional.

In *Drummond*, Drummond's neighbor summoned police because they were concerned that Drummond, who had diagnosed mental health conditions and had run out of medicine, would hurt himself by darting in and out of traffic.  See Drummond, 343 F.3d at 1054.  Drummond was agitated and hallucinating, and three police officers called for an ambulance to transport Drummond to a hospital pursuant to § 5150.  See id.  Before the ambulance arrived, the three officers decided to take Drummond into custody and knocked Drummond to the ground.  See id. The officers cuffed Drummond behind his back while he was on his stomach.  See id.  Although Drummond offered no resistance, one officer put his knees into Drummond's back and placed the

---

[25] The Court recognizes that only Calvert sat on the backboard and not all City Officers or County Deputies exerted the same amount of force at the same time or on key areas of Perez's body.  Nevertheless, the evidence indicates that all officers and deputies observed or participated in some manner in the detention, pressure, and placement of the backboard and thus, could be liable either for a failure to intervene or as integral participants.  See Green v. City & Cnty of San Francisco, 751 F.3d 1039, 1051 (9th Cir. 2014); Tobias, 996 F.3d at 584; Blankenhorn, 485 F.3d at 481 n.12.

weight of his body on Drummond.  See id.  Another officer also put his knees on Drummond's

back and placed his weight on Drummond, except one knee was on Drummond's neck.  See id.

Drummond repeatedly told the officers that he could not breathe and that the officers were

choking him.  See id.  Although it was obvious that Drummond was having trouble breathing, the

officers did nothing.  See id. at 1054-55.  A third officer arrived and placed a hobble restraint

around Drummond's ankles.  See id. at 1055.  One minute after the ankle restraint was placed,

Drummond went limp, and the officers realized that Drummond had lost consciousness.  See id. at

1055.  The officers checked Drummond's pulse, removed the cuffs and ankle restraint, and

attempted to perform CPR.  See id.  Although Drummond was briefly revived, he fell into a coma

and lapsed into a permanent vegetative state.  See id.  The Ninth Circuit found a constitutional

violation because Drummond was restrained, not resisting, was being taken into custody for his

own health, departmental training warned about placing weight on a prone subject, and the force

used was severe and unwarranted.  See id. at 1056-60.  The Ninth Circuit also held that qualified

immunity was improper because the officers "allegedly crushed Drummond against the ground by

pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for

air, and despite the fact that his hands were cuffed behind his back and he was offering no

resistance."  Id. at 1061.  Further, local stories, two recent federal district court cases, and police

department training materials all described the dangers of positional asphyxiation.  See id. at 1062.

Drummond is admittedly very close to the facts of this case.  However, there are key

differences.  First, the Ninth Circuit emphasized that Drummond was compliant and not resisting.

In this case, after Perez stood up, he was no longer compliant.  Moreover, Perez was resisting and

continuing to attempt to roll, raise up, or move his body after he was taken to the ground until

sometime after the backboard was placed.  Again, while the Court agrees that Perez at some point

was likely moving to get air, that does not seem true for the entire encounter or even most of the

encounter considering the volume and nature of the statements made by Perez.  Further, although

Perez may have been restrained by the officers, Perez was not sufficiently restrained to the point

that the AA personnel could safely transport him to the hospital.  Unlike Drummond, some form

of additional restraint, like the backboard, was necessary to transport Perez to the hospital.

1    Second, and more importantly, the officers in *Drummond* acted on their own and prior to

2    any medical personnel arriving on scene.  Both the City and the County have policies of having

3    the officers and deputies deferring to the direction of medical personnel for purposes of medical

4    treatment and transportation.  AA personnel had been summoned for the purpose of taking Perez

5    to the hospital.   From the evidence presented, the tipping point in the encounter occurred when

6    the backboard was placed on Perez's back.[26]  The backboard was placed at the direction of

7    paramedic Anderson and was placed for the purpose of restraining and transporting Perez to the

8    hospital, i.e. in furtherance of medical treatment and transportation.  While Perez was restrained

9    by the officers and deputies, Perez was not sufficiently restrained to the point that he could be

10   safely transported to the hospital, which necessitated the use of the backboard.  Additionally, it

11   was Anderson who ordered Calvert to sit on the backboard and was supervising the process of

12   applying the backboard.  It does not appear that any officer or deputy did anything on their own or

13   contrary to what AA personnel were directing, rather, the City Officers and County Deputies were

14   following the instructions of AA/medical personnel so that Perez could be taken to the hospital.

15   While the backboard was being placed, while Calvert sat on the backboard at the direction of

16   Anderson, and while other officers and deputies applied pressure, AA/medical personnel were

17   present, supervising, viewing Perez, and capable of monitoring Perez.  Plaintiffs cite no cases in

18   which officers applied pressure or a medical implement/device on a prone individual at the

19   direction of medical personnel for the purpose of transporting the individual to the hospital.

20   Therefore, existing case law does not make it clear that Defendants' conduct was unconstitutional.

21   The absence of a case establishing the unconstitutionality of an officer's conduct is not

22   fatal when the unconstitutional nature of the conduct is "obvious."  However, the "situations

23   where a constitutional violation is 'obvious,' in the absence of any relevant case law, are rare,"

24   and application of the "obviousness exception" in the Fourth Amendment context is "especially

25

26   [26] Plaintiffs do not attempt to argue that any particular application of pressure by a particular individual Defendant
     was unconstitutional, with the possible exception of Calvert.  Instead, Plaintiffs focus largely on the opinion of Dr.
27   Chambliss and on the fact that pressure was applied for an extended period of time while Perez was prone, which
     ultimately lead to Perez's death.  Dr. Chambliss's opinion focuses largely on the backboard.  See PSF No. 119.
28   Therefore, while the Court does consider the struggles and pressure that were applied leading up to the placement of
     the backboard, given Dr. Chambliss's opinion, the Court focuses mostly on placement of the backboard.  See id.

problematic." O'Doan v. Sanford, 991 F.3d 1027, 1044 (9th Cir. 2021).  While the Court would agree in general that it is obvious that application of enough weight and pressure on a prone individual can lead to the asphyxiation and death of a person, that is an improper over-generalization about what happened in this case.  From the time that AA personnel arrived, the City Officers and County Deputies followed the instructions of the AA personnel so that AA personnel could transport Perez to the hospital, all while AA personnel observed Perez and supervised the actions of the officers and deputies.  There is no question that summoning the AA personnel for purposes of a § 5150 transport was appropriate.  Further, in the Ninth Circuit, when someone is injured or in medical distress in the course of an arrest or detention, law enforcement personnel fulfill their constitutional obligations by summoning medical personnel/paramedics, like the AA personnel.  See Tatum v. City & Cnty of San Francisco, 441 F.3d 1090, 1098-99 (9th Cir. 2006).  It is not obvious why a police officer (who typically does not have the medical training of a paramedic) would know that applying pressure with hands, body, and a backboard to a detainee at the direction of the medical personnel who were summoned to transport the detainee to the hospital and who would have been called if that detainee was experiencing any kind of medical distress (including stopping breathing) was unconstitutional.  Therefore, this is not one of the rare cases in which the officers' and deputies' conduct was obviously unconstitutional.

Finally, the Court agrees with Plaintiffs' point that the officers and deputies would not defer to a paramedic's instruction regarding the use of force in general.  In the apprehension and detention of a criminal or a person who is a threat to others, the officers and deputies are attempting to arrest and take to prison a suspect.  The officers have the training and expertise to utilize various force options to effectuate the arrest of such an individual.  However, that is not this case.  Perez was being restrained under § 5150 for the purpose of providing him medical treatment because he was a danger to himself.  Perez was generally restrained, but he was not sufficiently restrained to the point that he could be safely transported to the hospital by AA personnel.  AA personnel were giving instruction on the application of a medical tool (the backboard) for the purpose of medical transport of a person who was in need of urgent medical care.  The expertise at that point shifts to the AA personnel.  Simply put, the use of force by the officers with the

placement of a backboard at the direction of medical personnel is fundamentally different from an officer utilizing a force option (e.g. a taser) to incapacitate and arrest a criminal.

In sum, given the unique factual situation that confronted the officers and deputies, particularly the presence and direction of the medical personnel, the Court concludes that it would not be "beyond debate" such that every reasonable official would understand that what the City Officers and County Defendants were doing was unlawful.  See Wesby, 138 S.Ct. at 589; Vos, 892 F.3d at 1035.  Thus, the City Officers and County Deputies are entitled to qualified immunity for Plaintiffs' Fourth Amendment claims based on pressure on Perez while he was prone.[27]

### b.    Towel & Ripp Restraint

The Court has determined that use of the towel to protect Perez's head from the concrete and application of the Ripp restraint did not violate the Fourth Amendment.  In the alternative, the Court holds that qualified immunity is appropriate.  Plaintiffs have not identified a case that is sufficiently close to the use of the towel or the use of the Ripp restraint[28] on Perez such that the City Officers and County Deputies would be placed on notice that their conduct was unconstitutional.  Moreover, the Court cannot say that this was an obvious case in which use of the towel or Ripp restraint was unconstitutional.

## B.    Third Cause of Action – 42 U.S.C. § 1983 – Fourteenth Amendment

### Defendants' Argument

The County Defendants argue that their conduct does not shock the conscience.  First, there was no purpose to harm Perez.  Each application of force prior to the arrival of AA personnel was done without time for deliberation and in an attempt to restrain Perez while he continued to resist.  Further, the pressure that was applied in an attempt to stabilize the backboard was done

---

[27] Plaintiffs have argued that the law enforcement defendants' actions were contrary to City and County policy/training.  To the extent that the City Officers or County Deputies violated their training or municipal policy, the Court cannot say that the violation was sufficient to negate qualified immunity, particularly considering the involvement of AA personnel. Cf. City & Cnty of San Francisco v. Sheehan, 575 U.S. 600, 616 (2015) ( "Even if an officer acts contrary to her training, . . . that does not itself negate qualified immunity where it would otherwise be warranted.").

[28] The Court again notes that the evidence is insufficient to support the assertion that Robnett and Manasan "hog-tied," i.e. twelve inches or less separated Perez's connected ankles and wrists, Perez.

quickly and in response to orders from AA personnel.  The County Deputies deferred to the judgment of AA personnel.  Second, in terms of deliberate indifference, the actions of the deputies prior to the arrival of AA personnel were performed in an attempt to gain compliance from Perez and to contain his resistance.  The County Deputies argue that they were concerned about Perez's ability to breathe and no action was taken despite knowledge of a substantial risk of serious harm.  Alternatively, the County Deputies argue that the law was not clearly established and thus, are entitled to qualified immunity.

The City Defendants make similar arguments.  First, the City Defendants argue that because Perez's restraint resulted from a snap judgment about the best way to handle the escalating situation, the purpose to harm standard applies.  However, there is no evidence that a City Officer acted with a purpose to harm that was unrelated to legitimate law enforcement objectives.  Second, even if the deliberate indifference standard applied, the officers' use of force was not without justification and was reasonable.  The City Officers did not know that Perez could be put in excessive risk by their actions when Perez continued to speak and move, low-level methods of restraint were used, and they were following the instructions of emergency medical personnel.  Alternatively, the City Deputies argue that they are entitled to qualified immunity.

*Plaintiffs' Opposition*

Plaintiffs argue that the facts of this case are indicative of deliberate indifference because officers asphyxiated an unarmed and defenseless man who was already handcuffed and who posed no substantial danger to anyone.  The asphyxiation did not involve a split-second snap judgment, since Stoltenberg testified that there was a discussion about the best way to put Perez on the backboard.  If there is time to discuss, there is time to deliberate.  However, even if there was no time to deliberate, the evidence is sufficient to demonstrate a purpose to harm.  All the individual Defendants knew that restraining a person in a prone position for an extended period of time could result in death, and the individual Defendants were all present when Perez stated that he could not breathe.  Further, Perez's death was particularly brutal and horrifying because for a protracted period of time, Perez struggled to breathe while officers pressed down on him and ignored his plea that he could not breathe. This evidence demonstrates malice and a purpose to cause harm.

1    As to qualified immunity, for the reasons that qualified immunity was inappropriate for the

2    Fourth Amendment claims, it is inappropriate for the Fourteenth Amendment claims.

3        *Legal Standards*

4        The Fourteenth Amendment encompasses protected liberty interest in the companionship

5    and society between a parent and child.  See Lam v. City of Los Banos, 976 F.3d 986, 1003 (9t h

6    Cir. 2020); A.D. v. State of Cal. Highway Patrol, 712 F.3d 446, 453 (9th Cir. 2013); Wilkinson v.

7    Torres, 610 F.3d 546, 554 (9th Cir. 2010).  A government officer violates this liberty interest if he

8    engages in conduct that shocks the conscience.  See Lam, 976 F.3d at 1003; A.D., 713 F.3d at 453;

9    Wilkinson, 610 F.3d at 554.  The Fourteenth Amendment's shocks the conscience standard is

10   different from the Fourth Amendment's reasonableness standard.  Lam, 976 F.3d at 1003.

11   Conduct will shock the conscience depending on whether the circumstances were such that actual

12   deliberation by the officer was practical.  Lam, 976 F.3d at 1003; Nicholson v. City of L.A., 935

13   F.3d 685, 692 (9th Cir. 2019); Wilkinson, 610 F.3d at 554.  If deliberation is practical, the

14   officer's conduct will shock the conscience if the conduct was done with "deliberate indifference."

15   See Nicholson, 935 F.3d at 692-93; A.D., 712 F.3d at 453; Wilkinson, 610 F.3d at 554.  Conduct

16   is done with deliberate indifference if the officer disregarded "a known or obvious consequence of

17   his action."  Nicholson, 935 F.3d at 693; Patel v. Kent Sch. Dist., 648 F.3d 965, 974 (9th Cir.

18   2011).  Deliberate indifference "entails something more than negligence but is satisfied by

19   something less than acts or omissions for the very purpose of causing harm or within knowledge

20   that harm will result."  Tennison v. City & Cnty of San Francisco, 570 F.3d 1078, 1089 (9th Cir.

21   2009).  If deliberation is not practical, such as where an officer makes a snap judgment because of

22   an escalating situation, the officer's conduct will shock the conscience if the officer acted with a

23   purpose to harm that was unrelated to legitimate law enforcement objectives.  See A.D., 712 F.3d

24   at 453; Wilkinson, 610 F.3d at 554.  The "purpose to harm" standard is a "heightened" standard

25   and a subjective standard of culpability.  See Lam, 976 F.3d at 1003; A.D., 712 F.3d at 453.  An

26   officer may act with a legitimate purpose when his objective is self-defense, arrest, or protecting

27   the public, but may act with an illegitimate purpose when his objective is to bully a suspect, "teach

28   the suspect a lesson," or to get even.  See Lam, 976 F.3d at 1003-04; Nehad v. Browder, 929 F.3d

38

1125, 1139 (9th Cir. 2019).  "[A]lthough most purpose to harm cases will involve evidence of ulterior motive or bad intent separate and apart from evidence of an unreasonable use of force," some cases might involve a use of force that is "so grossly and unreasonably excessive that it alone could evidence a subjective purpose to harm."  Nehad, 929 F.3d at 1140.  The term "deliberation" is not to be interpreted in a narrow, literal, or technical sense.  See Wilkinson, 610 F.3d at 554.  If an officer is forced to act quickly because of an escalating situation or the evasive actions of a suspect, then it will be deemed that an insufficient period of time for deliberation existed and the heightened purpose to harm standard will apply.  See Lam, 976 F.3d at 1003-04; Wilkinson, 610 F.3d at 554.

*Discussion*

1.    Constitutional Violation

Plaintiffs' familial relationship was interfered with at the point in which Perez stopped breathing and died.  As discussed above, Dr. Chambliss opined that Perez was asphyxiated and died because a "backboard was placed on [Perez] in such a fashion as he is also being placed in a hobble type condition, and during that particular process, greater than a ten minute restraining process, he becomes unresponsive . . . ."  PSF No. 119.  The Court therefore continues to view the key point as the placement of the backboard and the continued restraint and pressure on Perez and the backboard.

At the time that the backboard was placed, Perez was restrained by multiple law enforcement officers and handcuffed, but Perez was not sufficiently restrained for purposes of medical transport.  AA personnel evaluated the scene and gave instructions.  The bodycam video does not appear to show AA personnel making quick or urgent demands of any deputy or officer.  Further, Plaintiffs are correct that Stoltenberg testified that he recalled discussion on how to place the backboard on Perez.  See PSF No. 89; Stoltenberg Depo. 46:1-3.  Under these circumstances, deliberation was possible, which means that the deliberate indifference standard applies.

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could conclude that the City Officers and County Deputies acted in reckless disregard of Perez's rights.  Prior to the placement of the backboard, Perez had been struggling and had varying

degrees of pressure applied to him while he was prone.  When the backboard was placed, he had the weight of Calvert, plus the weight of the backboard, plus unknown additional amounts of pressure from other officers and deputies bearing down on him.  Importantly, no City Officer or County Deputy appears to have checked and ensured that Perez could actually breathe after Perez said that he could not breathe.  Law enforcement officers are trained to take such a statement seriously, the County has policies regarding compression asphyxiation, and the City and County train their officers to monitor breathing, yet no one appears to have actually confirmed Perez's ability to breathe.  While it was determined that Perez was moving, there was no follow up about his ability to breathe.  Instead, the City Officers and County Deputies either continued to apply some form pressure on Perez or watched some form of pressure being applied once it was determined that Perez could move.  Given the struggles that preceded the placement of the backboard, the force associated with application of the backboard, the policies of the City and County, and the City Officers and County Deputies' failure to more specifically follow up on Perez's statement that he could not breathe, a reasonable trier of fact could conclude the City Officers and County Deputies acted with reckless disregard for Perez's safety and rights.[29]

      2.    Qualified Immunity

      The parties briefing on qualified immunity makes no distinction between the Fourth Amendment claims and the Fourteenth Amendment claims.[30]  Therefore, Plaintiffs contend that either the officers and deputies' conduct were obviously unconstitutional or that *Drummond* put the officers and deputies on notice that their actions were unconstitutional.

      For the same reasons explained above, the Court again concludes that the officers and deputies are entitled to qualified immunity.  As to *Drummond*, that case is distinguishable because of:  (1) the presence and direction of emergency medical personnel in the medical transportation

---

[29] To the extent that Plaintiffs contend that a constitutional violation occurred even if there was not time to deliberate under the purpose to harm standard, summary judgment on such a theory is appropriate.  The undisputed evidence indicates that the officers and deputies were taking Perez into custody under § 5150 for his own safety, were attempting to control Perez, attempted to keep his head from hitting concrete, had called emergency medical personnel, checked when the ambulance was late, and followed all instruction from AA personnel once they arrived on scene, all in an attempt to transport Perez to the hospital.  There is no purpose to harm.

[30] The Court notes that the standards that determine a Fourth Amendment violation are different from the standards that determine a Fourteenth Amendment violation.  See Lam, 976 F.3d at 1003.

1   process (including placement of the backboard); (2) Perez acted in a resistive manner and was not

2   compliant; and (3) Perez was not sufficiently restrained for purposes of medical transport.  As to

3   obviousness, it would not be obvious that following the instructions of AA personnel so that they

4   could transport Perez to the hospital, all while AA personnel observed Perez and supervised the

5   actions of the officers and deputies, would violate the Fourteenth Amendment.  Therefore, for the

6   same reasons that the County Deputies and City Officers are entitled to qualified immunity for the

7   Fourth Amendment claims, the County Deputies and City Officers are entitled to qualified

8   immunity for the Plaintiffs' Fourteenth Amendment claim.

9       **C.**       **Fifth Cause of Action – 42 U.S.C. § 1983 –** *Monell Liability*

10      *Defendants' Argument*

11          The County argues that there is no *Monell* liability because there was no constitutional

12   violation and because none of the *Monell* theories advanced by Plaintiffs are viable.  First, there is

13   no ratification.  The investigation into this matter has been tolled pursuant to Cal. Gov. Code §

14   3304(f), and the County has made no determinations regarding the County Deputies' conduct.

15   Second, there is no evidence that the County has been deliberately indifferent by failing to train its

16   deputies.  The County trains its officers regarding the use of force, restraints, intervening when

17   violations of policy or law by another officer, asphyxia, respiratory compromise, and sudden death

18   syndrome.  There is no evidence that deputies were improperly trained or that a policy of

19   inadequate training exists.  Finally, there is no evidence that the County has ever had a policy,

20   practice, or custom regarding the use of restraints that cause asphyxia or death.

21          The City makes similar arguments.  The City argues that there was no constitutional

22   violation, Plaintiffs have failed to show that any City policies are deliberately indifferent or the

23   cause of any constitutional violations, there is no evidence that the City disregarded a substantial

24   risk of inadequate training, and Plaintiffs fail to identify any deficiency in training.

25      *Plaintiffs' Opposition*

26          With respect to the City, Plaintiffs argue that while written City policies prohibit officers

27   from engaging in the conduct that killed Perez, the City Officers testimony shows that they were

28   unaware of these policies.  Calvert reviewed training materials relating to restraints, handcuffing,

1  mentally ill persons, and persons under the influence and did not remember seeing any mention of

2  positional asphyxia, restraint asphyxia, or compression asphyxia.  Calvert was trained that recent

3  medical studies show that it is unlikely that a person will stop breathing due to positional

4  asphyxia.  Calvert was trained that if a person is able to talk and respond, the person is probably

5  breathing and he did not know whether a person could be deprived of oxygen and still talk.  Also,

6  Martinez was not trained that if pressure is applied to the back of a prone person for some period

7  of time that the person could asphyxiate and stop breathing.  Rosetti was not trained that if

8  someone is in a prone position and enough pressure is applied to that person's back over some

9  period of time, they could asphyxiate and stop breathing.  Rosetti was also not trained that officers

10  should try and turn such a person on his side as soon as possible.  Finally, the City's Rule 30(b)(6)

11  witness gave non-answers and was evasive.  These training failures are the equivalent of providing

12  firearms to officers without giving them training on the constitutional limits of deadly force.  The

13  fact that three involved officers did not know the relevant City policies is enough for a jury to

14  conclude that the training was inadequate.

15       With respect to the County, while the County has policies that prohibited the deputies from

16  engaging in the conduct that killed Perez, the County Deputies violated those policies.

17  Specifically, the County Deputies violated:  (1) the policy against hog-tying; (2) the policy against

18  spit masks, which also applies to the use of the towel; (3) the policy against restraining subjects on

19  their stomachs; and (4) training regarding restraint/positional asphyxia.  Robnett expressed a belief

20  that was directly contrary to training and policy that it was "very unlikely" that applying

21  downward pressure on someone's back while they were prone could cause asphyxiation and death.

22  A jury could view this evidence and conclude improper training was the moving force behind

23  Perez's death.

24       *Legal Standards*

25       Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be

26  liable for causing a constitutional deprivation.  Monell v. Department of Soc. Servs., 436 U.S. 658,

27  690 (1978); Castro v. County of L.A., 797 F.3d 654, 670 (9th Cir. 2015).  A municipality,

28  however, "cannot be held liable solely because it employs a tortfeasor or, in other words, a

municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory." Monell, 436 U.S. at 691; see Castro, 797 F.3d at 670.  Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  Monell, 436 U.S. at 694; Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008).  Municipal liability may be premised on: (1) conduct pursuant to a formal or expressly adopted official policy; (2) a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate.  See Thomas v. County of Riverside, 763 F.3d 1167, 1170 (9th Cir. 2014); Price, 513 F.3d at 966.

In limited circumstances, a government's failure to train may rise to the level of an official policy, but municipal "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Connick v. Thompson, 563 U.S. 51, 61 (2011); Benavidez v. County of San Diego, 993 F.3d 1134, 1154 (9th Cir. 2021).  A municipality's failure to train its employees may create § 1983 liability where the "failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact."  Connick, 563 U.S. at 61; City of Canton v. Harris, 489 U.S. 378, 388 (1989).  To recover for a failure to train, a plaintiff must show:  (1) he was deprived of a constitutional right, (2) the municipality had a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons with whom [its police officers] are likely to come into contact;" and (3) his constitutional injury would have been avoided had the municipality properly trained those officers.  Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007); see Benavidez, 993 F.3d at 1153-54.  The  inadequate training must have "actually caused" the deprivation of rights.  Marsh v. County of San Diego, 680 F.3d 1148, 1159-60 (9th Cir. 2012); Merritt v. County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989). "Deliberate indifference is a stringent standard of fault requiring proof that a municipal actor

disregarded a known or obvious consequence of his action." Connick, 563 U.S. at 61; Kirkpatrick v. County of Washoe, 843 F.3d 784, 794 (9th Cir. 2016); Flores v. County of L.A., 758 F.3d 1154, 1158 n.10 (9th Cir. 2014).  "Mere negligence in training or supervision . . . does not give rise to a Monell claim." Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference' for purposes of failure to train." Connick, 563 U.S. at 62; Kirkpatrick, 843 F.3d at 794; Flores, 758 F.3d at 1159.  However, although "rare," "in a narrow range of circumstances," a pattern of similar violations may not be necessary where violations of constitutional rights are patently obvious or the "highly predictable consequence" of a failure to train.  Connick, 563 U.S. at 63; Hyde v. City of Willcox, 23 F.4th 863, 874-75 (9th Cir. 2022); Kirkpatrick, 843 F.3d at 794; Flores, 758 F.3d at 1159.  Finally, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." City of Canton, 489 U.S. at 391; Hyde, 23 F.4th at 875; Erdman v. Cochise Cnty., 926 F.2d 877, 882-83 (9th Cir. 1991).  "[A]n inadequate training policy itself cannot be inferred from a single incident." Hyde, 23 F.4th at 875; see Merritt, 875 F.2d at 770 ("Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the County.").

### *Discussion*

#### 1.    The County

Plaintiffs do not address all of the *Monell* related arguments raised by the County.  Instead Plaintiffs only pursue an inadequate training theory.  The problem, however, is that Plaintiffs have not addressed the general rule for inadequate training.  As stated above, in an inadequate training case, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference' for purposes of failure to train." Connick, 563 U.S. at 62; Kirkpatrick, 843 F.3d at 794; Flores, 758 F.3d at 1159.  Plaintiffs have not identified any other situations in which County deputies have played a material role in the compression asphyxiation of other individuals, particularly when emergency medical personnel are present and giving instructions.

1    Without other instances that demonstrate a pattern of similar constitutional violations,

2  Plaintiffs' alternative is to demonstrate that the shortcomings in the County's training program are

3  so deficient that a constitutional violation is patently obvious or highly predictable.  See Connick,

4  563 U.S. at 63; Kirkpatrick, 843 F.3d at 794; Flores, 758 F.3d at 1159.  However, Plaintiffs do not

5  identify any problems with the policies or training implemented by the County, nor do Plaintiffs

6  identify any training that the County does not perform.  Further, there is no showing that any

7  training provided or the absence of particular training makes constitutional violations similar to

8  the one in this case patently obvious or highly predictable.  Therefore, Plaintiffs have not

9  demonstrated that this is one of the rare cases in which a pattern of similar violations are

10  unnecessary.

11    Plaintiffs point out that Robnett testified that compression asphyxiation by pressing weight

12  on the back of a prone individual is extremely rare.  However, this is the testimony of a single

13  deputy, it still is part of only a single incident, and it does not state that compression asphyxiation

14  is not a phenomenon or an area of concern.  Plaintiffs do not cite authority that shows how this

15  particular testimony from a single deputy is sufficient to demonstrate a training program that is

16  deliberately indifferent to the rights of Fresno County residents.

17    Plaintiffs also argue that the County Deputies violated four County policies.  However, as

18  discussed above, there is insufficient evidence that Perez was hog-tied under the County's policy

19  and McEwen was not using the towel as a substitute for a spit mask.  Further, it is not necessarily

20  clear that the County Deputies may have violated the policy against keeping a suspect prone for an

21  unreasonable period of time, and it is not necessarily clear that the County Deputies violated a

22  policy that recognizes that positional or compression asphyxiation is a real phenomenon.

23  Assuming a violation of those two policies, Plaintiffs again cite no authority that shows how these

24  violations demonstrate a training program that is so inadequate that it shows deliberate

25  indifference.  "[A]dequately trained officers occasionally make mistakes; the fact that they do says

26  little about the training program or the legal basis for holding the [municipality] liable."  City of

27  Canton, 489 U.S. at 391; Hyde, 23 F.4th at 875; Erdman, 926 F.2d at 882-83.

28    In sum, Plaintiffs ultimately are relying on this incident with Perez to demonstrate

45

deliberately indifferent training.  But "an inadequate training policy itself cannot be inferred from a single incident."  Hyde, 23 F.4th at 875; see Merritt, 875 F.2d at 770.  Because Plaintiffs have not presented sufficient evidence that demonstrates deliberately indifferent training, summary judgment in favor of the County on Plaintiffs' Monell claim is appropriate.  See Connick, 563 U.S. at 61-63; Hyde, 23 F.4th at 874-75; Kirkpatrick, 843 F.3d at 794; Flores, 758 F.3d at 1159; Erdman, 926 F.2d at 882-83; Merritt, 875 F.2d at 770.

2.     The City

Plaintiffs' opposition addresses only an inadequate training theory against the City.  Like their Monell claim against the County, Plaintiffs do not present any evidence of a "pattern of similar constitutional violations" involving compression asphyxiation by City police officers, particularly when emergency medical personnel are present and giving instructions.  Further, Plaintiffs do not identify any problem with the policies or training implemented by the City, do not identify any necessary training that the City does not perform, and make no showing that any training provided or the absence of particular training makes constitutional violations similar to the one in this case patently obvious or highly predictable.

Plaintiffs argue that the City Officers were unaware of the relevant policies of the City.  However, Calvert was trained about compression asphyxia, that enormous weight on a person's back could cause asphyxia, and to monitor the breathing of prone individuals by asking questions.  See Calvert Depo. 90:10-92:3, 96:2-16.  Although Calvert indicated that the policies regarding handcuffs and restraints that he had reviewed did not use terms like positional asphyxia, there is no evidence that he did not know the policy that, once a person has been secured, the person should not be placed in a prone position.  It is true, as Plaintiffs point out, that Calvert did not know if a person could still be talking yet be deprived of oxygen, and Calvert mentioned medical literature that indicated that compression asphyxiation is extremely unlikely.  However, Plaintiffs have submitted no evidence about whether a person who is being deprived of oxygen could have been able to vocalize in both the duration and volume as Perez did for most for the encounter.[31]

---

[31] At least from a lay perspective, it would seem that loud and frequent vocalizations or answers to questions, even if the vocalizations or questions did not expressly relate to or address the ability to breathe, would indicate that a person has sufficient oxygen in their lungs.

1  Further, Plaintiffs have cited the Court to no evidence regarding any scientific information to

2  contradict Calvert's belief regarding recent medical literature or that demonstrates a consensus or

3  common understanding regarding positional or compression asphyxia during police encounters.

4       With respect to Martinez, he testified that he was not trained that prolonged pressure on the

5  back of a prone individual could cause asphyxia and an inability to breathe.  There is no indication

6  that Martinez did not know that individuals who were securely restrained were not to be kept in a

7  prone position.  With respect to Rosetti, he testified that he was unaware that prolonged

8  compression on the back of a prone individual could cause asphyxia and he did not appear to be

9  aware of the policy that individuals who have been detained in a prone position are to be placed in

10  a recovery position as soon as possible.  This evidence indicates that one officer was unaware of

11  the policy regarding recovery positions for individuals who were detained in a prone position, and

12  two officers were unaware that some amount of pressure on the back of a prone individual for a

13  prolonged period of time could lead to asphyxia.  Plaintiffs cite no authority that shows how the

14  testimony of these two officers demonstrate a City wide training program that is so inadequate that

15  it shows deliberate indifference.  "[A]dequately trained officers occasionally make mistakes; the

16  fact that they do says little about the training program or the legal basis for holding the

17  [municipality] liable."  City of Canton, 489 U.S. at 391; Hyde, 23 F.4th at 875; Erdman, 926 F.2d

18  at 882-83.

19       In sum, because Plaintiffs have not presented sufficient evidence that demonstrates

20  deliberately indifferent training, summary judgment in favor of the City on Plaintiffs' *Monell*

21  claim is appropriate.  See Connick, 563 U.S. at 61-63; Hyde, 23 F.4th at 874-75; Kirkpatrick, 843

22  F.3d at 794; Flores, 758 F.3d at 1159; Erdman, 926 F.2d at 882-83; Merritt, 875 F.2d at 770.

23       **D.**     **Punitive Damages**

24       As municipalities, punitive damages are not available against the City or the County.  See

25  City of Newport v. Fact Concerts, 453 U.S. 247, 271 (1981); Howard v. City of Coos Bay, 871

26  F.3d 1032, 1044 n.9 (9th Cir. 2017); Bell v. Clackamas Cnty, 341 F.3d 858, 868 n.4 (9th Cir.

27  2003).  Further, the Court has found that the County Deputies and City Officers are entitled to

28  qualified immunity for the § 1983 constitutional claims alleged against them.  Therefore, there is

1  no predicate federal claims that can serve as the basis for punitive damages against the individual

2  defendants.  See Booke, 98 F.Supp.3d at 1132; Romero v. Nevada Dep't of Corr., 2013 U.S. Dist.

3  LEXIS 168736, *48 n.23 (D. Nev. Nov. 27, 2013).  Plaintiffs' claims for punitive damages under

4  § 1983 will be dismissed.

5

6  **II.     AA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – FEDERAL CLAIMS**

7       **A.     Second & Fourth Causes of Action – 42 U.S.C. § 1983 – Fourth & Fourteenth**

8            **Amendment**

9       *Defendants' Argument*

10         Anderson argues that he is entitled to qualified immunity for the § 1983 claims alleged

11  against him.  AA personnel were called to render medical aid and medical transport pursuant to

12  § 5150.  No Supreme Court or Ninth Circuit authority has addressed liability for Fourth or

13  Fourteenth Amendment violations by a paramedic.  However, cases from the Sixth, Seventh, and

14  Eighth Circuits indicate that emergency responders/paramedics like Anderson who restrain

15  individuals while providing emergency medical aid are not subject to liability under the Fourth or

16  Fourteenth Amendments.  Therefore, because it was not clearly established that any action by

17  Anderson was unconstitutional, qualified immunity is appropriate.  Additionally, with respect to

18  the Fourteenth Amendment interference with familial relationship claim, Anderson argues that he

19  was not deliberately indifferent and did not act with a purpose to harm.  The evidence

20  demonstrates that his actions were undertaken for medical purposes and not for a purpose to harm

21  or with deliberate indifference.

22       *Plaintiffs' Opposition*

23         Plaintiffs argue that Anderson is not entitled to qualified immunity.  Qualified immunity

24  protects public servants for conduct that they could not reasonably anticipate would be improper,

25  it does not protect the incompetent or those who knowingly disregard the rights of others.   At his

26  deposition, Anderson heard on the bodycam video someone telling the City Officers to sit on the

27  backboard.  However, Anderson claimed that he could not tell if that was his voice because that

28  would not be something that he would normally do.  Anderson said he did not know who said to

sit on the backboard, and he acknowledged that sitting on top of a patient is generally not a good idea because *inter alia* it could cause the patient to asphyxiate and stop breathing.  Only after his deposition and in response to a request for admission did Anderson admit that he was the one who had told the City Officers to sit on the board.  By his own admission, Anderson knew that his instructions were unlawful and "not a good idea."  Further, *Drummond* illustrates the dangers of improper restraint techniques and asphyxiation and it established a constitutional right against such asphyxiation.  Finally, this case involves conduct that was obviously unconstitutional.  None of AA's training materials reference restraining a patient onto a backboard while the patient is prone.  Dines testified that he was trained that a patient should be in a supine position before applying a backboard because that method helps medical personnel visualize the airway.  Dines and Ortiz had never seen a patient restrained to a backboard in a prone position.  Thus, Anderson's application of the backboard was for a purpose he invented on his own, which he knew was not a good idea because it could lead to asphyxia, was contrary to *Drummond*, and contrary to the training and practice of AA.

With respect to the Fourteenth Amendment claim, Plaintiffs argue that the deliberate indifference standard applies to this case because no snap judgments were required and Anderson and the law enforcement officers had time to discuss the best way to place the backboard. Nevertheless, whether the deliberate indifference or a purpose to harm standard applies, the evidence is sufficient to show a constitutional violation.  The evidence indicates that all of the defendants knew that restraining a person for an extended period of time could result in death, and all defendants were present when Perez stated that he could not breathe.  For a protracted period of time, Perez struggled to breathe while the defendants pressed down on him and ignored his plea that he was unable to breathe.

### *Discussion*

#### 1.    Fourteenth Amendment Standard

For the same reasons discussed above with respect to the law enforcement defendants, the Court concludes that deliberation was possible.  At the time that Anderson arrived, he saw Perez yelling and moving/thrashing, but Perez was handcuffed, hobbled, surrounded by law

1  enforcement, and had  a towel around his head.  Anderson appears to have assessed the situation,

2  see Anderson Depo. 80:5-16, and there was a discussion about the best way to put the backboard

3  on Perez.  See PSF No. 89; Stoltenberg Depo. 46:1-3.  The bodycam video does not appear to

4  show Anderson making quick or urgent decisions.  Therefore, the Court concludes that there was

5  time for Anderson to deliberate and the deliberate indifference standard applies.

6         To the extent that Plaintiffs contend that a constitutional violation occurred even if there

7  was not time to deliberate under the purpose to harm standard, summary judgment on such a

8  theory is appropriate.  The undisputed evidence indicates that AA personnel had been summoned

9  by the City Officers to take Perez into custody under § 5150 for his own safety.  The call was

10  initially a Code Two, indicating a "normal" § 5150 request, but was elevated shortly thereafter to a

11  Code Three and Stoltenberg had reported that Perez was being combative.  It is apparent that

12  Anderson observed Perez and concluded that Perez was not sufficiently restrained for medical

13  transport.  Anderson decided to utilize the backboard and then gave instructions to law

14  enforcement so that the backboard could be placed on Perez.  The backboard was used as part of

15  the process of transporting Perez for further medical treatment.  None of the evidence submitted,

16  including the video, indicates that any of Anderson's instructions were performed for a purpose

17  other than to provide medical treatment for Perez's own safety.  This is particularly so considering

18  his instruction for McEwen to either stop using the towel around Perez's head or hold Perez's

19  head by hand instead, which indicates concern for Perez.  Therefore, any Fourteenth Amendment

20  violation occurred only under the deliberate indifference standard.

21         2.      Qualified Immunity

22         Courts have observed that there are relatively few cases that apply Fourth or Fourteenth

23  Amendment constitutional standards to paramedics who respond to calls for emergency medical

24  services.  See Peete v. Metro. Gov't of Nashville & Davidson Cty., 486 F.3d 217, 220 (6th Cir.

25  2007); Martinez v. City of L.A., 2021 U.S. Dist. LEXIS 191059, *18 (C.D. Cal. July 23, 2021).

26  The parties have cited no Ninth Circuit or Supreme Court cases that have addressed such liability.

27  Prior to May 2017 (the date of this incident), the Court is aware of two cases that addressed

28  constitutional liability against paramedics in situations similar to this case.

First, in *Peete*, paramedics responded to a 911 call that had requested medical assistance for someone experiencing an epileptic seizure.  See Peete, 486 F.3d at 219-20.  Upon arrival at the residence, the paramedics briefly discussed the epileptic history of one Becerra with Becerra's grandmother.  See id. at 220.  Paramedics then restrained Becerra "by using their bodies to apply weight and pressure to Becerra's head, neck, shoulders, arms, torso, and legs in an attempt to prevent [him] from moving."  Id.  The paramedics also tied Becerra's hands and ankles behind his back and continued to apply pressure to Becerra while he was in a prone position.  See id.  The paramedics did not take any precautions to ensure that Becerra had a clear passage to breathe.  See id.  Shortly after being restrained in this manner, Becerra died.  See id.  In assessing qualified immunity, the Sixth Circuit noted that, "where the purpose is to render solicited aid in an emergency rather than to enforce the law, punish, deter, or incarcerate, there is no federal case authority creating a constitutional liability for the negligence, deliberate indifference, and incompetence alleged in the instant case."  Id. at 221.  While distinguishing prior Sixth Circuit precedent (*Champion v. Outlook Nashville*, 380 F.3d 893 (6th Cir. 2004)), the *Peete* court further explained:

> The *Champion* case does not support the plaintiff's argument that paramedics violated Becerra's Fourth Amendment rights. The paramedics did not unreasonably seize him for the purpose of interfering with his liberty. They responded to Becerra's grandmother's call that he was experiencing an epileptic seizure and needed medical attention. They were not acting to enforce the law, deter or incarcerate. They are unlike the police officers in *Champion* who handcuffed and shackled the plaintiff in order to arrest and incapacitate him. The cases are not the same because the paramedics acted in order provide medical aid to Becerra. They were attempting to help him, although they badly botched the job according to the complaint.
>
> Since Becerra was neither communicative, nor conscious and the paramedics were attempting to render aid, neither Green nor Champion applies. The plaintiff does not allege that either Becerra or his grandmother asked the paramedics to refrain from treating him. The plaintiff's excessive force claim thus looks like a medical malpractice claim rather than a Fourth Amendment or Due Process violation. Assuming arguendo that the restraint techniques used by the EMT's were excessive or medically unreasonable, the plaintiff may be entitled to recovery under the state law of negligence, but improper medical treatment by a government employee, standing alone, does not violate the Fourth or Fourteenth Amendment.

Id. at 222.  Ultimately, the Sixth Circuit concluded that there was "no basis at all in this case on which plaintiff can recover for a federal constitutional tort . . . ."  Id. at 223.

1   Subsequent Sixth Circuit authority that pre-dates May 2017 described *Peete* in relevant

2   part as holding:  "the Fourth Amendment did not apply to the  actions of paramedics responding to

3   a 911 call who 'were not acting to enforce the law, deter or incarcerate,' but rather were acting to

4   'provide medical aid.' [Peete, 486 F.3d at 222].  Even if the paramedics' techniques were

5   medically unreasonable or excessive, such 'improper medical treatment by a government

6   employee, standing alone, does not violate the Fourth or Fourteenth Amendment.  Id.'"  Hearring

7   v. Sliwowski, 712 F.3d 275, 281 (6th Cir. 2013).

8   Second, in *Haas*, pre-school teacher Haas stepped out of his classroom after feeling light-

9   headed and collapsed on the floor.  See Haas v. County of El Dorado, 2012 U.S. Dist. LEXIS

10  56801, *2 (E.D. Cal. Apr. 2, 2012).  Co-workers called 911 for emergency medical service.  See

11  id.  However, after two minutes, Haas stood up, told his co-workers he was feeling fine, and went

12  to the bathroom to compose himself.  See id. at *2-*3.  When the paramedics arrived, they found

13  Haas standing without assistance in the bathroom.  See id. at *3.  After questioning Haas, the

14  paramedics advised him that they were going to take him to a hospital (which was located 100 feet

15  from the school).  See id.  Haas stated that he was feeling fine, that he did not want or need to go

16  to the hospital, and that he was declining medical treatment.  See id.  Haas said that he did not

17  want an ambulance charge and that he would either walk to the hospital or have a co-worker drive

18  him.  See id.  The paramedics told Haas that he had no choice, but Haas again declined to be

19  treated or transported to the hospital and returned to work.  See id. at *3-*4.  At some point, the

20  paramedics called the police and requested assistance.  See id. at *4.  Police officers arrived at the

21  school and went to Haas's classroom with the paramedics.  See id.  After clearing the classroom,

22  the police officers told Haas that he had to comply with the paramedics' orders.  See id.  Haas

23  again refused.  See id.  When Haas attempted to leave the classroom, the officers tackled him to

24  the ground.  See id. at *5.  Haas was forced to lie face down, was handcuffed, and tasered three

25  times.  See id.  One of the police officers ordered a paramedic to sedate Haas.  See id.  Despite

26  Haas stating that he declined all medical treatment, a paramedic injected Haas with a sedative.

27  See id.  Haas was then shackled, placed on a gurney, and transported.  See id.  In assessing

28  whether the paramedics violated any clearly established rights, District Judge England examined

*Peete*, *Green v. New York*, 465 F.3d 65 (2d Cir. 2004) (a case in which the Second Circuit found

Fourth Amendment liability against a paramedic who refused to honor a competent plaintiff's

refusal of medical treatment),[32] and *McKenna v. Edgell*, 617 F.3d 432 (6th Cir. 2010) (a case in

which the Sixth Circuit held that the rationale in *Peete* could apply to police officers if the officers

acted in an emergency medical response capacity).  See id. at *16-*-*23.  After examining *Peete*,

*Green*, and *McKenna*, Judge England explained:

> When synthesized, the above cases, all of which had been decided before the
> incident alleged in the Complaint took place, suggest that defendants - police
> officers or paramedics - who "seize" an individual while responding to a 911 call
> requesting medical assistance are entitled to qualified immunity when:
>
> (1) the plaintiff was unconscious, incompetent to refuse medical treatment, or
> dangerous; (2) defendants acted as medical emergency responders, as opposed to
> law enforcement officer; and (3) the plaintiff was in actual or apparent need of
> medical assistance.

Id. at *23-*24.  Because the paramedic defendants could not meet the above criteria, qualified

immunity was denied.  See id. at *24.

Cases subsequent to May 2017 from outside the Sixth Circuit have acknowledged and

followed *Peete*.

In *Thompson*, the Seventh Circuit addressed whether a paramedic was entitled to qualified

immunity.  See Thompson v. Cope, 900 F.3d 414, 420-24 (7th Cir. 2018).  Paramedic Cope had

been dispatched to treat a person who had been bitten by another person.  See id. at 418.  Before

assessing the bite victim, officers asked Cope to take a look at one Heishman (who had bitten the

other person) because he was being combative.  See id.  Heishman had been running naked in the

street, was delusional and sweating profusely, appeared to be on drugs, refused to obey

commands, and the officer and two bystanders had to use force to restrain him.  See id.  Cope saw

Heishman lying prone on the street with his hands cuffed, his ankles hobbled, and his ankles and

wrists shackled together.  See id.  In the struggle, Heishman had been punched, choked, and

tasered.  See id.  Heishman was still struggling and fighting with officers who were holding him

on the ground.  See id.  Cope checked Heishman's breathing and pulse and gave Heishman a

---

[32] The Court does not find that *Green* is relevant to this case because the plaintiff in *Green* was capable of declining medical treatment (unlike Perez who was delusional) and was not being detained under the New York equivalent of § 5150.  See Green, 465 F.3d at 83.

sedative for his and others' safety.  See id.  Cope watched Heishman's breathing.  See id.  Cope

and the officers eventually picked Heishman up, laid him on his back on a cot, and covered him

with a blanket while waiting for an ambulance.  See id.  Because it was night, the darkness made it

difficult for Cope to assess Heishman.  See id.  When Heishman was eventually placed in the

ambulance, he had no pulse and was not breathing.  See id.  CPR eventually restored a heartbeat,

but Heisman lost brain function and died eight days later.  See id.  In assessing Cope's actions, the

Seventh Circuit found two cases that had allowed § 1983 cases to proceed against paramedics, but

the reasoning of those cases did not apply to the facts of the case.  See id. at 420-21.  The Seventh

Circuit did not decide whether there was actually a constitutional violation and instead analyzed

whether the law was clearly established.  See id. at 421.  The Seventh Circuit defined the inquiry

as whether it was clearly established in 2014 that a paramedic seizes an arrestee and is subject to

Fourth Amendment limits on excessive force by sedating the arrestee – who appears to be

suffering a medical emergency—before taking the arrestee by ambulance to the hospital.  See id.

at 422.  The Seventh Circuit held that the law was not clearly established.  See id. at 422-23.  As

relevant to this case, the Seventh Circuit rejected the district court's apparent reliance on the

"obvious case" exception and then cited *Peete* with approval as follows:

> But we do not think a paramedic (or his lawyer) reasonably familiar with circuit
> and Supreme Court precedent would have understood that the Fourth Amendment
> prohibition of unreasonable searches and seizures applies to treatment in the field
> during a medical emergency.  Fourth Amendment restrictions are almost wholly
> alien to that situation, where paramedics are subject to a distinct set of professional
> standards and goals aimed at responding to medical emergencies. See [Peete, 486
> F.3d at 222] (reversing denial of qualified immunity for paramedics on excessive
> force claim; paramedics who responded to 911 call about an epileptic seizure
> "acted in order [to] provide medical aid" and did not act "to enforce the law, deter
> or incarcerate" by restraining patient while patient was in prone position).

Id. at 422-23.  The Seventh Circuit concluded that the law was not clearly established and that

immunity was appropriate.  See id. at 424.

    In *Martinez*, the Central District dismissed claims through Rule 12(b)(6) against

paramedics when there were insufficient factual allegations to state a plausible Fourth Amendment

claim.  See Martinez v. City of L.A., 2021 U.S. Dist. LEXIS 191059, *19-*20 (C.D. Cal. July 23,

2021).  The incident at issue occurred in June 2019.  See id. at *2.  From the sparse allegations,

paramedics transported Martinez to a hospital and provided general treatment to her, including IV fluids.  See id. at *3.  Apparently upon arrival at the hospital, Martinez went comatose.  See id. at *4.  When she awoke, she had bruising on her body near her breasts and believed that she had been assaulted.  See id.  The *Martinez* court explained the applicable Fourth Amendment law as follows:

> While courts have held that the Fourth Amendment protections extend to actions by government officials beyond police officers, there are few cases applying the Fourth Amendment to paramedics. [Peete, 486 F.3d at 220]. When considering whether the paramedics have violated an individual's Fourth Amendment right against seizures, it is necessary to consider the "specific purpose and the particular nature of the conduct alleged." Id. "Where the purpose is to render solicited aid in an emergency rather than to enforce the law... or incarcerate, there is no federal case authority creating a constitutional liability..." Id. . . . .

Id. at *18.  While the Central District's dismissal was general and did not involve an express discussion of *Peete*, *Peete* was nevertheless cited as setting the applicable legal standard for an event that occurred in June 2019.  See id. at *18-*20.

Finally, in *Buckley*, the Eighth Circuit addressed whether paramedics were entitled to qualified immunity for using a sedative.  See Buckley v. Hennepin Cnty, 9 F.4th 757, 761-65 (8th Cir. 2021).  In December 2017, Buckley was depressed about her father's death and began drinking and threatening self-harm over a two day period.  See id. at 759.  Buckley's friend called 911 for a welfare check and let police into Buckley's apartment.  See id.  After speaking to Buckley, the officers called paramedics.  See id.  The paramedics arrived, spoke with Buckley, and determined she needed to go to the hospital.  See id.  The paramedics told Buckley she was on a medical transportation hold.  See id.  Buckley objected, but the officers and paramedics handcuffed her and carried her to the ambulance.  See id.  In the ambulance, Buckley was strapped to a gurney and given a sedative by the paramedics over her objections.  See id.  Buckley reacted to the sedative and developed respiratory distress.  See id. at 759-60.  Buckley was hospitalized, but survived.  See id. at 760.  Following her hospitalization, Buckley brought suit against the paramedics for violations of the Fourth and Fourteenth Amendments.  See id.  In assessing qualified immunity for the Fourth Amendment claim, the Eighth Circuit cited and expressly agreed with *Peete* and *Thompson*'s rationales and ultimately concluded that: "Whether Buckley

1   needed to be sedated, and if so what sedative, are questions of appropriate medical care that must

2   be resolved in a medical malpractice action under state law."  Id. at 762.  With respect to the

3   Fourteenth Amendment, the Eighth Circuit found that the paramedics' actions of placing Buckley

4   on a medical hold and transporting her to the hospital demonstrated deliberate concern for

5   Buckley, not deliberate indifference, and there was insufficient evidence that administering a

6   common sedative constituted deliberate indifference.  See id. at 764-65.

7        From the above, the two pre-incident cases would not have placed a reasonable paramedic

8   on notice that Anderson's conduct was unconstitutional.  Anderson and other AA personnel were

9   summoned by law enforcement to take Perez to receive mental health/medical help under § 5150

10  because Perez was a danger to himself.  At no time was Anderson attempting to arrest or help

11  incarcerate Perez, nor was Anderson assisting any law enforcement personnel to arrest or

12  incarcerate Perez.  Anderson assessed the situation, determined that a backboard was needed to aid

13  in the medical treatment and transportation of Perez, cf. Anderson Depo. 37:13-39:3 (describing

14  that Perez did not respond to questions and was thrashing and flailing, which made the situation

15  unsafe and rendered Anderson unable to provide treatment and do a full assessment, including

16  obtaining pulse and respiratory rates), and then gave instructions for utilizing the backboard,

17  which in this context was a medical implement.  There is nothing before the Court to suggest that

18  Anderson was attempting to do anything other than effectuate the medical transport and care of

19  Perez under § 5150 so that Perez could receive further and appropriate medical help at a hospital.

20       Particularly striking are the facts of Peete when compared to this case.  As in Peete, an

21  individual was in a prone position and the pressure/force that was being applied to a prone

22  person's back led to asphyxiation and death.  Although the paramedics in Peete used their body

23  weight and Anderson was directing the placement of and pressure on (e.g. telling Calvert to sit on

24  the backboard) the backboard, that is not a material distinction.  In both Peete and this case, the

25  pressure being applied to the prone individual was for the purpose of trying to effectuate medical

26  treatment and transport, as opposed to aiding officers in the enforcement of the criminal law.[33]

27

28  [33] Further, because Perez was clearly not competent or capable of refusing treatment, Anderson meets the three criteria
    for qualified immunity identified by Haas.  Haas, 2012 U.S. Dist. LEXIS 56801 at *23-*24.

1   *Thompson*, *Martinez*, and *Buckley* all post-date this incident and thus, could provide no

2   warnings to Anderson.  Nevertheless, *Thompson*, *Martinez*, and *Buckley* all relied on and followed

3   *Peete*.  Neither *Thompson*, *Martinez*, nor *Buckley* disagreed with *Peete* or identified any authority

4   that was directly contrary to *Peete*, or suggest that the law in May 2017 was anything other than

5   what was reflected in *Peete*.  *Peete* has not been cited or adopted by the Ninth Circuit, but the

6   Court is unaware of any Ninth Circuit authority (particularly authority that pre-dates May 2017)

7   that is clearly contrary to *Peete*.

8            With respect to Plaintiffs' claims that Anderson's conduct was obviously unconstitutional,

9   the Court cannot agree.  It is true, as Plaintiffs point out, that none of the AA personnel, County

10  Deputies, or City Officers had ever seen a backboard placed on the back of a prone person.  It is

11  also true that Anderson himself recognized that placing a backboard on a prone individual is

12  generally not a good idea because one of the possible dangers of that practice appears to have

13  manifested in this case - asphyxiation.  Nevertheless, Anderson was confronted with a § 5150

14  situation in which the call had been elevated from a Code Two (straight § 5150 situation) to a

15  Code Three with combative behavior reported.  When he arrived, Anderson saw numerous law

16  enforcement officers around a prone individual who was hobbled, had a towel around his face,

17  was yelling, and was moving/thrashing/flailing, and behaving in a resistive manner (be it from

18  attempting to get air, reacting to hallucinations, or making a conscious choice to disobey).

19  Anderson gave instructions to move the towel, was unable to treat or assess Perez, but determined

20  that applying a backboard on Perez was needed to accomplish adequate restraint for purposes of

21  medical transportation and care.  Anderson of necessity would have had to balance the possible

22  benefits and dangers of applying the backboard in the way he instructed in light of the purpose of a

23  § 5150 detainment and the situation that he observed.  In a circumstance such as this, particularly

24  in light of *Peete* and *Haas*, the Court agrees with the observations of the Sixth and Seventh

25  Circuits.  At their essence, Plaintiffs' claims are based on a paramedic improperly using and

26  attempting to place a piece of emergency medical equipment on Perez.  Thus, Plaintiffs' claims

27  against Anderson are based on botched medical care and involve state law medical duties or

28  medical malpractice claims, they are not constitutional torts.  See <u>Thompson</u>, 900 F.3d at 422-23;

1   Hearring, 712 F.3d at 281; Peete, 463 F.3d at 222-23.  The Court cannot hold that this is such a

2   case where the actions of Anderson were obviously unconstitutional.  See id.

3        In sum, particularly in light of *Peete* and *Haas*, the law as it existed in May 2017 was not

4   so clear that a reasonable paramedic would have known that Anderson's conduct was

5   unconstitutional, and this is not a rare case in which the Anderson's behavior was obviously

6   unconstitutional.  See Hearring, 712 F.3d at 281; Peete, 486 F.3d at 222-23; Haas, 2012 U.S. Dist.

7   LEXIS 56801 at *23-*24; see also Buckley, 9 F.4t h at 761-62, 764-65; Thompson, 900 F.3d at

8   422-24; Martinez, 2021 U.S. Dist. LEXIS 191059 at *18.  Therefore, the Court holds that

9   Anderson is entitled to qualified immunity.  See Hearring, 712 F.3d at 281; Peete, 486 F.3d at

10  222-23; Haas, 2012 U.S. Dist. LEXIS 56801 at *23-*24.

11

12  **III.   STATE LAW CLAIMS**

13       The FAC alleges state law claims against all Defendants for battery, negligence, and Cal.

14  Civ. Code § 52.1, and for violation of Cal. Health & Safety Code § 1799.102 against the AA

15  Defendants.  With summary judgment granted on Plaintiffs' § 1983 claims, the Court has only

16  supplemental jurisdiction over the remaining state law claims.

17       Under 28 U.S.C. § 1367(c), a district "may decline to exercise supplemental jurisdiction"

18  *inter alia* if "the district court has dismissed all claims over which it has original jurisdiction."  28

19  U.S.C. § 1367(c)(3).  The general rule is "when federal claims are dismissed before trial . . .

20  pendent state claims should also be dismissed."  Religious Tech. Ctr v. Wollersheim, 971 F.2d

21  364, 367-68 (9th Cir. 1992); Schultz v. Sundberg, 759 F.2d 714, 718 (9th Cir. 1985). Considering

22  judicial economy, convenience, fairness, and comity, and because summary judgment has been

23  granted on all of Plaintiffs' federal claims, the Court finds that it is appropriate to decline to

24  exercise supplemental jurisdiction.  The Court finds the consideration of comity to be an

25  especially weighty consideration.  In the context of a § 5150 emergency medical situation, this

26  case involves the inter-relationship between law enforcement and emergency medical providers

27  who are contracted to respond to all requests by law enforcement for emergency medical

28  assistance in Fresno County.  There is, therefore, a significant local/non-federal interest in this

1   case.  Further, whether any Defendant (be they an emergency medical provider or a law

2   enforcement officer) violated state recognized standards of care in their treatment of Perez is a

3   question that is more appropriately left to the California courts to decide, particularly considering

4   the nature of the interactions between the AA personnel and the law enforcement defendants.

5   Therefore, the Court will decline to exercise supplemental jurisdiction over the remaining state

6   law claims.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); Whalen v.

7   McMullen, 907 F.3d 1139, 1153 (9th Cir. 2018) ("After holding that [Defendant] was entitled to

8   qualified immunity on [Plaintiff's] federal claim, the district court delinked to exercise

9   supplemental jurisdiction over [Plaintiff's] related state-law claims.  This was not an abuse of

10  discretion."); City of Colton v. American Promotional Events, Inc.-West, 614 F.3d 998, 1008 (9th

11  Cir. 2010) ("Because the district court did not err in granting summary judgment on the federal

12  claims, it did not abuse its discretion in dismissing the state-law claims."); Religious Tech., 971

13  F.2d at 367-68; Jack v. Pearson, 2020 U.S. Dist. LEXIS 6218, *29-*30 (E.D. Cal. Jan. 13, 2020);

14  Neylon v. Inyo County, 2018 U.S. Dist. LEXIS 130979, *56-*57 (E.D. Cal. Aug. 3, 2018).

15

16  **IV.   MISCELLANEOUS MOTIONS**

17         The City Defendants filed motions to exclude two of Plaintiffs experts, Dr. Alon Steinberg

18  and John Everlove.  See Doc. Nos. 144, 145.  The County Defendants joined the motion to

19  exclude Everlove.  See Doc. No. 149.  The AA Defendants also filed a motion to exclude

20  testimony from Everlove.  See Doc. No. 157.  For their part, Plaintiffs filed a motion to exclude

21  defense experts Drs. Vilke and Chan.  See Doc. No. 153.  The parties did not sufficiently rely on

22  the testimony of Everlove or Drs. Steinberg, Vilke, and Chan for purposes of this summary

23  judgment motion.  Because the Court is declining to exercise supplemental jurisdiction over the

24  remaining state law claims, it is unnecessary for the Court to resolve these *Daubert* motions to

25  exclude.  Instead, the Court will deny these motions without prejudice to refiling in state court.

26  //

27  //

28  //

1

## **ORDER**

2    Accordingly, IT IS HEREBY ORDERED that:

3  1.    The County Defendants' motion for summary judgment (Doc. No. 142) is GRANTED

4        with respect to the first, third, and fifth causes of action;

5  2.     The AA Defendants' motion for summary judgment (Doc. No. 147) is GRANTED

6        with respect to the second and fourth causes of action;

7  3.    The City Defendants' motion for summary judgment (Doc. No. 148) is GRANTED

8        with respect to the first, third, and fifth causes of action;

9  4.    The County Defendants' motions to exclude the testimony of Dr. Alon Steinberg and

10        John Everlove (Doc. Nos. 144, 145) is DENIED without prejudice to refiling in state

11        court;

12  5.    Plaintiffs' motion to exclude the testimony of Drs. Vilke and Chan (Doc. No. 153) is

13        DENIED without prejudice to refiling in state court;

14  6.    The AA Defendants' motion to exclude the testimony of John Everlove (Doc. No. 157)

15        is DENIED without prejudice to refiling in state court;

16  7.    Pursuant to 28 U.S.C. § 1367(c)(3), the Court DECLINES to exercise supplemental

17        jurisdiction over the remaining state law claims;

18  8.    All currently set dates and deadlines are VACATED; and

19  9.    The Clerk is directed to CLOSE this case.

20

21  IT IS SO ORDERED.

22  Dated:   March 17, 2022

                                    SENIOR  DISTRICT  JUDGE

23

24

25

26

27

28